Tyler Wright
07/11/2025

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:23-cv-01313-PGB-LHP

JAMIYAH ROBINSON, as Personal
Representative of the ESTATE
OF JAMES LOWERY, Deceased,

       Plaintiff,

vs

JOSHUA NATHAN PAYNE, individually
and as an agent and employee of
the Titusville Police Department,
and CITY OF TITUSVILLE, FLORIDA,

       Defendants.
_____

VIDEO-RECORDED REMOTE DEPOSITION OF
TYLER WRIGHT

VOLUME 1 (Pages 1 - 79)

Friday, July 11, 2025
10:40 a.m. - 12:13 p.m.

LOCATION:  Remote via Zoom
Titusville, Florida

STENOGRAPHICALLY REPORTED BY:
CINDY A. LAYER, CSR

Job No.  412339

Tyler Wright
07/11/2025

```
                                                              Page 2
 1    APPEARANCES:  (All parties appearing via Zoom.)

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4
          HART, McLAUGHLIN & ELDRIDGE, LLC
 5        One South Dearborn, Suite 1400
          Chicago, Illinois 60603
 6        (312) 955-0545
          BY:  JOHN MARRESE, ESQUIRE
 7        jmarrese@hmelegal.com

 8
      ON BEHALF OF JOSHUA PAYNE:
 9

10        ROBERTS, REYNOLDS, BEDARD & TUZZIO, PLLC
          470 Columbia Drive, Suite C101
11        West Palm Beach, Florida 33409
          (561) 688-6560
12        BY:  JAMES JIMENEZ, ESQUIRE
          jjimenez@rrbpa.com
13

14    ON BEHALF OF CITY OF TITUSVILLE:

15
          ROPER, TOWNSEND & SUTPHEN, P.A.
16        255 S. Orange Avenue, Suite 750
          Orlando, Florida 32801
17        (407) 897-5150
          BY:  DAVID JADON, ESQUIRE
18        djadon@roperpa.com

19

20

21

22    Also present:  Stephan Hoog, videographer

23

24

25
```

Tyler Wright
07/11/2025

Page 3

1                        I N D E X

2

3    Tyler Wright                                  PAGE

4

5        Direct Examination by Mr. Marrese           5

6        Cross-Examination by Mr. Jimenez           70

7        Cross-Examination by Mr. Jadon             71

8

9    CERTIFICATE OF OATH                            76

10   CERTIFICATE OF REPORTER                        77

11   READ AND SIGN LETTER                           78

12   ERRATA SHEET                                   79

13

14

15                   INDEX OF EXHIBITS

16   NO.              DESCRIPTION                   ID

17   1                Composite of pages from file  56

18   2                Transcript of interview       56

19   STENOGRAPHER NOTE: Exhibits retained by counsel

20

21

22

23

24   (Stenographer's note:  All exhibits were received

25   and marked at the conclusion of the deposition.)

Tyler Wright
07/11/2025

Page 4

1    Remote proceedings began at 10:40 a.m.:

2              VIDEOGRAPHER:  We are now on the record

3         for the video deposition of Commander Tyler

4         Wright.  Today's date is July 11th, 2025.

5         The time is 10:40 a.m. as indicated on my

6         video screen.  The caption of the case is

7         Jamiyah Robinson, et al, versus Joshua

8         Nathan Payne.  Case Number

9         6:23-CV-01313-PGB-LHP.  This deposition is

10        being recorded remotely.

11             My name is Stephan Hoog.  I'm the legal

12        video specialist with Lexitas Chicago.  At

13        this time counsel present will identify

14        themselves and whom they represent.

15             MR. MARRESE:  John Marrese for

16        plaintiff.

17             MR. JIMENEZ:  James Jimenez for

18        Defendant Joshua Nathan Payne.

19             MR. JADON:  David Jadon on behalf of

20        City of Titusville and Commander Wright.

21             VIDEOGRAPHER:  Thank you.  Our court

22        reporter today is Cindy Layer.  Can you

23        please swear in the witness?

24             STENOGRAPHER:  Do you swear to tell the

25        truth, the whole truth, and nothing but the

Tyler Wright
07/11/2025

Page 5

1      truth?

2           THE WITNESS:  Yes, I do.

3           STENOGRAPHER:  Thank you.

4   WHEREUPON,

5             T Y L E R   W R I G H T

6   was called as a witness and, after having been

7   first duly sworn, was deposed and testified as

8   follows:

9                DIRECT EXAMINATION

10  BY MR. MARRESE:

11          Q.   Good morning.  Would you please state

12  your name for the record?

13          A.   Yes.  Tyler Wright, W-r-i-g-h-t.

14          Q.   Commander Wright, my name is John

15  Marrese.  We met a moment ago.  I represent the

16  plaintiff in litigation filed against former

17  Officer Joshua Payne and the City of Titusville.

18  I'm here to take your deposition in that lawsuit.

19  You understand that you are not a defendant or

20  being sued in that lawsuit, correct?

21          A.   Correct.

22          Q.   All right.  Thank you.  We're here

23  today to focus on primarily an interview you gave

24  in conjunction with the professional standards

25  division review of the shooting in this case, and

Tyler Wright
07/11/2025

Page 6

1    then also my general understanding is that you are

2    someone with a great deal of training experience at

3    a general level and then also some experience in

4    particular with Officer Payne.  Is that all

5    generally fair?

6            A.    Yes, sir.

7            Q.    Thank you.  In terms of depositions in

8    a civil case, have you ever sat for one before?

9            A.    No, not through civil.

10           Q.    Okay.  Just a couple of ground rules

11   that will govern our conversation today.

12   Everything that we say is being transcribed by the

13   court reporter, Ms. Layer, who's on the screen.

14   This deposition is also being videotaped, but for

15   clarity sake and for the sake of the transcript

16   that results, please continue to give verbal

17   responses to my questions as you have been as

18   opposed to head nods, or shakes, or shrugs, or

19   things like that.  Does that make sense?

20           A.    Understood.  Yes, sir.

21           Q.    Thank you.  Everything that you testify

22   today is under oath just like it was if you were

23   testifying in court in front of a judge or jury.  I

24   know you understand that.  Is that fair?

25           A.    Yes, sir.

Tyler Wright
07/11/2025

Page 7

```
 1          Q.   Thank you.  You may hear objections to
 2   my questions from time to time today.  That's
 3   perfectly typical and a normal part of the process.
 4   It's just the lawyer trying to preserve his record.
 5   After the objection is done I'll ask you to answer
 6   my question anyway if you understand it.  Does that
 7   make sense?
 8          A.   Yes, it does.
 9          Q.   Okay.  If you don't understand
10   something I ask you, which I'm sure will happen at
11   some point today, sometimes it's just because I ask
12   a bad question, sometimes it's just a tough
13   subject, whatever, you let me know and I'll
14   rephrase the question so it's more understandable.
15   Okay?
16          A.   Got it.
17          Q.   All right.  Let's think.  You can take
18   a break any time you want today and really as many
19   breaks as you want, just let me know.  Okay?
20          A.   Okay.
21          Q.   The only exception will be if I've
22   asked you a question, I'll ask you to answer it
23   before we take a break.  Okay?
24          A.   Understood.
25          Q.   And last guideline for today is, you
```

Tyler Wright
07/11/2025

Page 8

1    are here to testify about what you know, and so I

2    won't ask you to guess, or speculate, or anything

3    like that.  Okay?

4            A.   Understood.

5            Q.   All right.  Did you -- well, let me

6    preface this by saying, I don't want to know what

7    you and your attorney, Mr. Jadon, talked about or

8    any other attorney that you prepped with in

9    advance, but I will ask you some questions just to

10   figure out what you did to prepare for today's

11   deposition.  Okay?

12           A.   Okay.

13           Q.   Did you meet with an attorney to

14   prepare for today's deposition?

15           A.   Yes, I did.

16           Q.   Who did you meet with?

17           A.   Mr. Jadon.

18           Q.   When did that meeting occur?

19           A.   Yesterday we briefly spoke, and then we

20   met -- I'm trying to get my days right here.  I

21   want to say it was sometime this week.  I just got

22   back from vacation.  I was out of the area, so I'm

23   trying to remember what day it was that we met, but

24   it was sometime this week, I believe.

25           Q.   Okay.  Thank you very much.  How long

Tyler Wright
07/11/2025

Page 9

1    did that meeting last this week?

2           A.    Give or take, an hour.

3           Q.    Did you review any documents in

4    preparation for today?

5           A.    Yes, I did.

6           Q.    What did you review?

7           A.    I don't know how many pages it was, but

8    it was my -- he's commander now, but Lieutenant

9    Demmon at the time, his typed summary of my

10   interview for the internal investigation that he

11   ran.

12          Q.    There's actually -- I've seen that

13   typed summary.  You're talking about the summary

14   that's a part of his 107 page PSD report?

15          A.    Yes.

16          Q.    That's the professional standards

17   division report that I was referring to, right?

18          A.    Correct.

19          Q.    Okay.  And there's also actually a

20   fully transcribed document of your interview.

21   There's actually a transcription of a full

22   interview in another place that was produced to us

23   in the case.  Did you take a look at that?

24          A.    Oh, actually, I misspoke.  I reviewed

25   the transcription part of my interview, not the

Tyler Wright
07/11/2025

Page 10

1    typed portion.  Sorry.

2            Q.    That's okay.  Do you have that

3    transcription with you today?

4            A.    Yes, I do.

5            Q.    The transcription that I have for you

6    is 25 pages long.  Is that the same as the one you

7    have?

8            A.    Yes, it is.  26 if you count the cover

9    page, basically being sworn in.

10           Q.    Yeah.  Okay.  Great.  We'll look at

11   that at some point today.  Thank you.  Other than

12   your transcribed interview, did you review any

13   other documents to prepare for today?

14           A.    No, I did not.

15           Q.    Did you review any of the Axon video or

16   body cam video in preparation for today in

17   particular?

18           A.    No, I did not.

19           Q.    Back in 2022 when you were interviewed

20   by now Commander Demmon, you looked at some of the

21   body cam relating to this shooting as a part of

22   that interview, correct?

23           A.    Yes, that's correct.

24           Q.    And have you looked at it since that

25   time?

Tyler Wright
07/11/2025

Page 11

1          A.   Not that I can recall.

2          Q.   Thank you.  Other than meetings or

3    discussions with your attorney, did you speak with

4    anyone else about today's deposition?

5          A.   It would have been briefly when I got

6    the notification of today's depo I went to

7    Commander Demmon, because I've never been a part of

8    civil, so I just asked, hey, what's going to be my

9    involvement, and then to get the copies of the

10   transcription.

11         Q.   Okay.  Great.  And other than your

12   transcript, you said you didn't review any body cam

13   or anything like that particularly in preparation

14   for today.  Did you listen to any audio or do

15   anything else to prepare for today?

16         A.   No, sir.

17         Q.   Did you do any internet searches, any

18   Googling, any media searches about the case to

19   prepare for today?

20         A.   No, sir.

21         Q.   Have you seen the actual complaint, the

22   lawsuit that my client filed that generated this

23   case?

24         A.   No, I have not.

25         Q.   Okay.  Thank you.  How old are you,

Tyler Wright
07/11/2025

Page 12

1    Commander Wright?

2         A.    You're going to make me do math.  I

3    think 38.  I don't keep track of my age.  I was

4    born in 1987.

5         Q.    You're only as old as you feel.

6         A.    Yeah, 38.

7         Q.    All right.  Great.  And you live in the

8    State of Florida, obviously?

9         A.    Yes.

10        Q.    And in terms of your plans today, you

11   plan to continue to be a law enforcement officer

12   with the City of Titusville for the foreseeable

13   future?

14        A.    Yes, I do.

15        Q.    No plans to relocate in terms of your

16   permanent residence outside of the State of

17   Florida?

18        A.    No plans.

19        Q.    Were you born in Florida?

20        A.    No.

21        Q.    Where were you born?

22        A.    Utah.

23        Q.    What brought you out to Florida?

24        A.    I was -- parents relocated at a young

25   age, pretty much still an infant, due to work.

Tyler Wright
07/11/2025

Page 13

1        Q.    Was that in or around the Titusville

2    area?

3        A.    Yes.

4        Q.    And I want to talk with you briefly

5    about any educational background that you had.  Did

6    you graduate high school in Florida?

7        A.    Yes, I did.

8        Q.    Where did you graduate from?

9        A.    Astronaut High School in Titusville.

10       Q.    After high school did you attend any

11   further schooling?

12       A.    It might have been a few college

13   classes here and there, and then I jumped into the

14   law enforcement academy.

15       Q.    The few college classes you took, was

16   that at a local college, or community college, or

17   whatever?

18       A.    Yes.  It would have been -- at the time

19   it was called Brevard Community College.  It is now

20   Eastern Florida State College.  But it was BCC

21   then.

22       Q.    Thank you.  Did you receive any degrees

23   or certificates from then Brevard County Community

24   College?

25       A.    Not for like your AA or AS or anything

Tyler Wright
07/11/2025

Page 14

1    like that, but there was a certificate from the

2    academy through them for the law enforcement

3    academy.

4            Q.    Thank you.  What year did you receive

5    that certificate?

6            A.    That would have been 2007, beginning of

7    2007.

8            Q.    When did you first begin working for

9    the Titusville Police Department?

10           A.    That would have been in January or

11   February of 2007.  I think I was sworn in

12   February 5th, 2007.

13           Q.    The law enforcement certificate you got

14   through the Brevard Community College, were you

15   already with the Titusville Police Department at

16   that time, or is that something you get before you

17   apply?

18           A.    I put myself through, and then it was

19   roughly halfway through when I started putting

20   applications in.  I think it was, give or take,

21   October or November when I learned that Titusville

22   would be hiring me, but I wasn't on-boarded and

23   officially hired until, I believe, January of 2007.

24           Q.    Have you worked for the Titusville

25   Police Department continuously since that time?

Tyler Wright
07/11/2025

Page 15

```
 1          A.   Yes, I have.

 2          Q.   Fantastic.  Have you ever been in the

 3   United States military?

 4          A.   No, I have not.

 5          Q.   Can you take me through -- I know

 6   you're a commander as of today in the Titusville

 7   Police Department, correct?

 8          A.   Yes.

 9          Q.   Can you take me through the positions

10   that you held from 2007 up to the present?  I know

11   it's a number of years, so take your time.  I just

12   want to understand what you did professionally.

13          A.   Yes.  So 2007 through 2009 I was an

14   officer assigned to patrol.  I was assigned to

15   midnights those two years.  In February of 2009 I

16   transferred to the criminal investigations division

17   as a detective.  2009 through 2013 I was in that

18   position as a detective, and there was a blend from

19   roughly 2010 or 2011 until the time in 2013 that I

20   was duel sworn through ATF, Alcohol, Tobacco and

21   Firearms as a, I think they called them special

22   agents, doing part-time task force stuff.

23          And then I believe it was May of 2013 I was

24   promoted to the rank of corporal, which it the

25   lowest line level supervisor in our department.
```

Tyler Wright
07/11/2025

Page 16

1    Went back to patrol as a patrol corporal for two

2    years running patrol -- or working in a patrol

3    capacity.  And then some of that was a blend where

4    I was assigned to our crime suppression unit which

5    focused on like violent crime, and persons of

6    interest, not just patrol, but, you know, specific

7    focus area.  That was maybe a three or four-month

8    stint.

9           And then I believe it was May of 2015 I was

10   promoted to the rank of sergeant, went back to

11   midnight patrol, and for about two years I ran

12   midnight patrol shift as a sergeant.  That brings

13   us to, I believe it was May 2017, I transferred,

14   still as a sergeant, but I went to the professional

15   standards division as a background investigator and

16   recruiter, was also going to be helping with

17   accreditation stuff here and there, but that was

18   very short.  That was only three months.

19          At that time I came out of that spot as an

20   acting lieutenant, went back to patrol from -- I

21   want to say that was August of '17 to January of

22   '18 I was an acting lieutenant.  January of 2018

23   then I was promoted to lieutenant.  2018 through

24   end of 2022 I was lieutenant for patrol operations

25   running a shift, sometimes two shifts at a time.

Tyler Wright
07/11/2025

Page 17
1           Then there was a blend in there where I was
2    running special operations, which consists of
3    traffic, traffic unit, canine unit, school resource
4    officers -- there's something else on special
5    operations.  Oh, and kind of going back, sorry,
6    2010 through beginning of 2023 I was on our
7    department SWAT team.  In 2015 I was a team leader.
8    2019 to '20, somewhere around there, I was a team
9    commander.  And then that would have been part of
10   special operations -- SWAT fell under that part as
11   well.  I believe that was everything on that side.
12           January of 2023 I was promoted to the rank
13   of major, and I transferred to the professional
14   standards division leading that area, which
15   consists of backgrounds, recruiting, training,
16   accreditation, kind of HR component, working with
17   our city HR.  Held that assignment from January of
18   2023 through December 30th of 2024.  Then
19   December 30th of 2024 I was promoted to the rank of
20   commander and transferred to operations, which
21   consists of patrol, investigations, communication
22   center, forensics, or our evidence section, and
23   code enforcement.
24           Q.   Thank you very much.  That's the
25   position that you continue to serve in today?

