Matthew Gonzalez
07/30/2025

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


JAMIYAH ROBINSON,
as personal Representative of the
ESTATE OF JAMES LOWERY,
DECEASED,

     Plaintiff,

v.                   CASE NO. 6:23-cv-01313-PGB-LHP

JOSHUA NATHAN PAYNE, individually
and as an agent and employee of the
Titusville Police Department, and
CITY OF TITUSVILLE, FLORIDA,

     Defendants.

_____/


VIDEO-RECORDED DEPOSITION OF
MATTHEW GONZALEZ


Wednesday, July 30, 2025
1:06 p.m. – 2:09 p.m.


LOCATION:  Remote via Zoom
Titusville, Florida


STENOGRAPHICALLY REPORTED BY:
DAVID A. DEIK, CP, CPE

Matthew Gonzalez
07/30/2025

Page 2

```
 1  APPEARANCES:
 2
 3  ON BEHALF OF THE PLAINTIFF:
 4          HART McLAUGHLIN & ELDRIDGE, LLC
            One South Dearborn, Suite 1400
 5          Chicago, Illinois 60603
 6      BY:  JOHN MARRESE, ESQUIRE
            (Lead Counsel Pursuant to L.R. 2.02(a))
 7          jmarrese@hmelegal.com
            (Appearing remotely via Zoom)
 8
 9  ON BEHALF OF THE DEFENDANT
10  CITY OF TITUSVILLE, FLORIDA:
11          ROPER, TOWNSEND & SUTPHEN, P.A.
            255 South Orange Avenue., Suite 750
12          Orlando, Florida 32801
13      BY:  RAMON VAZQUEZ, ESQUIRE
            rvazquez@roperpa.com
14          (Appearing remotely via Zoom)
15
16  ON BEHALF OF THE DEFENDANT JOSHUA NATHAN PAYNE,
    Individually and as an agent employee of the
17  Titusville Police Department:
18          ROBERTS, REYNOLDS, BEDARD & TUZZIO, PLLC
            470 Columbia Drive, Suite C101
19          West Palm Beach, Florida 33409
20      BY:  JAMES R. JIMENEZ, ESQUIRE
            jjimenez@rrbpa.com
21          (Appearing remotely via Zoom)
22
23  ALSO PRESENT:
24          Lexitas
            Jason Stapleton, videographer
25          (Appearing remotely via Zoom)
```

Page 3

```
 1  APPEARANCES (continued):
 2
 3          Lexitas
            Jason Stapleton, videographer
 4          (Appearing remotely via Zoom)
 5
            Lexitas
 6          Denise M. Sheffield, Notary Commission
            No. HH-446131, State of Florida
 7          expiration date 9/20/27
            (Appearing remotely via Zoom)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           I N D E X
 2  DESCRIPTION                              PAGE
 3  VIDEOGRAPHER INFORMATION                   3
 4  NOTARY INFORMATION                         3
 5  CERTIFICATE OF REPORTER                   44
 6  READ AND SIGN LETTER                      45
 7           - - -
 8  EXAMINATIONS                             PAGE
 9  MATTHEW GONZALEZ
10      Direct Examination by Mr. Marres      7
10      Cross-Examination by Mr. Jimenez     41
11           - - -
12       INDEX OF EXHIBITS
13  NO.  DESCRIPTION                         PAGE
14  1    Body cam video                       38
15  2    Supplemental case report             39
16  3    2/9/22.  Internal Affairs or         40
            administrative investigation portion
17          of the report that is a transcript
            of an interview of Officer Gonzalez
18
             - - -
19
        (STENOGRAPHER'S NOTE:  The exhibits were
20
    not received at the time of production and
21
    distribution of the transcript.)
22
23
24
25
```

Page 5

```
 1      (Thereupon, the following deposition began
 2  at 1:06 p.m.:)
 3      THE VIDEOGRAPHER:  We're on the record.
 4  This is Media Unit Number 1.
 5      We are here today, July 30, 2025, at
 6  approximately 1:06 p.m. for the video deposition
 7  of Officer Matthew Gonzalez in the case styled
 8  Jamiyah Robinson, et al. vs. Joshua Nathan Payne,
 9  et al, Case Number 6:23-cv-01313-PGB-LHP.  The
10  videographer is Jason Stapleton and our
11  stenographer is Dave Deik.
12      At this time would counsel please state
13  their appearances for the record.
14      MR. MARRESE:  John Marrese on behalf of the
15  plaintiff.
16      MR. VAZQUEZ:  Ramon Vazquez on behalf of
17  defendant City of Titusville.
18      MR. JIMENEZ:  And James Jimenez on behalf
19  of defendant Joshua Payne.
20      THE NOTARY:  Good afternoon.  My name is
21  Denise Sheffield.  I'm a commissioned online
22  notary with the State of Florida, and I'll be
23  administering your oath to you today.
24      Officer Jimenez [sic], can you please
25  provide your government-issued photo ID and hold
```

Matthew Gonzalez
07/30/2025

Page 6

1  it in front of the camera?
2       THE WITNESS:  You mean Officer Gonzalez?
3  Because I'm -- I'm Officer Gonzalez, not Jimenez.
4       THE NOTARY:  Did I say that incorrectly?  I
5  apologize.
6       Officer Gonzalez, before we begin can you
7  please provide your government issued photo ID
8  and hold it in front of the camera?
9       THE WITNESS:  I understand.
10      THE NOTARY:  Okay.  Thank you.
11      And what city and state are you currently
12  located in; Titusville, Florida?
13      THE WITNESS:  I live in Rockledge, Florida.
14      THE NOTARY:  Right now where are you
15  currently located?
16      MR. JIMENEZ:  No, no.  We're in Titusville.
17      THE WITNESS:  Yeah, we're in Titusville
18  currently.  I'm sorry.
19      THE NOTARY:  Thank you very much.
20      And do you consent to my administering this
21  oath remotely?
22      THE WITNESS:  Yes, ma'am.
23      THE NOTARY:  Please raise your right hand.
24      Officer Gonzalez, do you swear or affirm
25  that the testimony that you are about to give is

