IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JAMIYAH ROBINSON,
as Personal Representative of the
ESTATE OF JAMES LOWERY,
Deceased,

No. 6:23-cv-01313

       Plaintiff,

v.

JOSHUA NATHAN PAYNE, individually
and as an agent and employee of the
Titusville Police Department, and
CITY OF TITUSVILLE, FLORIDA,

       Defendants.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO EXCLUDE REPORT AND TESTIMONY OF ANDREW J. SCOTT, III**

Plaintiff, Jamiyah Robinson, as Personal Representative of the Estate of James Lowery, deceased, by and through her undersigned counsel, opposes Defendants' Joint Motion to Exclude Report and Testimony of Andrew J. Scott, III (Doc. 84) as follows:

**OVERVIEW**

This case involves former Titusville Police Department (TPD) Officer Joshua Payne's foot pursuit and killing of James Lowery. 40-year-old James Lowery was unarmed and running from Payne when he flung himself over a gate, feet to the sky.

Within one second, Officer Payne, who was following Lowery, reached over the gate and shot Lowery in the back of the head. Those facts are undisputed.

Officer Payne testified that the reason he shot Lowery was because he perceived Lowery as being in a "shooter's posture." (Ex. 3, Payne Dep., at 65.) When asked to describe that posture, Officer Payne testified that Lowery was *on his knees with his back to Officer Payne*. (*Id.* at 51.) According to Payne, he nonetheless perceived Lowery as in a "shooter's posture" because Lowery had his right arm bent to look like it was attempting to retrieve something, possibly a firearm, from the front pocket of his hooded sweatshirt. (*Id.* at 65-66.)

Officer Payne's pursuit of Lowery had other problems. Following Lowery to the gate, Payne was running with a firearm in one hand and a taser in the other. (*Id.* at 50, 90.) Officer Payne testified that he did not receive any training on foot pursuits involving a firearm and believed he was following protocol by running after a suspect with both gun and taser drawn. (*Id.* at 88, 90, 94-95.) Officer Payne testified that he believes he should have received foot pursuit training. (*Id.* at 95.)

TPD reviewed Officer Payne's shooting and determined that the shooting was unjustified, unreasonable, and violated TPD policies. (*Id.* at 85.) Around that time, Officer Payne resigned from TPD. (*Id.* at 77-78.) Thereafter Officer Payne pled guilty to felony manslaughter (adjudication of guilt withheld) in connection with criminal charges brought against him by the State's Attorney. (*Id.* at 117.)

In support of his claims for excessive force against Officer Payne and failure to train against the City of Titusville, Plaintiff disclosed police practices expert Andrew

J. Scott, III, DCJ ("Dr. Scott"). A copy of Dr. Scott's report and C.V. are attached here. (Ex. 1, Scott Rpt.; Ex. 2, Scott CV.) Defendants did not take the deposition of Dr. Scott.

In sum, with respect to use of force, Dr. Scott opines that Officer Payne's use of force violated national standards, violated TPD policies, and was unjustified and unreasonable. (Scott Rpt., at 7-21.) Dr. Scott explains that even accepting Officer Payne's testimony as true, James Lowery was not in a "shooter's posture" as Payne characterized it. (*Id.* at 13.)[1]

With respect to training, in sum, Dr. Scott opines that the TPD's failure to enact a foot pursuit policy coupled with its failure to provide any foot pursuit training was improper. (*Id.* at 21-29.) Importantly, Dr. Scott explains that shooting and moving drills or building clearing training — which are referenced by TPD as proof that they provided foot pursuit training — are not, in fact, foot pursuit training at all. (*Id.* at 28 (¶ 2.13).)

Here, Defendants seek to exclude Dr. Scott's opinions under Rule 702 and *Daubert*. Defendants' motion is scattershot. It jumps from argument to argument, without heading or structure and often without reference to the aspects of Dr. Scott's opinions that Defendants are attacking. In multiple places, Defendants misattribute

---

[1] The record includes facts — including video evidence — from which a jury may conclude that Lowery was not even in the posture claimed by Payne when he was shot, and that Lowery was simply executed an instant after he had just crashed to the ground. Plaintiff will address those facts in detail in response to Defendants' summary judgment briefs.

statements to Dr. Scott which Dr. Scott has not made and which appear to be unconnected to this case.

