# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION,

JAMIYAH ROBINSON, )
as Personal Representative of the )
ESTATE OF JAMES LOWEY, )
Deceased, )
                       )
        *Plaintiff,* )
                       )      Case No.: 6:23-cv-01313-PGD-LHP
     v. )
                       )
JOSHUA NATHAN PAYNE, individually )
and as an agent and employee of the )
Titusville Police Department, and )
CITY OF TITUSVILLE, FLORIDA )
                       )
        *Defendants.* )

### ATTORNEY:

Mr. John Marrese, Esq.

### FIRM ADDRESS:

Hart McLaughlin & Eldridge
One South Dearborn, Suite 1400
Chicago, Illinois 60603

(O): 312-767-4425
(F): 312-971-9243

### ITEMS REVIEWED:

1. Complaint.
2. Florida Department of Law Enforcement (FDLE) Use of Force Investigation, Titusville Police Department, Case Number OR-27-0404.
3. Deposition of Commander Charles Demmon.

1

4. Deposition of Commander Tyler Wright.
5. Deposition of Officer Matthew Gonzalez.
6. Deposition of Lt. Gonzalez.
7. Deposition of Mr. Joshua Payne
8. Titusville Police Department (TPD) General Orders.
9. TPD Internal Affairs Investigation-IA 318 (3 binders).
10. TPD/FDLE video regarding the shooting incident (9:59 in length).
11. Body Worn Camera (BWC) of TPD Officer Payne.
12. Arrest Affidavit of TPD Officer Payne.
13. CAPIAS for TPD Officer Payne.
14. Plaintiff's Notice of Discovery.
15. City of Titusville and the Fraternal Order of Police Agreement (10-1-19/9-30-22).
16. State Attorney Information for Manslaughter charging TPD Officer Payne.
17. Not Guilty Plea by TPD Officer Payne.
18. Order Granting Motion to Continue.
19. TPD Officer Payne's Criminal Records.
20. TPD Officer Payne's Resignation Letter.
21. TPD Officer Payne's Training Records.
22. TPD Officer Payne's Personnel File.
23. TPD Police Report - Domestic Violence Case # 2021-00100443.
24. FDLE Investigative Summary Report, Case Number: OR27-0404.
25. FDLE audio interviews of TPD Ofc. Baez, TPD Ofc. Wilder, TPD Ofc. Rosas, TPD Ofc.
    Gonzalez, TPD Ofc. Deal, TPD Ofc. Logan, TPD Ofc. Mick
26. FDLE audio interviews of witnesses Ragan Tisdale and Yashica McCloud.
27. Police dispatch audio (1857-1930).
28. 911 call (audio) reference domestic disturbance.
29. TPD CAD report.
30. Petition to Waive Bond of Personal Representative.
31. JPG Images 7747-8198.
32. Video ID H635-Wilder - 21-100443.
33. Video ID 8801-Baez - 21-100443.
34. Video ID 8805 -Deal - 21-100443.
35. Video ID 8832-Rosas - 21-100443.
36. Video ID 8833-Mick - 21-100443.
37. Video ID 8833-Mick - ID 039E392021.
38. Video ID 8833-Mick - Continued.
39. Axon and Body_2 _Video_2021-21-26-1908 Wilder.
40. Axon and Body_2 _Video_2021-21-26-1913 Officer Rosas.
41. Axon and Body_2 _Video_2313 - Mick.

42. Axon and Body_2 _Video_2354 - Sergeant Nelson.
43. BWC Domestic_Disturbance (1) - Brandon Williams.
44. BWC Domestic_Disturbance - Brandon Williams.
45. Axon Body X 81628839.
46. Axon Body 2 X815Z8295- Mack Gonzalez - S22D (2).
47. Axon Body 2 X81487561-Tyrone Logan - S22D (3).
48. Axon Body 2 X81628829-Deal-S22D.
49. Axon Body 2 X81487561-Logan (Second Reporting)-S22D.
50. Axon Body 2 X816628295- Matt Gonzalez - S22D.
51. Axon Body 2 X81672077-Officer Chris Wood-S22D.
52. Axon Body 2 X81668673-Officer Baez-XD1.
53. Various Documents (Bates Stamped Robinson 00001-000548, 000549-000579).
54. TPD General Order (GO) titled *Response to Resistance,* Number 412.15, Effective Date: February 21, 2023.
55. TPD GO titled, *Less Lethal Weapons,* Number 411.7,  Effective Date, June 5, 2020.
56. TPD GO titled *Training*, Number 220.12, Effective Date September 15, 2022.
57. TPD GO titled *Dart-Firing Stun Guns*, Number 410.8, Effective Date: February 3, 2020.

## INCIDENT, DATE, TIME AND LOCATION:

December 26, 2021, approximately 7:00 p.m.

1520 Gayle Avenue, Titusville, Florida.

## INDIVIDUALS INVOLVED:

James G. Lowery (Deceased).

## LAW ENFORCEMENT:

Joshua N. Payne (Former TPD police officer)

Jurisdiction: Titusville (FL) Police Department.

## MEDICAL EXAMINER:

Sajid Quaiser, M.D.
Brevard County Medical Examiner's Office

Cause of Death: Gunshot wound to the head.
Manner of Death: Homicide.

## INCIDENT SUMMARY:

*The Incident Summary is based upon various materials noted in this report's "Items Reviewed" section, including depositions, police reports, and video evidence. This writer makes no credibility assessments of the individuals involved in this incident.*

The Probable Cause Affidavit generated by Special Agent Chris Shephard of the Florida Department of Law Enforcement, Case Number OR-27-0404, dated May 26th, 2022, stated in part,

*"On the above date and time, Titusville Police Department (TPD) Officer Joshua Payne attempted to stop James Lowery, who matched the description of a suspect of a battery domestic violence complaint. Lowery walked away from Officer Payne, which led to a foot pursuit. Officer Payne discharged the first cartridge from his Taser at the fleeing Lowery. The taser was ineffective and the foot pursuit continued. Officer Payne used his radio to inform TPD dispatch and other officers that he was in a foot pursuit. Officer Payne deployed the second cartridge from his taser and it was again, ineffective. Lowery approached a gate to a residence where he returned and faced Officer Payne. Officer Payne gave commands to Lowery, "Drop it, drop it get down." Lowery removed an object from his pocket and threw it over a fence. The object was later found to be a small red bag containing illicit narcotics. Officer Payne drew his firearm with his left hand from the holster and continued to hold his taser in his right hand. Officer Payne continued to give Lowery commands, "Get down." Lowery returned, took a step to the gate and climbed over. Officer Payne approached the gate with his firearm in his left hand and his taser in his right hand. Lowery was on the opposite side of the gate as Officer Payne. Evidence supports that Officer Payne simultaneously pulled the trigger of his taser and his firearm. Officer Payne fired a single gunshot striking Lowery in the back of his head and killing him. There were no weapons found on Lowery or in his vicinity.*

*Brevard County Medical Examiner's autopsy report, Medical Examiner Sajid, Qaiser, M.D. reported that the cause of death for James Lowery was due to gunshot wound of head. The manner of death was listed as a homicide."[1]*

---

[1] Probable Cause Affidavit for the arrest of TPD Officer Joshua Payne, Arrest Number OR-27-0404, by FDLE Special Agent Chris Shephard, dated May 26, 2022

4

The Titusville Police Department requested the Florida Department of Law Enforcement
investigate the shooting. The encounter between Officer Payne and Mr. James Lowery was
captured on Officer Payne's Body Worn Camera (BWC). Mr. Lowery was not involved with the
initial domestic disturbance call.

