# EXHIBIT 1

Joshua Payne
08/06/2025

Page 1

 1                   UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION

 3            CASE NO.: 6:23-cv-01313-PGB-LHP

 4    JAMIYAH ROBINSON,
      as Personal Representative of the
 5    ESTATE OF JAMES LOWERY,
      Deceased,
 6
            Plaintiff,
 7
      v.
 8
      JOSHUA NATHAN PAYNE, individually
 9    and as an agent and employee of the
      Titusville Police Department, and
10    CITY OF TITUSVILLE, FLORIDA,

11          Defendants.
      _____/
12

13                 VIDEO-RECORDED DEPOSITION OF

14                        JOSHUA PAYNE

15

                     Wednesday, August 6, 2025
16                    10:00 a.m. - 2:10 p.m.

17

                           Lexitas Legal
18             20 North Orange Avenue, Suite 700
                     Orlando, Florida  32801
19

20

                   Stenographically Reported by:
21              Mary L. Dobson, Court Reporter
                 Notary Public, State of Florida
22

23

24

25

Page 2

```
1    APPEARANCES:
2
     On Behalf of the Plaintiff:
3
          Hart McLaughlin & Eldridge, LLC
4         One South Dearborn
          Suite 1400
5         Chicago, Illinois  60603
          (312)955-0545
6    BY:  JOHN MARRESE, ESQUIRE
          jmarrese@hmelegal.com
7
8    On Behalf of Defendant, Joshua Payne:
9         Roberts, Reynolds, Bedard & Tuzzio, PLLC
          470 Columbia Drive
10        Suite C101
          West Palm Beach, Florida 33409-1983
11        561-688-6560
     BY:  JAMES R. JIMENEZ, ESQUIRE
12        jjimenez@rrbpa.com
13
     On Behalf of Defendant, The City of Titusville, Florida:
14
          Roper, Townsend & Sutphen, P.A.
15        255 South Orange Avenue
          Suite 750
16        Orlando, Florida  32801-3450
          (407)897-5150
17   BY:  RAMON VAZQUEZ, ESQUIRE
          rvazquez@roperpa.com
18
19
20   Also Present:  Erik Nelson, Videographer
21
22
23
24
25
```

Page 3

```
1
2              I N D E X
3    Examination                                    Page
4    Testimony of JOSHUA PAYNE
5    Direct Examination by Mr. Marrese               5
     Cross Examination by Mr. Vazquez               118
6    Redirect Examination by Mr. Marrese            134
     Recross Examination by Mr. Vazquez             139
7    Further Examination by Mr. Marrese             140
8
     Certificate of Oath                            143
9    Certificate of Reporter                        144
     Errata Sheet                                   145
10   Notification Letter                            146
11
     (Stenographer's note:  Ex. 1 not attached per counsel's
12   instruction.)
13        PLAINTIFF'S EXHIBITS
14   No.                                            Page
15   1     Video recording                           62
16   2     Report form                               73
17   3     Amended Answers to Interrogatories        74
18   4     6/1/22 Letter                             77
19   5     Personnel Training Listing                83
20   6     Professional Standards Division of        84
           Internal Affairs Investigation Report
21
     7     Book 2 of 3, Titusville IA Binder 2       97
22
23
24
25
```

Page 4

```
1    Proceedings began at 10:00 a.m.:
2         VIDEO TECHNICIAN:  Good morning.  This is
3    the video-recorded deposition of Joshua Payne,
4    which is being taken in the matter of Jamiyah
5    Robinson versus Joshua Nathan Payne, et al.
6         This deposition is being held at 20 North
7    Orange Avenue in Orlando, Florida on
8    August 6th, 2025.  The videographer is Erik
9    Nelson, and the court reporter is Mary Dobson,
10   both in association with Lexitas.
11        Will Counsel please announce their
12   appearance for the record.
13        MR. MARRESE:  John Marrese for plaintiff.
14        MR. JIMENEZ:  James Jimenez for
15   defendant, Joshua Nathan.
16        MR. VAZQUEZ:  Ramon Vazquez for
17   defendant, City of Titusville.
18        THE STENOGRAPHER:  Would you please raise
19   your right hand?
20        Do you solemnly swear the testimony you
21   are about to give will be the truth, the whole
22   truth, and nothing but the truth?
23        THE WITNESS:  I swear.
24        THE STENOGRAPHER:  Thank you.
25             JOSHUA NATHAN PAYNE,
```

Page 5

```
1    having been first duly sworn, testified under oath as
2    follows:
3              DIRECT EXAMINATION
4    BY MR. MARRESE:
5    Q    Good morning.  Would you please state your
6    name for the record?
7    A    My name is Joshua Nathan Payne.
8    Q    Good morning, Mr. Payne.  My name is John
9    Marrese.  We met a moment ago.  I'm the lawyer for the
10   plaintiff in this case, who's filed a lawsuit against
11   you.
12        You understand you're here to give a
13   deposition in a civil case today, correct?
14   A    Yes, sir.
15   Q    Have you given a deposition in a civil case
16   before?
17   A    No, sir.
18   Q    Okay.  A couple of ground rules I want to go
19   over for you today.  It will be a question and answer
20   session.  I'll begin by asking most of the questions.
21   Some other lawyers may have questions for you
22   thereafter.
23        You're to provide answers to my questions, and
24   those answers are under oath, just as if you were in a
25   courtroom, in front of a judge, in front of a jury.
```

Jenna Payne
08/06/2025

Page 6

1    Does that make sense?
2    A    Yep.
3    Q    Okay.  You're doing an excellent job.
4    Continue to give verbal responses as opposed to shrugs
5    or nods.  The court reporter to your left is taking down
6    everything that we say, so it's important that both you
7    and I communicate verbally.
8    Does that make sense?
9    A    Yep, I understand.
10    Q    Okay.  Often you will anticipate the questions
11    I'm about to ask you.  They'll be obvious to you, maybe.
12    Wait until I finish before you provide your answer.  And
13    the same rule goes for me, I need to wait until you
14    finish your answer before I ask my next question.
15    Does that make sense?
16    A    Yep.
17    Q    That's the same reason -- the court reporter's
18    writing down everything that we say.  There's gonna be a
19    written transcript along with a video evidence, but that
20    helps make the proceedings go more smoothly and makes
21    sure that you know what I've asked you before you
22    answer, okay?
23    A    Okay.
24    Q    All right.  If you don't understand a question
25    that I've asked you, just let me know.  If it makes

Page 7

1    sense, I'll rephrase it, okay?
2    A    Okay.
3    Q    All right.  If you don't know the answer to --
4    to a question, that's okay.  I don't want you to guess
5    or speculate today.  I'm here to get answers from you
6    based on your personal knowledge and recollection.
7    Does that make sense?
8    A    Yes.
9    Q    Okay.  And we'll be going for a little bit of
10    time today.  If you need a break at any time, just let
11    me know.  We can take it.  It doesn't matter why.  If
12    you want to get up, walk around, use the restroom,
13    whatever.  The only exception to that rule is if I have
14    a question pending, please answer it before we take the
15    break, okay?
16    A    Okay.
17    Q    All right.  Thanks.
18    I want to talk to you about any preparation
19    you did for today's deposition.  With the caveat that I
20    don't want you to tell me what you spoke about with your
21    attorney or attorneys.  That's private, that's
22    privileged.  You don't have to tell me that.  You
23    shouldn't.
24    What I am gonna ask you about is -- is just to
25    get a general sense of what you did.  So, meetings you

Page 8

1    had, any documents you reviewed; things like that.
2    With that kind of introduction, did you meet
3    with your attorneys to prepare for today?
4    A    Yes.
5    Q    How many times?
6    A    We had a Zoom call a couple of weeks ago.  And
7    then we met prior to this meeting this morning.
8    Q    Thank you.  And the Zoom call a couple of
9    weeks ago, who was that with?
10    A    Mr. James, right here.
11    Q    And just Mr. James?
12    A    Yes, sir.
13    Q    Okay.  And how long did that Zoom call last?
14    A    I'd say approximately 30 minutes, maybe less.
15    Q    Okay.  And then, in the meeting that you had
16    this morning, was that with Mr. James, as well?
17    A    Yes, sir.
18    Q    Okay.  And how long was that meeting?
19    A    Approximately 15 minutes.
20    Q    Okay.  And, other than that, you have not met
21    with any attorneys to prepare for today's deposition in
22    particular?
23    A    No, sir.
24    Q    All right, thank you.
25    As a part of your preparation for today's

Page 9

1    deposition, whether it was during a meeting with your
2    attorney or just on your own, did you review any
3    documents?
4    A    I just quickly watched the body cam video of
5    it one more time.
6    Q    Okay.  And the body cam video that you're
7    referencing is your body camera video from December
8    26th, 2021?
9    A    Yes, sir.
10    Q    Okay.  And when you say you watched it one
11    more time, you had watched it before that?
12    A    I had watched the -- whatever was put out on
13    the news, as far as that body cam.  Because I was never
14    shown the full one like I have right now.
15    Q    Okay.  And so, when did you first review the
16    full body cam?
17    A    Yesterday.
18    Q    Okay.  And, prior to that, all that you had
19    reviewed of your body cam was what you were able to see
20    on the news?
21    A    Correct.
22    Q    Okay.  And I'll show you the body camera
23    footage I have for you from the night in question today.
24    It's a little less than 15 minutes long.  The version I
25    have, 14 minutes 39 seconds.

Page 10

1    Is that about what -- what the video that you
2  looked at?
3    A   Yes, sir.
4    Q   Okay.  Other than that video, did you review
5  any other video?
6    A   No, sir.
7    Q   Okay.  Did you review any documents, whether,
8  you know, paper document or electronically, online?
9    A   I just looked at the transcripts that were
10  being forwarded between attorneys.
11    Q   Okay.  And when you say "transcripts", were
12  they transcripts of depositions taken in this case?
13    A   Yes, sir.
14    Q   Okay.  And do you remember whose deposition
15  transcripts those were?
16    A   Matt Demmon, Xavier Spies, Matthew Gonzalez,
17  and major -- Major Gonzalez.  I think he's a major.  And
18  I read the mother.  I can't remember her name, and
19  Jamiyah's transcript, as well.
20    Q   Thank you.  James Lowery's mother's name is
21  Linda Lowery Johnson.
22    Is that the deposition you think you reviewed?
23    A   Yes.  Yes, sir.
24    Q   Thank you.  And Major Gonzalez, is that Jeremy
25  Gonzalez?

Page 11

1    A   Yes, sir.
2    Q   Thank you.  And were you more or less
3  reviewing those as you received them, as time went on?
4    A   Yeah.  As each one came in, I would click and
5  just read it briefly and then wait for the next one to
6  come.
7    Q   Okay, thank you.
8    Other than the deposition transcripts you just
9  mentioned, have you reviewed any other documents in
10  preparation for today?
11    A   No.
12    Q   Okay.  How about prior to, you know, beginning
13  your preparation for today, did you review any documents
14  associated with the case?
15    A   Related to the -- civil case?
16    Q   Yes.
17    A   No.
18    Q   Okay, thank you.
19    And then, how about have you ever reviewed the
20  Titusville Police Department's Internal Affairs
21  investigation and report, those documents?
22    A   No.
23    Q   Okay.  So, you've not reviewed their
24  conclusions in this matter either, correct?
25    A   No.

Page 12

1    Q   Okay.  Have we covered everything that you
2  reviewed to prepare for today's deposition?
3    A   Yes.
4    Q   Thank you.  Did you do any Internet research
5  in conjunction with this case?
6    A   No.
7    Q   Okay, thank you.
8    How old are you?
9    A   I'll be 33 on December 28th of this year, so
10  32.
11    Q   Thank you.  And you live in Florida?
12    A   Yes, sir.
13    Q   Are you married?
14    A   Yes, sir.
15    Q   And where -- and you live in the state of
16  Florida, you already established that.  You're married.
17    Do you have any children?
18    A   Two step-children.
19    Q   Thank you.  And how long have you been
20  married?
21    A   Just a little bit over a year.
22    Q   And do you plan to remain in Florida for the
23  foreseeable future, in terms of being a resident?
24    A   Yes, sir.
25    Q   Okay.  Are you currently employed?

Page 13

1    A   Self-employed.
2    Q   And what do you do?
3    A   I run a landscaping company.
4    Q   And the landscaping company, is that for,
5  like, residential homes?
6    A   It's a mix of commercial properties and
7  residential homes.
8    Q   Okay.  And how long have you been doing that?
9    A   Just a little bit over two years now.
10    Q   And does the business have a name?
11    A   Payne In My Grass Landscaping.
12    Q   And do you have any employees other than
13  yourself?
14    A   No, sir.
15    Q   Okay.  Have you ever been in the United States
16  military?
17    A   No, sir.
18    Q   Okay.  Where did you attend high school?
19    A   Winter Springs High School in Orlando,
20  Florida.
21    Q   And you graduated, correct?
22    A   Correct.
23    Q   In what year?
24    A   2011.
25    Q   And then, you also obtained a college degree,

Page 14

1  correct?

2      A    Correct.

3      Q    And where did you obtain that from?

4      A    I got my -- or I got my associate's degree

5  from Seminole State.  And then, I got my bachelor's in

6  Criminal Justice from UCF.

7      Q    And have you taken any additional education

8  outside of the law enforcement context, beyond receiving

9  your bachelor's?

10     A    I started my master's degree and I got, like,

11 two semesters in.

12     Q    And what were you studying?

13     A    Public administration.

14     Q    And when -- what year were those two

15 semesters?

16     A    The -- like, August of 2021, and then January

17 of 2022.

18     Q    Okay.  And so, you remained there through that

19 second semester, January -- that began January of 2022?

20     A    I'm not sure if I finished the semester

21 because it was around all of this happening.  But I had

22 started the second semester.

23     Q    And so, you couldn't say when you stopped

24 going, in terms of what month?

25     A    I'd say March of 2022.

Page 15

1      Q    And -- thank you.

2           What college did you attend for that or

3  university?

4      A    Florida Institute of Technology.

5      Q    And why did you begin attending Florida

6  Institute of Technology to get that master's?

7      A    It was a course that was provided as officers

8  that had their bachelor's degrees, and teachers would

9  come into the police department.  And so, class was held

10 at the police department.  So, it was one of those

11 things where they would pay for you to further your

12 education.

13     Q    The decision to stop, was that one that you

14 made or did someone tell you that you had to stop?

15     A    That was my decision.

16     Q    Okay.  And why did you stop?

17     A    Because the department was paying for the

18 classes, and then all of this happened and I was just

19 unsure if it was gonna continue or not.

20     Q    Okay.  In other words, you didn't know if they

21 would pay for the schooling anymore?

22     A    Correct.

23     Q    Okay.  Do you have any plans to go back?

24     A    No.

25     Q    Do you stay in touch with anyone at the

Page 16

1  Titusville Police Department?

2      A    A few people.

3      Q    Who do you stay in touch with?

4      A    I've talked to and Xaviaz Baez, maybe here and

5  there.  You know, happy birthday or something like that.

6  I talk to Carly Rosis, just catching up, seeing how

7  everything's going.  And, who else?  Brian Deal, I talk

8  to.  Just people on the squad.

9      Q    Mr. Baez gave a deposition in this lawsuit,

10 and you reviewed that deposition transcript, correct?

11     A    Correct.

12     Q    Did you talk to him after that?

13     A    No.

14     Q    Okay.  Do you remember the last time you spoke

15 with him?

16     A    Maybe two months ago.

17     Q    And what did you guys talk about?

18     A    I just saw that his kids were getting bigger.

19 And I was just telling him, you know, they look like

20 you.  Congratulations.  You know, your family's

21 beautiful.

22     Q    So, just a personal call like that?

23     A    Yeah.

24     Q    Okay.  And did you know that he was being

25 deposed at that time?

Page 17

1      A    No.

2      Q    Okay.  And did you discuss this lawsuit at all

3  at that time?

4      A    No.

5      Q    And the conversation you had with them, was

6  that over the phone?  Was that in person?  Was that via

7  social media?

8      A    I don't remember.

9      Q    Are you connected with Officer Baez on social

10 media?

11     A    Yes.

12     Q    Okay.  In -- in what social media app?

13     A    Instagram.

14     Q    Have you ever texted any Titusville Police

15 Department officer about this shooting?

16     A    No.

17     Q    Okay.  Have you ever texted any Titusville

18 Police Department officer about this lawsuit?

19     A    No.

20     Q    How about with respect to e-mails, have you

21 ever e-mailed any Titusville Police Department officer

22 about the shooting or this lawsuit?

23     A    No.

24     Q    Okay, thank you.

25          Have you ever sent any direct messages on

Page 18

1 social media or similar platforms to any Titusville
2 Police Department officer about this shooting or this
3 lawsuit?
4     A    No.
5     Q    We've spoken about your meetings with
6 attorneys.
7         So, my next question is, other than your wife
8 or your parents, have you spoken to anyone about this
9 civil lawsuit?
10     A    No.
11     Q    Okay.  Have you ever written about the
12 shooting in any form online?
13     A    No.
14     Q    Okay.  And so, it's fair to say that you've
15 never posted it anywhere?
16     A    No, no.
17     Q    Thank you.  And fair to say, other than with
18 attorneys or messages exchanged with your wife, you
19 haven't written about this lawsuit to anyone?
20     A    Correct.
21     Q    Thank you.  In Officer Baez's deposition, he
22 testified that he had spoken to your girlfriend, at the
23 time, on the evening of the shooting.
24         Was your girlfriend then, is that your wife
25 now?

Page 19

1     A    No.
2     Q    Okay.  And what is your wife's name?
3     A    Jocelyn, J-O-C-E-L-Y-N.
4     Q    And is her last name Payne?
5     A    It's Novoa, N-O-V-O-A.
6     Q    Thank you.  And who was your girlfriend at the
7 time of the December 26th, 2021 shooting that Officer
8 Baez spoke with?
9     A    Her name is Meryem, M-E-R-Y-E-M; last name
10 E-L-F-E-R-R-A-N-E.
11     Q    And do you know where Meryem lives?
12     A    No.
13     Q    And when did your relationship with Meryem
14 end?
15     A    April 2022.
16     Q    And when were you married?
17     A    May 2024.
18     Q    Thank you.  And so, you never texted or
19 communicated in writing in any way to Meryem about the
20 shooting incident?
21     A    No.
22     Q    Thank you.  After you graduated from college,
23 you held a few jobs before you went into law
24 enforcement, correct?
25     A    Correct.

Page 20

1     Q    And what did you do?
2     A    Every job?
3     Q    Please.
4     A    I was a pizza delivery guy at Papa John's.
5 And then I worked at Carrabba's Italian Grill for a long
6 time.  And then I worked at Another Broken Egg Cafe.
7 And then police officer.
8     Q    Thank you.  And when you were at Another
9 Broken Egg Cafe, you were a line cook?
10     A    Line cook -- line cook/manager.
11     Q    Okay.  And you held that job, according to
12 your resumé, from August 2017 until you became a police
13 officer or shortly before?
14     A    Correct.
15     Q    Okay.  And when you were at Carrabba's Italian
16 Grill, you were a line cook there from May 2012 to
17 August 2017, according to your resumé; is that correct?
18     A    Correct.
19     Q    Okay.  And you were a line cook there?
20     A    Yes.
21     Q    Okay.  And you held a delivery driver position
22 at Papa John's right after college for roughly a year,
23 from 2011 to 2012; is that correct?
24     A    Yes.
25     Q    Okay.  And so, prior to becoming a law

Page 21

1 enforcement officer with the Titusville Police
2 Department, you had no law enforcement experience; is
3 that correct?
4     A    That's correct.
5     Q    Okay.  Did you have any experience as a
6 security guard of -- or anything that you might describe
7 as adjacent to law enforcement experience prior to
8 joining the Titusville Police Department?
9     A    No.
10     Q    And so, it's fair to say that your
11 professional experience as a young man out of college
12 was limited to being a cook, restaurant management
13 duties, and some delivery driving?
14     A    Correct.
15     Q    Thank you.  You did not own a firearm prior to
16 joining the Titusville Police Department, correct?
17     A    Correct.
18     Q    Prior to attending -- well, strike the
19 question.
20         Prior to joining the Titusville Police
21 Department, you attended the Florida Department --
22 Florida Law Enforcement Academy, excuse me?
23     A    Yes, sir.
24     Q    Okay.  Prior to that, did you have any firearm
25 training?

Joshua Payne
08/06/2025

Page 22

1    A    No, sir.
2    Q    Okay.  Had you ever picked up a firearm prior
3  to that?
4    A    Prior to Titusville?
5    Q    Prior to -- well, let me ask you, did you use
6  firearms at the Florida Law Enforcement Academy?
7    A    Yes.
8    Q    And prior to that, had you ever picked up a
9  firearm?
10   A    Yes.
11   Q    Okay.  On how many occasions?
12   A    I'd say approximately seven.
13   Q    Okay.  Had you ever actually discharged a
14  firearm?
15   A    Yes.
16   Q    Okay.  And -- and what was the context?
17   A    A gun range.
18   Q    And only in a gun range; is that fair?
19   A    Correct.
20   Q    Okay.  So, you never went hunting or anything
21  like that?
22   A    No.
23   Q    Okay.  And using a firearm at a gun range, was
24  it more or less just for fun, just an activity to do?
25   A    Just father-son time.

Page 23

1    Q    So, you'd do -- you did it with your dad?
2    A    Yeah.
3    Q    Okay.  The start date I have for you at the
4  Titusville Police Department was July 6th, 2020.
5        Is that consistent with your recollection?
6    A    Yes.
7    Q    Okay.  And, prior to that, you had attended
8  the Florida Law Enforcement Academy from August 19th,
9  2019 to February 28th, 2020, correct?
10   A    Correct.
11   Q    Okay.  My understanding is that the first year
12  of your tenure at the Titusville Police Department, you
13  were on probationary status; is that correct?
14   A    Yes, I think that's how it works.
15   Q    Okay, yeah.  And it's that way for anybody new
16  who joins the department as a patrol officer, correct?
17   A    Correct.
18   Q    Okay.  And that's a period during which you're
19  evaluated as a patrol officer?
20   A    The --
21   Q    The probationary period.
22   A    Yes.
23   Q    Okay.  When you are working as a probationary
24  officer in that first year, are you called a
25  probationary officer?  Is that your rank, or do you hold

Page 24

1  some other title?
2    A    You're just called a police officer.
3    Q    Thank you.  And you pretty quickly went out on
4  patrol after becoming a police officer in July 2020,
5  correct?
6    A    Correct.
7    Q    Okay.  Did you have a shift at that time?
8    A    I think my first shift was day shift on
9  Phase 1, FTO.
10   Q    And how long was Phase 1, do you recall?
11   A    I want to say a month.
12   Q    And then, after that, did you transition to a
13  different shift?
14   A    Phase 2, which is -- was night shift.  And
15  that lasted a month, as well.
16   Q    And then, did you transition thereafter?
17   A    Then go to a check-off phase, which is two
18  weeks.  And my check-off phase was also night shift.
19   Q    And what is night shift, in terms of the
20  hours?
21   A    1800 to 0600.
22   Q    Okay.  And then is there any phase after the
23  check-off phase?
24   A    No, sir.
25   Q    Okay.  And so, as a new probationary officer,

Page 25

1  you're riding with a field training officer, correct?
2    A    That's correct.
3    Q    Okay.  And so, the period of time that you
4  just identified is two and a half months time; Phase 1
5  being one month, Phase 2 being another, and a check-off
6  phase being two weeks.
7        Do we agree --
8    A    Yes.
9    Q    Okay.  Is that the period of time that you're
10  with the field training officer?
11   A    Yes.
12   Q    Okay.  Do you continue to -- to ride with a
13  field training officer there ever -- thereafter, or do
14  you get your own car?
15   A    If you successfully complete field training,
16  then they assign -- then you get to -- then you go on
17  patrol by yourself.
18   Q    Okay.  And you did that after your two and a
19  half month stint, correct?
20   A    Correct.
21   Q    Okay.  So, you successfully completed that
22  training?
23   A    Correct.
24   Q    And so, by late September of 2020, you had
25  your own patrol car?

Page 26

1    A    Yeah.
2    Q    And when you had your own patrol car after the
3  field training period, did you have a shift that you
4  typically worked?
5    A    I was on night shift, predominantly, my whole
6  time with Titusville.
7    Q    Thank you.  That's the same 1800 hours to 0600
8  hours in the morning?
9    A    With varying times.  It might be 1730 to 0530.
10  It might be 1830 to 0630; like, in those three time
11  spans.
12    Q    Thank you.  And so, on December 26th, 2021,
13  your encounter with James Lowery occurred roughly 7:15
14  in the evening or thereabouts.
15         Is that consistent with your recollection?
16    A    Yes.
17    Q    Okay.  So, it was relatively early in your
18  night shift, correct?
19    A    Yes, the shift just started.
20    Q    Okay.  And you -- and that was the typical
21  shift that -- that you were accustomed to working,
22  correct?
23    A    Correct.
24    Q    Okay.  And you were patrolling that night in
25  your own patrol car, correct?

Page 27

1    A    Correct.
2    Q    Okay.  Who was your supervisor at the time?
3    A    Sergeant Brian Nelson.
4    Q    And did you report directly to him?
5    A    Yes, sir.
6    Q    Did you report directly to anyone else?
7    A    Just Sergeant Nelson.
8    Q    Okay.  And then, who was Sergeant Jeremy
9  Gonzalez to you in -- in the chain of command?
10    MR. VAZQUEZ:  Object to the form.
11  Lieutenant.
12    MR. MARRESE:  Ah, thank you.  Let me
13  withdraw and restate the question.
14  BY MR. MARRESE:
15    Q    Who was Lieutenant Jeremy Gonzalez to you in
16  the chain of command?
17    A    He would be the Shift Commander.
18    Q    Okay.  And so, in charge of all patrol
19  officers on that particular night shift?
20    A    Correct.
21    Q    Okay.  And so, as a patrol officer on that
22  night shift, you would report to him, correct?
23    A    I would report to Sergeant Nelson, and
24  Sergeant Nelson would report to Lieutenant Gonzalez.
25    Q    Thank you.  Did you ever serve as a field

Page 28

1  training officer in the Titusville Police Department?
2    A    No, sir.
3    Q    Okay.  Do you know if you were eligible to do
4  that at the time that -- that you left the department?
5    A    I think I was just getting to that point of --
6  of the FTO's training stage.
7    Q    Thank you.  So, in other words, in your
8  understanding, you were just about reaching there, in
9  terms of experience level; but then you left the
10  department, so that never came to pass?
11    A    I had enough experience where I was
12  interviewing for other specialized positions.  But FTO
13  wouldn't be available until, like, 2022; in the middle
14  of some time that year.
15    Q    Thank you.  And what -- what specialized
16  positions were you interviewing for?
17    A    Swat Team, the Traffic Unit, and Special
18  Investigations.
19    Q    And how did that work, in terms of, did you
20  apply to those specialized units?
21    A    It was like a formal job application.  And
22  then, you would sit down in a setting like this with
23  Commanders and Sergeants and other people from that
24  division, and interview for it.
25    Q    Okay.  And so, did you submit three different

Page 29

1  applications, one to the Swat, one to Traffic, and one
2  to Special Investigations; or is that how it would work?
3    A    You submit a letter to the Commander.  And you
4  state, like, your intent and you wish to transfer out of
5  patrol to one of these departments.  And your supervisor
6  has to approve it.  And then you -- then you go -- they
7  schedule, like, an interview date for everybody.  And
8  then, you go that day and interview for it.
9    Q    Okay.  And did your supervisor approve of you
10  after you submitted a letter?
11    A    Yes.
12    Q    And did you go sit for the interview that you
13  described?
14    A    All of them.
15    Q    Okay.  And had you received any response after
16  the interview yet?
17    A    I know that -- I think I was moving forward in
18  both processes.
19    Q    When you say "both processes", what do you
20  mean?
21    A    I think I would be moving forward to do the
22  Swat tryouts.  That was supposed to happen.  And I think
23  I was moving forward to, like, the selection process
24  of -- of the Traffic Unit.
25    Q    And why did you think that?

Joshua Payne
08/06/2025

Page 30

1      A    I got good letters of recommendation, and I
2  was a pretty proactive police officer.
3      Q    And who provided the letters of
4  recommendation?
5      A    At the time, Sergeant Josh Burn; and then, my
6  Sergeant, Brian Nelson.
7      Q    Had you received any response from the
8  department in terms of moving to the Swat or Traffic
9  Unit tryouts?
10     A    For the Swat Team, I got the e-mail with all
11 the dates and when the next step was, which would be
12 February, I think, of 2022, which was the next step.
13 For the Traffic Unit, I didn't -- I didn't get to hear
14 back because this incident took place right after the
15 interview.
16     Q    And then, what about Special Investigations,
17 you interviewed for that, as well, correct?
18     A    Yes.
19     Q    And what happened thereafter?
20     A    I think out of maybe approximately six people,
21 I placed third.
22     Q    And what did that mean?
23     A    That, based off of how many spots were open,
24 they would select the -- in order of No. 1, No. 2, and
25 so on.