Tyler Wright
07/11/2025

Page 18

```
 1        A.   Yes.

 2        Q.   As a part of that role, I assume

 3   everyone within patrol ultimately reports to you;

 4   is that fair?

 5        A.   Everyone within operations.  So patrol,

 6   investigators, our crime scene and forensic

 7   section, communications, which is our dispatchers,

 8   code enforcement, feels like about 90 percent of

 9   the department.

10        Q.   Okay.  Thank you.  I understand there's

11   the Chief of Police John Lau, there's another

12   commander, Commander Demmon, whom we spoke with

13   yesterday.  Is there someone -- anyone between you

14   two and the chief of police in terms of the

15   hierarchy?  I can't recall.

16        A.   Yeah, we have a deputy chief.

17        Q.   Who's the deputy chief right now?

18        A.   Todd Hutchinson.

19        Q.   Thank you.

20        A.   You're welcome.

21        Q.   Just briefly to confirm, you have never

22   spoken with Officer Josh Payne, or former officer

23   now, about the shooting incident in this case,

24   correct?

25        A.   No, I have not.
```

Tyler Wright
07/11/2025

Page 19

1          Q.   Thank you.  You have had involvement in

2     training in your nearly two decades with the

3     Titusville Police Department both as someone who

4     has received training, and then someone who has

5     actually acted as an instructor providing training

6     to other law enforcement officers; is that fair?

7          A.   Yes.

8          Q.   We'll look at a number of documents

9     during today's deposition.  It will be the bulk of

10    our focus.  But I wanted to ask you, some of the

11    documents, you know, include lesson plans for

12    different training operations, and training

13    exercises, and things like that, and you actually

14    authored some of them; is that correct?

15         A.   Yes.

16         Q.   When did you first start taking on that

17    kind of responsibility?

18         A.    It would have been around 2014, I

19    believe, and I think I started with the defensive

20    tactics, getting certified as a defensive tactics

21    instructor, one of the high liability topics.

22    There might have been -- I'm trying to go back to

23    the SWAT side too because there might have been

24    some topics that I helped like teach with, but I

25    don't think I wrote any lesson plans back then.  I

Tyler Wright
07/11/2025

Page 20

1   probably just helped the main instructor.

2          But I would be confident saying 2014 and on

3   would be involved with beginning to write lesson

4   plans, and going to the general instructor

5   techniques class and things, starting to get all

6   these certifications.

7          Q.   And you continue to do that today in

8   some capacity?

9          A.   I don't think I've wrote a lesson plan

10  probably in the last year, year and a half, give or

11  take, because my responsibilities have kind of

12  changed and I've started taking a back seat to some

13  of this stuff and letting other people, but I

14  certainly could.

15         Q.   That makes sense.  Basically, you're a

16  commander now, obviously a lot of responsibility

17  that comes with that, not as much time you're going

18  to be spending with those responsibilities doing

19  the actual training or preparing the actual lesson

20  plans for training officers; is that fair?

21         A.   Correct.  Yeah, that's fair.

22         Q.   All right.  Would you agree with me

23  that in the period leading up to the time that

24  Mr. Payne shot James Lowery, the incident that's at

25  issue in this case, he was involved in a foot

Tyler Wright
07/11/2025

Page 21

1    pursuit of Mr. Lowery?

2            A.    Yes.

3            Q.    And I want to talk about foot pursuits

4    in particular in terms of the training that Officer

5    Payne would have received.  First question, did

6    Officer Payne receive training as it relates to

7    foot pursuits of a suspect?

8            A.    We don't have like a specific lesson

9    plan for foot pursuits, but those type of

10   incidences fall under a ton of different topics

11   that we train and teach on.

12           Q.    Okay.  Can you tell me what training

13   topics would be relevant in terms of instruction

14   relating to foot pursuits?

15           A.    Sure.  Specifically physiological and

16   psychological response to stress, or dynamic

17   response to stress.  De-escalation techniques.  I'm

18   trying to remember the other term off the top of my

19   head.  But those two I gave you are intertwined

20   within most of our topics that we discuss and talk

21   about.

22           Q.    In terms of physiological and

23   psychological response to stress, what training was

24   Officer Payne provided?

25           A.    I mean, specifically, if we're talking

Tyler Wright
07/11/2025

Page 22

1    just about those topics, we talk about what the

2    body does during stress, during those

3    psychological/physiological responses to your heart

4    rate, to the cortisol, adrenaline.  But to branch

5    out from that, there's firearms training, taser

6    training, defensive tactics training, handcuffing,

7    use of the baton, even flashlight.

8         Then we have scenario-based training,

9    simunitions.  I know there's a few other ones off

10   the top of my head.  Chemical spray, OC spray.

11   Yeah, those are about the main ones that are, you

12   know, bouncing off my head right now.

13        Q.   Thank you.  In terms of what the body

14   does in response to stress, what is it that Officer

15   Payne was taught?

16        A.   If your heart rate is going up, you

17   can't combat it, control it, that

18   physiological/psychological response, you tend to

19   get the tunnel vision where your cognitive ability

20   kind of starts to diminish, your hearing could go

21   away, you could lose the fine and gross motor

22   movement skills with your hands, and simple little

23   things that used to be simple, because you're in

24   that high stress environment are no longer simple

25   to get yourself through.

Tyler Wright
07/11/2025

Page 23

1          Q.    Was he taught ways of dealing with

2    those physiological responses?

3          A.    Yes.

4          Q.    What was he taught in that respect?

5          A.    Specifically in my topics was like

6    healthiness, proper food nutrition diet, exercise

7    regime, specifically doing cardiovascular

8    exercises, kind of like mental preparedness-type

9    stuff, like starting to walk yourself through

10   things, visualizing-type stuff, stuff like that.

11   That was specifically my area that I focused on.

12         Q.    In terms of mental preparedness and

13   walking yourself through things, what did you

14   instruct in particular in that respect?

15         A.    There's videos out there all over the

16   place, you know.  Officers on their own time, they

17   were encouraged and spoken to about go out there,

18   find these videos, watch them, break them down,

19   find out where things started going wrong.  Even if

20   it was a picture perfect one, try to pick things

21   apart to see, you know, what could have been done

22   better.

23         We teach this good, better, best philosophy

24   here, and so a lot of it was on their own, to go do

25   on their own, to put themselves in that mindset so

Tyler Wright
07/11/2025

Page 24

1    if they were ever presented with similar scenarios,

2    then they could draw back on what they watched on

3    their own.  And then also the scenario-based

4    training that we put them through, trying to put

5    them through real-life style scenarios, whether we

6    found them online or they're our own incidences

7    that we were trying to recreate.

8             Q.   And beyond finding videos -- when you

9    say findings videos, I assume you mean online, or

10   on YouTube.  There's various -- I personally seen

11   law enforcement instruction videos or things --

12   whatever.  You can find almost everything on

13   YouTube.

14            A.   Correct.

15            Q.   Is that the kind of thing you're

16   talking about, going out and doing searches like

17   that?

18            A.   Correct.

19            Q.   Okay.  Beyond that and the

20   scenario-based training, is there anything else

21   that they would have -- that Payne would have been

22   instructed with respect to mental preparedness?

23            A.   That's all I can think of specifically

24   on my topics.

25            Q.   Okay.  Thank you.  Are you aware of

Tyler Wright
07/11/2025

Page 25

1   anything else that someone else would have

2   instructed when it comes to dealing with the body's

3   response to stress?

4         A.    Yeah, like I said, a lot of our topics

5   are intertwined.  I know in taser it's covered.

6   Physiological/psychological defensive tactics, we

7   covered it, which was my topic.  Firearms was one

8   of my topics, so it's covered in there.  It's

9   something that we've always tried to intertwine

10  with all these topics that are intertwined even

11  though they're broken apart into subtopics.

12        Q.    That makes sense.  In terms of firearm

13  training, and in particular dealing with potential

14  physiologic or psychological responses to stress,

15  what did you instruct as a part of that firearm

16  training?

17        A.    It should have been all the same lines:

18  Heart rate, controlling your breathing, vision

19  focus, stuff like that.  Trying to keep --

20  basically keeping the heart rate down so you can

21  see clearly, hear clearly, think clearly.  And

22  then, obviously, out in the field when we're doing

23  the training at the range, we try to get their

24  stress up as well.

25        Q.    Thank you.  Was Officer Payne

Tyler Wright
07/11/2025

Page 26

1    instructed that foot pursuits of suspects in

2    particular could cause those kinds of physiologic

3    or psychological reactions?

4           A.    It basically fell under any type of

5    resistance that our officers were faced with.

6    Their response options, they will go through some

7    type of physiological/psychological response of

8    their own.

9           Q.    And is a fleeing suspect considered a

10   type of resistance?

11          A.    Yes.

12          Q.    Okay.  And in terms of discussing

13   physiologic or psychological response to forms of

14   resistance, what would Officer Payne have been

15   instructed in terms of dealing with that?

16          A.    If I'm understanding your question

17   correctly, it's, again, the heart rate, trying to

18   control the stress, control the breathing, keep the

19   heart rate at a decent area to where that specific

20   person can function through it, see things clearly,

21   hear things clearly, feel and understand things

22   clearly.

23          Q.    When you say -- and you've said it a

24   number of times in terms of trying to control your

25   breathing is that -- I guess what I just -- what I

Tyler Wright
07/11/2025

Page 27

1    think is logical in terms of interpreting it,

2    focusing on your breathing so it's controlled and

3    you're intaking air and expelling air like you

4    would, you know, or as best you would normally?

5         A.   Yeah.  And the specific term we use is

6    tactical breathing, and everybody has different

7    versions of it, but we try to stick to the same

8    thing here where it's a controlled breath in for so

9    many seconds, hold, controlled breath out, and then

10   repeat the process, and that naturally helps your

11   body start calming down and keeping your heart rate

12   low.

13        Q.   Thank you.  Is there any prohibition on

14   unholstering or carrying your firearm while

15   involved in a foot pursuit?

16        A.   There's no prohibition, and we never

17   say never.  We do give the good, better, best

18   options.  If you're running after somebody, it's

19   best to probably have your hands clear, but each

20   scenario and each situation is going to be

21   different.  If it's a person with a gun, I can't

22   tell that person it's a bad choice to unholster

23   your gun and run after somebody.  It just depends.

24   Each scenario is different.

25        Q.   The Titusville Police Department,

Tyler Wright
07/11/2025

Page 28

1    though, as of the December 2021 shooting in this

2    case, did instruct that while running it might not

3    be the best option to be carrying a firearm?

4           A.   It's -- I would say yes.  Again, we

5    cover -- it's all scenario dependent, what they're

6    seeing and all that type of stuff, but -- and I

7    believe specifically we also break it down to

8    running with a handgun and running with a rifle are

9    two different things because the rifle is easier to

10   control the muzzle versus the handgun having a such

11   a short barrel it's a little harder.  So, again,

12   everything was situational-dependent depending on

13   the call for service, type of crime, all that type

14   of stuff.

15          Q.   Why -- you know, and -- let's start

16   with the understanding.  You've testified it's

17   scenario dependent, and obviously every scenario is

18   a little different, so your decisions in those

19   scenarios may differ, right?  I mean, we can't

20   account for every possible permutation of a

21   situation, if I'm understanding what you're saying

22   generally, right, why you never say never type of

23   thing, right?  We're on that page?

24          A.   Right.  And it goes to what a

25   reasonable officer on scene is seeing, feeling,

Tyler Wright
07/11/2025

Page 29

1    hearing, thinking.

2          Q.    And why might in certain scenarios it

3    might not be the best practice or even a good

4    practice to be in a foot pursuit while carrying

5    your firearm?

6                MR. JADON:  Form.  You can answer.

7          A.    Sorry.  Say that one more time.

8    BY MR. MARRESE:

9          Q.    Yeah.  Would you agree with me that in

10   certain circumstances it's not a good idea to be

11   carrying your firearm while in a foot pursuit?

12         A.    Correct.

13         Q.    And why might that be?

14         A.    Simply because, you know, you're

15   running, heart rate could be going up, high stress,

16   and those sympathetic reflexes could possibly

17   happen if you're running with a firearm in your

18   hand and violating any of the firearm safety

19   cardinal rules.

20         Q.    What is sympathetic reflex?

21         A.    The uncontrolled -- basically the

22   uncontrolled movement of your hand.  If I'm a

23   right-handed -- say I'm a right-handed shooter and

24   the handgun is in my right hand, and I go to grab

25   something with my left hand, under stress I might

Tyler Wright
07/11/2025

Page 30

1    squeeze my right hand, you know, clinch it.  And,

2    again, if you're violating one of the cardinal

3    range rules, then that could cause the firearm to

4    go off.

5          Q.    So in the scenario you just described

6    in defining sympathetic reflex, you're really

7    talking about an accidental discharge of the

8    firearm, right?

9          A.    Correct.

10         Q.    Okay.  Would you agree with me that

11   running with a firearm can increase the chances

12   that you make a bad intentional decision to shoot

13   your firearm?

14              MR. JADON:  Form.

15              MR. JIMENEZ:  Join.

16         A.    I'd have to say no on that one, if I'm

17   understanding your question correctly.

18   BY MR. MARRESE:

19         Q.    Let me ask it a few different ways.  So

20   there are scenarios where you're at the shooting

21   range and your two feet are firmly planted, you're

22   able to square up to your target and discharge your

23   firearm, right?

24         A.    Okay.

25         Q.    Okay.  In terms of the possibility of

Tyler Wright
07/11/2025

Page 31

1   bad -- strike the question.  It was going to be

2   bad.

3           There are situations where you're running

4   with a firearm and you're pursuing a suspect,

5   right?

6           A.   Okay.

7           Q.   Okay.  Comparing a situation where

8   you're firmly planted, you're squared to your

9   target and you're not running after a suspect,

10  would you agree that the likelihood of making the

11  wrong decision with respect to discharging your

12  firearm increases when you're running with the

13  weapon after a suspect?

14          A.   I would say it depends on if the --

15  mainly the one cardinal rule of firearm safety is

16  violated, then potentially yes.

17          Q.   What is that cardinal rule?

18          A.   Having your finger on the trigger at

19  any time you don't intend to pull the trigger.

20          Q.   Okay.  Now, when you're in a foot

21  pursuit following a suspect, you know, typically

22  you can expect your heart rate to be higher as

23  compared to when you're firmly planted and not

24  running after a fleeing suspect; is that fair?

25          A.   Yes.

Tyler Wright
07/11/2025

Page 32

1          Q.   There's exceptions to everything, but
2    typically speaking you'd agree with that?
3          A.   Correct.
4          Q.   Even if you are trained to control your
5    breathing during a foot pursuit and you do a good
6    job at doing that, the same is likely true that
7    your heart rate and the stresses you're
8    experiencing on average are going to be higher when
9    you're in a foot pursuit of a suspect as opposed to
10   when you're firmly planted somewhere; is that fair?
11         A.   Yes.
12         Q.   Does -- typically speaking, does that
13   increased physiological response during a foot
14   pursuit make it more likely that you're going to be
15   dealing with more factors that affect the ability
16   to make a good decision about shooting as compared
17   to a situation where you're firmly planted?
18              MR. JADON:  Form.
19              MR. JIMENEZ:  Join.
20         A.   I will say to that answer, it depends
21   on the person.  It depends on their amount of
22   training, how much they train on theirselves, their
23   mental preparedness, their mental mindset.  That's
24   where it's situation-dependent on the person.  It
25   could change the decisionmaking capabilities.

Tyler Wright
07/11/2025

Page 33

```
 1   BY MR. MARRESE:

 2        Q.   Now, and so I understand that in law

 3   enforcement, really probably like anything else in

 4   life, some people are naturally better than others,

 5   some people work harder at it than others, some

 6   people really listen and focus on their training

 7   and do things outside the office to get better at

 8   it, whereas some don't.  There's different

 9   variables that make, you know, one person versus

10   another better or worse at various tasks.  Do we

11   agree on that as a baseline?

12        A.   Correct, and that's yes for every

13   profession.

14        Q.   For sure.  So I guess my question is,

15   just taking your average patrol officer, would you

16   expect them -- would you expect the decision as to

17   whether to shoot as to be confronting more

18   difficult variables while running with the firearm

19   pursuing a suspect as opposed to be firmly planted

20   with your weapon pointed?

21             MR. JADON:  Form.

22             MR. JIMENEZ:  Join.

23        A.   I would say no to that, if I understand

24   the question correctly.

25   BY MR. MARRESE:
```

Tyler Wright
07/11/2025

Page 34

1          Q.   Why not?

2          A.   Because our department, we train moving

3    and shooting.  That's pretty much the first thing

4    we do.  We try to get them out of the mindset of

5    firmly planted and basically point shooting.

6    Really the only time we do that is when we do the

7    qualifications when they're standing still for the

8    most part.  Everything else is moving and shooting,

9    left, right, forward, backwards, diagonally.

10         We try to put that training and mindset on

11   them in our department here for that, so that's why

12   I would say no for the decision to shoot or not

13   shoot while running with a handgun could be

14   diminished or not diminished.

15         Q.   Okay.  Thank you.  Let's talk about the

16   training that the Titusville Police Department did

17   as of December 26, 2021 in terms of moving and

18   shooting.  What was done in that respect?

19         A.   So our -- specifically our new hire

20   training is roughly, give or take, 20 hours spread

21   across three days where two of those days and, give

22   or take, 16 hours are all hands-on out in the field

23   at the range.  There's -- in the lesson plan that

24   I'm sure you have, there's four to six handgun

25   courses of fire that involve moving and shooting.

Tyler Wright
07/11/2025

Page 35

1    They all have their different titles.

2         I'm trying to go back in my memory of what

3    they are right now, but those are all specifically

4    moving and shooting forward, backwards, right,

5    left, diagonal.  And that's just the handgun

6    portion.  And then there's also moving and shooting

7    courses of fire with a rifle as well.

8         Q.   In this case on the body camera video

9    we can see that former Officer Payne runs up to a

10   fence, reaches over it and shoots.  That was

11   something that was at issue in this case.  Would

12   you agree?

13        A.   Reaches over and the firearm goes off,

14   yes, I would.  Yes.

15        Q.   Do you train in the moving and shooting

16   drills for that kind of scenario?

17        A.   No.

18        Q.   And why not?

19        A.   Because if we're talking about trying

20   to jump something, or climb up something, or pull

21   yourself over something, good, better, best, you're

22   going to want your hands clear.