Page 7

1       the truth, the whole truth, and nothing but the
2       truth?
3            THE WITNESS:  I do.
4            THE NOTARY:  At this time I'll be leaving
5       the meeting.  Have a good day.
6  THEREUPON,
7                 Matthew Gonzalez
8       having been first duly sworn remotely via Zoom by
9       Denise M. Sheffield, Notary Public, State of
10      Florida, was examined and testified as follows:
11                 DIRECT EXAMINATION
12  BY MR. MARRESE:
13      Q    Good morning, Officer Gonzalez.  My name is
14  John Marrese.  I'm the attorney for plaintiff who will
15  be taking your deposition today.
16           Would you just please start by stating your
17  name for the record?
18      A    My name is Matthew Gonzalez.
19      Q    Thank you for joining us here today.
20           Have you given a deposition in a civil
21  lawsuit before?
22      A    No, sir.
23      Q    Okay.  Just a couple of ground rules that
24  you're probably a little bit familiar with, but I'll
25  go over them with you with regards to how today will

Page 8

1  proceed.  Okay?
2       A    Yes, sir.
3       Q    All right.  This will be a
4  question-and-answer session under oath.  So, it's as
5  if you're giving testimony in a courtroom in front of
6  a judge or a jury or any kind of sworn statement that
7  you would as a police officer.  Does that make sense?
8       A    Yes, sir.
9       Q    All right.  Thank you.
10           If you don't understand -- I'll be asking
11  most of the questions today.  If you don't understand
12  a question that I've asked you, just tell me.  And if
13  it doesn't make sense, I'll rephrase it for you.
14  Okay?
15      A    Yes, sir.
16      Q    All right.  You're going to hear objections
17  to my questions from time to time.  You might hear
18  "Objection; form," things like that.  That's just a
19  lawyer preserving his rights in the litigation.  It's
20  a typical part of the process.
21           Unless you're instructed otherwise by your
22  attorney, I'm going to ask you to answer the question
23  I've posed anyway after the objection, if you
24  understand it.  Okay?
25      A    Okay.

Page 9

1       Q    All right.  I don't want you to guess or
2  speculate today.  You're here in your capacity to
3  testify about personal knowledge that you have
4  relating to the December 26, 2021 shooting of James
5  Lowery and events surrounding that.
6            But if you don't know the answer to a
7  question personally, I don't want you to speculate.  I
8  just want you to tell me "I don't know."  Okay?
9       A    Yes, sir.
10      Q    All right.  Thank you.
11           Breaks.  We can take breaks at any time you
12  want today.  Just let me know.  The only exception is
13  if I've asked you a question, I'll have you answer it
14  before we take the break.  Okay?
15      A    Yes, sir.
16      Q    All right.  I don't expect today will be
17  terribly long, but that rule, you know, applies all
18  the same.  Whenever you need a break, just let me
19  know.  Okay?
20      A    Yes, sir.
21      Q    All right.  And you're going to anticipate
22  a lot of the questions I ask you.  If we were, you
23  know, kind of chatting in an informal session, we
24  could interrupt each other.  We'd interject with
25  stories, everything like that.

Mattew Gonzalez
07/30/2025

Page 10

1      Today, since it's a formal process and
2 since a court reporter is writing down everything that
3 you and I and anyone else says, please wait until I
4 finish my question before you answer.  And I need to
5 do the same, wait until you finish giving your answer
6 before I ask my next question.  Does that make sense?
7      A    Yes, sir.
8      Q    All right.  Thank you.
9      And you understand you are not a defendant
10 in this civil lawsuit?
11     A    Yes, sir.
12     Q    All right.  Great.
13     I just have a few questions about what, if
14 anything, you did to prepare for today's deposition.
15 I don't want to know about any conversations you had
16 with your lawyer or lawyers.  Those are privileged and
17 protected.
18     But I do generally want to know what you
19 did to prepare.  So with that, my first question is:
20 Did you meet with any attorneys to prepare for today's
21 deposition?
22     A    Yes, sir, Mr. Vazquez.
23     Q    All right.  Great.  And when did you meet
24 with Mr. Vazquez?
25     A    Yesterday at 1 o'clock.

Page 11

1      Q    And how long did that meeting last?
2      A    Approximately an hour at most.
3      Q    Thank you.
4      And other than that meeting, did you meet
5 with any other attorneys to prepare for today's
6 deposition?
7      A    No, sir.
8      Q    And did you review any documents as a part
9 of your preparation for today?
10     A    No, sir.
11     Q    There is body cam or Axon camera video from
12 you and others that have been produced to the
13 plaintiff in this litigation.  Did you review any of
14 that body camera?
15     A    No, sir.
16     Q    All right.  So you haven't reviewed any
17 documents.  You haven't reviewed any body camera.
18     In preparation for today specifically, did
19 you do anything else other than meet with your
20 attorney to prepare for today?
21     A    No, sir.
22     Q    All right.  No Internet research or
23 anything like that?
24     A    No, sir.
25     Q    Okay.  Thank you.