Defendants do not attack Dr. Scott's qualifications. Moreover, Defendants do not attack several important aspects of Dr. Scott's opinions. For example, Defendants do not attack Dr. Scott's opinions that: (i) the use of deadly force by Officer Payne was inconsistent with well-established police practices and TPD policies (Scott Rpt. at 7 (Opinion 1); *id.* at 20-21); (ii) Officer Payne's foot pursuit of Mr. Lowery was dangerous and unnecessary (*id.* at 21); (iii) the dangers associated with police foot pursuits have long been known by law enforcement (*id.* at 26); and (iv) training on "moving and shooting" does not constitute foot pursuit training (*id.* at 28).

However, Defendants attack certain other opinions, including generally that Officer Payne's use of force was unreasonable and that the TPD failed to train on foot pursuits. Defendants repeatedly claim that Dr. Scott's opinions are methodologically unsound because they constitute "speculation" or "conjecture." A review of Dr. Scott's report demonstrates the opposite: a proper police practices methodology and a thorough review and recounting of the record to arrive at his opinions. Indeed, Dr. Scott reviewed video, documents, and witness testimony and recounted them accurately; addressed national and local standards for use of force and training; and thoroughly outlined and explained his opinions based on the record and standards. Defendants do not engage with any of that. They are content to merely label it speculative, unhelpful, or confusing.

Defendants' characterizations of Dr. Scott's opinions are undeveloped, unsupported by the record, and unsupported by the law. The Court should deny Defendants' motion, as more fully explained below.

## LEGAL STANDARD

Federal Rule of Evidence 702 "governs the admissibility of expert testimony," and is a "codification of the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Polk v. General Motors, LLC*, No. 3:20-cv-549-MMH-LLL, 2024 WL 326624, at *4 (M.D. Fla. Jan. 29, 2024). Accordingly, Rule 702 "imposes an obligation on a trial court to act as a gatekeeper," to ensure that expert testimony or evidence "is not only relevant, but reliable." *Id.* (citing *Daubert*, 509 U.S. at 592).

The Eleventh Circuit has enumerated three discrete inquiries that district courts must consider in performing the gatekeeping function:

> (1) the expert is qualified to testify competently regarding the matters he intends to address, (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*, and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Edmonds v. Air & Liquid Sys. Corp.*, No. 8:22-cv-825-CEH-SPF, 2024 WL 2814169, at *6 (M.D. Fla. June 3, 2024) (citing *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*)).

"The burden of establishing qualification, reliability, and helpfulness lies with the party offering the expert opinion." *Polk*, 2024 WL 326624, at *4 (citing *McClain v.*

*Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005)). Whether expert testimony should be admitted is a matter committed to the court's "broad discretion." *Apple Glen Investors, L.P. v. Express Scripts, Inc.*, No. 8:14-cv-1527-T-33EAJ, 2015 WL 3721100, at *1 (M.D. Fla. June 15, 2015) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

However, "rejection of expert testimony is the exception rather than the rule." *Id.* (quoting Advisory Committee Notes to the 2000 Amend. to Rule 702). Indeed, "[t]he gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury: [v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Stepanovich v. Bradshaw*, No. 2:14cv270-PAM-MRM, 2017 WL 10084903, at *5 (M.D. Fla. Feb. 3, 2017).

## ARGUMENT

I. **Defendants' attacks on certain of Dr. Scott's opinions in their "Introduction" fail.**

   A. **Dr. Scott's explaining that James Lowery was not in a "shooter's posture," as characterized by Officer Payne, is not "conjecture."**

At deposition, Officer Payne characterized James Lowery as being in "a shooter's posture" when he shot Lowery. (Ex. 3, Payne Dep., at 65.) Yet, Payne admitted that Lowery was on his knees with his back to Payne on the other side of a gate when Payne shot him in the back of the head. (*Id.* at 51-52, 59-60.)

To rebut the notion that Officer Payne is employing a specialized law enforcement perspective through his characterization of Lowery's "shooter's posture,"

6

Dr. Scott explains that the phrase "shooter's posture" is not a term of art and that James Lowery was not in the posture of a shooter, even accepting Payne's description of Lowery as true. (Scott Rpt., at 13 ("I have never heard of the term 'shooter's posture' as described by Officer Payne. Whatever Payne meant by the term, he testified that Mr. Lowery had his back to Officer Payne and his knees on the ground when he was shot. That is not the posture of a shooter as it pertained to Officer Payne.").)