On June 1, 2022, TPD Officer Payne resigned from the Titusville Police Department. On the
same day he was charged by the State's Attorney's Office with Manslaughter FSS 782.07(1)[2] for
the shooting death of Mr. Lowery.

Former TPD Officer Payne plead guilty to one count of Manslaughter and was sentenced to five
years of probation. Adjudication of the criminal charge was withheld.

## SUMMARY OF PRIMARY OPINION(S):

### *My opinions are provided to educate the jury on well-established police practices and procedures.*

My opinions and the basis for my opinions are formed from the totality of my specialized
knowledge, skill, education, research, literature, training, and information I have reviewed. My
opinions and basis for my opinions are based on sufficient facts and data reviewed and are the
product of reliable law enforcement principles and methods. I have applied these law
enforcement principles and methods reliably to the facts and circumstances of this case. There is
a body of knowledge in literature about the practices and standards to which modern,
professionally administered police agencies should adhere. The standards and accepted practices
have evolved in the interest of fostering and maintaining police agencies that are professional,
effective, and whose practices and policies are observant of the law. Standards have evolved, in

---

[2] **782.07 Manslaughter; aggravated manslaughter of an elderly person or disabled adult; aggravated
manslaughter of a child; aggravated manslaughter of an officer, a firefighter, an emergency medical
technician, or a paramedic.—**

(1) The killing of a human being by the act, procurement, or culpable negligence of another, without lawful
justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable
homicide or murder, according to the provisions of this chapter, is manslaughter, a felony of the second degree,
punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&URL=0700-
0799/0782/Sections/0782.07.html).

part, as a response to reported cases of police misconduct and as tools to limit police discretion and ensure that police behavior is within acceptable professional, legal, and constitutional limits.

There is a substantial body of literature and knowledge regarding the types and causes of police misconduct. I am well familiar with and have contributed to the literature and body of knowledge regarding the types and causes of police misconduct. Within the broad range of criminal justice, my area of study and practical experience is, and has been, high liability police practices, including police misconduct and its relationship with policy, procedure, training, supervision, and accountability mechanisms.

I am a life member of the International Association of Chiefs of Police (IACP), a member of the Police Executive Research Forum (PERF), a life member of the Florida Police Chiefs Associations (FPCA), and a life member of the Palm Beach County Association of Chiefs of Police (PBCAC). I hold a Doctor of Criminal Justice degree from Saint Leo University, Florida. My additional experience, knowledge, and training are further identified in my Curriculum Vitae attached to this report.

My opinions are also based on my 30 years of law enforcement experience, knowledge, and training (see attached Curriculum Vitae). My experience includes seven years as Chief of Police and four years as an Assistant Chief of Police. My experience and training include being an Assessor and Team Leader for The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) and an assessor, Team Leader, and former Chairperson for the Commission on Florida Law Enforcement Accreditation, Inc. (CFA). As an assessor for both accreditation bodies, I conducted assessments for over 100 law enforcement agencies nationwide. These assessments included a review of all the department's policies, including use of force and training. My opinions were derived from my experience as Commander of the Personnel and Training Unit, Commander of the Internal Affairs Unit, and Commander of Uniform Patrol during my law enforcement career. My opinions were supported by written material published by The International Association of Chiefs of Police (IACP) Model Policies and Training Keys, The Police Executive Research Forum (PERF), and publications authored by scholarly academicians. In this case, my opinions were supported by my published Doctoral dissertation titled, *Should Initiation of Police Vehicle Pursuits Be Based On The Objectively Reasonable Calculus?*

*I presently hold the following opinions to a reasonable degree of professional certainty:*

6

## Opinion 1:

Titusville Police Department Officer Joshua Payne utilized deadly force by shooting James
Lowery as Lowery fled from him on foot. Mr. Lowery was unarmed. Mr. Lowery was running
away from Officer Payne. The use of deadly force by Officer Payne killing Mr. Lowery was
inconsistent with well-established police practices, TPD policy, and Florida State Statute. A
reasonable and well-trained officer given similar circumstances would not have shot Mr.
Lowery. The use of force by Officer Payne to kill Mr. Lowery was not reasonable.

## Analysis:

1.1    Law enforcement officers throughout the country, including TPD law enforcement
       personnel, are trained concerning the United States Supreme Court decision in *Graham.
       v. Connor*, 490 U.S. 386 (1989) regarding objectively reasonable force. As the court
       explained, the *"proper application [of force] requires careful attention to the facts and
       circumstances of each particular case, including the severity of the crime at issue,
       whether the suspect poses an immediate threat to the safety of the officers or others,
       and whether he is actively resisting arrest or attempting to evade arrest by flight."* *Id.*
       at 395.[3]

1.2    *Graham* provided additional information about the reasonableness of force used by the
       police. The Supreme Court's decision stated:

       *"...the 'reasonableness' of a particular use of force must be judged from the
       perspective of a reasonable officer on the scene, rather than with 20-20 vision of
       hindsight... the calculus of reasonableness must embody allowance for the fact that
       officers are often forced to make split - second judgments in circumstances that are
       tense, uncertain, and rapidly evolving about the amount of force that is necessary in
       that particular situation."[4]*

1.3    Additionally, police are trained to use only that force that is objectively reasonable and
       legally justified for the following reasons: in defense of another; in self-defense, to
       effectuate an arrest, to prevent an arrest from being defeated by resistance or escape.
       Furthermore, as previously cited in this report, law enforcement officers are trained
       throughout the country on the objectively reasonable use of force calculus when seizing
       an individual under the 4th Amendment to include: would a reasonably prudent and well

---

[3] *Graham. v. Connor*, 490 U.S. 38 (1989)
[4] Ibid.

trained officer act in a similar fashion given similar circumstances and were the actions
acceptable, or more importantly, reasonable.

1.4    TPD General Order Number 412.15 titled *Response to Resistance* (effective date
February 21, 2023) states, in part,

> *"2.    Policy [CFA 4.01 M]*
> *The Titusville Police Department's sworn members shall only use responses to*
> *resistance objectively reasonable to affect lawful objectives and in accordance*
> *with Florida state law. Sworn members shall not strike or use physical force*
> *against any person except when necessary in self-defense, in defense of another*
> *to overcome physical resistance to lawful commands or to prevent the escape of*
> *an arrested person. When deadly force is justified, it shall be considered a last*
> *resort and shall be employed for effect and not forewarning."[5]*

TPD requires its officer to use only force that is objectively reasonable.