Page 31

1      Q    And had you heard anything?
2      A    Yeah.  That they were selecting.  They had one
3  open position.  And to -- next year, you interview again
4  to go higher up again.
5      Q    Okay.  And so, they only had one open
6  position, so you weren't gonna get it that year because
7  you were third out of six; is that fair?
8      A    Correct.
9      Q    But you -- you'd have another opportunity the
10 following year to apply again, if you wanted?
11     A    Correct.
12     Q    Okay.  In terms of Swat or Traffic Unit, did
13 you have a preference between those two, in terms of
14 what you hoped that you would enter?
15     A    Nope.  Just happy to be in either.
16     Q    Okay.  Either/or -- these are my words, but
17 either/or would have been kind of a step up in the you
18 know, your development as an officer?
19     A    It would have just been a different, like,
20 accolade to have on your career, moving through the
21 department.
22     Q    Understood.  Okay.
23         Okay.  I want to move to December 26th, 2021,
24 the incident that we're here to discuss.
25         What do you recall about the start of your

Page 32

1  shift before you responded to the call that ultimately
2  led to Mr. Lowery?
3      A    I start the shift the same way every day.  I
4  pick up my body cam from the PD, and I go, take my car
5  to go to car wash.
6      Q    And after you took your car to get a car wash,
7  did you respond to any calls before responding to the
8  one that took you to Mr. Lowery?
9      A    By the time I got done with the car wash, I
10 heard the call of the domestic.
11         That was the original call that come out over
12 the radio.
13     Q    And how long, if you recall, was it from that
14 time to when you ultimately saw Mr. Lowery for the first
15 time?
16     A    I'd say 20 minutes.
17     Q    And what information do you recall having
18 received prior to that time?
19     A    Prior to seeing Mr. Lowery?
20     Q    Yes.
21     A    Prior to seeing Mr. Lowery, I had stopped out
22 with Officer Gonzalez, maybe Officer Deal, as well.  And
23 they had -- both had the wrong subject.  And I think
24 Officer Gonzalez said -- I can't remember this detail.
25 I think Officer Gonzalez said either via the radio or

Page 33

1  via to me, and gave a description of a black male
2  wearing a -- which was the description he had gotten
3  from the victim.  And saying it was a black male.  He
4  was wearing a black hoodie with jeans, and he had dreads
5  that were tied up into a pony tail.
6      Q    And that was Officer Matthew Gonzalez?
7      A    Yes.
8      Q    And you had not spoken to the victim or
9  complainant, herself, correct?
10     A    Correct.
11     Q    And you mentioned that -- that you heard a
12 call about a domestic, correct?
13     A    Correct.
14     Q    That's a domestic battery?
15     A    They -- they come in as disturbances.  And
16 then, the dispatcher will basically let you know if the
17 battery has occurred or if it's just a verbal
18 disagreement.
19     Q    And did you get confirmation one way or
20 another?
21     A    Over the radio -- the reason why I started
22 heading over there is because I heard over the radio the
23 dispatcher was saying that there were multiple calls are
24 coming in of a man trying to push a woman into traffic.
25         So, to me, it sounded like it was gonna be a

Page 34

1  serious case.
2      Q    And then, after hearing that, you spoke to
3  Officer Gonzalez and perhaps Officer Deal?
4      A    After hearing that, I showed up to where they
5  were located, and stopped out with people and got the
6  information.
7      Q    And what did they tell you, in terms of what
8  they knew about the domestic disturbance?
9      A    They were saying there was a woman that was --
10  was battered, and -- and she looked like she had been in
11  a physical altercation.  And they had explained that she
12  had just been assaulted, I think.
13          And so, that's just the information -- to me,
14  what it sounded like is, we had a -- a felony domestic
15  battery, is what I thought we had.
16      Q    And do you recall being told anything else by
17  Officer Gonzalez or Deal before you left in your patrol
18  car?
19      A    I think they -- they tried to give out an
20  approximate location of where the subject might have ran
21  off to.
22      Q    Do you remember what that location was?
23      A    He pointed in the direction of, like, west;
24  like where Queen Street and Gayle and Cora and all those
25  streets are.

Page 35

1      Q    Were you familiar with that area?
2      A    Yes.
3      Q    Okay.  Were you very familiar with that area?
4      A    Yes.
5      Q    Okay.  And is that all the information that
6  you received from Officers Gonzalez or Deal?
7      A    Yep.  Just a description and potentially where
8  he headed, where he had headed.
9      Q    Okay.  And so, then, what did you do with that
10  information?
11      A    I got back in my car, and as I was about to
12  leave, Officer Gonzalez noticed somebody who was
13  originally walking towards us, but then had went another
14  direction.  And so, I headed in that direction that the
15  man looked like he was trying to duck off on us.
16      Q    Okay.  And is that ultimately who turned out
17  to be James Lowery?
18      A    I believe so.
19      Q    Okay.  You're not certain; is that fair?
20      A    He had to have been two blocks from where I
21  was standing, so it's -- it's -- hard to tell if it was
22  him.
23      Q    Understood.  And -- and you had never met
24  James Lowery before, correct?
25      A    Never.

Page 36

1      Q    Okay.  You are aware now that James Lowery was
2  not responsible for that domestic situation, correct?
3      A    Correct.
4      Q    Okay.  And you never -- just like you never
5  interviewed or interacted with the victim/complainant,
6  you'd never interviewed or interacted with the actual
7  suspect or offender, correct?
8      A    No.
9      Q    Am I correct?
10      A    I -- I never interviewed the suspect, no.
11      Q    Thank you.  And so, then, you drove your
12  vehicle towards the male that you saw walk away from you
13  at that point?
14      A    Correct.  I went south on Deleon Street.  And
15  then I went west.  I'm not sure -- I can't remember the
16  street name of that one.  And then, I made an immediate
17  right onto the first street.  And that male looked like
18  he was walking towards me at that point.
19      Q    Okay.  And did you think it was the same male
20  that you had seen a couple of blocks earlier?
21      A    Correct.  Because when I saw him closer, he
22  met the description that I was given.
23      Q    Then did you get out of your vehicle at that
24  point?
25      A    I exited my vehicle.

Page 37

1      Q    And did you say anything as you exited your
2  vehicle?
3      A    Standard practice for me is -- is get out of
4  my vehicle really fast and walk around the opposite
5  side.  So, as I was getting out of my vehicle and coming
6  around the passenger's side of my vehicle, I had noticed
7  the guy who was walking towards me originally before I
8  could even give him -- he had -- he had his hands in his
9  pocket and turned around really fast and started walking
10  away from me.
11      Q    And so, let me just make sure I understand it
12  correctly.
13          When you get out of the car, you come back
14  around behind the car and then -- to approach on the
15  passenger's side?
16      A    Correct.  So, like, if the car was on the
17  right side of the street, I hopped out really quick with
18  my take-down lights on him.  I walked around my car,
19  basically where the sidewalk is.  Coming around the
20  sidewalk to the front of my vehicle again.  And then, I
21  had hit him with my flashlight.  And then, he turned
22  around and walked away.
23      Q    And did you say anything to him before he
24  turned around and walked away?
25      A    I think I said -- I don't think -- I don't

Joshua Payne
08/06/2025

Page 38

1  remember.
2      Q   That's okay.  And you were in uniform?
3      A   Yes.
4      Q   You were in a marked patrol car?
5      A   Yes.
6      Q   Okay.  Then after -- well, let's pause for a
7  second and establish.
8          This is ultimately James Lowery, whoever it
9  was two blocks earlier, at this point you're dealing
10 with James Lowery, correct?
11     A   Correct.
12     Q   Okay.  After he turned and walked away, what
13 did you do?
14     A   I started to get on the radio to alert
15 somebody, alert people around me that I had somebody who
16 was clearly about to -- he appeared that he was gonna
17 run or walk away or put up a fight or -- something.
18     Q   Okay.  Did you draw any weapons at that point?
19     A   No.  As I was getting on the radio, he
20 began -- I couldn't hear what he was saying.  Had his
21 hands in his pocket and just started off jogging and
22 then sprinted -- and started sprinting away.
23     Q   And, when he started sprinting, did you run
24 after him?
25     A   I sprinted after him and I drew my taser.

Page 39

1      Q   Okay.  And, at that point, you had only drawn
2  your taser to stun him, correct?
3      A   Correct.
4      Q   Okay.  And what -- where is your taser located
5  on your person?
6      A   On my off-gun hand, so my right side.
7      Q   So, it's -- is it on your right hip?
8      A   Yes, sir.
9      Q   Okay.  And when you say your "off-gun hand",
10 that means that your gun hand is your left hand,
11 correct?
12     A   Yes, sir.
13     Q   Okay.  And so, you're a leftie?
14     A   Yes, sir.
15     Q   Okay.  And so, are you running with your taser
16 in your right hand?
17     A   Yes, sir.
18     Q   Okay.  And you ultimately discharged the
19 taser, correct?
20     A   I discharged it right after, like, the initial
21 burst of sprinting, before we exited the initial street
22 we were on.  And I think I missed.
23     Q   How far was Mr. Lowery from you when you first
24 discharged your taser?
25     A   Ten feet, maybe.

Page 40

1      Q   Okay.  You discharged your taser additional
2  times after that, correct?
3      A   Correct.
4      Q   Do you know how many times you discharged your
5  taser?
6      A   The TASER 7 only has two cartridge shots.
7      Q   Okay.  And so, you discharged it twice?
8      A   Yes, sir.
9      Q   Okay.  And did you ever make contact with
10 Mr. Lowery with any of those discharges?
11     A   I think the second one I hit him with one of
12 the barbs, because his shoulder kind of, like, flared
13 forward a little bit.  But it wasn't enough to make the
14 neuromuscular incapacitation.
15     Q   And when you discharged the taser for the
16 second time, where were you?
17     A   We had just rounded the corner onto Queen
18 Street.  And I was on Queen Street maybe halfway down
19 before we reached the other street where I discharged
20 the taser the second time.
21     Q   Okay.  When you discharged the taser the
22 second time, had you drawn your firearm yet?
23     A   No.
24     Q   Okay.  Ultimately, Mr. Lowery approached a
25 gate to a property, correct?

Page 41

1      A   Correct.
2      Q   Okay.  And what street is that gate on?
3      A   I'm gonna say Gayle.
4      Q   Okay.
5      A   But I'm not 100 percent sure.
6      Q   And so, you drew your firearm sometime after
7  discharging the second taser and before you approached
8  the gate, correct?
9      A   When Mr. Lowery was running, he had his hands
10 in his pockets, dumping things out.  And then, we
11 rounded the corner and I discharged my taser again, and
12 I still saw, like, when he did the shoulder flare thing,
13 I saw that he had one of his hands still in his pocket.
14         We rounded the corner, got to the gate.  And
15 it was like he cornered himself.  And he still had his
16 hands in his pocket and he wasn't facing me, so I drew
17 my firearm.
18     Q   Okay.  And so, you drew your firearm before
19 Mr. Lowery went over the gate, correct?
20     A   Correct.
21     Q   Okay.  And you drew your firearm off your left
22 hip?
23     A   Correct.
24     Q   With your left hand?
25     A   Correct.

Jenna Payne
08/06/2025

Page 42

1  Q   And when you drew your firearm, did you have
2  it pointed at Mr. Lowery?
3  A   When he was faced away from me, initially?
4  Yes.
5  Q   Okay.  And this is before he's gone over the
6  gate, correct?
7  A   This is -- yeah.  This is before the
8  altercation, and then he goes over the gate.
9  Q   Okay.  And you just described an altercation.
10 What did -- what did you mean by that?
11 A   When -- when we got to the gate and I assumed
12 he was gonna give up and he turned around and grabbed
13 the barrel of my gun and striked (sic) me and tried to
14 like -- like, we were like throwing each other around.
15 I don't -- it was, like, happening very fast.  But we
16 were, like, interlocked with each other.  And then, I
17 disengaged from him, and that's when he, like, stumbled
18 back and hopped the gate.
19 Q   Okay.  When -- so, you say Mr. Lowery grabbed
20 your gun barrel, correct?
21 A   Very, very briefly, yeah.
22 Q   Okay.  With what -- what hand of his?
23 A   I -- I'm not sure.
24 Q   Okay.  And when you say "very briefly", did he
25 get ahold of it?

Page 43

1  A   I just -- when I watched the -- when I was in
2  the midst of it, I saw it happening really quick.  And
3  then, when I rewatched the body camera, you can see his
4  hand grab the barrel of the gun.
5  Q   Okay.  I mean -- so, forget about watching the
6  body cam for a second.  I know it can be hard to do
7  that, but forget about that for a second.
8  In the moment, did you think he had grabbed
9  your gun?
10 A   I saw him do it.
11 Q   Okay.  And where was your gun when he grabbed
12 it?
13 A   It was, like, pointed up like this
14 (indicating) kind of.  And the taser was -- the taser
15 was kind of like right here (indicating), and my gun was
16 like this.  And then, he grabbed and it looked like we
17 tussled a little bit and disengaged.
18 Q   Okay.  And what -- and so, he grabbed the gun
19 barrel, in particular?
20 A   I don't think he maybe -- you know, if he knew
21 he was grabbing the gun barrel, but he grabbed the gun
22 barrel and grabbed me all in the same motion.
23 Q   Okay.  What -- what part of the gun barrel did
24 he grab?
25 A   Like, the slide, the top part of the slide.

Page 44

1  Q   Okay.  And so, he never got hold of it; is
2  that fair?
3  A   I would say it was in his hand for a
4  briefly -- for a brief moment.
5  Q   Okay.
6  A   Like, not the whole gun, but that portion of
7  the gun was in his hand for a brief moment.
8  Q   Okay.  And then, what -- what part of you did
9  he touch after that?
10 A   I want to say he was grabbing my shoulders.
11 Q   Okay.  And did you do anything when he did
12 that?
13 A   My whole thought process was, I -- I'm not --
14 I don't want to die.  And so, at that point, I was
15 thinking to myself, I'm way too close to this guy.  And
16 so, I disengaged from him.
17 Q   How did you do that?
18 A   I feel like I just shoved him.
19 Q   With what?
20 A   Like (indicating) -- like, I kind of just
21 pushed off of him from where we were.
22 Q   Holding the gun and the taser?
23 A   Yes.
24 Q   Okay.  And what was -- when he -- when he hit
25 your shoulder, do you know what shoulder it was?

Page 45

1  A   I want to say my right shoulder.  We were just
2  interlocked together.
3  Q   Did he say anything to you?
4  A   He was saying something, I just couldn't hear
5  it.
6  Q   Did you say anything to him?
7  A   No.  It's not -- I think I said initially
8  before the fight to get on the ground or put your hands
9  behind your back, but when the fighting was occurring,
10 he sounded like he was just grunting.  Like -- like, an
11 angry, like, somebody who's fighting, like, grunting.
12 Like, uh, uh, uh.  Like, it kind of sounded like that.
13 Q   Okay.  And when -- when he stumbled back,
14 that's when he turned and went -- and went over the
15 gate?
16 A   Correct.
17 Q   Okay.  And so, when he -- when he grabbed --
18 when you and he were in close quarters for that point in
19 time before the gate, he had both of his hands out of
20 his shirt at that point?
21 A   Yes.
22 Q   Okay.  You said he had been dropping stuff as
23 he ran?
24 A   Correct.
25 Q   Did you get a look at what it was he was

Page 46

1  dropping?

2      A    Initially, when he first took off running, it
3  looked like money was flying out of his pocket.  And I
4  think I saw a baggie, which a baggie would be, you know,
5  a plastic bag maybe with some sort of narcotic or
6  something in it.

7          I couldn't see anything else, 'cause as he was
8  running initially, he was running with one hand in his
9  sweatshirt and the other hand was giving him the --
10  like, the propulsion.

11     Q    Okay.  And so, when you describe dropping,
12  he's -- he's reaching in and dropping things to the
13  ground, correct?

14     A    He's -- he's tossing, he's reaching and
15  tossing.

16     Q    Okay.  He didn't throw anything, correct?

17     A    Meaning?

18     Q    Well, I just want to understand the movement
19  that he's making as he's running and dropping things.

20     A    He's not -- he's not running and just
21  dropping.  He's, like, tossing as he runs.

22     Q    To his side?

23     A    Yeah.

24     Q    Okay.  And Mr. Lowery goes over the gate next,
25  correct?

Page 47

1      A    Correct.

2      Q    Okay.  He uses both his hands to hoist himself
3  up over the gate, correct?

4      A    Correct.

5      Q    His feet go directly up in the air vertical,
6  as he's going over the gate, correct?

7      A    Correct.

8      Q    Okay.  At the time that he turns and runs to
9  the gate, you have not seen any firearm on Mr. Lowery's
10  person, correct?

11     A    By the time we disengaged and he turned, I
12  couldn't see.  He wasn't facing me, so I wasn't able to
13  tell if he was armed or not at the time he went over the
14  gate.

15     Q    You had not seen any firearm at that time,
16  correct?

17     A    On Mr. Lowery?

18     Q    Correct.

19     A    Correct.

20     Q    Okay.  And he had just used both his hands,
21  you say, to engage with you before the gate, correct?

22     A    Correct.

23     Q    And there was no firearm in his hands,
24  correct?

25     A    Correct.

Page 48

1      Q    There was no other weapon in his hands,
2  correct?

3      A    That's correct.

4      Q    Okay.  When he went over the gate, it was the
5  same, no firearm no weapon in his hands, correct?

6      A    He went over the gate.  It's just -- that
7  whole area is dark.  It was dark.  And so, when he went
8  over the gate, when I looked down at him, all I could
9  see was him, like this (indicating), looking up at me.

10     Q    And so --

11     A    So, I couldn't see what was in his hands.

12     Q    So, listen to my question.  And maybe my
13  question wasn't clear.

14         I'm talking about as he hoists himself up over
15  the gate.

16     A    Did I see?

17     Q    You testified he used his hands to do that,
18  right?

19     A    Yeah.

20     Q    Okay.  So, he didn't have any weapons in his
21  hands while he did that, correct?

22     A    No.

23     Q    Okay, thank you.

24         Okay.  You would agree with me that when
25  Mr. Lowery goes over the gate, he's continuing to flee

Page 49

1  from you, correct?

2      A    Correct.

3      Q    Okay.  When he goes over the gate, his back is
4  to you, correct?

5      A    Correct.

6      Q    Okay.  He's trying to get away, correct?

7      A    Correct.

8      Q    Okay.  You follow to the gate, correct?

9      A    Correct.

10     Q    Okay.  When you get to the gate, what happens?

11     A    I go -- 'cause, like, it was dark, so I didn't
12  see beyond the gate.  So, I go to go over the gate.  And
13  then, when I looked down to see where I'm gonna land, I
14  see him.  And he's looking up at me like this
15  (indicating).

16     Q    Did you attempt to climb over the gate?

17     A    I was attempting to climb over the gate,
18  initially, until I looked down to see where my landing
19  spot was and I saw him in the position I -- I described.

20     Q    Whether you say you were "attempting
21  initially", what does that mean?  What did you do?

22     A    I put my -- I put my hands like this
23  (indicating), 'cause I had my firearm in this hand and
24  my taser in this hand.  I go like this (indicating) to
25  see above the gate, to see what's -- what's past the

Joshua Payne
08/06/2025

Page 50

1  gate. And that's where I saw him.
2      Q    Okay. And so, your hands are like you just
3  indicated, on top of the gate with both firearm in left
4  hand and taser in the right hand?
5      A    Correct.
6      Q    Is your fist closed around the handle on each
7  of those weapons?
8      A    It's probably holding onto the handle of the
9  weapons, but my finger is not in the trigger guard of
10  these weapons.
11      Q    Okay. So, your finger's not on the firearm's
12  trigger at that point?
13      A    Correct.
14      Q    Okay. And did you push yourself up off the
15  ground at all?
16      A    No. I stood on, like, basically like my tippy
17  toes.
18      Q    You got to the fence, put both hands on it,
19  and stood on your tippy toes?
20      A    Like, pressed up like this yeah (indicating).
21  Like, I don't even know if it was my tippy toes, because
22  the gate wasn't that tall. Like, it was just like chain
23  link gate that was covered, so you couldn't see what was
24  beyond the gate.
25      Q    Okay. And we'll look at the video in a

Page 51

1  second. There's a piece of -- of kind of sheet metal or
2  something like that on the gate, correct?
3      A    Yeah, something was blocking the --
4      Q    Okay. And what do you see when you look over?
5      A    I see Mr. Lowery. Like, I don't know what the
6  position name you would call it in, he's -- he's like
7  crouched down looking back at me like this (indicating).
8  Like looking up. Like, if this was the fence and I'm
9  looking over the fence, he's like this (indicating).
10      Q    Okay. So, his back is to you, but he's craned
11  his head back towards you?
12      A    Yeah, his head is turned back like -- like,
13  his head -- like, is turned back this much. So, I see
14  this profile of his face, and like this (indicating).
15      Q    Okay. And where are his feet?
16      A    It looked like he was on his knees.
17      Q    And could you see his hands?
18      A    No. I saw just that one -- just that one,
19  like, elbow bent. Like, that's the only visual of his
20  hand I could see.
21      Q    Okay. So, you only saw his elbow bent?
22      A    Yes.
23      Q    Okay. You did not see any of his hands?
24      A    Correct.
25      Q    Okay. And so, if his back is to you as you

Page 52

1  just described it, you say that's his right elbow that's
2  bent?
3      A    Correct.
4      Q    Looking like he's on his knees?
5      A    Correct. Like, it just looks like he, like,
6  either was waiting for an ambush, or he was just sitting
7  there maybe thinking we would run past him. I don't
8  know.
9      Q    You said it looked like he was on his knees.
10          Was his -- was he straight up in a
11  perpendicular position, or was his butt resting on -- on
12  the backs of his -- back of his calves? Describe what
13  he looked like when he was on his knees.
14      A    Just -- just, maybe in a position like --
15  like, he was on his knees, like somebody who's doing
16  like a -- like a dumbbell row, like. Like, you couldn't
17  see his other hand, but maybe he was using that to kind
18  of prop himself. And then, his other hand was like this
19  (indicating). It's like he was on his knees, but he
20  wasn't up. He was, like, hunched; like this
21  (indicating).
22      Q    Okay. And that's when you shot him?
23      A    Correct.
24      Q    Okay. You shot him once?
25      A    Correct.

Page 53

1      Q    And that shot was in the back of the head?
2      A    I guess that's what they found out. I
3  didn't see where the shot had placed.
4      Q    What were you aiming for when you shot him?
5      A    Like, center mass.
6      Q    And what is "center mass" in that situation?
7      A    Just -- just, like, the body area.
8      Q    Okay. But his back was to you, so through the
9  back to the front chest area?
10      A    Yeah. Like just, I was aiming for just the
11  body area of him. I wasn't, like, aiming specifically
12  at his head.
13      Q    Okay. You intended to shoot him, correct?
14      A    Correct.
15      Q    And when you shot him, he was in the position
16  that you just described for us, correct?
17      A    When I shot him? Yeah, he was in the position
18  that he was in. And then, after I shot him, he just
19  dropped.
20      Q    Okay. You knew immediately that you had
21  disabled him, correct?
22      A    I knew that he was disabled, yes.
23      Q    Okay. In other words, you were not concerned
24  that he was gonna get back up and reengage, correct?
25          MR. VAZQUEZ: Object to the form.

Page 54

1        MR. JIMENEZ:  Join.  You can answer.
2        MR. MARRESE:  Let me -- let me reask the
3    question.
4    BY MR. MARRESE:
5        Q    In other words, after you shot him, you were
6    not concerned that he was going to get back up, correct?
7        A    After I shot him, I was just like -- I wasn't
8    thinking about whether he was gonna get back up or not.
9        Q    Okay.  So, you didn't know one way or another?
10       A    No.  It was almost like I shot him, and then,
11   like, all the emotional buildup that was occurring
12   through this whole experience had just been released.
13   And, like -- like, I had -- I had seen other police cars
14   showing up.  And, like, I felt like I was just in a
15   fight for my life, so I couldn't -- I just -- everything
16   kind of tunneled.  Like, and your ears are ringing and
17   stuff, so you can't -- like, I wasn't -- I wasn't really
18   thinking if he's gonna get back up or not, 'cause I saw
19   everybody else showing up.
20       Q    Did you know that you had shot him in the
21   head?
22       A    No.
23       Q    Okay.  You didn't know where you had shot him?
24       A    No.
25       Q    Okay.  Did you have a belief as to where you

Page 55

1    shot him?
2        A    When everything was happening so fast, after I
3    had shot him and maybe two seconds, three seconds later,
4    other officers showed up.  And then, somebody put it out
5    over the radio that -- and that's when I found out I
6    shot him in the head.  They said, Dude, we have a head
7    shot, or something like that, over the radio.
8        Q    Okay.  You described Mr. Lowery's right arm
9    being bent when he was in the position you described
10   earlier, correct?
11       A    Correct.
12       Q    And that's -- it was bent when you shot him,
13   correct?
14       A    Yes.
15       Q    Okay.  You could not see his hands, correct?
16       A    Correct.
17       Q    Okay.  You did not see his hands in his shirt,
18   correct?
19       MR. VAZQUEZ:  Object to the form.
20       MR. JIMENEZ:  Join.
21       A    Can you rephrase that question?
22   BY MR. MARRESE:
23       Q    Like, did you see -- did you see that his
24   hands were in his shirt at all?
25       A    After he went over the wall?

Page 56

1        Q    Yeah.
2        A    Yeah, it looked like -- it looked like the
3    right hand was in his sweatshirt pocket.
4        Q    Right.  But you couldn't see it in his
5    sweatshirt pocket, correct?
6        A    Correct.
7        Q    You're saying it looked like that because of
8    the way his arm was bent?
9        A    It just -- it just -- honestly, it just looked
10   like his hand was in his sweatshirt pocket.  It just was
11   sitting -- it wasn't sitting in a pocket.  It wasn't
12   sitting planted on the floor.  It was just sitting like
13   this (indicating).
14       Q    Okay.  And -- but my question is, you are
15   reaching -- you reached that conclusion because the arm
16   was bent, correct?
17       A    The conclusion that he might be armed?
18       Q    No.  The conclusion that his -- that it looked
19   like his -- his hand was in his sweatshirt.  Because --
20   well, let's just establish this.
21            You didn't see it in his sweatshirt, correct?
22       A    Correct.
23       Q    Okay.  But you did -- your observation was
24   that his arm, his right arm was bent, correct?
25       A    His right arm was bent and it was concealed.

Page 57

1        Q    Okay.  And then, based on that, you're
2    concluding that it was in his -- potentially in his
3    sweatshirt?
4        A    Correct.
5        Q    Okay.
6        MR. VAZQUEZ:  Can we take a break now,
7    John?  Is it a good time to take a break or --
8    it's been over an hour.
9        MR. MARRESE:  Sure, yeah.
10       VIDEO TECHNICIAN:  We are gonna go off
11   the record at 11:17.
12       (Off the record at 11:17 a.m.)
13       VIDEO TECHNICIAN:  We're back on the
14   record at 11:26.
15   BY MR. MARRESE:
16       Q    Mr. Payne, I want to go back to when you got
17   to the gate and you say you had your left and right
18   hands with your gun and taser, respectively, resting on
19   top of the gate, correct?
20       A    Correct.
21       Q    Okay.  The gun and taser are being held in
22   your hand sideways at that point?
23       A    I don't recall the orientation.
24       Q    Okay.  You go to your tippy toes at that time?
25       A    Correct.