23        Q.   What if you're not going to climb or

24   jump over something, do you teach shooting by

25   reaching over an object, like a fence or things

Tyler Wright
07/11/2025

Page 36

1    like that?

2            A.    We teach shooting around things.    I

3    guess a fence could be over, but we teach shooting

4    around, so like cars, barrels, areas that provide

5    the officer either some form of cover or

6    concealment.    We teach that.

7            Q.    Has the Titusville Police Department

8    trained at carrying both a firearm and a taser in

9    two hands at the same time?

10           A.    Yes.

11           Q.    What is that training?

12           A.    That would be specifically like

13   transition drills.

14           Q.    What are those?

15           A.    Like you might have your taser out,

16   situation changes from less lethal to lethal and

17   you need to come out with your firearm, so

18   transition drill would be bringing that taser down

19   completely out of the way, or holstering and going

20   to your other tool, or the taser's ineffective, et

21   cetera.    But transitioning out of that tool, lethal

22   or less lethal, to the other option, whatever might

23   be going back and forth.

24           Q.    So the training does not encourage

25   having both drawn at the same time; is that fair?

Tyler Wright
07/11/2025

Page 37

1          A.    You could have them both drawn at the

2    same time, but drawn and pointing them both in the

3    same direction is discouraged and not trained on.

4          Q.    Wouldn't having them drawn at the same

5    time even if not pointed at the same time run the

6    risk of that sympathetic reflex that you've

7    discussed?

8                MR. JADON:  Form.

9                MR. JIMENEZ:  Join.

10               THE WITNESS:  Good to answer?

11               MR. JADON:  Yeah.  Yeah, you can

12         answer.

13         A.    No.  It's situational dependent, but

14    no.  If the taser is in your left hand and the

15    situation changes from less lethal to lethal, and

16    you bring your less lethal hand completely down and

17    out of the way, or bring it into your chest and you

18    come out strong hand with just the handgun only.

19    BY MR. MARRESE:

20         Q.    In that circumstance you would not run

21    a greater risk of a sympathetic reflex where you

22    pull the wrong weapon?

23         A.    Trying to remember what you asked here.

24    In my opinion, no.

25         Q.    Okay.  And so what is specifically

Tyler Wright
07/11/2025

Page 38

1   discouraged is pointing both a lethal and less

2   lethal weapon at the same time?

3        A.   Yes, by the individual person

4   themselves, yes.

5        Q.   Is running with both a lethal and less

6   lethal weapon drawn at the same time discouraged?

7        A.   From what I recall, yes.

8        Q.   Is it prohibited?

9        A.   I don't recall if that's in the

10  training or the policy itself, but, I mean, that's

11  something we don't train on.

12       Q.   When you say it's something you don't

13  train on, do I understand you to mean it's not

14  something that you're training law enforcement

15  officers to do?

16       A.   Correct.

17       Q.   You might not tell them this is

18  prohibited, never run with the taser in one hand

19  and the firearm in another, but you're not training

20  them to affirmatively do that?

21       A.   Correct.

22       Q.   How would an officer know that he or

23  she should not do that?

24       A.   It goes back to our good, better, best

25  practices, and, again, it goes to situational.

Tyler Wright
07/11/2025

Page 39

1    Maybe they are running with their taser out and it

2    turns to lethal, so then they would be going

3    through that transition, so it could happen there.

4    We always talk about holstering is the best option.

5    Depending on what's happening in front of you and

6    what you're seeing, you might not be able to get

7    back reholstered, but...

8         Q.   If you transition from less lethal to

9    lethal and had the opportunity, the proper practice

10   is to holster the less lethal at that point?

11        A.   The preferred, yes.

12        Q.   Would Officer Payne have been

13   instructed that?

14        A.   Yes, he would have, but I don't believe

15   that fell in any of my lesson plans.  That probably

16   would have been specifically the taser training

17   portion, and that wasn't one of my areas of

18   teaching.

19             MR. MARRESE:  Let's take a break, and

20        we'll come back and start to look at some of

21        the documents.  We can come back at --

22             MR. JADON:  12:05?

23             MR. MARRESE:  Yeah.  That's perfect.

24             MR. JADON:  I was about to ask for a

25        break too, so thank you.

Tyler Wright
07/11/2025

Page 40

1          VIDEOGRAPHER:  Going off the record at

2      10:58 a.m.

3          (A short recess was taken.)

4          VIDEOGRAPHER:  We are back on the

5      record at 11:07 a.m.

6  BY MR. MARRESE:

7      Q.   Commander Wright, I'm sharing my screen

8  with you right now.  Can you see the screen?

9      A.   Yes.

10      Q.   This is Page 4 of binder -- of Book 3,

11  excuse me, of the internal investigation of Joshua

12  Payne's shooting in this case.  And it's a summary

13  table of various trainings that Joshua Payne

14  received at the Titusville Police Department.  Do

15  you see that?

16      A.   Yes, I do.

17      Q.   Okay.  Have you seen this kind of

18  summary table before?

19      A.   Yes, I have.

20      Q.   So this tells us that the officer

21  received these particular trainings in the

22  particular general orders listed at the particular

23  signature times listed?

24      A.   Yes.

25      Q.   Okay.  And so in both July of 2020 and

Tyler Wright
07/11/2025

Page 41

1    November of 2021 Officer Payne would have received

2    the general orders relating to response to

3    resistance?

4            A.   Yes.

5            Q.   And what does that mean?  Does it mean

6    he receives them and signs off on them that he's

7    read them, or does he receive training in

8    conjunction with that?  What does it mean?

9            A.   This looks like the summary table for

10   our Power DMS, which holds our policies, and this

11   would be when he was either reassigned it to sign

12   off on it and acknowledge it, or they were revised

13   and then you sign off on the revision.

14           Q.   Okay.  Thank you.  So this is in

15   particular confirming that Officer Payne had

16   access, could have reviewed and should have

17   reviewed the general orders listed at the times he

18   signed off on them?

19           A.   Correct.

20           Q.   Okay.  Thanks.  I'm going to move in

21   the same binder to the fifth page, which is -- it's

22   a firearms qualification standard document for

23   Joshua Payne, and you are the instructor who signed

24   off on that in July 2020, correct?

25           A.   Yes.

Tyler Wright
07/11/2025

Page 42

1          Q.   And what does this represent?

2          A.   That is FDLE's form.  It's called the

3    86A form.  It is their qualification standard for

4    handgun, which is a -- we just switched it, so I'm

5    trying to remember, but I believe this is a

6    40-round -- yeah, 40-round course.  This was their

7    qualification course at the time to qualify a

8    specific officer with a specific handgun.

9          Q.   Okay.  And as the instructor signing

10   off on this, are you actually present for that

11   proficiency exam?

12         A.   Yes.

13         Q.   So you actually watched Officer Payne

14   fire his weapon in the various stages identified

15   here?

16         A.   Yes.

17         Q.   On the second page of this -- well,

18   strike that.  It's actually the 6th page in Book 3

19   still.  This is an individual weapon and firearm

20   tracking sheet, and you've signed off as the range

21   officer for Joshua Payne here, correct?

22         A.   Yes.

23         Q.   And you've written some instructor

24   notes in there?

25         A.   Yes, I did.

Tyler Wright
07/11/2025

                                                          Page 43
 1            Q.    In one of them a bullet point says,

 2    "Needs to work on trigger control on both handgun

 3    and rifle."  Do you see that?

 4            A.    Yes, I do.

 5            Q.    What did that mean?

 6            A.    Throughout his day, based on where the

 7    rounds were landing on the qualification target, I

 8    could tell he was kind of slapping the trigger and

 9    he wasn't focusing on that trigger control

10    technique to have the basic -- you know, fire

11    instructor terms -- but have that group of shot

12    placements like nice and tight, basically.  So that

13    was a common theme for him during that training

14    was, hey, work on your trigger control, nice, slow

15    trigger pulls versus slapping the trigger to

16    control your shot placements.

17            Q.    And the point of that is to be more

18    accurate with your shots?

19            A.    Correct.

20            Q.    This Page 7 of the same book, do you

21    see the instructor notes you've written there?

22            A.    Yes.

23            Q.    Can you read those?

24            A.    Yeah.  I'm trying to read my

25    handwriting here.  I believe it says, "Rifle, needs

Tyler Wright
07/11/2025

Page 44

1    to stay familiarized with weapon controls and sight

2    picture alignment."

3              Q.    What does that mean?

4              A.    So weapon controls, the safety lever,

5    the on/off for the safety selector switch, could

6    have been that.  It could have been the magazine

7    release control.  It could have been the charging

8    handle.  Another part of the weapon control is the

9    magazine release catch.  And then sight picture

10   alignment, basically proper lining up the front and

11   rear aperture, especially with distance shooting.

12   If you could scroll up for me --

13             Q.    Yes.

14             A.    -- so I can see okay what you got --

15   okay.  So he had this version Colt which would have

16   had a rear aperture on it that should have given

17   him two options of a larger hole on the rear sight

18   and a smaller hole, so a sight picture alignment

19   between those two different holes in that appar --

20   I want to say apparatus.  That's not right.

21   Aperture.  So that's what I'm meaning by that in a

22   short, brief note.

23             Q.    Thank you.  On Page 11 there's a

24   document, Lesson Plan Cover Sheet.  You see this?

25             A.    Yes.

Tyler Wright
07/11/2025

Page 45

1          Q.    It was prepared by a Sergeant Hamann.

2     Are you familiar with Hamann?

3          A.    Yeah, it's Hamann.

4               MR. MARRESE:   H-a-m-a-n-n, for the

5          record.

6     BY MR. MARRESE:

7          Q.    This particular lesson plan cover sheet

8     says, in terms of its scope and course objective,

9     "Provide practice for officers in the area high

10    liability.  Patrol activities such as building

11    searches, utilizing force on force, real-time

12    feedback."  And then it lists a number of

13    objectives.

14          Question, in terms of high liability, you

15    used that word earlier today, can you just define

16    for the jury what that means?

17          A.    Sure.  High liability is -- high

18    liability patrol activities would be those response

19    to resistance in scenarios, incidents.  Could be

20    certain calls for service.  For example, domestic

21    calls for service, those are some of the most

22    dangerous ones we respond to, so that could be

23    considered a high liability patrol activity.

24          A high-risk style traffic stop, depending on

25    if you know who's in the car, what the car is

Tyler Wright
07/11/2025

Page 46

1  related to, et cetera.  Those could fall under high

2  liability patrol activities.

3       Q.  Is it referred to as high liability in

4  reference to the likelihood that you or somebody

5  else could get hurt, or what is that in particular,

6  you know, trying to denote?

7       A.  So Sergeant Hamann wrote this.  If I

8  could speculate --

9       Q.  If you don't know -- if you don't know,

10 you don't know.  I don't want you to guess.

11      A.  Can you repeat your question then?

12      Q.  I was only just trying to understand

13 what in particular high liability is supposed to

14 reference.  You've identified high liability, you

15 know, in my mind as kind of patrol activities

16 involving more dangerous situations; is that fair?

17      A.  Yes.  I gotcha.  I understand what

18 you're asking now.

19      Q.  Okay.  Am I right?  Is my

20 interpretation right, a high liability patrol

21 activity is essentially a more dangerous patrol

22 activity on average?

23      A.  More dangerous on average, yeah, like

24 not your normal, typical, routine style event.

25      Q.  Okay.  The second bullet point

Tyler Wright
07/11/2025

Page 47

1   objectives here says, "Officers will be given the

2   opportunity to practice the fundamentals of contact

3   and cover in dealing with uncooperative subjects."

4   Do you see that?

5           A.   Yes, I do.

6           Q.   What does that mean?

7           A.   Contact and cover, let's see -- it

8   could have a couple different meanings, but for me

9   contact and cover could be multiple officers

10  together at the same time dealing with something,

11  one of them is a contact officer, one of them is a

12  cover officer.

13          So your contact officer is going to be the

14  one speaking with the uncooperative subject or

15  subjects, while the cover officer is the one that's

16  going to be ready to respond to whatever force is

17  presented -- or resistance is presented.  Sorry.

18          Q.   In the next bullet point it says,

19  "Officers will be given the opportunity to practice

20  fundamental firearm skills under increased stress."

21  Do you see that?

22          A.   Yes.

23          Q.   Earlier you talked about increased

24  stress as involving stressful situations where the

25  heart rate might increase, controlling breathing

Tyler Wright
07/11/2025

1    and things of that nature.  Is this bullet point,

2    is that the kind of training that you were

3    referring to?

4          A.   Yes, it was.

5          Q.   In terms of fundamental firearm skills

6    under increased stress, what would be taught?

7          A.   Proper grip, sight picture alignment,

8    that proper trigger control, reloads, malfunction

9    drills, moving, walking, moving -- firearm skills

10   while moving, you know, whether it's forwards,

11   backwards, left, right, et cetera.  And then I

12   would also say like firearm safety skills also

13   would be a fundamental firearm skill.

14         Q.   What are those?

15         A.   Those pretty much cardinal rules.  We

16   have four of them here.  Finger not in the trigger

17   until sights are on target and you're wanting to

18   shoot, don't let your muzzle cover anything you

19   don't intend to destroy, treat every weapon as if

20   it's loaded, and know your target and what's behind

21   it.

22         Q.   The next few bullet points talk about

23   stress, including officers will better understand

24   the effects of stress on their minds and body, and

25   officers will be exposed to increased stress in a

Tyler Wright
07/11/2025

Page 49
1    controlled training environment.  Do you see those?

2         A.    Yes.

3         Q.    And the following one talks about the

4    opportunity to practice controlling stress in a

5    training scenario environment.  Do you see that?

6         A.    Yes.

7         Q.    And finally it says, "Officers will be

8    given the opportunity to experience how increased

9    stress will affect them."  Those four bullet points

10   talking about stress and addressing stress, is your

11   understanding that they would be addressing the

12   same things you discussed earlier in terms of

13   controlling breathing, appreciating rises in heart

14   rates, and responding accordingly?

15        A.    Yes, that physiological/psychological

16   dynamic.

17        Q.    Officer Payne would have received this

18   training?

19        A.    I believe so, yes.  He should have, but

20   I don't know if he signed that specific roster.

21        Q.    Okay.  I'm showing you Page 20 of Book

22   3, and this was prepared in November of 2018 by

23   you, Commander Wright.  It's a lesson plan cover

24   sheet.

25        A.    Yes.

Tyler Wright
07/11/2025

Page 50

1          Q.    It relates to firearms instruction,

2    correct?

3          A.    Correct.

4          Q.    There are a number of student

5    performance objectives written as it relates to

6    handguns, rifles, and other equipment.  Do you see

7    that?

8          A.    Yes.

9          Q.    Did you actually write this lesson plan

10   in terms of all these bullet points that were to be

11   a part of this plan?

12         A.    I believe so.  If you scroll up, it

13   should say -- yeah, prepared by me, yes.

14         Q.    One of the bullet points under rifle

15   is -- the second one is understand some of the

16   physiological reactions to combat stress.  Do you

17   see that?

18         A.    Yes.

19         Q.    What would that portion of the

20   instruction have involved?

21         A.    Same philosophy, the

22   physiological/psychological dynamics to stress, so

23   the heart rate, the breathing, the tunnel vision,

24   the audio exclusion -- audio exclusory (sic)

25   factors.  All the same stuff we've been talking

Tyler Wright
07/11/2025

Page 51

1    about.

2         Q.    And so the physiological reactions, if

3    I've understood your testimony today, they can

4    happen whether you're carrying a taser, a rifle, a

5    handgun.  It's just a function of stress; is that

6    fair to say?

7         A.    Yes.

8         Q.    And the physiological note here is in

9    particular written under the rifle.  I'm just

10   confirming, it's not specific to the rifle.  It

11   just happens to be written under rifle on this

12   lesson plan?

13        A.    Yes.

14        Q.    And there are General Orders 409 and

15   412, firearms in response to resistance referenced

16   in particular in this lesson plan at the bottom of

17   the page.  Do you see that?

18        A.    Yes.

19        Q.    So as a part of this instruction you

20   would be referencing those general orders in

21   teaching law enforcement officers with the

22   Titusville Police Department?

23        A.    Yes.

24        Q.    As a part of this lesson plan -- I'm

25   scrolling up for a second -- there are some --

Tyler Wright
07/11/2025

Page 52

1    well, first, let me ask you:  Did you look at any

2    of this lesson plan in preparation for today?

3            A.    No.

4            Q.    There are diagrams of what appear to be

5    shooter drills.  This first one is called near/far

6    drill with a diagram and then a description in a

7    box below it.  Do you see that?

8            A.    Yes.

9            Q.    And then if you continue on to the next

10    page, this is now -- that was Page 28.  This is

11    Page 29 of Book 3.  There's a shoot and move to

12    cover drill, and it's noted this drill is intended

13    to simulate an attack by an armed subject in a

14    relatively close range.  Do you see that?

15            A.    Yes.

16            Q.    Those are the kinds of simulations that

17    you were referencing earlier in terms of training

18    officers on how to behave in real-world situations?

19            A.    Yes.

20            Q.    I'm showing you now Page 40 of Book 3

21    is a training roster.  One of the officers who

22    signed here is Officer Payne.  It's dated July 27,

23    2020, and you're the instructor -- one of the

24    instructors who signed off on this, correct?

25            A.    Yes.

Tyler Wright
07/11/2025

Page 53

1           Q.   This relates to defensive tactics,

2    A-S-P, or ASP, and handcuffing.  New hire.  Do you

3    see this?

4           A.   Yes.

5           Q.   And de-escalation is also written as

6    one of the topics.  What is A-S-P or ASP?  What

7    does that represent?

8           A.   ASP is -- I forget what ASP stands for,

9    but it's a company that creates handcuffs, batons,

10   and flashlights.  That's what they are.  It's ASP

11   Armament Systems, but I can't remember what ASP

12   stands for.