Page 12

1      Have you ever texted former officer Joshua
2 Payne about this incident?
3      A    Not that I can recall.
4      Q    Okay.  Do you -- well, strike the question.
5      Were you -- well, describe the nature of
6 your relationship with Officer Payne when he worked at
7 the Titusville Police Department.
8      A    He was an officer on my squad.
9      Q    And were you close with him?
10     A    I suppose.
11     Q    Okay.  Did you guys have a social
12 relationship outside of work?
13     A    Yes, sir.
14     Q    Okay.  And so apart from being on the force
15 together, occasionally you'd hang out outside of work?
16     A    Yes, sir.
17     Q    Okay.  In terms of how close you were with
18 Officer Payne, were you -- was it one of your closest
19 friends, you know, outside of work or just more, you
20 know, one of -- one of the bunch?
21     A    Just one of the bunch.
22     Q    Okay.  All right.  Thanks.
23     A few questions about your background
24 generally.  Did you graduate from high school?
25     A    Yes, sir, I did.

Page 13

1      Q    And where did you graduate from?
2      A    Prescott High School in Prescott, Arizona.
3      Q    And when did you move to Florida?
4      A    Approximately five years ago.
5      Q    Okay.  Thank you.
6      And how old are you?
7      A    I am 25.
8      Q    And how long have you been a law
9 enforcement officer?
10     A    Approximately five years.
11     Q    And so that was the first job you took when
12 you moved from Prescott to Florida?
13     A    No, sir.
14     Q    Okay.  What did you do before you got into
15 law enforcement?
16     A    I worked at Publix.
17     Q    Okay.  And when you were working there, did
18 you have a plan to get into law enforcement?
19     A    Yes, sir.
20     Q    Okay.  And when did you join the Titusville
21 Police Department?
22     A    My -- my hire date was 11/11 of 2019.
23     Q    Thank you.
24     And are you still currently with the
25 Titusville Police Department?

Matthew Gonzalez
07/30/2025

Page 14

1    A    Yes, sir, I am.
2    Q    And what is your rank in the department
3  today?
4    A    I am a police officer.
5    Q    Thank you.
6         And have you held your role as a Titusville
7  police officer since November of 2019 continuously to
8  today?
9    A    I'm sorry.
10   Q    That's okay.
11        It's been continuous?
12   A    Yes, sir.
13   Q    And do you hold any outside employment?
14   A    No, sir.
15   Q    Thank you.
16        What brought you to Florida?
17   A    Just family decided to move here.
18   Q    Thank you.  Okay.
19        And as an officer with the Titusville
20  Police Department, have you ever received any
21  discipline?  And by "discipline," I mean an actual
22  formal reprimand, suspension or anything of that
23  caliber?
24   A    To our policy, I have not received any
25  discipline.

Page 15

1    Q    Okay.  Thank you.
2         And just to be clear, I'm not talking about
3  if a supervisor gave you feedback about something you
4  did or said, hey, you could do this better next time.
5  But in terms of actual formal discipline within the
6  department, you haven't had any; is that correct?
7    A    Yeah, correct.  So our policy states that
8  discipline starts at suspension, and I've never been
9  suspended.
10   Q    Okay.  Have you ever had any kind of
11  written reprimand short of a suspension?
12   A    Yes, sir.
13   Q    And for what?
14   A    I don't recall.
15   Q    Okay.  You would -- you would deem it a
16  pretty low level type reprimand?
17   A    Yes, sir.  If I could give an example, I
18  think one was for, like -- now that I'm thinking about
19  it, it was, like, a car accident.  I think I was
20  involved in an accident.  And I got written up for
21  that.
22   Q    Yeah.  So, like, you were in your patrol
23  vehicle and got into an accident, and --
24   A    Yes.
25   Q    -- of course that led to a reprimand for

Page 16

1  that.
2    A    Yes, sir.
3    Q    Okay.  Thank you.
4         I did some Internet research online.  And I
5  saw that you received an officer of the year award in
6  2022.  Am I correct about that?
7    A    Yes, sir.
8    Q    Okay.  And in addition to that, have you
9  received any other commendations in your time as a
10  police officer?
11   A    Yes, sir.
12   Q    Can you tell us what they are?
13   A    I have lifesaving awards, exceptional
14  service awards, officer of the month, employee of the
15  month for the City of Titusville, and a few more I
16  can't -- probably can't think of all of them.
17   Q    Thank you.
18        And in terms of your plans as of today -- I
19  know you can't predict the future with certainty, but
20  is your plan as of today to remain a Titusville police
21  officer?
22   A    Yes, sir.
23   Q    Okay.  Moving to the shooting that's at
24  issue in this case, did you see the shooting?
25   A    No, sir.

Page 17

1    Q    Did you hear Officer Payne fire any shots?
2    A    Not that I can recall.
3    Q    And when I ask you that question, I'm
4  distinguishing the hearing of shots from hearing over
5  the radio that shots were fired, right?  Those are two
6  different things?
7    A    Correct.
8    Q    And so I understand your testimony
9  correctly, you don't recall hearing any shots fired by
10  then Officer Payne, correct?
11   A    Correct.
12   Q    Have you ever spoken to Officer Payne about
13  the shooting?
14   A    No, sir.
15   Q    Do you remain in contact with Mr. Payne?
16   A    Not anymore, no, sir.
17   Q    All right.  And when was the last time that
18  you've spoken with him?
19   A    I don't recall.
20   Q    So for certain you haven't talked to him in
21  2025.  Is that fair?
22   A    I'm not sure.  I may have.
23   Q    Okay.
24   A    Not a hundred percent positive.
25   Q    You remember the last time you saw him?