In a single sentence in the Introduction, Defendants characterize Dr. Scott's treatment of the "shooter's posture" as "conjecture." (Doc. 84, at 2.) Defendants do not develop that argument or address it further in their brief. Given that Dr. Scott assumes the truth of Officer Payne's testimony in addressing his characterization of Lowery — i.e., Lowery on his knees, with his back to Payne, and arm bent – Dr. Scott's opinion is not "conjecture." It is based on Officer Payne's complete description of James Lowery within a second of Lowery flying over a gate with his feet to the sky. Accordingly, the Court should reject Defendants' undeveloped and unsupported argument that Dr. Scott's opinion is "conjecture."

### B. Dr. Scott's opinions that Officer Payne's use of force was unreasonable and that the City of Titusville failed to train on foot pursuits are proper.

In a single sentence, Defendants attack Dr. Scott's opinions that Officer Payne's use of force was unreasonable and that the City of Titusville failed to train on foot pursuits, as "conclusory opinions which invade the province of the jury." (Doc. 84, at 2.) First, Dr. Scott's opinions are not "conclusory." Dr. Scott has reviewed the record

7

and extensively recounted it in terms of support for these opinions in his report. (Ex. 1, Scott Rpt.) Defendants do not contend with any of that support in Dr. Scott's report.

Second, with respect to police practices experts like Dr. Scott, courts in this circuit permit experts to testify as to ultimate issues when they are based upon prevailing standards in law enforcement. For example, in *Baker v. Viehmann*, No. 8:21-cv-2851-SCB-SPF, 2023 WL 3664573, at *3 (M.D. Fla. Feb. 21, 2023), the Court denied the defendant's motion to exclude a police practices expert's testimony regarding the defendant's use of force. Permitting the expert to opine that the defendant's use of force was unreasonable, the court observed that "experts may express an opinion on an ultimate issue of fact," and "in the context of use of force, when an expert's testimony is considered in its entirety, it is possible for the expert to express such an opinion by testifying 'to the prevailing standards in the field of law enforcement.'" (citing *Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990) (affirming order permitting use of force expert to opine that officer's discharge of firearm was reasonable because "the manner in which the expert answered the question properly informed the jury that the expert was testifying regarding prevailing standards in the field of law enforcement.")).

For those reasons, *Baker* determined that whether the expert's testimony "will include improper legal conclusions can only be determined by the questions asked and answers given at trial," such that any objections were to be resolved during trial. *Id.; see also U.S. v. Myers*, 972 F.2d 1566, 1577 (11th Cir. 1992) (trial court did not abuse its discretion by admitting expert testimony that the use of a stun gun on a suspect "did

8

not constitute reasonable force" and that "based on what the [expert] witness saw, the use of the stun gun against [the suspect a] fourth and final time was unjustified," as the opinions were "properly framed . . . in accordance with prevailing police standards.").

For these reasons, the Court should reject Defendants' argument here.

### C. The opinions in *Wynn* and *DeBose* are inapplicable here, and Defendants make no attempt to explain otherwise.

In their Introduction, Defendants assert that Dr. Scott "is no stranger for giving improper opinions." (Doc. 84, at 4.) In turn, Defendants quote two opinions — *Wynn* and *Debose* — over the last 15 years in which Dr. Scott's opinions were excluded in whole or in part. (*Id.*) Defendants do not explain why those opinions are applicable to Dr. Scott's analysis here, other than to say Dr. Scott "has not done any testing, [has not] employed any reliable methodology, and simply uses conjecture to bolster Plaintiff's allegations." (*Id.* at 5.) Defendants provide no further explanation when they cite to these decisions again later in their brief. (*Id.* at 13.) This is because *Wynn* and *Debose* are irrelevant here.