1.5    TPD General Order 412.15 titled, *Response to Resistance* (effective date, February 21,
2023) states, in part,

> *"3.    Definitions*
> *H. Deadly Force -Per F.S.S. 776.06, force likely to cause death or great bodily*
> *harm and includes, but is not limited to:*
>
> *1.    The firing of a firearm in the direction of the person to be arrested, even though*
> *no intent exists to kill or inflict great bodily harm:*
> *2.    The firing of a firearm at a vehicle in which the person to be arrested, is riding.*
> *3.    The term "deadly force" does not include the discharge of a firearm by a law*
> *enforcement officer during and within the scope of his or her official duties,*
> *which is loaded with a less-lethal munition. As used in the subsection, the term*
> *"less lethal munition" means a projectile designed to stun, temporarily*
> *incapacitate, or cause temporary discomfort to a person without penetrating the*
> *person's body.*
> *4.    A law enforcement officer is not liable in any civil or criminal action arising*
> *out of use of any less-lethal munition in good faith during and within the scope*
> *of his or her official duty.*

---

[5] TPD GO 412.15 titled *Response to Resistance* (effective date, February 21, 2023) (p. 1).

There is no dispute that Officer Payne used deadly force to kill Mr. Lowery.

*W. Objectively Reasonable - The determination that the necessity for using force and the level of force used is based upon the officer's evaluation of the situation. In light of the totality of the circumstances known to the officer at the time the force is used and upon what a reasonably prudent officer would use under the same or similar circumstances.*

Given the totality of facts in this matter, a reasonable officer given similar circumstances would not have shot Mr. Lowery in the back of the head.

*Y. Reasonable Belief - The facts or circumstances the member knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances."[6]*

1.6   TPD General Order 412.15 titled, *Response to Resistance* (effective date, February 21, 2023) states, in part,

   **4.   Procedures**
   > *"A.   Use of Physical Force*
   >   *1.   Officers are legally permitted to escalate his or her response to resistance as the subject escalates his or her level of resistance. The officer's choices are determined by the subject's actions and the risk for physical harm posed to the officer or others.*
   >   *2.   Use of physical force should be discontinued when resistance ceases or when the incident is under control.*
   >
   >   *D.   Use of Less-Lethal (Non-Deadly) Force (CFA 4.06 M)*
   >
   > *1.   When de-escalation techniques are not effective or appropriate, officers may consider the use of less lethal force to control a non-compliant or actively resistant individual. Officers are authorized to use only agency-approved, less-lethal force techniques or issued weapons the department has authorized and with which the officer has been trained:*
   >   *a.   To protect the officer or others from immediate physical harm.*
   >   *b.   To restrain or subdue individual who is actively resisting or evading arrest, or*

---

[6] Ibid (pp. 1-4)

     c. *To bring an unlawful situation safely and effectively under control.*

2. *As with any force officers may use only that level of force that is objectively reasonable to bring the incident under control.*

Officer Payne's use of his Taser weapon was initially appropriate, however, the continued use of the Taser weapon, known to him to be ineffective, was activated at the same time he shot Mr. Lowery (as noted in Officer Payne's BWC video). Activating his Taser weapon while pointing his firearm at Mr. Lowery was not consistent with well-established police practices and procedures and was not reasonable.

H. *Use of Deadly Force and Deadly Force Restrictions.*

    1. *Members are authorized to use deadly force when it is objectively reasonable under the totality of circumstances. Use of deadly force is justified when one or both of the following apply:*

       a. *To protect a member, himself/herself, or others from what is reasonably believed to be an immediate threat of death or serious bodily injury.*

          1. *A previously demonstrated threat to human life or wanton disregard for human life may be considered as constituting a threat; however, such a threat must be immediate in nature with the potential and probability for immediate consequences. Long-term or long-range potential and probability for threat are not considered "immediate.*

       b. *To prevent the escape of a fleeing subject when the member has probable cause to believe the person has committed, or intends to commit a felony involving serious bodily injury or death and the member reasonably believes there is an imminent risk of serious bodily injury or death to the member or another if the subject is not immediately apprehended.*

Considering the totality of circumstances involving this shooting incident, it was not reasonable for Officer Payne to use deadly force against Mr. Lowery.

I. **Firearms.**

    *Firearms are considered lethal weapons and the use of firearms constitutes deadly force. The use of firearms to control the resistance of a subject will be limited to*

*those situations in which deadly force is warranted. A member's decision to draw or
exhibit a firearm will be based on the tactical situation and in the member's
reasonable suspicion there is a substantial risk. The situation may escalate to the
point where a lethal force may be justified."
Refer to GO 409 – Firearms for further information.*

L.  **Response to Resistance Guidelines.**

    *1.*  **Subject Resistance Levels**

        *a. Passive Resistance – a subject's verbal and/or physical refusal to
comply with a member's lawful direction causing the member to use
physical techniques to establish control.*

        *b. Active Resistance - A subject's use of physically evasive movements
directed toward the member such as bracing, tensing, pushing, or
pulling, to prevent the member from establishing control over the
subject.*

        *c. Aggressive Resistance - a subject's hostile, attacking movements
toward a member that may cause injury but are not likely to cause death
or great bodily harm to the member or others.*

        *d. Deadly Force Resistance - a subject's hostile, attacking movements
with or without a weapon that create a reasonable perception by the
member that the subject intends to cause and has the capability of
causing death or great bodily harm to the member or others.*

There is no dispute that Mr. Lowery engaged in active resistance when he fled
from Officer Payne. Similarly, when Mr. Lowery turned around and grabbed the
Taser wires and allegedly, and briefly, grabbed Officer Payne's firearm, and
allegedly grabbed onto Officer Payne's shoulder, Mr. Lowery was engaged in
Aggressive Resistance. Mr. Lowery then turned and jumped the gate of the fence.
Once Mr. Lowery was disengaged from Officer Payne and he jumped over the
fence Mr. Lowery was no longer a threat to Officer Payne. At no point should
Officer Payne have utilized deadly force against Mr. Lowery.

    *2.*  *The nature of the members response to a subject's resistance is determined by
the subject's actions. Members should try to resolve a situation with the amount
of force necessary for the situation. Command presence and verbal
communication often will diffuse many volatile situations; however, sometimes
these responses are not enough or members may not have the opportunity to use
these responses. Members need not apply force in gradually increasing steps in
order to justify physical control or even deadly force. Instead, members need to*

respond with the force reasonably necessary for the circumstances in each
specific situation to include but not limited to, the following:

a.  **Physical Control**
b.  **Nonlethal Weapon**
c.  **Lethal Weapon**
d.  **Deadly Force**

3.  **Factors for Determining the Justification of the Use of Deadly Force**
    Members use three subject criteria for making deadly force decisions:
    a.  **Ability**
    b.  **Opportunity**
    c.  **Intent.**

4.  **Totality of Circumstances.**
    *Totality of circumstances is a term used to refer to all facts and circumstances
    known to the member at the time or reasonably perceived by the member as the
    basis for response to resistance decision. The courts will look at the totality of
    the circumstances in determining whether the decision was objectively
    reasonable and therefore legally justified. The totality of circumstances
    includes, but it's not necessarily limited to, consideration of the subject's form
    of resistance, all reasonably perceived factors that may have an effect on the
    situation and the response options available to the member."[7]*

The totality of circumstances in this event did not require the use of deadly force
by Officer Payne. Mr. Lowery generally matched the description of a suspect
involved in a recent domestic dispute (although it would later be determined Mr.
Lowery had nothing to do with the domestic dispute). When Mr. Lowery was
approached by Officer Payne, Mr. Lowery ran from him. Mr. Lowery was
observed putting his hands in his sweatshirt pockets, he was observed throwing
things to the ground (later determined to be illegal narcotics). When Mr. Lowery
came up to the gate of a fence he turned around and approached Officer Payne.
Mr. Lowery grabbed the Taser weapon wires and according to Officer Payne,
briefly grabbed Officer Payne's gun and physically grabbed his shoulder,
however, the two quickly disengaged from each other. Mr. Lowery then jumped
over the fence gate, head first. Within a second of jumping over the fence, Officer
Payne shot Mr. Lowery in the back of the head. No weapon was found on or near
Mr. Lowery. Officer Payne testified in his deposition that he thought Mr. Lowery

---

[7] Ibid (pp. 4-13

was crouched in a shooter's posture and feared for his life and shot Mr. Lowery.
Officer Payne's description of Mr. Lowery's shooter's posture was first
mentioned during his deposition. He never told the court when he plead guilty to
Manslaughter for killing Mr. Lowery about seeing Mr. Lowery in a shooter's
posture when Lowery jumped over the fence, head first.