Page 58

1    Q    Okay.  Your toes don't leave the ground?
2    A    No.
3    Q    Okay.  So, you're not attempting to jump,
4    correct?
5    A    I'm attempting to pursue, but I'm not
6    rushing -- like, I'm going over to look.  Like, my first
7    action is to look, not just jump blindly over the fence.
8    Q    And then, when you shot Mr. Lowery, how
9    were you pointing your firearm?
10   A    Like this (indicating).
11   Q    Okay.  And so, that's a downward shot,
12   correct?
13   A    Correct.
14   Q    Okay.  You were pointing it with one arm, your
15   left arm, downward at Mr. Lowery, correct?
16   A    Correct.
17   Q    And were your feet flat on the ground at that
18   point?
19   A    I was still in the same position.
20   Q    And were you hold -- then, where was your
21   right arm with the taser?
22   A    The taser was just in my right hand.
23   Q    Still resting on the gate?
24   A    Yeah.  Or it might have been like -- I -- I
25   don't remember where the orientation of the taser was

Page 59

1    during the time I shot him.
2    Q    But you transitioned from the gun in your hand
3    resting on the gate to pointing downward and shooting?
4    A    Correct.
5    Q    So, your body is on the side of the
6    gate opposite -- bad question.  Let me withdraw it.  I'm
7    sorry.
8         You're on the other side of the gate from
9    Mr. Lowery when you shoot him, correct?
10   A    Correct.
11   Q    Your arm is extending downward over the gate,
12   correct?
13   A    Correct.
14   Q    When you approached the gate, were you running
15   to it?
16   A    I think it was like a -- like a -- yeah, I
17   guess you could say I was running.
18   Q    When Mr. Lowery was on his knees on the other
19   side of the gate and hunched over, how far hunched over
20   was he?
21   A    It wasn't like he was doing a full crunch, but
22   it was like -- like, I'd say maybe, like, half, like
23   this (indicating), maybe like a half crunch.
24   Q    When you looked down over the gate at
25   Mr. Lowery, was -- I want to understand his position in

Page 60

1    terms of whether he was lined up just below you or off
2    to one side or the other when you're looking down?
3    A    He wasn't lined up just below me.  If you were
4    looking above the gate, he would be, like, not -- like,
5    if you were gonna hop the gate, he's not directly below
6    me, he's more off to the side.
7    Q    Okay.  And so, you're motioning to your right?
8    A    Yes.
9    Q    Okay.  And so, he was to your right down
10   there?
11   A    Correct.
12   Q    Okay.  And how far from the gate was he, in
13   terms of feet or inches?
14   A    Half a foot.
15   Q    Okay.  So, about six inches?
16   A    Correct.
17   Q    And, in terms of his left arm, you couldn't
18   see that, correct?
19   A    No.
20   Q    Am I correct?
21   A    Yes, you're correct.  I couldn't see it.
22   Q    I'll do that occasionally, just so the record
23   is clear.  Thank you.
24        And, earlier, when you testified that perhaps
25   he was using his left arm to, you know, brace himself

Page 61

1    against the ground, you're surmising that just based on
2    his body positioning; you didn't see that, correct?
3    A    Correct.
4    Q    Okay.  I'm gonna mark as Exhibit 1 to your
5    deposition the digital Axon Body Camera for you that was
6    produced, which depicts the events that we've been
7    discussing in part.
8         I want you to watch that from the start of the
9    video until about a minute and a half in and pause it.
10   I'm gonna give you this computer to do that.  And then,
11   we'll follow up with some questioning.
12        As you know, the first 30 seconds are gonna be
13   silent.  All right.
14        THE STENOGRAPHER:  Do you want me to
15   write the video?
16        MR. MARRESE:  No, that's all right.
17        VIDEO TECHNICIAN:  Do you want me to
18   record it?
19        MR. MARRESE:  Yes.
20        You can just use your finger and press
21   play when you're ready.  And then, when you
22   get about a minute and a half in, you can
23   pause it.
24        (Whereupon a video was being played for the
25   witness.)

Joshua Payne
08/06/2025

Page 62

1          (Exhibit No. 1 was marked for
2    identification.)
3          MR. JIMENEZ:  Now, Counsel, we're exactly
4    at one minute 30 seconds on the video.
5          MR. MARRESE:  Thank you.
6    BY MR. MARRESE:
7    Q    I'm sorry.  Why don't you use this for
8    a minute.  I want to go through some of the portions of
9    that video with you.  If you're comfortable with it,
10   I'll ask you to go to particular portions of the video,
11   okay?  Just to line up some of what's on the video with
12   some of what we discussed, okay?
13         Okay.  If you can go from 45 seconds to
14   55 seconds in the video?
15   A    Do you want me to hit play whenever?
16   Q    Please watch those ten seconds, yeah, again.
17   A    (Witness complies.)
18         MR. JIMENEZ:  Right at 55.
19         MR. MARRESE:  Okay.  Thank you.
20   BY MR. MARRESE:
21   Q    You discharged your taser for a second time at
22   that point?
23   A    Uh-huh.
24   Q    Okay.  And then, if you'll watch between
25   55 seconds and a minute and 3 seconds.

Page 63

1    A    (Witness complies.)
2    Q    And it sounds like you stopped it at about a
3    minute-seven?
4    A    Yeah.
5    Q    Okay.  That portion of the video, between
6    55 seconds and a minute and 3 seconds roughly, that's
7    the portion during which you say that the two of you
8    engaged close quarters?
9    A    Yeah.
10   Q    Okay.  That's when you say he grabbed at your
11   gun barrel and your shoulder, correct?
12   A    All within that time period, correct.
13   Q    Okay.  And so, by a minute 3 or a minute 4 on
14   the video, it stopped.  He's turned around and gone back
15   to the gate?
16   A    Yeah, around that time he -- we disengaged and
17   he goes to the gate.
18   Q    Okay.  It's between a very short period of
19   time, between a minute 5 and a minute 6 when Mr. Lowery
20   goes over the gate with his feet up in the air, correct?
21   A    Yeah.
22   Q    In the video you can see his feet go
23   completely vertical, correct?
24   A    Yeah, as he's hopping the gate.
25   Q    Okay.  And it's within an instant of that,

Page 64

1    that you shoot him, correct?
2    A    I'd say within a few seconds, yeah.
3    Q    Okay.  Well, I'll tell you on the video he's
4    going over the gate at about a minute 6, and the shot is
5    fired at about a minute 6, maybe just as a minute 7
6    strikes.  So, we're talking about, you know, within
7    a second of time here.
8    A    Yeah.
9    Q    Okay.  Having seen that, it's still your
10   testimony that he was on his knees after having gone
11   over the gate like that?
12   A    Correct.  It doesn't change.  It's just --
13   that's just the speed that things are moving at.  But
14   it -- it doesn't change where he was positioned when I
15   saw him.
16   Q    Okay.
17   A    Your computer locked.
18   Q    Thanks.  I'll take it away from you for now.
19         Why did you shoot James Lowery in that moment?
20   A    I was in fear for my life.
21   Q    Why did you believe you were in fear for your
22   life -- excuse me.
23         Why did you believe your life was in danger?
24   A    From the moment that I saw him reaching and
25   dumping things out of his pocket, while we were chasing

Page 65

1    each other, those aren't, like, typical encounters.
2          And so, as things start to escalate, it makes
3    you more worried as -- as you're trying to apprehend
4    somebody.  And it's -- and it's -- the situation is
5    escalating further and further.
6          He didn't stop when we got to the gate.  He
7    turned around and engaged with me some more.  And we had
8    got in that quick scuffle, and I believe that he would
9    do anything it takes to get away from me.
10   Q    In the moment that Mr. Lowery was crouched, as
11   you say, on the other side of the fence, what about that
12   moment made you shoot?
13   A    He had looked like he had a shooter's posture
14   from a crouched position.  And that's what I believed it
15   to be.  And, based off having an altercation with him
16   and chasing him and him running with his hands in his
17   pockets and him not initially giving up after we
18   cornered and still fighting with me, I believe that --
19   that he was trying to do harm to me and trying to end my
20   life.
21   Q    You believed -- strike the question.
22         You interpreted his posture on the other side
23   of the fence to be a shooter's posture?
24   A    I interpreted it, yes, to be somebody who was
25   postured like they were drawing a firearm.

Page 66

1    Q    Other than the fact that you interpreted his
2  posture to be postured as drawing a firearm, was there
3  anything else that caused you to shoot then?
4    A    No.
5    Q    Did you tell anyone that Mr. Lowery had
6  grabbed or attempted to grab your gun barrel?
7    A    No.
8    Q    Did you tell anyone that Mr. Lowery had struck
9  or attempted to strike your shoulder?
10   A    I -- I just explained to -- that we had --
11  that we were just involved in a physical altercation.
12  And that it's -- anything -- any, like, descriptions I
13  gave at that time were very, like, brief.  Because it's
14  so hard to recount things that are happening -- that
15  just happened, like that traumatic, that fast.
16   Q    Did you tell anyone about Mr. Lowery's
17  posture, in terms of you interpreting that posture to be
18  a shooter's position?
19   A    I never gave any statements to anybody about
20  what I thought the facts of the case were.
21   Q    Okay.  Other than Mr. -- Well, strike the
22  question.
23        What about Mr. Lowery's posture made you
24  believe it to be a shooter's posture?
25        MR. VAZQUEZ:  Objection to form.

Page 67

1        MR. JIMENEZ:  Join.
2  BY MR. MARRESE
3    Q    You can answer.
4    A    I just -- I just believed it to be a shooter's
5  posture, because it just, through -- through my
6  experience looking at people who are drawing firearms,
7  it looked like he could potentially be drawing a
8  firearm.  You know, just a reasonable person, I feel,
9  like, would believe after that altercation and -- and
10  seeing that, would see that, potentially, this might be
11  looked at as a draw (indicating).
12   Q    You were ultimately prosecuted by the state's
13  attorney's office for a crime in conjunction with this
14  shooting, correct?
15        MR. VAZQUEZ:  Object to the form.
16        MR. JIMENEZ:  Join.
17   A    That's correct.
18  BY MR. MARRESE:
19   Q    Did you tell the Court about Mr. Lowery's
20  shooter's position?
21        MR. VAZQUEZ:  Standing objection;
22        objecting anything regarding the criminal case
23        against Mr. Payne.
24        MR. JIMENEZ:  Join.
25  BY MR. MARRESE:

Page 68

1    Q    And so, I didn't give you this instruction at
2  the beginning of the deposition.
3        From time to time, attorneys will object to
4  questions I ask.  It's perfectly appropriate.  Excuse
5  me.  It's a standard part of the deposition practice.
6  They're just trying to preserve their rights.
7        What I'll do is, I'll ask you to answer the
8  question anyway if you understand it, okay?
9    A    So, there --
10   Q    Let me ask it again.
11   A    Okay.
12   Q    I'm just -- the general instruction is, after
13  those objections are lodged, then I'll say, you know,
14  "Mr. Payne, please answer the question," okay?
15   A    Okay.
16   Q    So, in this instance, did you tell the Court
17  in that criminal case that -- about Mr. Lowery's
18  shooter's posture?
19   A    No.
20        MR. VAZQUEZ:  Standing objection as to
21        criminal case against Mr. Payne.  And just so
22        you understand, a "standing objection" means
23        anything regarding that criminal case, we have
24        an objection.  And we'll deal with it later --
25        THE WITNESS:  Okay.

Page 69

1        MR. VAZQUEZ:  -- with the court.
2    A    Okay.
3  BY MR. MARRESE:
4    Q    Did you tell the state's attorney's office or
5  any prosecutor with the state's attorney's office about
6  Mr. Lowery's shooter's posture?
7    A    I never gave any statements to any
8  investigators or attorney's office or anybody.
9    Q    Okay.  You watched the entirety of your body
10  cam recently, in preposition -- preparation for this
11  deposition, correct?
12   A    Correct.  Up until the end of the shooting.  I
13  didn't watch the other parts after the shooting.
14   Q    So, the part that we just watched, the first
15  90 seconds, that's really the only part that you watched
16  in preparation?
17   A    Maybe the first minute and 20 seconds after
18  Officer Gonzalez comes up to me.  After that, just...
19   Q    Okay.  And I can show you that -- the rest of
20  that video and allow you the opportunity to watch it.  I
21  have just a few questions about some of what occurs
22  after the shooting.
23        Officer Baez, at one point, tells you to turn
24  off your body camera.
25        Do you remember that?

Jessica Payne
08/06/2025

Page 70

1   A   Yeah.  He said to mute the body camera.

2   Q   Thank you.  That's correct, "mute" not turn it

3  off?

4   A   Yeah.

5   Q   And he muted his body camera.

6       Were you aware of that?

7   A   Correct, yeah.

8   Q   Okay.  And you muted your body camera after

9  Officer Baez told to you do so, correct?

10  A   Correct.

11  Q   Did you do it because he told you do so?

12  A   Yes.

13  Q   Okay.  Did you discuss the shooting with

14 Officer Baez after that?

15  A   Officer Baez was explaining to me, like, my

16 police officer rights, basically, at that point and

17 saying, you know, Just get back to the PD.  Don't talk

18 to anybody.  Don't stand here.  Get -- you know, let's

19 get your -- let's get you back into the car and get you

20 to the PD.  And don't give any statements to anybody.

21 And so, you know, like, you've slept it off or whatever

22 and are able to think clearly.

23  Q   Apart from that, did he ask you any questions

24 about how the shooting occurred?

25  A   No.

Page 71

1   Q   Did you talk to him at all about how the

2  shooting had occurred?

3   A   No.  He told me that -- he said, Just don't

4  tell anybody what's going on, and -- and just get back

5  to the PD as soon as possible.

6   Q   Okay.  And you followed his instructions?

7   A   Yes.

8   Q   Okay.  Other than that, do you remember

9  anything else from your time on the scene after the

10 shooting?

11  A   No.  It was -- it was a very brief -- after

12 the shooting, and I just remember somebody taking me

13 back to the -- to the police department.

14  Q   And when you got back to the police

15 department, what did you do?

16  A   I instantly saw, at the time, Lieutenant

17 Gonzalez and gave him a hug.  And then, he asked me

18 briefly just -- I think I kind of uttered it out to him,

19 briefly, what was happening before he even asked me.

20 And then, he told me not to say anymore and just...

21  Q   And where did that meeting take place?

22  A   In the police department.  Like -- like, their

23 big -- their big training room, I guess you would say.

24 There's a big room in the police department.

25  Q   And how long were you in there with Lieutenant

Page 72

1  Gonzalez?

2   A   Maybe 10 minutes.

3   Q   And what did you tell him?

4   A   I said that, you know, I thought this guy was

5  gonna kill me.  You know, I told him, I chased this guy,

6  and I thought he was gonna kill me, so I shot him.

7   Q   Do you remember telling him anything else?

8   A   I don't remember the whole conversation I had,

9  because everything was processing at that time.

10  Q   Did you tell him about the altercation between

11 you and Mr. Lowery; specifically, that Mr. Lowery

12 attempted to or did grab the barrel of your gun?

13  A   No.

14  Q   The same question with respect to Mr. Lowery

15 attempting to or actually grabbing or striking your

16 shoulder.

17      Did you tell that to Lieutenant Gonzalez?

18  A   I explained it in a way -- I explained it

19 that, like, we had got into a physical -- all I said is,

20 We got into a physical altercation.

21  Q   And, other than telling him that you thought

22 Mr. Lowery was going to kill you, so you shot him, did

23 you give him any other explanation as to why you shot

24 him?

25  A   No.  The conversation was brief.

Page 73

1   Q   Okay.  How long was the conversation in your

2  recollection?

3   A   Maybe, at most, 10 minutes -- maybe not even

4  that much; like, 5 minutes.

5   Q   Since that time, other than with your

6  attorneys, have you discussed the details of why you

7  shot Mr. Lowery with anyone else?

8   A   No.

9      (Exhibit No. 2 was marked for

10     identification.)

11 BY MR. MARRESE:

12  Q   We'll mark as Exhibit 2 to your deposition

13 this report from, then, Lieutenant Jeremy Gonzalez.  The

14 second page of the report and the third page of the

15 report has Lieutenant Gonzalez's narrative from December

16 26th, 2021, including that which relates to your

17 discussion with him.

18      Have you seen this report before?

19  A   No.

20  Q   Okay.  Take a moment and read it to yourself

21 in entirety, and then, I'll just ask you one or two

22 questions about it.

23  A   Okay.  (Witness complies.)  Okay, I've read

24 it.

25  Q   Okay.  Officer -- excuse me, Lieutenant

Joshua Payne
08/06/2025

Page 74

1  Gonzalez's narrative relating to your discussion begins
2  in that third paragraph on page 2, correct?
3      A   Correct.
4      Q   Okay.  Is there anything in there that you
5  think is inaccurate, in terms of what you told him?
6      A   No.
7      Q   Okay.  You can put that to the side.
8          (Exhibit No. 3 was marked for
9      identification.)
10 BY MR. MARRESE:
11     Q   Okay.  I've marked as Exhibit 3 to your
12 deposition your Amended Answers to Plaintiff's Initial
13 Interrogatories in this case.  The first several pages
14 are just a service list.
15         You can move on to the portion where it says:
16 "Interrogatories to Defendant, Joshua Payne."  And then,
17 there's a numbered list and answers.  If you'd just
18 briefly flip through there, my question for you is on
19 the last page.
20         There's your notarized signature dated
21 July 2nd, 2025, correct?
22     A   Correct.
23     Q   Okay.  And so, these are Sworn Answers to
24 Interrogatories in this case that you, at a minimum,
25 reviewed and approved of with your signature, correct?

Page 75

1      A   Correct.
2      Q   All right.  If you go to Interrogatory No. 2,
3  it asks for you to state the reasons you shot James
4  Lowery.  Take a moment and read the answer to yourself.
5  I just have one or two questions.
6      A   Okay, I've read it.
7      Q   About seven lines up from the bottom, there's
8  a sentence that says:  "I saw that Mr. Lowery had his
9  arm in his shirt and appeared to be drawing a firearm or
10 other weapon."
11         Do you see that?
12     A   Yes.
13     Q   Today, you've talked exclusively about the
14 fear that Mr. Lowery was in a shooter's posture.
15         Is that fair to say?
16     A   Yes.
17     Q   Okay.  And in this answer it says:  "Firearm
18 or other weapon."
19         Do you see that?
20     A   Yes.
21     Q   Why do you say "or other weapon"?
22     A   Because I would be -- I just would be unsure
23 of -- my first belief was that he would have a firearm.
24 And then, saying "any other weapon" would just be my
25 belief that he was armed one way or another.

Page 76

1      Q   And you believed that weapon to be potentially
2  contained in his shirt, correct?
3      A   Yes.  In his sweatshirt, correct.
4      Q   Okay.  And where in his sweatshirt, in
5  particular?
6      A   Hoodie sweatshirts tend to all have the same
7  center two-handed pocket you can rest your hands in.  I
8  believe that what -- the firearm or weapon that he'd be
9  using would be sitting in that pocket, because they're
10 stretchy and you can store a lot of items in a single
11 sweatshirt, or conceal a lot of items in a sweatshirt.
12     Q   And so, your belief was that it was possible
13 he had a firearm in the sweatshirt pocket on the front?
14     A   Correct.
15     Q   Do you know if Mr. -- you didn't know what
16 kind of pocket it was on that night, in terms of whether
17 it was the kind of sweatshirt pocket that didn't have a
18 divider in it; it was just one long pocket versus a
19 sweatshirt that had two kind of pockets up front?
20     A   Correct.  I wasn't sure which type of
21 sweatshirt he could be having on.
22     Q   Prior to viewing Mr. Lowery in what you
23 considered to be a shooter's posture, you did not see
24 anything that appeared to be a weapon in his sweatshirt
25 pocket, correct?

Page 77

1          MR. VAZQUEZ:  Object to the form.
2          MR. JIMENEZ:  Join.
3      A   I did not see any -- any weapons on him.
4  BY MR. MARRESE:
5      Q   In response to Interrogatory No. 5 it states:
6  "State the reasons you resigned from the Titusville
7  Police Department."
8          Let me start by saying you did, in fact,
9  resign, correct?
10     A   Correct.
11         (Exhibit No. 4 was marked for
12     identification.)
13 BY MR. MARRESE:
14     Q   Marked as Exhibit 4 is the June 1, 2022 letter
15 signed by you to Chief John Lau at the Titusville Police
16 Department.
17         Do you see that?
18     A   Yes.
19     Q   Okay.  And is that your letter of resignation?
20     A   Yes, sir.
21     Q   Okay.  And that is written on attorney
22 letterhead, correct?
23     A   Correct.
24     Q   And were those your attorneys in the criminal
25 matter pending as a result of this incident?

Page 78

1    A    Yes, sir.
2    Q    Okay.  Did you ever receive a response to this
3    letter?
4    A    No.
5    Q    Okay.  And moving back to the prior Exhibit
6    No. 3, moving back to your answer to Interrogatory No. 5
7    you said:  "The Titusville Police Department gave me a
8    choice to resign or to be terminated."
9         Is that true?
10   A    Correct.
11   Q    Okay.  And how was that communicated to you?
12   A    Via my criminal attorneys.
13   Q    Okay.  And I don't want to know anything about
14   anything they told you or anything like that, but I do
15   want to know about your understanding.
16        So, your understanding, generally, was that
17   you had a choice to either resign or be terminated?
18   A    Right after they announced they were filing
19   charges, probably three days later was when I had that
20   choice to make.
21   Q    And why did you decide to resign?
22   A    I just felt like that was the best option for
23   me.
24   Q    In other words, you'd prefer to resign on your
25   own as opposed to wait to be terminated?

Page 79

1    A    I understood that there was an upcoming
2    criminal case against me.  And I understood that I -- I
3    didn't want to be giving any statements in the IA that
4    could potentially be used against me in court.
5    Q    Okay.  Thank you.
6         But your belief was that if you did not
7    resign, then the Titusville Police Department would have
8    terminated you?
9         MR. VAZQUEZ:  Objection to form.
10        MR. JIMENEZ:  Join.
11   A    I'm not sure what their decision would have
12   been.
13   BY MR. MARRESE:
14   Q    But that was your belief, that's my question.
15        Your belief was that if you did not resign,
16   then you would have been terminated?
17   A    I think what was communicated to me via my
18   attorneys was basically --
19        MR. VAZQUEZ:  Whoa --
20        MR. JIMENEZ:  Yeah.  Don't --
21   BY MR. MARRESE:
22   Q    Yeah.  You don't need to -- I just want to
23   know what your belief was.  So, you don't need to tell
24   me what your lawyers said.
25   A    Okay.

Page 80

1    Q    Just without reference to them --
2    A    My belief was that they were gonna fire me?
3    Yeah.
4    Q    Thank you.  Prior to the charges associated
5    with this incident, you had never been charged with a
6    criminal offense as an adult, correct?
7    A    Never, no.
8    Q    Okay.  I've reviewed your personnel file in
9    this matter.  And, prior to this incident, I see a
10   corrective memorandum relating to a car accident, for
11   lack of a better word, on the job.
12        Is that consistent with your recollection?
13   A    Yes.
14   Q    Okay.  You struck a pole in your police
15   cruiser, essentially?
16   A    Yeah.  I was responding to a fight call, and I
17   crashed into a -- stop sign.
18   Q    Other than that instance, did you have any
19   other corrective memorandum like that?
20   A    No.
21   Q    Okay.  Did you have any other kind of
22   discipline beyond that, apart from the instance we're
23   here to discuss?
24   A    I think just like a verbal talking for cursing
25   at somebody on body camera.

Page 81

1    Q    And who were you cursing at?
2    A    It was a suspect that was just involved in a
3    fight.  And he was, like, actively resisting me while I
4    was trying to take him out of the bar he was fighting
5    in.
6    Q    And so, this was just a supervisor saying,
7    kind of verbally directing you, Hey, we don't do that.
8    This is how we do it, you know?
9    A    Just watch what you're saying to -- to the
10   public.
11   Q    Okay.  Other than that, is that the extent of
12   it?
13   A    Yeah.
14   Q    Okay.  I'm gonna play a portion of the body
15   camera video, very late into it, when the sound comes
16   back on starting at 1337.  The sound has been off for
17   several minutes.
18        And I'll represent to you that what I hear is:
19   "I didn't want to do that, bro," okay, followed by some
20   language.  But I want you to listen and tell me if you
21   hear the same.
22        (Video being played.)
23   Q    Okay.  I'm stopping the video at 1350.
24        Did you hear that?
25   A    Yeah.

Page 82

1    Q   Okay. Was that you speaking before Officer
2 Baez responds?
3    A   Yes.
4    Q   Okay. And what did you mean when you said
5 that?
6    A   Well --
7       MR. VAZQUEZ: Objection to form.
8       MR. JIMENEZ: Join. You can answer.
9       THE WITNESS: Nobody -- nobody wants to
10      be in a position where you kill another human
11      being. And so, I -- I view myself as a -- as,
12      like, an upstanding person and a good citizen.
13      And you -- you feel bad. Like, you feel sorry
14      that's how the outcome ended. Like, it's --
15      it's not like a win for us or a win for them.
16      I mean, it was unpleasant to go through that
17      chase and fight, and then realize, you know,
18      that I killed this guy. So, that is just
19      something that nobody wants to do is -- is
20      kill anybody.
21 BY MR. MARRESE:
22    Q   Do you believe today that you made a mistake
23 by firing?
24       MR. VAZQUEZ: Objection to form.
25       MR. JIMENEZ: Join.

Page 83

1    A   No.
2 BY MR. MARRESE:
3    Q   You believe it was the right decision?
4    A   I stand by my decision.
5       (Exhibit No. 5 was marked for
6      identification.)
7 BY MR. MARRESE:
8    Q   I'm going to mark as Exhibit 5, the Personnel
9 Training List.
10      Well, can you hand that back to me? I may
11 have handed you the wrong one.
12    A   (Witness complies.)
13    Q   No. That was correct. Sorry.
14      This is a three-page document entitled
15 "Personnel Training Listing for Joshua Payne". This was
16 produced to us, Mr. Payne, the plaintiff in this
17 litigation, as representing a kind of electronic record
18 of certain training courses you received during your
19 time with the Titusville Police Department.
20      Have you ever seen this kind of printout
21 before?
22    A   No.
23    Q   Okay. That doesn't surprise me. I just want
24 to ask you a couple more questions, and then we'll go on
25 another short break.

Page 84

1      There are dates associated with each of the
2 courses listed here. And the vast majority of them, I
3 will represent to you, occurred in 2020, you know,
4 towards the start of your employment. Then, there are
5 some others that stretch into 2021.
6      That general description, is that consistent
7 with your recollection of the formal training you
8 received at the Titusville Police Department?
9    A   Yes.
10    Q   Okay.
11       MR. MARRESE: Okay. Let's take a break,
12      and we'll come back and discuss some training.
13      Thank you.
14       VIDEO TECHNICIAN: We're going off the
15      record at 12:23.
16      (Off the record at 12:23 p.m.)
17      (Exhibit No. 6 was marked for
18      identification.)
19       VIDEO TECHNICIAN: We're back on the
20      record at 12:31.
21 BY MR. MARRESE:
22    Q   Mr. Payne, I'm marking as Exhibit 6 to your
23 deposition a 103-page document that is the Professional
24 Standards Division or Internal Affairs Investigation
25 Report and conclusions with respect to the shooting in

Page 85

1 this case. The first page here is page 3. Then, if you
2 turn to the next page, there's page 1, 2; this is how it
3 was produced to us, just a bit out of order.
4       MR. MARRESE: For the record, the Bates
5      labels are Robinson 248 through Robinson 354.
6 BY MR. MARRESE
7    Q   This is a long document, so I don't want you
8 to read it. I just want to ask you, have you seen this
9 before?
10    A   Never.
11    Q   Okay. And so, flip to the end of this
12 document starting at page 98, which is Robinson 345 for
13 the record. There's a conclusion section.
14      Do you see that?
15    A   Yes.
16    Q   Okay. And then, what follows in -- in the
17 several pages through 107 and thereafter, are a series
18 of conclusions in terms of whether or not alleged
19 violations of general orders or other Titusville Police
20 Department policies were violated by you on December
21 26th, 2021.
22      You have not seen these either, correct?
23    A   Correct.
24    Q   Okay. You can put that to the side then.
25      I want to talk about your training at the

Jenna Payne
08/06/2025

Page 86

1  Titusville Police Department for a little bit now.
2         On December 26th, 2021, you would agree with
3  me that you were in a foot pursuit with Mr. Lowery,
4  correct?
5     A    Correct.
6     Q    You were in a foot pursuit leading up until
7  the moment that you shot him, correct?
8     A    Correct.
9         MR. VAZQUEZ:  Objection to form.
10        MR. JIMENEZ:  Join, excuse me.
11        MR. MARRESE:  Thank you.  And --
12 BY MR. MARRESE:
13        THE STENOGRAPHER:  I didn't get your
14    answer.  I'm sorry.
15        THE WITNESS:  Correct.
16        THE STENOGRAPHER:  Thank you.
17 BY MR. MARRESE:
18    Q    The Titusville Police Department had in effect
19 in 2021, at the time of this incident, a series of
20 general orders.
21        Do you remember that, generally?
22    A    Yeah.
23    Q    Okay.  And I have reviewed the general orders
24 and I will represent to you that I have not seen any
25 general order specifically relating to foot pursuits.