13          Q.   Thank you.  Page 41, another lesson

14   plan that you prepared entitled Defensive Tactics

15   for Law Enforcement New Hires Begins.  Do you see

16   that?

17          A.   Yes.

18          Q.   If you move to Page 43, as I am, there

19   is discussion about de-escalation, disengagement,

20   escalation, exigent circumstances, objectively

21   reasonable.  Do you see that?

22          A.   Yes.

23          Q.   In terms of de-escalation, what did you

24   teach officers?

25          A.   From what I can recall at that time,

Tyler Wright
07/11/2025

Page 54

 1   de-escalation is basically if you have distance and

 2   cover in nonfirearm-related incidences -- they

 3   could be armed with something else, or not armed in

 4   that, but as long as they have distance and cover,

 5   then they have time on their side.  They can slow

 6   the scene down to get more tools and resources in

 7   place, and to also formulate better decisions or

 8   better plans to make a better decision.

 9        Q.   At Page 9 of Book 3 is another lesson

10   plan prepared by you and a Corporal Watson.  Do you

11   see that?

12        A.   Yes.

13        Q.   The subject of this lesson plan is

14   reality-based training, scenario-based firearms

15   training for first aide, and IFAK.  What was this

16   lesson plan about?

17        A.   If I can kind of just look at the

18   objectives to refresh.

19        Q.   Yeah, let me scroll to those, and I'll

20   try to blow it up a bit.

21        A.   I can see it.

22        Q.   Okay.

23        A.   From what I can recall, this was mainly

24   an IFAK, so that stands for Individual First Aide

25   Kit.  This was mainly an officer medical class for

Tyler Wright
07/11/2025

Page 55

1    themselves should they get injured out in the

2    field.  It was mainly that.  Corporal Watson was

3    running point with that because she's our medical

4    instructor, and then I came to her with the idea of

5    to try to blend some of these trainings on top of

6    each other to help with the psychological and

7    physiological responses.

8         I gave her the idea of bringing in the

9    simunitions style that you see in here.  The

10   security .9 millimeter blank rounds, I gave her

11   that idea to take the level of training she had to

12   kind of level it up a little bit more to provide

13   that stress environment to our officers.

14        Q.   And how did you do that?

15        A.   Through the simunitions gear that we

16   have, simunitions firearms, and we used blank .9

17   millimeter rounds, basically allowing these

18   officers to go into a scenario with most of the

19   tools on their belt for this medical scenario that

20   they were wanting the officers to go through.

21        Q.   Okay.  Earlier in the deposition we

22   talked a bit about sympathetic reflex.  Was it your

23   understanding or impression that Officer Payne's

24   shooting in this case was the result of a

25   sympathetic reflex?

Tyler Wright
07/11/2025

Page 56

1              MR. JADON:  Form.

2              MR. JIMENEZ:  Join.

3              MR. JADON:  You can answer.

4         A.   You said was it my opinion that it was

5    a sympathetic reflex?

6    BY MR. MARRESE:

7         Q.   Did you ever reach a conclusion in that

8    respect?

9         A.   My personal conclusion, yes.

10        Q.   Okay.  You don't know that for a fact,

11   but that was your conclusion, that the shooting was

12   the result of a sympathetic reflex?

13        A.   Yes.

14        Q.   Thank you.  So I'm sharing with you now

15   the transcript I have of your interview with the

16   professional standards division relating to this

17   case, Commander Wright.  It starts at Page 258 of

18   Book 3 and it continues, just for the record, to

19   Page 235, which is Page 283 of Book 3.

20              MR. MARRESE:  We'll mark it as Exhibit

21              2 to this case.  Exhibit 1 will be a

22              composite of the pages we referenced

23              previously.

24              (Exhibit Nos. 1 and 2 were identified

25              for the record.)

Tyler Wright
07/11/2025

Page 57

 1   BY MR. MARRESE:

 2        Q.   I want to move to Page 7 of the

 3   transcript.  There's a question and answer about

 4   foot pursuits, and after some introduction it says,

 5   "In your training and experience, can you explain

 6   an officer's stress level during a high-risk

 7   situation involving a foot pursuit, physical

 8   altercation with another subject?"

 9        And you answer, "Yeah, so with anything, but

10   especially foot pursuits, heart rate goes up.  We

11   talk about, in the training, the different

12   conditions of a person's body.  White, which is

13   like us just sitting right here, our heart rates

14   are normal.  We have condition yellow, condition

15   orange, condition red, condition black, and it's

16   all broken down in between, you know, heart rates,

17   and all that type of stuff, and how a person

18   responds to stress.

19        So, obviously, the higher the heart rate

20   elevation you go without proper training and

21   mindset.  And it's stuff like that, not being able

22   to control your heart rate.  And typically people

23   can tend -- tend to get in that condition black

24   where sometimes they're not able to make rational

25   decisions or anything, or respond to stress

Tyler Wright
07/11/2025

Page 58

1    accurately."  Do you see that?

2            A.    Yes, I do.

3            Q.    Is that still an accurate response

4    today as you review it?

5            A.    Yes.

6            Q.    And you've touched on this throughout

7    today's deposition.  The different color conditions

8    you've given to stress levels or heart rate levels:

9    White, yellow, orange, red, black.  Are those

10   things in particular that Officer Payne would have

11   been trained on?

12           A.    Yes.

13           Q.    In conjunction, this is the very same

14   kind of training you talked about earlier in terms

15   of teaching officers how to control breathing, how

16   to recognize the increase in stress and control it?

17           A.    Yes.

18           Q.    Were you ever personally involved in

19   training Officer Payne on managing stress?

20           A.    Yes.

21           Q.    Do you have recollections of how he did

22   during that training?

23           A.    I know we had like a scenario-based

24   training, I think, June of '21, like a

25   reality-based training, and I don't recall having

Tyler Wright
07/11/2025

Page 59

1    any concerns noted with him during that one.   That

2    was a department-wide training.

3          Q.   And the department-wide reality-based

4    training in 2021, was that the active shooter

5    training at the middle school?

6          A.   Yes.

7          Q.   What did that involve?

8          A.   That was -- going off my memory, it was

9    a two-part, like two-part scenario, but basically

10   they were -- my version of training where we

11   changed things was I never liked where it was,

12   okay, today's taser training, so put all your stuff

13   up and it's a taser.  It's spray day, put all your

14   stuff up.  I wanted them to have all their tools on

15   them.

16         So this specific training they had every

17   tool and resource that they would normally have on

18   everyday patrol on their belt, so handgun, spray --

19   I believe the only thing we took away was the baton

20   because it's hard to holster the training baton

21   because it's a big foam baton.

22         But they would have had a simunitions

23   handgun, inert chemical spray.  We had the taser 7s

24   at the time, so they would have had -- I think they

25   were called the Halt cartridge, which are the

Tyler Wright
07/11/2025

Page 60

1    cartridges meant to be deployed on a taser training

2    suit.  They would have had their flashlight, and

3    probably training handcuffs on, if not the real

4    handcuffs.

5         And the whole premise of the training was

6    they get dispatched to a call for service -- there

7    should have been two scenarios in there.  The first

8    scenario should have been the, quote, unquote, SRO

9    calling for, hey, I need another unit here.  A guy,

10   I think, rushed the school or jumped the counter

11   and he's confronting a teacher in a classroom.  And

12   the officer is supposed respond, and then try to

13   find the SRO, gather what information they can, and

14   then there's their scenario and handle it

15   accordingly.  That was scenario one.

16        Q.   There was another scenario?

17        A.   Sorry?

18        Q.   You said there were two scenarios, I

19   think?

20        A.   Yeah.  I believe the second scenario

21   would have been more of like active shooter call

22   for service.  I believe the SRO keys up, I hear

23   active shots happening inside the school.  I need

24   assistance.  And then they respond, and enter

25   through a predetermined door, and they're presented

Tyler Wright
07/11/2025

Page 61

1    with the information they see, hear, smell, et

2    cetera.

3        Q.    We talked about de-escalation a moment

4    ago, and some of what you described in terms of

5    training on that, if I recall correctly, is giving

6    yourself time and distance, which allows you better

7    opportunity to make decisions; is that fair?

8        A.    It's distance and cover.  If you have

9    distance and cover, then generally time is on your

10   side.

11       Q.    And the purpose of having time on your

12   side is to give yourself an opportunity to assess

13   the situation and make the best decision possible?

14       A.    Yeah, assess, make decisions, get other

15   tools, resources, personnel there.

16       Q.    In this case, you watched the body cam,

17   and Officer Payne followed James Lowery to the

18   fence, and ultimately James Lowery jumps the fence

19   followed by the shooting.  You recall that pattern

20   in particular?

21       A.    Yes.

22       Q.    Do you have any criticisms of Officer

23   Payne in terms of his failure to use distance and

24   cover in that situation?

25       A.    Watching that sitting from a controlled

Tyler Wright
07/11/2025

Page 62

1    environment, arm chair quarterbacking, I would have

2    liked to seen something different.  Knowing that

3    Mr. Lowery jumped the fence, knowing everything

4    Officer Payne went through at that time, I feel

5    like things could have been slowed down.

6         Q.    Thank you.

7              MR. MARRESE:  Why don't we take a

8         five-minute break.  I'll come back, and I'll

9         probably have a little bit more questioning,

10        but it's not going to be too long.

11             VIDEOGRAPHER:  We're going off the

12        record at 11:46 a.m.

13             (A short recess was taken.)

14             VIDEOGRAPHER:  We're back on the record

15        at 11:54 a.m.

16   BY MR. MARRESE:

17        Q.    Commander Wright, you reviewed this

18   transcript in entirety before today's deposition at

19   some point this week, correct?

20        A.    Yes.

21        Q.    Was there any answer during that review

22   that you thought was wrong, or that you wished you

23   could change, or anything like that?

24        A.    No.

25        Q.    Let me ask you about a few other items

Tyler Wright
07/11/2025

Page 63

 1    in here and we'll be done for today.  At Page 15 --

 2    let me pull it back up -- of the transcript you are

 3    asked, "So it is reasonable for an officer to point

 4    both their taser and their gun at a subject at the

 5    same time?"  And you answer, "At the same time, no.

 6    That's not reasonable and that's not in line with

 7    our training."  Do you see that?

 8             A.    Yes.

 9             Q.    That's an answer you stand by today?

10             A.    Yes.

11             Q.    On Page 16 you were asked, "All right.

12    So do you provide training involving drawing and

13    pointing both firearm and taser at a subject at the

14    same time?"  And you've answered, "I don't -- I

15    don't train in the taser side, I'm not a taser

16    instructor, but I do know the topics, and I do have

17    conversations about that stuff in trainings.  And,

18    again, we talk about -- we've always talked about

19    one job one hundred percent of the time.  So if

20    you're out on lethal, stay on lethal until it's

21    time to go to something else, put that up, and then

22    you go to some -- your other tool or tactic that

23    you have."  You see that?

24             A.    Yes.

25             Q.    What did you mean by that, if you're

Tyler Wright
07/11/2025

Page 64

1    out on lethal stay on lethal until it's time to go

2    to something else?

3          A.    So one job one hundred percent of the

4    time.  If it's a lethal situation, stay out on

5    lethal.  If it gets de-escalated, whether it's the

6    officer de-escalated it or the subject in question

7    decided to de-escalate on their side as well, you

8    know, maybe they drop the gun and stay away from

9    the gun, then it might be time to transition to

10   something different.  But singularly talking about

11   when you're by yourself, one job one hundred

12   percent of the time.

13         Q.    Does that motto mean that it is the

14   preferred practice not to have both a less lethal

15   and lethal weapon in your hands at the same time?

16         A.    Pointed at somebody at the same time,

17   yes.  There could be scenarios where you might

18   still have a less lethal in your hand as long as

19   you made that decision to index down, do something

20   completely different with it so it's not pointing

21   at the person, it could be possible.  Again, not

22   preferred, but there could be scenarios where it's

23   like that.

24         Q.    On Page 18 of the transcript there's

25   the question here at the top of the page I'm

Tyler Wright
07/11/2025

Page 65

1    showing you, "Okay.  Did anyone that -- do you

2    recall if any of our officers or anyone going

3    through the training scenarios had both their

4    firearm and taser out during the same time, running

5    with them, pointing at them, doing anything like

6    that?"  Answer, "No, they did not."  Question,

7    "Okay.  If you saw that, what would you have done?"

8    Let me stop there for a second.

9          In terms of you answering no, they did not

10   with respect to training scenarios involving

11   officers having their firearms and tasers out

12   during the same time, did you mean that to say that

13   during training there were not any scenarios where

14   any officers were running with both out at the same

15   time?

16          A.    Correct.

17          Q.    The next question is, "Okay.  If you

18   saw that, what would you have done?"  And you give

19   the answer that's stated here, and part of it is,

20   and you can have a second to review that before you

21   answer my question, but part of it is, you're

22   talking about during training stopping the

23   individual at some point and talking about the

24   negative side of doing this, meaning having both

25   out at the same time.  And my question is, what is

Tyler Wright
07/11/2025

Page 66

1    the negative side of doing that?

2         A.   So specifically talking about having

3    both handgun -- or lethal and less lethal in both

4    of your hands pointing, a/k/a dual wielding,

5    pointing it at somebody at the same time, the

6    negative side of that would be bad decision-making,

7    sympathetic reflex, et cetera.

8         Q.   And a bad decision you can make under

9    that circumstance is to shoot someone where that

10   shooting is unjustified because they do not present

11   an imminent lethal threat or an imminent threat of

12   serious bodily harm; is that fair?

13              MR. JADON:  Form.

14              MR. JIMENEZ:  Join.

15        A.   Can you repeat that question?

16   BY MR. MARRESE:

17        Q.   Yeah.  I'll break it down.  You

18   mentioned that, you know, part of the negative

19   sides of carrying both the firearm and taser at the

20   same time is bad decision-making, sympathetic

21   reflex, et cetera.  Do you remember that?

22        A.   Yes.

23        Q.   I'm focusing on the bad decision-making

24   portion of that answer in saying that one of the

25   bad decisions that's possible and is a negative

Tyler Wright
07/11/2025

Page 67

1    side is an unjustified shoot; is that fair?

2              MR. JADON:  Same objection.

3    BY MR. MARRESE:

4         Q.   You can answer.

5         A.   I would say that bad decision would

6    lead to any type of sympathetic reflex that the

7    person didn't intend to do, whether --

8         Q.   Okay.  You're -- I'm sorry.  Finish

9    your answer.  I interrupted.

10        A.   Yeah, like whether they meant to pull a

11   certain trigger on something, you know, lethal or

12   less lethal.

13        Q.   Do you recognize the possibility that

14   carrying both could contribute to the wrong

15   decision to shoot someone intentionally?

16        A.   I think in that stress scenario

17   carrying both, if you meant to deploy less lethal

18   and you're also holding your handgun in your hand,

19   could cause you to have that sympathetic reflex.

20        Q.   So the primary negative is the

21   possibility of a sympathetic reflex; is that fair?

22        A.   Yes.

23        Q.   Okay.  On Page 19 you were asked about

24   use of force reviews that you participated in

25   specifically where an officer at the Titusville

Tyler Wright
07/11/2025

Page 68

1    Police Department displayed both the firearm and

2    taser at the same time, and you talk about an

3    officer Kim LaFrance.  Do you see that?

4          A.   Yes.

5          Q.   That was another officer in the

6    Titusville Police Department that in a real-life

7    situation had pointed both a taser and a firearm at

8    a citizen?

9          A.   If I recall -- I can't remember if both

10   handgun -- or lethal and less lethal, handgun and

11   taser, was indexed and pointed at the lady at the

12   same time, but I do recall she had taser, less

13   lethal, out, and a handgun out.  I don't remember

14   if both of them were pointed at the subject at the

15   same time, or if the firearm was indexed down.

16         Q.   Do you recall what the result -- I

17   assume Officer LaFrance was reviewed and

18   disciplined as a result of that?

19         A.   I'm trying to remember all the facts

20   that happened with that one because there was an

21   appeal, but she's no longer with our agency from

22   all this.  But there was an appeal somewhere, and I

23   don't remember everything that happened with that

24   one.

25         Q.   Okay.  At Page 20 you were asked about

Tyler Wright
07/11/2025

Page 69

1    reviewing the body camera again and whether it's

2    reasonable to have the firearm out during this

3    incident, or to have discharged the firearm in this

4    incident.  And in your answer you say -- again, you

5    can review that answer in full before you answer,

6    but in that answer you stated, "Based on the video,

7    I don't see anything that would show a lethal

8    threat."

9          My question is simply, you stand by that

10   testimony today based on review of Officer Payne's

11   body camera video, correct?

12         A.   I stand by the part where I say, based

13   on the video, I don't see anything that would show

14   a lethal threat, because that's the angle of the

15   camera, and I couldn't tell what was on the other

16   side of the subject's body in that one.

17         Q.   Have you received any information since

18   you gave this interview in early 2022 that would

19   cause you to believe Mr. Lowery presented an

20   imminent lethal threat or imminent threat of

21   serious bodily injury to Mr. Payne?