Page 18

1    A    No, sir.
2    Q    Okay.  And do you know what he's doing for
3  a living or otherwise right now?
4    A    No, sir.
5    Q    All right.  For a little bit now I'm going
6  to pull up body camera video -- Axon camera video that
7  I have for you in this case.
8         And what we'll do generally is, I'll play,
9  you know, some period of time of the video, have you
10  watch it and listen, and then I'll ask you a few
11  questions.  Okay?
12    A    Yes, sir.
13    Q    All right.  Thank you.
14         For the record, this is going to be body
15  camera video provided for Officer Gonzalez.  There's a
16  total of about four hours.  It's four hours and two
17  seconds in particular of footage.  And it's labeled
18  S22D, Matt Gonzalez.
19         Can you see that video on your screen right
20  now?  It's frozen, but can you see that?
21    A    Could you make it a little bit bigger?
22    Q    Yeah, I think I can.  How about that?
23    A    Yes, sir.
24    Q    All right.  Great.
25         It's -- it's very dark right now, right,

Page 19

1  what you see?
2    A    Yes, sir.  Looks like the inside of a car.
3    Q    All right.  Let me start it at the very
4  beginning.  So, at zero.  And like all body camera, it
5  takes about 30 seconds before sound to kick in.
6         (Audio played, partially garbled.)
7  BY MR. MARRESE:
8    Q    All right.  Stopping the video at 32
9  seconds there.  Do you recognize the woman in the
10  video?
11    A    Yes, sir.
12    Q    Okay.  And do you recall her name?
13    A    I do not.
14    Q    Okay.  I'll pull it up here.  Give me a
15  minute.
16         This is the complainant that prompted what
17  I'll refer to as a domestic battery investigation on
18  December 26, 2021 going into December 27th.  Is that
19  fair?
20    A    Yes, sir.
21    Q    Okay.  And were you the first officer to
22  speak with her?
23    A    Yes, sir.
24    Q    Okay.  Let me continue playing the video.
25         (Audio played, partially garbled.)

Page 20

1  BY MR. MARRESE:
2    Q    All right.  Stopping it at a minute and
3  six, the victim has told you that the suspect is
4  wearing a black jacket, jeans, and is a black male
5  with dreds?
6    A    Yes, sir.
7    Q    Okay.  Let's continue for a minute.
8         (Audio played, partially garbled.)
9  BY MR. MARRESE:
10    Q    Okay.  You had mentioned the word "battery"
11  in the portion of the video between a minute and a
12  minute and a half that I just played.  Did you hear
13  that?
14    A    Yes, sir.
15    Q    Okay.  And that's you identifying the
16  nature of the offense that you suspected?
17    A    Yes, sir.
18    Q    Okay.  Thank you.  Thank you.
19         Did you notice any injuries on this
20  complainant that night?
21    A    Yes, sir.
22    Q    What did you notice?
23    A    She had a visible injury, I believe below
24  one of her eyes, and she also had a ripped shirt.
25    Q    Okay.  I'm going to play the video for some

Page 21

1  time further here, just to provide us some context.
2         (Audio played, partially garbled.)
3         MR. MARRESE:  Pausing at two minutes and 35
4    seconds into the body camera video.
5  BY MR. MARRESE:
6    Q    Two officers with the Titusville Police
7  Department just walked up near you, correct?
8    A    Yes, sir.
9    Q    And who are those two officers?
10    A    That's Officer Tyrone Logan and former
11  officer Brian Deal.
12    Q    Okay.  And Logan being in the front right
13  now in the freezed frame and Deal being in the back?
14    A    Yes, sir.
15    Q    All right.  Thank you.
16         I'll continue playing it at 2:35.
17         (Audio played, partially garbled.)
18         MR. MARRESE:  All right.  Stopping the
19    video at three minutes, 12 seconds.
20         MR. VAZQUEZ:  I'm sorry to interrupt.  I
21    just have a question.
22         Is the court reporter taking down what's
23    said in the video, or are you just playing it?
24         MR. MARRESE:  I don't know the answer to
25    that question.  I'm certainly playing it.

Page 22

1    MR. VAZQUEZ:  Okay.
2         Typically we don't take down what's in the
3    video.  I know you're going to submit it as an
4    exhibit.  And that's fine.  It just creates a
5    longer transcript.
6         THE STENOGRAPHER:  This is the court
7    reporter.  Not only that; it's pretty difficult
8    to get every word because it's kind of wonky.
9         MR. VAZQUEZ:  Okay.  That's acceptable.
10        THE STENOGRAPHER:  I won't take it.
11        MR. VAZQUEZ:  Thank you.
12        And I know that John is identifying the
13   time frame, so that's fine.
14        THE STENOGRAPHER:  Yes.
15        MR. VAZQUEZ:  Yes.
16        MR. MARRESE:  Okay.  Thank you.
17        All right.  Let me know when we're back on.
18        THE WITNESS:  I can see the screen again,
19   sir.
20        MR. MARRESE:  Okay.  Great.
21   BY MR. MARRESE:
22        Q    Okay.  So I'm stopping at three minutes and
23   12 seconds, Officer Gonzalez.
24        And in that portion of the video that I
25   just played for you, you've asked the complainant the

Page 23

1    name of the suspect.
2         And she says, Rico.
3         Did you hear that?
4         A    Yes, sir.
5         Q    When she told you it was Rico, were you --
6    did you know who it was that she was talking about?
7         A    No, sir.
8         Q    Okay.  Ultimately the police report
9    identifies the suspect that had engaged with this
10   complainant as Alton Johnson.  Does that -- do you
11   recall that?
12        A    No, sir.
13        Q    Okay.  Do you know an Alton Johnson in that
14   area as Rico?
15        A    No, sir.
16        Q    Okay.  And you didn't on this night?
17        A    No, sir.
18        Q    Do you know if any other officer did?
19        A    I do not.
20        Q    Thank you.
21        All right.  I'll continue at three minutes
22   and 12 seconds.
23        (Audio played, partially garbled.)
24        MR. MARRESE:  Pausing the video at three
25   minutes, 59 seconds.