In the unpublished Eleventh Circuit decision, *Wynn v. City of Griffin, Ga.*, the plaintiff-appellants challenged Dr. Scott's exclusion at the district court; however, the Eleventh Circuit did not consider that challenge because they found summary judgment was appropriate in either case. No. 19-10479, 2021 WL 4848075, at *5 n.17 (11th Cir. Oct. 18, 2021). Defendants do not cite to the district court's opinion, but a review of the Northern District of Georgia's exclusion of Dr. Scott there shows that it had to do with the fact that the court deemed summary judgment appropriate on the

9

false arrest, excessive force, and inadequate investigation claims at issue and, therefore, did "not refer to or rely upon Mr. Scott's testimony in its analysis as it [could not] allow expert evidence, even well-qualified and un-rebutted, to supplant its role as the sole arbiter of the law in this case." *Wynn v. City of Griffin, Ga.*, No. 3:16-CV-94-TCB, 2019 WL 9088168, at *1 (N.D. Ga. Jan. 7, 2019). Defendants do not and could not explain how Dr. Scott's opinions could do the same here.

In *Debose v. City of Jacksonville*, the portions of Dr. Scott's opinions that were excluded have nothing to do with his opinions here. They involved testifying (i) as to what the officer at issue could see and (ii) as to a *Monell* opinion about the number of shootings by a particular law enforcement agency, which the court found insufficiently backed by research or data. *DeBose v. City of Jacksonville*, No. 3:09-CV-579-J-34JBT, 2012 WL 13098470, at *3 (M.D. Fla. Feb. 7, 2012).

In fact, *Debose* rejected the defendants' request to exclude the portion of Dr. Scott's opinions there that is applicable here, namely, his use of force opinion:

> Scott's opinion that a use of deadly force against an unarmed suspect would have been against police procedure and practices, in contrast, is based on his specialized knowledge as a police officer and an assessor for two accreditation agencies (the Commission on Accreditation for Law Enforcement Agencies, Inc. and the Commission on Florida Law Enforcement Accreditation). [citation omitted] Scott is qualified to give opinions in this area and his training and experience could assist the trier of fact in determining whether Moon's use of deadly force was improper, given a particular set of circumstances consistent with those facts proven at trial. Consequently, Scott's opinions on that issue would be admissible and the Motion will be denied with respect to his opinion that deadly force should not have been used against an unarmed man who did not pose a threat to Defendant Moon, other officers, or the community.

*Id.* at *4. Defendants omit that portion of the *DeBose* opinion which is directly on point here. The Court should reject Defendants' cherry-picking of inapposite portions of exclusion opinions from the last 15 years.

## II. Dr. Scott's methodology is proper.

Dr. Scott's report sets out the full record he reviewed to arrive at his opinions. (Scott Rpt., at 1-3.) Furthermore, Dr. Scott summarizes his approach to review of Officer Payne's use of force and the TPD's training based on his education, training, and experience, national and local police practices and standards, as well as the body of literature and professional law enforcement organizations that support such practices and standards. (*Id.* at 5-6.) Defendants do not address this, nor do they discuss Dr. Scott's methodology in any detail. Instead, they raise two hollow attacks that fail.

### A. Dr. Scott's method of evaluating Officer Payne's use of force is sound.

Defendants assert that Dr. Scott's methodology is flawed because it is "self-serving." (Doc. 84, at 10.) Defendants do not explain how Dr. Scott's methodology is self-serving and, in that sense, the argument is not developed and should be ignored. Even if Defendants' argument was developed, the argument has no merit. Dr. Scott evaluates Officer Payne's use of force based on the body camera video and Officer Payne's own testimony, among other evidence in the record. (Scott Rpt., at 4-21.) Indeed, Defendants have not identified any evidence in the record that Dr. Scott has

ignored, nor have they explained how his citation to any such evidence is "self-serving."

Second, Defendants attack Dr. Scott's methodology as "consist[ing] of assuming certain facts and suggesting Payne should have followed the IACP model policy." (Doc. 84, at 10.) Defendants do not identify the facts they believe Dr. Scott improperly "assumed" and, as such, there is nothing to address in that respect specifically. Contrary to Defendants' naked assertion, Dr. Scott extensively recounted facts shown on the body camera, testified by Officer Payne, and testified by other officers with the TPD. (Scott Rpt., at 4-21.) Defendants do not quibble with the accuracy of any such recounting and, therefore, their assertion is hollow.