Moreover, if one were to consider the description provided by Officer Payne of
Mr. Lowery's posture as true once he jumped the fence, one would have to take
into account how Mr. Lowery could scale the fence, head first with his feet
vertical and land knees to the ground, looking back at Officer Payne. All of this
within a second or two before being shot by Officer Payne. Furthermore, given
this writer's extensive law enforcement experience, training, knowledge
education, and expert witness experience, I have never heard of the term
"shooter's posture" as described by Officer Payne. Whatever Officer Payne meant
by the term, he testified that Mr. Lowery had his back to Officer Payne and his
knees on the ground when he was shot. That is not the posture of a shooter as it
pertained to Officer Payne.

1.7    The Titusville Police Department Professional Standards Division, Administrative
Investigations report, case Number 0318-IA, determined and sustained that Officer Payne
violated the following TPD policies, in addition to other City of Titusville Personnel
Policies not cited in this report.[8]

*"City of Titusville Police Department General Order, 300.6-Standards of Conduct
(4)(A)(23) Unsatisfactory Performance.*

*City of Titusville Police Department General Order 300.6 - Standards of Conduct
(4)(A)(2) Professional Conduct.*

*City of Titusville Police Department general order 300.6- Standards of Conduct
(4)(A)(10) Unnecessary Force."[9]*

*<u>"City of Titusville Personnel Policy (revised 06/04/2021) 6.13 (F)(15) disciplinary
Actions/Capital Violations and Suggested Discipline – (Depending on circumstances
and/or progressive disciplinary actions) /Unlawful [10]or improper conduct, either on or</u>*

---

[8] TPD Professional Standards Division Administrative Investigation Report – 0318-IA – *Conclusion* (p. 98-107).

[9] TPD Professional Standards Division Administrative Investigation Report – 0318-IA (p. 98).

[10] TPD Professional Standards Division Administrative Investigation Report – 0318-IA (p. 104).

*off the job, which tends to affect the employee's relationship to his/her job, fellow
workers, his/her reputation or goodwill in the community.*

- *Based on the conclusion of this investigation, Officer Payne's decision to use
deadly force demonstrated improper conduct and affected his relationship to his
job, fellow workers, and his reputation or goodwill in the community.*
- *Based on the conclusion of this investigation, Officer Payne's failure to retain
training affected his conduct during this incident, which in turn affected his
relationship to his/ her job, fellow workers and his reputation for goodwill in the
community."[11]*

*"City of Titusville personnel policy (Revised 06/04/2021) 6.13 F(20) Disciplinary
Actions/Capital Violations and Suggested Discipline - Actions when considered on
their own merit are equal and seriousness to the established capital violations.*

- *Officer Payne's decision to use deadly force and his failure to retain training and
established policy principles based on the findings of this investigation are equal in
seriousness to establish capital violations as noted above."[12]*

*"City of Titusville Police Department General Order G.0.300.6. - Standards of
Conduct/ (4)(A)(22) Conformance to Laws.*

- *Based on the conclusion and summary of the independent criminal investigation
conducted by the Florida Department of Law Enforcement, charges were brought
against Officer Payne for Manslaughter by means of Culpable Negligence.*
- *Officer Payne resigned his position as a police officer prior to providing any
statement, through an interview or by other means, in accordance with his police
officer bill of rights.*
- *The charges against Officer Payne did not result in a conviction prior to his
resignation. Therefore, this policy of conformance to laws cannot be sustained."[13]*

1.8    As previously noted in this report, TPD Officer Payne responded to an area in the City of
Titusville to search for a domestic battery suspect which had recently occurred. The
domestic battery report was authored by TPD Officer Logan, Case # 2021-00100443, and

---

[11] Ibid (p. 104).
[12] Ibid (p. 105).
[13] Ibid (p. 106).

14

occurred at 909 Gibson Street.[14] While searching the area, Officer Payne came across James Lowery who generally matched the description of the suspect in the domestic battery (it would later be determined that Mr. Lowery was not the domestic battery suspect).[15] Officer Payne exited is patrol car and confronted Lowery. Lowery took off running from Officer Payne. Officer Payne gave chase, on foot, after Officer Payne advised over the police radio that he was engaged in a foot pursuit. As Mr. Lowery was running he was observed dropping items on the ground (later discovered to be narcotics).[16]

1.9    During the foot pursuit, Officer Payne discharged his Taser weapon[17] twice at Mr. Lowery (although he would activate the Taser several other times during the event).[18] The Taser weapon did not have an effect on Mr. Lowery. During the foot pursuit, Officer Payne eventually had his firearm in his left hand and his Taser weapon in his right hand.[19] The pursuit came to an end along the side of a house located at 1520 Gayle Ave., Titusville. Mr. Lowery had stopped at a fence gate on the side of the property. Officer Payne continued to order Lowery to get on the ground and activated his Taser weapon, with no effect. Mr. Lowery turned toward Officer Payne, ignoring Officer Payne's orders to get on the ground, and came towards Officer Payne, grabbing the Taser wires and his gun.[20] Officer Payne claimed he may have drive-stunned[21] Mr. Lowery with his Taser weapon during the brief altercation. Mr. Lowery then turned towards the fence gate and jumped over the fence head first.[22] Officer Lowery approached the fence, reached over the fence with his firearm in his left hand and his Taser weapon in his right hand and he discharged one round from his firearm and struck Mr. Lowery in the back of the head killing him. Mr. Lowery fell to the ground and Officer Payne notified police dispatch that shots had been fired.[23]

---

[14] TPD Case Report, Case # 2021-00100443, titled Domestic Disturbance, authored by TPD Officer Logan.

[15] FDLE Use of Force Investigation – Titusville Police Department, Case Number: OR-27-0404.

[16] Ibid.

[17] Taser weapon is a device that can cause electro-muscular disruption in a person when deployed. Officer Payne had a Taser weapon that had two cartridges that could deploy two dart like prongs each, connected to wires, and an electrical charge (12 Volts) can be activated by pulling the weapon's trigger. The effect of the deployment causes muscle to lock-up or freeze causing the individual to fall or drop. Officer Payne deployed both cartridges with no effect on Mr. Payne. The Taser can be activated any number of times by pulling the trigger.

[18] FDLE Use of Force Investigation – Titusville Police Department, Case Number: OR-27-0404.

[19] Ibid.

[20] Ibid.

[21] Drive stun is a pain compliance technique using the Taser weapon without use of the darts.

[22] FDLE Use of Force Investigation – Titusville Police Department, Case Number: OR-27-0404.