Page 87

1         Is that consistent with your experience?
2     A    Yes.
3     Q    Okay.  You were never provided a general order
4  governing foot pursuits, correct?
5         MR. VAZQUEZ:  Objection to form.
6         MR. JIMENEZ:  Join.
7     A    There was no general order dictating foot
8  pursuits.
9  BY MR. MARRESE:
10    Q    And what is a "general order"?
11    A    It would be -- a general order would be a rule
12 or order established by the police department in how
13 you're supposed to conduct yourself while employed as a
14 police department -- or a police officer.
15    Q    So, these are written policies from the police
16 department which are meant to govern your actions?
17    A    Yes.
18    Q    Okay.  And, as a police officer, the police
19 department expects you to read them, correct?
20    A    Yes, correct.
21    Q    They expect you to be familiar with them,
22 correct?
23    A    Correct.
24    Q    They expect you to be comfortable applying the
25 policies within the general orders to your actions out

Page 88

1  on the street, correct?
2     A    Correct.
3     Q    Okay.  In terms of the general orders that
4  were in effect as of December 26th, 2021, you had
5  reviewed those orders, correct?
6     A    Up until that point?
7     Q    Yes.
8     A    Yes.
9     Q    Thank you.  On December 26th, 2021 -- and
10 that's the date all of these questions will, of course,
11 relate to.
12        Did you know if the Titusville Police
13 Department permitted running after a suspect with a
14 firearm drawn?
15        MR. VAZQUEZ:  Objection to form.
16        MR. JIMENEZ:  Join.
17    A    Yeah.  I think it was permitted.
18 BY MR. MARRESE:
19    Q    And why did you think that?
20    A    Because there's no -- there's no training on
21 foot pursuits.  And what I was in, was a foot pursuit.
22    Q    And so, did anyone ever tell you not to carry
23 a firearm while running in a foot pursuit?
24    A    Nobody ever said that, no.
25    Q    No one ever trained or instructed you on

Page 89

1  circumstances where you shouldn't run with a firearm
2  pursuing a suspect; is that fair?
3         MR. VAZQUEZ:  Objection to form.
4         MR. JIMENEZ:  Join.
5     A    Can you -- can you rephrase that question?
6  BY MR. MARRESE:
7     Q    Yeah, sure.
8         No one ever trained you on circumstances --
9  strike the question.
10        Did you receive any training that instructed
11 you not to engage in a foot pursuit while simultaneously
12 carrying a firearm and a taser?
13        MR. VAZQUEZ:  Objection to form.
14        MR. JIMENEZ:  Join.
15    A    There was no instruction that said you
16 couldn't carry your firearm and taser while running
17 after a suspect.
18 BY MR. MARRESE:
19    Q    And there was no instruction, just to be
20 clear, that you could not run after a suspect with both
21 firearm and taser drawn, correct?
22        MR. VAZQUEZ:  Form objection.
23        MR. JIMENEZ:  Join.
24    A    There was no general order stating that we
25 weren't allowed to dual wield while pursuing a suspect.

Jessica Payne
08/06/2025

Page 90

1  Q    And when you say "dual wield", that's carrying
2  a firearm in one hand drawn, and a taser in the other
3  drawn?
4  A    Correct.
5  Q    Okay.  They're out of your holster, correct?
6  A    Correct.
7  Q    Okay.  And so I'm correct, no one instructed
8  you that you should not do that, correct?
9  A    Yes.
10        MR. VAZQUEZ:  Objection to form.
11        MR. JIMENEZ:  Join.
12 BY MR. MARRESE:
13  Q    Okay.  When you carried drawn both firearm and
14 taser as you ran after Mr. Lowery, you believed you were
15 acting in accordance with your training, correct?
16  A    Correct.
17  Q    Did the Titusville Police Department ever
18 train you on how your decision making with respect to
19 firearms might be impacted during a foot pursuit?
20        MR. VAZQUEZ:  Objection to form.
21        MR. JIMENEZ:  Join.
22 BY MR. MARRESE
23  Q    You can answer.
24  A    I think in what we did was scenario-based
25 training, and in those discussions, you know, they

Page 91

1  would -- they would say, you know, If you have the
2  opportunity to holster, holster, like, in certain
3  situations.  But it was never like -- it was never like
4  a formal training, like, the gun needs -- like, you need
5  to have -- you need to put away your guns and your taser
6  before pursuing somebody again or continue pursuing
7  somebody again.
8  BY MR. MARRESE:
9  Q    Listen to my particular -- and I appreciate
10 that answer.
11        Listen to my next question, which is -- is
12 similar, which is that, were you ever trained that your
13 decision making with respect to the discharge of a
14 firearm could be implicated -- impacted by the fact that
15 you're in a foot pursuit, running after a suspect?
16        MR. VAZQUEZ:  Objection to form; asked
17        and answered.
18  A    I'm not sure how to answer that.  We weren't
19 trained about decision making, but it was more of --
20 discussed while running certain scenarios, that if --
21 you know, decision making like -- like, while you're
22 running with a firearm, you know, you're gonna -- you
23 might have like -- I'm just not sure how to answer that
24 question.  Like...
25 BY MR. MARRESE:

Page 92

1  Q    You were about to say you might have like a --
2  like, a what?
3  A    Like, when you're -- like, I feel like --
4  like -- like, if you're running with a firearm, like --
5  you know, like your decision making's gonna be sped up
6  and faster because your -- your -- like, your heart's
7  racing and you're not -- I don't know if that answers
8  your question.  I don't know.
9  Q    It does a little bit.
10        And so, that was some of the instruction that
11 you received at Titusville?
12  A    I wouldn't say, like, instruction.  I would
13 just say, like, it was informal.  Because, again, we
14 didn't have, like, trainings on those type of scenarios
15 where, you know, you're running with your gun and your
16 taser out.
17        So, it was more of just like we would talk
18 through situations here and there, you know, about how,
19 you know, certain things could affect, you know, your
20 decision-making skills while, you know, pursuing
21 somebody.
22  Q    Did you ever, as a part of a simulation at the
23 Titusville Police Department, engage in a foot pursuit
24 of a suspect with a firearm drawn?
25  A    No.

Page 93

1  Q    Can you -- did you -- strike the question.
2        Prior to December 26th, 2021, had you ever
3  engaged in a foot pursuit with a -- with your firearm
4  drawn, chasing a suspect?
5  A    No.
6  Q    So, December 26th, 2021 was the first time
7  that you had to engage in a foot pursuit with your
8  firearm drawn?
9  A    Correct.
10  Q    You had never been trained on firing a weapon
11 during a foot pursuit, correct?
12        MR. VAZQUEZ:  Objection to form.
13        MR. JIMENEZ:  Join.
14  A    Correct.
15 BY MR. MARRESE:
16  Q    You had never simulated firing a weapon in a
17 foot pursuit, specifically, correct?
18        MR. VAZQUEZ:  Objection to form.
19        MR. JIMENEZ:  Join.
20  A    Correct.
21 BY MR. MARRESE:
22  Q    Were you ever taught how to carry a firearm
23 while engaging in a foot pursuit at the Titusville
24 Police Department?
25        MR. VAZQUEZ:  Objection to form.

Page 94

1          MR. JIMENEZ:  Join.

2    BY MR. MARRESE:

3       Q    You can answer.

4       A    No.

5       Q    Were you trained at the Titusville Police

6    Department, ever, on approaching barriers like the gate

7    that you approached during the foot pursuit on December

8    26th, 2021?

9          MR. VAZQUEZ:  Objection to form.

10         MR. JIMENEZ:  Join.

11         MR. MARRESE:  Let me withdraw the

12       question and ask it a little differently.

13    BY MR. MARRESE:

14       Q    Were you ever trained by the Titusville Police

15    Department on approaching barriers during foot pursuits,

16    in particular?

17         MR. VAZQUEZ:  Objection to form.

18         MR. JIMENEZ:  Join.

19       A    No.

20    BY MR. MARRESE:

21       Q    Were you ever trained by the Titusville Police

22    Department in terms of how to handle a firearm, as you

23    approached a barrier like the gate, during a foot

24    pursuit?

25         MR. VAZQUEZ:  Objection to form.

Page 95

1          MR. JIMENEZ:  Join.

2       A    No.

3    BY MR. MARRESE:

4       Q    When you approached the gate on December 26th,

5    2021 carrying an unholstered both firearm and taser, you

6    believe you were acting consistent with your training at

7    the Titusville Police Department?

8       A    Correct.

9       Q    Do you believe that you should have received

10    training on foot pursuits from the Titusville Police

11    Department?

12         MR. VAZQUEZ:  Objection to form.

13         MR. JIMENEZ:  Join.

14    BY MR. MARRESE:

15       Q    You can answer.

16       A    Do I believe that I should have received

17    training on foot pursuits?  Yeah.

18    BY MR. MARRESE:

19       Q    The Florida Law Enforcement Academy, you

20    attended that in 2019 to 2020, the dates we discussed

21    earlier, prior to becoming a Titusville Police officer,

22    correct?

23       A    Correct.

24       Q    Can you describe what you did at the academy?

25       A    We do legal courtroom studies, crime scene

Page 96

1    studies, simunitions training, firearms course, medic,

2    like, a medical, like, course, I guess.  Driving, and

3    just, like, PT training.

4       Q    And what is "PT training"?

5       A    Physical training.

6       Q    Thank you.  Did you receive any instruction on

7    foot pursuits in the simunitions or firearms training

8    that you received at the Law Enforcement Academy?

9          MR. VAZQUEZ:  Objection to form.

10         MR. JIMENEZ:  Join.

11       A    Did we receive any instructions on foot

12    pursuits?

13    BY MR. MARRESE:

14       Q    Yes.

15       A    No.

16       Q    Did you ever simulate a foot pursuit as a part

17    of your simunitions or firearms training at the Florida

18    Law Enforcement Academy?

19         MR. VAZQUEZ:  Objection to form.

20         MR. JIMENEZ:  Join.

21       A    No.

22         MR. MARRESE:  All right.  I'm going to

23       mark as Exhibit 7.  This is book two of three,

24       produced by the Titusville Police Department.

25       It is a large document.  It is 400 and --

Page 97

1    excuse me, 510 pages, which we have -- the

2    plaintiff has labeled at the bottom

3    "Titusville IA Binder 2", followed by the

4    numbers 1 through 510.

5          Counsel, I only have one physical copy

6    today.

7          Are you able to pull up Binder 2?

8          MR. JIMENEZ:  I believe so.

9          MR. MARRESE:  I'm gonna be referencing it

10       on my laptop.

11         THE WITNESS:  Okay.  It looks like it,

12       yeah.

13          (Exhibit No. 7 was marked for

14       identification.)

15    BY MR. MARRESE:

16       Q    Okay.  And I'm not gonna ask you about all 510

17    pages, Mr. Payne.  I'm gonna point you to various pages

18    and just ask you a few questions as it pertains to

19    training.  If you move to page 296 in this document.

20          On the bottom right-hand side, do you see

21    those page numbers?  Are you there?

22          This is a daily report during the time that

23    you were receiving field training.  And I'll represent

24    to you that -- that it moves through page 389.  So, from

25    296 to 389 there are daily comments from field training

Page 98

1    officers that are signed off on by shift supervisors.
2    And then, it appears to be signed off by you, as well.
3         Do you see that?
4    A    Yes.
5    Q    Okay.  And I have reviewed these, and I will
6    represent to you that there is not any mention of a foot
7    pursuit by you with a firearm.
8         Is that consistent with your recollection?
9         MR. VAZQUEZ:  Objection to the form.
10        MR. JIMENEZ:  Join.
11   A    Correct.
12   BY MR. MARRESE:
13   Q    Okay.  All right.
14        If you'd go to page 311.  There are comments
15   in the third comment box on that page.
16        Read those to yourself for a moment.
17   A    The --
18   Q    It's the one that begins with -- after
19   numbers, it begins:  "Officer Payne responded to a call
20   for service regarding a shooting"?
21   A    Okay.  I've read it.
22   Q    Okay.  In this instance, you have received
23   some feedback from a supervisor relating to how you were
24   engaging with a victim on scene, correct?
25   A    Yes.

Page 99

1    Q    Okay.  And, in that instance, you informed the
2    supervisor that part of that was due to you never
3    experiencing a high stressful situation before, at that
4    time.  And this was August 17th of 2020, so shortly
5    after you began; is that correct?
6    A    Yeah.
7    Q    Okay.  And in communicating -- well, strike
8    the question.
9         If you move up to page 4 -- 144 in this
10   binder, you see that there are critical performance
11   tasks that are identified as a part of your field
12   training program, correct?
13   A    Yes.
14   Q    Okay.  Take a moment and just read those.
15   They go from page 144 to 155.  You don't need to read
16   every word on the page, but I'd like you to read the
17   bolded titles of each critical performance task, okay?
18   A    From 144 to what?
19   Q    155.  It's 1 through 33.
20   A    Okay, I read it.
21   Q    Okay.  And there is nothing in that program
22   which specifically calls out foot pursuits, correct?
23        MR. VAZQUEZ:  Objection to form.
24        MR. JIMENEZ:  Join.
25   A    Yeah, there's nothing in here that talks about

Page 100

1    foot pursuits.
2    BY MR. MARRESE:
3    Q    Okay.  If you move to page 156, you'll see
4    that from 156 to 158, there's a kind of outline.  It's
5    the Training Outline Checklist, which identifies
6    different lessons that you're to receive as an officer
7    in training.
8         Do you see that?
9    A    Yes.
10   Q    Okay.  Take a moment and review those.
11   A    Okay, I've reviewed.
12   Q    Okay.  There is nothing in there regarding
13   foot pursuits either, correct?
14        MR. VAZQUEZ:  Objection to form.
15        MR. JIMENEZ:  Join.
16   A    Correct.
17   BY MR. MARRESE:
18   Q    Okay.  The lessons, themselves, begin on
19   page 159, or at least the lesson outlines.  And they
20   stretch all the way to 295.  And these correspond to the
21   table of contents you just reviewed.  I want to talk
22   about a few of them.
23        First, let me ask you:  These written lessons,
24   for example, Lesson 1 on page 159, "Preparing for
25   Patrol".

Page 101

1         Do you recall reading those as a part of your
2    field training experience?
3    A    Yes.
4    Q    Okay.  If you move to page 161, which is
5    lesson No. 2, Use of Weapons/Off-duty.
6         Do you see that?
7    A    Yes, sir.
8    Q    Okay.  There is nothing in that lesson
9    relating to the use of weapons during a foot pursuit?
10        MR. VAZQUEZ:  Objection to form.
11   BY MR. MARRESE:
12   Q    Is that consistent with your experience?
13        MR. VAZQUEZ:  Form objection.
14        MR. JIMENEZ:  Join.
15   A    That's correct.
16   BY MR. MARRESE:
17   Q    Okay.  If you move to Lesson No. 3 titled
18   "Officer Safety", that starts on page 164 and continues
19   on 165.
20        There is nothing in that lesson either
21   pertaining to officer safety during foot pursuits,
22   correct?
23        MR. VAZQUEZ:  Standing objection as to
24   form, regarding foot pursuits in the lessons.
25        MR. JIMENEZ:  Join.

Joshua Payne
08/06/2025

1    A    There's -- there's nothing in here that is
2    about foot pursuits.
3    BY MR. MARRESE:
4    Q    Okay.  And that's consistent with your
5    experience of training at the Titusville Police
6    Department, correct?
7    A    Correct.
8    Q    If you turn to Lesson 44, which is at page 244
9    entitled "Suspect Encounters", there's a subsection C
10   entitled "Approaching the Suspect".  And then, there's
11   a -- a number of subsections there.
12        Do you see that?
13   A    Yes.
14   Q    Okay.  There is nothing there in terms of a
15   foot pursuit while running with a firearm, correct?
16        MR. VAZQUEZ:  Same standing objection.
17   A    That's correct.
18   BY MR. MARRESE:
19   Q    You received firearm training while at the
20   Titusville Police Department, correct?
21   A    Correct.
22   Q    That included classroom instruction, correct?
23   A    Yes, correct.
24   Q    And that included instruction at the shooting
25   range, correct?

1    A    Correct.
2    Q    You had to pass proficiency tests at the
3    shooting range, correct?
4    A    Correct.
5    Q    You did not simulate using your firearm in a
6    foot pursuit, ever, at the Titusville Police Department,
7    correct?
8        MR. VAZQUEZ:  Objection to form.
9        MR. JIMENEZ:  Join.
10   A    Correct.
11   BY MR. MARRESE:
12   Q    Did you receive scenario-based firearms
13   training at the Titusville Police Department?
14   A    No.  We received training.  It was like --
15   like, with our firearm, like, looking through at the
16   range, like, looking through a little makeshift
17   window-like door they had, like, how to approach a door
18   with your firearm.  Nothing about foot pursuits.
19   Q    Okay.  And the training with respect to
20   approaching a door, how to approach the door, what --
21   what did that entail?  What was the message there?
22   A    Just -- just slow and steady and -- and, like,
23   don't go -- don't go rushing through the door with --
24   with your gun.
25   Q    And how long did that training exercise last,

1    specifically, relating to approaching a door?
2    A    Maybe, like, an hour.
3    Q    And other than that, do you recall any
4    other -- was that -- strike the question.
5        Was that at the gun range?
6    A    Yes.
7    Q    Okay.  Did you ever have firearms-based
8    training outside the classroom and, obviously, outside
9    of being on patrol, anywhere but the gun range?
10       MR. VAZQUEZ:  Objection to form.
11       MR. JIMENEZ:  Join.
12   A    We would do, like, building clearing.  But
13   there was no live ammunition in the guns.  It was just
14   learning how to pie through doors and -- and clear
15   rooms, like, at a low ready with your firearm, and that
16   type of training.
17   Q    And how long did that training last?
18   A    Like, officially, we did it for a whole day.
19   And then, we would practice building clearing as a
20   squad, like, once in a while, maybe.  Like, just to give
21   you time, like, once every, like, six months or so.
22   Q    Okay.  Those building clearing exercises did
23   not involve any simulated foot pursuits, correct?
24   A    Correct.
25       MR. VAZQUEZ:  Object to the form.

1        MR. JIMENEZ:  Join.
2        MR. MARRESE:  And that was correct, for
3    the record.
4        THE STENOGRAPHER:  Thank you.
5    BY MR. MARRESE:
6    Q    There has been some discussion in depositions
7    about active shooter training at a middle school.
8        Do you remember that?
9    A    Yes.
10   Q    Okay.  And that occurred in or around June of
11   2021.
12       Is that consistent with your recollection?
13   A    That sounds about right.
14   Q    Okay.  What did you learn at that training?
15   A    That training involved, like, live action --
16   like, live humans playing roles.  And we basically were
17   called to go to the school.  And then, you'd switch your
18   radio to, like, a training radio.  And then, they would
19   fake dispatch an active shooter.
20       And you would -- you would go into the school,
21   and you would have to apply the principles of building
22   clearing and trying to identify who was a suspect and
23   who was innocent, while moving through the school to --
24   to get to the shooter.
25   Q    Did that training involve any foot pursuit

Page 106

1   simulation?
2          MR. VAZQUEZ:  Objection to form.
3          MR. JIMENEZ:  Join.
4      A   No.
5   BY MR. MARRESE:
6      Q   Did that training involve any foot pursuit
7   instruction?
8          MR. VAZQUEZ:  Objection to form.
9          MR. JIMENEZ:  Join.
10     A   No.
11  BY MR. MARRESE:
12     Q   Did that training involve any simulation
13  wherein you were running with your firearm, making the
14  decision whether or not to shoot?
15         MR. VAZQUEZ:  Objection to form.
16         MR. JIMENEZ:  Join.
17     A   No.  To answer, no.
18  BY MR. MARRESE:
19     Q   Do you recall receiving taser certification
20  training shortly after hire in July of 2020?
21     A   Yes.
22     Q   Okay.  What did that entail?
23     A   The beginning portion of the class was
24  describing how to operate the functions of the taser --
25  I'm sorry, the beginning portion of the class was

Page 107

1   instruction and introduction of the TASER 7.  And then,
2   it moved through talking about the functions of the
3   taser.  And then, it moved through talking about
4   reloading and changing the cartridges and the different
5   cartridges and distances that the taser has.  And then,
6   the last part of it was getting tased.
7      Q   So, you actually personally get tased?
8      A   Yes.
9      Q   Did you tase anyone?
10     A   That day?
11     Q   Yes.
12     A   No.
13     Q   Okay.  Did that training involve the use of a
14  taser during a foot pursuit?
15         MR. VAZQUEZ:  Objection to form.
16         MR. JIMENEZ:  Join.
17     A   No.
18  BY MR. MARRESE:
19     Q   Did that training involve any simulation of
20  running after a suspect while trying to tase him?
21     A   No.
22         MR. VAZQUEZ:  Objection to form.
23  BY MR. MARRESE:
24     Q   If you look at page 9 to 10 of that big
25  exhibit in front of you?

Page 108

1      A   Okay.
2      Q   That is a sign-in sheet for Simunitions New
3   Hire Training that you've signed, correct?
4      A   Correct.
5      Q   And then, the next page -- well, let me ask
6   you:  Do you remember what this simunitions training
7   involved?
8      A   This might be the -- when -- like, the
9   building clearing exercises that had simunitions in it.
10     Q   Okay.  And can you define "simunitions" or
11  just tell us what -- what it means to a trainee?
12     A   It's like paintball.
13     Q   Okay.  And so, it's like a simulation of
14  something?
15     A   It's like taking actual firearms and unloading
16  real ammunition from it and inserting, like, paint
17  rounds into the gun.
18     Q   So, it's to practice with safe rounds,
19  essentially?
20     A   Yes.
21     Q   Okay.  And look at the next page, page 10 of
22  the exhibit.  There's a description under "Simunitions,
23  effects, marking cartridge safety brief."
24         Do you see that?
25     A   Where are you looking?

Page 109

1      Q   It's a -- it's a big block of type that's in
2   bold.  Yeah, you're looking at it on your left-hand
3   side.
4      A   Oh, okay.
5      Q   Yeah.  Can you read that to yourself?
6      A   Okay, I read it.
7      Q   Had you read that before?
8      A   Yeah.
9      Q   And does that refresh your recollection in
10  terms of what simunitions training involved?
11     A   Yes.
12     Q   Okay.  And what did it involve?
13     A   It's just, like, what I said.  It's just
14  simunitions was just like a scenario.  They make up a
15  scenario, and they have other officers come act as bad
16  guys.  And they give you the scenario to -- to whether
17  it's a traffic stop scenario, or whether it's a -- I
18  think in this -- in this scenario, this one was a -- was
19  traffic stops.  And you were just presented with
20  different factors, and you had to approach it and -- and
21  go off of that.
22     Q   And did any of that involve chasing a suspect
23  with a firearm?
24     A   No.
25     Q   Thank you.

Page 110

1        MR. VAZQUEZ:  Form objection there.
2  BY MR. MARRESE:
3        Q    Okay.  If you can move to page 26.
4        A    (Witness complies.)
5        Q    There's a diagram of a reload drill.
6             Do you see that?
7        A    Yes.
8        Q    Okay.  And take a look and -- read the
9  description underneath it to yourself.
10       A    Okay, I've read it.
11       Q    Did you partake in that particular exercise?
12       A    Yes.
13       Q    Okay.  And explain to us, what is that?
14       A    This one is -- this is teaching you -- I think
15  this was an activity on how to clear malfunctions within
16  the weapon while moving to cover.
17       Q    Okay.  And so, this is not an exercise where
18  you're engaged in a foot pursuit, correct?
19       A    Correct.
20       Q    Okay.  And then, move to the next page, 27,
21  there's another diagram titled, "The Lobby".  And read
22  that to yourself, the description underneath.
23       A    Okay, I've read it.
24       Q    Did you participate in that exercise?
25       A    Yes.

Page 111

1        Q    Okay.  And explain to us what -- what that is.
2        A    This one is -- is an exercise on, like,
3  shooting behind cover.  Basically, like, the kind of
4  like the drill we did at the gun range where you run,
5  you take -- you pie, you shoot, you go to the other
6  side.  Then you -- you pie, you shoot.  And then, you go
7  across to the other side, while taking cover at the same
8  time.  Like, while utilizing your cover, shooting
9  between each, like, gap.
10       Q    That -- that drill did not involve a
11  simulation of a foot pursuit using a firearm, correct?
12            MR. VAZQUEZ:  Objection to the form.
13            MR. JIMENEZ:  Join.
14       A    Correct.
15  BY MR. MARRESE:
16       Q    Thank you.  Move to page 29, if you will.
17  That's another diagram of shoot and move to cover.
18            Read that to yourself.
19       A    Okay.
20       Q    And did you participate in that shoot and move
21  to cover drill?
22       A    Yeah.
23       Q    And explain to us, what is it?
24       A    It's a -- it's a drill where, basically,
25  you're practicing, you're interviewing somebody.  And

Page 112

1  then, the situation turns deadly really fast.  And
2  you're supposed to draw, dump some rounds down, and then
3  move to cover.
4        Q    Similarly, this is not a drill where you are
5  simulating the use of a firearm during a foot pursuit of
6  a suspect, correct?
7             MR. VAZQUEZ:  Object to the form.
8             MR. JIMENEZ:  Join.
9        A    Correct.
10  BY MR. MARRESE:
11       Q    On page 31, there's a document, "Patrol Rifle
12  Qualification Course".
13            Take a look at that and read it to yourself
14  for a minute, and let me know when you're done.
15       A    Okay, I've read it.
16       Q    Okay.  Did you participate in the Patrol Rifle
17  Qualification Course?
18       A    Yes.
19       Q    Okay.  And explain to us, what is that?
20       A    You start at the hundred-yard mark and you
21  zero your sites in, and you've gotta hit the target from
22  100 yards.  Then you move up to 75 yard -- I'm sorry.  I
23  think the -- the order's wrong.
24            You start at the closest target, and then we
25  worked our way back to the hundred.  But I guess the way

Page 113

1  it's described in here is true.  You shoot from the
2  hundred, then you shoot from 75.  But you gotta -- you
3  can choose shooting from 75 from a kneeling or a
4  crouched position.  And then, you shoot from 50.  And
5  then, you shoot from 25, and then you shoot, like --
6  like a quick-draw shoot from up close.
7        Q    Okay.  And this drill, similarly not a
8  simulation of the use of a firearm during a foot
9  pursuit, correct?
10            MR. VAZQUEZ:  Objection to form.
11            MR. JIMENEZ:  Join.
12       A    Correct.
13  BY MR. MARRESE:
14       Q    A number of these firearm drills that we've
15  discussed involve shooting, finding cover, shooting,
16  finding cover; is that fair to say?
17       A    Correct.
18       Q    Okay.  None of them involved instruction or
19  live simulation on the use of a firearm during a foot
20  pursuit, correct?
21            MR. VAZQUEZ:  Objection to form.
22            MR. JIMENEZ:  Join.
23       A    Correct.
24  BY MR. MARRESE:
25       Q    None of them involved foot pursuits in any

Page 114

1  fashion whatsoever, correct?
2        MR. VAZQUEZ:  Objection to form.
3        MR. JIMENEZ:  Join.
4     A  Yeah, that's correct.
5  BY MR. MARRESE:
6     Q  Okay.  If you move to page 41.  This is a
7  lesson plan entitled, "Defensive Tactics for Law
8  Enforcement".  And there's a description of -- of the
9  course beneath it.
10        Take a minute and -- and read that to
11  yourself.
12     A  Okay.
13     Q  Did you receive instruction in defensive
14  tactics?
15     A  Yes.
16     Q  Okay.  And what -- and so, you recall this
17  course, in particular?
18     A  Yes.
19     Q  What did it involve?
20     A  Handcuffing techniques, like come-with-mes.
21  Like, the way you restrain somebody, the way -- just how
22  to handle -- how to, like, move through the use of force
23  continuum.  Like, if someone's presenting with you this
24  option, how would you handle that option?
25     Q  Okay.  This training did not involve any

Page 115

1  instruction related to foot pursuits of a fleeing
2  suspect, correct?
3        MR. VAZQUEZ:  Object to the form.
4        MR. JIMENEZ:  Join.
5     A  Correct.
6  BY MR. MARRESE:
7     Q  This training did not involve any instruction
8  or simulation of foot pursuits of a fleeing suspect
9  while armed, correct?
10        MR. VAZQUEZ:  Objection to form.
11        MR. JIMENEZ:  Join.
12     A  Correct.
13  BY MR. MARRESE:
14     Q  This training did not involve any instruction
15  or simulation on foot pursuits with a drawn firearm,
16  correct?
17        MR. VAZQUEZ:  Objection to form.
18        MR. JIMENEZ:  Join.
19     A  Correct.
20  BY MR. MARRESE:
21     Q  Thank you.  And if you move to page 64, the
22  subject is "June 2021 Scenario-based Training".  And it
23  continues to page 66.
24     A  Okay.
25     Q  This is the training that relates to the

Page 116

1  Madison Middle School active shooter training, correct?
2     A  Yes.
3     Q  That's the training that you discussed
4  earlier?
5     A  Yes.
6     Q  Okay.  And, having reviewed this
7  documentation, was your description of that training
8  earlier consistent with this?
9     A  Yes.
10     Q  Okay.  And that training did not involve
11  instruction on foot pursuits, correct?
12        MR. VAZQUEZ:  Objection to form.
13        MR. JIMENEZ:  Join.
14     A  It did not involve any training on foot
15  pursuits.
16  BY MR. MARRESE:
17     Q  Okay.  It did not involve any training on
18  chasing a fleeing suspect, correct?
19        MR. VAZQUEZ:  Objection to form.
20        MR. JIMENEZ:  Join.
21     A  Correct.
22  BY MR. MARRESE:
23     Q  It did not involve any training on the use of
24  a firearm while chasing a fleeing suspect, correct?
25        MR. VAZQUEZ:  Objection to form.