22         A.   No.

23              MR. MARRESE:  I don't have any further

24         questions right now.  Some of the others may

25         have questions for you.  I really appreciate

Tyler Wright
07/11/2025

Page 70

```
 1              your time this morning.  Thank you.
 2                   THE WITNESS:  Absolutely.
 3                   MR. JADON:  James, do you have any?
 4                   MR. JIMENEZ:  I think I have two quick
 5              ones, if that's all right.
 6                   MR. JADON:  Yeah.  Yeah.  Go ahead.
 7                       CROSS-EXAMINATION
 8    BY MR. JIMENEZ:
 9         Q.   Sir, my name is James Jimenez.  I'm the
10    counsel for former Officer Payne in this matter.  I
11    just have a couple quick questions, I think, then
12    we can move on to any questions from your counsel
13    in this matter.
14         I just want to confirm, I think you
15    testified earlier, but you've never spoken to
16    former Officer Payne about this incident?
17         A.   No, I did not.
18         Q.   And aside from the body-worn camera
19    footage, which you reviewed as part of the IA
20    investigation, are you aware of any additional
21    observations, impressions that former Officer Payne
22    may have had during that incident?
23         A.   What he knew at the time, is that what
24    you're asking?
25         Q.   Yes.
```

Tyler Wright
07/11/2025

Page 71

1          A.   In this, my interview for the IA, I

2    listened to the -- it was either the 9-1-1 call or

3    the dispatched audio to the officers.  I think it

4    was the dispatched audio to the officers, what

5    dispatch relayed to them of what was happening,

6    subject description to include clothing, hair, et

7    cetera, stuff like that.

8          Q.   But nothing beyond that additional

9    audio you heard?

10         A.   No.

11         Q.   Other than the statement you gave

12   during that investigation, did you have any other

13   involvement in that IA investigation?

14         A.   No, I did not.

15              MR. JIMENEZ:  Okay.  That's all I have.

16              MR. MARRESE:  David, any for you?

17              MR. JADON:  Yeah I got a couple

18         questions.  Give me one second.

19                   CROSS-EXAMINATION

20   BY MR. JADON:

21         Q.   Commander Wright, as you know, my name

22   is David Jadon.  I'm a lawyer for the City of

23   Titusville.  I have a couple questions for you

24   today on this matter.

25              Do you recall receiving your notice of

Tyler Wright
07/11/2025

Page 72

1    deposition in this case?

2            A.    Yes.

3            Q.    Were you noticed as a corporate

4    representative for today's deposition?

5            A.    No, I was not.

6            Q.    Is it fair to say that all your

7    testimony today has been based on your personal

8    knowledge and/or experience?

9            A.    Yes.

10           Q.    As part of your experience with the

11   Titusville Police Department, you have trained

12   officers; is that fair?

13           A.    Yes, that's fair.

14           Q.    And you've written various lesson

15   plans?

16           A.    Yes.

17           Q.    And in your experience as a trainer

18   with the Titusville Police Department, is it your

19   expectation that officers are to remember the

20   training that they receive?

21           A.    Yes.

22           Q.    Does the department encourage

23   officers -- excuse me.  Let me back up.

24           To your knowledge, does the department

25   encourage officers to train or learn more on their

Tyler Wright
07/11/2025

Page 73

1    own time outside the classroom training that you

2    provided them?

3            A.    Yes, we do.

4            Q.    Do you remember some questions that you

5    received, I think from Mr. Marrese, about shooting

6    and shooting around obstacles?

7            A.    Yes, I do.

8            Q.    Does the -- have you ever trained an

9    officer to shoot when their line of sight is

10   obstructed?

11           A.    No, we do not.

12           Q.    Have you ever trained officers to teach

13   them to run after a suspect when they can no longer

14   see the suspect?

15           A.    We don't specifically train on once

16   they lose sight of the suspect.  There could be a

17   multitude of scenarios.  It could be a corner.  It

18   could be a fence.  But we tell them to slow down

19   and -- threshold kind of is the term we use, get a

20   good pie slice of the corner until you just blindly

21   go around something or over something.

22           Q.    So I guess I'll give you a more

23   specific example.  A suspect is running from an

24   officer, the suspect turns the corner, disappears

25   behind the building.  Would you train the officer

Tyler Wright
07/11/2025

Page 74

1    then to keep running without slowing down and maybe

2    looking around the wall first to see what's, you

3    know, on the other side?

4            A.    Correct, we talk to them about slowing

5    things down and taking their time before going in.

6    Same thing with like building searching, they're

7    not just going to go into an open doorway where

8    they last saw somebody.  They're going to take

9    their time to try to see as much from the outside

10   in before they go in.

11           Q.    Fair to say you taught officers here at

12   Titusville Police Department to not blindly pursue

13   a suspect then?

14           A.    Correct.

15           Q.    Have you ever been involved in foot

16   pursuits personally?

17           A.    Yes, I have.

18           Q.    In your experience involving foot

19   pursuits, have they been exactly the same each

20   time?

21           A.    No, they have not.

22           Q.    In your experience as a trainer with

23   the Titusville Police Department, is it possible to

24   train officers for every circumstance or

25   contingency while they're out in the street or in

Tyler Wright
07/11/2025

Page 75

1    the field?

2              A.   No, that's impossible to do.

3                   MR. JADON:  No other questions.

4                   MR. MARRESE:  None for me.

5                   MR. JIMENEZ:  Nothing for me.

6                   VIDEOGRAPHER:  Going off the record at

7         12:13 p.m.  That concludes today's testimony

8         of Commander Wright.

9                   (A discussion was held off the record.)

10                  STENOGRAPHER:  Can I get any orders if

11        anyone is ordering?

12                  MR. MARRESE:  For plaintiff, electronic

13        pdf.  No video at this time.  Thank you.

14                  MR. JIMENEZ:  Not at this time, no.

15        (The deposition was concluded at 12:13 p.m.)

16

17

18

19

20

21

22

23

24

25

Tyler Wright
07/11/2025

Page 76

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA    )
                         )
 4   COUNTY OF ESCAMBIA  )

 5

 6

 7               I, Cynthia Layer, certify that TYLER

 8   WRIGHT remotely appeared before me on the 11th day

 9   of July 2025, and was duly sworn.

10               Signed this 25th day of July 2025.

11

12

13

14

15

16

17        _____
          CYNTHIA LAYER, CSR
18        Notary Public, State of Florida
          My Commission No. HH 341507
          My Commission Expires: 12/14/26
19

20

21

22

23

24

25
```

Tyler Wright
07/11/2025

Page 77

1                           CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA    )
                         )
4    COUNTY OF ESCAMBIA  )

5

6             I, Cynthia Layer, CSR, do hereby

7    certify that I was authorized to and did

8    stenographically report the foregoing deposition of

9    TYLER WRIGHT; that a review of the transcript was

10   requested; and that the transcript, pages 1 through

11   75 is a true record of my stenographic notes.

12             I further certify that I am not a

13   relative, employee, attorney, or counsel of any of

14   the parties, nor am I a relative or employee of any

15   of the parties' attorneys or counsel connected with

16   the action, nor am I financially interested in this

17   action.

18             Signed this 25th day of July 2025.

19

20

21

22   _____

       CYNTHIA LAYER, CSR
23     Certified Shorthand Reporter

24

25

Tyler Wright
07/11/2025

Page 78

```
 1   July 25, 2025

 2   David Jadon, Esquire
     C/o  Roper, Townsend & Sutphen, P.A.
 3   255 S. Orange Avenue, Suite 750
     Orlando, Florida 32801
 4   djadon@roperpa.com

 5   WITNESS:  Tyler Wright
     RE:  Jamiyah Robinson v Joshua Payne, et al
 6   Case No:  6:23-cv-01313-PGB-LHP
     Type of Proceeding: Deposition on July 11, 2025
 7
     The transcript of the above proceeding is now
 8   available and requires signature by the witness.

 9   Please e-mail fl.production@lexitaslegal.com for
     access to a read-only PDF transcript and
10   PDF-fillable errata sheet via computer or use the
     errata sheet that is located at the back of the
11   transcript.

12   Once completed, please print, sign, and return the
     the e-mail address listed below for distribution to
13   all parties.

14   If the witness does not read and sign the
     transcript within a reasonable amount of time (or
15   30 days if Federal), the original transcript may be
     filed with the Clerk of the Court.
16
     If the witness wishes to waive his/her signature
17   now, please have the witness sign in the blank at
     the bottom of this letter and return to the e-mail
18   address listed below.

19   Very truly yours,

20
     Cindy Layer, CSR
21   Lexitas
     Fl.production@lexitaslegal.com
22
     I do hereby waive my signature.
23
     _____
24   Tyler Wright