Page 24

1    BY MR. MARRESE:
2         Q    You've gotten back into your police
3    vehicle, correct?
4         A    Yes, sir.
5         Q    And what are you doing at this point?
6         A    I'm leaving the area of the victim to go
7    canvas the area for the suspect.
8         Q    Okay.
9         And then Officers Logan and Deal were going
10   to take over with the complainant or victim at that
11   point?
12        A    Yes, sir.  They assumed the investigation.
13        MR. MARRESE:  Okay.  All right.  I'll begin
14   playing again.
15        (Audio played, partially garbled.)
16   BY MR. MARRESE:
17        Q    Pausing at four minutes and 37 seconds on
18   the video.
19        In the last few seconds we heard some
20   buzzing and kind of a sound.  You know, I don't know
21   how to describe it.  Like a -- you know, a
22   notification type sound.  Did you hear that?
23        A    No, sir.
24        Q    Okay.  Well, let me go back and play it.
25        (Audio played, partially garbled.)

Page 25

1    BY MR. MARRESE:
2         Q    Did you hear that?
3         A    I did not, sir.
4         Q    Oh.
5         (Audio played, partially garbled.)
6         A    I heard that.
7    BY MR. MARRESE:
8         Q    You heard that.  Okay.
9         Do you know what that is?
10        A    Sounds like my body cam.
11        Q    Okay.  And do you know why it does that?
12        A    They auto vibrate every so often.  I'm not
13   sure.
14        MR. MARRESE:  Okay.  Continue playing at
15   4:32.
16        (Audio played, partially garbled.)
17   BY MR. MARRESE:
18        Q    Did you hear that?
19        A    No, sir.
20        Q    That's strange.
21        MR. MARRESE:  Ramon, are you hearing that?
22        MR. VAZQUEZ:  No.
23   BY MR. MARRESE:
24        Q    So there's no, like, ringing sound that you
25   hear?

Matteo Gonzalez
07/30/2025

Page 26

```
 1              MR. VAZQUEZ:  No, sir.
 2       A    No.
 3  BY MR. MARRESE:
 4       Q    I'm hearing it on my end.  That's odd.  All
 5  right.
 6       A    Just so you're aware, like, the video has
 7  kind of been, like, gargly, almost like someone's
 8  under water.  So I'm catching -- I thought it was that
 9  way for you as well, but some of the words that are
10  being said I can't hear all of, or even when I was
11  talking to Officer Deal and Officer Logan.
12       Q    No.  I -- I -- that's the same for me.  I
13  think it depends on where you're standing.  I think
14  from time to time some of the words are not going to
15  be that clear to you.  So I -- I -- I think you and I
16  are hearing the same thing in that respect.
17       A    Understood.
18            (Audio played, partially garbled.)
19            MR. MARRESE:  All right.  Stopping the
20       video at six minutes, 22 seconds in.
21  BY MR. MARRESE:
22       Q    This is you investigating the domestic
23  complaint?
24       A    Yes, sir.
25       Q    Okay.  And this is the first gentleman that
```

Page 27

```
 1  you speak with in that regard?  He turns out not to be
 2  the Rico you're looking for.  Is that fair?
 3       A    Yes, sir.
 4            MR. MARRESE:  Okay.  Continue playing at
 5       six minutes, 22 seconds.
 6            (Audio played, partially garbled.)
 7            MR. MARRESE:  Okay.  Stopping the video at
 8       eight minutes and 38 seconds in.
 9  BY MR. MARRESE:
10       Q    So, you finished --
11       A    So, I don't know if it's an issue on your
12  end as well, but it's saying your net width -- band
13  width is low, and you're kind of breaking up.  And I'm
14  not seeing the video anymore.  So, I don't know if
15  it's just our computer or not.
16       Q    Let me stop the share and reshare it.
17            Can you hear me?  Can y'all hear me?
18       A    I can hear you now, sir.
19       Q    Okay.  And do you see the freezed screen?
20            THE STENOGRAPHER:  Yeah.  He was frozen.
21       It's his computer.
22            MR. MARRESE:  Yeah.  He just dropped out.
23       Go off the record.  Time is . . . hang on.
24            (Discussion off the record.)
25            MR. VAZQUEZ:  Who was -- who was -- who was
```

Page 28

```
 1  frozen?  I heard you say --
 2            THE WITNESS:  All right.  I think it's our
 3  Internet.  It just keeps kind of . . .
 4            MR. JIMENEZ:  Are we still on the record?
 5            MR. VAZQUEZ:  Yeah.  We're using the police
 6  department's Internet here and WiFi, so I'm not
 7  sure if it's our end.
 8            MR. MARRESE:  Okay.  Are you guys able to
 9  hear me right now?
10            THE WITNESS:  Yeah, we can hear you now.
11  There was like a message popped up and said your
12  Internet connection is unstable.  So, if that
13  comes back up, we'll try to let you know or if I
14  can't hear you, I'll let you know.
15            MR. MARRESE:  Okay.  Thanks.
16  BY MR. MARRESE:
17       Q    Let me go back to the body camera video.
18            My question was going to be:  The portion
19  that we just watched and I stopped it at eight minutes
20  and 38 seconds in, that was you talking to that same
21  male.  You determined he wasn't the suspect you were
22  looking for, and you moved on, correct?
23       A    Yes, sir.
24       Q    All right.  I'm going to move ahead now
25  closer in time to when you come upon Officer Payne in
```