As for Defendants' reference to the fact that Dr. Scott uses IACP policy, Defendants do not attack the substance of any of the IACP policies or guidance upon which Dr. Scott relies. Nor do they attack the credibility of the IACP as a general matter. Accordingly, Defendants do not identify anything substantively problematic with respect to Dr. Scott's reliance on the IACP. Any such attack would be a matter for cross-examination anyway. Furthermore, Dr. Scott also uses the TPD's policies as part of his opinions on Officer Payne's use of force and, therefore, buttresses his own evaluation with these local standards as well as the national standards of the IACP. (Scott Rpt., at 8-14.) It is entirely appropriate for police practices experts to discuss how an officer's conduct comports with national and local standards on use of force. *See Blessing v. Williams*, No. 3:19-cv-731-TJC-MCR, 2022 WL 4182534, at *17 (M.D. Fla. Sept. 13, 2022) (experts may "use [their] experiences and review of relevance

12

evidence to discuss law enforcement standards and best practices and whether [Defendants'] actions met these standards"); *Shew v. Horvath*, No. 8:16-cv-766-T-33JSS, 2017 WL 632515, at *7-8 (M.D. Fla. Feb. 16, 2017) (permitting expert to opine as to training, policies, and procedures that apply to officers in the defendant's police department and whether the defendant followed these procedures); *Baker*, 2023 WL 3664573, at *3 (denying motion to exclude police practices expert opinion that the defendant officer's use of force was in violation of police department policy and best practices).

Finally, Defendants assert that Dr. Scott "utilizes speculation, conjecture, and hindsight by placing himself in Payne's position as the incident was unfolding[.]" (Doc. 84, at 10.) The law requires that one place himself in the position of the officer on scene. Indeed, Dr. Scott cites *Graham v. O'Connor*, 490 U.S. 38 (1989), for the proposition. (Scott Rpt., at 7.) Therefore, there is nothing "speculative" about placing oneself in the officer's shoes. Defendants again do not explain what it speculative about Dr. Scott's evaluation of Officer Payne's use of force. The Court should therefore reject Defendants' argument.

      **B.**    **The discretionary function exception to sovereign immunity is inapposite to a methodology attack under Rule 702.**

Defendants separately attack Dr. Scott's methodology as it pertains to evaluation of the TPD's failure to train. They argue that training decisions are discretionary and therefore barred by the discretionary function exception to the waiver of sovereign immunity. (Doc. 84, at 10 (citing *Lewis v. City of St. Petersburg*, 260

13

F.3d 1260, 1266-67 (11th Cir. 2001).) This is not a *Daubert* challenge. This is a summary judgment argument as to Plaintiff's training claim. Indeed, *Lewis v. City of St. Petersburg*, upon which Defendants rely, is not a *Daubert* ruling. Moreover, Plaintiff's failure to train claim is a federal deliberate indifference claim under the Fourth Amendment. (Doc. 1 (Count 4).) The discretionary function exception to sovereign immunity is only applicable to Florida state law claims, which is indeed what *Lewis v. City of St. Petersburg*, was addressing. Therefore, Defendants' misplaced argument should be denied. *See Shivers v. United States*, 1 F.4th 924, 933 (11th Cir. 2021) (availability of discretionary function exception to waiver of sovereign immunity based upon the nature and source of the claim, explaining that plaintiffs "can and should bring constitutional claims against individual" officers for their unconstitutional conduct, even where they would be otherwise barred from asserting tort claims based on the government's tortious abuse of that function).

### III. Dr. Scott's opinions will assist the trier of fact.

Defendants argue that Dr. Scott's opinions will not assist the trier of fact. (Doc. 84, at 13-14.) According to Defendants, Dr. Scott "simply second guesses Officer Payne's and the City's actions" and addresses matters which "are not beyond the understanding of the average lay person." (*Id.*) Defendants do not specify which aspects of Dr. Scott's opinions are within the understanding of the average juror. With respect to Plaintiff's training claims on foot pursuits, that is not true. The average juror has never been a police officer, does not understand the nature of officer training, the scenarios officers may face on the street, why discontinuing a foot pursuit or calling

14

for back-up may be preferable to engagement, why foot pursuit policies are essential and why certain training (e.g., shooting and moving drills at a target range) is not the same as foot pursuit training. Dr. Scott addresses these matters in his report, among others relating to foot pursuits. (Scott Rpt., at 21-29.)