[23] Ibid.

15

1.10   Titusville Commander Demmon was a Lieutenant overseeing Internal Affairs when the
shooting incident occurred and was tasked with investigating the actions of Officer
Payne. Commander Demmon testified in his deposition (p. 49) that he determined the use
of force by Officer Payne was not justified. He further testified (p. 50) the force used by
Officer Payne was not objectively reasonable. He further testified (p. 51) that Officer
Payne did not use other force options that were available to him during his encounter
with Mr. Lowery.

1.11   Commander Demmon testified (p. 54) that Officer Payne had his Taser weapon and his
firearm in his hands when he approached the fence where Mr. Lowery initially stopped
and then jumped over. According to Commander Demmon (p. 54), other TPD officers he
interviewed during his Internal Affairs investigation suggested that Officer Payne's
actions in this instance were unreasonable [simultaneously carrying a firearm and Taser
weapon unholstered]. Commander Demmon testified (p. 55) that he concluded Officer
Payne violated TPD training by having his taser and sidearm in his hands as he
approached the fence. He further testified (p. 56) the reason that officers should not hold
both weapons simultaneously is due to a sympathetic reflex.[24]

1.12   TPD Commander Wright was the agency's high-liability training instructor at the time
the shooting incident occurred. TPD Commander Wright described in his deposition (p.
29) a sympathetic reflex, stating, "The uncontrolled, basically the uncontrolled movement
of your hand." The sympathetic reflex could result in a negligent discharge of a gun.
Commander Wright testified (p. 31) that one of the cardinal rules of firearm safety is not
to have your finger on the trigger of a firearm unless you intend to pull the trigger. More
succinctly, the cardinal rule just mentioned, states "Keep your finger off the trigger until
your sights are on target."[25] Commander Wright testified (p. 37) that having a gun and a
Taser weapon deployed at the same time at a subject is discouraged and TPD officers are
not trained to do that. He further testified (p. 37) that simultaneously presenting a gun and
a Taser at a subject would not lead to a sympathetic reflex, yet the TPD discourages such
actions. Conversely, Commander Wright testified (p. 56) that he concluded that Officer
Payne discharged his firearm based on a sympathetic reflex. Commander Wright testified
(p. 38) that TPD does not train its officers to run after someone with both a gun and Taser
weapon unholstered. Commander Wright testified (p. 39) that Officer Payne would have
been instructed to holster the Taser weapon if transitioning to lethal force (a gun).

---

[24] Sympathetic reflex suggests that the use of one hand, while holding an object or in this instance, a gun, while
holding another item in the opposite hand or in this instance, a Taser weapon, could cause a person to flex the
fingers of the opposite hand resulting in the discharge of Officer Payne's gun.
[25] Wilson, Jim. (February 8, 2021, p. 3). How to Avoid Negligent Discharges. National Rifle Association.

Commander Wright testified (p. 63) that it was not reasonable to point a gun and Taser at the same time and is not in line with TPD training. He further testified (p. 66-67) that doing as such would be a "bad decision." Commander Wright provided a statement to TPD Internal Affairs. Commander Wright (Lieutenant at the time of the statement) was asked *"So it is reasonable for an officer to point both their Taser and their gun at a subject at the same time?"* He responded, *"At the same time, no, that's not reasonable and that's not in line with our training."*[26]

1.13    Commander Wright testified (p. 69) that after reviewing Officer Payne's BWC video, he did not see anything that demonstrated a lethal threat [requiring deadly force by Officer Payne]. Commander Demmon testified (p. 49) that he determined in his Internal Affairs investigation that the use of force by Officer Payne was not justified. He further testified (p. 50) that the force used by Officer Payne was not objectively reasonable. Commander Demmon testified (p. 52) that Officer Payne violated TPD General Order 412. Commander Demmon testified (p. 62) that Officer Payne did not maintain his competencies to perform his duties.

1.14    Former Officer Joshua Payne testified in his deposition (p. 34) he heard over the police radio a call regarding a domestic disturbance and he responded to the area to be of assistance for other officers assigned to the call. According to Officer Payne (deposition testimony, p. 35), Officer Gonzalez pointed in a general direction where a Black male subject was walking towards the officers and upon seeing them, he immediately turned around. Officer Payne started to look for the subject. Officer Payne testified (p. 37) he observed a Black male (later identified as James Lowery) walking in the street. Officer Payne exited his police vehicle to make contact with the individual. According to Officer Payne, the subject had his hands in his pocket, turned around quickly and started to walk away from him. Officer Payne testified (p. 38), he got on the police radio to inform dispatch and the subject sprinted away from him.

1.15    Officer Payne testified (p. 38) he ran after the subject with his Taser weapon unholstered. Officer Payne testified (pp. 39-40) he discharged his Taser weapon twice during the foot pursuit.[27] Officer Payne testified that he thought the first Taser deployment missed the subject, however, he thought the second deployment struck the subject but had no effect. Officer Payne testified (p. 40) that he had not unholstered his firearm at that point. Officer Payne testified (p. 41) that Mr. Lowery approached a gated fence (on or about

---

[26] Statement of Commander Wright to Internal Affairs, REF: IA-318 (p. 15).

[27] The Taser weapon had two cartridges that can deploy probes to strike an individual in an attempted to temporarily immobilize the person.

Gayle Street) and as he was running Mr. Lowery was reaching into his pockets dumping things onto the ground. Officer Payne activated his Taser weapon again, with no effect, and Mr. Lowery had one hand in his pocket. Officer Payne testified (p. 41) that when he and Mr. Lowery rounded a corner, and got to the gate, Lowery was cornered. He added that Mr. Lowery had his hands in his pocket and faced Officer Payne and Officer Payne unholstered his firearm [while still holding the Taser weapon in his right hand].

1.16   Officer Payne testified (p.42) he thought Mr. Lowery was going to give up, however, Mr. Lowery turned around and grabbed the barrel of his gun while striking Officer Payne. According to Officer Payne (p. 42) they were "Like throwing each other around. It was happening fast." Officer Payne disengaged, Mr. Lowery stumbled back and then jumped head-first over the gate. Officer Payne testified (pp. 47-48) he was uncertain if Mr. Lowery was armed but he did not see Mr. Lowery with a gun nor did Officer Payne see Mr. Lowery with any other weapons.

1.17   Officer Payne testified (p. 49) that he looked over the fence and observed Mr. Lowery looking back up at him. Officer Payne further testified that he was attempting to climb over the gate until he observed Lowery on the ground. Officer Payne described that he had his hands on top of the gate holding his firearm in his left hand and his Taser weapon in his right hand standing on his "tippy-toes." (Payne deposition testimony, p. 50). Officer Payne testified (pp.51-52) that Mr. Lowery was crouched down, with his back to Officer Payne, and "craned" his head to look at Officer Payne, and it looked like Mr. Lowery was on his knees. Officer Payne testified (p. 52) that Mr. Lowery was "hunched down" when he shot Mr. Lowery.