Page 117

1        MR. JIMENEZ:  Join.
2     A  That's correct.
3  BY MR. MARRESE:
4     Q  Thank you.  Okay.  You can put that to the
5  side now.  Thank you.
6        Did you pull the trigger of your taser at the
7  same time you pulled the trigger of your firearm to
8  shoot Mr. Lowery?
9     A  No.
10     Q  Thank you.  Sorry.  Just give me one moment.
11  I just want to ask you some brief questions with respect
12  to the -- the criminal case that was pending against you
13  relating to the shooting.
14        You ultimately pled guilty to a manslaughter
15  charge in that case, correct?
16        MR. VAZQUEZ:  Same standing objection as
17        before regarding the criminal case.
18  BY MR. MARRESE
19     Q  You can answer.
20     A  Correct.
21     Q  Okay.  And an Adjudication of Guilt was
22  withheld in that matter?
23     A  Correct.
24     Q  Okay.  The offense that you pled guilty to was
25  manslaughter, a felony in the second degree?

Page 118

1    A    Correct.
2    Q    Okay.  You received a sentence of probation
3 for a period of five years, under the supervision of the
4 Department of Corrections --
5    A    That's correct.
6    Q    -- according to terms?
7    A    Yes.
8    Q    Okay.  And you are still under that period of
9 probation, correct?
10    A    Correct.
11    Q    In conjunction, you were ordered to pay the
12 family of James Lowery certain expenses that they had
13 incurred in conjunction with his death?
14    A    That's correct.
15    Q    Thank you.  Those are all the questions I have
16 for you right now.  Thank you very much.
17         MR. VAZQUEZ:  I do have some questions,
18    but let's take a break.
19         MR. JIMENEZ:  Okay.
20         VIDEO TECHNICIAN:  We're going off the
21    record at 1:32.
22         (Off the record at 1:32 p.m.)
23         VIDEO TECHNICIAN:  We're back on the
24    record at 1:39.
25                   CROSS EXAMINATION

Page 119

1 BY MR. VAZQUEZ:
2    Q    Good afternoon, Mr. Payne.
3    A    Good afternoon.
4    Q    As I introduced myself earlier, my name is
5 Ramon Vazquez.  And I represent the City of Titusville
6 in this lawsuit filed by the estate of Mr. Lowery.
7         You've been asked a lot of questions today,
8 and I may sound a little bit all over the place, but I
9 just need some clarification as to some of your answers.
10         So, I'll be going over those, okay?  Is that
11 understood?
12    A    Yes, sorry.
13    Q    Okay.  So, on the date of the incident, which
14 I understand occurred on December 26th of 2021, correct?
15    A    Correct.
16    Q    Okay.  You reported to work.  You had your --
17 you picked up your body cam and your vehicle watch, and
18 then you heard a call about a domestic incident,
19 correct?
20    A    Yes.  That's after leaving the car wash.
21    Q    After leaving the car wash?
22    A    Yes.
23    Q    Okay.  So, this was early within your shift,
24 correct?
25    A    Correct.

Page 120

1    Q    I believe you testified earlier that, to you,
2 it sounded like a very serious case, the domestic
3 incident, correct?
4    A    Correct.
5    Q    Okay.  And, in your -- in your mind, it was a
6 felony domestic battery, correct?
7    A    In my mind, the way the facts were playing
8 out, yeah, it sounded like a felony domestic battery.
9    Q    Would you consider that a serious crime?
10    A    Yes.
11    Q    You were shown a copy of your body cam video
12 in which you said you had reviewed for the first minute
13 and half or so prior to today, correct?
14    A    Correct.
15    Q    Okay.  Is the body cam position at the same
16 level as your eyes, or is it at a different vantage
17 point?
18    A    The body cam would be sitting right where this
19 microphone is sitting on my chest (indicating), so...
20    Q    Okay.  So, more -- go ahead.
21    A    So, then, lower than my head would be.
22    Q    So, the vantage point for the body cam is
23 somewhat different from your eyesight, correct?
24    A    Correct.
25    Q    Is it fair to say that everything that you see

Page 121

1 and interpret is not necessarily the same as it's
2 depicted on the body cam?
3    A    Yes.
4    Q    As you first saw who we now know is
5 Mr. Lowery, did you state any verbal commands?  And I
6 understand that the body cam video is silent as to the
7 first 30 seconds or so.
8         But did you state anything verbally to him
9 during that timeframe that -- when we can't hear
10 anything from the video?  Do you recall one way or the
11 other?
12    A    I might have said Come here or Hey, come here;
13 or something along those lines.
14    Q    Okay.  And my understanding is based on the
15 report that you were presented prepared by Lieutenant
16 Gonzalez.  There's a narrative that you told him that
17 his name was James or something along those lines.
18         Do you recall seeing that earlier today?
19    A    Yes.
20         MR. MARRESE:  Form of the question.
21 BY MR. VAZQUEZ:
22    Q    Okay.  So, is it your understanding that you
23 did say those things to Lieutenant Gonzalez?
24         MR. MARRESE:  Form.
25    A    My -- my account of what I told him?

Joshua Payne
08/06/2025

Page 122

```
1   BY MR. VAZQUEZ:
2       Q    Yes.
3       A    Yes.
4       Q    Okay.  As you approached Mr. Lowery, was --
5   was your intention to investigate him as a potential
6   suspect in this felony battery --
7       A    Correct.
8       Q    -- investigation?
9       A    Correct.
10      Q    Was Mr. Lowery cooperative?
11      A    No.
12      Q    Why wasn't he cooperative?  What -- what did
13  he do?
14      A    Well, when I was simply coming to identify
15  him, he immediately turned around and proceeded to take
16  off on foot away from me.
17      Q    Would you consider that resistence?
18      A    I would consider that active resistence.
19      Q    And, as we saw on the body cam video, did he
20  further resist you, physically, during the incident?
21      A    Yes.
22      Q    Okay.  And you have described what your
23  recollection is, correct?
24      A    Like, a physical altercation?
25      Q    Altercation?
```

Page 123

```
1       A    Correct, yes.
2       Q    And you described that he grabbed the barrel
3   of the gun and all that, correct?
4           MR. MARRESE:  Form.
5       A    Correct.
6   BY MR. VAZQUEZ:
7       Q    Okay.  And, as the video -- the body cam video
8   was played, the actual altercation up to the time of him
9   being shot transpires in approximately 10 seconds or so,
10  correct?
11      A    Yes.
12      Q    Would you say that that was a rapidly evolving
13  scenario?
14          MR. MARRESE:  Form.
15      A    Yes.
16  BY MR. VAZQUEZ:
17      Q    Was it tense at the time?
18      A    Very.
19      Q    Okay.  And I understand that you testified
20  that you were not sure one way or the other if he was
21  armed at the time, correct?
22      A    Correct.
23      Q    Had Mr. Lowery not resisted and would have
24  just stopped, what was your intention to do?  What did
25  you intend to do?
```

Page 124

```
1           MR. MARRESE:  Form; foundation.  You can
2   answer.
3       A    To -- to identify him and briefly hold him
4   there to see if this was the guy that was just involved
5   in this domestic case.
6   BY MR. VAZQUEZ:
7       Q    Okay.  Because, at the time, he fit the
8   description of the suspect, correct?
9           MR. MARRESE:  Form.
10      A    Correct.
11  BY MR. VAZQUEZ:
12      Q    You testified that behind the gate, as
13  Mr. Lowery jumped the area, it was dark, correct?
14      A    Correct.
15      Q    Okay.  And -- and several times you
16  describe -- and I know it's on video -- that he crouched
17  down and did something and then, you said, quote, like
18  this.
19          What did you mean "like this"?  Did he do any
20  type of furtive movement that would make you believe
21  that he was going for a firearm?
22          MR. MARRESE:  Form of the question.
23      A    After he went over the gate?
24  BY MR. VAZQUEZ:
25      Q    Yes, sir.
```

Page 125

```
1       A    Yeah, he was -- his elbow was kind of, like --
2   like, 90 degrees, like, posturing, like if, you know, he
3   was gonna shoot.
4       Q    In your experience as a law enforcement
5   officer, is that consistent with a movement of going
6   after a firearm?
7           MR. MARRESE:  Form.
8       A    Yes.
9   BY MR. VAZQUEZ:
10      Q    As you pursued Mr. Lowery, we can hear you on
11  the video saying, "Stop reaching into your pockets, drop
12  it, get down."
13          Is that correct?
14      A    Yes.
15          MR. MARRESE:  Form.
16  BY MR. VAZQUEZ:
17      Q    Okay.  Did he obey any of your commands?
18      A    No.
19      Q    Did you have a reasonable belief that your
20  life was in danger at the time you shot Mr. Lowery?
21          MR. MARRESE:  Form.
22      A    Yes.
23  BY MR. VAZQUEZ:
24      Q    Did Mr. Lowery live at the property where he
25  jumped into?
```

Page 126

1    A    I'm not sure.
2    Q    Okay.  Did you find out, after the fact,
3  whether or not he lived there?
4    A    I have no idea.
5    Q    You have no idea.
6         When you spoke to Lieutenant Gonzalez, were
7  you distraught?
8    A    Yeah.
9    Q    Were you still emotionally excited about the
10  whole thing?
11    A    I was giving him a hug and I was crying.
12    Q    Okay.  Were you taken or removed from the
13  scene and taken to the police department within a matter
14  of minutes?
15    A    Yes.
16    Q    When asked by Mr. Marrese, you said that, to
17  this date you stand by your decision.
18         Do you recall that testimony?
19    A    Yes.
20    Q    Okay.  Do you stand by that decision based on
21  the totality of the circumstances that you faced that
22  day?
23    A    Yes.
24    Q    I understand that before you unholstered your
25  firearm, you attempted to stop Mr. Lowery with your

Page 127

1  taser, correct?
2    A    Correct.
3    Q    Okay.  Is that pursuant to a use of force
4  continuum or a matrix?
5         MR. MARRESE:  Form.
6    A    Yes.
7  BY MR. VAZQUEZ:
8    Q    Are you supposed to use less lethal force
9  before you go to deadly force?
10    A    Yes.
11    Q    Were you trained in that regard?
12    A    Yes.
13    Q    And I believe you said you had two cartridges
14  in your taser, and the first one did not make contact
15  and the second one did not reach the desired outcome of
16  immobilizing him, correct?
17    A    Correct.
18    Q    Okay.  So, by that time, you can no longer use
19  your taser unless you loaded another cartridge, correct?
20    A    You can only drive stun --
21    Q    Drive stun?
22    A    -- people with it at that the point.
23    Q    Okay.  And, within that scenario, within less
24  than 10 seconds, you didn't have that opportunity,
25  correct?

Page 128

1         MR. MARRESE:  Form.
2    A    I -- I attempted to drive stun him, but there
3  was no desired effect from him.
4  BY MR. VAZQUEZ:
5    Q    Okay.  You were shown several documents,
6  including Exhibit 7, consisting of Book 2 of 3 of the
7  Internal Affair Investigations, okay?
8         Have you ever seen that document, Exhibit 7,
9  before today?
10    A    Never.
11    Q    Okay.  It says Book 2 of 3.
12         Have you ever seen Book 1 of 3?
13    A    No.
14    Q    Have you ever seen Book 3 of 3?
15    A    No.
16         MR. MARRESE:  Just object to the form.
17  BY MR. VAZQUEZ:
18    Q    Okay.  Mr. Marrese asked you to look at
19  certain portions of Exhibit 7 and go over them.
20         Did you read them in detail?
21    A    Yes.
22    Q    Okay.  And do you recall, specifically, each
23  lesson that was taught in totality the day of what
24  transpired or in general terms?
25         MR. MARRESE:  Form.

Page 129

1    A    In -- in general terms.
2    Q    Have you ever met Ms. Jamiyah Robinson, the
3  daughter of James Lowery?
4    A    Never.
5    Q    Have you ever met any of his relatives?
6    A    Never.
7    Q    Have you ever seen them from a distance?
8    A    Just during the criminal court.
9    Q    And they were present in the courtroom?
10    A    I believe so.
11    Q    Okay.  Did you see them with their attorneys
12  present?
13    A    Yes.
14    Q    I see that as part of your training, you were
15  familiar with the Officer Bill of Rights, correct?
16    A    Correct.
17    Q    Okay.  And it is within your right to not give
18  any statements after an incident such as this one,
19  correct?
20    A    Correct.
21    Q    Okay.  And you chose to exercise that right;
22  is that right?
23    A    Yes.
24    Q    Okay.  I believe you testified that you had
25  never engaged in a foot pursuit with a firearm

Joshua Payne
08/06/2025

Page 130

1  unholstered before this incident; is that correct?
2    A    That's correct.
3    Q    Had you ever engaged in a foot pursuit,
4  regardless of whether or not you had something in your
5  hands, before this incident?
6    A    Yes.
7    Q    On how many occasions, approximately?
8    A    Three or four.
9    Q    Three or four, okay.
10        Would that be while you were acting as a law
11 enforcement officer for the City of Titusville?
12   A    Yes.
13   Q    Okay.  Did you learn anything whatsoever about
14 foot pursuits while you were at the academy?
15   A    Not one thing.
16   Q    That term was never used at the academy, ever?
17   A    There was no -- it was used, but there was
18 no -- it was not, like, talked about.  They said, In
19 this job, you might be in a foot pursuit.
20   Q    Was it described to you what foot pursuit
21 entails?
22   A    Yes.
23   Q    Okay.  And what was the description?
24   A    When you're trying to detain a subject and
25 they take flight from you on foot, that's, like, the

Page 131

1  general term of a foot pursuit.  You pursue them.
2    Q    While you were undergoing your field training
3  with an officer present, did any situation arise where
4  you had to engage -- you or your trainer -- in a foot
5  pursuit during your field training period?
6    A    No.
7    Q    Okay.  I understand that -- that your
8  testimony is that the City of Titusville, specifically
9  the police department, did not have a formal foot
10 pursuit general order, correct?
11   A    Correct.
12   Q    Okay.  There has been testimony -- I'll
13 represent to you that there has been testimony that foot
14 pursuit was covered in other aspects of training, not --
15 but not specifically as a foot pursuit training per se,
16 okay?
17        Do you recall that being mentioned in other
18 facets of training, without specifically referring to a
19 foot pursuit policy per se?
20        MR. MARRESE:  Form.
21   A    Can you rephrase that?
22        MR. MARRESE:  Foundation.
23 BY MR. VAZQUEZ:
24   Q    Okay.  There has been testimony -- I'm
25 representing to you --

Page 132

1    A    Okay.
2    Q    -- there has been testimony that foot pursuit
3  is covered, but not as a specific or separate
4  training --
5    A    Yes.
6    Q    -- aspect.
7        Okay.  Do you recall that foot pursuit was
8  indeed covered in other areas, but not with the
9  specificity asked by Mr. Marrese?
10       MR. MARRESE:  Form.
11   A    Correct.
12 BY MR. VAZQUEZ:
13   Q    Okay.  Had Mr. Lowery stopped when you asked
14 him to stop and allowed you to investigate who he was
15 and clear him, would we be here today?
16   A    No.
17   Q    Had Mr. Lowery not engaged in a physical
18 altercation with you, would be -- would we be here
19 today?
20       MR. MARRESE:  Form.
21   A    No.
22       MR. MARRESE:  Foundation.
23 BY MR. VAZQUEZ:
24   Q    You had already undergone active shooter
25 training before this incident, correct?

Page 133

1    A    Correct.
2    Q    And you had undergone use of force continuum
3  training before this incident, right?
4    A    Correct.
5    Q    And you had undergone scenario-based firearms
6  training before this incident, correct?
7    A    Correct.
8    Q    Same question as to taser training, you had
9  undergone taser training before this incident, correct?
10   A    Yes, correct.
11   Q    Did you later learn that Mr. Lowery was
12 throwing away illegal substances?
13   A    Yes.
14   Q    Okay.  Had you ever encountered Mr. Lowery
15 before this incident?
16   A    No.
17   Q    Did you have any animosity towards Mr. Lowery
18 before this incident?
19   A    No.
20   Q    And, again, your encounter with Mr. Lowery is
21 less than two minutes, correct?  All together, since you
22 first see him until he's shot, right?
23   A    Yes.
24   Q    Okay.
25       MR. VAZQUEZ:  That's all I have for now.

Page 134

1    MR. JIMENEZ:  I don't have any questions.
2    MR. MARRESE:  Just a couple more on that.
3  Yeah.
4              REDIRECT EXAMINATION
5  BY MR. MARRESE:
6    Q    Mr. Payne, a few questions just in follow up
7  to what Mr. Vasquez asked you.
8         The reference to the name "James" in your
9  interactions with Mr. Lowery on that night, that was
10  Mr. Lowery telling you his name was James, at some
11  point, when he was on the street?
12    A    I just -- I don't remember that part of -- of
13  me actually saying that until I read what was in here.
14    Q    Okay.
15    A    But I would say that -- what was your -- what
16  was your --
17    Q    Well, it was -- I'd just like to clarify
18  because of the way it was asked earlier.  I just wanted
19  to clarify.
20         You didn't know his name was James, obviously,
21  correct?
22    A    Correct.
23    Q    And so, for you to have received that
24  information as relayed by Lieutenant Jeremy Gonzalez,
25  you would have had to tell them him that you heard the

Page 135

1  suspect say that to you, right?
2    A    Right.
3    Q    Okay.  But you don't remember in what context
4  he said it or when he said it during the pursuit?
5    A    Yeah.  I don't remember that part of the --
6  the whole event.
7    Q    Okay.  Thank you.
8         You mentioned "drive stun" during the
9  questioning from Mr. Vasquez.
10         Can you just explain to us exactly what that
11  is?
12    A    So, the taser has three functions.  You can
13  shoot long range or you can shoot close range.  And,
14  after those are gone, you can -- there's a function on
15  the right side that you press and it arcs it, and it
16  creates, like, a bolt of lightning.  And you can drive
17  that into somebody while your arcing it.  And it, like,
18  makes them, like -- it's like a stinging -- it's a,
19  like, a distraction technique, to make them change their
20  behavior from what they're doing.
21    Q    Okay.  And you tried to do that to Mr. Lowery
22  at one point?
23    A    After I -- after I had shot the second
24  cartridge and I realized that he wasn't giving up and he
25  came closer to me, that's when I tried to drive stun

Page 136

1  him.
2    Q    Did you make any contact with him when you did
3  that?
4    A    I did, but he was wearing a sweatshirt; so,
5  there was, like, no effect.
6    Q    And this was before he backed up, turned
7  around and then went over the gate?
8    A    Yes.
9    Q    Okay.  At one point during the questioning
10  with Mr. Vasquez, you described a 90-degree angle that
11  you believed you observed Mr. Lowery's right elbow in
12  when you looked over the gate, correct?
13    A    Correct.
14    MR. VAZQUEZ:  Objection to form.
15  BY MR. MARRESE:
16    Q    And then, you said that you interpreted that
17  as looking like he was going to shoot.
18         My question is this:  When you were describing
19  it earlier, it was a bent elbow as if you hand was in
20  his sweatshirt.
21         Am I correct about that?
22    A    Yeah, that's how I said earlier.
23    Q    Okay.  And so, when you said, like, he was
24  going to shoot, you didn't mean his arm was then pointed
25  at you or anything like that; you're describing the same

Page 137

1  position as if his arm was in or at least near his
2  sweatshirt?
3    A    Yeah, I'm describing, like, his elbow was
4  bent.  Like, the best way I could describe it, it looked
5  like a -- like a 90-degree angle, like...
6    Q    Okay.  Thank you.  Toward the end of
7  Mr. Vasquez's questioning, he asked you a general
8  question like, foot pursuit, you know, was covered at
9  some point, just not in the specific way as Mr. Marrese
10  was asking you about.
11         Do you remember that?
12    A    Yes.
13    Q    Okay.  And you said, Yeah, it was covered.
14         Earlier in your -- your testimony, you -- with
15  Mr. Vasquez, you had explained that foot pursuit was
16  mentioned and foot pursuit was, you know, defined as,
17  you know, any time you're chasing after a fleeing
18  suspect.
19         Beyond that, did you get any training on foot
20  pursuits?
21    MR. VAZQUEZ:  Objection to form.
22    A    There was no, like, formal training on a foot
23  pursuit.
24  BY MR. MARRESE:
25    Q    Okay.  And no simulation-based training on --

Jessica Payne
08/06/2025

Page 138

1   on foot pursuits, correct?
2       A    There -- without, like, the simulation --
3       Q    I mean, actually chasing someone.
4       A    Yeah, like, we -- we would -- like, we would
5   meet as a squad and park, and they would be, like, All
6   right.  You're gonna simulate a traffic stop.  And then,
7   the only time we did one where somebody took off was --
8   was you do one, and then the guy takes off, you chase
9   him.  And then, he's waiting behind the wall.
10          And the whole purpose for that training was
11  to -- to basically make sure that you clear walls, like,
12  while you're pursuing somebody.  There was not, like, a
13  Oh, take your gun out.  You know, this is what you do
14  when you're running with your gun.  There was none of
15  that.
16          It was just a quick, what do you do in this
17  situation when the guy takes off from you running in a
18  traffic stop.
19      Q    Okay.  And so, when you were running in that
20  one situation, you didn't have your gun unholstered?
21      A    No.
22      Q    Okay.  You didn't have taser unholstered?
23      A    No.
24      Q    Okay.  And that was the only example you can
25  think of where are you were running after someone who

Page 139

1   had fled in a training?
2       MR. VAZQUEZ:  Objection to form.
3       MR. JIMENEZ:  Join.
4       A    Yes.  And, actually, during those trainings,
5   they disarm you, so you don't have taser or your -- your
6   gun.
7       Q    Thank you.
8       MR. MARRESE:  I don't have further
9   questions.
10              RECROSS EXAMINATION
11  BY MR. VAZQUEZ:
12      Q    To be clear, foot pursuits were mentioned in
13  other types of training.  This is one that involved some
14  kind of active exercise.
15          Was it also covered in other types of training
16  in the classroom, as such?
17      A    No.  Meaning, like, was -- after we did this,
18  was that discussed, like, formally with, like, people
19  explaining -- like a debrief on it, basically or...
20      Q    No, no, no, not necessarily.  It could be a
21  debrief.  It could be a debrief.
22          But was it covered in a classroom setting or
23  perhaps when another officer has an encounter with
24  someone, with a suspect, and you go over it in order to
25  see what could have done -- could have been done

Page 140

1   differently or better?
2       A    I see what you're saying, yeah.
3       MR. MARRESE:  Form.
4       A    We -- we did look -- critique.  We did use
5   other officer's foot pursuit videos to talk about the
6   good things and talk about the bad things and what you
7   could learn from it.
8       Q    Okay.
9       MR. VAZQUEZ:  Thank you.
10      MR. JIMENEZ:  Go ahead.
11              FURTHER EXAMINATION
12  BY MR. MARRESE:
13      Q    Other officers' videos, to talk about what you
14  could learn from a foot pursuit, when did you do that?
15      A    There was no, like, designated time.  It would
16  just be periodically, whether somebody had like a -- a
17  good foot pursuit or somebody had a terrible foot
18  pursuit, you know.
19          And by "good", I mean, like, they were very
20  clear over the radio.  They stayed in the chase and they
21  got the guy apprehended and nobody got hurt.  And bad, I
22  mean, like, somebody goes to chase a guy and they jump a
23  fence and wipe out, and the guy gets away.
24      Q    So, nothing with respect to the use of a
25  firearm during a foot pursuit?

Page 141

1       MR. VAZQUEZ:  Objection.
2       A    Correct.
3       MR. JIMENEZ:  Join.
4   BY MR. MARRESE:
5       Q    That's correct?
6       A    That's correct.
7       MR. MARRESE:  Thank you.  I don't have
8   any further.
9       MR. VAZQUEZ:  I don't have anything
10  further.
11      MR. JIMENEZ:  I don't have anything
12  further.  We are gonna read.
13          What that means is that if a transcript
14  is ordered, as I expect it will be in this
15  case, you will have an opportunity to read it
16  over first.  You won't be able to change
17  anything substantial.  You can't change a
18  "yes" to "no".  But if there's small mistakes
19  in spelling or things like that, you can mark
20  that down on a separate sheet so it's clear
21  for the record, okay?
22      THE WITNESS:  Okay.
23      MR. JIMENEZ:  We'll read once that comes
24  in.
25      VIDEO TECHNICIAN:  Before we go off the

Joshua Payne
08/06/2025

Page 142

```
1   record, would anybody like to order the
2   transcript and video?
3       MR. VAZQUEZ:  I'll hold off.  You can
4   send me an estimate.
5       MR. MARRESE:  Yeah, I'll order an
6   electronic PDF of the transcript, no video at
7   this time.
8       MR. JIMENEZ:  Same for us, we'll do a
9   PDF, but no video at this time.
10      VIDEO TECHNICIAN:  All right.  So, this
11  concludes the video recorded deposition of
12  Joshua Payne on August 6th, 2025.  And we're
13  gonna go off the video record at 2:08 p.m.
14      (Off the written record at 2:10 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 143

```
                CERTIFICATE OF OATH
1
2   STATE OF FLORIDA)
3   COUNTY OF ORANGE)
4
5       I, MARY L. DOBSON, COURT REPORTER, Notary
6   Public, State of Florida, certify that JOSHUA PAYNE
7   personally appeared before me on August 6, 2025 and was
8   duly sworn.
9       Signed this 19th day of August, 2025.
10
11  Personally known ___ or produced identification X__.
12
    Type of identification produced: Driver's License.
13
14
15
16  _____
    Mary L. Dobson
17  Notary Public - State of Florida
    My Commission Number:   HH302626
18  My Commission Expires:  August 19, 2026
19
20
21
22
23
24
25
```

Page 144

```
                CERTIFICATE OF REPORTER
1
2
    STATE OF FLORIDA
3
    COUNTY OF ORANGE
4
5       I, Mary L. Dobson, Court Reporter and Notary
6   Public, do hereby certify that I was authorized
7   to and did stenographically report the foregoing
8   deposition of JOSHUA PAYNE; that a review of the
9   transcript was requested; and that the transcript,
10  pages 1 through 142, is a true record of my
11  stenographic notes.
12      I FURTHER CERTIFY that I am not a relative,
13  employee, attorney, or counsel of any of the
14  parties, nor am I a relative or employee of any of
15  the parties' attorneys or counsel connected with
16  the action, nor am I financially interested in the
17  action.
18      Dated this 19th day of August, 2025.
19
20
21  _____
    MARY L. DOBSON, COURT REPORTER
22
23
24
25
```

Page 145

```
                ERRATA SHEET
1
2           DO NOT WRITE ON THE TRANSCRIPT
            ENTER CHANGES ON THIS SHEET
3
    Case: ROBINSON V. PAYNE, ET AL.
4   Deponent: JOSHUA PAYNE
    Date of Deposition: AUGUST 6, 2025
5   Case No.: 6:23-cv-01313-PGB-LHP
6   PAGE    LINE    REMARKS
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  Under penalties of perjury, I declare that I have
    read the foregoing document and that the facts
20  stated in it are true.
21  Signature of Witness _____
22  Dated this _____ day of _____, _____.
    email to: flproduction@lexitaslegal.com
23
24  Job No. : 416566
25
```

Joshua Payne
08/06/2025