25   Job No. 412339
```

Tyler Wright
07/11/2025

Page 79

1                          ERRATA SHEET

2        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3        In Re:  Jamiyah Robinson v Joshua Payne, et al
                Case No.:  6:23-cv-01313-PGB-LHP
4                          Tyler Wright
                          July 11, 2025
5
      PAGE    LINE    CHANGE                    REASON
6
7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    Under penalties of perjury, I declare that I have
      read the foregoing transcript of my deposition and
19    I hereby swear that my testimony therein was true
      at the time it was given and is now true and
20    correct, including any corrections and/or
      amendments listed above.
21

22    _____       _____
      DATE            Name
23

24

25    Job No.   412339

Tyler Wright
07/11/2025

1

**1987**
12:4

_____

**2**

**2**
56:21,
24

**20**
17:8
34:20
49:21
68:25

**2007**
14:6,7,
11,12,
23
15:10,
13

**2009**
15:13,
15,17

**2010**
15:19
17:6

**2011**
15:19

**2013**
15:17,
19,23

**2014**
19:18
20:2

**2015**
16:9
17:7

**2017**
16:13

**2018**
16:22,

23
49:22

**2019**
17:8

**2020**
40:25
41:24
52:23

**2021**
28:1
34:17
41:1
59:4

**2022**
10:19
16:24
69:18

**2023**
17:6,
12,18

**2024**
17:18,
19

**2025**
4:4

**21**
58:24

**235**
56:19

**25**
10:6

**258**
56:17

**26**
10:8
34:17

**27**
52:22

**28**
52:10

**283**
56:19

**29**
52:11

_____

**3**

**3**
40:10
42:18
49:22
52:11,
20  54:9
56:18,
19

**30th**
17:18,
19

**38**
12:3,6

_____

**4**

**4**
40:10

**40**
52:20

**40-round**
42:6

**409**
51:14

**41**
53:13

**412**
51:15

**43**
53:18

**5**

**5th**
14:12

**6**

**6:23-CV-
01313-
PGB-LHP**
4:9

**6th**
42:18

_____

**7**

**7**
43:20
57:2

**7s**
59:23

_____

**8**

**86A**
42:3

_____

**9**

**9**
54:9
55:10,
16

**9-1-1**
71:2

**90**
18:8

_____

**A**

**A-S-P**
53:2,6

**a.m.**
4:1,5
40:2,5
62:12,
15

**a/k/a**
66:4

**AA**
13:25

**ability**
22:19
32:15

**Absolute
ly**
70:2

**academy**
13:14
14:2,3

**access**
41:16

**accident
al**
30:7

**account**
28:20

**accredit
ation**
16:17
17:16

**accurate**
43:18
58:3

**accurate
ly**
58:1

**acknowle
dge**
41:12

_____

**1**

**1**
56:21,
24

**107**
9:14

**10:40**
4:1,5

**10:58**
40:2

**11**
44:23

**11:07**
40:5

**11:46**
62:12

**11:54**
62:15

**11th**
4:4

**12:05**
39:22

**12:13**
75:7,15

**15**
63:1

**16**
34:22
63:11

**17**
16:21

**18**
16:22
64:24

**19**
67:23

Tyler Wright
07/11/2025

2

acted
  19:5
acting
  16:20,
  22
active
  59:4
  60:21,
  23
activities
  45:10,
  18
  46:2,15
activity
  45:23
  46:21,
  22
actual
  11:21
  20:19
additional
  70:20
  71:8
addressing
  49:10,
  11
adrenaline
  22:4
advance
  8:9
affect
  32:15
  49:9

affirmatively
  38:20
age
  12:3,25
agency
  68:21
agents
  15:22
agree
  20:22
  29:9
  30:10
  31:10
  32:2
  33:11
  35:12
ahead
  70:6
aide
  54:15,
  24
air
  27:3
Alcohol
  15:20
alignment
  44:2,
  10,18
  48:7
allowing
  55:17
altercation
  57:8
amount
  32:21

and/or
  72:8
angle
  69:14
answering
  65:9
aperture
  44:11,
  16,21
appar
  44:19
apparatus
  44:20
appeal
  68:21,
  22
applications
  14:20
apply
  14:17
appreciating
  49:13
area
  8:22
  13:2
  16:7
  17:14
  23:11
  26:19
  45:9
areas
  36:4
  39:17
arm

62:1
Armament
  53:11
armed
  52:13
  54:3
ASP
  53:2,6,
  8,10,11
assess
  61:12,
  14
assigned
  15:14
  16:4
assignment
  17:17
assistance
  60:24
assume
  18:2
  24:9
  68:17
Astronaut
  13:9
ATF
  15:20
attack
  52:13
attend
  13:10
attorney
  8:7,8,
  13  11:3

audio
  11:14
  50:24
  71:3,4,
  9
August
  16:21
authored
  19:14
average
  32:8
  33:15
  46:22,
  23
aware
  24:25
  70:20
Axon
  10:15

————
    B
back
  8:22
  10:19
  16:1,
  10,20
  17:5
  19:22,
  25
  20:12
  24:2
  35:2
  36:23
  38:24
  39:7,
  20,21
  40:4
  62:8,14
  63:2
  72:23

background
  13:5
  16:15
backgrounds
  17:15
backwards
  34:9
  35:4
  48:11
bad
  7:12
  27:22
  30:12
  31:1,2
  66:6,8,
  20,23,
  25  67:5
barrel
  28:11
barrels
  36:4
based
  43:6
  69:6,
  10,12
  72:7
baseline
  33:11
basic
  43:10
basically
  10:9
  20:15
  25:20
  26:4

| | | | | | |
|---|---|---|---|---|---|
| 29:21 | bit | 70:18 | 47:25 | 14 | caption |
| 34:5 | 54:20 | book | 49:13 | | 4:6 |
| 43:12 | 55:12, | 40:10 | 50:23 | _____ | car |
| 44:10 | 22 62:9 | 42:18 | 58:15 | C | 45:25 |
| 54:1 | black | 43:20 | Brevard | call | cardinal |
| 55:17 | 57:15, | 49:21 | 13:19, | 28:13 | 29:19 |
| 59:9 | 23 58:9 | 52:11, | 23 | 60:6,21 | 30:2 |
| baton | blank | 20 54:9 | 14:14 | 71:2 | 31:15, |
| 22:7 | 55:10, | 56:18, | briefly | called | 17 |
| 59:19, | 16 | 19 | 8:19 | 5:6 | 48:15 |
| 20,21 | blend | born | 11:5 | 13:19 | cardiova |
| batons | 15:18 | 12:4, | 13:4 | 15:21 | scular |
| 53:9 | 16:3 | 19,21 | 18:21 | 42:2 | 23:7 |
| BCC | 17:1 | bottom | bring | 52:5 | carrying |
| 13:20 | 55:5 | 51:16 | 37:16, | 59:25 | 27:14 |
| began | blindly | bouncing | 17 | calling | 28:3 |
| 4:1 | 73:20 | 22:12 | bringing | 60:9 | 29:4,11 |
| begin | 74:12 | box | 36:18 | calls | 36:8 |
| 14:8 | blow | 52:7 | 55:8 | 45:20, | 51:4 |
| beginnin | 54:20 | branch | brings | 21 | 66:19 |
| g | bodily | 22:4 | 16:12 | calming | 67:14, |
| 14:6 | 66:12 | break | broken | 27:11 | 17 |
| 17:6 | 69:21 | 7:18,23 | 25:11 | cam | cars |
| 20:3 | body | 23:18 | 57:16 | 10:16, | 36:4 |
| Begins | 10:16, | 28:7 | brought | 21 | cartridg |
| 53:15 | 21 | 39:19, | 12:23 | 11:12 | e |
| behalf | 11:12 | 25 62:8 | building | 61:16 | 59:25 |
| 4:19 | 22:2,13 | 66:17 | 45:10 | camera | cartridg |
| behave | 27:11 | breaks | 73:25 | 35:8 | es |
| 52:18 | 35:8 | 7:19 | 74:6 | 69:1, | 60:1 |
| belt | 48:24 | breath | bulk | 11,15 | case |
| 55:19 | 57:12 | 27:8,9 | 19:9 | 70:18 | 4:6,8 |
| 59:18 | 61:16 | breathin | bullet | canine | 5:25 |
| big | 69:1, | g | 43:1 | 17:3 | 6:8 |
| 59:21 | 11,16 | 25:18 | 46:25 | capabili | 9:23 |
| binder | body's | 26:18, | 47:18 | ties | 11:18, |
| 40:10 | 25:2 | 25 | 48:1,22 | 32:25 | 23 |
| 41:21 | body- | 27:2,6 | 49:9 | capacity | 18:23 |
| | worn | 32:5 | 50:10, | 16:3 | 20:25 |
| | | | | 20:8 | |

28:2
35:8,11
40:12
55:24
56:17,
21
61:16
72:1

catch
44:9

center
17:22

certificate
14:1,5,
13

certificates
13:23

certifications
20:6

certified
19:20

cetera
36:21
46:1
48:11
61:2
66:7,21
71:7

chair
62:1

chances
30:11

change
32:25
62:23

changed
20:12
59:11

charging
44:7

chemical
22:10
59:23

chest
37:17

Chicago
4:12

chief
18:11,
14,16,
17

choice
27:22

Cindy
4:22

circumstance
37:20
66:9
74:24

circumstances
29:10
53:20

citizen
68:8

city
4:20
5:17
12:12
17:17
71:22

civil
6:8,9

11:8

clarity
6:15

class
20:5
54:25

classes
13:13,
15

classroom
60:11
73:1

clear
27:19
35:22

client
11:22

climb
35:20,
23

clinch
30:1

close
52:14

clothing
71:6

code
17:23
18:8

cognitive
22:19

college
13:12,
15,16,
19,20,
24

14:14

color
58:7

Colt
44:15

combat
22:17
50:16

commander
4:3,20
5:14
9:8
10:20
11:7
12:1
15:6
17:9,20
18:12
20:16
40:7
49:23
56:17
62:17
71:21
75:8

common
43:13

communication
17:21

communications
18:7

community
13:16,
19,23
14:14

company
53:9

compared
31:23
32:16

Comparing
31:7

complaint
11:21

completely
36:19
37:16
64:20

component
17:16

composite
56:22

concealment
36:6

concerns
59:1

concluded
75:15

concludes
75:7

conclusion
56:7,9,
11

condition
57:14,
15,23

conditions
57:12
58:7

confident
20:2

confirm
18:21
70:14

confirming
41:15
51:10

confronting
33:17
60:11

conjunction
5:24
41:8
58:13

considered
26:9
45:23

consists
17:2,
15,21

contact
47:2,7,
9,11,13

| | | | | | |
|---|---|---|---|---|---|
| contingency | 47:25 | 41:19, | 6:13,23 | 46:16, | 47:3,10 |
| 74:25 | 49:4,13 | 24 | cover | 21,23 | decades |
| continue | controls | 42:21 | 10:8 | date | 19:2 |
| 6:16 | 44:1,4 | 43:19 | 28:5 | 4:4 | December |
| 12:11 | conversation | 50:2,3 | 36:5 | dated | 17:18, |
| 17:25 | 6:11 | 52:24 | 44:24 | 52:22 | 19 28:1 |
| 20:7 | conversations | 62:19 | 45:7 | David | 34:17 |
| 52:9 | 63:17 | 65:16 | 47:3,7, | 4:19 | decent |
| continues | copies | 69:11 | 9,12,15 | 71:16, | 26:19 |
| 56:18 | 11:9 | 74:4,14 | 48:18 | 22 | decided |
| continuously | corner | correctly | 49:23 | day | 64:7 |
| 14:25 | 73:17, | 26:17 | 52:12 | 8:23 | decision |
| contribute | 20,24 | 30:17 | 54:2,4 | 43:6 | 30:12 |
| 67:14 | corporal | 33:24 | 61:8,9, | 59:13 | 31:11 |
| control | 15:24 | 61:5 | 24 | days | 32:16 |
| 22:17 | 16:1 | cortisol | covered | 8:20 | 33:16 |
| 26:18, | 54:10 | 22:4 | 25:5,7, | 34:21 | 34:12 |
| 24 | 55:2 | counsel | 8 | de- | 54:8 |
| 28:10 | corporate | 4:13 | creates | escalate | 61:13 |
| 32:4 | 72:3 | 70:10, | 53:9 | 64:7 | 64:19 |
| 43:2,9, | correct | 12 | crime | de- | 66:8 |
| 14,16 | 5:20,21 | count | 16:4,5 | escalated | 67:5,15 |
| 44:7,8 | 9:18 | 10:8 | 18:6 | 64:5,6 | decision |
| 48:8 | 10:22, | counter | 28:13 | de- | -making |
| 57:22 | 23 15:7 | 60:10 | criminal | escalation | 66:6, |
| 58:15, | 18:24 | County | 15:16 | 21:17 | 20,23 |
| 16 | 19:14 | 13:23 | criticisms | 53:5, | decision |
| controlled | 20:21 | couple | 61:22 | 19,23 | making |
| 27:2,8, | 24:14, | 6:10 | CROSS- | 54:1 | 32:25 |
| 9 49:1 | 18 | 47:8 | EXAMINATION | 61:3 | decisions |
| 61:25 | 29:12 | 70:11 | 70:7 | deal | 28:18 |
| controlling | 30:9 | 71:17, | 71:19 | 6:2 | 54:7 |
| 25:18 | 32:3 | 23 | | dealing | 57:25 |
| | 33:12 | courses | ———— | 23:1 | 61:7,14 |
| | 38:16, | 34:25 | D | 25:2,13 | 66:25 |
| | 21 | 35:7 | dangerous | 26:15 | defendant |
| | | court | 45:22 | 32:15 | 4:18 |
| | | 4:21 | | | |

| | | | | | |
|---|---|---|---|---|---|
| 5:19 | department-wide | depositions | DIRECT | discussions | 10:13 |
| **defensive** | 59:2,3 | 6:7 | 5:9 | 11:3 | 19:8,11 |
| 19:19, | **dependent** | **deputy** | **direction** | **disengagement** | 39:21 |
| 20 22:6 | 28:5,17 | 18:16, | 37:3 | 53:19 | **domestic** |
| 25:6 | 37:13 | 17 | **disappears** | **dispatch** | 45:20 |
| 53:1,14 | **depending** | **description** | 73:24 | 71:5 | **door** |
| **define** | 28:12 | 52:6 | **discharge** | **dispatched** | 60:25 |
| 45:15 | 39:5 | 71:6 | 30:7,22 | 60:6 | **doorway** |
| **defining** | 45:24 | **destroy** | **discharged** | 71:3,4 | 74:7 |
| 30:6 | **depends** | 48:19 | 69:3 | **dispatchers** | **draw** |
| **degrees** | 27:23 | **detective** | **discharging** | 18:7 | 24:2 |
| 13:22 | 31:14 | 15:17, | 31:11 | **displayed** | **drawing** |
| Demmon | 32:20, | 18 | **disciplined** | 68:1 | 63:12 |
| 9:9 | 21 | **diagonal** | 68:18 | **distance** | **drawn** |
| 10:20 | **deploy** | 35:5 | **discouraged** | 44:11 | 36:25 |
| 11:7 | 67:17 | **diagonally** | 37:3 | 54:1,4 | 37:1,2, |
| 18:12 | **deployed** | 34:9 | 38:1,6 | 61:6,8, | 4 38:6 |
| **denote** | 60:1 | **diagram** | **discuss** | 9,23 | **drill** |
| 46:6 | **depo** | 52:6 | 21:20 | **division** | 36:18 |
| **department** | 11:6 | **diagrams** | **discussed** | 5:25 | 52:6,12 |
| 14:9, | **deposed** | 52:4 | 37:7 | 9:17 | **drills** |
| 15,25 | 5:7 | **diet** | 49:12 | 15:16 | 35:16 |
| 15:7,25 | **deposition** | 23:6 | **discussing** | 16:15 | 36:13 |
| 17:7 | 4:3,9 | **differ** | 26:12 | 17:14 | 48:9 |
| 18:9 | 5:18 | 28:19 | **discussion** | 56:16 | 52:5 |
| 19:3 | 6:14 | **difficult** | 53:19 | DMS | **drop** |
| 27:25 | 8:11,14 | 33:18 | 75:9 | 41:10 | 64:8 |
| 34:2, | 11:4 | **diminish** | | **document** | **dual** |
| 11,16 | 19:9 | 22:20 | | 9:20 | 66:4 |
| 36:7 | 55:21 | **diminished** | | 41:22 | **due** |
| 40:14 | 58:7 | 34:14 | | 44:24 | 12:25 |
| 51:22 | 62:18 | | | **documents** | **duel** |
| 68:1,6 | 72:1,4 | | | 9:3 | 15:20 |
| 72:11, | 75:15 | | | | **duly** |
| 18,22, | | | | | 5:7 |
| 24 | | | | | **dynamic** |
| 74:12, | | | | | 21:16 |
| 23 | | | | | 49:16 |

dynamics
50:22

**E**

earlier
45:15
47:23
49:12
52:17
55:21
58:14
70:15
early
69:18
easier
28:9
Eastern
13:20
educational
13:5
effects
48:24
electronic
75:12
elevation
57:20
encourage
36:24
72:22,
25
encouraged
23:17
end

16:24
enforcement
12:11
13:14
14:2,13
17:23
18:8
19:6
24:11
33:3
38:14
51:21
53:15
enter
60:24
entirety
62:18
entitled
53:14
environment
22:24
49:1,5
55:13
62:1
equipment
50:6
escalation
53:20
essentially
46:21
et al
4:7
event
46:24

everyday
59:18
evidence
17:22
exam
42:11
EXAMINATION
5:9
exception
7:21
exceptions
32:1
exclusion
50:24
exclusitory
50:24
excuse
40:11
72:23
exercise
23:6
exercises
19:13
23:8
exhibit
56:20,
21,24
exigent
53:20
expect
31:22
33:16

expectation
72:19
expelling
27:3
experience
6:2,3
49:8
57:5
72:8,
10,17
74:18,
22
experiencing
32:8
explain
57:5
exposed
48:25

**F**

faced
26:5
fact
56:10
factors
32:15
50:25
facts
68:19
failure
61:23
fair
6:5,24
18:4

19:6
20:20,
21
31:24
32:10
36:25
46:16
51:6
61:7
66:12
67:1,21
72:6,
12,13
74:11
fall
21:10
46:1
familiar
45:2
familiarized
44:1
Fantastic
15:2
FDLE's
42:2
February
14:11,
12
15:15
feedback
45:12
feel
12:5
26:21
62:4
feeling
28:25

feels
18:8
feet
30:21
fell
17:10
26:4
39:15
fence
35:10,
25  36:3
61:18
62:3
73:18
field
25:22
34:22
55:2
75:1
figure
8:10
filed
5:16
11:22
finally
49:7
find
23:18,
19
24:12
60:13
finding
24:8
findings
24:9
fine
22:21
finger
31:18

Tyler Wright
07/11/2025

8

48:16
**Finish**
67:8
**fire**
34:25
35:7
42:14
43:10
**firearm**
25:12,
15
27:14
28:3
29:5,
11,17,
18
30:3,8,
11,13,
23
31:4,
12,15
33:18
35:13
36:8,17
38:19
42:19
47:20
48:5,9,
12,13
63:13
65:4
66:19
68:1,7,
15
69:2,3
**firearms**
15:21
22:5
25:7
41:22
50:1

51:15
54:14
55:16
65:11
**firmly**
30:21
31:8,23
32:10,
17
33:19
34:5
**five-minute**
62:8
**flashlight**
22:7
60:2
**flashlights**
53:10
**fleeing**
26:9
31:24
**Florida**
12:8,
17,19,
23
13:6,20
**foam**
59:21
**focus**
5:23
16:7
19:10
25:19
33:6
**focused**
16:5

23:11
**focusing**
27:2
43:9
66:23
**food**
23:6
**foot**
20:25
21:3,7,
9,14
26:1
27:15
29:4,11
31:20
32:5,9,
13
57:4,7,
10
74:15,
18
**footage**
70:19
**force**
15:22
45:11
47:16
67:24
**forensic**
18:6
**forensics**
17:22
**foreseeable**
12:12
**forget**
53:8

**form**
29:6
30:14
32:18
33:21
36:5
37:8
42:2,3
56:1
66:13
**forms**
26:13
**formulate**
54:7