Page 29

```
 1  the body camera video.  Okay?
 2       A    Yes, sir.
 3       Q    All right.  I'm going to start it at 12:48,
 4  so 12 minutes, 48 seconds in, which is a little before
 5  then, but -- but we'll watch the lead-up.
 6       A    Yes, sir.
 7       Q    Can you see that screen now?
 8       A    Yes, sir.
 9            (Audio played, partially garbled.)
10            MR. MARRESE:  Okay.  Stopping the video at
11       13:14.
12  BY MR. MARRESE:
13       Q    Did you hear foot pursuit called out a
14  moment ago?
15       A    I believe so.
16       Q    Okay.  And do you recall hearing that on
17  the night in question?
18       A    Yes, sir.
19       Q    Okay.
20            Did you know who called out foot pursuit at
21  that point?
22       A    No, sir.
23            MR. MARRESE:  Okay.  I'll start the video
24       again at 13:14.
25            (Audio played, partially garbled.)
```

Matthew Gonzalez
07/30/2025

Page 30

1    MR. MARRESE:  All right.  Let me stop at
2    14:03.
3  BY MR. MARRESE:
4    Q    Did you just hear shots fired called out
5  over the radio?
6    A    Yes, sir.
7    Q    Okay.  And did you know who called that out
8  at that point?
9    A    Yes, sir.
10    Q    Okay.  And you knew that was Officer Payne
11  at that point?
12    A    Yes, sir.
13    Q    Let me continue the video.
14        Well, I should ask:  When you hear shot
15  fired or shots fired, what does that mean to you?
16    A    Means that someone is shooting at the
17  police.
18    Q    Okay.
19        And if a police officer were to call --
20  were to tell you that he or she is shooting at a
21  suspect, what would the proper verbiage be for that?
22    A    We say "shots away."
23    MR. MARRESE:  Okay.  I'm going to continue
24    playing the video at 14:03.
25    (Audio played, partially garbled.)

Page 31

1    MR. MARRESE:  Okay.  I'm pausing the video
2    at 14:33.
3  BY MR. MARRESE:
4    Q    Did you just hear you giving instructions
5  to Officer Payne on scene?
6    A    Yes, sir.
7    Q    Okay.  And one of the things you say is:
8  Get lethal cover on this male.  Did you hear that?
9    A    Yes, sir.
10    Q    What does that mean?
11    A    That means cover their person with -- I --
12  I -- supposed to be your firearm, but I said lethal
13  cover.
14    Q    Okay.  And what is that meant to do?
15    A    It's just officer safety thing.
16    Q    And in terms of officer safety, meaning
17  that you're going to check on the male and you need
18  protection in case something happens?
19    A    Yes, sir.
20    Q    Okay.  And I've freezed the frame here at
21  14 minutes and 33 seconds.
22        And you can see James Lowery lying on the
23  ground, correct?
24    A    Yes, sir.
25    Q    Okay.  And this is from your body camera.

Page 32

1    Is this the first time that you got a
2  glimpse of James Lowery that night?
3    A    I -- I believe so.  I mean, aside from
4  looking over the fence, but I don't recall what I saw
5  when I -- I initially looked over the fence before I
6  climbed over it.
7    Q    Okay.  Thank you.
8        But in terms of -- in terms of the
9  positioning that Mr. Lowery is in here in this frozen
10  shot at 14 minutes --
11    A    I'm sorry, sir.  You're breaking up.
12    Q    Okay.  Can you hear me now?
13    A    Disconnect again.
14    (Discussion off the record.)
15  BY MR. MARRESE:
16    Q    Can you hear me, Officer Gonzalez?
17    A    Yes, sir.
18    Q    All right.  I'm going to share the screen
19  again at that 14 minute, 33 second mark.
20    A    Yes, sir.
21    Q    Do you see that?
22    A    Yes, sir.
23    Q    In terms of the position that Mr. Lowery is
24  laying in, is that consistent with your recollection
25  of what he looked like when you first saw him?

Page 33

1    A    Yes, sir.
2    Q    Thank you.
3        And did you have any immediate impressions
4  when you first saw him, in terms of what had occurred?
5    A    No, sir.
6    MR. MARRESE:  Okay.  I'll continue playing
7    the video.
8  BY MR. MARRESE:
9    Q    Well, let me ask before I do:  Had anyone
10  moved Mr. Lowery prior to you seeing him here?
11    A    Not to my knowledge.
12    Q    Thank you.
13    MR. MARRESE:  I will continue playing the
14    video at 14:33.
15    (Audio played, partially garbled.)
16    MR. MARRESE:  Stopping the video at 15
17    minutes, 25 seconds.
18  BY MR. MARRESE:
19    Q    During the portion that I just played, you
20  handcuffed Mr. Lowery, correct?
21    A    Yes, sir.
22    Q    And during that time, did you have an
23  impression as to what the situation was in terms of
24  Mr. Lowery?
25    A    No, sir.

Matthew Gonzalez
07/30/2025

---

Page 34

1    Q    Okay.  Did you suspect he was dead at that
2 point?
3    A    No, sir.
4    Q    Okay.  Did you -- what did you believe in
5 terms of his status?
6    A    He was unresponsive.
7    Q    Okay.  Did you understand that he had been
8 shot?
9    A    No, sir.
10        MR. MARRESE:  Okay.  I'll continue playing
11   the video at 15 minutes, 25 seconds for some
12   time.
13        (Audio played, partially garbled.)
14        MR. MARRESE:  Stopping the video at 16
15   minutes, 13 seconds.
16 BY MR. MARRESE:
17   Q    At one point during the portion of the
18 video I just played, you noted that Mr. Lowery was not
19 breathing, correct?
20   A    Yes, sir.
21   Q    Okay.  And how did you determine that?
22   A    I didn't see his back raising or falling or
23 his chest raising or falling.
24   Q    You remained on scene either with Mr.
25 Lowery's body or near it for several hours thereafter,