As for the excessive force claims against Officer Payne, Plaintiff concedes that the average juror can understand, standing alone, the unlawfulness of an officer shooting an unarmed man on his knees in the back of the head while he faces away from the officer. However, Defendants have attempted to complicate the dispute here on excessive force in important respects which an expert can assist Plaintiff in addressing. For example, Defendants have characterized James Lowery as being in a "shooter's posture" when he was shot. By way of another example, Defendants have referenced aspects of Payne's foot pursuit occurring before he shot the unarmed Lowery — e.g., Lowery discarding drugs from his pockets, Lowery "squaring off" momentarily with Payne before disengaging — as supporting Payne's decision to use deadly force. Dr. Scott's opinions illustrate why Officer Payne's decision was nonetheless inconsistent with both national standards, TPD policy, and was unreasonable. For these reasons, the Court should deny Defendants' argument.

### IV. Defendants' argument that Dr. Scott's opinions are confusing or misleading is wrong.

Defendants separately attack Dr. Scott's opinions under Federal Rule of Evidence 403 as "confusing" and "misleading." (Doc. 84, at 11.) As in other places throughout their brief, Defendants do not specify which opinions they are attacking

15

here; however, they appear to focus on Dr. Scott's review of Officer Payne's use of force. (*Id.*) Defendants do not explain what is confusing or misleading about Dr. Scott's testimony in this respect. There is nothing confusing or misleading about it. Dr. Scott's opinions are thoroughly reported, explained, and organized and based upon a full review of this record.

Exclusion under Rule 403 is "an extraordinary remedy which should be used sparingly" under "narrow circumstances." *Ingole v. Certain Underwriters at Lloyd's of London*, No. 8:08-cv-1089-T-27EAJ, 2009 WL 10670569, at *1 n.2 (M.D. Fla. May 13, 2009) (rejecting the plaintiff's motion to exclude expert under Rule 403 for failure to substantiate her argument, agreeing with the defendants that the "rule is used only in narrow circumstances not present here."); *see also Stepanovich*, 2017 WL 10084903, at *5 (explaining that "[t]he gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury: [v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

The Court should reject Defendants' unsupported Rule 403 argument.

**V.     Defendants twice falsely attribute statements to Dr. Scott.**

In two places in their brief, Defendants falsely attribute statements to Dr. Scott that he has not made. First, Defendants attribute the following quote to Dr. Scott in their Introduction: "'There is no way to determine if these reports are valid violations without putting full trust in the officer's alleged perceptions leaving them noticeably

16

open to abuse and exploitation.'" (Doc. 84, at 3 (citing Scott Rpt., at 19-20).) This quotation — or anything like it — is not in Dr. Scott's report.

Second, Defendants assert that Dr. Scott characterizes language from the Supreme Court's *Whren* decision as "susceptible to abuse." (Doc. 84, at 6 (citing Scott Rpt., at 17).) This statement — or anything like it — is also not in Dr. Scott's report.

The Court should reject Defendants' misattributions to Dr. Scott.

## CONCLUSION

For the above reasons, the Court should include Defendants' motion in entirety.

Dated: December 17, 2025         Respectfully submitted,

Jamiyah Robinson, as Personal Representative of the Estate of James Lowery, Deceased

By:   /s/   *John Marrese*
              John Marrese

Ben Crump
Natalie Jackson
BEN CRUMP LAW
122 S. Calhoun Street
Tallahassee, Florida 32301
(800) 713-1222
ben@bencrump.com
natalie@nataliejacksonlaw.com

Steven Hart*
Brian Eldridge*
John Marrese* (*Lead Counsel Pursuant to L.R. 2.02(a)*)

17

Paige Smith*
HART MCLAUGHLIN & ELDRIDGE, LLC
One South Dearborn, Suite 1400
Chicago, IL 60603
(312) 955-0545
shart@hmelegal.com
beldridge@hmelegal.com
jmarrese@hmelegal.com
psmith@hmelegal.com

Kevin Edwards*
EDWARDS INJURY LAW
226 Baldwin Avenue
Charlotte, NC 28204
(980) 400-3244
kevin@edwardsinjury.com

*Attorneys for Plaintiffs*

*Under Special Admission