1.18   Officer Payne testified (p. 53) that he was aiming his gun at "center mass"[28] before he shot Mr. Lowery. Officer Payne testified (p. 53) he was not specifically aiming at Mr. Lowery's head, but he did intend on shooting Mr. Lowery. Officer Payne testified (p. 54) that after shooting Mr. Lowery he thought he was in a fight for his life. Officer Payne testified (p. 55) that when he shot Mr. Lowery he could not see Mr. Lowery's hands. He further testified (p. 56) that it looked like Mr. Lowery had his right hand in his pocket and his right arm was bent and concealed. Officer Payne testified (p. 58) that his (Payne's) arm was extending downward over the gate [when he shot Mr. Lowery] and Mr. Lowery was "half" crouched down. He further testified (p. 60) that he could not see Mr. Lowery's left arm. A review of Officer Payne's BWC video indicated that Mr. Lowery jumped the

---

[28] Center mass is a term universally taught to law enforcement officers regarding where to aim their firearm when deciding to shoot an individual. Center Mass refers to the torso of a human being which contains most of the vital organs of an individual.

18

fence gate, head first, at 1:05-1:06 minute mark on the video. Officer Payne shot Mr. Lowery at the 1:06-1:07 minute mark of the video. Officer Payne shot Mr. Lowery no later than one second after he scaled the fence head first with his feet in the air. Officer Payne testified (p. 123) that he agreed that the amount of time that transpired from the initial altercation on the side of the residence to the time Mr. Lowery was shot was ten seconds.

1.19    Officer Payne testified (p. 64) that he shot Mr. Lowery because he was in fear of his life. Officer Payne attempted to justify the shooting of Mr. Lowery when he testified (p. 65) that Mr. Lowery was dumping things from his pocket, reaching into his pockets, there was a brief struggle, and he thought Mr. Lowery would do anything to get away from him. He further testified that it looked like Mr. Lowery had a "shooter's posture" from his crouched position on the other side of the fence and it appeared Mr. Lowery was trying to harm him. He further testified that from that shooter's posture he thought Mr. Lowery was drawing a firearm (p. 67).

1.20    Officer Payne testified (p. 120) that when the initial domestic disturbance call was dispatched he thought it was a felony domestic battery incident. Officer Payne testified (p. 123) that he agreed that the altercation with Mr. Payne up to the time he was shot was rapidly evolving, tense and he (Payne) was uncertain Mr. Lowery was armed. Officer Payne testified (p. 125) that Mr. Lowery demonstrated "furtive" movements by having his arm in a 90 degree angle and posturing to shoot. Officer Payne claimed he was in danger.

1.21    Officer Payne testified (p. 66) that after the incident he never told any person or investigator that Mr. Lowery tried to grab his gun. He further testified that he (Payne) did not give a statement to anyone. Officer Payne testified (p. 67) that he was prosecuted by the State Attorney's Office [Brevard County]. Officer Payne testified (p. 68) that he agreed, he never told the court in his criminal case that Mr. Lowery took a "shooter's posture." Officer Payne testified (pp. 71-72) that he spoke to Lt. Gonzalez shortly after the shooting and he told Lt. Gonzalez that he thought the guy [Lowery] was going to kill him, but did not mention that Mr. Lowery allegedly tried to grab his gun. He only told Lt. Gonzalez that he got into a physical altercation with the subject.

1.22    Officer Payne testified (p. 117) that he plead guilty to the criminal Manslaughter charge, however adjudication was withheld. He further testified (p. 118) that he received five years of probation.

1.23    If a jury were to consider the facts presented during his deposition as true, they would
have to also consider the totality of the events that unfolded, reconcile the discrepancies
of his deposition testimony compared to his actions, and inactions, before and after the
shooting, the conclusions of the FDLE and TPD investigations and Payne's subsequent
pleading guilty to the criminal charge of Manslaughter for killing Mr. Lowery. Officer
Payne's plea of guilty to Manslaughter undermines any reasonableness for the shooting
of Mr. Lowery.

## CONCLUSION:

1.24    The use of deadly force by former TPD Police Officer Payne was not consistent with
well-established police practices, TPD policies, and state statute. Furthermore, the use of
deadly force killing Mr. Lowery was not reasonable for the following reasons.

1. Mr. Lowery was unarmed.
2. Mr. Lowery was running away from Officer Payne.
3. Mr. Lowery did not pose an immediate threat of great bodily harm or
   death to Officer Payne or anyone else when he was shot.
4. Officer Payne engaged in a foot pursuit and confronted Mr. Lowery
   while simultaneously holding his firearm in his left hand and a Taser
   weapon in his right hand, contrary to well-established police practices
   and procedures.
5. A reasonable officer, given similar circumstances faced by Officer
   Payne, would not have shot and killed an unarmed individual who was
   running away and posed no immediate threat to the officer or the
   public.
6. Officer Payne testified that he intended to shoot Mr. Lowery.
7. It is this writer's opinion that Officer Payne intentionally shot Mr.
   Lowery based upon Officer Payne's testimony and video evidence.
8. Regardless if Officer Payne discharged his firearm intentionally or it
   was a negligent discharge, Mr. Lowery should not have been shot.
9. Officer Payne shot and killed Mr. Lowery one second after Mr.
   Lowery jumped the fence gate, head first.
10. Once Mr. Lowery jumped the fence, Officer Payne's safety was no
    longer threatened.
11. Officer Payne provided no statement in his defense during the entire
    criminal investigation, during the entire TPD administrative
    investigation, and provided no statement of the facts as he recollected

> them to be to the court when he plead guilty to the Manslaughter
> charge.
> 12. If a jury were to determine that Officer Payne's deposition testimony
>     was true regarding the events of the incident as he perceived it, the
>     jury would have to reconcile why Officer Payne would plead guilty to
>     a criminal Manslaughter charge.
> 13. TPD Internal Affairs investigation determined, among other things,
>     that Officer Payne's use of deadly force demonstrated improper
>     conduct for the shooting death of Mr. Lowery as reviewed under the
>     objectively reasonable calculus.[29]
> 14. The TPD IA investigation determined that Officer Payne's shooting of
>     Mr. Lowery *"does not meet the objectively reasonable standard and
>     as such this use of deadly force is not justified."*[30]
> 15. Officer Payne was criminally charged by the Brevard County State
>     Attorney's Office for Manslaughter.[31]
> **16.** Officer Payne plead guilty to the charge of Manslaughter, adjudication
>     was withheld, and was sentence to five years of probation.

## Opinion 2:

Officer Payne encountered Mr. Lowery and engaged in a foot pursuit with Mr. Lowery. The foot pursuit ended when Officer Payne shot and killed Mr. Lowery. Engaging in the foot pursuit to apprehend Mr. Lowery was dangerous and unnecessary and contributed to the death of Mr. Lowery. TPD failed to train Officer Payne on foot pursuits. A law enforcement agency's failure to properly train its members is inconsistent with well-established police practices and procedures.

## Analysis:

2.1 Titusville Police Department was a Florida state accredited law enforcement agency at the time of the shooting. The Commission on Florida Law Enforcement Accreditation, Inc. (CFA) dedicates an entire standards Chapter (10) on Training which highlights the extremely important requirement of police departments to properly train their respective members. The introduction to Chapter 10 states,

---

[29] TPD Professional Standards Division Administrative Investigation Report – 0318-IA (Conclusion, pp. 98-107).
[30] Ibid (p. 103).
[31] In The Circuit Court Of The Eighteenth Judicial Circuit In And For Brevard County, Florida - Information – State of Florida vs. Joshua Nathan Payne – Manslaughter (F2) 782.07(1).