```
                                                    Page 146
 1    August 19, 2025
 2    Joshua Payne
      c/o Roberts, Reynolds, Bedard
 3      & Tuzzio, PLLC
      470 Columbia Drive
 4    Suite C101
      West Palm Beach, Florida 33409-1983
 5
 6    ATTN:  James Jimenez, Esquire
 7    Re: Robinson v. Payne, et al.
      Case No.:  6:23-cv-01313-PGB-LHP
 8
      Please take notice that on August 6, 2025 you gave
 9    your deposition in the above cause.  At that time,
      you did not waive your signature.
10
      The above-addressed attorney has ordered a copy of this
11    transcript and will make arrangements with you to read
      their copy.  Please execute the Errata Sheet, which can
12    be found at the back of the transcript, and have it
      returned to us for distribution to all parties.
13
      If you do not read and sign the deposition
14    within a reasonable amount of time, the original,
      which has already been forwarded to the ordering
15    attorney, may be filed with the Clerk of the Court.
16    If you wish to now waive signature, please sign your
      name in the blank at the bottom of this letter and
17    return to the email address listed below.
18    Very truly yours,
19    _____
20    Mary Dobson, Court Reporter
      Lexitas
21    fl.production@lexitaslegal.com
22    I do hereby waive my signature.
23    _____
24    Joshua Payne
25    Job No.: 416566
```

Jessica Payne
08/06/2025

**Exhibits**

**JPayne08**
**0625 Ex**
**002**
  3:16
  73:9,12

**JPayne08**
**0625 Ex**
**003**
  3:17
  74:8,11
  78:5,6

**JPayne08**
**0625 Ex**
**004**
  3:18
  77:11,14

**JPayne08**
**0625 Ex**
**005**
  3:19
  83:5,8

**JPayne08**
**0625 Ex**
**006**
  3:20
  84:17,22

**JPayne08**
**0625 Ex**
**007**
  3:21
  96:23
  97:13
  128:6,8,
  19

_____

**0**

**0530**
  26:9

**0600**
  24:21
  26:7

**0630**
  26:10

_____

**1**

**1**
  24:9,10
  25:4
  30:24
  61:4
  62:1
  77:14
  85:2
  97:4
  99:19
  100:24
  128:12

**10**
  72:2
  73:3
  107:24
  108:21
  123:9
  127:24

**100**
  41:5
  112:22

**103-page**
  84:23

**107**
  85:17

**10:00**
  4:1

**11:17**
  57:11,12

**11:26**
  57:14

**12:23**
  84:15,16

**12:31**
  84:20

**1337**
  81:16

**1350**
  81:23

**14**
  9:25

**144**
  99:9,15,
  18

**15**
  8:19
  9:24

**155**
  99:15,19

**156**
  100:3,4

**158**
  100:4

**159**
  100:19,
  24

**161**
  101:4

**164**
  101:18

**165**
  101:19

**1730**
  26:9

**17th**
  99:4

**1800**
  24:21
  26:7

**1830**
  26:10

**19th**
  23:8

**1:32**
  118:21,
  22

**1:39**
  118:24

_____

**2**

**2**
  24:14
  25:5
  30:24
  73:9,12
  74:2
  75:2
  85:2
  97:3,7
  101:5
  128:6,11

**20**
  4:6
  32:16
  69:17

**2011**
  13:24
  20:23

**2012**
  20:16,23

**2017**
  20:12,17

**2019**
  23:9
  95:20

**2020**
  23:4,9
  24:4
  25:24
  84:3
  95:20
  99:4
  106:20

**2021**
  9:8
  14:16
  19:7
  26:12
  31:23
  73:16
  84:5
  85:21
  86:2,19
  88:4,9
  93:2,6
  94:8
  95:5
  105:11
  115:22
  119:14

**2022**
  14:17,
  19,25
  19:15
  28:13
  30:12
  77:14

**2024**
  19:17

**2025**
  4:8
  74:21
  142:12

**244**
  102:8

**248**
  85:5

**25**
  113:5

**26**
  110:3

**26th**
  9:8 19:7
  26:12
  31:23

**27**
  110:20

**28th**
  12:9
  23:9

**29**
  111:16

**295**
  100:20

**296**
  97:19,25

**2:08**
  142:13

**2:10**
  142:14

**2nd**
  74:21

_____

**3**

**3**
  62:25
  63:6,13
  74:8,11
  78:6
  85:1
  101:17
  128:6,
  11,12,14

**30**
  8:14
  61:12
  62:4
  121:7

**31**
112:11

**311**
98:14

**32**
12:10

**33**
12:9
99:19

**345**
85:12

**354**
85:5

**389**
97:24,25

**39**
9:25

**4**

**4**
63:13
77:11,14
99:9

**400**
96:25

**41**
114:6

**44**
102:8

**45**
62:13

**5**

**5**
63:19
73:4
77:5
78:6
83:5,8

**50**
113:4

**510**
97:1,4,
16

**55**
62:14,
18,25
63:6

**6**

**6**
63:19
64:4,5
84:17,22

**64**
115:21

**66**
115:23

**6th**
4:8 23:4
142:12

**7**

**7**
40:6
64:5
96:23
97:13
107:1
128:6,8,
19

**75**
112:22
113:2,3

**7:15**
26:13

**9**

**9**
107:24

**90**
69:15
125:2

**90-
degree**
136:10
137:5

**98**
85:12

**A**

**a.m.**
4:1
57:12

**academy**
21:22
22:6
23:8
95:19,24
96:8,18
130:14,
16

**accident**
80:10

**accolade**
31:20

**accordance**
90:15

**account**
121:25

**accustomed**
26:21

**act**
109:15

**acting**
90:15
95:6
130:10

**action**
58:7
105:15

**actions**
87:16,25

**active**
105:7,19
116:1
122:18
132:24
139:14

**actively**
81:3

**activity**
22:24
110:15

**actual**
36:6
108:15
123:8

**additional**
14:7
40:1

**adjacent**
21:7

**Adjudication**
117:21

**administration**
14:13

**adult**
80:6

**Affair**
128:7

**Affairs**
11:20
84:24

**affect**
92:19

**afternoon**
119:2,3

**agree**
25:7
48:24
86:2

**ahead**
120:20
140:10

**ahold**
42:25

**aiming**
53:4,10,
11

**air**
47:5
63:20

**alert**
38:14,15

**alleged**
85:18

**allowed**
89:25
132:14

**altercation**
34:11
42:8,9
65:15
66:11
67:9
72:10,20
122:24,
25 123:8
132:18

**ambush**
52:6

**Amended**
74:12

**ammunition**
104:13
108:16

**angle**
136:10
137:5

**angry**
45:11

**animosity**
133:17

**announce**
4:11

**announced**
78:18

**answers**
5:23,24
7:5
74:12,
17,23
92:7
119:9

**anticipate**
6:10

**anymore**
15:21
71:20

**app**
17:12

**appearance**
4:12

**appeared**

38:16
75:9
76:24

**appears**
98:2

**application**
28:21

**applications**
29:1

**apply**
28:20
31:10
105:21

**applying**
87:24

**apprehend**
65:3

**apprehended**
140:21

**approach**
37:14
103:17,
20
109:20

**approached**
40:24
41:7
59:14
94:7,23
95:4
122:4

**approaching**
94:6,15
102:10
103:20

104:1

**approve**
29:6,9

**approved**
74:25

**approximate**
34:20

**approximately**
8:14,19
22:12
30:20
123:9
130:7

**April**
19:15

**arcing**
135:17

**arcs**
135:15

**area**
35:1,3
48:7
53:7,9,
11
124:13

**areas**
132:8

**arise**
131:3

**arm**
55:8
56:8,15,
24,25
58:14,
15,21
59:11
60:17,25
75:9
136:24

137:1

**armed**
47:13
56:17
75:25
115:9
123:21

**asks**
75:3

**aspect**
132:6

**aspects**
131:14

**assaulted**
34:12

**assign**
25:16

**associate's**
14:4

**association**
4:10

**assumed**
42:11

**attempt**
49:16

**attempted**
66:6,9
72:12
126:25
128:2

**attempting**
49:17,20
58:3,5
72:15

**attend**

13:18
15:2

**attended**
21:21
23:7
95:20

**attending**
15:5
21:18

**attorney**
7:21  9:2
77:21

**attorney's**
67:13
69:4,5,8

**attorneys**
7:21
8:3,21
10:10
18:6,18
68:3
73:6
77:24
78:12
79:18
129:11

**August**
4:8
14:16
20:12,17
23:8
99:4
142:12

**Avenue**
4:7

**aware**
36:1
70:6

**Axon**
61:5

—————————

**B**

**bachelor's**
14:5,9
15:8

**back**
15:23
30:14
35:11
37:13
42:18
45:9,13
49:3
51:7,10,
11,12,
13,25
52:12
53:1,8,
9,24
54:6,8,
18
57:13,16
63:14
70:17,19
71:4,13,
14 78:5,
6 81:16
83:10
84:12,19
112:25
118:23

**backed**
136:6

**backs**
52:12

**bad**
59:6
82:13
109:15

140:6,21

**Baez**
16:4,9
17:9
19:8
69:23
70:9,14,
15 82:2

**Baez's**
18:21

**bag**
46:5

**baggie**
46:4

**bar**
81:4

**barbs**
40:12

**barrel**
42:13,20
43:4,19,
21,22,23
63:11
66:6
72:12
123:2

**barrier**
94:23

**barriers**
94:6,15

**based**
7:6
30:23
57:1
61:1
65:15
121:14
126:20

**basically**
33:16

37:19
50:16
70:16
79:18
105:16
111:3,24
138:11
139:19

**Bates**
85:4

**battered**
34:10

**battery**
33:14,17
34:15
120:6,8
122:6

**beautiful**
16:21

**began**
4:1
14:19
38:20
99:5

**begin**
5:20
15:5
100:18

**beginning**
11:12
68:2
106:23,
25

**begins**
74:1
98:18,19

**behavior**
135:20

**belief**
54:25
75:23,25
76:12
79:6,14,
15,23
80:2
125:19

**believed**
65:14,21
67:4
76:1
90:14
136:11

**beneath**
114:9

**bent**
51:19,21
52:2
55:9,12
56:8,16,
24,25
136:19
137:4

**big**
71:23,24
107:24
109:1

**bigger**
16:18

**Bill**
129:15

**binder**
97:3,7
99:10

**birthday**
16:5

**bit**
7:9
12:21
13:9
40:13

43:17
85:3
86:1
92:9
119:8

**black**
33:1,3,4

**blindly**
58:7

**block**
109:1

**blocking**
51:3

**blocks**
35:20
36:20
38:9

**body**
9:4,6,7,
13,16,
19,22
32:4
43:3,6
53:7,11
59:5
61:2,5
69:9,24
70:1,5,8
80:25
81:14
119:17
120:11,
15,18,22
121:2,6
122:19
123:7

**bold**
109:2

**bolded**
99:17

**bolt**
135:16

**book**
96:23
128:6,
11,12,14

**bottom**
75:7
97:2,20

**box**
98:15

**brace**
60:25

**break**
7:10,15
57:6,7
83:25
84:11
118:18

**Brian**
16:7
27:3
30:6

**briefly**
11:5
42:21,24
44:4
71:18,19
74:18
124:3

**bro**
81:19

**Broken**
20:6,9

**building**
104:12,
19,22
105:21
108:9

**buildup**
54:11

**Burn**
30:5

**burst**
39:21

**business**
13:10

**butt**
52:11

———————

**C**

**Cafe**
20:6,9

**call**
8:6,8,13
16:22
32:1,10,
11 33:12
51:6
80:16
98:19
119:18

**called**
23:24
24:2
105:17

**calls**
32:7
33:23
99:22

**calves**
52:12

**cam**
9:4,6,
13,16,19
32:4
43:6
69:10
119:17
120:11,
15,18,22
121:2,6
122:19
123:7

**camera**
9:7,22
43:3
61:5
69:24
70:1,5,8
80:25
81:15

**car**
25:14,25
26:2,25
32:4,5,
6,9
34:18
35:11
37:13,
14,16,18
38:4
70:19
80:10
119:20,
21

**career**
31:20

**Carly**
16:6

**Carrabba
's**
20:5,15

**carried**
90:13

**carry**
88:22
89:16
93:22

**carrying**
89:12
90:1
95:5

**cars**
54:13

cartridge
40:6
108:23
127:19
135:24
cartridges
107:4,5
127:13
case
5:10,13,
15 10:12
11:14,15
12:5
34:1
66:20
67:22
68:17,
21,23
74:13,24
79:2
85:1
117:12,
15,17
120:2
124:5
141:15
catching
16:6
caused
66:3
caveat
7:19
center
53:5,6
76:7
certification
106:19
chain
27:9,16

50:22
change
64:12,14
135:19
141:16,
17
changing
107:4
charge
27:18
117:15
charged
80:5
charges
78:19
80:4
chase
82:17
138:8
140:20,
22
chased
72:5
chasing
64:25
65:16
93:4
109:22
116:18,
24
137:17
138:3
check-
off
24:17,
18,23
25:5
Checklist
100:5

chest
53:9
120:19
Chief
77:15
children
12:17
choice
78:8,17,
20
choose
113:3
chose
129:21
circumstances
89:1,8
126:21
citizen
82:12
City
4:17
119:5
130:11
131:8
civil
5:13,15
11:15
18:9
clarification
119:9
clarify
134:17,
19
class
15:9
106:23,
25
classes

15:18
classroom
102:22
104:8
139:16,
22
clear
48:13
60:23
89:20
104:14
110:15
132:15
138:11
139:12
140:20
141:20
clearing
104:12,
19,22
105:22
108:9
click
11:4
climb
49:16,17
close
44:15
45:18
63:8
113:6
135:13
closed
50:6
closer
36:21
135:25
closest
112:24
college

13:25
15:2
19:22
20:22
21:11
come-
with-mes
114:20
comfortable
62:9
87:24
command
27:9,16
Commander
27:17
29:3
Commanders
28:23
commands
121:5
125:17
comment
98:15
comments
97:25
98:14
commercial
13:6
communicate
6:7
communicated
19:19
78:11
79:17

communicating
99:7
company
13:3,4
complainant
33:9
complete
25:15
completed
25:21
completely
63:23
complies
62:17
63:1
73:23
83:12
110:4
computer
61:10
64:17
conceal
76:11
concealed
56:25
concerned
53:23
54:6
concludes
142:11
concluding
57:2

conclusi
on
  56:15,
  17,18
  85:13
conclusi
ons
  11:24
  84:25
  85:18
conduct
  87:13
confirma
tion
  33:19
Congratu
lations
  16:20
conjunct
ion
  12:5
  67:13
  118:11,
  13
connecte
d
  17:9
consider
ed
  76:23
consiste
nt
  23:5
  26:15
  80:12
  84:6
  87:1
  95:6
  98:8
  101:12
  102:4

105:12
116:8
125:5
consisti
ng
  128:6
contact
  40:9
  127:14
  136:2
containe
d
  76:2
contents
  100:21
context
  14:8
  22:16
  135:3
continue
  6:4
  15:19
  25:12
  91:6
continue
s
  101:18
  115:23
continui
ng
  48:25
continuu
m
  114:23
  127:4
  133:2
conversa
tion
  17:5
  72:8,25
  73:1

cook
  20:9,10,
  16,19
  21:12
cook/
manager
  20:10
cooperat
ive
  122:10,
  12
copy
  97:5
  120:11
Cora
  34:24
corner
  40:17
  41:11,14
cornered
  41:15
  65:18
correct
  5:13
  9:21
  11:24
  13:21,22
  14:1,2
  15:22
  16:10,11
  18:20
  19:24,25
  20:14,
  17,18,23
  21:3,4,
  14,16,17
  22:19
  23:9,10,
  13,16,17
  24:5,6
  25:1,2,
  19,20,23

26:18,
22,23,25
27:1,20,
22 30:17
31:8,11
33:9,10,
12,13
35:24
36:2,3,
7,9,14,
21 37:16
38:10,11
39:2,3,
11,19
40:2,3,
25 41:1,
8,19,20,
23,25
42:6,20
45:16,24
46:13,
16,25
47:1,3,
4,6,7,
10,16,
18,19,
21,22,
24,25
48:2,3,
5,21
49:1,2,
4,5,6,7,
8,9
50:5,13
51:2,24
52:3,5,
23,25
53:13,
14,16,
21,24
54:6
55:10,
11,13,
15,16,18

56:5,6,
16,21,
22,24
57:4,19,
20,25
58:4,12,
13,15,16
59:4,9,
10,12,13
60:11,
16,18,
20,21
61:2,3
63:11,
12,20,23
64:1,12
67:14,17
69:11,12
70:2,7,
9,10
74:2,3,
21,22,25
75:1
76:2,3,
14,20,25
77:9,10,
22,23
78:10
80:6
83:13
85:22,23
86:4,5,
7,8,15
87:4,19,
20,22,23
88:1,2,5
89:21
90:4,5,
6,7,8,
15,16
93:9,11,
14,17,20
95:8,22,
23

98:11,24
99:5,12,
22
100:13,
16
101:15,
22
102:6,7,
15,17,
20,21,
22,23,25
103:1,3,
4,7,10
104:23,
24 105:2
108:3,4
110:18,
19
111:11,
14
112:6,9
113:9,
12,17,
20,23
114:1,4
115:2,5,
9,12,16,
19
116:1,
11,18,
21,24
117:2,
15,20,23
118:1,5,
9,10,14
119:14,
15,19,
24,25
120:3,4,
6,13,14,
23,24
122:7,9,
23
123:1,3,

5,10,21,
22
124:8,
10,13,14
125:13
127:1,2,
16,17,
19,25
129:15,
16,19,20
130:1,2
131:10,
11
132:11,
25
133:1,4,
6,7,9,
10,21
134:21,
22
136:12,
13,21
138:1
141:2,5,
6

**Correcti
ons**
118:4

**correcti
ve**
80:10,19

**correctl
y**
37:12

**correspo
nd**
100:20

**Counsel**
4:11
62:3
97:5

**couple**
5:18
8:6,8
36:20
83:24
134:2

**courses**
83:18
84:2

**court**
4:9 6:5,
17 67:19
68:16
69:1
79:4
129:8

**courtroo
m**
5:25
95:25
129:9

**cover**
110:16
111:3,7,
8,17,21
112:3
113:15,
16

**covered**
12:1
50:23
131:14
132:3,8
137:8,13
139:15,
22

**craned**
51:10

**crashed**
80:17

**creates**
135:16

**crime**
67:13
95:25
120:9

**criminal**
14:6
67:22
68:17,
21,23
77:24
78:12
79:2
80:6
117:12,
17 129:8

**critical**
99:10,17

**critique**
140:4

**CROSS**
118:25

**crouched**
51:7
65:10,14
113:4
124:16

**cruiser**
80:15

**crunch**
59:21,23

**crying**
126:11

**cursing**
80:24
81:1

———————

**D**

**dad**
23:1

**daily**
97:22,25

**danger**
64:23
125:20

**dark**
48:7
49:11
124:13

**date**
23:3
29:7
88:10
119:13
126:17

**dated**
74:20

**dates**
30:11
84:1
95:20

**daughter**
129:3

**day**
24:8
29:8
32:3
104:18
107:10
126:22
128:23

**days**
78:19

**deadly**
112:1
127:9

**deal**
16:7
32:22
34:3,17
35:6
68:24

**dealing**
114:7,13

38:9

**death**
118:13

**debrief**
139:19,
21

**December**
9:7 12:9
19:7
26:12
31:23
73:15
85:20
86:2
88:4,9
93:2,6
94:7
95:4
119:14

**decide**
78:21

**decision**
15:13,15
79:11
83:3,4
90:18
91:13,
19,21
92:5
106:14
126:17,
20

**decision
-making**
92:20

**defendan
t**
4:15,17
74:16

**defensiv
e**
114:7,13

**define**
108:10

**defined**
137:16

**degree**
13:25
14:4,10
117:25

**degrees**
15:8
125:2

**Deleon**
36:14

**delivery**
20:4,21
21:13

**Demmon**
10:16

**departme
nt**
15:9,10,
17 16:1
17:15,
18,21
18:2
21:2,8,
16,21
23:4,12,
16 28:1,
4,10
30:8
31:21
71:13,
15,22,24
77:7,16
78:7
79:7
83:19
84:8
85:20
86:1,18
87:12,

| | | | | | |
|---|---|---|---|---|---|
| 14,16,19 | 142:11 | **details** | **disarm** | **discussi** | 28:24 |
| 88:13 | **depositi** | 73:6 | 139:5 | **on** | 84:24 |
| 90:17 | **ons** | **detain** | **discharg** | 73:17 | **Dobson** |
| 92:23 | 10:12 | 130:24 | **e** | 74:1 | 4:9 |
| 93:24 | 105:6 | **developm** | 91:13 | 105:6 | **document** |
| 94:6,15, | **describe** | **ent** | **discharg** | **discussi** | 10:8 |
| 22 95:7, | 21:6 | 31:18 | **ed** | **ons** | 83:14 |
| 11 96:24 | 46:11 | **diagram** | 22:13 | 90:25 | 84:23 |
| 102:6,20 | 52:12 | 110:5,21 | 39:18, | **disengag** | 85:7,12 |
| 103:6,13 | 95:24 | 111:17 | 20,24 | **ed** | 96:25 |
| 118:4 | 124:16 | **dictatin** | 40:1,4, | 42:17 | 97:19 |
| 126:13 | 137:4 | **g** | 7,15,19, | 43:17 | 112:11 |
| 131:9 | **describi** | 87:7 | 21 41:11 | 44:16 | 128:8 |
| **Departme** | **ng** | **die** | 62:21 | 47:11 | **document** |
| **nt's** | 106:24 | 44:14 | **discharg** | 63:16 | **ation** |
| 11:20 | 136:18, | **differen** | **es** | **dispatch** | 116:7 |
| **departme** | 25 137:3 | **tly** | 40:10 | 105:19 | **document** |
| **nts** | **descript** | 94:12 | **discharg** | **dispatch** | **s** |
| 29:5 | **ion** | 140:1 | **ing** | **er** | 8:1 9:3 |
| **depicted** | 33:1,2 | **digital** | 41:7 | 33:16,23 | 10:7 |
| 121:2 | 35:7 | 61:5 | **discipli** | **distance** | 11:9,13, |
| **depicts** | 36:22 | **direct** | **ne** | 129:7 | 21 128:5 |
| 61:6 | 84:6 | 5:3 | 80:22 | **distance** | **domestic** |
| **deposed** | 108:22 | 17:25 | **discuss** | **s** | 32:10 |
| 16:25 | 110:9,22 | **directin** | 17:2 | 107:5 | 33:12,14 |
| **depositi** | 114:8 | **g** | 31:24 | **distract** | 34:8,14 |
| **on** | 116:7 | 81:7 | 70:13 | **ion** | 36:2 |
| 4:3,6 | 124:8 | **directio** | 80:23 | 135:19 | 119:18 |
| 5:13,15 | 130:23 | **n** | 84:12 | **distraug** | 120:2,6, |
| 7:19 | **descript** | 34:23 | **discusse** | **ht** | 8 124:5 |
| 8:21 9:1 | **ions** | 35:14 | **d** | 126:7 | **door** |
| 10:14,22 | 66:12 | **directly** | 62:12 | **disturba** | 103:17, |
| 11:8 | **designat** | 27:4,6 | 73:6 | **nce** | 20,23 |
| 12:2 | **ed** | 47:5 | 91:20 | 34:8 | 104:1 |
| 16:9,10 | 140:15 | 60:5 | 95:20 | **disturba** | **doors** |
| 18:21 | **desired** | **disabled** | 113:15 | **nces** | 104:14 |
| 61:5 | 127:15 | 53:21,22 | 116:3 | 33:15 | **downward** |
| 68:2,5 | 128:3 | **disagree** | 139:18 | **divider** | 58:11,15 |
| 69:11 | **detail** | **ment** | **discussi** | 76:18 | 59:3,11 |
| 73:12 | 32:24 | 33:18 | **ng** | **division** | **draw** |
| 74:12 | 128:20 | | 61:7 | | 38:18 |
| 84:23 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 67:11 | drop | e-mails | 136:11, | 65:19 | enter |
| 112:2 | 125:11 | 17:20 | 19 137:3 | 69:12 | 31:14 |
| drawing | dropped | earlier | electron | 85:11 | entirety |
| 65:25 | 53:19 | 36:20 | ic | 137:6 | 69:9 |
| 66:2 | dropping | 38:9 | 83:17 | ended | 73:21 |
| 67:6,7 | 45:22 | 55:10 | 142:6 | 82:14 | entitled |
| 75:9 | 46:1,11, | 60:24 | electron | enforcem | 83:14 |
| drawn | 12,19,21 | 95:21 | ically | ent | 102:9,10 |
| 39:1 | drove | 116:4,8 | 10:8 | 14:8 | 114:7 |
| 40:22 | 36:11 | 119:4 | eligible | 19:24 | Erik |
| 88:14 | dual | 120:1 | 28:3 | 21:1,2, | 4:8 |
| 89:21 | 89:25 | 121:18 | emotiona | 7,22 | escalate |
| 90:2,3, | 90:1 | 134:18 | l | 22:6 | 65:2 |
| 13 92:24 | duck | 136:19, | 54:11 | 23:8 | escalati |
| 93:4,8 | 35:15 | 22 | emotiona | 95:19 | ng |
| 115:15 | Dude | 137:14 | lly | 96:8,18 | 65:5 |
| dreads | 55:6 | early | 126:9 | 114:8 | essentia |
| 33:4 | due | 26:17 | employed | 125:4 | lly |
| drew | 99:2 | 119:23 | 12:25 | 130:11 | 80:15 |
| 38:25 | duly | ears | 87:13 | engage | 108:19 |
| 41:6,16, | 5:1 | 54:16 | employee | 47:21 | establis |
| 18,21 | dumbbell | educatio | s | 89:11 | h |
| 42:1 | 52:16 | n | 13:12 | 92:23 | 38:7 |
| drill | dump | 14:7 | employme | 93:7 | 56:20 |
| 110:5 | 112:2 | 15:12 | nt | 131:4 | establis |
| 111:4, | dumping | effect | 84:4 | engaged | hed |
| 10,21,24 | 41:10 | 86:18 | encounte | 63:8 | 12:16 |
| 112:4 | 64:25 | 88:4 | r | 65:7 | 87:12 |
| 113:7 | duties | 128:3 | 26:13 | 93:3 | estate |
| drills | 21:13 | 136:5 | 133:20 | 110:18 | 119:6 |
| 113:14 | | effects | 139:23 | 129:25 | estimate |
| drive | ——————— | 108:23 | encounte | 130:3 | 142:4 |
| 127:20, | E | Egg | red | 132:17 | et al |
| 21 128:2 | E-L-F-E- | 20:6,9 | 133:14 | engaging | 4:5 |
| 135:8, | R-R-A-N- | either/ | encounte | 93:23 | evaluate |
| 16,25 | E | or | rs | 98:24 | d |
| driver | 19:10 | 31:16,17 | 65:1 | entail | 23:19 |
| 20:21 | e-mail | elbow | 102:9 | 103:21 | evening |
| driving | 30:10 | 51:19,21 | end | 106:22 | 18:23 |
| 21:13 | e-mailed | 52:1 | 19:14 | entails | 26:14 |
| 96:2 | 17:21 | 125:1 | | 130:21 | |

event
135:6

events
61:6

everything's
16:7

evidence
6:19

evolving
123:12

EXAMINATION
5:3
118:25
134:4
139:10
140:11

excellent
6:3

exception
7:13

exchanged
18:18

excited
126:9

exclusively
75:13

excuse
21:22
64:22
68:4
73:25
86:10
97:1

exercise

103:25
110:11,
17,24
111:2
129:21
139:14

exercises
104:22
108:9

exhibit
61:4
62:1
73:9,12
74:8,11
77:11,14
78:5
83:5,8
84:17,22
96:23
97:13
107:25
108:22
128:6,8,
19

exited
36:25
37:1
39:21

expect
87:21,24
141:14

expects
87:19

expenses
118:12

experience
21:2,5,
7,11
28:9,11
54:12

67:6
87:1
101:2,12
102:5
125:4

experiencing
99:3

explain
110:13
111:1,23
112:19
135:10

explained
34:11
66:10
72:18
137:15

explaining
70:15
139:19

explanation
72:23

extending
59:11

extent
81:11

eyes
120:16

eyesight
120:23