**forward**
34:9
35:4
**forwards**
48:10
**found**
24:6
**four-month**
16:7
**front**
6:23
39:5
44:10
**full**
9:21
69:5
**fully**
9:20
**function**
26:20
51:5

**fundamental**
47:20
48:5,13
**fundamentals**
47:2
**future**
12:13

———

**G**
**gather**
60:13
**gave**
5:23
21:19
55:8,10
69:18
71:11
**gear**
55:15
**general**
6:1,3
20:4
40:22
41:2,17
51:14,
20
**generally**
6:5
28:22
61:9
**generated**
11:22
**get all**
20:5

**give**
6:16
9:2
14:20
20:10
27:17
34:20,
21
61:12
65:18
71:18
73:22
**giving**
61:5
**good**
5:11
23:23
27:17
29:3,10
32:5,16
35:21
37:10
38:24
73:20
**Googling**
11:18
**gotcha**
46:17
**govern**
6:11
**grab**
29:24
**graduate**
13:6,8
**great**
6:2
10:10
11:11
12:7

Tyler Wright
07/11/2025

9

| | | | | | |
|---|---|---|---|---|---|
| **greater** 37:21 | **Halt** 59:25 | 60:14 | **healthiness** 23:6 | **helps** 27:10 | **hold** 27:9 |
| **grip** 48:7 | **Hamann** 45:1,2,3 46:7 | **hands** 22:22 27:19 35:22 36:9 64:15 66:4 | **hear** 7:1 25:21 26:21 60:22 61:1 | **hey** 11:8 43:14 60:9 | **holding** 67:18 |
| **gross** 22:21 | **hand** 29:18,22,24,25 30:1 37:14,16,18 38:18 64:18 67:18 | **hands-on** 34:22 | **heard** 71:9 | **hierarchy** 18:15 | **holds** 41:10 |
| **ground** 6:10 | | **handwriting** 43:25 | **hearing** 22:20 29:1 | **high** 13:6,9,10 19:21 22:24 29:15 45:9,14,17,23 46:1,3,13,14,20 | **hole** 44:17,18 |
| **group** 43:11 | **handcuffing** 22:6 53:2 | **happen** 7:10 29:17 39:3 51:4 | **heart** 22:3,16 25:18,20 26:17,19 27:11 29:15 31:22 32:7 47:25 49:13 50:23 57:10,13,16,19,22 58:8 | | **holes** 44:19 |
| **guess** 8:2 26:25 33:14 36:3 46:10 73:22 | **handcuffs** 53:9 60:3,4 | **happened** 68:20,23 | | **high-risk** 45:24 57:6 | **holster** 39:10 59:20 |
| **guideline** 7:25 | **handgun** 28:8,10 29:24 34:13,24 35:5 37:18 42:4,8 43:2 51:5 59:18,23 66:3 67:18 68:10,13 | **happening** 39:5 60:23 71:5 | | **higher** 31:22 32:8 57:19 | **holstering** 36:19 39:4 |
| **gun** 27:21,23 63:4 64:8,9 | | **hard** 59:20 | | **hire** 34:19 53:2 | **Hoog** 4:11 |
| **guy** 60:9 | | **harder** 28:11 33:5 | **held** 15:10 17:17 75:9 | **hired** 14:23 | **hour** 9:2 |
| | **handguns** 50:6 | **harm** 66:12 | **helped** 19:24 20:1 | **Hires** 53:15 | **hours** 34:20,22 |
| **H** | **handle** 44:8 | **head** 6:18 21:19 22:10,12 | **helping** 16:16 | **hiring** 14:22 | **HR** 17:16,17 |
| **H-A-M-A-N-N** 45:4 | | | | | **hundred** 63:19 64:3,11 |
| **hair** 71:6 | | | | | **hurt** 46:5 |
| **half** 20:10 | | | | | **Hutchinson** 18:18 |
| **halfway** 14:19 | | | | | |

Tyler Wright
07/11/2025

10

I

IA
  70:19
  71:1,13
idea
  29:10
  55:4,8,
  11
identifi
ed
  42:14
  46:14
  56:24
identify
  4:13
IFAK
  54:15,
  24
imminent
  66:11
  69:20
impossib
le
  75:2
impressi
on
  55:23
impressi
ons
  70:21
incidenc
es
  21:10
  24:6
  54:2
incident
  18:23

20:24
69:3,4
70:16,
22
incident
s
  45:19
include
  19:11
  71:6
includin
g
  48:23
increase
  30:11
  47:25
  58:16
increase
d
  32:13
  47:20,
  23
  48:6,25
  49:8
increase
s
  31:12
index
  64:19
indexed
  68:11,
  15
individu
al
  38:3
  42:19
  54:24
  65:23

ineffect
ive
  36:20
inert
  59:23
infant
  12:25
informat
ion
  60:13
  61:1
  69:17
injured
  55:1
injury
  69:21
inside
  60:23
instruct
  23:14
  25:15
  28:2
instruct
ed
  24:22
  25:2
  26:1,15
  39:13
instruct
ion
  21:13
  24:11
  50:1,20
  51:19
instruct
or
  19:5,21
  20:1,4
  41:23

42:9,23
43:11,
21
52:23
55:4
63:16
instruct
ors
  52:24
intaking
  27:3
intend
  31:19
  48:19
  67:7
intended
  52:12
intentio
nal
  30:12
intentio
nally
  67:15
interest
  16:6
internal
  9:10
  40:11
internet
  11:17
interpre
tation
  46:20
interpre
ting
  27:1
interrup
ted

67:9
intertwi
ne
  25:9
intertwi
ned
  21:19
  25:5,10
intervie
w
  5:23
  9:10,
  20,22,
  25
  10:12,
  22
  56:15
  69:18
  71:1
intervie
wed
  10:19
introduc
tion
  57:4
investig
ation
  9:10
  40:11
  70:20
  71:12,
  13
investig
ations
  15:16
  17:21
investig
ator
  16:15

investig
ators
  18:6
involve
  34:25
  59:7
involved
  20:3,25
  27:15
  50:20
  58:18
  74:15
involvem
ent
  11:9
  19:1
  71:13
involvin
g
  46:16
  47:24
  57:7
  63:12
  65:10
  74:18
issue
  20:25
  35:11
items
  62:25

J

Jadon
  4:19
  8:7,17
  29:6
  30:14
  32:18
  33:21

Tyler Wright
07/11/2025

11

37:8,11
39:22,
24
56:1,3
66:13
67:2
70:3,6
71:17,
20,22
75:3
**James**
4:17
20:24
61:17,
18
70:3,9
**Jamiyah**
4:7
**January**
14:10,
23
16:21,
22
17:12,
17
**Jimenez**
4:17
30:15
32:19
33:22
37:9
56:2
66:14
70:4,8,
9 71:15
75:5,14
**job**
32:6
63:19
64:3,11

**John**
4:15
5:14
18:11
**Join**
30:15
32:19
33:22
37:9
56:2
66:14
**Josh**
18:22
**Joshua**
4:7,18
5:17
40:11,
13
41:23
42:21
**judge**
6:23
**July**
4:4
40:25
41:24
52:22
**jump**
35:20,
24
**jumped**
13:13
60:10
62:3
**jumps**
61:18
**June**
58:24

**jury**
6:23
45:16

_____

**K**

**keeping**
25:20
27:11
**keys**
60:22
**Kim**
68:3
**kind**
17:5,16
19:17
20:11
22:20
23:8
24:15
35:16
40:17
43:8
46:15
48:2
54:17
55:12
58:14
73:19
**kinds**
26:2
52:16
**Kit**
54:25
**knew**
70:23
**knowing**
62:2,3

**knowledge**
72:8,24

_____

**L**

**lady**
68:11
**Lafrance**
68:3,17
**landing**
43:7
**larger**
44:17
**Lau**
18:11
**law**
12:11
13:14
14:2,13
19:6
24:11
33:2
38:14
51:21
53:15
**lawsuit**
5:18,20
11:22
**lawyer**
7:4
71:22
**Layer**
4:22
6:13
**lead**
67:6
**leader**
17:7

**leading**
17:14
20:23
**learn**
72:25
**learned**
14:21
**left**
29:25
34:9
35:5
37:14
48:11
**legal**
4:11
**lesson**
19:11,
25
20:3,9,
19 21:8
34:23
39:15
44:24
45:7
49:23
50:9
51:12,
16,24
52:2
53:13
54:9,
13,16
72:14
**lethal**
36:16,
21,22
37:15,
16
38:1,2,
5,6

39:2,8,
9,10
63:20
64:1,4,
5,14,
15,18
66:3,11
67:11,
12,17
68:10,
13
69:7,
14,20
**letting**
20:13
**level**
6:3
15:25
55:11,
12 57:6
**levels**
58:8
**lever**
44:4
**Lexitas**
4:12
**liability**
19:21
45:10,
14,17,
18,23
46:2,3,
13,14,
20
**lieutenant**
9:8
16:20,
22,23,

| | | | | | |
|---|---|---|---|---|---|
| 24 | 64:18 | 7:7 | 75:4,12 | **mentioned** | 70:1 |
| **life** | **longer** | 12:2 | **math** | 66:18 | **motor** |
| 33:4 | 22:24 | 30:12 | 12:2 | **met** | 22:21 |
| **likelihood** | 68:21 | 32:14, | **matter** | 5:15 | **motto** |
| | 73:13 | 16 33:9 | 70:10, | 8:20,23 | 64:13 |
| 31:10 | **looked** | 54:8 | 13 | **middle** | **move** |
| 46:4 | 10:20, | 57:24 | 71:24 | 59:5 | 41:20 |
| **lines** | 24 | 61:7, | **meaning** | **midnight** | 52:11 |
| 25:17 | **lose** | 13,14 | 44:21 | 16:11, | 53:18 |
| **lining** | 22:21 | 66:8 | 65:24 | 12 | 57:2 |
| 44:10 | 73:16 | **makes** | **meanings** | **midnights** | 70:12 |
| **listed** | **lot** | 20:15 | 47:8 | 15:15 | **movement** |
| 40:22, | 20:16 | 25:12 | **means** | **military** | 22:22 |
| 23 | 23:24 | **making** | 45:16 | 15:3 | 29:22 |
| 41:17 | 25:4 | 31:10 | **meant** | **millimeter** | **moving** |
| **listen** | **low** | **malfunction** | 60:1 | 55:10, | 34:2,8, |
| 11:14 | 27:12 | 48:8 | 67:10, | 17 | 17,25 |
| 33:6 | **Lowery** | **managing** | 17 | **mind** | 35:4,6, |
| **listened** | 20:24 | 58:19 | **media** | 46:15 | 15 |
| 71:2 | 21:1 | **mark** | 11:18 | **minds** | 48:9,10 |
| **lists** | 61:17, | 56:20 | **medical** | 48:24 | **multiple** |
| 45:12 | 18 62:3 | **Marrese** | 54:25 | **mindset** | 47:9 |
| **litigation** | 69:19 | 4:15 | 55:3,19 | 23:25 | **multitude** |
| | **lowest** | 5:10,15 | **meet** | 32:23 | |
| 5:16 | 15:25 | 29:8 | 8:13,16 | 34:4,10 | 73:17 |
| **live** | | 30:18 | **meeting** | 57:21 | **muzzle** |
| 12:7 | ——— | 33:1,25 | 8:18 | **misspoke** | 28:10 |
| **loaded** | **M** | 37:19 | 9:1 | 9:24 | 48:18 |
| 48:20 | **made** | 39:19, | **meetings** | **moment** | |
| **local** | 64:19 | 23 40:6 | 11:2 | 5:15 | ——— |
| 13:16 | **magazine** | 45:4,6 | **memory** | 61:3 | **N** |
| **logical** | 44:6,9 | 56:6,20 | 35:2 | **months** | **Nathan** |
| 27:1 | **main** | 57:1 | 59:8 | 16:18 | 4:8,18 |
| **long** | 20:1 | 62:7,16 | **mental** | **morning** | **naturally** |
| 8:25 | 22:11 | 66:16 | 23:8,12 | 5:11 | |
| 10:6 | **major** | 67:3 | 24:22 | | 27:10 |
| 54:4 | 17:13 | 69:23 | 32:23 | | 33:4 |
| 62:10 | **make** | 71:16 | | | **nature** |
| | 6:19 | 73:5 | | | 48:1 |

| | | | | | |
|---|---|---|---|---|---|
| near/far | November | observat | 15 | 58:15 | opposed |
| 52:5 | 14:21 | ions | 49:17 | 65:2, | 6:18 |
| negative | 41:1 | 70:21 | 52:22 | 11,14 | 32:9 |
| 65:24 | 49:22 | obstacle | 54:25 | 71:3,4 | 33:19 |
| 66:1,6, | number | s | 55:23 | 72:12, | option |
| 18,25 | 4:8 | 73:6 | 58:10, | 19,23, | 28:3 |
| 67:20 | 15:11 | obstruct | 19 | 25 | 36:22 |
| nice | 19:8 | ed | 60:12 | 73:12 | 39:4 |
| 43:12, | 26:24 | 73:10 | 61:17, | 74:11, | options |
| 14 | 45:12 | OC | 22 62:4 | 24 | 26:6 |
| nods | 50:4 | 22:10 | 63:3 | officiall | 27:18 |
| 6:18 | nutritio | occur | 64:6 | y | 44:17 |
| nonfirea | n | 8:18 | 67:25 | 14:23 | orange |
| rm- | 23:6 | October | 68:3,5, | on- | 57:15 |
| related | ———— | 14:21 | 17 | boarded | 58:9 |
| 54:2 | O | office | 69:10 | 14:22 | ordering |
| normal | oath | 33:7 | 70:10, | on/off | 75:11 |
| 7:3 | 6:22 | officer | 16,21 | 44:5 | orders |
| 46:24 | object | 5:17 | 73:9, | online | 40:22 |
| 57:14 | 35:25 | 6:4 | 24,25 | 24:6,9 | 41:2,17 |
| Nos | objection | 12:11 | officer' | open | 51:14, |
| 56:24 | 7:5 | 15:14 | s | 74:7 | 20 |
| note | 67:2 | 18:22 | 57:6 | operatio | 75:10 |
| 44:22 | objections | 21:4,6, | officers | ns | ———— |
| 51:8 | 7:1 | 24 | 17:4 | 16:24 | P |
| noted | objective | 22:14 | 19:6 | 17:2,5, | p.m. |
| 52:12 | 45:8 | 25:25 | 20:20 | 10,20 | 75:7,15 |
| 59:1 | objectiv | 26:14 | 23:16 | 18:5 | pages |
| notes | ely | 28:25 | 26:5 | 19:12 | 9:7 |
| 42:24 | 53:20 | 33:15 | 38:15 | opinion | 10:6 |
| 43:21 | objectiv | 35:9 | 45:9 | 37:24 | 56:22 |
| notice | es | 36:5 | 47:1,9, | 56:4 | parents |
| 71:25 | 45:13 | 38:22 | 19 | opportun | 12:24 |
| noticed | 47:1 | 39:12 | 48:23, | ity | part |
| 72:3 | 50:5 | 40:20 | 25 49:7 | 39:9 | 7:3 |
| notifica | 54:18 | 41:1,15 | 51:21 | 47:2,19 | 9:14,25 |
| tion | | 42:8, | 52:18, | 49:4,8 | 10:21 |
| 11:6 | | 13,21 | 21 | 61:7,12 | 11:7 |
| | | 47:11, | 53:24 | | 17:9,10 |
| | | 12,13, | 55:13, | | |
| | | | 18,20 | | |

18:2
25:15
34:8
44:8
50:11
51:19,
24
65:19,
21
66:18
69:12
70:19
72:10
**part-
time**
15:22
**particip
ated**
67:24
**patrol**
15:14
16:1,2,
6,11,
12,20,
24
17:21
18:3,5
33:15
45:10,
18,23
46:2,
15,20,
21
59:18
**pattern**
61:19
**Payne**
4:8,18
5:17
6:4

18:22
20:24
21:5,6,
24
22:15
24:21
25:25
26:14
35:9
39:12
40:13
41:1,
15,23
42:13,
21
49:17
52:22
58:10,
19
61:17,
23 62:4
69:21
70:10,
16,21
**Payne's**
40:12
55:23
69:10
**pdf**
75:13
**people**
20:13
33:4,5,
6 57:22
**percent**
18:8
63:19
64:3,12
**perfect**
23:20

39:23
**perfectl
y**
7:3
**performa
nce**
50:5
**period**
20:23
**permanen
t**
12:16
**permutat
ion**
28:20
**person**
26:20
27:21,
22
32:21,
24 33:9
38:3
57:17
64:21
67:7
**person's**
57:12
**personal**
56:9
72:7
**personal
ly**
24:10
58:18
74:16
**personne
l**
61:15

**persons**
16:5
**philosop
hy**
23:23
50:21
**physical**
57:7
**physiolo
gic**
25:14
26:2,13
**physiolo
gical**
21:15,
22 23:2
32:13
50:16
51:2,8
55:7
**physiolo
gical/
psycholo
gical**
22:18
25:6
26:7
49:15
50:22
**pick**
23:20
**picture**
23:20
44:2,9,
18 48:7
**pie**
73:20
**place**
9:22

23:16
54:7
**placemen
ts**
43:12,
16
**plaintif
f**
4:16
5:16
75:12
**plan**
12:11
20:9
21:9
34:23
44:24
45:7
49:23
50:9,11
51:12,
16,24
52:2
53:14
54:10,
13,16
**plans**
12:10,
15,18
19:11,
25
20:4,20
39:15
54:8
72:15
**planted**
30:21
31:8,23
32:10,
17

33:19
34:5
**point**
7:11
10:11
34:5
39:10
43:1,17
46:25
47:18
48:1
55:3
62:19
63:3
65:23
**pointed**
33:20
37:5
64:16
68:7,
11,14
**pointing**
37:2
38:1
63:13
64:20
65:5
66:4,5
**points**
48:22
49:9
50:10,
14
**police**
14:9,
15,25
15:7
18:11,
14 19:3
27:25

Tyler Wright
07/11/2025

15

34:16
36:7
40:14
51:22
68:1,6
72:11,
18
74:12,
23

**policies**
41:10

**policy**
38:10

**portion**
10:1
35:6
39:17
50:19
66:24

**position**
15:18
17:25

**positions**
15:9

**possibility**
30:25
67:13,
21

**possibly**
29:16

**potential**
25:13

**potentially**
31:16

**Power**
41:10

**practice**
29:3,4
39:9
45:9
47:2,19
49:4
64:14

**practices**
38:25

**predetermined**
60:25

**preface**
8:6

**preferred**
39:11
64:14,
22

**premise**
60:5

**preparation**
9:4
10:16
11:13
52:2

**prepare**
8:10,14
10:13
11:15,
19

**prepared**
45:1
49:22
50:13

53:14
54:10

**preparedness**
23:12
24:22
32:23

**preparedness-type**
23:8

**preparing**
20:19

**prepped**
8:8

**present**
4:13
15:10
42:10
66:10

**presented**
24:1
47:17
60:25
69:19

**preserve**
7:4

**pretty**
12:25
34:3
48:15

**previously**
56:23

**primarily**
5:23

**primary**
67:20

**proceedings**
4:1

**process**
7:3
27:10

**produced**
9:22

**profession**
33:13

**professional**
5:24
9:16
16:14
17:13
56:16

**professionally**
15:12

**proficiency**
42:11

**prohibited**
38:8,18

**prohibition**
27:13,
16

**promoted**
15:24
16:10,
23
17:12,
19

**proper**
23:6
39:9
44:10
48:7,8
57:20

**provide**
36:4
45:9
55:12
63:12

**provided**
21:24
73:2

**providing**
19:5

**PSD**
9:14

**psychological**
21:16,
23
25:14
26:3,13
55:6

**psychological/physiological**
22:3

**pull**
31:19
35:20
37:22
63:2
67:10

**pulls**
43:15

**purpose**
61:11

**pursue**
74:12

**pursuing**
31:4
33:19

**pursuit**
21:1
27:15
29:4,11
31:21
32:5,9,
14 57:7

**pursuits**
21:3,7,
9,14
26:1
57:4,10
74:16,
19

**put**
14:18
23:25
24:4
34:10
59:12,
13
63:21

**putting**
14:19

———

**Q**

**qualification**
41:22
42:3,7
43:7

| | | | | | |
|---|---|---|---|---|---|
| **qualifications** | **quick** | **rational** | 44:11, | **receiving** | **reference** |
| 34:7 | 70:4,11 | 57:24 | 16,17 | 71:25 | 46:4,14 |
| **qualify** | **quote** | **reach** | **reasonable** | **recess** | **referenced** |
| 42:7 | 60:8 | 56:7 | 28:25 | 40:3 | 51:15 |
| **quarterbacking** | ——————— | **reaches** | 53:21 | 62:13 | 56:22 |
| 62:1 | **R** | 35:10, | 63:3,6 | **recognize** | **referencing** |
| **question** | **ran** | 13 | 69:2 | 58:16 | 51:20 |
| 7:6,12, | 9:11 | **reaching** | **reassigned** | 67:13 | 52:17 |