---

Page 35

1 correct?
2    A    Yes, sir.
3    Q    Okay.  And Mr. Lowery did not have any
4 weapons on his person, correct?
5    A    Not that I located.
6    Q    Okay.  And you did not locate any weapons
7 near his person either, correct?
8    A    I'm sorry.  You broke up again.  You have
9 to repeat the question.
10   Q    That's okay.
11        And there were no weapons located near Mr.
12 Lowery's person either, correct?
13   A    No, sir, not that I located.
14   Q    Okay.  And you're not aware of anyone
15 locating any weapons, correct?
16   A    No, sir.
17   Q    Okay.  Am I correct?  Sorry.  Just for the
18 record.
19        I'm correct when I say that no weapons
20 associated with Mr. Lowery were recovered on the
21 scene, correct?
22   A    I'm sorry.  I think you have to repeat
23 again.  You broke up.  I'm sorry.
24   Q    That's okay.
25        You are not aware of any weapons being

---

Page 36

1 located on the scene, correct?
2    A    No, sir.  Or I mean yes, sir, I guess.  I'm
3 sorry.
4    Q    Yeah.  Thank you.
5        MR. MARRESE:  I'm going to move ahead to 41
6   minutes into the video.  We'll call it 40 minutes
7   and 47 seconds.
8        (Audio played, partially garbled.)
9        MR. MARRESE:  All right.  Stopping the
10   video at 42 minutes, 25 seconds.
11 BY MR. MARRESE:
12   Q    Who are you talking to in that portion of
13 the video we just played?
14   A    Sergeant Bryan Nelson.
15   Q    And in that portion of the video, you're
16 giving Sergeant Nelson your summary of what had
17 occurred in the minutes prior, correct?
18   A    Yes, sir.
19   Q    And as of today, that's an accurate
20 summary, correct?
21   A    Yes, sir.
22        MR. MARRESE:  Okay.  I'm going to move
23   ahead in the video to an hour and seven
24   minutes -- an hour, seven minutes and five
25   seconds.  And I'll start playing now.

---

Page 37

1        (Audio played, partially garbled.)
2        MR. MARRESE:  Okay.  Stopping the video at
3   an hour eight and 45 seconds.
4 BY MR. MARRESE:
5    Q    Who are you talking with in that portion of
6 the video?
7    A    It looks like Corporal Daniel Gibbons.
8    Q    And you are giving him a summary of what
9 had transpired over the last -- over the course of the
10 last several minutes.  Is that fair?
11   A    Yes, sir.
12   Q    And as a part of what you say there, you
13 say that you were in your car when the shot was fired,
14 correct?
15   A    Yes, sir.
16   Q    Okay.  And that's consistent with what
17 you've said here today, which is that you don't recall
18 hearing a shot fired.  Is that fair?
19   A    Yes, sir.
20   Q    Okay.
21   A    Sir, the heat alarm from my truck for my
22 dog just went off.  Can I run outside to check on him
23 real quick?
24   Q    Yes, you can.
25   A    Thank you.  I'm sorry.

---

Page 38

1      MR. MARRESE:  No problem.
2          We'll take a break, and we'll come back and
3  we won't have too much more.
4      THE VIDEOGRAPHER:  The time is 1:57.  Off
5  the record.
6      (Recess from 1:57 p.m. until 2:04 p.m.)
7      THE VIDEOGRAPHER:  Time is 2:04.  We are
8  back on the record.
9  BY MR. MARRESE:
10  Q    Officer Gonzalez, just to confirm, you
11  didn't see the shooting, didn't hear the shooting,
12  correct?
13  A    Yes, sir.
14  Q    Okay.  Is it fair to say that you're not
15  going to, if you're called at trial, give any opinion
16  as to whether or not former officer Payne's shooting
17  was justified?
18  A    Correct.
19      MR. MARRESE:  Okay.  We'll mark the body
20  cam video as Exhibit 1.
21      (Exhibit 1 will be marked for
22  identification at the time the exhibit is
23  received by the court reporter.)
24      MR. MARRESE:  Exhibit 2 is going to be a
25  supplemental case report that you prepared.  Let

Page 39

1  me pull it up.
2      (Exhibit 2 will be marked for
3  identification at the time the exhibit is
4  received by the court reporter.)
5  BY MR. MARRESE:
6  Q    Do you see that?
7  A    I can't read it.  It's too small, but I can
8  see it.
9  Q    All right.  I'm increasing the size.  Can
10  you see that now?
11  A    Yes, sir.
12  Q    Okay.  And I'm scrolling through it.  It's
13  a two-page narrative.  And the reporting officer on
14  the bottom left-hand side of the first page is
15  identified as 214 Gonzalez, date 12/26/2021, reviewed
16  by Bryan Nelson, 12/27/2021.  Do you see that?
17  A    Yes, sir.
18  Q    Okay.  Do you recognize this as the
19  supplemental narrative that you wrote in this case?
20  A    Yes, sir.
21  Q    Okay.  And you can take the time to read it
22  now.  I have no problem with that, of course.
23      My only question is going to be:  Is this
24  report still an accurate accounting of what occurred
25  in your experience that night?