*Training is one of the most important responsibilities of any law enforcement agency. It contributes greatly toward the overall professionalism of the agency while the consequence for lack of training jeopardizes the credibility of the agency and exposes the agency to civil liability.*

*Agency training and program development should be the responsibility of a training component which develops and administers programs, and maintains records.*

*All part-time and full-time members will participate in required training."[32]*

2.2 The International Association of Chiefs of Police Concepts and Issues papers (updated July, 2019) titled *Foot Pursuits* emphasizes the dangers of foot pursuits and states, in part,

*I.   Introduction*

    *B.  Background*

*"No foot pursuit is "routine." However, the principles and rules that should be remembered when determining whether to initiate or terminate a pursuit and the procedures to follow during pursuits remain consistent. Persons who run from law enforcement do so for many reasons, but a large number flee because they know their capture will result in incarceration for the incident offense and/or other crimes as yet unknown to the pursuing officer. This warrants a high level of caution for law enforcement officers engaged in such pursuits*

*When addressing foot pursuits, agencies must establish a balance between protecting the safety of the public and officers during foot pursuits and law enforcement's duty to enforce the law and apprehend suspects. Officers should consider when deciding to engage in a foot pursuit, whether the known offense justifies the pursuit. It may be more prudent to suspend or terminate a pursuit rather than risk unnecessary injury to officers, suspects or innocent bystanders."[33]*

*II.   "Procedures.*

---

[32] Commission on Floria Law Enforcement Accreditation, Inc., Chapter 10 titled Training, Introduction (edition 1.14-Oct-2023).

[33] IACP Concepts & Issues paper (July 2019) titled Foot Pursuits. IACP Law Enforcement Policy Center (p. 1).

### A. Prevention of Foot Pursuits.

*Whenever possible, foot pursuits should be avoided. While officers cannot prevent suspects from choosing to flee, they can make it more difficult or reduce the likelihood of flight by taking simple preventative measures. This includes maintaining awareness that a suspect may consider escaping and looking for early signs of escape, to include changes in body language. For instance, the suspect may glance at a potential escape route, move a foot in one direction or shift their weight when deciding whether or not to flee.*

*Officers should also consider how they can diminish the options for flight. This may include approaching a subject when they are situated in front of a barrier such as a building, fence, hill, drop off or similar location. Approaching a suspect standing in an open area, such as an alley or field, may provide them with an unnecessary flight advantage.*[34]

### C. Deciding Whether to Pursue.

*The decision to pursue a fleeing suspect should not be regarded as required or even prudent action in all instances. The safety of the pursuing officer(s), fellow officers who may respond, and the public is the primary concern. It may be preferable for a suspect to escape than an officer take unnecessary risks that could pose unreasonable danger to officers and others.*

*However, the decision to pursue depends in part on the seriousness of the offense and the potential for harm should the suspect be allowed to flee. Because of the inherent and demonstrated dangers involved in foot pursuits, it is recommended that officers be provided with discretion to decide not to engage or to terminate a foot pursuit.*

*Even though the decision to pursue must normally be made quickly, officers should consider a number of factors such as alternatives to foot pursuit and an assessment of unreasonable dangers and risks. Officers should continue to assess and reevaluate the propriety of the foot pursuit as it progresses.*

*Alternatives to foot pursuit. Officers should consider whether reasonable alternatives to foot pursuit exists given the location, surroundings, seriousness*

---

[34] Ibid (p. 2).

*and urgency of the situation. The following are examples of potential
alternatives to consider.*

*The use of containment may be advisable in situations where the suspect flees
into a building and these situations securing the building would back up
officers followed by a systematic search is generally preferable.*

- *Aerial support. if available may be useful in a variety of situations such
  as pursuing persons in and around neighborhoods and wooded areas,
  when dark and related situations where cover is readily available and
  the chances of ambush more likely."*
- *The use of containment may be advisable in situations where the suspect
  flees into a building. In these situations, securing the building with
  backup officers followed by a systematic search is generally preferable.*
- *The use of a canine may be preferred when conducting searches of
  buildings, open fields, contained areas such as junk yards, and locations
  that provide cover and concealment options for suspects.*
- *Saturating the area with officers provides the opportunity to contain the
  suspect, block their paths of escape, and intercept them through
  coordination of officer movements.*
- *If the officer can identify the suspect and there is reason to believe that
  they can be located at a later time, it may be advisable to forgo a foot
  pursuit and utilize other methods to locate the individual.*

*Risk factors. There are a number of risk factors that officers should consider when
deciding whether to initiate or continue a foot pursuit. These include but are not
limited to the following.*

- *"Acting alone - Normally conducting a foot pursuit alone is not recommended.
  However, it is difficult to state categorically that officers acting alone should not
  conduct foot pursuits. Instead, agencies may elect to establish overriding guidance
  for these situations. For instance, agencies may allow an individual officer to
  engage in a foot pursuit if, in the officer professional judgment the need for
  immediate apprehension outweighs the danger to the officer or others."*
- *Area familiarity - Officers who are unfamiliar with the area in which pursuit will
  be conducted may be at a disadvantage. In these situations, there is a greater
  likelihood that the suspect will be able to take advantage of obstacles, hiding places,
  terrain, and other factors that the officer cannot anticipate and plan for.*

24

- *Area Hostility - Some locations, such as those in which known drug dealing is prevalent, present a strategic disadvantage to officers on foot. Individuals in these areas likely will not provide officers with any meaningful cooperation or may even assist the suspect or intervene on their behalf.*
- *Available backup – Normally, officers working alone, and particularly those working in rural environments, who cannot expect ready backup assistance or support, should not engage in foot pursuits. Again, this admonition must be weighed in the context of the situation given a trained and experienced officer.*
- *Weather and darkness – Inclement weather and darkness are additional risk factors that should be weighed by officers. Reduced visibility is a primary concern during foot pursuits as it provides more opportunities for the suspect to hide, evade capture or create an ambush. Nighttime or low-light pursuits generally require aerial support for safety and effectiveness as well as the additional assistance of backup officers for containment. Inclement weather also makes it more difficult for officers to maneuver and maintain their footing."[35]*

## E.    Foot Pursuit Tactics

*When developing their foot pursuit policies, agencies should establish approved tactics for use during the pursuit. The following are suggested procedures for agencies to consider for inclusion in their own policies and training.*

*The primary officer should directly or indirectly coordinate with a secondary officer to establish a perimeter to contain the suspect. Generally, the primary officer should not try to overtake the fleeing suspect which but should keep them in sight until sufficient manpower is available to take them into custody."[36]*

*"By the time officers have caught up with the suspect they should have developed a plan of action. In many instances, it is safer for officers to find cover a short distance away and determine whether the suspect will respond to verbal commands. This distance is important if the suspect is or may be armed has demonstrated violent behavior, or exhibits behavior that suggests attempting to restrain them could trigger an aggressive response.*

---

[35] Ibid (pp. 2-4).
[36] Ibid (p. 4).

*In general, officers should wait for backup officers to respond before effecting the physical arrest and restraint of the suspect. An officer's physical strength can be significantly depleted following a foot pursuit, which can also affect cognitive abilities. If the situation allows, officers should pause to regain their composure and strength, survey the situation, and determine how best to approach the subject.* [37]

2.3    It has been well known in law enforcement that foot pursuits of suspects by police officers are extremely dangerous. The seriousness and potential dangers associated with police foot pursuits has been known for decades as evidenced by police officer fatalities resulting from foot pursuits.[38] As cited in this report, the International Association of Chiefs of Police dedicated an entire publication on Foot Pursuits to include Considerations for policy development, Concepts & Issues paper, and Summary of key points on the topic.