———————
F

face
51:14

faced

42:3
126:21

facets
131:18

facing
41:16
47:12

fact
66:1
77:8
91:14
126:2

factors
109:20

facts
66:20
120:7

fair
18:14,17
21:10
22:18
31:7
35:19
44:2
75:15
89:2
113:16
120:25

fake
105:19

familiar
35:1,3
87:21
129:15

family
118:12

family's
16:20

fashion
114:1

fast
37:4,9
42:15
55:2
66:15
112:1

faster
92:6

father-
son
22:25

fear
64:20,21
75:14

February
23:9
30:12

feedback
98:23

feel
44:18
67:8
82:13
92:3

feet
39:25
47:5
51:15
58:17
60:13
63:20,22

felony
34:14
117:25
120:6,8
122:6

felt
54:14
78:22

fence
50:18

51:8,9
58:7
65:11,23
140:23

field
25:1,10,
13,15
26:3
27:25
97:23,25
99:11
101:2
131:2,5

fight
38:17
45:8
54:15
80:16
81:3
82:17

fighting
45:9,11
65:18
81:4

file
80:8

filed
5:10
119:6

filing
78:18

find
126:2

finding
113:15,
16

finger
50:9
61:20

finger's
50:11

finish
 6:12,14
finished
 14:20
fire
 80:2
firearm
 21:15,24
 22:2,9,
 14,23
 40:22
 41:6,17,
 18,21
 42:1
 47:9,15,
 23 48:5
 49:23
 50:3
 58:9
 65:25
 66:2
 67:8
 75:9,17,
 23 76:8,
 13
 88:14,23
 89:1,12,
 16,21
 90:2,13
 91:14,22
 92:4,24
 93:3,8,
 22 94:22
 95:5
 98:7
 102:15,
 19
 103:5,
 15,18
 104:15
 106:13
 109:23
 111:11

 112:5
 113:8,
 14,19
 115:15
 116:24
 117:7
 124:21
 125:6
 126:25
 129:25
 140:25
firearm'
s
 50:11
firearms
 22:6
 67:6
 90:19
 96:1,7,
 17
 103:12
 108:15
 133:5
firearms
-based
 104:7
fired
 64:5
firing
 82:23
 93:10,16
fist
 50:6
fit
 124:7
flare
 41:12
flared
 40:12
flashlig
ht

 37:21
flat
 58:17
fled
 139:1
flee
 48:25
fleeing
 115:1,8
 116:18,
 24
 137:17
flight
 130:25
flip
 74:18
 85:11
floor
 56:12
Florida
 4:7
 12:11,
 16,22
 13:20
 15:4,5
 21:21,22
 22:6
 23:8
 95:19
 96:17
flying
 46:3
follow
 49:8
 61:11
 134:6
foot
 60:14
 86:3,6,
 25 87:4,
 7 88:21,

 23 89:11
 90:19
 91:15
 92:23
 93:3,7,
 11,17,23
 94:7,15,
 23
 95:10,17
 96:7,11,
 16 98:6
 99:22
 100:1,13
 101:9,
 21,24
 102:2,15
 103:6,18
 104:23
 105:25
 106:6
 107:14
 110:18
 111:11
 112:5
 113:8,
 19,25
 115:1,8,
 15
 116:11,
 14
 122:16
 129:25
 130:3,
 14,19,
 20,25
 131:1,4,
 9,13,15,
 19
 132:2,7
 137:8,
 15,16,
 19,22
 138:1
 139:12

 140:5,
 14,17,25
footage
 9:23
force
 114:22
 127:3,8,
 9 133:2
foreseea
ble
 12:23
forget
 43:5,7
form
 18:12
 27:10
 53:25
 55:19
 66:25
 67:15
 77:1
 79:9
 82:7,24
 86:9
 87:5
 88:15
 89:3,13,
 22
 90:10,20
 91:16
 93:12,
 18,25
 94:9,17,
 25 95:12
 96:9,19
 98:9
 99:23
 100:14
 101:10,
 13,24
 103:8
 104:10,

 25
 106:2,8,
 15
 107:15,
 22 110:1
 111:12
 112:7
 113:10,
 21 114:2
 115:3,
 10,17
 116:12,
 19,25
 121:20,
 24
 123:4,14
 124:1,9,
 22
 125:7,
 15,21
 127:5
 128:1,
 16,25
 131:20
 132:10,
 20
 136:14
 137:21
 139:2
 140:3
formal
 28:21
 84:7
 91:4
 131:9
 137:22
formally
 139:18
forward
 29:17,
 21,23
 40:13

forwarded
  10:10
found
  53:2
  55:5
foundation
  124:1
  131:22
  132:22
front
  5:25
  37:20
  53:9
  76:13,19
  107:25
FTO
  24:9
  28:12
FTO's
  28:6
full
  9:14,16
  59:21
fun
  22:24
function
  135:14
functions
  106:24
  107:2
  135:12
furtive
  124:20
future
  12:23

**G**

gap
  111:9
gate
  40:25
  41:2,8,14,19
  42:6,8,11,18
  45:15,19
  46:24
  47:3,6,9,14,21
  48:4,6,8,15,25
  49:3,8,10,12,16,17,25
  50:1,3,22,23,24
  51:2
  57:17,19
  58:23
  59:3,6,8,11,14,19,24
  60:4,5,12
  63:15,17,20,24
  64:4,11
  65:6
  94:6,23
  95:4
  124:12,23
  136:7,12
gave
  16:9
  33:1
  66:13,19
  69:7

  71:17
  78:7
Gayle
  34:24
  41:3
general
  7:25
  68:12
  84:6
  85:19
  86:20,23,25
  87:3,7,10,11,25
  88:3
  89:24
  128:24
  129:1
  131:1,10
  137:7
generally
  78:16
  86:21
girlfriend
  18:22,24
  19:6
give
  4:21
  5:12 6:4
  34:19
  37:8
  42:12
  61:10
  68:1
  70:20
  72:23
  104:20
  109:16
  117:10
  129:17

giving
  46:9
  65:17
  79:3
  126:11
  135:24
Gonzalez
  10:16,17,24,25
  27:9,15,24
  32:22,24,25
  33:6
  34:3,17
  35:6,12
  69:18
  71:17
  72:1,17
  73:13
  121:16,23 126:6
  134:24
Gonzalez's
  73:15
  74:1
good
  4:2 5:5,8 30:1
  57:7
  82:12
  119:2,3
  140:6,17,19
gotta
  112:21
  113:2
govern
  87:16
governing

  87:4
grab
  43:4,24
  66:6
  72:12
grabbed
  42:12,19
  43:8,11,16,18,21,22
  45:17
  63:10
  66:6
  123:2
grabbing
  43:21
  44:10
  72:15
graduated
  13:21
  19:22
Grass
  13:11
Grill
  20:5,16
ground
  5:18
  45:8
  46:13
  50:15
  58:1,17
  61:1
grunting
  45:10,11
guard
  21:6
  50:9
guess
  7:4 53:2
  59:17

  71:23
  96:2
  112:25
Guilt
  117:21
guilty
  117:14,24
gun
  22:17,18,23
  39:10
  42:13,20
  43:4,9,11,15,18,21,23
  44:6,7,22
  57:18,21
  59:2
  63:11
  66:6
  72:12
  91:4
  92:15
  103:24
  104:5,9
  108:17
  111:4
  123:3
  138:13,14,20
  139:6
guns
  91:5
  104:13
guy
  20:4
  37:7
  44:15
  72:4,5
  82:18

124:4
138:8,17
140:21,
22,23
**guys**
16:17
109:16

---

**H**
**half**
25:4,19
59:22,23
60:14
61:9,22
120:13
**halfway**
40:18
**hand**
4:19
39:6,9,
10,16
41:24
42:22
43:4
44:3,7
46:8,9
49:23,24
50:4
51:20
52:17,18
56:3,10,
19 57:22
58:22
59:2
83:10
90:2
136:19
**Handcuff
ing**
114:20
**handed**
83:11

**handle**
50:6,8
94:22
114:22,
24
**hands**
37:8
38:21
41:9,13,
16 45:8,
19 47:2,
20,23
48:1,5,
11,17,21
49:22
50:2,18
51:17,23
55:15,
17,24
57:18
65:16
76:7
130:5
**happen**
29:22
**happened**
15:18
30:19
66:15
**happening**
14:21
42:15
43:2
55:2
66:14
71:19
**happy**
16:5
31:15
**hard**
35:21

43:6
66:14
**harm**
65:19
**head**
51:11,
12,13
53:1,12
54:21
55:6
120:21
**headed**
35:8,14
**heading**
33:22
**hear**
30:13
38:20
45:4
81:18,
21,24
121:9
125:10
**heard**
31:1
32:10
33:11,22
119:18
134:25
**hearing**
34:2,4
**heart's**
92:6
**held**
4:6 15:9
19:23
20:11,21
57:21
**helps**
6:20

**Hey**
81:7
121:12
**high**
13:18,19
99:3
**higher**
31:4
**hip**
39:7
41:22
**hire**
106:20
108:3
**hit**
37:21
40:11
44:24
62:15
112:21
**hoist**
47:2
**hoists**
48:14
**hold**
23:25
44:1
58:20
124:3
142:3
**holding**
44:22
50:8
**holster**
90:5
91:2
**homes**
13:5,7
**honestly**
56:9

**hoodie**
33:4
76:6
**hop**
60:5
**hoped**
31:14
**hopped**
37:17
42:18
**hopping**
63:24
**hour**
57:8
104:2
**hours**
24:20
26:7,8
**hug**
71:17
126:11
**human**
82:10
**humans**
105:16
**hunched**
52:20
59:19
**hundred**
112:25
113:2
**hundred-
yard**
112:20
**hunting**
22:20
**hurt**
140:21

---

**I**
**IA**
79:3
97:3
**idea**
126:4,5
**identifi
cation**
62:2
73:10
74:9
77:12
83:6
84:18
97:14
**identifi
ed**
25:4
99:11
**identifi
es**
100:5
**identify**
105:22
122:14
124:3
**illegal**
133:12
**immediat
ely**
53:20
122:15
**immobili
zing**
127:16
**impacted**
90:19
91:14

| | | | | | |
|---|---|---|---|---|---|
| implicated | 44:20 | instance | intent | 77:5 | investigators |
| 91:14 | 48:9 | 68:16 | 29:4 | 78:6 | 69:8 |
| important | 49:15, | 80:18,22 | intention | interview | involve |
| 6:6 | 23,24 | 98:22 | 122:5 | 28:24 | 104:23 |
| inaccurate | 50:20 | 99:1 | 123:24 | 29:7,8, | 105:25 |
| 74:5 | 51:7,9, | instant | interacted | 12,16 | 106:6,12 |
| incapacitation | 14 | 63:25 | 36:5,6 | 30:15 | 107:13, |
| 40:14 | 52:19,21 | instantly | interactions | 31:3 | 19 |
| inches | 56:13 | 71:16 | 134:9 | interviewed | 109:12, |
| 60:13,15 | 58:10 | Institute | interlocked | 30:17 | 22 |
| incident | 59:23 | 15:4,6 | 42:16 | 36:5,6, | 111:10 |
| 19:20 | 67:11 | instructed | 45:2 | 10 | 113:15 |
| 30:14 | 120:19 | 88:25 | Internal | interviewing | 114:19, |
| 31:24 | informal | 89:10 | 11:20 | 28:12,16 | 25 |
| 77:25 | 92:13 | 90:7 | 84:24 | 111:25 | 115:7,14 |
| 80:5,9 | information | instruction | 128:7 | introduced | 116:10, |
| 86:19 | 32:17 | 68:1,12 | Internet | 119:4 | 14,17,23 |
| 119:13, | 34:6,13 | 89:15,19 | 12:4 | introduction | involved |
| 18 120:3 | 35:5,10 | 92:10,12 | interpret | 8:2 | 66:11 |
| 122:20 | 134:24 | 96:6 | 121:1 | 107:1 | 81:2 |
| 129:18 | informed | 102:22, | interpreted | investigate | 105:15 |
| 130:1,5 | 99:1 | 24 106:7 | 65:22,24 | 122:5 | 108:7 |
| 132:25 | initial | 107:1 | 66:1 | 132:14 | 109:10 |
| 133:3,6, | 39:20,21 | 113:18 | 136:16 | investigation | 113:18, |
| 9,15,18 | 74:12 | 114:13 | interpreting | 11:21 | 25 124:4 |
| included | initially | 115:1,7, | 66:17 | 84:24 | 139:13 |
| 102:22, | 42:3 | 14 | Interrogatories | 122:8 | Italian |
| 24 | 45:7 | 116:11 | 74:13, | Investigations | 20:5,15 |
| including | 46:2,8 | instructions | 16,24 | 28:18 | items |
| 73:16 | 49:18,21 | 71:6 | Interrogatory | 29:2 | 76:10,11 |
| 128:6 | 65:17 | 96:11 | 75:2 | 30:16 | |
| incurred | innocent | intend | | 128:7 | ——————— |
| 118:13 | 105:23 | 123:25 | | | J |
| indicating | inserting | intended | | | J-O-C-E- |
| 43:14,15 | 108:16 | 53:13 | | | L-Y-N |
| | Instagram | | | | 19:3 |
| | 17:13 | | | | James |
| | | | | | 4:14 |
| | | | | | 8:10,11, |
| | | | | | 16 10:20 |
| | | | | | 26:13 |
| | | | | | 35:17,24 |

36:1
38:8,10
64:19
75:3
118:12
121:17
129:3
134:8,
10,20

**Jamiyah**
4:4
129:2

**Jamiyah'
s**
10:19

**January**
14:16,19

**jeans**
33:4

**Jeremy**
10:24
27:8,15
73:13
134:24

**Jimenez**
4:14
54:1
55:20
62:3,18
67:1,16,
24 77:2
79:10,20
82:8,25
86:10
87:6
88:16
89:4,14,
23
90:11,21
93:13,19
94:1,10,
18 95:1,

13
96:10,20
97:8
98:10
99:24
100:15
101:14,
25 103:9
104:11
105:1
106:3,9,
16
107:16
111:13
112:8
113:11,
22 114:3
115:4,
11,18
116:13,
20 117:1
118:19
134:1
139:3
140:10
141:3,
11,23
142:8

**job**
6:3
20:2,11
28:21
80:11
130:19

**jobs**
19:23

**Jocelyn**
19:3

**jogging**
38:21

**John**
4:13 5:8

57:7
77:15

**John's**
20:4,22

**Johnson**
10:21

**Join**
54:1
55:20
67:1,16,
24 77:2
79:10
82:8,25
86:10
87:6
88:16
89:4,14,
23
90:11,21
93:13,19
94:1,10,
18 95:1,
13
96:10,20
98:10
99:24
100:15
101:14,
25 103:9
104:11
105:1
106:3,9,
16
107:16
111:13
112:8
113:11,
22 114:3
115:4,
11,18
116:13,
20 117:1
139:3

141:3

**joining**
21:8,16,
20

**joins**
23:16

**Josh**
30:5

**Joshua**
4:3,5,
15,25
5:7
74:16
83:15
142:12

**judge**
5:25

**July**
23:4
24:4
74:21
106:20

**jump**
58:3,7
140:22

**jumped**
124:13
125:25

**June**
77:14
105:10
115:22

**jury**
5:25

**Justice**
14:6

_____
**K**

**kids**
16:18

**kill**
72:5,6,
22
82:10,20

**killed**
82:18

**kind**
8:2
31:17
40:12
43:14,15
44:20
45:12
51:1
52:17
54:16
71:18
76:16,
17,19
80:21
81:7
83:17,20
100:4
111:3
125:1
139:14

**kneeling**
113:3

**knees**
51:16
52:4,9,
13,15,19
59:18
64:10

**knew**
34:8
43:20
53:20,22

**knowledg
e**
7:6

_____
**L**

**labeled**
97:2

**labels**
85:5

**lack**
80:11

**land**
49:13

**landing**
49:18

**landscap
ing**
13:3,4,
11

**language**
81:20

**laptop**
97:10

**large**
96:25

**lasted**
24:15

**late**
25:24
81:15

**Lau**
77:15

**law**
14:8
19:23
20:25
21:2,7,
22 22:6
23:8
95:19
96:8,18
114:7
125:4

Jessica Payne
08/06/2025

130:10

**lawsuit**
5:10
16:9
17:2,18,
22 18:3,
9,19
119:6

**lawyer**
5:9

**lawyers**
5:21
79:24

**leading**
86:6

**learn**
105:14
130:13
133:11
140:7,14

**learning**
104:14

**leave**
35:12
58:1

**leaving**
119:20,
21

**led**
32:2

**left**
6:5
28:4,9
34:17
39:10
41:21,24
50:3
57:17
58:15
60:17,25

**left-
hand**
109:2

**leftie**
39:13

**legal**
95:25

**lesson**
100:19,
24
101:5,8,
17,20
102:8
114:7
128:23

**lessons**
100:6,
18,23
101:24

**lethal**
127:8

**letter**
29:3,10
77:14,19
78:3

**letterhead**
77:22

**letters**
30:1,3

**level**
28:9
120:16

**Lexitas**
4:10

**Lieutenant**
27:11,
15,24
71:16,25
72:17

73:13,
15,25
121:15,
23 126:6
134:24

**life**
54:15
64:20,
22,23
65:20
125:20

**lightning**
135:16

**lights**
37:18

**limited**
21:12

**Linda**
10:21

**lined**
60:1,3

**lines**
75:7
121:13,
17

**link**
50:23

**list**
74:14,17
83:9

**listed**
84:2

**listen**
48:12
81:20
91:9,11

**Listing**
83:15

**litigation**
83:17

**live**
12:11,15
104:13
105:15,
16
113:19
125:24

**lived**
126:3

**lives**
19:11

**loaded**
127:19

**Lobby**
110:21

**located**
34:5
39:4

**location**
34:20,22

**locked**
64:17

**lodged**
68:13

**long**
8:13,18
9:24
12:19
13:8
20:5
24:10
32:13
71:25
73:1
76:18
85:7
103:25
104:17

135:13

**longer**
127:18

**looked**
10:2,9
34:10
35:15
36:17
43:16
46:3
48:8
49:13,18
51:16
52:9,13
56:2,7,
9,18
59:24
65:13
67:7,11
136:12
137:4

**lot**
76:10,11
119:7

**low**
104:15

**lower**
120:21

**Lowery**
10:21
26:13
32:2,8,
14,19,21
35:17,24
36:1
38:8,10
39:23
40:10,24
41:9,19
42:2,19
46:24
47:17

48:25
51:5
58:8,15
59:9,18,
25 63:19
64:19
65:10
66:5,8
72:11,
14,22
73:7
75:4,8,
14 76:22
86:3
90:14
117:8
118:12
119:6
121:5
122:4,10
123:23
124:13
125:10,
20,24
126:25
129:3
132:13,
17
133:11,
14,17,20
134:9,10
135:21

**Lowery's**
10:20
47:9
55:8
66:16,23
67:19
68:17
69:6
136:11

M

M-E-R-Y-
E-M
  19:9
made
  15:14
  36:16
  65:12
  66:23
  82:22
Madison
  116:1
major
  10:17,24
majority
  84:2
make
  6:1,8,
  15,20
  7:7
  37:11
  40:9,13
  78:20
  109:14
  124:20
  127:14
  135:19
  136:2
  138:11
makes
  6:20,25
  65:2
  135:18
makeshif
t
  103:16
making
  46:19
  90:18
  91:13,

  19,21
  106:13
making's
  92:5
male
  33:1,3
  36:12,
  17,19
malfunct
ions
  110:15
man
  21:11
  33:24
  35:15
manageme
nt
  21:12
manslaug
hter
  117:14,
  25
March
  14:25
mark
  61:4
  73:12
  83:8
  96:23
  112:20
  141:19
marked
  38:4
  62:1
  73:9
  74:8,11
  77:11,14
  83:5
  84:17
  97:13

marking
  84:22
  108:23
Marrese
  4:13
  5:4,9
  27:12,14
  54:2,4
  55:22
  57:9,15
  61:16,19
  62:5,6,
  19,20
  67:2,18,
  25  69:3
  73:11
  74:10
  77:4,13
  79:13,21
  82:21
  83:2,7
  84:11,21
  85:4,6
  86:11,
  12,17
  87:9
  88:18
  89:6,18
  90:12,22
  91:8,25
  93:15,21
  94:2,11,
  13,20
  95:3,14,
  18
  96:13,22
  97:9,15
  98:12
  100:2,17
  101:11,
  16
  102:3,18
  103:11

  105:2,5
  106:5,
  11,18
  107:18,
  23  110:2
  111:15
  112:10
  113:13,
  24  114:5
  115:6,
  13,20
  116:16,
  22
  117:3,18
  121:20,
  24
  123:4,14
  124:1,9,
  22
  125:7,
  15,21
  126:16
  127:5
  128:1,
  16,18,25
  131:20,
  22
  132:9,
  10,20,22
  134:2,5
  136:15
  137:9,24
  139:8
  140:3,12
  141:4,7
  142:5
married
  12:13,
  16,20
  19:16
Mary
  4:9

mass
  53:5,6
master's
  14:10
  15:6
matrix
  127:4
Matt
  10:16
matter
  4:4  7:11
  11:24
  77:25
  80:9
  117:22
  126:13
Matthew
  10:16
  33:6
Meaning
  46:17
  139:17
means
  39:10
  68:22
  108:11
  141:13
meant
  87:16
media
  17:7,10,
  12  18:1
medic
  96:1
medical
  96:2
meet
  8:2
  138:5
meeting
  8:7,15,

  18 9:1
  71:21
meetings
  7:25
  18:5
memorand
um
  80:10,19
mention
  98:6
mentione
d
  11:9
  33:11
  131:17
  135:8
  137:16
  139:12
Meryem
  19:9,11,
  13,19
message
  103:21
messages
  17:25
  18:18
met
  5:9  8:7,
  20  35:23
  36:22
  129:2,5
metal
  51:1
micropho
ne
  120:19
middle
  28:13
  105:7
  116:1

midst
43:2
military
13:16
mind
120:5,7
minimum
74:24
minute
61:9,22
62:4,8,
25 63:6,
13,19
64:4,5
69:17
112:14
114:10
120:12
minute-
seven
63:3
minutes
8:14,19
9:24,25
32:16
72:2
73:3,4
81:17
126:14
133:21
missed
39:22
mistake
82:22
mistakes
141:18
mix
13:6
moment
5:9 43:8
44:4,7

64:19,24
65:10,12
73:20
75:4
86:7
98:16
99:14
100:10
117:10
money
46:3
month
14:24
24:11,15
25:5,19
months
16:16
25:4
104:21
morning
4:2 5:5,
8 8:7,16
26:8
mother
10:18
mother's
10:20
motion
43:22
motioning
60:7
move
31:23
74:15
97:19
99:9
100:3
101:4,17
110:3,20
111:16,

17,20
112:3,22
114:6,22
115:21
moved
107:2,3
movement
46:18
124:20
125:5
moves
97:24
moving
29:17,
21,23
30:8
31:20
64:13
78:5,6
105:23
110:16
multiple
33:23
mute
70:1,2
muted
70:5,8

———————
N

N-O-V-O-
A
19:5
narcotic
46:5
narrative
73:15
74:1
121:16
Nathan
4:5,15,

25 5:7
necessar
ily
121:1
139:20
Nelson
4:9
27:3,7,
23,24
30:6
neuromus
cular
40:14
news
9:13,20
night
9:23
24:14,
18,19
26:5,18,
24
27:19,22
76:16
134:9
nods
6:5
North
4:6
notarize
d
74:20
noticed
35:12
37:6
Novoa
19:5
number
102:11
113:14
numbered
74:17

numbers
97:4,21
98:19

———————
O

oath
5:1,24
obey
125:17
object
27:10
53:25
55:19
67:15
68:3
77:1
104:25
112:7
115:3
128:16
objectin
g
67:22
objectio
n
66:25
67:21
68:20,
22,24
79:9
82:7,24
86:9
87:5
88:15
89:3,13,
22
90:10,20
91:16
93:12,
18,25
94:9,17,
25 95:12

96:9,19
98:9
99:23
100:14
101:10,
13,23
102:16
103:8
104:10
106:2,8,
15
107:15,
22 110:1
111:12
113:10,
21 114:2
115:10,
17
116:12,
19,25
117:16
136:14
137:21
139:2
141:1
objectio
ns
68:13
observat
ion
56:23
observed
136:11
obtain
14:3
obtained
13:25
obvious
6:11
occasion
ally
60:22

occasions
  22:11
  130:7
occurred
  26:13
  33:17
  70:24
  71:2
  84:3
  105:10
  119:14
occurring
  45:9
  54:11
occurs
  69:21
off-gun
  39:6,9
offender
  36:7
offense
  80:6
  117:24
office
  67:13
  69:4,5,8
officer
  17:9,15,
  18,21
  18:2,21
  19:7
  20:7,13
  21:1
  23:16,
  19,24,25
  24:2,4,
  25 25:1,
  10,13
  27:21
  28:1

30:2
31:18
32:22,
24,25
33:6
34:3,17
35:12
69:18,23
70:9,14,
15,16
73:25
82:1
87:14,18
95:21
98:19
100:6
101:18,
21 125:5
129:15
130:11
131:3
139:23
officer'
s
  140:5
officers
  15:7
  27:19
  35:6
  55:4
  98:1
  109:15
officers'
  140:13
officially
  104:18
online
  10:8
  18:12

open
  30:23
  31:3,5
operate
  106:24
opportunity
  31:9
  69:20
  91:2
  127:24
  141:15
opposed
  6:4
  78:25
opposite
  37:4
  59:6
option
  78:22
  114:24
Orange
  4:7
order
  30:24
  85:3
  86:25
  87:3,7,
  10,11,12
  89:24
  131:10
  139:24
  142:1,5
order's
  112:23
ordered
  118:11
  141:14
orders
  85:19
  86:20,23

87:25
88:3,5
orientation
  57:23
  58:25
original
  32:11
originally
  35:13
  37:7
Orlando
  4:7
  13:19
outcome
  82:14
  127:15
outline
  100:4,5
outlines
  100:19

———————
P
p.m.
  84:16
  118:22
  142:13,
  14
pages
  74:13
  85:17
  97:1,17
paint
  108:16
paintball
  108:12
Papa
  20:4,22

paper
  10:8
paragraph
  74:2
parents
  18:8
park
  138:5
part
  8:25
  43:23,25
  44:8
  61:7
  68:5
  69:14,15
  92:22
  96:16
  99:2,11
  101:1
  107:6
  129:14
  134:12
  135:5
partake
  110:11
participate
  110:24
  111:20
  112:16
parts
  69:13
pass
  28:10
  103:2
passenger's
  37:6,15
past
  49:25

52:7
patrol
  23:16,19
  24:4
  25:17,25
  26:2,25
  27:18,21
  29:5
  34:17
  38:4
  100:25
  104:9
  112:11,
  16
patrolling
  26:24
pause
  38:6
  61:9,23
pay
  15:11,21
  118:11
paying
  15:17
Payne
  4:3,5,25
  5:7,8
  13:11
  19:4
  57:16
  67:23
  68:14,15
  74:16
  83:15,16
  84:22
  97:17
  98:19
  119:2
  134:6
  142:12

PD
  32:4
  70:17,20
  71:5
PDF
  142:6,9
pending
  7:14
  77:25
  117:12
people
  16:2,8
  28:23
  30:20
  34:5
  38:15
  67:6
  127:22
  139:18
percent
  41:5
perfectly
  68:4
performance
  99:10,17
period
  23:18,21
  25:3,9
  26:3
  63:12,18
  118:3,8
  131:5
periodically
  140:16
permitted
  88:13,17

perpendicular
  52:11
person
  17:6
  39:5
  47:10
  67:8
  82:12
personal
  7:6
  16:22
personally
  107:7
personnel
  80:8
  83:8,15
pertaining
  101:21
pertains
  97:18
phase
  24:9,10,
  14,17,
  18,22,23
  25:4,5,6
phone
  17:6
physical
  34:11
  66:11
  72:19,20
  96:5
  97:5
  122:24
  132:17

physically
  122:20
pick
  32:4
picked
  22:2,8
  119:17
pie
  104:14
  111:5,6
piece
  51:1
pizza
  20:4
place
  30:14
  71:21
  119:8
plaintiff
  4:13
  5:10
  83:16
  97:2
Plaintiff's
  74:12
plan
  12:22
  114:7
plans
  15:23
planted
  56:12
plastic
  46:5
platforms
  18:1

play
  61:21
  62:15
  81:14
played
  61:24
  81:22
  123:8
playing
  105:16
  120:7
pled
  117:14,
  24
pocket
  37:9
  38:21
  41:13,16
  46:3
  56:3,5,
  10,11
  64:25
  76:7,9,
  13,16,
  17,18,25
pockets
  41:10
  65:17
  76:19
  125:11
point
  28:5
  36:13,
  18,24
  38:9,18
  39:1
  44:14
  45:18,20
  50:12
  57:22
  58:18
  62:22

69:23
  70:16
  88:6
  97:17
  120:17,
  22
  127:22
  134:11
  135:22
  136:9
  137:9
pointed
  34:23
  42:2
  43:13
  136:24
pointing
  58:9,14
  59:3
pole
  80:14
police
  11:20
  15:9,10
  16:1
  17:14,
  18,21
  18:2
  20:7,12
  21:1,8,
  16,20
  23:4,12
  24:2,4
  28:1
  30:2
  54:13
  70:16
  71:13,
  14,22,24
  77:7,15
  78:7
  79:7
  80:14

83:19
  84:8
  85:19
  86:1,18
  87:12,
  14,15,18
  88:12
  90:17
  92:23
  93:24
  94:5,14,
  21 95:7,
  10,21
  96:24
  102:5,20
  103:6,13
  126:13
  131:9
policies
  85:20
  87:15,25
policy
  131:19
pony
  33:5
portion
  44:6
  63:5,7
  74:15
  81:14
  106:23,
  25
portions
  62:8,10
  128:19
position
  20:21
  31:3,6
  49:19
  51:6
  52:11,14
  53:15,17

| | | | | | |
|---|---|---|---|---|---|