| 14,22 | 16:11 | 35:25 | 41:11 | **recollections** | **referred** |
| 21:5 | **range** | **reactions** | **recall** | 58:21 | 46:3 |
| 26:16 | 25:23 | 26:3 | 11:1 | **record** | **referring** |
| 30:17 | 30:3,21 | 50:16 | 18:15 | 4:2 | 9:17 |
| 31:1 | 34:23 | 51:2 | 38:7,9 | 5:12 | 48:3 |
| 33:14, | 42:20 | **read** | 53:25 | 7:4 | **reflex** |
| 24 | 52:14 | 41:7 | 54:23 | 40:1,5 | 29:20 |
| 45:14 | **rank** | 43:23, | 58:25 | 45:5 | 30:6 |
| 46:11 | 15:24 | 24 | 61:5,19 | 56:18, | 37:6,21 |
| 57:3 | 16:10 | **ready** | 65:2 | 25 | 55:22, |
| 64:6,25 | 17:12, | 47:16 | 68:9, | 62:12, | 25 |
| 65:6, | 19 | **real** | 12,16 | 14 | 56:5,12 |
| 17,21, | **rate** | 60:3 | 71:25 | 75:6,9 | 66:7,21 |
| 25 | 22:4,16 | **real-** | **receive** | **recorded** | 67:6, |
| 66:15 | 25:18, | **life** | 13:22 | 4:10 | 19,21 |
| 69:9 | 20 | 24:5 | 14:4 | **recreate** | **reflexes** |
| **questioning** | 26:17, | 68:6 | 21:6 | 24:7 | 29:16 |
| 62:9 | 19 | **real-** | 41:7 | **recruiter** | **refresh** |
| **questions** | 27:11 | **time** | 72:20 | 16:16 | 54:18 |
| 6:17 | 29:15 | 45:11 | **received** | **recruiting** | **regime** |
| 7:2 8:9 | 31:22 | **real-** | 19:4 | 17:15 | 23:7 |
| 69:24, | 32:7 | **world** | 21:5 | **red** | **reholstered** |
| 25 | 47:25 | 52:18 | 40:14, | 57:15 | 39:7 |
| 70:11, | 50:23 | **reality-** | 21 41:1 | 58:9 | **related** |
| 12 | 57:10, | **based** | 49:17 | | 46:1 |
| 71:18, | 19,22 | 54:14 | 69:17 | | |
| 23 73:4 | 58:8 | 58:25 | 73:5 | | |
| 75:3 | **rates** | 59:3 | **receives** | | |
| | 49:14 | **rear** | 41:6 | | |
| | 57:13, | | | | |
| | 16 | | | | |

relates
  21:6
  50:1,5
  53:1
relating
  10:21
  21:14
  41:2
  56:16
relayed
  71:5
release
  44:7,9
relevant
  21:13
reloads
  48:8
relocate
  12:15
relocated
  12:24
remember
  8:23
  21:18
  37:23
  42:5
  53:11
  66:21
  68:9,
  13,19,
  23
  72:19
  73:4
Remote
  4:1
remotely
  4:10

repeat
  27:10
  46:11
  66:15
rephrase
  7:14
report
  9:14,17
reporter
  4:22
  6:13
reports
  18:3
represent
  4:14
  5:15
  42:1
  53:7
representative
  72:4
residence
  12:16
resistance
  26:5,
  10,14
  41:3
  45:19
  47:17
  51:15
resource
  17:3
  59:17
resources
  54:6

61:15
respect
  23:4,14
  24:22
  31:11
  34:18
  56:8
  65:10
respond
  45:22
  47:16
  57:25
  60:12,
  24
responding
  49:14
responds
  57:18
response
  21:16,
  17,23
  22:14,
  18  25:3
  26:6,7,
  13
  32:13
  41:2
  45:18
  51:15
  58:3
responses
  6:17
  22:3
  23:2
  25:14
  55:7

responsibilities
  20:11,
  18
responsibility
  19:17
  20:16
result
  55:24
  56:12
  68:16,
  18
results
  6:16
review
  5:25
  9:3,6
  10:12,
  15
  11:12
  58:4
  62:21
  65:20
  69:5,10
reviewed
  9:24
  41:16,
  17
  62:17
  68:17
  70:19
reviewing
  69:1
reviews
  67:24
revised
  41:12

revision
  41:13
rifle
  28:8,9
  35:7
  43:3,25
  50:14
  51:4,9,
  10,11
rifles
  50:6
right-handed
  29:23
rises
  49:13
risk
  37:6,21
Robinson
  4:7
role
  18:2
roster
  49:20
  52:21
roughly
  14:19
  15:19
  34:20
rounds
  43:7
  55:10,
  17
routine
  46:24
rule
  31:15,
  17

rules
  6:10
  29:19
  30:3
  48:15
run
  27:23
  37:5,20
  38:18
  73:13
running
  16:2,25
  17:2
  27:18
  28:2,8
  29:15,
  17
  30:11
  31:3,9,
  12,24
  33:18
  34:13
  38:5
  39:1
  55:3
  65:4,14
  73:23
  74:1
runs
  35:9
rushed
  60:10

—————
S
safety
  29:18
  31:15
  44:4,5
  48:12

Tyler Wright
07/11/2025

18

| | | | | | |
|---|---|---|---|---|---|
| sake | school | selector | 48:18 | 16 | signature |
| 6:15 | 13:6,9, | 44:5 | 52:11 | shots | |
| sat | 10 17:3 | sense | 66:9 | 43:18 | 40:23 |
| 6:8 | 59:5 | 6:19 | 67:1,15 | 60:23 | signed |
| scenario | 60:10, | 7:7 | 73:9 | show | 41:18, |
| 27:20, | 23 | 20:15 | shooter | 69:7,13 | 23 |
| 24 | schoolin | 25:12 | 29:23 | showing | 42:20 |
| 28:5,17 | g | sergeant | 52:5 | 49:21 | 49:20 |
| 30:5 | 13:11 | 16:10, | 59:4 | 52:20 | 52:22, |
| 35:16 | scope | 12,14 | 60:21 | 65:1 | 24 |
| 49:5 | 45:8 | 45:1 | shooting | shrugs | signing |
| 55:18, | screen | 46:7 | 5:25 | 6:18 | 42:9 |
| 19 59:9 | 4:6 | serve | 10:21 | sic | signs |
| 60:8, | 6:13 | 17:25 | 18:23 | 50:24 | 41:6 |
| 14,15, | 40:7,8 | service | 28:1 | side | similar |
| 16,20 | scroll | 28:13 | 30:20 | 17:11 | 24:1 |
| 67:16 | 44:12 | 45:20, | 32:16 | 19:23 | simple |
| scenario | 50:12 | 21 | 34:3,5, | 54:5 | 22:22, |
| -based | 54:19 | 60:6,22 | 8,18,25 | 61:10, | 23,24 |
| 22:8 | scrollin | shakes | 35:4,6, | 12 | simply |
| 24:3,20 | g | 6:18 | 15,24 | 63:15 | 29:14 |
| 54:14 | 51:25 | sharing | 36:2,3 | 64:7 | 69:9 |
| 58:23 | searches | 40:7 | 40:12 | 65:24 | simulate |
| scenario | 11:17, | 56:14 | 44:11 | 66:1,6 | 52:13 |
| s | 18 | sheet | 55:24 | 67:1 | simulati |
| 24:1,5 | 24:16 | 42:20 | 56:11 | 69:16 | ons |
| 28:19 | 45:11 | 44:24 | 61:19 | 74:3 | 52:16 |
| 29:2 | searchin | 45:7 | 66:10 | sides | simuniti |
| 30:20 | g | 49:24 | 73:5,6 | 66:19 | ons |
| 45:19 | 74:6 | shift | shoots | sight | 22:9 |
| 60:7,18 | seat | 16:12, | 35:10 | 44:1,9, | 55:9, |
| 64:17, | 20:12 | 25 | short | 17,18 | 15,16 |
| 22 | seconds | shifts | 16:18 | 48:7 | 59:22 |
| 65:3, | 27:9 | 16:25 | 28:11 | 73:9,16 | singular |
| 10,13 | section | shoot | 40:3 | sights | ly |
| 73:17 | 17:22 | 30:12 | 44:22 | 48:17 | 64:10 |
| scene | 18:7 | 33:17 | 62:13 | sign | sir |
| 18:6 | security | 34:12, | shot | 41:11, | 6:6,20, |
| 28:25 | 55:10 | 13 | 20:24 | 13 | 25 |
| 54:6 | | | 43:11, | | |

11:16,
20 70:9
**sitting**
57:13
61:25
**situation**
27:20
28:21
31:7
32:17
36:16
37:15
57:7
61:13,
24 64:4
68:7
**situation-dependent**
32:24
**situational**
37:13
38:25
**situational-dependent**
28:12
**situations**
31:3
46:16
47:24
52:18
**skill**
48:13

**skills**
22:22
47:20
48:5,9,
12
**slapping**
43:8,15
**slice**
73:20
**slow**
43:14
54:5
73:18
**slowed**
62:5
**slowing**
74:1,4
**smaller**
44:18
**smell**
61:1
**speak**
11:3
**speaking**
32:2,12
47:14
**special**
15:21
17:2,4,
10
**specialist**
4:12
**specific**
16:6
21:8
26:19
27:5
42:8

49:20
51:10
59:16
73:23
**specifically**
21:15,
25
23:5,7,
11
24:23
28:7
34:19
35:3
36:12
37:25
39:16
66:2
67:25
73:15
**speculate**
8:2
46:8
**spending**
20:18
**spoke**
8:19
18:12
**spoken**
18:22
23:17
70:15
**spot**
16:19
**spray**
22:10
59:13,
18,23

**spread**
34:20
**square**
30:22
**squared**
31:8
**squeeze**
30:1
**SRO**
60:8,
13,22
**stages**
42:14
**stand**
63:9
69:9,12
**standard**
41:22
42:3
**standards**
5:24
9:16
16:15
17:14
56:16
**standing**
34:7
**stands**
53:8,12
54:24
**start**
19:16
27:11
28:15
39:20
**started**
14:19
19:19

20:12
23:19
**starting**
20:5
23:9
**starts**
22:20
56:17
**state**
5:11
12:8,16
13:20
**stated**
65:19
69:6
**statement**
71:11
**States**
15:3
**stay**
44:1
63:20
64:1,4,
8
**STENOGRAPHER**
4:24
5:3
75:10
**Stephan**
4:11
**stick**
27:7
**stint**
16:8
**stop**
45:24
65:8

**stopping**
65:22
**street**
74:25
**stress**
21:16,
17,23
22:2,
14,24
25:3,
14,24
26:18
29:15,
25
47:20,
24
48:6,
23,24,
25
49:4,9,
10
50:16,
22 51:5
55:13
57:6,
18,25
58:8,
16,19
67:16
**stresses**
32:7
**stressful**
47:24
**strike**
31:1
42:18
**strong**
37:18

Tyler Wright
07/11/2025

20

| student | sued | sworn | 21:3,20 | 37:14 | team |
|---|---|---|---|---|---|
| 50:4 | 5:20 | 5:7 | 22:1 | 38:18 | 17:7,8 |
| **stuff** | **suit** | 10:9 | 34:15 | 39:1,16 | **technique** |
| 15:22 | 60:2 | 14:11 | 39:4 | 51:4 | 43:10 |
| 16:17 | **summary** | 15:20 | 48:22 | 59:12, | **techniques** |
| 20:13 | 9:9,13 | **sympathetic** | 57:11 | 13,23 | |
| 23:9,10 | 40:12, | 29:16, | 63:18 | 60:1 | 20:5 |
| 25:19 | 18 41:9 | 20 30:6 | 68:2 | 63:4, | 21:17 |
| 28:6,14 | **supervisor** | 37:6,21 | 74:4 | 13,15 | **tells** |
| 50:25 | 15:25 | 55:22, | **talked** | 65:4 | 40:20 |
| 57:17, | **supposed** | 25 | 8:7 | 66:19 | **tend** |
| 21 | 46:13 | 56:5,12 | 47:23 | 68:2,7, | 22:18 |
| 59:12, | 60:12 | 66:7,20 | 55:22 | 11,12 | 57:23 |
| 14 | **suppression** | 67:6, | 58:14 | **taser's** | **term** |
| 63:17 | 16:4 | 19,21 | 61:3 | 36:20 | 21:18 |
| 71:7 | **suspect** | Systems | 63:18 | **tasers** | 27:5 |
| **style** | 21:7 | 53:11 | **talking** | 65:11 | 73:19 |
| 24:5 | 26:9 | _____ | 9:13 | **task** | **terms** |
| 45:24 | 31:4,9, | **T** | 21:25 | 15:22 | 6:7 |
| 46:24 | 13,21, | **table** | 24:16 | **tasks** | 12:10, |
| 55:9 | 24 32:9 | 40:13, | 30:7 | 33:10 | 15 |
| **subject** | 33:19 | 18 41:9 | 35:19 | **taught** | 18:14 |
| 7:13 | 73:13, | **tactic** | 49:10 | 22:15 | 21:4, |
| 47:14 | 14,16, | 63:22 | 50:25 | 23:1,4 | 13,22 |
| 52:13 | 23,24 | **tactical** | 64:10 | 48:6 | 22:13 |
| 54:13 | 74:13 | 27:6 | 65:22, | 74:11 | 23:12 |
| 57:8 | **suspects** | **tactics** | 23 66:2 | **teach** | 25:12 |
| 63:4,13 | 26:1 | 19:20 | **talks** | 19:24 | 26:12, |
| 64:6 | **SWAT** | 22:6 | 49:3 | 21:11 | 15,24 |
| 68:14 | 17:7,10 | 25:6 | **target** | 23:23 | 27:1 |
| 71:6 | 19:23 | 53:1,14 | 30:22 | 35:24 | 30:25 |
| **subject's** | **swear** | **taking** | 31:9 | 36:2,3, | 34:17 |
| 69:16 | 4:23,24 | 19:16 | 43:7 | 6 53:24 | 43:11 |
| **subjects** | **switch** | 20:12 | 48:17, | 73:12 | 45:8,14 |
| 47:3,15 | 44:5 | 33:15 | 20 | **teacher** | 48:5 |
| **subtopics** | **switched** | 74:5 | **taser** | 60:11 | 49:12 |
| 25:11 | 42:4 | **talk** | 22:5 | **teaching** | 50:10 |
| | | 13:4 | 25:5 | 39:18 | 52:17 |
| | | | 36:8, | 51:21 | 53:23 |
| | | | 15,18 | 58:15 | |

58:14
61:4,23
65:9

**testified**
5:7
28:16
70:15

**testify**
6:21
8:1

**testifying**
6:23

**testimony**
51:3
69:10
72:7
75:7

**theirselves**
32:22

**theme**
43:13

**thing**
24:15
27:8
28:23
34:3
59:19
74:6

**things**
6:19
19:13
20:5
22:23
23:10,
13,19,

20
24:11
26:20,
21 28:9
33:7
35:25
36:2
48:1
49:12
58:10
59:11
62:5
74:5

**thinking**
29:1

**thought**
62:22

**threat**
66:11
69:8,
14,20

**threshold**
73:19

**tight**
43:12

**time**
4:5,13
7:2,18
9:9
10:25
13:18
14:16,
25
15:11,
19
16:19,
25
20:17,
23

23:16
29:7
31:19
34:6
36:9,25
37:2,5
38:2,6
42:7
47:10
53:25
54:5
59:24
61:6,9,
11 62:4
63:5,
14,19,
21
64:1,4,
9,12,
15,16
65:4,
12,15,
25
66:5,20
68:2,
12,15
70:1,23
73:1
74:5,9,
20
75:13,
14

**times**
26:24
40:23
41:17

**titles**
35:1

**Titusville**
4:20

5:17
12:12
13:1,9
14:9,
15,21,
24 15:6
19:3
27:25
34:16
36:7
40:14
51:22
67:25
68:6
71:23
72:11,
18
74:12,
23

**Tobacco**
15:20

**today**
4:22
5:23
6:11,22
7:2,11,
18,25
9:4
10:3,
11,13,
16
11:14,
15,19
12:10
15:6
17:25
20:7
45:15
51:3
52:2
58:4

63:1,9
69:10
71:24
72:7

**today's**
4:4
8:10,14
11:4,6
19:9
58:7
59:12
62:18
72:4
75:7

**Todd**
18:18

**ton**
21:10

**tool**
36:20,
21
59:17
63:22

**tools**
54:6
55:19
59:14
61:15

**top**
21:18
22:10
55:5
64:25

**topic**
25:7

**topics**
19:21,
24
21:10,
13,20

22:1
23:5
24:24
25:4,8,
10 53:6
63:16

**touched**
58:6

**tough**
7:12

**track**
12:3

**tracking**
42:20

**traffic**
17:3
45:24

**train**
21:11
32:22
34:2
35:15
38:11,
13
63:15
72:25
73:15,
25
74:24

**trained**
32:4
36:8
37:3
58:11
72:11
73:8,12

**trainer**
72:17
74:22

| | | | | | |
|---|---|---|---|---|---|
| **training** | 60:1,3, | **transition** | 13,22 | 48:23 | Utah |
| 6:2 | 5 61:5 | | 57:17 | 50:15 | 12:22 |
| 17:15 | 63:7,12 | 36:13, | 67:6 | **understandable** | **utilizing** |
| 19:2,4, | 65:3, | 18 | **typed** | | |
| 5,12 | 10,13, | 39:3,8 | 9:9,13 | 7:14 | 45:11 |
| 20:19, | 22 | 64:9 | 10:1 | **understanding** | ———— |
| 20 | 72:20 | **transitioning** | **typical** | | |
| 21:4,6, | 73:1 | | 7:3 | 6:1 | **V** |
| 12,23 | **trainings** | 36:21 | 46:24 | 26:16 | **vacation** |
| 22:5,6, | | **treat** | **typically** | 28:16, | 8:22 |
| 8 24:4, | 40:13, | 48:19 | | 21 | **variables** |
| 20 | 21 55:5 | **trigger** | 31:21 | 30:17 | |
| 25:13, | 63:17 | 31:18, | 32:2,12 | 49:11 | 33:9,18 |
| 16,23 | **transcribed** | 19 | 57:22 | 55:23 | **verbal** |
| 32:22 | | 43:2,8, | ———— | **understood** | 6:16 |
| 33:6 | 6:12 | 9,14,15 | | | **version** |
| 34:10, | 9:20 | 48:8,16 | **U** | 6:20 | 44:15 |
| 16,20 | 10:12 | 67:11 | **ultimately** | 7:24 | 59:10 |
| 36:11, | **transcript** | **true** | | 8:4 | **versions** |
| 24 | | 32:6 | 18:3 | 51:3 | 27:7 |
| 38:10, | 6:15 | **truth** | 61:18 | **unholster** | **versus** |
| 14,19 | 11:12 | 4:25 | **uncontrolled** | | 4:7 |
| 39:16 | 56:15 | 5:1 | | 27:22 | 28:10 |
| 41:7 | 57:3 | **tunnel** | 29:21, | **unholstering** | 33:9 |
| 43:13 | 62:18 | 22:19 | 22 | | 43:15 |
| 48:2 | 63:2 | 50:23 | **uncooperative** | 27:14 | **video** |
| 49:1,5, | 64:24 | **turns** | | **unit** | 4:3,6, |
| 18 | **transcription** | 39:2 | 47:3,14 | 16:4 | 12 |
| 52:17, | | 73:24 | **understand** | 17:3 | 10:15, |
| 21 | 9:21,25 | **two-part** | | 60:9 | 16 35:8 |
| 54:14, | 10:3,5 | 59:9 | 5:19 | **United** | 69:6, |
| 15 | 11:10 | **Tyler** | 6:24 | 15:3 | 11,13 |
| 55:11 | **transferred** | 4:3 | 7:6,9 | **unjustified** | 75:13 |
| 57:5, | | 5:13 | 15:12 | | **videos** |
| 11,20 | 15:16 | **type** | 18:10 | 66:10 | 23:15, |
| 58:14, | 16:13 | 21:9 | 26:21 | 67:1 | 18 |
| 19,22, | 17:13, | 26:4,7, | 33:2,23 | **unquote** | 24:8,9, |
| 24,25 | 20 | 10 | 38:13 | 60:8 | 11 |
| 59:2,4, | | 28:6, | 46:12, | | **violated** |
| 5,10, | | | 17 | | 31:16 |
| 12,16, | | | | | |
| 20 | | | | | |

Tyler Wright
07/11/2025

23

**violating**
29:18
30:2
**violent**
16:5
**vision**
22:19
25:18
50:23
**visualiz ing-type**
23:10

**W**

**W-R-I-G-H-T**
5:13
**walk**
23:9
**walking**
23:13
48:9
**wall**
74:2
**wanted**
19:10
59:14
**wanting**
48:17
55:20
**watch**
23:18
**watched**
24:2
42:13
61:16

**Watching**
61:25
**Watson**
54:10
55:2
**ways**
23:1
30:19
**weapon**
31:13
33:20
37:22
38:2,6
42:14, 19
44:1,4, 8 48:19
64:15
**week**
8:21,24
9:1
62:19
**White**
57:12
58:9
**wielding**
66:4
**wished**
62:22
**word**
45:15
**work**
12:25
33:5
43:2,14
**worked**
14:24
**working**
14:8

16:2
17:16
**worse**
33:10
**Wright**
4:4,20
5:13,14
12:1
40:7
49:23
56:17
62:17
71:21
75:8
**write**
20:3
50:9
**written**
42:23
43:21
50:5
51:9,11
53:5
72:14
**wrong**
23:19
31:11
37:22
62:22
67:14
**wrote**
19:25
20:9
46:7

**Y**

**year**
14:4
20:10

**years**
15:11, 15
16:2,11
**yellow**
57:14
58:9
**yesterda y**
8:19
18:13
**young**
12:24
**Youtube**
24:10, 13