Page 40

1  A    Yes, sir.
2  Q    Okay.  Thank you.  Let me pull that down.
3      MR. MARRESE:  And then lastly Exhibit 3 is
4  going to be a 12-page exhibit.  It's the Internal
5  Affairs or administrative investigation portion
6  of the report that is a transcript of an
7  interview of you, Officer Gonzalez, conducted on
8  February 9, 2022.
9      (Exhibit 3 will be marked for
10  identification at the time the exhibit is
11  received by the court reporter.)
12      MR. MARRESE:  Let me zoom in a bit.
13      THE WITNESS:  Thank you.
14  BY MR. MARRESE:
15  Q    Lieutenant Matt Demmon did the interview
16  and Sergeant Telly Joiner was present.  Do you recall
17  that interview?
18  A    Yes, sir.
19  Q    Okay.  And I'm just scrolling through it
20  quickly to show you it's a series of questions and
21  answers, that the transcript itself is 11 pages.  The
22  cover page isn't part of the transcript, but that's
23  what makes it 12 pages long.
24      Have you reviewed this transcript at any
25  point in time?

Page 41

1  A    No, sir.
2  Q    My only question for you, then, is:  When
3  you were interviewed by Lieutenant Demmon, you gave
4  truthful answers to the best of your ability based
5  upon your personal experience?
6  A    Yes, sir.
7  Q    Okay.  I don't have any further questions.
8  Thank you very much for your time today, Officer.  I
9  appreciate it.
10  A    Yes, sir.  Thank you.
11      MR. VAZQUEZ:  James, do you have any
12  questions?
13      MR. JIMENEZ:  Just one, I think, quickly.
14          CROSS-EXAMINATION
15  BY MR. JIMENEZ:
16  Q    Good afternoon, sir.  I'll be brief.  I am
17  counsel for former officer Payne in this action.  I
18  believe Mr. Marrese already went over this, but I just
19  want to confirm with you.
20      I know you -- obviously you weren't there
21  for the shooting itself or you didn't hear the shot.
22  You appeared on scene after former officer Payne fired
23  upon Mr. Lowery.
24      Did officer -- former officer Payne ever
25  tell you why he fired upon Mr. Lowery that night?

Page 42

```
1   A    No, sir.
2         MR. JIMENEZ:  Okay.  That's all I have.
3   Thank you.
4         MR. VAZQUEZ:  I don't have any questions.
5         MR. MARRESE:  I don't know -- Ramon, if you
6   want to explain reading or waiving.
7         MR. VAZQUEZ:  He'll read.
8         MR. MARRESE:  He'll read.  Okay.  Great.
9         That's it, Officer Gonzalez.  Thanks again.
10  I'm glad we were able to get you out relatively
11  quickly.  Sorry to take up your time.  We do
12  appreciate it.
13        THE WITNESS:  Yes, sir.  Thank you.
14        THE VIDEOGRAPHER:  Are you buying a copy of
15  the transcript or video?
16        MR. MARRESE:  Transcript only.  No video at
17  this time for plaintiff.  Electronic PDF is fine.
18        MR. VAZQUEZ:  Did you order, John?
19        MR. MARRESE:  I did, the transcript only.
20        MR. VAZQUEZ:  Okay.  Can you send us an
21  estimate of how much it would cost?  Because I
22  think there's been an issue with the other
23  deponents, as far as costs, for a copy.  Just a
24  straight copy of the PDF.
25        THE STENOGRAPHER:  Yes, I'll tell Lexitas
```

Page 43

```
1   to do that.
2         MR. VAZQUEZ:  Yes.  Send us an estimate of
3   how much it would be before we order.
4         THE STENOGRAPHER:  And this is Mr. Vazquez,
5   right?
6         MR. VAZQUEZ:  Yes.
7         MR. JIMENEZ:  Nothing for Mr. Jimenez at
8   this time.
9         THE VIDEOGRAPHER:  Okay.  With that we can
10  go off the record.
11        Time is 2:09.  Off the record.
12        (The video-recorded deposition was
13  concluded at 2:09 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 44

```
1              CERTIFICATE OF STENOGRAPHER
2
3   STATE OF FLORIDA    )
    COUNTY OF ESCAMBIA  )
4
5        I, DAVID A. DEIK, CP, CPE, Professional
6   Reporter, do hereby certify that I was authorized to
7   and did stenographically report the remote deposition
8   of MATTHEW GONZALEZ; that a review of the transcript
9   was requested; and that the foregoing transcript,
10  pages 1 through 43, is a true record of my
11  stenographic notes, to the best of my ability.
12
13       I further certify that I am not a relative,
14  employee, or attorney, or counsel to any of the
15  parties, nor am I a relative or employee of any of the
16  parties' attorney or counsel connected with the
17  action, nor am I financially interested in the action.
18
19       DATED this 10th day of August 2025.
20
21
22
23       _____
         DAVID A. DEIK, CP, CPE
24       Professional Stenographer
25
```

Page 45

August 10, 2025
MATTHEW GONZALEZ
c/o  ROPER, TOWNSEND & SUTPHEN, P.A.; 255 South Orange
Avenue., Suite 750; Orlando, Florida 32801
ATTN:  Ramon Vazquez, Esquire; rvazquez@roperpa.com
Re:  Jamiyah Robinson, et al. v. Joshua Nathan Payne,
et al.; Case No. 6:23-cv-01313-PGB-LHP
     Please take notice that on July 30, 2025, you
gave your deposition in the above cause.  At that
time, you did not waive your signature.  The
transcript is now available for your review.
     Please email fl.production@lexitaslegal.com for
access to a read-only PDF transcript via computer.
Please execute the PDF-fillable Errata Sheet which
will be forwarded to you by Lexitas.  Once completed,
please print, sign, and return to us for distribution
to all parties.
     If you do not read and sign the deposition
within a reasonable amount of time, the original,
which has already been forwarded to the ordering
attorney, may be filed with the Clerk of the Court.
     If you wish to waive your signature now, please
sign your name in the blank at the bottom of this
letter and email to the address listed below.
Very truly yours,
_____
David A. Deik, CP, CPE
Lexitas
fl.production@lexitaslegal.com
I do hereby waive my signature.

_____
Matthew Gonzalez