2.4    Based on this writer's review of the material provided in this matter, the Titusville Police Department did not have a written policy on when and how its members should engage in foot pursuits. TPD Commander Wright testified in his deposition (p. 21) that the agency did not have a specific lesson plan for foot pursuits. However, he testified (p. 21) that Officer Payne had training on the physiological and psychological responses to stress, in general.

2.5    Commander Wright testified (p. 27) that TPD training did not prohibit an officer from unholstering their firearm during a foot pursuit, but added (pp. 27-28) that TPD did not train its officers to run after suspects with their firearm drawn. He further testified (p. 27-28) that TPD officers were instructed that running with a firearm unholstered was not the best option. He testified (p. 29), that in certain circumstances it is not a good idea to be holding a firearm while in a foot pursuit.

2.6    The Titusville Police Department does not have a foot pursuit policy that assists in guiding its members to either engage in a foot pursuit or what to do if they choose not to engage in a foot pursuit. Foot pursuits are very much like vehicle pursuits in the sense that they're uncertain and they are dangerous not only to the officer, but to the public and to the suspect the officer is chasing. To that end, there is no evidence that the Titusville Police Department provided any training or written guidance to its members, including Officer Payne, regarding the procedures to engage in a pursuit, or not.

---

[37] Ibid (pp.5-6)

[38] https://www.odmp.org/officer/2305-police-officer-nathaniel-k-broom

2.7     As previously mentioned in this report, Commander Wright testified in his deposition (p. 21) that there was no specific lesson plan for training officers in foot pursuits. He testified (p. 27) that there was no prohibition on unholstering and carrying a firearm in a foot pursuit. However, he further testified (p. 27-28) that TPD officers were instructed that running with a firearm is not the best option. He testified (p. 29), that in certain circumstances it is not a good idea to be holding a firearm while in a foot pursuit.

2.8     Officer Payne testified throughout his deposition that he was not trained by TPD on foot pursuits. Officer Payne testified (p. 87) that he agreed that TPD did not have a written policy on foot pursuits. He further testified (p. 88) TPD provided no foot pursuit training. He testified (p. 89) that he agreed that there was no TPD instruction prohibiting holding a firearm and a Taser weapon while running after a subject. He added (p. 89-90) there was no instruction or TPD General Order prohibiting an officer from dual wielding[39] during a foot pursuit. Officer Payne testified (p. 90) that no one instructed him not to dual wield his weapons (firearm & Taser weapon simultaneously) and he thought he acted according to his training when he was running after Mr. Lowery. Officer Payne testified (pp. 94-95) that although he was not trained on how to handle his firearm when he approached barriers in a foot pursuit, he thought he was following his training when he approached the fence gate while simultaneously holding his firearm in his left hand and his Taser weapon in his right hand. He further testified (p. 95) he thought he should have had training on foot pursuits. Officer Payne acknowledged, while reviewing his training with TPD, that he effectively had no training on foot pursuits (Payne deposition pp. 96-117 & deposition Exhibit 7).

2.9     Conversely, when Officer Payne was questioned during his deposition by the attorney representing the City of Titusville, Officer Payne agreed, although there was no formal training on foot pursuits, foot pursuits were discussed (Payne deposition, pp. 131-132). Officer Payne testified (p. 130) that he learned nothing about foot pursuits when he attended the police academy. Officer Payne testified (p. 140) that they [TPD] would review foot pursuit videos and critique what the officers did correctly or incorrectly. However, he testified (p. 141) that none of the videos depicted what an officer should do with a firearm during a foot pursuit.

2.11    Overall, based on this writer's review of the material provided, there were no TPD records documenting foot pursuit training.

---

[39] Officer Payne defined "dual wield" as carrying a firearm in one hand and a Taser weapon in another (Payne deposition, p. 89-90).

2.12    Officer Payne should not have engaged in a foot pursuit with Mr. Lowery. Officer
Payne was alone. It was nighttime. Officer Payne had the ability to set up a perimeter
to contain the fleeing suspect. Officer Payne had access to K-9 units who could have
conducted a search for Mr. Lowery. Had Officer Payne been properly trained on foot
pursuits, he would have considered those options rather than chase after Mr. Lowery.

2.13    Commander Wright testified in his deposition that TPD provided its officers firearm
training that included moving and shooting. The moving and shooting concept
focuses on laying down gunfire at a target and then rapidly moving to another area of
cover and deploying additional rounds at the target or multiple targets. Based on this
writer's ongoing and recent firearms and use of force training, moving and shooting
firearms training is not training related to how, or if, an officer should hold or carry a
firearm during a foot pursuit and how to do as such when the suspect is confronted or
scaling barriers.

## CONCLUSION:

2.14    The Titusville Police Department failed to properly train and instruct Officer Payne as to
how and when to engage in foot pursuits. Furthermore, the TPD failed to properly
instruct Officer Payne not to simultaneously unholster and carry a firearm in one hand
and Taser weapon in the opposite hand while engaged in a foot pursuit and when
confronting a fleeing subject. TPD's failure to properly train Officer Payne contributed to
the shooting death of Mr. Lowery for the following reasons,

> 1. Law Enforcement has known for decades that police foot pursuits are
>    dangerous to the officer, the public, and the fleeing suspect.
> 2. TPD had no written policy or procedure on foot pursuits.
> 3. Officer Payne was not formally trained on how and when to engage in
>    a foot pursuit.
> 4. TPD had no written training records on training its members on foot
>    pursuits.
> 5. There is no evidence in the record that TPD cautioned its officers not
>    to simultaneously "dual wield" a firearm and Taser weapon when
>    pursuing an offender on foot or when confronting an offender.
> 6. Failing to train an officer on foot pursuits is inconsistent with well-
>    established police practices and procedures.
> 7. TPD was a Florida law enforcement accredited agency at the time of
>    the shooting. As such, TPD had an obligation to properly train its
>    members.

8. Officer Payne testified in his deposition that he intentionally shot Mr. Lowery because he was in fear of his life. However, TPD and FDLE investigations determined that, more likely than not, Officer Payne discharged his gun resulting from a "sympathetic reflex" when Officer Payne activated his Taser weapon at the same time he shot Mr. Lowery.

9. Regardless if Officer Payne intentionally shot Mr. Lowery or the shooting resulted from a sympathetic reflex (negligent discharge), Officer Lowery was not trained in foot pursuits nor did TPD provide any written guidance regarding foot pursuits and the manner in which firearms and other weapons should be held or deployed.

*I reserve the right to amend my opinions as needed in order to rebut the opinions set forth by the Defendant's expert and/or new information is brought to light upon further discovery.*

**APPENDICES:**

Curriculum Vitae
Testimony List
Fees

Respectfully submitted,

Andrew J. Scott, III, D.C.J.
Doctor of Criminal Justice

AJS Consulting, LLC
12902 Big Bear Bluff
Boynton Beach, FL 33473

ascott@ajspoliceconsulting.com
561-302-0756

August 24, 2025

29