| 55:9 | **potentia** | **present** | **private** | **proficie** | **pulled** |
| 58:19 | **lly** | 129:9,12 | 7:21 | **ncy** | 117:7 |
| 59:25 | 35:7 | 131:3 | **privileg** | 103:2 | **purpose** |
| 65:14 | 57:2 | **presente** | **ed** | **profile** | 138:10 |
| 66:18 | 67:7,10 | **d** | 7:22 | 51:14 | **pursuant** |
| 67:20 | 76:1 | 109:19 | **proactiv** | **program** | 127:3 |
| 82:10 | 79:4 | 121:15 | **e** | 99:12,21 | **pursue** |
| 113:4 | **practice** | **presenti** | 30:2 | **prop** | 58:5 |
| 120:15 | 37:3 | **ng** | **probatio** | 52:18 | 131:1 |
| 137:1 | 68:5 | 114:23 | **n** | **properti** | **pursued** |
| **position** | 104:19 | **preserve** | 118:2,9 | **es** | 125:10 |
| **ed** | 108:18 | 68:6 | **probatio** | 13:6 | **pursuing** |
| 64:14 | **practici** | **press** | **nary** | **property** | 89:2,25 |
| **position** | **ng** | 61:20 | 23:13, | 40:25 | 91:6 |
| **ing** | 111:25 | 135:15 | 21,23,25 | 125:24 | 92:20 |
| 61:2 | **predomin** | **pressed** | 24:25 | **propulsi** | 138:12 |
| **position** | **antly** | 50:20 | **proceede** | **on** | **pursuit** |
| **s** | 26:5 | **pretty** | **d** | 46:10 | 86:3,6 |
| 28:12,16 | **prefer** | 24:3 | 122:15 | **prosecut** | 88:21,23 |
| **posted** | 78:24 | 30:2 | **proceedi** | **ed** | 89:11 |
| 18:15 | **preferen** | **principl** | **ngs** | 67:12 | 90:19 |
| **posture** | **ce** | **es** | 4:1 6:20 | **prosecut** | 91:15 |
| 65:13, | 31:13 | 105:21 | **process** | **or** | 92:23 |
| 22,23 | **preparat** | **printout** | 29:23 | 69:5 | 93:3,7, |
| 66:2,17, | **ion** | 83:20 | 44:13 | **provide** | 11,17,23 |
| 23,24 | 7:18 | **prior** | **processe** | 5:23 | 94:7,24 |
| 67:5 | 8:25 | 8:7 9:18 | **s** | 6:12 | 96:16 |
| 68:18 | 11:10,13 | 11:12 | 29:18,19 | **provided** | 98:7 |
| 69:6 | 69:10,16 | 20:25 | **processi** | 15:7 | 101:9 |
| 75:14 | **prepare** | 21:7,15, | **ng** | 30:3 | 102:15 |
| 76:23 | 8:3,21 | 18,20,24 | 72:9 | 87:3 | 103:6 |
| **postured** | 12:2 | 22:2,4, | **produced** | **PT** | 105:25 |
| 65:25 | **prepared** | 5,8 23:7 | 61:6 | 96:3,4 | 106:6 |
| 66:2 | 121:15 | 32:18, | 83:16 | **public** | 107:14 |
| **posturing** | **Preparing** | 19,21 | 85:3 | 14:13 | 110:18 |
| 125:2 | **g** | 76:22 | 96:24 | 81:10 | 111:11 |
| **potential** | 100:24 | 78:5 | **professi** | **pull** | 112:5 |
| 122:5 | **preposit** | 80:4,9 | **onal** | 97:7 | 113:9,20 |
| | **ion** | 93:2 | 21:11 | 117:6 | 129:25 |
| | 69:10 | 95:21 | 84:23 | | 130:3, |
| | | 120:13 | | | 19,20 |
| | | | | | 131:1,5, |

10,14,
15,19
132:2,7
135:4
137:8,
15,16,23
140:5,
14,17,
18,25
**pursuits**
86:25
87:4,8
88:21
94:15
95:10,17
96:7,12
99:22
100:1,13
101:21,
24 102:2
103:18
104:23
113:25
115:1,8,
15
116:11,
15
130:14
137:20
138:1
139:12
**push**
33:24
50:14
**pushed**
44:21
**put**
9:12
38:17
45:8
49:22
50:18
55:4

74:7
85:24
91:5
117:4

———————

**Q**

**Qualific
ation**
112:12,
17
**quarters**
45:18
63:8
**Queen**
34:24
40:17,18
**question**
5:19
6:14,24
7:4,14
9:23
18:7
21:19
27:13
48:12,13
54:3
55:21
56:14
59:6
65:21
66:22
68:8,14
72:14
74:18
79:14
89:5,9
91:11,24
92:8
93:1
94:12
99:8
104:4

121:20
124:22
133:8
136:18
137:8
**question
ing**
61:11
135:9
136:9
137:7
**question
s**
5:20,21,
23 6:10
68:4
69:21
70:23
73:22
75:5
83:24
88:10
97:18
117:11
118:15,
17 119:7
134:1,6
139:9
**quick**
37:17
43:2
65:8
138:16
**quick-
draw**
113:6
**quickly**
9:4 24:3
**quote**
124:17

———————

**R**

**racing**
92:7
**radio**
32:12,25
33:21,22
38:14,19
55:5,7
105:18
140:20
**raise**
4:18
**Ramon**
4:16
119:5
**ran**
34:20
45:23
90:14
**range**
22:17,
18,23
102:25
103:3,16
104:5,9
111:4
135:13
**rank**
23:25
**rapidly**
123:12
**reach**
127:15
**reached**
40:19
56:15
**reaching**
28:8
46:12,14
56:15

64:24
125:11
**read**
10:18
11:5
73:20,23
75:4,6
85:8
87:19
98:16,21
99:14,
15,16,20
109:5,6,
7 110:8,
10,21,23
111:18
112:13,
15
114:10
128:20
134:13
141:12,
15,23
**reading**
101:1
**ready**
61:21
104:15
**real**
108:16
**realize**
82:17
**realized**
135:24
**reask**
54:2
**reason**
6:17
33:21
**reasonab
le**

67:8
125:19
**reasons**
75:3
77:6
**recall**
24:10
31:25
32:13,17
34:16
57:23
101:1
104:3
106:19
114:16
121:10,
18
126:18
128:22
131:17
132:7
**receive**
78:2
89:10
96:6,11
100:6
103:12
114:13
**received**
11:3
29:15
30:7
32:18
35:6
83:18
84:8
92:11
95:9,16
96:8
98:22
102:19
103:14
118:2

134:23

**receiving**

14:8
97:23
106:19

**recently**
69:10

**recollection**
7:6 23:5
26:15
73:2
80:12
84:7
98:8
105:12
109:9
122:23

**recommendation**
30:1,4

**record**
4:12 5:6
57:11,
12,14
60:22
61:18
83:17
84:15,
16,20
85:4,13
105:3
118:21,
22,24
141:21
142:1,
13,14

**recorded**
142:11

**recount**
66:14

**RECROSS**
139:10

**REDIRECT**
134:4

**reengage**
53:24

**reference**
80:1
134:8

**referencing**
9:7 97:9

**referring**
131:18

**refresh**
109:9

**regard**
127:11

**relate**
88:11

**related**
11:15
115:1

**relates**
73:16
115:25

**relating**
74:1
80:10
86:25
98:23
101:9
104:1
117:13

**relationship**
19:13

**relatives**
129:5

**relayed**
134:24

**released**
54:12

**reload**
110:5

**reloading**
107:4

**remain**
12:22

**remained**
14:18

**remember**
10:14,18
16:14
17:8
32:24
34:22
36:15
38:1
58:25
69:25
71:8,12
72:7,8
86:21
105:8
108:6
134:12
135:3,5
137:11

**removed**
126:12

**rephrase**
7:1
55:21
89:5
131:21

**report**
11:21
27:4,6,
22,23,24
73:13,
14,15,18
84:25
97:22
121:15

**reported**
119:16

**reporter**
4:9 6:5

**reporter's**
6:17

**represent**
81:18
84:3
86:24
97:23
98:6
119:5
131:13

**representing**
83:17
131:25

**research**
12:4

**resident**
12:23

**residential**
13:5,7

**resign**
77:9
78:8,17,
21,24
79:7,15

**resignation**
77:19

**resigned**
77:6

**resist**
122:20

**resisted**
123:23

**resistence**
122:17,
18

**resisting**
81:3

**respect**
17:20
72:14
84:25
90:18
91:13
103:19
117:11
140:24

**respond**
32:7

**responded**
32:1
98:19

**responding**
32:7
80:16

**responds**
82:2

**response**
29:15
30:7
77:5

78:2

**responses**
6:4

**responsible**
36:2

**rest**
69:19
76:7

**restate**
27:13

**restaurant**
21:12

**resting**
52:11
57:18
58:23
59:3

**restrain**
114:21

**restroom**
7:12

**result**
77:25

**resumé**
20:12,17

**review**
9:2,15
10:4,7
11:13
100:10

**reviewed**
8:1 9:19
10:22
11:9,19,
23 12:2
16:10
74:25
80:8

Jenna Payne
08/06/2025

86:23
88:5
98:5
100:11,
21 116:6
120:12
**reviewing**
11:3
**rewatched**
43:3
**ride**
25:12
**riding**
25:1
**Rifle**
112:11,
16
**right-hand**
97:20
**rights**
68:6
70:16
129:15
**ringing**
54:16
**Robinson**
4:5
85:5,12
129:2
**roles**
105:16
**room**
71:23,24
**rooms**
104:15
**Rosis**
16:6

**roughly**
20:22
26:13
63:6
**rounded**
40:17
41:11,14
**rounds**
108:17,
18 112:2
**row**
52:16
**rule**
6:13
7:13
87:11
**rules**
5:18
**run**
13:3
38:17,23
52:7
89:1,20
111:4
**running**
39:15
41:9
46:2,8,
19,20
59:14,17
65:16
88:13,23
89:16
91:15,
20,22
92:4,15
102:15
106:13
107:20
138:14,
17,19,25

**runs**
46:21
47:8
**rushing**
58:6
103:23

—————

**S**

**safe**
108:18
**safety**
101:18,
21
108:23
**scenario**
109:14,
15,16,
17,18
123:13
127:23
**scenario-based**
90:24
103:12
115:22
133:5
**scenarios**
91:20
92:14
**scene**
71:9
95:25
98:24
126:13
**schedule**
29:7
**school**
13:18,19
105:7,
17,20,23

116:1
**schooling**
15:21
**scuffle**
65:8
**seconds**
9:25
55:3
61:12
62:4,13,
14,16,25
63:6
64:2
69:15,17
121:7
123:9
127:24
**section**
85:13
**security**
21:6
**select**
30:24
**selecting**
31:2
**selection**
29:23
**Self-employed**
13:1
**semester**
14:19,
20,22
**semesters**
14:11,15
**Seminole**

14:5
**send**
142:4
**sense**
6:1,8,15
7:1,7,25
**sentence**
75:8
118:2
**separate**
132:3
141:20
**September**
25:24
**Sergeant**
27:3,7,
8,23,24
30:5,6
**Sergeants**
28:23
**series**
85:17
86:19
**serve**
27:25
**service**
74:14
98:20
**session**
5:20
**setting**
28:22
139:22
**sheet**
51:1
108:2
141:20
**shift**

24:7,8,
13,14,
18,19
26:3,5,
18,19,21
27:17,
19,22
32:1,3
98:1
119:23
**shirt**
45:20
55:17,24
75:9
76:2
**shoot**
53:13
59:9
64:1,19
65:12
66:3
106:14
111:5,6,
17,20
113:1,2,
4,5,6
117:8
125:3
135:13
136:17,
24
**shooter**
105:7,
19,24
116:1
132:24
**shooter's**
65:13,23
66:18,24
67:4,20
68:18
69:6

75:14
76:23

**shooting**
17:15,22
18:2,12,
23 19:7,
20 59:3
67:14
69:12,
13,22
70:13,24
71:2,10,
12 84:25
98:20
102:24
103:3
111:3,8
113:3,15
117:13

**short**
63:18
83:25

**shortly**
20:13
99:4
106:20

**shot**
52:22,24
53:1,3,
4,15,17,
18 54:5,
7,10,20,
23 55:1,
3,6,7,12
58:8,11
59:1
64:4
72:6,22,
23 73:7
75:3
86:7
123:9
125:20

133:22
135:23

**shots**
40:6

**shoulder**
40:12
41:12
44:25
45:1
63:11
66:9
72:16

**shoulders**
44:10

**shoved**
44:18

**show**
9:22
69:19

**showed**
34:4
55:4

**showing**
54:14,19

**shown**
9:14
120:11
128:5

**shrugs**
6:4

**sic**
42:13

**side**
37:5,6,
15,17
39:6
46:22
59:5,8,
19 60:2,
6 65:11,

22 74:7
85:24
97:20
109:3
111:6,7
117:5
135:15

**sidewalk**
37:19,20

**sideways**
57:22

**sign**
80:17

**sign-in**
108:2

**signature**
74:20,25

**signed**
77:15
98:1,2
108:3

**silent**
61:13
121:6

**similar**
18:1
91:12

**similarly**
112:4
113:7

**simply**
122:14

**simulate**
96:16
103:5
138:6

**simulated**
93:16

104:23

**simulating**
112:5

**simulation**
92:22
106:1,12
107:19
108:13
111:11
113:8,19
115:8,15
138:2

**simulation-based**
137:25

**simultaneously**
89:11

**simunitions**
96:1,7,
17
108:2,6,
9,10,22
109:10,
14

**single**
76:10

**sir**
5:14,17
8:12,17,
23 9:9
10:3,6,
13,23
11:1
12:12,
14,24
13:14,17
21:23
22:1

24:24
27:5
28:2
39:8,12,
14,17
40:8
77:20
78:1
101:7
124:25

**sit**
28:22
29:12

**sites**
112:21

**sitting**
52:6
56:11,12
76:9
120:18,
19

**situation**
36:2
53:6
65:4
99:3
112:1
131:3
138:17,
20

**situations**
91:3
92:18

**skills**
92:20

**slept**
70:21

**slide**
43:25

**slow**
103:22

**small**
141:18

**smoothly**
6:20

**social**
17:7,9,
12 18:1

**solemnly**
4:20

**someone's**
114:23

**sort**
46:5

**sound**
81:15,16
119:8

**sounded**
33:25
34:14
45:10,12
120:2,8

**sounds**
63:2
105:13

**south**
36:14

**spans**
26:11

**speaking**
82:1

**Special**
28:17
29:2
30:16

**specialized**
28:12,

15,20

**specific**

132:3

137:9

**specific
ally**

53:11

72:11

86:25

93:17

99:22

104:1

128:22

131:8,

15,18

**specific
ity**

132:9

**speculat
e**

7:5

**sped**

92:5

**speed**

64:13

**spelling**

141:19

**Spies**

10:16

**spoke**

7:20

16:14

19:8

34:2

126:6

**spoken**

18:5,8,

22 33:8

**spot**

49:19

**spots**

30:23

**Springs**

13:19

**sprinted**

38:22,25

**sprintin
g**

38:22,23

39:21

**squad**

16:8

104:20

138:5

**stage**

28:6

**stand**

70:18

83:4

126:17,

20

**standard**

37:3

68:5

**Standard
s**

84:24

**standing**

35:21

67:21

68:20,22

101:23

102:16

117:16

**start**

23:3

31:25

32:3

61:8

65:2

77:8

**spots** 84:4

112:20,

24

**started**

14:10,22

26:19

33:21

37:9

38:14,

21,22,23

**starting**

81:16

85:12

**starts**

101:18

**state**

5:5

12:15

14:5

29:4

75:3

77:6

121:5,8

**state's**

67:12

69:4,5

**statemen
ts**

66:19

69:7

70:20

79:3

129:18

**states**

13:15

77:5

**stating**

89:24

**status**

23:13

**stay**

15:25

16:3

**stayed**

140:20

**steady**

103:22

**STENOGRA
PHER**

4:18,24

61:14

86:13,16

105:4

**step**

30:11,12

31:17

**step-
children**

12:18

**stinging**

135:18

**stint**

25:19

**stood**

50:16,19

**stop**

15:13,

14,16

65:6

80:17

109:17

125:11

126:25

132:14

138:6,18

**stopped**

14:23

32:21

34:5

63:2,14

123:24

132:13

**stopping**

81:23

**stops**

109:19

**store**

76:10

**straight**

52:10

**street**

34:24

36:14,

16,17

37:17

39:21

40:18,19

41:2

88:1

134:11

**streets**

34:25

**stressfu
l**

99:3

**stretch**

84:5

100:20

**stretchy**

76:10

**strike**

21:18

65:21

66:9,21

89:9

93:1

99:7

104:4

**striked**

42:13

**strikes**

64:6

**striking**

72:15

**struck**

66:8

80:14

**studies**

95:25

96:1

**studying**

14:12

**stuff**

45:22

54:17

**stumbled**

42:17

45:13

**stun**

39:2

127:20,

21 128:2

135:8,25

**subject**

32:23

34:20

115:22

130:24

**submit**

28:25

29:3

**submitte
d**

29:10

**subsecti
on**

102:9

**subsecti
ons**

102:11

**substanc
es**

133:12

**substantial**
141:17
**successfully**
25:15,21
**supervision**
118:3
**supervisor**
27:2
29:5,9
81:6
98:23
99:2
**supervisors**
98:1
**supposed**
29:22
87:13
112:2
127:8
**surmising**
61:1
**surprise**
83:23
**suspect**
36:7,10
81:2
88:13
89:2,17,
20,25
91:15
92:24
93:4
102:9,10
105:22
107:20

109:22
112:6
115:2,8
116:18,
24 122:6
124:8
135:1
137:18
139:24
**Swat**
28:17
29:1,22
30:8,10
31:12
**swear**
4:20,23
**sweatshirt**
46:9
56:3,5,
10,19,21
57:3
76:3,4,
11,13,
17,19,
21,24
136:4,20
137:2
**sweatshirts**
76:6
**switch**
105:17
**sworn**
5:1
74:23

———

**T**
**table**
100:21
**tactics**

114:7,14
**tail**
33:5
**take-down**
37:18
**takes**
65:9
138:8,17
**taking**
6:5
71:12
108:15
111:7
**talk**
7:18
16:6,7,
12,17
70:17
71:1
85:25
92:17
100:21
140:5,6,
13
**talked**
16:4
75:13
130:18
**talking**
48:14
64:6
80:24
107:2,3
**talks**
99:25
**tall**
50:22
**target**
112:21,
24

**tase**
107:9,20
**tased**
107:6,7
**taser**
38:25
39:2,4,
15,19,24
40:1,5,
6,15,20,
21 41:7,
11 43:14
44:22
49:24
50:4
57:18,21
58:21,
22,25
62:21
89:12,
16,21
90:2,14
91:5
92:16
95:5
106:19,
24
107:1,3,
5,14
117:6
127:1,
14,19
133:8,9
135:12
138:22
139:5
**task**
99:17
**tasks**
99:11
**taught**
93:22

128:23
**teachers**
15:8
**teaching**
110:14
**Team**
28:17
30:10
**TECHNICIAN**
4:2
57:10,13
61:17
84:14,19
118:20,
23
141:25
142:10
**technique**
135:19
**techniques**
114:20
**Technology**
15:4,6
**telling**
16:19
72:7,21
134:10
**tells**
69:23
**ten**
39:25
62:16
**tend**
76:6
**tense**
123:17

**tenure**
23:12
**term**
130:16
131:1
**terminated**
78:8,17,
25 79:8,
16
**terms**
12:23
14:24
24:19
28:9,19
30:8
31:12,13
34:7
60:1,13,
17 66:17
74:5
76:16
85:18
88:3
94:22
102:14
109:10
118:6
128:24
129:1
**terrible**
140:17
**testified**
5:1
18:22
48:17
60:24
120:1
123:19
124:12
129:24

testimony
  4:20
  64:10
  126:18
  131:8,
  12,13,24
  132:2
  137:14
tests
  103:2
texted
  17:14,17
  19:18
thereabouts
  26:14
thing
  41:12
  126:10
  130:15
things
  8:1
  15:11
  41:10
  46:12,19
  64:13,25
  65:2
  66:14
  92:19
  121:23
  140:6
  141:19
thinking
  44:15
  52:7
  54:8,18
thought
  34:15
  44:13
  66:20
  72:4,6,

  21
three-
page
  83:14
throw
  46:16
throwing
  42:14
  133:12
tied
  33:5
time
  7:10
  9:5,11
  11:3
  16:14,25
  17:3
  18:23
  19:7
  20:6
  22:25
  24:7
  25:3,4,9
  26:6,10
  27:2
  28:4,14
  30:5
  32:9,14,
  15,18
  40:16,
  20,22
  45:19
  47:8,11,
  13,15
  57:7,24
  59:1
  62:21
  63:12,
  16,19
  64:7
  66:13
  68:3

71:9,16
72:9
73:5
83:19
86:19
93:6
97:22
99:4
104:21
111:8
117:7
123:8,
17,21
124:7
125:20
127:18
137:17
138:7
140:15
142:7,9
timeframe
  121:9
times
  8:5 26:9
  40:2,4
  124:15
tippy
  50:16,
  19,21
  57:24
title
  24:1
titled
  101:17
  110:21
titles
  99:17
Titusville
  4:17
  11:20

16:1
17:14,
17,21
18:1
21:1,8,
16,20
22:4
23:4,12
26:6
28:1
77:6,15
78:7
79:7
83:19
84:8
85:19
86:1,18
88:12
90:17
92:11,23
93:23
94:5,14,
21 95:7,
10,21
96:24
97:3
102:5,20
103:6,13
119:5
130:11
131:8
today
  5:13,19
  7:5,10
  8:3 9:23
  11:10,13
  75:13
  82:22
  97:6
  119:7
  120:13
  121:18
  128:9

132:15,
19
today's
  7:19
  8:21,25
  12:2
toes
  50:17,
  19,21
  57:24
  58:1
told
  34:16
  70:9,11
  71:3,20
  72:5
  74:5
  78:14
  121:16,
  25
top
  43:25
  50:3
  57:19
tossing
  46:14,
  15,21
totality
  126:21
  128:23
touch
  15:25
  16:3
  44:9
traffic
  28:17
  29:1,24
  30:8,13
  31:12
  33:24
  109:17,
  19

138:6,18
train
  90:18
trained
  88:25
  89:8
  91:12,19
  93:10
  94:5,14,
  21
  127:11
trainee
  108:11
trainer
  131:4
training
  21:25
  25:1,10,
  13,15,22
  26:3
  28:1,6
  71:23
  83:9,15,
  18 84:7,
  12 85:25
  88:20
  89:10
  90:15,25
  91:4
  95:6,10,
  17 96:1,
  3,4,5,7,
  17
  97:19,
  23,25
  99:12
  100:5,7
  101:2
  102:5,19
  103:13,
  14,19,25
  104:8,

16,17
105:7,
14,15,
18,25
106:6,
12,20
107:13,
19
108:3,6
109:10
114:25
115:7,
14,22,25
116:1,3,
7,10,14,
17,23
129:14
131:2,5,
14,15,18
132:4,25
133:3,6,
8,9
137:19,
22,25
138:10
139:1,
13,15
**trainings**
92:14
139:4
**transcript**
6:19
10:19
16:10
141:13
142:2,6
**transcripts**
10:9,11,
12,15
11:8

**transfer**
29:4
**transition**
24:12,16
**transitioned**
59:2
**transpired**
128:24
**transpires**
123:9
**traumatic**
66:15
**trigger**
50:9,12
117:6,7
**true**
78:9
113:1
**truth**
4:21,22
**tryouts**
29:22
30:9
**tunneled**
54:16
**turn**
69:23
70:2
85:2
102:8
**turned**
35:16
37:9,21,
24  38:12
42:12

45:14
47:11
51:12,13
63:14
65:7
122:15
136:6
**turns**
47:8
112:1
**tussled**
43:17
**two-handed**
76:7
**type**
76:20
92:14
104:16
109:1
124:20
**types**
139:13,
15
**typical**
26:20
65:1
**typically**
26:4

_____

**U**

**UCF**
14:6
**Uh-huh**
62:23
**ultimately**
32:1,14
35:16
38:8

39:18
40:24
67:12
117:14
**undergoing**
131:2
**undergone**
132:24
133:2,5,
9
**underneath**
110:9,22
**understand**
5:12
6:9,24
37:11
46:18
59:25
68:8,22
119:14
121:6
123:19
126:24
131:7
**understanding**
23:11
28:8
78:15,16
121:14,
22
**understood**
31:22
35:23
79:1,2
119:11

**unholstered**
95:5
126:24
130:1
138:20,
22
**uniform**
38:2
**Unit**
28:17
29:24
30:9,13
31:12
**United**
13:15
**units**
28:20
**university**
15:3
**unloading**
108:15
**unpleasant**
82:16
**unsure**
15:19
75:22
**upcoming**
79:1
**upstanding**
82:12
**utilizing**
111:8
**uttered**
71:18

_____

**V**

**vantage**
120:16,
22
**varying**
26:9
**Vasquez**
134:7
135:9
136:10
137:15
**Vasquez's**
137:7
**vast**
84:2
**Vazquez**
4:16
27:10
53:25
55:19
57:6
66:25
67:15,21
68:20
69:1
77:1
79:9,19
82:7,24
86:9
87:5
88:15
89:3,13,
22
90:10,20
91:16
93:12,
18,25
94:9,17,
25  95:12
96:9,19

98:9
99:23
100:14
101:10,
13,23
102:16
103:8
104:10,
25
106:2,8,
15
107:15,
22 110:1
111:12
112:7
113:10,
21 114:2
115:3,
10,17
116:12,
19,25
117:16
118:17
119:1,5
121:21
122:1
123:6,16
124:6,
11,24
125:9,
16,23
127:7
128:4,17
131:23
132:12,
23
133:25
136:14
137:21
139:2,11
140:9
141:1,9
142:3

**vehicle**
36:12,
23,25
37:2,4,
5,6,20
119:17
**verbal**
6:4
33:17
80:24
121:5
**verbally**
6:7 81:7
121:8
**version**
9:24
**versus**
4:5
76:18
**vertical**
47:5
63:23
**victim**
33:3,8
98:24
**victim/
complain
ant**
36:5
**video**
4:2 6:19
9:4,6,7
10:1,4,5
50:25
57:10,13
61:9,15,
17,24
62:4,9,
10,11,14
63:5,14,
22 64:3
69:20

81:15,
22,23
84:14,19
118:20,
23
120:11
121:6,10
122:19
123:7
124:16
125:11
141:25
142:2,6,
9,10,11,
13
**video-
recorded**
4:3
**videos**
140:5,13
**view**
82:11
**viewing**
76:22
**violated**
85:20
**violatio
ns**
85:19
**visual**
51:19

—————

**W**

**wait**
6:12,13
11:5
78:25
**waiting**
52:6
138:9

**walk**
7:12
36:12
37:4
38:17
**walked**
37:18,
22,24
38:12
**walking**
35:13
36:18
37:7,9
**wall**
55:25
138:9
**walls**
138:11
**wanted**
31:10
134:18
**wash**
32:5,6,9
119:20,
21
**watch**
61:8
62:16,24
69:13,20
81:9
119:17
**watched**
9:4,10,
11,12
43:1
69:9,14,
15
**watching**
43:5
**weapon**
48:1,5

75:10,
18,21,24
76:1,8,
24
93:10,16
110:16
**weapons**
38:18
48:20
50:7,9,
10 77:3
101:9
**Weapons/
off-duty**
101:5
**wearing**
33:2,4
136:4
**weeks**
8:6,9
24:18
25:6
**west**
34:23
36:15
**whatsoev
er**
114:1
130:13
**Whoa**
79:19
**wield**
89:25
90:1
**wife**
18:7,18,
24
**wife's**
19:2
**win**
82:15

**window-
like**
103:17
**Winter**
13:19
**wipe**
140:23
**withdraw**
27:13
59:6
94:11
**withheld**
117:22
**woman**
33:24
34:9
**word**
80:11
99:16
**words**
15:20
28:7
31:16
53:23
54:5
78:24
**work**
28:19
29:2
119:16
**worked**
20:5,6
26:4
112:25
**working**
23:23
26:21
**works**
23:14
**worried**
65:3

Jessica Payne
08/06/2025

**write**
 61:15

**writing**
 6:18
 19:19

**written**
 6:19
 18:11,19
 77:21
 87:15
 100:23
 142:14

**wrong**
 32:23
 83:11
 112:23

_____

**X**

**Xaviaz**
 16:4

**Xavier**
 10:16

_____

**Y**

**yard**
 112:22

**yards**
 112:22

**year**
 12:9,21
 13:23
 14:14
 20:22
 23:11,24
 28:14
 31:3,6,
 10

**years**
 13:9
 118:3

**Yesterday**
 9:17

**young**
 21:11

_____

**Z**

**Zoom**
 8:6,8,13