EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:23-cv-01313-PGB-LHP

JAMIYAH ROBINSON, as Personal
Representative of the ESTATE
OF JAMES LOWERY, Deceased,

        Plaintiff,

vs

JOSHUA NATHAN PAYNE, individually
and as an agent and employee of
the Titusville Police Department,
and CITY OF TITUSVILLE, FLORIDA,

        Defendants.
_____

REMOTE DEPOSITION OF
CHARLES DEMMON

VOLUME 1 (Pages 1 - 93)

Thursday, July 10, 2025
10:16 a.m. - 12:48 p.m.

LOCATION:  Remote via Zoom
Titusville, Florida

STENOGRAPHICALLY REPORTED BY:
CINDY A. LAYER, CSR

Page 2

```
1   APPEARANCES:  (All parties appearing via Zoom.)
2
3   ON BEHALF OF THE PLAINTIFF:
4
5         HART, McLAUGHLIN & ELDRIDGE, LLC
          One South Dearborn, Suite 1400
          Chicago, Illinois 60603
6         (312) 955-0545
          BY:  JOHN MARRESE, ESQUIRE
7         jmarrese@hmelegal.com
8
    ON BEHALF OF JOSHUA PAYNE:
9
10        ROBERTS, REYNOLDS, BEDARD & TUZZIO, PLLC
          470 Columbia Drive, Suite C101
11        West Palm Beach, Florida 33409
          (561) 688-6560
12        BY:  JAMES JIMENEZ, ESQUIRE
          jjimenez@rrbpa.com
13
14  ON BEHALF OF CITY OF TITUSVILLE:
15
          ROPER, TOWNSEND & SUTPHEN, P.A.
16        255 S. Orange Avenue, Suite 750
          Orlando, Florida 32801
17        (407) 897-5150
          BY:  DAVID JADON, ESQUIRE
18        djadon@roperpa.com
19
20
21
22  Also present:  Armando Forte, videographer
                   Morgan Forbes, paralegal
23
24
25
```

Page 3

```
1                I N D E X
2
3   Charles Demmon                          PAGE
4
5     Direct Examination by Mr. Marrese       5
6     Cross-Examination by Mr. Jadon         85
7
8   CERTIFICATE OF OATH                       #
9   CERTIFICATE OF REPORTER                  ##
10  READ AND SIGN LETTER                     ##
11  ERRATA SHEET                             ##
12
13
14             INDEX OF EXHIBITS
15  NO.        DESCRIPTION              ID
16  1          Investigative report     11
17  2          Investigative report     15
18
19
20
21
22
23  (Stenographer's note:  All exhibits were received
24  and marked at the conclusion of the deposition.)
25
```

Page 4

```
1   Remote proceedings began at 10:16 a.m.:
2         VIDEOGRAPHER:  We're now on the record.
3   The time is 10:16 a.m.  This is the
4   video-recorded deposition of Lieutenant Matt
5   Demmon taken in the matter of Robinson
6   versus Joshua Nathan Payne.  This deposition
7   is being held on Zoom.  Today's date is
8   July 10th, 2025.
9         My name is Armando Forte.  I am the
10  videographer representing Lexitas.  Our
11  court reporter for today is Cindy Layer,
12  also an association with Lexitas.
13        Will counsel please identify themselves
14  and who they represent?
15        MR. MARRESE:  John Marrese for the
16  plaintiff.
17        MR. JIMENEZ:  James Jimenez for
18  Defendant Joshua Nathan Payne.
19        MR. JADON:  David Jadon on behalf of
20  Mr. Demmon and City of Titusville.
21        VIDEOGRAPHER:  Thank you, Counsel.  The
22  court reporter will now swear in the
23  witness.
24        STENOGRAPHER:  Do you swear to tell the
25  truth, the whole truth, and nothing but the
```

Page 5

```
1   truth?
2         THE WITNESS:  Yes.
3         STENOGRAPHER:  Thank you.
4   WHEREUPON,
5         C H A R L E S   D E M M O N
6   was called as a witness and, after having been
7   first duly sworn, was deposed and testified as
8   follows:
9                DIRECT EXAMINATION
10  BY MR. MARRESE:
11        Q.  Good morning.  Would you please state
12  your name for the record?
13        A.  Good morning.  It's Charles Demmon,
14  D-e-m-m-o-n.  I go by Matt.
15        Q.  Thank you very much.  And Mr. Demmon,
16  at the time of the documents at issue in this case
17  you were a lieutenant with the Titusville Police
18  Department.  Are you still a lieutenant?
19        A.  No, sir.  I'm a commander.
20        Q.  You're a commander?
21        A.  Yes, sir.
22        Q.  Thank you.  Is it okay if I refer to
23  you as Commander Demmon then throughout the
24  deposition?
25        A.  Sure.
```

Charles Demmon
07/10/2025

Page 6

1     Q.   Thanks.  Mr. Demmon, we met -- I called
2   you Mister.  Mr. Demmon, we met a moment ago.  My
3   name is John Marrese again.  I represent the
4   plaintiff in a lawsuit against a former officer,
5   Joshua Payne, and the City of Titusville.  You
6   understand that you personally are not a defendant
7   in this lawsuit, correct?
8     A.   Yes, sir.
9     Q.   And that we're taking your deposition
10  today simply as a witness with some involvement in
11  the review of the shooting that is involved in this
12  case, correct?
13    A.   Yes, sir.
14    Q.   Thank you.  Have you given a deposition
15  before?
16    A.   I have.
17    Q.   Many times?
18    A.   On the criminal side, yes.
19    Q.   Let me just go over some ground rules
20  for our deposition in this civil case today.  I'll
21  ask you most of the questions for a while, some
22  others may ask you questions when I'm done, and the
23  answers that you provide are under oath in this
24  case just as if you were giving them before a judge
25  or a jury.  Does that make sense?

Page 7

1     A.   Yes, sir.
2     Q.   Thank you very much.  We will be going
3   for some time today, and there will probably be a
4   lot of questions that you anticipate exactly what
5   I'm going to ask you.  If we were in normal
6   conversation, kind of outside of this formal
7   setting, we'd interrupt each other, we'd interject,
8   say things.  In this setting, if you would, please,
9   wait until I finish my question entirely and
10  then -- and the rule applies to me.  I'll wait
11  until you finish your answer entirely before we
12  begin speaking.  Does that make sense?
13    A.   Yes, sir.
14    Q.   Thank you very much.  If you don't
15  understand a question that I've asked you for
16  whatever reason, you'll obviously let me know, and
17  if it makes sense, I'll rephrase it for you.  Is
18  that okay?
19    A.   Yes.
20    Q.   All right.  Great.  Just as you have
21  been today, provide verbal responses, yesses, noes,
22  and other explanations.  It's harder to interpret
23  shrugs, and nods, and things like that.  Even
24  though there is video of today's deposition, still
25  give verbal responses to my questions.  Okay?

Page 8

1     A.   Yes, sir.
2     Q.   All right.  Thank you.  You will from
3   time to time hear objections to my question, which
4   is a very typical part of the deposition process
5   where lawyers are just preserving their rights.
6   Please wait for those objections to be completed,
7   and when completed, answer my question if you
8   understand it.  Okay?
9     A.   Yes, sir.
10    Q.   I suppose there's an exception.  If
11  your attorney instructs you not to answer, you get
12  to make the decision whether to follow that advice,
13  but typically speaking, answer subject to the
14  objections.  Okay?
15    A.   Okay.
16    Q.   Thank you.  Lastly, we can take breaks
17  any time you prefer today, just let me know.  I may
18  call for them on my own at times.  If you need to
19  use the bathroom, get up, walk around, whatever,
20  just let me know and we'll do that.  Okay?
21    A.   Thank you.
22    Q.   Thanks very much.  I want to ask you
23  some questions about the preparation, if any, that
24  you did for today's deposition.  The caveat I want
25  to give you is, I don't want to know anything that

Page 9

1   you discussed with your attorneys or attorney.
2   That's privileged information, so don't disclose
3   that to me.  But I'll ask you some questions about,
4   you know, just when you met, if you met, what kind
5   of things you looked at.  Okay?
6     A.   Okay.
7     Q.   All right.  Did you have any meetings
8   with attorneys to prepare for today?
9     A.   Yes.
10    Q.   How many?
11    A.   I think just the one.
12    Q.   Okay.  Was that an in-person meeting?
13    A.   Yes.
14    Q.   When did that take place?
15    A.   Yesterday.
16    Q.   How long was that meeting?
17    A.   Maybe an hour.
18    Q.   Thank you.  With whom did you meet?
19    A.   Mr. -- is it David?  Yes, the attorney
20  here today, David.
21    Q.   Thank you very much.  And was anyone
22  else in the room with you when you prepared with
23  David?
24    A.   No.
25    Q.   Thank you.  That's the only meeting

Charles Demmon
07/10/2025

Page 10

1  that you had to prepare for today's deposition,
2  correct?
3      A.  Yes.
4      Q.  As a part of that meeting, did you
5  review any documents?
6      A.  My internal, yes, sir.
7      Q.  What documents did you review?
8      A.  The -- I went through some of my
9  summary, I believe some policy, some training, and
10  I think I looked at some transcripts, some printed
11  transcripts.
12      Q.  Did you review any video, including any
13  Axon video or body cam video as a part of preparing
14  for today?  I'm sorry.  I didn't hear you.
15      A.  No, sir.
16      Q.  Did you review any audio, be it of an
17  interview, or from 9-1-1 calls, or audio from
18  anyplace?
19      A.  No, sir.
20      Q.  That was a no?
21      A.  No.
22      Q.  Thank you.
23      A.  There's a lawn mower going behind us,
24  so I'll speak a little bit louder.
25      Q.  That's okay.  I don't know if it was on

Page 11

1  my end.  It just kind of trailed at the beginning.
2  It was hard to hear.  Thank you.
3      A.  Yes, sir.
4      Q.  So let's talk about the documents.
5  When you say the summary, do you mean your
6  professional standards division report in this
7  case?
8      A.  Yes, sir.
9      Q.  Let me just get this out of the way and
10  pull that up.  We'll be talking about that a bit
11  today.  So I have pulled up on the screen Page 1 of
12  102.  The first page is Titusville Police
13  Department Professional Standards Division and then
14  Administrative Investigation IA Number 031A-IA.
15  You see that?
16      A.  Yes, sir.
17      Q.  And this is a 102 page report.  Is that
18  the summary that you were referring to?
19      A.  Yes, sir.
20      Q.  Okay.  I'm not going to do it now --
21  okay.  Let's mark this as Exhibit 1.  I will just
22  scroll briefly through the 102 pages.
23          (Exhibit No. 1 was identified for the
24          record.)
25  BY MR. MARRESE:

Page 12

1      Q.  If you notice, when I get to Page 81
2  here -- you see that?  Let me blow it up a little
3  bit.  You see this Page 81?
4      A.  Yes, sir.
5      Q.  It changes to Page 81 of 107 as opposed
6  to 102 that we saw on the other pages.  Do you know
7  why that is?
8      A.  I don't.
9      Q.  Okay.
10      A.  I don't.  It might have been -- I
11  don't.  I don't know why.
12      Q.  Okay.  Thank you.  This report that I'm
13  looking at now, I'm going to scroll through the
14  findings in the report right now.  Getting towards
15  the end.  Page 107 of 107 has your signature on it,
16  correct?
17      A.  Yes, sir.
18      Q.  Okay.  I have a version -- so on this
19  version that we're looking at now, which is what
20  the city produced to us in this case, there's no
21  date next to your signature, but I have a version
22  that plaintiff produced, that I can pull up later,
23  that has a date of June 12, 2022 for your
24  signature, so two days before Chief John Lau's
25  signature.

Page 13

1      A.  Yes.
2      Q.  Does that sound accurate?
3      A.  Yes.  That's what I have.
4      Q.  I will tell you, I have not noticed any
5  differences between the version -- so you're
6  looking at the version with the date; is that
7  correct?
8      A.  Yes, sir.
9      Q.  Maybe I should pull that up then.
10  We'll mark this as Exhibit 1, and then give me one
11  minute and I'm going to see if I can pull the
12  version with the date on it.
13      A.  Okay.
14      Q.  That's a version you actually have in
15  front of you today?
16      A.  Yes, sir.
17      Q.  I should have asked, other than that,
18  do you have anything else in front of you in terms
19  of documents?
20      A.  Yes.  I have three binders, which is
21  the entire internal investigation.  You want me to
22  show you those?
23      Q.  Yeah.  Would you lift them up, because
24  I think I know the binders you're talking about.
25  Yep.  Book 2, Book 3 --

Charles Demmon
07/10/2025

Page 14

1      A.   And then there's this one, which is
2  Book 3.
3      Q.   You got Book 1 with you too?
4      A.   Yes, sir.  I'll pull that up.
5      Q.   Would you just -- I'm sorry to do this
6  again, but since we're on video, with each one,
7  would you kind of hold it straight to the camera?
8      A.   Oh, yeah, absolutely.
9      Q.   Hold it there for a couple seconds so
10  we -- Book 1 of 3.  Thank you.  Book 2 of 3.  Thank
11  you.  Book 3 of 3.  Thank you.
12      A.   Yes, sir.
13      Q.   Just give me one second.  I'm going to
14  see if I can find that -- the electronic version of
15  the summary.
16      A.   Okay.
17      Q.   Do you see my screen right now?
18      A.   I can, yes.
19      Q.   I'm going to scroll to the start of the
20  report.
21           MR. JADON:  John, for the record, are
22      you still referring to Binder 1?
23           MR. MARRESE:  No.  This is documents
24      that were produced to plaintiff.  I don't
25      remember when.  Not in this litigation.  I

Page 15

1      think presuit.  But plaintiff produced these
2      and Bates labeled these.  This is the
3      version -- it came to us a little bit out of
4      order, so you'll see it starts at Robinson
5      248.  Let me increase the size on that.
6      That's Page 3 of 102, then the next page is
7      Page 1, then it goes to Page 2 and
8      continues.  Let me just -- hold on a minute.
9      I lost it.
10  BY MR. MARRESE:
11      Q.   Can you see the screen?
12      A.   Yes.
13      Q.   This will be Exhibit 2, and you'll
14  notice at Page 81 it does the same thing where it
15  says goes to 107.  There's a problem on my screen
16  in terms of viewing the document.  Give me a
17  second.
18      A.   Okay.
19           (Exhibit No. 2 was identified for the
20           record.)
21  BY MR. MARRESE:
22      Q.   Can you see the document on my screen
23  now?
24      A.   Yes.
25      Q.   Let me get to where I want to go.  All

Page 16

1  right.  We're back in the report.  You see again it
2  changes to 107 at the bottom like the other
3  document?
4      A.   Yes.
5      Q.   Okay.  Then I'll go to the last page,
6  and on this one I've got the June 12th, 2022 date
7  next to your signature at Page 107 of 107, correct?
8      A.   Yes, sir.
9      Q.   Okay.  And then Chief John Lau's
10  signature is below that dated June 14th, 2022, with
11  the handwritten note, concur with changes I made.
12  Do you see that?
13      A.   Yes, sir.
14      Q.   Okay.  And the signature initials next
15  to the asterisk, concur with changes I made, is
16  that John Lau's signature?
17      A.   Yes, sir.
18      Q.   Okay.  Thank you.  So we'll mark this
19  as Exhibit 2, and this is the one that you have in
20  front of you, correct?
21      A.   Yes, sir.
22      Q.   This ends at Robinson 354, and so when
23  I refer to this document today, I'll pull that one
24  up.  Okay.  Stop the share for a second.  So that
25  was the summary that you reviewed during

Page 17

1  preparation, correct?
2      A.   Yes, sir.
3      Q.   And did you review that in full,
4  Mr. Demmon?  Did you say no?
5      A.   No.
6      Q.   Then you mentioned that you reviewed
7  some policies.  Do you recall which ones you
8  reviewed?
9      A.   It was, I think, the response to
10  resistance in Book 2, I believe, and I think some
11  of the trainings in Book 2, in-house, I think,
12  maybe.  And I looked at some rosters, I think, that
13  are attached to Book 2.  Not a lot.
14      Q.   In terms of training, what did you look
15  at?
16      A.   The in-house training for Officer Payne
17  -- or former Officer Payne, the in-house training,
18  and the Madison Middle School training, active
19  shooter training.  I looked at that.  And I believe
20  I browsed through some FTO stuff when he was on FTO
21  field training, some of the documents associated
22  with that.  I think that was it.  It wasn't much.
23      Q.   The in-house training I have had
24  produced to me a document that kind of identifies
25  various trainings that Mr. Payne went through with

Page 18

1  the Titusville Police Department. It's kind of a
2  spreadsheet, more or less. Is that what you were
3  looking at?
4        A.   No, I have -- can you show me the
5  spreadsheet you were looking at? I'll tell you if
6  I have that one or not.
7        Q.   Yes, I believe I can. Yes. I will
8  pull that up now. I don't know that I need to mark
9  this, but this is a document, personnel training
10 listing printed on August 3rd, 2023 for Joshua
11 Nathan Payne. Do you see that?
12       A.   I do. I didn't review that one, no.
13       Q.   Okay. Did you review the more
14 substantive documents that have like training
15 outlines?
16       A.   Yes, there was, I think, two or three,
17 and they were with Officer Mick and Officer Knapp.
18       Q.   Okay. Thank you. That was the extent
19 of the training you reviewed?
20       A.   Yes, sir.
21       Q.   Finally, you mentioned transcripts. Do
22 you recall what transcripts you reviewed?
23       A.   So in this Book 3 of 3 I went to see if
24 I still had the transcripts of my interview with
25 Jennings, and I think Wright, because if you

Page 19

1  look -- It's easier to explain. The tabs that are
2  listed in the book, I didn't see their tab
3  initially, so they're in the back of the book.
4  They weren't marked with an actual paper tab that
5  said that was their transcript in the back of
6  the book. And then I looked at Jennings'
7  transcript.
8        Q.   Did you also look at Wright's
9  transcript?
10       A.   No. No, sir.
11       Q.   When you say you looked at Jennings'
12 transcript, did you actually read that front to
13 back?
14       A.   Part of it. No, I didn't read the
15 whole thing, just part of it.
16       Q.   What part were you focused on?
17       A.   The training, his involvement with
18 training.
19       Q.   Okay. Thank you. Have we talked about
20 all the documents you reviewed in preparation for
21 today?
22       A.   I believe so.
23       Q.   Okay. Thank you. Did you speak to
24 anyone at the Titusville Police Department
25 regarding today's deposition?

Page 20

1        A.   I spoke to -- Jennings had reached out
2  and asked if I had a copy of his transcript for
3  preparation, and our training coordinator, at some
4  point I asked her, I think, for -- if I was missing
5  any lesson plans that she had provided in the
6  original, and she said no.
7        Q.   Who was the Titusville Police
8  Department training coordinator?
9        A.   Christina Schmidt.
10       Q.   Did she hold that position prior to the
11 December 26th, 2021 shooting that's at issue in
12 this case?
13       A.   Yes, sir.
14       Q.   Okay. Thank you. Do you know how long
15 she's held that position?
16       A.   I could find out for you. It's been
17 several years, at least five or so, maybe longer.
18       Q.   What is the role of a training
19 coordinator at the department?
20       A.   Coordinate our trainings. She puts our
21 trainings together, keeps our FDLE certifications.
22 She's kind of the keeper of the record, if you
23 will, on all of our trainings, for our in-house
24 training, training we do outside the department for
25 our trainers, our officers, that kind of stuff.

Page 21

1        Q.   Okay. If I paraphrase or summarize
2  what you just said, there's an administrative
3  function in terms of keeping the record of
4  everyone's training. There's also the function of
5  ensuring that the trainings are done and the
6  certifications are maintained, or renewed, or
7  whatever else. Is that a fair description?
8        A.   Yes, sir.
9        Q.   Okay. And then beyond that does
10 Ms. Schmidt do any actual training of the law
11 enforcement?
12       A.   No, just the coordination of it.
13       Q.   Thank you.
14       A.   Yes, sir.
15       Q.   And when you spoke to Mr. Jennings, did
16 you provide him his transcript?
17       A.   Yes, sir.
18       Q.   I assumed you spoke to him. Was that a
19 phone call, in-person meeting, e-mail?
20       A.   I saw him briefly in person, and then
21 it was a phone call.
22       Q.   Did you discuss the substance of your
23 involvement in the case with him during that time?
24       A.   No.
25       Q.   Did you discuss anything with him in

Page 22

1  terms of what you plan to testify about or anything
2  like that?
3      A.   No.
4      Q.   Same question with respect to him.  Did
5  he discuss any of that with you?
6      A.   No, sir.
7      Q.   Thank you very much.  And other than
8  your attorney, Mr. Jennings, and Ms. Schmidt, did
9  you speak with anyone else regarding today's
10 deposition?
11     A.   No.
12     Q.   So you did not speak with Chief John
13 Lau about that?
14     A.   No.  He knew I was having a deposition,
15 but no.
16     Q.   Thanks very much.  Is there anything
17 else that you did to prepare for today's deposition
18 outside of preparation?  And really anything, be
19 it, you know, Googling things online, checking into
20 the case, anything like that?
21     A.   I don't think so, no.
22     Q.   Okay.  Thank you.
23     A.   Yes, sir.
24     Q.   How old are you, Mr. Demmon?
25     A.   I mean, I look it, but I am 52.

Page 23

1      Q.   You look much younger.
2      A.   I appreciate that.  Thank you.
3      Q.   You live within the State of Florida
4  now; fair to say?
5      A.   Yes, sir.
6      Q.   Any plans to relocate outside the State
7  of Florida?
8           STENOGRAPHER:  I'm sorry.  I didn't
9  hear you.
10          THE WITNESS:  No, ma'am.
11 BY MR. MARRESE:
12     Q.   Some kind of basic background
13 questions.  Did you attend high school?
14     A.   Yes, I did.
15     Q.   Where did you attend?
16     A.   Titusville High School.
17     Q.   So you were born and raised in
18 Titusville?
19     A.   I was actually -- no, I was born in
20 Cape Canaveral, and we moved to Titusville from the
21 Cocoa area in 1989.
22     Q.   Wonderful.  Did you graduate from
23 Titusville High School?
24     A.   Yes, I did.
25     Q.   Did you attend any college after that?

Page 24

1      A.   Yes, sir.
2      Q.   Where did you attend?
3      A.   It was Brevard Community College back
4  then.  It's Eastern Florida now.  And then after I
5  graduated there, I attended University of Central
6  Florida where I obtained my bachelor's degree in
7  criminal justice, and then I went back to the
8  University of Central Florida and obtained my
9  master's degrees in criminal justice.
10     Q.   When did you obtain your master's?
11     A.   2008.
12     Q.   Thank you.  And then is there any other
13 education, you know, outside of certifications you
14 may have in law enforcement or things like that,
15 beyond the master's degree that you just discussed?
16     A.   No, sir.
17     Q.   All right.  Thank you.  When did you
18 join the Titusville Police Department?
19     A.   1998.
20     Q.   When did you graduate from college?
21     A.   Well, my master's in 2008, my
22 bachelor's was in 1997.  I graduated in '91 from
23 high school, so it was probably two years after
24 that I had my associate's, so '93, '94, maybe.
25     Q.   Wonderful.  So have you been with the

Page 25

1  Titusville Police Department continually since
2  1998?
3      A.   Yes, sir.
4      Q.   It sounds like that was pretty soon
5  after you had obtained your bachelor's degree that
6  you became a police officer?
7      A.   Yes, sir.
8      Q.   Can you take me through the roles you
9  had at the department over the course of those 27
10 years?
11     A.   Get ready for a long one.  No, I'm
12 kidding.  So in 1998 when I got hired, I got hired
13 as a patrol officer.  I spent two years on the road
14 as a patrol officer responding to calls for
15 service, report taker, that kind of thing, doing
16 traffic, investigating crimes, stuff like that.
17          And then I moved into the role of a
18 detective in 2000, initially in a rotating position
19 and then a permanent position.  It was our special
20 investigations unit.  And then from there I got
21 promoted to corporal in 2004.  I went back to the
22 road as a corporal, as a supervisor, and then in
23 2005 I got promoted to sergeant and was on the road
24 for a little bit as a sergeant.  And then in 2006 I
25 went back into special investigations as a

Page 26

1  sergeant.
2        And then 2010 I was promoted to lieutenant
3  and returned back to the road.  I oversaw patrol
4  functions, our property and evidence, at one point
5  code enforcement, investigations, canine traffic.
6  A little bit of everything when I went back as a
7  lieutenant.  Stayed a lieutenant for 12 years
8  coming out of professional standards in 2022 after
9  being promoted to commander.  Went back into
10  operations from -- 'til 2024, 2025 -- I went back
11  there probably in January of '25, back to
12  professional standards as commander.
13        Q.    When did you first join the
14  professional standards division?
15        A.    As a lieutenant, I want to say it was
16  2018.
17        Q.    And then it sounds like you were there
18  for a stint, maybe left for a short time, and then
19  returned.  Did I hear that right?
20        A.    Yes, sir.
21        Q.    Can you give me the time frame on that,
22  the years?
23        A.    From 2018 through 2022, the lieutenant
24  in professional standards, then I went back to
25  patrol operations from 2022 through 2025, early

Page 27

1  '25, and then I went back -- as a commander, and
2  then I went back in professional standards as a
3  commander early 2025.  I think January, February of
4  this year, something like that.
5        Q.    Can you give me the hierarchy of the
6  Titusville Police Department?  I understand chief
7  of police, and you're a commander, you were a
8  lieutenant prior to.  Can you give me the run-down
9  in terms of rank?
10        A.    Yes, sir.  So we have the chief of
11  police, and then we have deputy chief of police,
12  and then we have two commanders, two majors, I
13  believe five lieutenants, and then maybe seven or
14  eight sergeants and corporals, so seven or eight
15  sergeants, seven or eight corporals, and then we
16  have detectives and patrol officers.
17        Q.    Thank you.  For your summary of your
18  employment correctly, you went from being a
19  lieutenant to a commander, so kind of leaped over
20  that major stage?
21        A.    We didn't have majors at the time.
22  That came afterwards.  I got lucky, I guess.
23        Q.    Thank you very much.
24        A.    Yes, sir.
25        Q.    Who is the other commander currently?

Page 28

1        A.    Tyler Wright.  He goes by TJ.
2        Q.    In terms of responsibility between you
3  and Commander Wright, do you have the same
4  responsibilities split, or does one of you oversee
5  some aspect of the department versus another?  Can
6  you kind of explain that?
7        A.    Yes, sir.  So I oversee our
8  professional standards division.  He oversees our
9  operations division.  We pretty much just switched
10  roles, if you will, when he got promoted to
11  commander.  He's having his turn basically running
12  patrol operations, investigations, similar to what
13  I did when I came out of professional standards,
14  when I got promoted.  So he does that now, and I'm
15  back in professional standards.
16        Q.    Thank you.
17        A.    Yes, sir.
18        Q.    So currently are you the highest
19  ranking official in the professional standards
20  division?
21        A.    Yes, sir.
22        Q.    That's been the case as of early 2025?
23        A.    Yes, sir.
24        Q.    When you were in professional standards
25  in 2021 and 2022 after the December 26th, 2021

Page 29

1  shooting in this case, where did you rank within
2  the professional standards division?
3        A.    I was a lieutenant.
4        Q.    So there was a commander above you in
5  rank?
6        A.    Not in professional standards, no.
7        Q.    Were you the highest ranking individual
8  in professional standards at that time?
9        A.    Yes, sir.
10        Q.    How long were you the highest ranking
11  individual in professional standards?
12        A.    Since I came in.  Since I went in in
13  2018.
14        Q.    Oh, okay.  Thank you.  So the entirety
15  of the time you were in the professional standards
16  division you were the highest ranking officer
17  there?
18        A.    Yes, sir.
19        Q.    How many others worked under your
20  command within the professional standards division
21  during that time?  That was actually kind of a bad
22  question because there might be rotation in and
23  out.
24        A.    Yeah.
25        Q.    How many typically in professional

Page 30

1  standards during that time?
2      A.  We have our training coordinator,
3  accreditation manager, two sergeants who perform
4  background investigations or would assist me in
5  internal investigations, and then I have a police
6  service specialist that oversees our travel,
7  training, cost, things that are associated with
8  that, keeps track of our funds for, if you will,
9  for training or going to different events, that
10 kind of thing.
11     Q.  Is that it?
12     A.  Yes, sir.
13     Q.  In this particular investigation there
14 was a Sergeant Telly Joiner assigned alongside you
15 to conduct a review, correct?
16     A.  Yes, sir.
17     Q.  Sergeant Joiner, he would have been one
18 of those two background investigation sergeants in
19 the professional services division at the time --
20 standards division, excuse me?
21     A.  Yes, sir.
22     Q.  If I refer to the professional
23 standards division as the PSD; is that fair?
24     A.  Sure.  I may have to repeat it, but
25 yes.

Page 31

1      Q.  Sorry.  Then I won't.
2      A.  That's okay.
3      Q.  Is there anything you folks call it
4  inside the office that's easier than professional
5  standards division?
6      A.  We just call it professional standards.
7      Q.  All right.  Professional standards.
8  Thank you.
9      A.  Yes, sir.
10     Q.  So is it fair to say that throughout
11 your time in the professional standards division in
12 both your stints, you're the point person
13 responsible for any review of serious use of force
14 incidents?
15     A.  Yes, sir.
16     Q.  Okay.  Can you explain for the ladies
17 and gentlemen of the jury what the professional
18 standards division is?
19     A.  So it is a compliance division within
20 the police department that oversees policies,
21 procedures, training, backgrounds, hiring.  What
22 else?  Accreditation.  That's pretty much it in a
23 nutshell.  Oh, and internal investigations.  I'm
24 sorry.
25     Q.  That's okay.  Thank you.  In this case

Page 32

1  you conducted an internal investigation of Officer
2  Payne's shooting of James Lowery, correct?
3      A.  Yes, sir.
4      Q.  So that's a kind of internal
5  investigation that you would perform in internal
6  affairs.  Are there any other kinds of
7  investigations you perform other than use of force
8  investigations?
9      A.  It could be for claims of -- so use of
10 force, harassment, any kind of sworn complaints
11 against department members from the public that
12 come in, things like that.  It doesn't have to just
13 be a use of force.
14     Q.  Thank you.
15     A.  Yes, sir.
16     Q.  So is it fair to say that one of the
17 purposes of the division is to assess whether
18 officers within the department have complied with
19 the law?
20     A.  Yes, sir.
21     Q.  How long has the Titusville Police
22 Department had a professional services -- standards
23 division, excuse me?
24     A.  A long time.  Geez, I want to say
25 almost as long as I've been here.  I just don't

Page 33

1  remember if it was called that.  But we always
2  had -- there was always -- we always did our IAs,
3  training.  It was never -- it was always in-house
4  that was done.  I just don't remember if it was
5  called professional standards, but as long as I've
6  known it since I've been here it's been a
7  professional standards division.
8      Q.  Thank you.
9      A.  Yes, sir.
10     Q.  I should have asked, do you have any
11 plans -- I mean in the present moment.  Do you have
12 any plans to retire any time soon?
13     A.  Well, I'd like to.  I've got a few
14 grandkids now that take up some of my time, in a
15 good way, but not anything in the very near future,
16 no.
17     Q.  Okay.  Thanks.  Sometimes I ask that
18 question, do you have any plans to retire, and
19 pretty much everyone says, yeah, yeah, I'd like to
20 stop working eventually.
21     A.  I would, don't get me wrong, but I
22 think I'm going to have a full-time gig as a
23 babysitter, which is all good with me.  I just had
24 my sixth grandchild last night.
25     Q.  I'm guilty of that form of

Page 34

1  grandparenting, so I understand.
2      A.   Love it.
3      Q.   So you were responsible for performing
4  the internal investigation into Officer Payne's
5  shooting of James Lowery, correct?
6      A.   Yes, sir.
7      Q.   I will pull the report up again as we
8  refer to it here.  This was marked as Exhibit 2.
9  Can you see Page 3 of that report on the screen
10 right now?
11     A.   Yes.
12     Q.   It begins under the section
13 Investigation on December 26th, 2021.  Police chief
14 John Lau ordered internal investigation to ensure
15 the City of Titusville and their department rules
16 and regulations, general orders and/or state
17 statutes were followed by Officer Payne during his
18 attempted arrest and use of force against Mr. James
19 Lowery.  Do you see that?
20     A.   Yes, sir.
21     Q.   And that is the investigation you were
22 assigned to perform, correct?
23     A.   Yes, sir.
24     Q.   Sergeant Telly Joiner was assigned
25 along with you as we briefly mentioned, correct?

Page 35

1      A.   Yes, sir.
2      Q.   What was his role in this particular
3  investigation?
4      A.   Just to assist me in the investigation,
5  give him some experience in handling internal
6  investigations.  I try and give my sergeants that
7  work for me the opportunity to see the functions of
8  how this works, interviewing officers, things of
9  that nature, you know, collecting and reviewing
10 video, different things.  It gives them an
11 opportunity to use some of the training they've
12 been to to kind of look at things and, you know,
13 are we missing anything, are we on the right page,
14 that kind of deal.
15     Q.   Thank you for that.
16     A.   Yes, sir.
17     Q.   The next section says Internal Affairs
18 Investigation Order and Service, and it states, on
19 December 26th, 2021, "I, Lieutenant Matt Demmon,
20 met with Officer Payne in my office.  Officer Payne
21 was given notification of the formal investigation,
22 which included the allegations against him.  I told
23 Officer Payne of the process involved in this type
24 of investigation, which included me taking
25 interview statements from witness officers, as well

Page 36

1  as reviewing all materials related to this case."
2  Do you see that?
3      A.   Yes, sir.
4      Q.   Okay.  And do you recall that meeting
5  with Mr. Payne in your office?
6      A.   I do.
7      Q.   How long did that last?
8      A.   Very brief, maybe ten minutes.
9      Q.   Thank you.  And in this report it
10 indicates that Mr. Payne declined to give a
11 statement in conjunction with this investigation;
12 is that true?
13     A.   Yes.
14     Q.   Thank you.  In terms of an internal
15 investigation like this one, you mentioned that you
16 conduct interviews and review all materials
17 relating to the case, correct?
18     A.   Yes, sir.
19     Q.   How do you determine which interviews
20 to conduct?
21     A.   I look at -- when the case comes in,
22 depending on the circumstances surrounding the
23 case, I look at do I need to interview civilian
24 witnesses, do I need to interview -- what
25 department members I need to interview, and where

Page 37

1  that investigation leads.
2      So in this case I determined that I needed
3  to speak to the officers that responded there that
4  night, detectives, supervisors.  It's really based
5  off of what I see initially, and then that list can
6  grow.  It could shrink, potentially.  But basically
7  that's it in a nutshell, where I see the initial
8  investigation starting, and then as my interviews
9  develop, sometimes I find out I need to speak to
10 somebody else, or there's somebody else I may need
11 to interview along the way.
12     Q.   And you interviewed several officers of
13 the Titusville Police Department in conjunction
14 with this investigation, correct?
15     A.   Yes, sir.
16     Q.   Within this report that we're looking
17 at in Exhibit 2 there are summaries of your
18 interviews with those officers, correct?
19     A.   Yes, sir.
20     Q.   If you've interviewed an officer, you
21 will include a summary of that interview in the
22 report?
23     A.   Yes, sir.
24     Q.   And there is audio of those interviews
25 as well, correct?

Page 38

1      A.    Yes, sir.
2      Q.    And there are transcripts of those
3  interviews as well, correct?
4      A.    Yes, sir.
5      Q.    Thank you.  You also reviewed Officer
6  Payne's Axon video, otherwise called body cam
7  video, in this case?
8      A.    Yes, sir.
9      Q.    And you reviewed a variety of other
10  materials, including incident reports relating to
11  this shooting?
12      A.    Yes, sir.
13      Q.    Did you review the autopsy report in
14  this case?
15      A.    Yes.
16      Q.    Thank you.  Do you also review the FDLE
17  report?
18      A.    Yes.
19      Q.    Thank you.  You were assigned this
20  investigation immediately, on the same evening of
21  the shooting, December 26th, 2021, correct?
22      A.    Yes, sir.
23      Q.    And you executed this 107 page report
24  on June 12th, 2022, correct?
25      A.    Yes.

Page 39

1      Q.    And that is the final step in the
2  process when you are signing off on your report?
3      A.    Yes, sir.
4      Q.    So that is about five-and-a-half months
5  from the time you were assigned this investigation,
6  correct?
7      A.    Yes, sir.
8      Q.    And so that is a lengthy review and
9  investigation of the shooting, correct?
10      A.    Yes, sir.
11      Q.    That investigation that you performed
12  in this case was a thorough investigation of
13  Officer Payne's shooting, correct?
14      A.    Yes, sir.
15      Q.    And when you took on responsibility for
16  an investigation of this nature involving the use
17  of force of a fellow officer, that is a serious
18  responsibility, correct?
19      A.    Yes, sir.
20      Q.    And you understood the seriousness of
21  that responsibility when you undertook that
22  investigation, correct?
23      A.    Yes, sir.
24      Q.    And you understood the potential
25  implications of your findings for the career of a

Page 40

1  fellow officer, correct?
2      A.    Yes, sir.
3      MR. JADON:  Form.
4  BY MR. MARRESE:
5      Q.    And that is a job that you take and
6  took in this case very seriously, correct?
7      A.    Yes, sir.
8      Q.    It was your job to obtain accurate
9  facts and reach accurate conclusions based on those
10  facts to the best of your ability, correct?
11      A.    Yes, sir.
12      Q.    At this time in December of 2021 to
13  June of 2022, you had been an officer for nearly 25
14  years, correct?
15      A.    Yes, sir.
16      Q.    Part of what you bring to an
17  investigation like that are those decades of
18  experience in the various roles within the police
19  department that you testified about earlier; isn't
20  that fair?
21      A.    Yes, sir.
22      Q.    And you endeavored when you performed
23  this investigation and prepared this report to
24  reach accurate conclusions to the best of your
25  ability based on those decades of experience; is

Page 41

1  that fair?
2      A.    Yes, sir.
3      Q.    And when you prepared and signed this
4  report, you were putting your name behind it as
5  accurate to the best of your knowledge and belief?
6      A.    Yes, sir.
7      Q.    Thank you.
8      MR. JIMENEZ:  John, can we break for
9  like two minutes?  I got to call my wife
10  real quick.
11      MR. MARRESE:  No problem.
12      MR. JIMENEZ:  Thanks.  Sorry about
13  that.
14      MR. MARRESE:  Why don't we come back at
15  11:15 your time.
16      MR. JIMENEZ:  Okay.  Thank you.
17      VIDEOGRAPHER:  Going off the record at
18  11:08.
19      (A short recess was taken.)
20      VIDEOGRAPHER:  We're back on the record
21  11:16.
22  BY MR. MARRESE:
23      Q.    Commander Demmon, I'm going to share
24  with you Exhibit 2, your report, again, and I moved
25  to Page 102 of 107.  I want to talk about some of

Page 42

1  your conclusions in the report.  You reference in
2  your conclusions general orders, correct?
3       A.   Yes, sir.
4       Q.   What is a general order?
5       A.   A general order is similar to a policy.
6  Basically it is a guideline.  It is an order for
7  the way that we do business.  It gives us an
8  outline of the way we do certain things.
9       Q.   And officers are made aware of the
10  department's general orders, correct?
11       A.   Yes, sir.
12       Q.   How are they made aware of them?
13       A.   Through a program we use that we called Power
14  DMS.  So our in-house training or any subsequent
15  training through their career, if a policy is put
16  into place, or if something has changed, a record
17  is kept through what's called Power DMS, and the
18  officers sign on with a unique signature, and when
19  they have read the policy, they digitally sign that
20  they have read the policy and understand it.
21       Q.   Thank you.  And so officers are
22  expected to read the general orders, correct?
23       A.   Yes, sir.
24       Q.   Officers are expected to comply with
25  the general orders, correct?

Page 43

1       A.   Yes, sir.
2       Q.   And officers are informed of this,
3  correct?
4       A.   Yes.
5       Q.   Thank you.  Looking at this Page 102,
6  at the very top it says, sustained, underlined.  Do
7  you see that?
8       A.   Yes, sir.
9       Q.   What does that mean?
10       A.   That means that the allegation made
11  against the individual is sustained per my
12  investigation.
13       Q.   Just below that it says City of
14  Titusville Police Department General Order
15  300.6-Standards of Conduct/4A10 Unnecessary Force.
16  And just beneath that there are two asterisks in a
17  parenthesis, and in red it says, major violation,
18  colon.  Do you see that?
19       A.   Yes, sir.
20       Q.   What does the major violation phrase
21  mean?
22       A.   A designation of how the department
23  designates the policy violation.  If a violation
24  exists, it could be a capital violation, it could
25  be a minor violation, it could be a major

Page 44

1  violation.
2       Q.   Thank you.  Capital being the most
3  serious?
4       A.   Yes, sir.
5       Q.   Minor being the least serious?
6       A.   Yes, sir.
7       Q.   Can you explain that hierarchy for us?
8  Strike the question.  We'll get back to that.
9       A.   Okay.
10       Q.   Let's focus on the italicized words
11  here just beneath major violation.  It says,
12  "Department members shall not use more force in any
13  situation than is reasonably necessary under the
14  circumstances.  Members shall use force in
15  accordance with the law and department written
16  directives."  Do you see that?
17       A.   Yes, sir.
18       Q.   So that is a general order of the
19  department, correct?
20       A.   Yes, sir.
21       Q.   The purpose of that general order in
22  part is to instruct officers to use reasonable
23  force under the circumstances; is that fair?
24       A.   Can you repeat it again, please?
25       Q.   Yes.  The purpose of that instruction

Page 45

1  is to inform officers that they shall not use more
2  force in any situation than is reasonably necessary
3  under the circumstances; is that fair?
4       A.   Yes.
5       Q.   And the purpose of that general order
6  in part is to ensure that officers conform with the
7  law when they use force; is that fair?
8       A.   Yes.
9       Q.   Such law would include the law of the
10  State of Florida, correct?
11       A.   Yes.
12       Q.   And such law would include the law of
13  the United States Constitution, correct?
14       A.   Yes.
15       Q.   And that reference to department
16  written directives there, a general order is a kind
17  of written directive from the department, correct?
18       A.   Yes.
19       Q.   Thank you.  And then below there are
20  bullet points that begins with, based on general
21  order 412, response to resistance/4H, use of deadly
22  force and deadly force restrictions.  Do you see
23  that?
24       A.   Yes.
25       Q.   Okay.  And those bullet points, and

Charles Demmon
07/10/2025

Page 46

1  they continue on to the next page, 103, with
2  respect to this particular sustained general order
3  violation, those are bullet points that you wrote
4  as a part of this report, correct?
5        A.   Yes.  They came from the general order.
6  It was language that came specifically from the
7  general order.
8        Q.   Thank you for that distinction.  You
9  are actually quoting relevant portions of general
10 order 412 relating to response to resistance,
11 correct?
12       A.   Yes, sir.
13       Q.   And the portion in that first bullet
14 that you're quoting is directly from the general
15 order governing use of deadly force and deadly
16 force restrictions, correct?
17       A.   Yes.
18       Q.   And my point about the bullets is,
19 these are materials, whether you're copying them in
20 here or whatever, that you are including, correct?
21       A.   Yes.
22       Q.   If you move on to the next page, we'll
23 discuss this in some detail, but these are
24 conclusions that you've reached in support of your
25 determination to sustain the allegations, correct?

Page 47

1        A.   Correct.
2        Q.   I want to move to the second page of
3  this particular part of the report, so Page 103.
4  The top bullet point says, "In determining if the
5  force used against Mr. James Lowery in this
6  incident was appropriate, the, quote, objective
7  reasonableness, unquote, standard as set forth in
8  the United States Supreme Court case of Graham v
9  Conner was applied."  Do you see that?
10       A.   Yes, sir.
11       Q.   So you are applying that objective
12 reasonableness standard in your review of Officer
13 Payne's actions, correct?
14       A.   Yes.
15       Q.   You are applying that standard under
16 Graham v Conner in reviewing Officer Payne's use of
17 force against James Lowery, correct?
18       A.   Yes.
19       Q.   The next bullet point on that page
20 says, "Careful attention to the facts and
21 circumstances of this particular case, to include
22 the severity of the crime, the threat to the safety
23 of the officers or others, and whether Lowery was
24 actively resisting arrest or attempted to evade
25 arrest by flight were considered."  Do you see

Page 48

1  that?
2        A.   Yes.
3        Q.   That is a true statement that you paid
4  careful attention to the facts and circumstances of
5  this particular case which included those
6  variables?
7        A.   Yes.
8        Q.   You did that in preparing this report,
9  and conducting the interviews, and review of other
10 materials that formed the basis for this report,
11 correct?
12       A.   Correct.
13       Q.   Thank you.  The third bullet point
14 states, "Given Lowery's actions during this
15 incident, to include his physical confrontation
16 with Officer Payne, the force used by Officer Payne
17 to gain compliance met the standard of objective
18 reasonableness during the initial confrontation.
19 However, once the confrontation ended and Lowery
20 jumped over the fence, he no longer posed an
21 imminent threat to Officer Payne."  Do you see
22 that?
23       A.   Yes, sir.
24       Q.   And that was your conclusion in this
25 investigation, correct?

Page 49

1        A.   Yes.
2        Q.   And that remains your conclusion today,
3  correct?
4        A.   Yes.
5        Q.   And that is a conclusion that Chief of
6  Police John Lau concurred with, correct?
7        A.   Yes.
8        Q.   That means that Chief of Police John
9  Lau agreed with your determination in that respect,
10 correct?
11       A.   Correct.
12       Q.   When Officer Payne shot James Lowery,
13 James Lowery no longer posed an imminent threat to
14 Officer Payne, correct?
15       A.   Correct.
16       Q.   The third bullet point from bottom
17 states, "Officer Payne reached over the fence with
18 his firearm drawn and shot his firearm striking
19 Mr. James Lowery in his head.  Officer Payne's
20 decision to use his firearm in this manner and
21 under these particular set of circumstances does
22 not meet the objective reasonableness standard, and
23 as such this use of deadly force is not justified."
24 Do you see that?
25       A.   Yes, sir.

Page 50

1  Q.  That was your conclusion in this
2  investigation, correct?
3      A.  Correct.
4      Q.  And that is your conclusion today,
5  correct?
6      A.  Correct.
7      Q.  Officer Payne's decision to shoot James
8  Lowery after James Lowery had gone over the fence
9  was not objectively reasonable, correct?
10     A.  Correct.
11     MR. JADON:  John, were you asking that
12         question based on the document in front of
13         us, or is that a general question?
14     MR. MARRESE:  I don't understand.  If
15         you have an objection, you can make it, and
16         you can obviously ask questions when I'm
17         done, but I'd rather not have a discussion
18         on the record.
19     MR. JADON:  Okay.  Form.
20     MR. JIMENEZ:  Join.
21 BY MR. MARRESE:
22     Q.  The second bullet point from bottom
23 states, "Officer Payne failed to recognize other
24 available force compliance options, and therefore
25 used a force option not reasonably necessary under

Page 51

1  these circumstances enumerated in this report."  Do
2  you see that?
3      A.  Yes.
4      Q.  That was your conclusion in this
5  investigation, correct?
6      A.  Correct.
7      Q.  And that is your conclusion still as of
8  today, correct?
9      MR. JADON:  Form.
10     MR. JIMENEZ:  Join.
11 BY MR. MARRESE:
12     Q.  You can answer.
13     A.  Yes.
14     Q.  The next bullet point states, and it's
15 the last one on this page, "Officer Payne was
16 justified to utilize his dart-firing stun
17 gun/taser; however, absent seeing, feeling, or
18 being told of a weapon, the use of deadly force
19 during this incident is not justified."  Do you see
20 that?
21     A.  Yes.
22     Q.  That was your conclusion in this
23 investigation, correct?
24     A.  Correct.
25     Q.  And part of that conclusion was that --

Page 52

1  well, strike the question.
2      As a part of reaching that conclusion you
3  reviewed Officer Payne's Axon or body camera video,
4  correct?
5      A.  Correct.
6      Q.  With these conclusions you determined
7  that deadly force was not authorized against James
8  Lowery under the Titusville Police Department
9  General Order 412, correct?
10     A.  Correct.
11     Q.  I want to focus back on the first
12 bullet point on Page 102.  There's a section 1A
13 that you've quoted which states, "Members are
14 authorized to use deadly force when it is
15 objectively reasonable under the totality of the
16 circumstances.  Use of deadly force is justified
17 when one or both of the following apply:  A, to
18 protect a member, himself, herself, or others from
19 what is reasonably believed to be an immediate
20 threat of death or serious bodily injury."  Do you
21 see that?
22     A.  Yes.
23     Q.  Consistent with your conclusions, you
24 determined here that the circumstances did not
25 present a situation where deadly force was

Page 53

1  reasonably necessary to protect a member, himself,
2  herself, or others from what is reasonably believed
3  to be an immediate threat of death or serious
4  bodily injury, correct?
5      MR. JADON:  Form.
6      MR. JIMENEZ:  Join.
7      A.  Correct.
8  BY MR. MARRESE:
9      Q.  Thank you.  Subsection B, it states,
10 "To prevent" -- and, again, this relates -- let me
11 read it in entirety.  1B, "Members are authorized
12 to use deadly force when it is objectively
13 reasonable under the totality of the circumstances.
14 Use of deadly force is justified when one or both
15 of the following apply:  To prevent the escape of a
16 fleeing subject when the member has probable cause
17 to believe the person has committed or intends to
18 commit a felony involving serious bodily injury or
19 death, and the member reasonably believes there is
20 an imminent risk of serious bodily injury or death
21 to the member or another if the subject is not
22 immediately apprehended."  Do you see that?
23     A.  Yes.
24     Q.  Consistent with your conclusions in
25 this case, you determined that the circumstances

Charles Demmon
07/10/2025

Page 54

1  did not present a situation where deadly force was
2  reasonably necessary under that provision of the
3  general order, correct?
4        Could you state that again?  Sorry.  It
5  trailed a little bit.
6        A.   Correct.
7        Q.   Thank you.  As a part of your findings
8  in this case, Commander Demmon, you determined that
9  Officer Payne was carrying both his taser and
10 firearm when he approached the fence, correct?
11       A.   Yes.
12       Q.   I want to go to a bullet point on Page
13 103.  It is the fifth bullet point down.  It
14 states, "Officer Payne made the decision to carry
15 both his taser and firearm in his hands when he
16 approached the fence.  In determining if given the
17 same particular set of circumstances a reasonable
18 officer would have made the same decision.  It is
19 clear by testimony provided by Officers D. Knapp,
20 W. Mick, C. Wood, J. Cantalupo, M. Jennings, T.
21 Wright, and others, the actions taken were not
22 reasonable."  Do you see that?
23       A.   Yes.
24       Q.   That was your conclusion in this
25 investigation, correct?

Page 55

1        A.   Yes.
2        Q.   That remains your conclusion today,
3  correct?
4        A.   Yes.
5        MR. JADON:  Form.
6  BY MR. MARRESE:
7        Q.   The next bullet point reads, "Officer
8  Payne was not taught to keep his firearm and
9  dart-firing stun gun/taser both drawn as Lieutenant
10 Wright, Sergeant Jennings, and Officers Wood, D.
11 Knapp, and Mick testified during their interviews."
12 Do you see that?
13       A.   Yes.
14       Q.   Based on that finding did you conclude
15 that Officer Payne violated his training by keeping
16 both his firearm and dart-firing stun gun/taser
17 drawn as he approached the fence?
18       A.   Yes.
19       Q.   Do you have an opinion as to why an
20 officer should not keep both firearm and taser
21 drawn under these circumstances?
22       MR. JADON:  Form.
23       A.   Yes.
24 BY MR. MARRESE:
25       Q.   What is your opinion?

Page 56

1        A.   The rule of sympathetic reflex.
2        Q.   What is that?
3        A.   Sympathetic reflex means that when you
4  have an object in one hand and an object in another
5  hand, in this case a gun and taser, if you are
6  pulling the trigger on one, your brain may tell you
7  to pull the trigger -- if you're pulling the
8  trigger with your right hand, your brain may tell
9  you to pull the trigger with your left hand.  It's
10 called a sympathetic reflex.  You don't mean to do
11 it, but your brain is telling you to do it, so you
12 do it.
13       Q.   Do you have an opinion that there are
14 any other reasons you would not want to keep both
15 drawn at the same time under these circumstances?
16       MR. JADON:  Form.
17       A.   I've never been trained to do it, so my
18 opinion is that I wouldn't do it.  I believe the
19 other officers testimony was the same, you just --
20 we don't train that way.  You wouldn't do that.
21       VIDEOGRAPHER:  Mr. Marrese, be aware
22       that your volume is a little low when you're
23       not facing your microphone.
24       MR. MARRESE:  Thank you for that.
25 BY MR. MARRESE:

Page 57

1        Q.   Moving to Page 105 of Exhibit 2, there
2  is a sustained capital violation of City of
3  Titusville personnel policy revised 6-4-2021,
4  6.13(F)20 disciplinary actions, capital violations,
5  and suggested discipline actions when considered on
6  their own merit are equal and serious to establish
7  capital violations.
8        Then underneath that it says, "Officer
9  Payne's decision to use deadly force and his
10 failure to retain training and establish policy
11 principles based on the findings of this
12 investigation are equal in seriousness to establish
13 capital violations as noted above."  Do you see
14 that?
15       A.   Yes, sir.
16       Q.   What are you saying with this
17 conclusion?
18       A.   So for the capital violation, where it
19 meets it is because the actions of Payne in this
20 case, as I've noted here before in his decision to
21 use deadly force, his failure to retain training
22 because of him carrying both his -- and I think you
23 see it in other bullet points -- his firearm and
24 his taser out at the same time, do not follow the
25 principles that he was taught.

Page 58

1    And it's a serious issue when you're doing
2    both as noted here in the investigation, and that's
3    why I believe that it met the criteria for a
4    capital violation.
5        Q.    And is there a particular repercussion
6    associated with being found to have committed a
7    capital violation?
8        A.    So the repercussion could be -- are
9    you --
10        Q.    Yeah, I mean --
11        A.    Yeah, ask it again.
12        Q.    My question is, if you are found to
13    have committed a capital violation, what are the
14    professional repercussions that are possible?
15        A.    It could be a suspension, a demotion,
16    termination.  You could lose -- I mean, there's a
17    number of things that could come out of it.
18    Potential for losing your certificate.  A number of
19    things that could come out of it.
20        Q.    Was a decision made in terms of what
21    the repercussions for Mr. Payne would be in this
22    instance?
23        A.    From my standpoint, no.  I don't make a
24    determination on the discipline that would follow.
25        Q.    Who does?

Page 59

1        A.    That would be the chief with the
2    concurrence, I believe, of the HR manager or the
3    city manager.
4        Q.    Are you aware of whether or not such a
5    decision was made in this case?
6        A.    No.  I believe he resigned.  It was a
7    resignation, so I don't think he got any discipline
8    in this.
9        Q.    So is it fair to say that a decision in
10    terms of the repercussions from these capital
11    violations would have been made, but Mr. Payne
12    resigned before that decision was made, at least
13    insofar as you're aware?
14        A.    Yes.
15        Q.    And then moving up to Page 104, there
16    is another capital violation notice noted with
17    respect to City of Titusville personnel policy
18    revised 6-4-2021, 6.13(F)15 disciplinary actions,
19    capital violations, and suggested discipline.  It
20    continues from there.
21        Underneath the bullet point states, "Based
22    on the conclusion of this investigation, Officer
23    Payne's decision to use deadly force demonstrated
24    improper conduct and affected his relationship to
25    his job, fellow workers, and his reputation or good

Page 60

1    will in the community."  Do you see that?
2        A.    Yes, sir.
3        Q.    That was your conclusion in this
4    investigation, correct?
5        A.    Correct.
6        Q.    And that remains your conclusion today,
7    correct?
8        A.    Correct.
9        Q.    The Chief of Police John Lau agreed
10    with that conclusion, correct?
11        I'm sorry.  I didn't hear your response.
12        A.    Yes.
13        Q.    Thank you.  Moving to Page 106, there
14    is a particular violation that was not sustained at
15    the time of this report.  City of Titusville Police
16    Department General Order GO300.6, standards of
17    conduct for a 22 conformance to laws, which states,
18    "Department member shall comply with the laws,
19    ordinances, rules, and Constitution of the United
20    States, the State of Florida, and any other
21    subdivisions.  The intentional violation of any
22    federal, state, county laws or city ordinances may
23    result in discipline up to and including
24    termination."  Do you see that?
25        A.    Yes.

Page 61

1        Q.    You have stated that based on the
2    conclusion and summary of the independent criminal
3    investigation conducted by the Florida Department
4    of Law Enforcement, charges were brought against
5    Officer Payne for manslaughter by means of culpable
6    negligence.  Do you see that?
7        A.    Yes.
8        Q.    At the time that you completed this
9    report those charges had not been resolved one way
10    or another, correct?
11        A.    Correct.
12        Q.    You have noted that Officer Payne
13    resigned his position as a police officer prior to
14    providing any statement through interview or by
15    other means in accordance with his police officer
16    bill of rights.  Do you see that?
17        A.    Yes, sir.
18        Q.    So that notation, again, notes that
19    Officer Payne did not provide a statement as a part
20    of this investigation, correct?
21        A.    Correct.
22        Q.    And without such a statement or
23    resolution of the criminal charges that had been
24    brought against him, you were not in a position
25    factually, you felt at the time, to conclude that

Page 62

1  this violation should be sustained; is that fair?
2      A.   Yes.
3      Q.   Are you aware of the status of Officer
4  Payne's criminal charges as of today?
5      A.   I believe he pled to that.  I could be
6  mistaken, but I believe he pled to the charges.
7      Q.   If he entered a guilty plea to charges,
8  would that support a sustained finding with that
9  new fact?
10     A.   If he were still employed by the city,
11  then yes.
12     Q.   Thank you.  Moving up to Page 100,
13  there's another sustained finding by you with the
14  concurrence of the police chief, John Lau, relating
15  to General Order 300.6, standards of conduct for a
16  23, unsatisfactory performance.  Do you see that?
17     A.   Yes, sir.
18     Q.   And the bullet points underneath your
19  recitation of that portion of the general order
20  state, "Officer Payne did not maintain sufficient
21  competency to perform his duties during this
22  incident as he, Officer Payne, was not trained to
23  display both his firearm, lethal, and dart-firing
24  stun gun/taser, less lethal, at the same time."  Do
25  you see that?

Page 63

1      A.   Yes.
2      Q.   And that was your conclusion on that
3  date, correct?
4      A.   Yes.
5      Q.   It remains your conclusion, today?
6      A.   Yes.
7      Q.   Second bullet point states, "Officer
8  Payne's decision to transfer from a less lethal
9  response to a lethal response would require him to
10  holster/remove his dart-firing stun gun/taser from
11  the situation."  Do you see that?
12     A.   Yes.
13     Q.   That was your conclusion in this
14  investigation, correct?
15     A.   Yes.
16     Q.   And remains so today, correct?
17     A.   Yes.
18     Q.   On Page 101 you concluded another
19  sustained finding under General Order 300.6 that
20  relates to training, again, in terms of drawing
21  both the firearm and taser at the same time, but
22  Chief Lau does not concur with this particular
23  sustained finding.  Can you explain that?
24     A.   So my conclusion was that I had
25  sustained the major violation.  The chief, under

Page 64

1  professional conduct -- so professional conduct is
2  one of those we've used in the past for other
3  cases.  It's more -- as you read it, reflects
4  discredit to the department, department member.
5  These offenses may not be specifically enumerated,
6  considered conduct unbecoming a member of the
7  police department.
8      I think the chief was looking at this -- and
9  this is just my opinion in saying this, is that the
10  chief looked at this as he was not being
11  professional when this started or -- I don't know
12  how else to put it.  He just didn't -- like
13  somebody coming out to a scene and being goofy or
14  goofing around and doing something like that.  It
15  wasn't like he wasn't being unprofessional, it
16  was -- I believe, just in my opinion, that's why he
17  did not concur with that.
18     Q.   So the bullet point, the third bullet
19  point says, "The result of Officer Payne's actions
20  reflects discredit upon the Titusville Police
21  Department and department members, Officer Payne's
22  co-workers."  Do you see that?
23     A.   Yes, sir.
24     Q.   If I'm understanding your impression of
25  Chief Lau's ultimate determination, and I

Page 65

1  understand you're saying -- well, let me just make
2  this clear.  You don't know for a fact, you don't
3  have personal knowledge that that's why, but that
4  is your understanding and belief as to why he
5  didn't concur?
6      A.   Correct.
7      Q.   And that's because this standard
8  general order or portion of the general order is
9  used more for, as you described it, kind of
10  behavior that's -- if you were being silly, or
11  acting out of character, it brings discredit upon
12  officers in that respect as opposed to the conduct
13  that happened in this case, which was in violation
14  of several general orders, but not of that nature;
15  is that fair?  Do you understand what I'm saying?
16     A.   I think.  Can you say it again?
17     Q.   It was a terrible question.  That
18  happens.  Bottom line is, the nature of the
19  behavior that the department typically thinks of as
20  in violation of this portion of General Order 300.6
21  is something like, for example, like an officer
22  acting silly, or goofy, or unprofessional in that
23  way when interacting with the public, and this
24  wasn't that kind of incident.
25     A.   No.  And I think this is where you can

Charles Demmon
07/10/2025

Page 66

1  interpret policies, like I may interpret very black
2  and white, like this is how I see it.  But, again,
3  as a policy guideline, others can interpret it
4  maybe, in this case, this way.
5        I'm not looking at this as -- I'm looking at
6  this as the incident, and not looking at him being
7  silly, like he's not off duty, he's not just
8  goofing around.  Does that make sense?
9     Q.   Yes, it does.
10    A.   Okay.
11    Q.   Moving up to Page 80 of your report.
12  This is the beginning of the findings section of
13  the report, correct?
14    A.   Yes, sir.
15    Q.   These were findings that you made in
16  conjunction with reaching the ultimate conclusions
17  that we discussed with respect to the general
18  orders, correct?
19    A.   Yes, sir.
20    Q.   In Paragraph 8 or Number 8 of those
21  findings you wrote, "Officer Payne reached over the
22  fence and discharged his firearm at Lowery."  Do
23  you see that?
24    A.   Yes, sir.
25    Q.   That was a finding that you made in

Page 67

1  conjunction with this investigation, correct?
2     A.   Yes.
3     Q.   Thank you.  Paragraph 14 of the
4  findings at Page 93 says, "Officer Payne was not
5  trained to display both his firearm, lethal, and
6  dart-firing stun gun/taser, less lethal, at the
7  same time.  Officer Payne's decision to transfer
8  from a less lethal response to a lethal response
9  would require him to holster, remove his
10  dart-firing stun gun/taser from the situation."  Do
11  you see that?
12    A.   Yes.
13    Q.   That's consistent with the conclusions
14  we discussed earlier in conjunction with the
15  general order violations, correct?
16    A.   Yes.
17    Q.   Same thing is true of 15, which states,
18  "Officer Payne's decision to use lethal force
19  during this incident is not supported by the
20  evidence provided in this investigation," correct?
21    A.   Correct.
22    Q.   One second.  I'm looking for a one-page
23  document, I believe.
24    A.   Okay.
25         MR. JADON:  Do you want to go off the

Page 68

1  record, John?
2         MR. MARRESE:  No.  I found it.  Thanks.
3  I'll pull it up.  I'm going to take a break
4  here momentarily.  I just want to get
5  through a couple short things.
6         MR. JADON:  No worries.
7  BY MR. MARRESE:
8     Q.   I'm showing you the last page of Binder
9  Number 3, which you have in your possession.  It's
10  a June 1st, 2022 letter from Joshua Payne to Chief
11  John Lau of the Titusville Police Department.  In
12  it Officer Payne formally resigns from the
13  Titusville Police Department.  Do you see that?
14    A.   Yes.
15    Q.   Have you seen this letter before?
16    A.   I believe so, yes.  You said it's in
17  Binder 3?
18    Q.   Yes.  The last page of Binder 3, as I
19  have it.
20    A.   Yes.
21    Q.   Have you seen this before I just showed
22  it to you?
23    A.   I believe I'd seen it before, but I
24  haven't looked at it recently, so...
25    Q.   Okay.  This letter is dated June 1st,

Page 69

1  2022, so 11 days before you signed and submitted
2  your report to Chief Lau, correct?
3         I'm sorry.  I didn't hear your answer.
4     A.   Yes.
5     Q.   And then there's a notation at the
6  bottom left, accepted 6-3-2022, and I believe
7  that's Chief Lau's signature with it; is that
8  correct?
9     A.   Yes, sir.
10    Q.   Do you know if Officer Payne was aware
11  that your professional standards division
12  investigation report was soon to be coming out when
13  he sent this letter?
14    A.   I needed to interview him, so it wasn't
15  done.  It wouldn't have been done.
16    Q.   I'm not sure I understand that.
17    A.   So part of the police officer bill of
18  rights is in order for me to conduct an interview
19  with him, the times were told when there's a
20  criminal investigation active.  And it was my
21  desire to get an interview with him as part of this
22  investigation, but to do that he would have a right
23  to review all the evidence I have in my internal
24  investigation, and to do all that before I could
25  conduct the interview.  And that's usually

Charles Demmon
07/10/2025

Page 70

1  coordinated through the union representative or the
2  attorney representing the union in that case.
3      So I wanted to get an interview with him.
4  That was my desire to do that.  So in my mind I
5  wouldn't have been done until I had that interview
6  with him because I really wanted that for this
7  case.
8      Q.  Understood.  So would you have provided
9  him some version of your summary report like in
10 conjunction with asking for that interview?
11     A.  He wouldn't have gotten my summary.  He
12 would have gotten all the other evidence, the
13 interviews, any documentation that I would have,
14 aside from my summary, he would have had prior to
15 that.  If I knew he was going to give me a
16 statement in the case, as I've done in the past, he
17 would have been provided everything short of my
18 summary of the investigation.  Does that make
19 sense?
20     Q.  I think so, yes.  So like transcripts
21 of interviews, audio --
22     A.  Yes.  Any video, anything that I was
23 using in my case against him from the internal
24 side, he would have had access to so that he could
25 prepare his statement.  And that's covered under

Page 71

1  the Florida Police Officer Bill of Rights, and I
2  believe the Collective Bargaining Agreement.
3      Q.  So am I understanding you to say that
4  at least as far as you're aware, he would not know
5  which way you were leaning in terms of your
6  conclusions with respect to the general orders and
7  compliance of the law?
8      A.  No, he wouldn't have known that until
9  he was provided everything.  And I wouldn't have
10 told him my conclusions or either way I was leaning
11 with that.  Again, my role is a fact finder, so my
12 questions would have been geared towards the facts
13 of the case, and the questions would have been
14 relevant to that.  And then whatever his answers
15 would be, he could offer something that I may not
16 have thought of that I wanted to look into further
17 during his questioning, you know, when he gave a
18 statement.
19     But that's kind of how I design my
20 interviews is, I have a particular list of
21 questions that I go in with, and then based on
22 their responses the interview may go where I have
23 to cover something else that maybe I wasn't aware
24 of or didn't see at the time.  If that make sense.
25     Q.  Yeah, it does.  Thank you.

Page 72

1      MR. MARRESE:  Let's take a break and
2  come back at 12:15 your time.
3      VIDEOGRAPHER:  Going off the record at
4  12:06.
5      (A short recess was taken.)
6      VIDEOGRAPHER:  We're back on the record
7  at 12:17.
8  BY MR. MARRESE:
9      Q.  Commander Demmon, are you aware of
10 whether any new training was or has been
11 implemented in the Titusville Police Department
12 relating to Officer Payne's actions in this case?
13     A.  No, I don't believe so.
14     Q.  When you say I don't believe so, just
15 to be clear, you mean you don't believe any new
16 training has been implemented, correct?
17     A.  Well, we do a lot of training, but
18 specifically related to this, no, I don't think we
19 did anything like that.  Not that I'm aware of.
20     Q.  Okay.  And same question with respect
21 to revisions in training or changes in training.
22 None that you are aware of specifically relating to
23 Officer Payne's actions in this case; is that fair?
24     A.  Yeah, I'd say that's fair.
25     Q.  Okay.  Are you aware of any training

Page 73

1  that has been implemented that's new or different
2  subsequent to the shooting that even if it doesn't
3  specifically relate to this case that you think is
4  relevant to what you found was wrong about Officer
5  Payne's actions?
6      A.  Can you ask that one more time?  I
7  think I followed you, but if you could ask that one
8  more time.
9      Q.  It wasn't a very good question.  So
10 you've already answered my questions with respect
11 to whether there's any new or different training
12 specifically related to this case.  Is there any
13 that comes to mind that is new or different that
14 would relate to the things that you found wrong
15 about Officer Payne's actions?
16     What I'm talking about in particular are his
17 holding both the taser and the gun at the same
18 time, and his use of deadly force under the
19 circumstances.
20     A.  No.
21     Q.  Thank you.  When I use the term foot
22 pursuit, I'm referring to a situation where an
23 officer pursues a fleeing suspect on foot.  Does
24 that make sense?
25     A.  Yes.

Charles Demmon
07/10/2025

Page 74

1    Q.   And would you agree with me that here
2  that for a time Officer Payne was involved in a
3  foot pursuit of James Lowery?
4    A.   Yes.
5    Q.   Is that the kind of activity that you
6  can expect a patrol officer to engage in from time
7  to time?
8    A.   Yes.
9    Q.   And officers approach suspects on foot,
10  correct?
11    A.   Yes.
12    Q.   If a suspect flees, an officer might
13  have to chase them on foot, correct?
14    A.   Yes.
15    Q.   So it's a predictable part of the
16  patrol officer's job, fair?
17    A.   Yeah, that's fair.
18    Q.   Does the Titusville Police Department
19  as of December 26, 2021 train on how to comport
20  one's self during a foot pursuit?
21    A.   So the trainings that I've been a part
22  of or with, we've done scenarios with traffic stops
23  where someone flees from the vehicle and the
24  officer gives chase.  We've gone over in our
25  response to resistance what active resistance is,

Page 75

1  which is evading an officer, heart rate, I believe
2  environmental factors.  They kind of run the whole
3  gamut of what to expect, that kind of thing.  If
4  that makes sense.
5    Q.   Okay.  And this is training that you
6  have had in particular in your time at the
7  Titusville Police Department?
8    A.   Yes, sir.
9    Q.   Let's talk about it in terms of the
10  scenario of a traffic stop where the driver, or
11  passenger, or some suspect gets out of the vehicle
12  and starts running and an officer has to give
13  chase.  What were you taught as a part of that
14  instruction?
15    A.   It depends on the scenario.  It could
16  be where you would use your taser.  It could be
17  firearms and simunitions.  I remember one in
18  particular, one of the -- give me a minute and I'll
19  think of who was a role player.  But it was at the
20  back of the PD, and we got out of the car to
21  address it, and he ran on foot behind one of the
22  sheds we had back there.
23       And you run up, and the training was you
24  want to make sure you kind of -- it's called like
25  slicing the pie.  If you come out, be mindful of

Page 76

1  your environment, what's around it so you don't
2  just run blindly around a corner, because the role
3  player was there and he presented different types
4  of force multipliers if you will.
5       He may have nothing in his hand.  He may
6  have a plastic knife in his hand.  He may have
7  something that gives you the ability do I shoot,
8  don't shoot, that type deal.  If that makes sense.
9       I know when I've run supervisory scenarios
10  in the past, we did one with a foot pursuit of an
11  individual and an officer getting on the radio, and
12  then the supervisor, who was part of the hands-on
13  portion of the process, was to hear the officer's
14  engaged in a foot pursuit with a subject, and then
15  the supervisor making a decision, setting up a
16  perimeter, do I need to lock down schools, that
17  type thing.
18       The physiological responses to it, again,
19  active resistance, so are you fighting, are you
20  running after them, what are you doing that's
21  causing your heart rate to increase besides just
22  the stress of the situation, and then how to
23  control your breathing, that kind of thing.  We've
24  done that in the past.
25       Let me think through simunitions.  Active

Page 77

1  shooter scenarios, we did one.  This was this past
2  year, so it probably wouldn't be relevant to this.
3  I know we did the one at Madison Middle School that
4  I cited in my report where you had two scenarios:
5  One was a deadly force type active shooter, the
6  other was an angry parents and a less lethal type
7  scenario, how would you handle it.  I remember that
8  one.
9       Those are the ones that are coming to mind.
10  I'm sure there's more, but those are the ones I
11  participated in that I can recall off the top of my
12  head.  I know our new hires when they get hired
13  they go through a number of scenario-type base
14  training for that, traffic stops when it comes to
15  radio procedures, stress, inducing stress, those
16  type things.
17    Q.   I want to focus on the portion of your
18  answer relating to physiological responses.
19    A.   Okay.
20    Q.   What is it that you have been taught
21  about physiological responses as it pertains to
22  foot pursuits?
23    A.   So when you -- I have a guideline that
24  was put out.  I can get a copy of it.  Basically,
25  it was classroom instruction, and it was here's how

Charles Demmon
07/10/2025

Page 78

1  to control your heart rate:  Be mindful that, you
2  know, at a certain point if your heart rate gets
3  too high, you might start seeing black, which is
4  you're not aware of your surroundings, you know,
5  your stress is really high.  This is some things
6  you need to watch out for so that you don't make
7  like a bad decision, that kind of deal.  I've had a
8  couple different instructors go over that over the
9  time I've been here.
10       They do defensive tactics on our ground
11  fighting stuff too.  It's the same thing they go
12  over.  So I think -- that one -- those are both
13  classroom and practical.  So like you have a
14  classroom portion that's covered, whether it's
15  through a PowerPoint or something that the
16  instructor is going over, and then you have the
17  practical portion, which is like scenario based, or
18  combination of the two.
19       Q.   So if I understood your testimony
20  correctly, a part of that instruction talks about
21  how in certain circumstances your heart rate will
22  increase, and it can increase to such a point where
23  you're seeing black and therefore not as cognizant
24  of your environment and what's going on in it; is
25  that fair?

Page 79

1       A.   Yes.
2       Q.   Is that instructed in particular with
3  respect to something that can happen during a foot
4  pursuit?
5       A.   Yes, so it's called active resistance.
6  So when a subject is doing that, maybe they're
7  fighting, maybe they're running.  Those are the
8  factors that go into it because now you're running,
9  your heart is elevated, you're in a physical
10  confrontation, your heart is elevated, that type
11  deal.  And these are the things to be cognizant of
12  to look for.
13       Q.   In terms of attempting to control your
14  heart rate, or to avoid a situation where you make
15  a bad decision as a result of physiologic responses
16  to the body, were you taught anything?
17       A.   Breathing techniques, how to slow down,
18  how to control your breathing.  Yeah, I think, if I
19  remember correctly, that was a classroom portion,
20  and that's what they went over, these are the
21  things that you need to be mindful.  I can remember
22  that one in particular.
23       And it was -- I want to say that was
24  Lieutenant Burn, who's one of our DT instructors,
25  that went over that, that did that classroom

Page 80

1  portion.  I think Mark may have done the same,
2  Jennings, and TJ Wright probably -- they were all
3  part of that cadre, that training cadre.
4       So they could probably give you more
5  specifics on that.  But what I can recall in
6  particular is the breathing exercises, the things
7  to watch for, and the things you do.
8       Q.   Thank you.
9       A.   Yes, sir.
10       Q.   Have you ever received instruction on
11  the use of a weapon during a foot pursuit?
12       A.   Again, that would be more towards
13  transitioning from, again -- so best I can describe
14  it as, I would say yes, and here's how:  Active
15  resistance versus passive resistance from
16  aggressive resistance to deadly force, and how to
17  transition from a taser to a pistol.
18       Now, I quit carrying a taser many years ago.
19  I'm the old guy now, right, so I'm not out there
20  humping calls and doing that kind of stuff.  But,
21  again, it's in a classroom portion.  It was going
22  over that stuff, this is how you transition, you
23  know, that type deal.  All of a sudden you may be
24  in an active resistance situation and now it's,
25  okay, now they're passive, now they've given up,

Page 81

1  they've laid down, it's over.  Deescalation
2  techniques, that kind of stuff.
3       Q.   Is it -- do officers receive training
4  at the Titusville Police Department in terms of
5  firing their weapon during a foot pursuit?
6       A.   We go to the range for -- so we have
7  the qualification, and then it's proficiency with a
8  firearm, so that's where simunition comes into
9  play, is proficiency.  So one year it may be
10  proficiency, the following year it would be for
11  qualifications.
12       And we're taught how to shoot and move,
13  running up to an area, stopping, shooting,
14  addressing threats, maybe, you know, in certain
15  scenarios this is a lethal situation, now it's less
16  lethal so holster your weapon, draw your taser.  It
17  doesn't have to be your taser.  It could be your
18  spray, because they go over that.  It could be your
19  baton.  It could be just hands on at that point,
20  you know.  It just depends on what the scenario is
21  and what the situation is.
22       I'm the old guy again, so I've been to the
23  range and I've had to -- in situations and
24  scenarios where you're running with the handgun and
25  it has simunitions in it, and it's a shoot

Page 82

1  scenario, it's a don't shoot scenario, and then I'm
2  using de-escalation techniques to talk the
3  situation down.  So, yeah, as far as that goes,
4  yes.  It's not every situation.  It's not every
5  scenario, but they do train on that.
6      Q.   A few times you've noted you're kind of
7  the old guy.  I know it's somewhat -- you know,
8  it's both true because you've been in the
9  department for a while, somewhat tongue and cheek,
10  so overstated, but I think if I'm hearing you, your
11  point is, there's other officers, including
12  Jennings and Wright, who are going to have a more
13  detailed understanding of Titusville Police
14  Department's training certainly as it pertained to
15  Officer Payne and officers in the department as of
16  December 2021?
17      A.   Yes.
18      Q.   Would you defer to them in terms of the
19  details of training, particularly when it comes to
20  use of force and foot pursuits?
21      A.   I would.  They're at all the training,
22  so if it's part of their cadre they're assigned
23  when the officers go, they'd be there.  So if it's
24  a three-day training or if it's a week-long
25  training, they would be there pretty much every day

Page 83

1  either all together or one or the other, if that
2  makes sense.
3      Q.   Yes.
4      A.   I think I've called myself old guy like
5  ten times now.
6      Q.   You're not even that old.
7      A.   I appreciate that, but I feel it.
8      Q.   But I bet you feel like it with all
9  those grandkids.
10      A.   Yes, I do.  My wife sent me pictures of
11  the new grandbaby --
12      Q.   I was going to say, my colleague,
13  Morgan, on a break -- I didn't hear you say it, but
14  you said you had a sixth grandchild last night?
15      A.   Yes.
16      Q.   I did not --
17      A.   Thank you.  She's amazing.  I'm a big
18  softy, a big cry-baby when it comes to that, so I
19  walk in, my wife laughs at me.  She's like, why do
20  you cry at that.  I said, because I'm happy.  It's
21  a big deal to me.  She laughs.  She gets a big kick
22  out of it.  I'm like, whatever.  You guys make fun
23  of me now.
24      Q.   Just a few more questions, I think, for
25  now.  This is going to be a little shorter than I

Page 84

1  thought.
2      A.   Okay.
3      Q.   Have you -- are you aware of other
4  shootings of civilians during a foot pursuit
5  specifically with respect to the Titusville Police
6  Department?
7          MR. JADON:  Form.
8      A.   I have a current internal that I'm
9  working right now that involved an armed subject.
10  The officer -- I can't really get into it, but as a
11  current officer-involved shooting.  I don't believe
12  any component of that was a foot pursuit, but
13  individual was armed.  Give me a second to think.
14  We really don't have a lot of officer-involved
15  shootings.  I don't think so, no.  I'm really
16  trying to go back to my early stuff.  I don't think
17  so.
18  BY MR. MARRESE:
19      Q.   Okay.  Is the officer-involved shooting
20  that you just referenced, did that occur in
21  February of this year?
22      A.   Yes, sir.
23      Q.   That was -- I'm going to pronounce the
24  name wrong -- Trimaria Raquan Charles (ph)?
25      A.   Yes, sir.

Page 85

1      Q.   And your understanding is that he was
2  involved -- he was armed.  Is that armed with a
3  firearm?
4      A.   Yes, sir.
5          MR. MARRESE:  I don't have any further
6  questions right now.  Thank you very much
7  for your time, Commander Demmon.
8          THE WITNESS:  Yes, sir.  Thank you.
9  Thank you very much.
10          MR. JADON:  Can we take five real quick
11  so I can look at my notes?
12          MR. MARRESE:  Sure.
13          VIDEOGRAPHER:  Going off the record at
14  12:38.
15          (A short recess was taken.)
16          VIDEOGRAPHER:  We're back on the record
17  at 12:45.
18          MR. JADON:  Can everyone hear me okay
19  and clearly for the computer?
20          MR. MARRESE:  Yes.
21          MR. JIMENEZ:  Yes.
22          THE WITNESS:  Yes, sir.
23          CROSS-EXAMINATION
24  BY MR. JADON:
25      Q.   Good afternoon, Mr. Demmon.  My name is

Charles Demmon
07/10/2025

Page 86

1  David Jadon.  I'm the lawyer for the City of
2  Titusville today.  How are you?
3       A.   I'm good.
4       Q.   I have a couple questions for you today
5  just real quick.  Do you remember getting your
6  notice of deposition in this case?
7       A.   Yes.
8       Q.   In that notice of deposition were you
9  ever noticed as a corporate representative for the
10  City of Titusville?
11      A.   No.
12      Q.   Is it fair to say, then, all your
13  testimony today was based on your personal
14  knowledge?
15      A.   Yes.
16      Q.   And your personal involvement, if any,
17  in this case?
18      A.   Yes.
19      Q.   Do you remember showing Mr. Marrese
20  three binders?
21      A.   Yes.
22      Q.   Those three binders constitute the
23  internal affairs report that you wrote, right?
24      A.   Yes, sir.
25      Q.   I think you said before you did not

Page 87

1  review all 900-plus pages in that report in those
2  three binders prior to today, correct?
3       A.   Correct.
4       Q.   Fair to say that your testimony today,
5  unless there was something shown explicitly on the
6  screen word for word, it's based on your best
7  recollection?
8       A.   Yes.
9       Q.   You did not -- you testified to this
10  before, but you did not interview Mr. Payne; is
11  that correct?
12      A.   Correct.
13      Q.   Obviously, you were not at the incident
14  that we're here for today, right?
15      A.   Correct.
16      Q.   And so you do not know what Mr. Payne
17  saw or did not see outside of the body camera,
18  correct?
19      A.   Correct.
20      Q.   Now, you were asked some questions
21  about foot pursuits.  Do you remember those?
22      A.   Yes.
23      Q.   In your 20-something or 20-plus years
24  with the Titusville Police Department, were you
25  ever involved in foot pursuits yourself?

Page 88

1       A.   Yes.
2       Q.   Can you recall all the foot pursuits
3  you were ever in?
4       A.   No.
5       Q.   Were any of them exactly the same?
6       A.   No.
7       Q.   You received -- you had some questions
8  about training today and training in foot pursuits.
9  In your experience and your involvement with the
10  Titusville Police Department, is it possible to
11  train for every scenario that an officer could be
12  involved in?
13      A.   No.
14           MR. JADON:  I have no other questions.
15           MR. MARRESE:  Nothing from plaintiff.
16           MR. JIMENEZ:  Nothing from me.
17           MR. JADON:  Mr. Demmon, you have the
18           option to read or waive your transcript
19           testimony.  I recommend that you read it
20           just in case to see if there were any
21           spelling issues when the transcript is
22           created, or any errors, something like that.
23           You don't have the ability necessarily to
24           rewrite anything, but I recommend everyone
25           reads it just to make sure.

Page 89

1           THE WITNESS:  Okay.  I'll read.
2           VIDEOGRAPHER:  Going off the video
3  record at 12:48.  We're off the video.
4           STENOGRAPHER:  Can I get transcript
5  orders before I go off the record?
6           MR. MARRESE:  Yeah, plaintiff will take
7  an electronic pdf, no video at this time.
8  Thank you.
9           STENOGRAPHER:  Anybody else?
10          MR. JIMENEZ:  Not at this time for
11  Officer Payne.
12          MR. JADON:  I don't think we need one
13  either, Cindy, but we will reach out if we
14  do.
15  (The deposition was concluded at 12:48 p.m.)
16
17
18
19
20
21
22
23
24
25

Charles Demmon
07/10/2025

Page 90

```
 1                 CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA   )
                        )
 4   COUNTY OF ESCAMBIA )
 5
 6
 7            I, Cynthia Layer, certify that CHARLES
 8   DEMMON remotely appeared before me on the 10th day
 9   of July 2025, and was duly sworn.
10            Signed this 21st day of July 2025.
11
12
13
14
15
16
17                    _____
                      CYNTHIA LAYER, CSR
                      Notary Public, State of Florida
18                    My Commission No. HH 341507
                      My Commission Expires: 12/14/26
19
20
21
22
23
24
25
```

Page 91

```
 1                 CERTIFICATE OF REPORTER
 2
 3   STATE OF FLORIDA   )
                        )
 4   COUNTY OF ESCAMBIA )
 5
 6            I, Cynthia Layer, CSR, do hereby
 7   certify that I was authorized to and did
 8   stenographically report the foregoing deposition of
 9   CHARLES DEMMON; that a review of the transcript was
10   requested; and that the transcript, pages 1 through
11   89 is a true record of my stenographic notes.
12            I further certify that I am not a
13   relative, employee, attorney, or counsel of any of
14   the parties, nor am I a relative or employee of any
15   of the parties' attorneys or counsel connected with
16   the action, nor am I financially interested in this
17   action.
18            Signed this 21st day of July 2025.
19
20
21
22                    Cynthia Layer
                      CYNTHIA LAYER, CSR
23                    Certified Shorthand Reporter
24
25
```

Page 92

```
                                   July 21, 2025
     David Jadon, Esquire
     C/o  Roper, Townsend & Sutphen, P.A.
     255 S. Orange Avenue, Suite 750
     Orlando, Florida 32801
     Djadon@roperpa.com
     WITNESS:  Charles Demmon
     RE:  Jamiyah Robinson v Joshua Payne, et al
     Case No:  6:23-cv-01313-PGB-LHP
     Type of Proceeding: Deposition on July 10, 2025
     The transcript of the above proceeding is now
     available and requires signature by the witness.
     Please e-mail philadelphia.production@lexitaslegal.com
     for access to a read-only PDF transcript and
     PDF-fillable errata sheet via computer or use the
     errata sheet that is located at the back of the
     transcript.
     Once completed, please print, sign, and return the
     the e-mail address listed below for distribution to
     all parties.
     If the witness does not read and sign the
     transcript within a reasonable amount of time (or
     30 days if Federal), the original transcript may be
     filed with the Clerk of the Court.
     If the witness wishes to waive his/her signature
     now, please have the witness sign in the blank at
     the bottom of this letter and return to the e-mail
     address listed below.
     Very truly yours,
     Cindy Layer, CSR
     Lexitas
     philadelphia.production@lexitaslegal.com
     I do hereby waive my signature.
                      _____
     Charles Demmon
```

Page 93

```
 1                 ERRATA SHEET
 2   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 3   In Re:  Jamiyah Robinson v Joshua Payne, et al
           Case No.:  6:23-cv-01313-PGB-LHP
 4                    Charles Demmon
                      July 10, 2025
 5
     PAGE   LINE   CHANGE                   REASON
 6
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   Under penalties of perjury, I declare that I have
     read the foregoing transcript of my deposition and
19   I hereby swear that my testimony therein was true
     at the time it was given and is now true and
20   correct, including any corrections and/or
     amendments listed above.
21
22   _____    _____
     DATE        Name
23
24
25
```

**Exhibits**

**412344MD
emmon071
025 Ex 0
01**
  3:16
  11:21,23
  13:10
**412344MD
emmon071
025 Ex 0
02**
  3:17
  15:13,19
  16:19
  34:8
  37:17
  41:24
  57:1

---

**0**

**031A-IA**
  11:14

---

**1**

**1**
  11:11,
  21,23
  13:10
  14:3,10,
  22  15:7
**100**
  62:12
**101**
  63:18
**102**
  11:12,
  17,22
  12:6
  15:6

---

  41:25
  43:5
  52:12
**103**
  46:1
  47:3
  54:13
**104**
  59:15
**105**
  57:1
**106**
  60:13
**107**
  12:5,15
  15:15
  16:2,7
  38:23
  41:25
**10:16**
  4:1,3
**10th**
  4:8
**11**
  69:1
**11:08**
  41:18
**11:15**
  41:15
**11:16**
  41:21
**12**
  12:23
  26:7
**12:06**
  72:4
**12:15**
  72:2
**12:17**
  72:7

---

**12:38**
  85:14
**12:45**
  85:17
**12:48**
  89:3,15
**12th**
  16:6
  38:24
**14**
  67:3
**14th**
  16:10
**15**
  67:17
**1989**
  23:21
**1997**
  24:22
**1998**
  24:19
  25:2,12
**1A**
  52:12
**1B**
  53:11
**1st**
  68:10,25

---

**2**

**2**
  13:25
  14:10
  15:7,13,
  19  16:19
  17:10,
  11,13
  34:8
  37:17
  41:24

---

  57:1
**20-plus**
  87:23
**20-
somethin
g**
  87:23
**2000**
  25:18
**2004**
  25:21
**2005**
  25:23
**2006**
  25:24
**2008**
  24:11,21
**2010**
  26:2
**2018**
  26:16,23
  29:13
**2021**
  20:11
  28:25
  34:13
  35:19
  38:21
  40:12
  74:19
  82:16
**2022**
  12:23
  16:6,10
  26:8,23,
  25  28:25
  38:24
  40:13
  68:10
  69:1

---

**2023**
  18:10
**2024**
  26:10
**2025**
  4:8
  26:10,25
  27:3
  28:22
**22**
  60:17
**23**
  62:16
**248**
  15:5
**25**
  26:11
  27:1
  40:13
**26**
  74:19
**26th**
  20:11
  28:25
  34:13
  35:19
  38:21
**27**
  25:9

---

**3**

**3**
  13:25
  14:2,10,
  11  15:6
  18:23
  34:9
  68:9,17,
  18
**300.6**
  62:15

---

  63:19
  65:20
**300.6-
standard
s**
  43:15
**354**
  16:22
**3rd**
  18:10

---

**4**

**412**
  45:21
  46:10
  52:9

---

**5**

**52**
  22:25

---

**6**

**6-3-2022**
  69:6
**6-4-2021**
  57:3
  59:18
**6.13(F)
15**
  59:18
**6.13(F)
20**
  57:4

---

**8**

**8**
  66:20
**80**
  66:11

Charles Demmon
07/10/2025

**81**
  12:1,3,5
  15:14

——————

**9**

**9-1-1**
  10:17

**900-plus**
  87:1

**91**
  24:22

**93**
  24:24
  67:4

**94**
  24:24

——————

**A**

**a.m.**
  4:1,3

**ability**
  40:10,25
  76:7
  88:23

**absent**
  51:17

**absolutely**
  14:8

**accepted**
  69:6

**access**
  70:24

**accordance**
  44:15
  61:15

**accreditation**
  30:3

**31:22**

**accurate**
  13:2
  40:8,9,
  24 41:5

**acting**
  65:11,22

**actions**
  47:13
  48:14
  54:21
  57:4,5,
  19 59:18
  64:19
  72:12,23
  73:5,15

**active**
  17:18
  69:20
  74:25
  76:19,25
  77:5
  79:5
  80:14,24

**actively**
  47:24

**activity**
  74:5

**actual**
  19:4
  21:10

**address**
  75:21

**addressing**
  81:14

**administrative**
  11:14
  21:2

**advice**
  8:12

**affairs**
  32:6
  35:17
  86:23

**affected**
  59:24

**afternoon**
  85:25

**aggressive**
  80:16

**agree**
  74:1

**agreed**
  49:9
  60:9

**Agreement**
  71:2

**allegation**
  43:10

**allegations**
  35:22
  46:25

**alongside**
  30:14

**amazing**
  83:17

**and/or**
  34:16

**angry**
  77:6

**answers**
  6:23

**71:14**

**anticipate**
  7:4

**anyplace**
  10:18

**applied**
  47:9

**applies**
  7:10

**apply**
  52:17
  53:15

**applying**
  47:11,15

**apprehended**
  53:22

**approach**
  74:9

**approached**
  54:10,16
  55:17

**area**
  23:21
  81:13

**Armando**
  4:9

**armed**
  84:9,13
  85:2

**arrest**
  34:18
  47:24,25

**aspect**
  28:5

**assess**
  32:17

**assigned**
  30:14
  34:22,24
  38:19
  39:5
  82:22

**assist**
  30:4
  35:4

**associate's**
  24:24

**association**
  4:12

**assumed**
  21:18

**asterisk**
  16:15

**asterisks**
  43:16

**attached**
  17:13

**attempted**
  34:18
  47:24

**attempting**
  79:13

**attend**
  23:13,
  15,25
  24:2

**attended**
  24:5

**attention**
  47:20

**48:4**

**attorney**
  8:11
  9:1,19
  22:8
  70:2

**attorneys**
  9:1,8

**audio**
  10:16,17
  37:24
  70:21

**August**
  18:10

**authorized**
  52:7,14
  53:11

**autopsy**
  38:13

**avoid**
  79:14

**aware**
  42:9,12
  56:21
  59:4,13
  62:3
  69:10
  71:4,23
  72:9,19,
  22,25
  78:4
  84:3

**Axon**
  10:13
  38:6
  52:3

---

**B**

**babysitter**
33:23

**bachelor's**
24:6,22
25:5

**back**
16:1
19:3,5,
13  24:3,
7  25:21,
25  26:3,
6,9,10,
11,24
27:1,2
28:15
41:14,20
44:8
52:11
72:2,6
75:20,22
84:16
85:16

**background**
23:12
30:4,18

**backgrounds**
31:21

**bad**
29:21
78:7
79:15

**Bargaining**
71:2

**base**

77:13

**based**
37:4
40:9,25
45:20
50:12
55:14
57:11
59:21
61:1
71:21
78:17
86:13
87:6

**basic**
23:12

**basically**
28:11
37:6
42:6
77:24

**basis**
48:10

**Bates**
15:2

**bathroom**
8:19

**baton**
81:19

**began**
4:1

**begin**
7:12

**beginning**
11:1
66:12

**begins**
34:12
45:20

**behalf**
4:19

**behavior**
65:10,19

**belief**
41:5
65:4

**believed**
52:19
53:2

**believes**
53:19

**beneath**
43:16
44:11

**bet**
83:8

**big**
83:17,
18,21

**bill**
61:16
69:17
71:1

**Binder**
14:22
68:8,17,
18

**binders**
13:20,24
86:20,22
87:2

**bit**
10:24
11:10
12:3
15:3
25:24
26:6
54:5

**behalf**
4:19

**black**
66:1
78:3,23

**blindly**
76:2

**blow**
12:2

**bodily**
52:20
53:4,18,
20

**body**
10:13
38:6
52:3
79:16
87:17

**book**
13:25
14:2,3,
10,11
17:10,
11,13
18:23
19:2,3,6

**born**
23:17,19

**bottom**
16:2
49:16
50:22
65:18
69:6

**brain**
56:6,8,
11

**break**
41:8
68:3
72:1
83:13

**breaks**
8:16

**breathing**
76:23
79:17,18
80:6

**Brevard**
24:3

**briefly**
11:22
21:20
34:25

**bring**
40:16

**brings**
65:11

**brought**
61:4,24

**browsed**
17:20

**bullet**
45:20,25
46:3,13
47:4,19
48:13
49:16
50:22
51:14
52:12
54:12,13
55:7
57:23
59:21
62:18
63:7
64:18

**bullets**
46:18

**Burn**
79:24

**business**
42:7

---

**C**

**cadre**
80:3
82:22

**call**
8:18
21:19,21
31:3,6
41:9

**called**
5:6  6:1
33:1,5
38:6
42:13,17
56:10
75:24
79:5
83:4

**calls**
10:17
25:14
80:20

**cam**
10:13
38:6

**camera**
14:7
52:3
87:17

**Canaveral**
23:20

**canine**
26:5

**Cantalupo**
54:20

Charles Demmon
07/10/2025

Cape
23:20
capital
43:24
44:2
57:2,4,
7,13,18
58:4,7,
13
59:10,
16,19
car
75:20
career
39:25
42:15
careful
47:20
48:4
carry
54:14
carrying
54:9
57:22
80:18
case
5:16
6:12,20,
24 11:7
12:20
20:12
21:23
22:20
28:22
29:1
31:25
36:1,17,
21,23
37:2
38:7,14
39:12
40:6

47:8,21
48:5
53:25
54:8
56:5
57:20
59:5
65:13
66:4
70:2,7,
16,23
71:13
72:12,23
73:3,12
86:6,17
88:20
cases
64:3
causing
76:21
caveat
8:24
Central
24:5,8
certificate
58:18
certifications
20:21
21:6
24:13
changed
42:16
character
65:11
charges
61:4,9,
23 62:4,
6,7

Charles
5:13
84:24
chase
74:13,24
75:13
checking
22:19
cheek
82:9
chief
12:24
16:9
22:12
27:6,10,
11 34:13
49:5,8
59:1
60:9
62:14
63:22,25
64:8,10,
25 68:10
69:2,7
Christina
20:9
Cindy
4:11
89:13
circumstances
36:22
44:14,23
45:3
47:21
48:4
49:21
51:1
52:16,24
53:13,25
54:17

55:21
56:15
73:19
78:21
cited
77:4
city
4:20 6:5
12:20
34:15
43:13
57:2
59:3,17
60:15,22
62:10
86:1,10
civil
6:20
civilian
36:23
civilians
84:4
claims
32:9
classroom
77:25
78:13,14
79:19,25
80:21
clear
54:19
65:2
72:15
co-
workers
64:22
Cocoa
23:21

code
26:5
cognizant
78:23
79:11
colleague
83:12
collecting
35:9
Collective
71:2
college
23:25
24:3,20
colon
43:18
combination
78:18
command
29:20
commander
5:19,20,
23 26:9,
12 27:1,
3,7,19,
25 28:3,
11 29:4
41:23
54:8
72:9
85:7
commanders
27:12

commit
53:18
committed
53:17
58:6,13
community
24:3
60:1
competency
62:21
complaints
32:10
completed
8:6,7
61:8
compliance
31:19
48:17
50:24
71:7
complied
32:18
comply
42:24
60:18
component
84:12
comport
74:19
computer
85:19
conclude
55:14

61:25

**concluded**

63:18

89:15

**conclusion**

48:24

49:2,5

50:1,4

51:4,7,

22,25

52:2

54:24

55:2

57:17

59:22

60:3,6,

10 61:2

63:2,5,

13,24

**conclusions**

40:9,24

42:1,2

46:24

52:6,23

53:24

66:16

67:13

71:6,10

**concur**

16:11,15

63:22

64:17

65:5

**concurred**

49:6

**concurrence**

59:2

62:14

**conduct**

30:15

36:16,20

59:24

60:17

62:15

64:1,6

65:12

69:18,25

**Conduct/4a10**

43:15

**conducted**

32:1

61:3

**conducting**

48:9

**conform**

45:6

**conformance**

60:17

**confrontation**

48:15,

18,19

79:10

**conjunction**

36:11

37:13

66:16

67:1,14

70:10

**Conner**

47:9,16

**considered**

47:25

57:5

64:6

**consistent**

52:23

53:24

67:13

**constitute**

86:22

**Constitution**

45:13

60:19

**continually**

25:1

**continue**

46:1

**continues**

15:8

59:20

**control**

76:23

78:1

79:13,18

**conversation**

7:6

**Coordinate**

20:20

**coordinated**

70:1

**coordination**

21:12

**coordinator**

20:3,8,

19 30:2

**copy**

20:2

77:24

**copying**

46:19

**corner**

76:2

**corporal**

25:21,22

**corporals**

27:14,15

**corporate**

86:9

**correct**

6:7,12

10:2

12:16

13:7

16:7,20

17:1

30:15

32:2

34:5,22,

25 36:17

37:14,

18,25

38:3,21,

24 39:6,

9,13,18,

22 40:1,

6,10,14

42:2,10,

22,25

43:3

44:19

45:10,

13,17

46:4,11,

16,20,25

47:1,13,

17

48:11,

12,25

49:3,6,

10,11,

14,15

50:2,3,

5,6,9,10

51:5,6,

8,23,24

52:4,5,

9,10

53:4,7

54:3,6,

10,25

55:3

60:4,5,

7,8,10

61:10,

11,20,21

63:3,14,

16 65:6

66:13,18

67:1,15,

20,21

69:2,8

72:16

74:10,13

87:2,3,

11,12,

15,18,19

**correctly**

27:18

78:20

79:19

**cost**

30:7

**counsel**

4:13,21

**county**

60:22

**couple**

14:9

68:5

78:8

86:4

**court**

4:11,22

47:8

**cover**

71:23

**covered**

70:25

78:14

**created**

88:22

**crime**

47:22

**crimes**

25:16

**criminal**

6:18

24:7,9

61:2,23

62:4

69:20

**criteria**

58:3

**CROSS-EXAMINATION**

85:23

**cry**

83:20

cry-baby
83:18
culpable
61:5
current
84:8,11

---

D
D-E-M-M-O-N
5:14
dart-firing
51:16
55:9,16
62:23
63:10
67:6,10
date
4:7
12:21,23
13:6,12
16:6
63:3
dated
16:10
68:25
David
4:19
9:19,20,
23 86:1
day
82:25
days
12:24
69:1
de-escalation
82:2

deadly
45:21,22
46:15
49:23
51:18
52:7,14,
16,25
53:12,14
54:1
57:9,21
59:23
73:18
77:5
80:16
deal
35:14
76:8
78:7
79:11
80:23
83:21
death
52:20
53:3,19,
20
decades
40:17,25
December
20:11
28:25
34:13
35:19
38:21
40:12
74:19
82:16
decision
8:12
49:20
50:7
54:14,18
57:9,20

58:20
59:5,9,
12,23
63:8
67:7,18
76:15
78:7
79:15
declined
36:10
Deescalation
81:1
defendant
4:18 6:6
defensive
78:10
defer
82:18
degree
24:6,15
25:5
degrees
24:9
Demmon
4:5,20
5:13,15,
23 6:1,2
17:4
22:24
35:19
41:23
54:8
72:9
85:7,25
88:17
demonstrated
59:23

demotion
58:15
department
5:18
11:13
18:1
19:24
20:8,19,
24 24:18
25:1,9
27:6
28:5
31:20
32:11,
18,22
34:15
36:25
37:13
40:19
43:14,22
44:12,
15,19
45:15,17
52:8
60:16,18
61:3
64:4,7,
21 65:19
68:11,13
72:11
74:18
75:7
81:4
82:9,15
84:6
87:24
88:10
department's
42:10
82:14

depending
36:22
depends
75:15
81:20
deposed
5:7
deposition
4:4,6
5:24
6:9,14,
20 7:24
8:4,24
10:1
19:25
22:10,
14,17
86:6,8
89:15
deputy
27:11
describe
80:13
description
21:7
design
71:19
designates
43:23
designation
43:22
desire
69:21
70:4
detail
46:23

detailed
82:13
details
82:19
detective
25:18
detectives
27:16
37:4
determination
46:25
49:9
58:24
64:25
determine
36:19
determined
37:2
52:6,24
53:25
54:8
determining
47:4
54:16
develop
37:9
differences
13:5
digitally
42:19
DIRECT
5:9

Charles Demmon
07/10/2025

directive
  45:17
directives
  44:16
  45:16
directly
  46:14
discharged
  66:22
disciplinary
  57:4
  59:18
discipline
  57:5
  58:24
  59:7,19
  60:23
disclose
  9:2
discredit
  64:4,20
  65:11
discuss
  21:22,25
  22:5
  46:23
discussed
  9:1
  24:15
  66:17
  67:14
discussion
  50:17

display
  62:23
  67:5
distinction
  46:8
division
  11:6,13
  26:14
  28:8,9,
  20 29:2,
  16,20
  30:19,
  20,23
  31:5,11,
  18,19
  32:17,23
  33:7
  69:11
DMS
  42:14,17
document
  15:16,22
  16:3,23
  17:24
  18:9
  50:12
  67:23
documentation
  70:13
documents
  5:16
  10:5,7
  11:4
  13:19
  14:23
  17:21
  18:14
  19:20

draw
  81:16
drawing
  63:20
drawn
  49:18
  55:9,17,
  21 56:15
driver
  75:10
DT
  79:24
duly
  5:7
duties
  62:21
duty
  66:7

——————

       E
e-mail
  21:19
earlier
  40:19
  67:14
early
  26:25
  27:3
  28:22
  84:16
easier
  19:1
  31:4
Eastern
  24:4
education
  24:13

electronic
  14:14
  89:7
elevated
  79:9,10
employed
  62:10
employment
  27:18
end
  11:1
  12:15
endeavored
  40:22
ended
  48:19
ends
  16:22
enforcement
  21:11
  24:14
  26:5
  61:4
engage
  74:6
engaged
  76:14
ensure
  34:14
  45:6
ensuring
  21:5
entered
  62:7
entire
  13:21

entirety
  29:14
  53:11
enumerated
  51:1
  64:5
environment
  76:1
  78:24
environmental
  75:2
equal
  57:6,12
errors
  88:22
escape
  53:15
establish
  57:6,10,
  12
evade
  47:24
evading
  75:1
evening
  38:20
events
  30:9
eventually
  33:20
everyone's
  21:4
evidence
  26:4

67:20
69:23
70:12
EXAMINATION
  5:9
exception
  8:10
excuse
  30:20
  32:23
executed
  38:23
exercises
  80:6
exhibit
  11:21,23
  13:10
  15:13,19
  16:19
  34:8
  37:17
  41:24
  57:1
exists
  43:24
expect
  74:6
  75:3
expected
  42:22,24
experience
  35:5
  40:18,25
  88:9
explain
  19:1
  28:6

31:16
44:7
63:23

**explanations**
7:22

**explicitly**
87:5

**extent**
18:18

_____

**F**

**facing**
56:23

**fact**
62:9
65:2
71:11

**factors**
75:2
79:8

**facts**
40:9,10
47:20
48:4
71:12

**factually**
61:25

**failed**
50:23

**failure**
57:10,21

**fair**
21:7
23:4
30:23
31:10
32:16

40:20
41:1
44:23
45:3,7
59:9
62:1
65:15
72:23,24
74:16,17
78:25
86:12
87:4

**FDLE**
20:21
38:16

**February**
27:3
84:21

**federal**
60:22

**feel**
83:7,8

**feeling**
51:17

**fellow**
39:17
40:1
59:25

**felony**
53:18

**felt**
61:25

**fence**
48:20
49:17
50:8
54:10,16
55:17
66:22

**field**
17:21

**fighting**
76:19
78:11
79:7

**final**
39:1

**Finally**
18:21

**find**
14:14
20:16
37:9

**finder**
71:11

**finding**
55:14
62:8,13
63:19,23
66:25

**findings**
12:14
39:25
54:7
57:11
66:12,
15,21
67:4

**finish**
7:9,11

**firearm**
49:18,20
54:10,15
55:8,16,
20 57:23
62:23
63:21
66:22
67:5
81:8
85:3

**firearms**
75:17

**firing**
81:5

**five-
and-a-
half**
39:4

**fleeing**
53:16
73:23

**flees**
74:12,23

**flight**
47:25

**Florida**
23:3,7
24:4,6,8
45:10
60:20
61:3
71:1

**focus**
44:10
52:11
77:17

**focused**
19:16

**folks**
31:3

**follow**
8:12
57:24
58:24

**foot**
73:21,23
74:3,9,
13,20
75:21
76:10,14
77:22
79:3
80:11

81:5
82:20
84:4,12
87:21,25
88:2,8

**force**
31:13
32:7,10,
13 34:18
39:17
43:15
44:12,
14,23
45:2,7,
22
46:15,16
47:5,17
48:16
49:23
50:24,25
51:18
52:7,14,
16,25
53:12,14
54:1
57:9,21
59:23
67:18
73:18
76:4
77:5
80:16
82:20

**form**
33:25
40:3
50:19
51:9
53:5
55:5,22
56:16
84:7

**formal**
7:6
35:21

**formally**
68:12

**formed**
48:10

**Forte**
4:9

**found**
58:6,12
68:2
73:4,14

**frame**
26:21

**front**
13:15,18
16:20
19:12
50:12

**FTO**
17:20

**full**
17:3

**full-
time**
33:22

**fun**
83:22

**function**
21:3,4

**functions**
26:4
35:7

**funds**
30:8

**future**
33:15

G

gain
48:17

gamut
75:3

gave
71:17

geared
71:12

Geez
32:24

general
34:16
42:2,4,
5,10,22,
25 43:14
44:18,21
45:5,16,
20 46:2,
5,7,9,14
50:13
52:9
54:3
60:16
62:15,19
63:19
65:8,14,
20 66:17
67:15
71:6

gentlemen
31:17

gig
33:22

give
7:25
8:25
13:10
14:13

15:16
26:21
27:5,8
35:5,6
36:10
70:15
75:12,18
80:4
84:13

giving
6:24

GO300.6
60:16

good
5:11,13
33:15,23
59:25
73:9
85:25
86:3

goofing
64:14
66:8

goofy
64:13
65:22

Googling
22:19

governing
46:15

graduate
23:22
24:20

graduated
24:5,22

Graham
47:8,16

grandbaby
83:11

grandchild
33:24
83:14

grandkids
33:14
83:9

grandparenting
34:1

Great
7:20

ground
6:19
78:10

grow
37:6

guess
27:22

guideline
42:6
66:3
77:23

guilty
33:25
62:7

gun
56:5
73:17

gun/taser
51:17
55:9,16
62:24
63:10
67:6,10

guy
80:19
81:22
82:7
83:4

guys
83:22

H

hand
56:4,5,
8,9
76:5,6

handgun
81:24

handle
77:7

handling
35:5

hands
54:15
81:19

hands-on
76:12

handwritten
16:11

happen
79:3

happened
65:13

happy
83:20

harassment
32:10

hard
11:2

harder
7:22

head
49:19
77:12

hear
8:3
10:14
11:2
23:9
26:19
60:11
69:3
76:13
83:13
85:18

hearing
82:10

heart
75:1
76:21
78:1,2,
21 79:9,
10,14

held
4:7
20:15

hierarchy
27:5
44:7

high
23:13,
16,23
24:23
78:3,5

highest
28:18
29:7,10,
16

hired
25:12
77:12

hires
77:12

hiring
31:21

hold
14:7,9
15:8
20:10

holding
73:17

holster
67:9
81:16

holster/remove
63:10

hour
9:17

HR
59:2

humping
80:20

I

IA
11:14

IAS
33:2

identified
11:23
15:19

identifies
17:24

identify
4:13

immediately
38:20

| | | | | | |
|---|---|---|---|---|---|
| 53:22 | include | initiall | intentio | 87:10 | 58:2 |
| imminent | 37:21 | y | nal | intervie | 59:22 |
| 48:21 | 45:9,12 | 19:3 | 60:21 | wed | 60:4 |
| 49:13 | 47:21 | 25:18 | interact | 37:12,20 | 61:3,20 |
| 53:20 | 48:15 | 37:5 | ing | intervie | 63:14 |
| implemen | included | initials | 65:23 | wing | 67:1,20 |
| ted | 35:22,24 | 16:14 | interjec | 35:8 | 69:12, |
| 72:11,16 | 48:5 | injury | t | intervie | 20,22,24 |
| 73:1 | includin | 52:20 | 7:7 | ws | 70:18 |
| implicat | g | 53:4,18, | internal | 36:16,19 | investig |
| ions | 10:12 | 20 | 10:6 | 37:8,18, | ations |
| 39:25 | 38:10 | inside | 13:21 | 24 38:3 | 25:20,25 |
| impressi | 46:20 | 31:4 | 30:5 | 48:9 | 26:5 |
| on | 60:23 | instance | 31:23 | 55:11 | 28:12 |
| 64:24 | 82:11 | 58:22 | 32:1,4,5 | 70:13,21 | 30:4,5 |
| improper | increase | instruct | 34:4,14 | 71:20 | 31:23 |
| 59:24 | 15:5 | 44:22 | 35:5,17 | investig | 32:7,8 |
| in-house | 76:21 | instruct | 36:14 | ating | 35:6 |
| 17:11, | 78:22 | ed | 69:23 | 25:16 | involved |
| 16,17,23 | independ | 79:2 | 70:23 | investig | 6:11 |
| 20:23 | ent | instruct | 84:8 | ation | 35:23 |
| 33:3 | 61:2 | ion | 86:23 | 11:14 | 74:2 |
| 42:14 | individu | 44:25 | interpre | 13:21 | 84:9 |
| in- | al | 75:14 | t | 30:13,18 | 85:2 |
| person | 29:7,11 | 77:25 | 7:22 | 32:1,5 | 87:25 |
| 9:12 | 43:11 | 78:20 | 66:1,3 | 34:4,13, | 88:12 |
| 21:19 | 76:11 | 80:10 | interrup | 14,21 | involvem |
| incident | 84:13 | instruct | t | 35:3,4, | ent |
| 38:10 | inducing | or | 7:7 | 18,21,24 | 6:10 |
| 47:6 | 77:15 | 78:16 | intervie | 36:11,15 | 19:17 |
| 48:15 | inform | instruct | w | 37:1,8, | 21:23 |
| 51:19 | 45:1 | ors | 10:17 | 14 38:20 | 86:16 |
| 62:22 | informat | 78:8 | 18:24 | 39:5,9, | 88:9 |
| 65:24 | ion | 79:24 | 35:25 | 11,12, | involvin |
| 66:6 | 9:2 | instruct | 36:23, | 16,22 | g |
| 67:19 | informed | s | 24,25 | 40:17,23 | 39:16 |
| 87:13 | 43:2 | 8:11 | 37:11,21 | 43:12 | 53:18 |
| incident | initial | intends | 61:14 | 48:25 | issue |
| s | 37:7 | 53:17 | 69:14, | 50:2 | 5:16 |
| 31:14 | 48:18 | | 18,21,25 | 51:5,23 | 20:11 |
| | | | 70:3,5, | 54:25 | 58:1 |
| | | | 10 71:22 | 57:12 | |

issues
88:21
italicized
44:10

_____

**J**

Jadon
4:19
14:21
40:3
50:11,19
51:9
53:5
55:5,22
56:16
67:25
68:6
84:7
85:10,18,24
86:1
88:14,17
89:12

James
4:17
32:2
34:5,18
47:5,17
49:12,13,19
50:7,8
52:7
74:3

January
26:11
27:3

Jennings
18:25
20:1
21:15
22:8

54:20
55:10
80:2
82:12

Jennings'
19:6,11

Jimenez
4:17
41:8,12,16 50:20
51:10
53:6
85:21
88:16
89:10

job
40:5,8
59:25
74:16

John
4:15 6:3
12:24
14:21
16:9,16
22:12
34:14
41:8
49:6,8
50:11
60:9
62:14
68:1,11

join
24:18
26:13
50:20
51:10
53:6

Joiner
30:14,17
34:24

Joshua
4:6,18
6:5
18:10
68:10

judge
6:24

July
4:8

jumped
48:20

June
12:23
16:6,10
38:24
40:13
68:10,25

jury
6:25
31:17

justice
24:7,9

justified
49:23
51:16,19
52:16
53:14

_____

**K**

keeper
20:22

keeping
21:3
55:15

kick
83:21

kidding
25:12

kind

7:6 9:4
11:1
14:7
17:24
18:1
20:22,25
23:12
25:15
27:19
28:6
29:21
30:10
32:4,10
35:12,14
45:16
65:9,24
71:19
74:5
75:2,3,24 76:23
78:7
80:20
81:2
82:6

kinds
32:6

Knapp
18:17
54:19
55:11

knew
22:14
70:15

knife
76:6

knowledge
41:5
65:3
86:14

_____

**L**

labeled
15:2

ladies
31:16

laid
81:1

language
46:6

Lastly
8:16

Lau
22:13
34:14
49:6,9
60:9
62:14
63:22
68:11
69:2

Lau's
12:24
16:9,16
64:25
69:7

laughs
83:19,21

law
21:10
24:14
32:19
44:15
45:7,9,12 61:4
71:7

lawn
10:23

laws
60:17,18,22

lawsuit
6:4,7

lawyer
86:1

lawyers
8:5

Layer
4:11

leads
37:1

leaning
71:5,10

leaped
27:19

left
26:18
56:9
69:6

lengthy
39:8

lesson
20:5

lethal
62:23,24
63:8,9
67:5,6,8,18
77:6
81:15,16

letter
68:10,15,25
69:13

Lexitas
4:10,12

lieutenant
4:4
5:17,18
26:2,7,

| | | | | | |
|---|---|---|---|---|---|
| 15,23 | 17:12,19 | 43:10 | 83:2 | 89:6 | 44:12,14 |
| 27:8,19 | 19:6,11 | 54:14,18 | **making** | **master's** | 52:13 |
| 29:3 | 64:10 | 58:20 | 76:15 | 24:9,10, | 53:11 |
| 35:19 | 68:24 | 59:5,11, | **manager** | 15,21 | 64:21 |
| 55:9 | **lose** | 12 | 30:3 | **materials** | **mentioned** |
| 79:24 | 58:16 | 66:15,25 | 59:2,3 | 36:1,16 | 17:6 |
| **lieutenants** | **losing** | **Madison** | **manner** | 38:10 | 18:21 |
| 27:13 | 58:18 | 17:18 | 49:20 | 46:19 | 34:25 |
| **lift** | **lost** | 77:3 | **manslaughter** | 48:10 | 36:15 |
| 13:23 | 15:9 | **maintain** | 61:5 | **Matt** | **merit** |
| **list** | **lot** | 62:20 | **mark** | 4:4 5:14 | 57:6 |
| 37:5 | 7:4 | **maintained** | 11:21 | 35:19 | **met** |
| 71:20 | 17:13 | 21:6 | 13:10 | **matter** | 6:1,2 |
| **listed** | 72:17 | **major** | 16:18 | 4:5 | 9:4 |
| 19:2 | 84:14 | 27:20 | 18:8 | **means** | 35:20 |
| **listing** | **louder** | 43:17, | 80:1 | 43:10 | 48:17 |
| 18:10 | 10:24 | 20,25 | **marked** | 49:8 | 58:3 |
| **litigation** | **Love** | 44:11 | 19:4 | 56:3 | **Mick** |
| 14:25 | 34:2 | 63:25 | 34:8 | 61:5,15 | 18:17 |
| **live** | **low** | **majors** | **Marrese** | **meet** | 54:20 |
| 23:3 | 56:22 | 27:12,21 | 4:15 | 9:18 | 55:11 |
| **lock** | **Lowery** | **make** | 5:10 6:3 | 49:22 | **microphone** |
| 76:16 | 32:2 | 6:25 | 11:25 | **meeting** | 56:23 |
| **long** | 34:5,19 | 7:12 | 14:23 | 9:12,16, | **Middle** |
| 9:16 | 47:5,17, | 8:12 | 15:10,21 | 25 10:4 | 17:18 |
| 20:14 | 23 48:19 | 50:15 | 23:11 | 21:19 | 77:3 |
| 25:11 | 49:12, | 58:23 | 40:4 | 36:4 | **mind** |
| 29:10 | 13,19 | 65:1 | 41:11, | **meetings** | 70:4 |
| 32:21, | 50:8 | 66:8 | 14,22 | 9:7 | 73:13 |
| 24,25 | 52:8 | 70:18 | 50:14,21 | **meets** | 77:9 |
| 33:5 | 66:22 | 71:24 | 51:11 | 57:19 | **mindful** |
| 36:7 | 74:3 | 73:24 | 53:8 | **member** | 75:25 |
| **longer** | **Lowery's** | 75:24 | 55:6,24 | 52:18 | 78:1 |
| 20:17 | 48:14 | 78:6 | 56:21, | 53:1,16, | 79:21 |
| 48:20 | **lucky** | 79:14 | 24,25 | 19,21 | **minor** |
| 49:13 | 27:22 | 83:22 | 68:2,7 | 60:18 | 43:25 |
| **looked** | | 88:25 | 72:1,8 | 64:4,6 | 44:5 |
| 9:5 | ——————— | **makes** | 84:18 | **members** | **minute** |
| 10:10 | **M** | 7:17 | 85:5,12, | 32:11 | 13:11 |
| | **made** | 75:4 | 20 86:19 | 36:25 | |
| | 16:11,15 | 76:8 | 88:15 | | |
| | 42:9,12 | | | | |

15:8
75:18
minutes
36:8
41:9
missing
20:4
35:13
mistaken
62:6
Mister
6:2
moment
6:2
33:11
momentarily
68:4
months
39:4
Morgan
83:13
morning
5:11,13
move
46:22
47:2
81:12
moved
23:20
25:17
41:24
moving
57:1
59:15
60:13
62:12
66:11
mower
10:23

multipliers
76:4

———————

N

Nathan
4:6,18
18:11
nature
35:9
39:16
65:14,18
necessarily
88:23
needed
37:2
69:14
negligence
61:6
night
33:24
37:4
83:14
nods
7:23
noes
7:21
normal
7:5
notation
61:18
69:5
note
16:11
noted
57:13,20
58:2
59:16

61:12
82:6
notes
61:18
85:11
notice
12:1
15:14
59:16
86:6,8
noticed
13:4
86:9
notification
35:21
number
11:14
58:17,18
66:20
68:9
77:13
nutshell
31:23
37:7

———————

O

oath
6:23
object
56:4
objection
50:15
objections
8:3,6,14
objective
47:6,11

48:17
49:22
objectively
50:9
52:15
53:12
obtain
24:10
40:8
obtained
24:6,8
25:5
occur
84:20
offenses
64:5
offer
71:15
office
31:4
35:20
36:5
officer
6:4
17:16,17
18:17
25:6,13,14 29:16
32:1
34:4,17
35:20,23
37:20
38:5
39:13,17
40:1,13
47:12,16
48:16,21
49:12,14,17,19
50:7,23
51:15

52:3
54:9,14,18 55:7,15,20
57:8
59:22
61:5,12,13,15,19
62:3,20,22 63:7
64:19,21
65:21
66:21
67:4,7,18 68:12
69:10,17
71:1
72:12,23
73:4,15,23 74:2,6,12,24
75:1,12
76:11
82:15
84:10
88:11
89:11
officer's
74:16
76:13
officer-involved
84:11,14,19
officers
20:25
27:16
32:18
35:8,25
37:3,12,18 42:9,18,21,24

43:2
44:22
45:1,6
47:23
54:19
55:10
56:19
65:12
74:9
81:3
82:11,15,23
official
28:19
one's
74:20
one-page
67:22
online
22:19
operations
26:10,25
28:9,12
opinion
55:19,25
56:13,18
64:9,16
opportunity
35:7,11
opposed
12:5
65:12
option
50:25
88:18
options
50:24
order
15:4

35:18
42:4,5,6
43:14
44:18,21
45:5,16,
21 46:2,
5,7,10,
15 52:9
54:3
60:16
62:15,19
63:19
65:8,20
67:15
69:18

**ordered**
34:14

**orders**
34:16
42:2,10,
22,25
65:14
66:18
71:6
89:5

**ordinances**
60:19,22

**original**
20:6

**outline**
42:8

**outlines**
18:15

**oversaw**
26:3

**oversee**
28:4,7

**oversees**
28:8
30:6

31:20

**overstated**
82:10

——————

**P**
**p.m.**
89:15

**pages**
11:22
12:6
87:1

**paid**
48:3

**paper**
19:4

**Paragraph**
66:20
67:3

**paraphrase**
21:1

**parenthesis**
43:17

**parents**
77:6

**part**
8:4
10:4,13
19:14,
15,16
40:16
44:22
45:6
46:4
47:3
51:25
52:2
54:7

61:19
69:17,21
74:15,21
75:13
76:12
78:20
80:3
82:22

**participated**
77:11

**passenger**
75:11

**passive**
80:15,25

**past**
64:2
70:16
76:10,24
77:1

**patrol**
25:13,14
26:3,25
27:16
28:12
74:6,16

**Payne**
4:6,18
6:5
17:16,
17,25
18:11
34:17
35:20,23
36:5,10
48:16,21
49:12,
14,17
50:23
51:15
54:9,14

55:8,15
57:19
58:21
59:11
61:5,12,
19
62:20,22
66:21
67:4
68:10,12
69:10
74:2
82:15
87:10,16
89:11

**Payne's**
32:2
34:4
38:6
39:13
47:13,16
49:19
50:7
52:3
57:9
59:23
62:4
63:8
64:19,21
67:7,18
72:12,23
73:5,15

**PD**
75:20

**pdf**
89:7

**perform**
30:3
32:5,7
34:22
62:21

**performance**
62:16

**performed**
39:11
40:22

**performing**
34:3

**perimeter**
76:16

**permanent**
25:19

**person**
21:20
31:12
53:17

**personal**
65:3
86:13,16

**personally**
6:6

**personnel**
18:9
57:3
59:17

**pertained**
82:14

**pertains**
77:21

**ph**
84:24

**phone**
21:19,21

**phrase**
43:20

**physical**
48:15
79:9

**physiologic**
79:15

**physiological**
76:18
77:18,21

**pictures**
83:10

**pie**
75:25

**pistol**
80:17

**place**
9:14
42:16

**plaintiff**
4:16 6:4
12:22
14:24
15:1
88:15
89:6

**plan**
22:1

**plans**
20:5
23:6
33:11,
12,18

**plastic**
76:6

**play**
81:9

Charles Demmon
07/10/2025

**player**
  75:19
  76:3
**plea**
  62:7
**pled**
  62:5,6
**point**
  20:4
  26:4
  31:12
  46:18
  47:4,19
  48:13
  49:16
  50:22
  51:14
  52:12
  54:12,13
  55:7
  59:21
  63:7
  64:18,19
  78:2,22
  81:19
  82:11
**points**
  45:20,25
  46:3
  57:23
  62:18
**police**
  5:17
  11:12
  18:1
  19:24
  20:7
  24:18
  25:1,6
  27:6,7,
  11 30:5
  31:20

  32:21
  34:13
  37:13
  40:18
  43:14
  49:6,8
  52:8
  60:9,15
  61:13,15
  62:14
  64:7,20
  68:11,13
  69:17
  71:1
  72:11
  74:18
  75:7
  81:4
  82:13
  84:5
  87:24
  88:10
**policies**
  17:7
  31:20
  66:1
**policy**
  10:9
  42:5,15,
  19,20
  43:23
  57:3,10
  59:17
  66:3
**portion**
  46:13
  62:19
  65:8,20
  76:13
  77:17
  78:14,17
  79:19
  80:1,21

**portions**
  46:9
**posed**
  48:20
  49:13
**position**
  20:10,15
  25:18,19
  61:13,24
**possessi
on**
  68:9
**potentia
l**
  39:24
  58:18
**potentia
lly**
  37:6
**Power**
  42:13,17
**Powerpoi
nt**
  78:15
**practica
l**
  78:13,17
**predicta
ble**
  74:15
**prefer**
  8:17
**preparat
ion**
  8:23
  17:1
  19:20
  20:3
  22:18
**prepare**

  9:8 10:1
  22:17
  70:25
**prepared**
  9:22
  40:23
  41:3
**preparin
g**
  10:13
  48:8
**present**
  33:11
  52:25
  54:1
**presente
d**
  76:3
**preservi
ng**
  8:5
**presuit**
  15:1
**pretty**
  25:4
  28:9
  31:22
  33:19
  82:25
**prevent**
  53:10,15
**principl
es**
  57:11,25
**printed**
  10:10
  18:10
**prior**
  20:10
  27:8
  61:13

  70:14
  87:2
**privileg
ed**
  9:2
**probable**
  53:16
**problem**
  15:15
  41:11
**procedur
es**
  31:21
  77:15
**proceedi
ngs**
  4:1
**process**
  8:4
  35:23
  39:2
  76:13
**produced**
  12:20,22
  14:24
  15:1
  17:24
**professi
onal**
  11:6,13
  26:8,12,
  14,24
  27:2
  28:8,13,
  15,19,24
  29:2,6,
  8,11,15,
  20,25
  30:19,22
  31:4,6,
  7,11,17

  32:22
  33:5,7
  58:14
  64:1,11
  69:11
**proficie
ncy**
  81:7,9,
  10
**program**
  42:13
**promoted**
  25:21,23
  26:2,9
  28:10,14
**pronounc
e**
  84:23
**property**
  26:4
**protect**
  52:18
  53:1
**provide**
  6:23
  7:21
  21:16
  61:19
**provided**
  20:5
  54:19
  67:20
  70:8,17
  71:9
**providin
g**
  61:14
**provisio
n**
  54:2

PSD
30:23
public
32:11
65:23
pull
11:10
12:22
13:9,11
14:4
16:23
18:8
34:7
56:7,9
68:3
pulled
11:11
pulling
56:6,7
purpose
44:21,25
45:5
purposes
32:17
pursues
73:23
pursuit
73:22
74:3,20
76:10,14
79:4
80:11
81:5
84:4,12
pursuits
77:22
82:20
87:21,25
88:2,8
put
42:15

64:12
77:24
puts
20:20
putting
41:4

_____

Q
qualific
ation
81:7
qualific
ations
81:11
question
7:9,15
8:3,7
22:4
29:22
33:18
44:8
50:12,13
52:1
58:12
65:17
72:20
73:9
question
ing
71:17
question
s
6:21,22
7:4,25
8:23 9:3
23:13
50:16
71:12,
13,21
73:10
83:24

85:6
86:4
87:20
88:7,14
quick
41:10
85:10
86:5
quit
80:18
quote
47:6
quoted
52:13
quoting
46:9,14

_____

R
radio
76:11
77:15
raised
23:17
ran
75:21
range
81:6,23
rank
27:9
29:1,5
ranking
28:19
29:7,10,
16
Raquan
84:24
rate
75:1
76:21
78:1,2,

21 79:14
reach
40:9,24
89:13
reached
20:1
46:24
49:17
66:21
reaching
52:2
66:16
read
19:12,14
42:19,
20,22
53:11
64:3
88:18,19
89:1
reads
55:7
88:25
ready
25:11
real
41:10
85:10
86:5
reason
7:16
reasonab
le
44:22
50:9
52:15
53:13
54:17,22
reasonab
leness
47:7,12

48:18
49:22
reasons
56:14
recall
17:7
18:22
36:4
77:11
80:5
88:2
receive
81:3
received
80:10
88:7
recently
68:24
recess
41:19
72:5
85:15
recitati
on
62:19
recognize
50:23
recollec
tion
87:7
recommen
d
88:19,24
record
4:2 5:12
11:24
14:21
15:20
20:22
21:3

41:17,20
42:16
50:18
68:1
72:3,6
85:13,16
89:3,5
red
43:17
refer
5:22
16:23
30:22
34:8
referenc
e
42:1
45:15
referenc
ed
84:20
referrin
g
11:18
14:22
73:22
reflects
64:3,20
reflex
56:1,3,
10
regulati
ons
34:16
relate
73:3,14
related
36:1
72:18
73:12

relates
53:10
63:20
relating
36:17
38:10
46:10
62:14
72:12,22
77:18
relationship
59:24
relevant
46:9
71:14
73:4
77:2
relocate
23:6
remains
49:2
55:2
60:6
63:5,16
remember
14:25
33:1,4
75:17
77:7
79:19,21
86:5,19
87:21
Remote
4:1
remove
67:9
renewed
21:6
repeat
30:24

44:24
repercussion
58:5,8
repercussions
58:14,21
59:10
rephrase
7:17
report
11:6,17
12:12,14
14:20
16:1
25:15
34:7,9
36:9
37:16,22
38:13,
17,23
39:2
40:23
41:4,24
42:1
46:4
47:3
48:8,10
51:1
60:15
61:9
66:11,13
69:2,12
70:9
77:4
86:23
87:1
reporter
4:11,22
reports
38:10

represent
4:14  6:3
representative
70:1
86:9
representing
4:10
70:2
reputation
59:25
require
63:9
67:9
resignation
59:7
resigned
59:6,12
61:13
resigns
68:12
resistance
17:10
46:10
74:25
76:19
79:5
80:15,
16,24
resistance/4h
45:21
resisting
47:24

resolution
61:23
resolved
61:9
respect
22:4
46:2
49:9
59:17
65:12
66:17
71:6
72:20
73:10
79:3
84:5
responded
37:3
responding
25:14
response
17:9
45:21
46:10
60:11
63:9
67:8
74:25
responses
7:21,25
71:22
76:18
77:18,21
79:15
responsibilities
28:4

responsibility
28:2
39:15,
18,21
responsible
31:13
34:3
restrictions
45:22
46:16
result
60:23
64:19
79:15
retain
57:10,21
retire
33:12,18
returned
26:3,19
review
6:11
10:5,7,
12,16
17:3
18:12,13
30:15
31:13
36:16
38:13,16
39:8
47:12
48:9
69:23
87:1
reviewed
16:25
17:6,8
18:19,22

19:20
38:5,9
52:3
reviewing
35:9
36:1
47:16
revised
57:3
59:18
revisions
72:21
rewrite
88:24
rights
8:5
61:16
69:18
71:1
risk
53:20
road
25:13,
22,23
26:3
Robinson
4:5 15:4
16:22
role
20:18
25:17
35:2
71:11
75:19
76:2
roles
25:8
28:10
40:18

room
  9:22
rosters
  17:12
rotating
  25:18
rotation
  29:22
rule
  7:10
  56:1
rules
  6:19
  34:15
  60:19
run
  75:2,23
  76:2,9
run-down
  27:8
running
  28:11
  75:12
  76:20
  79:7,8
  81:13,24

―――――――
      S
safety
  47:22
scenario
  75:10,15
  77:7
  78:17
  81:20
  82:1,5
  88:11
scenario
-type
  77:13

scenario
s
  74:22
  76:9
  77:1,4
  81:15,24
scene
  64:13
Schmidt
  20:9
  21:10
  22:8
school
  17:18
  23:13,
  16,23
  24:23
  77:3
schools
  76:16
screen
  11:11
  14:17
  15:11,
  15,22
  34:9
  87:6
scroll
  11:22
  12:13
  14:19
seconds
  14:9
section
  34:12
  35:17
  52:12
  66:12
sense
  6:25
  7:12,17

66:8
70:19
71:24
73:24
75:4
76:8
83:2
sergeant
  25:23,24
  26:1
  30:14,17
  34:24
  55:10
sergeant
s
  27:14,15
  30:3,18
  35:6
seriousn
ess
  39:20
  57:12
service
  25:15
  30:6
  35:18
services
  30:19
  32:22
set
  47:7
  49:21
  54:17
setting
  7:7,8
  76:15
severity
  47:22
share
  16:24
  41:23

sheds
  75:22
shoot
  50:7
  76:7,8
  81:12,25
  82:1
shooter
  17:19
  77:1,5
shooting
  6:11
  20:11
  29:1
  32:2
  34:5
  38:11,21
  39:9,13
  73:2
  81:13
  84:11,19
shooting
s
  84:4,15
short
  26:18
  41:19
  68:5
  70:17
  72:5
  85:15
shorter
  83:25
shot
  49:12,18
show
  13:22
  18:4
showed
  68:21
showing

68:8
86:19
shown
  87:5
shrink
  37:6
shrugs
  7:23
side
  6:18
  70:24
sign
  42:18,19
signatur
e
  12:15,
  21,24,25
  16:7,10,
  14,16
  42:18
  69:7
signed
  41:3
  69:1
signing
  39:2
silly
  65:10,22
  66:7
similar
  28:12
  42:5
simply
  6:10
simuniti
on
  81:8
simuniti
ons
  75:17

76:25
81:25
sir
  5:19,21
  6:8,13
  7:1,13
  8:1,9
  10:6,15,
  19 11:3,
  8,16,19
  12:4,17
  13:8,16
  14:4,12
  16:8,13,
  17,21
  17:2
  18:20
  19:10
  20:13
  21:8,14,
  17 22:6,
  23 23:5
  24:1,16
  25:3,7
  26:20
  27:10,24
  28:7,17,
  21,23
  29:9,18
  30:12,
  16,21
  31:9,15
  32:3,15,
  20 33:9
  34:6,20,
  23 35:1,
  16 36:3,
  18
  37:15,
  19,23
  38:1,4,
  8,12,22
  39:3,7,

10,14,
19,23
40:2,7,
11,15,21
41:2,6
42:3,11,
23 43:1,
8 44:4,
6,17,20
46:12
47:10
48:23
49:25
57:15
60:2
61:17
62:17
64:23
66:14,
19,24
69:9
75:8
80:9
84:22,25
85:4,8,
22 86:24

**situatio
n**
44:13
45:2
52:25
54:1
63:11
67:10
73:22
76:22
79:14
80:24
81:15,21
82:3,4

**situatio
ns**
81:23

**sixth**
33:24
83:14
**size**
15:5
**slicing**
75:25
**slow**
79:17
**softy**
83:18
**sound**
13:2
**sounds**
25:4
26:17
**speak**
10:24
19:23
22:9,12
37:3,9
**speaking**
7:12
8:13
**special**
25:19,25
**speciali
st**
30:6
**specific
ally**
46:6
64:5
72:18,22
73:3,12
84:5
**specific
s**
80:5
**spelling**

88:21
**spent**
25:13
**split**
28:4
**spoke**
20:1
21:15,18
**spray**
81:18
**spreadsh
eet**
18:2,5
**stage**
27:20
**standard**
47:7,12,
15 48:17
49:22
65:7
**standard
s**
11:6,13
26:8,12,
14,24
27:2
28:8,13,
15,19,24
29:2,6,
8,11,15,
20 30:1,
20,23
31:5,6,
7,11,18
32:22
33:5,7
60:16
62:15
69:11
**standpoi
nt**

58:23
**start**
14:19
78:3
**started**
64:11
**starting**
37:8
**starts**
15:4
75:12
**state**
5:11
23:3,6
34:16
45:10
54:4
60:20,22
62:20
**stated**
61:1
**statemen
t**
36:11
48:3
61:14,
19,22
70:16,25
71:18
**statemen
ts**
35:25
**states**
35:18
45:13
47:8
48:14
49:17
50:23
51:14
52:13

53:9
54:14
59:21
60:17,20
63:7
67:17
**status**
62:3
**statutes**
34:17
**Stayed**
26:7
**STENOGRA
PHER**
4:24 5:3
23:8
89:4,9
**step**
39:1
**stint**
26:18
**stints**
31:12
**stop**
16:24
33:20
75:10
**stopping**
81:13
**stops**
74:22
77:14
**straight**
14:7
**stress**
76:22
77:15
78:5
**strike**
44:8

52:1
**striking**
49:18
**stuff**
17:20
20:25
25:16
78:11
80:20,22
81:2
84:16
**stun**
51:16
55:9,16
62:24
63:10
67:6,10
**subdivis
ions**
60:21
**subject**
8:13
53:16,21
76:14
79:6
84:9
**submitte
d**
69:1
**Subsecti
on**
53:9
**subseque
nt**
42:14
73:2
**substanc
e**
21:22

Charles Demmon
07/10/2025

substantive
  18:14
sudden
  80:23
sufficient
  62:20
suggested
  57:5
  59:19
summaries
  37:17
summarize
  21:1
summary
  10:9
  11:5,18
  14:15
  16:25
  27:17
  37:21
  61:2
  70:9,11,
  14,18
supervisor
  25:22
  76:12,15
supervisors
  37:4
supervisory
  76:9
support
  46:24
  62:8

supported
  67:19
suppose
  8:10
Supreme
  47:8
surrounding
  36:22
surroundings
  78:4
suspect
  73:23
  74:12
  75:11
suspects
  74:9
suspension
  58:15
sustain
  46:25
sustained
  43:6,11
  46:2
  57:2
  60:14
  62:1,8,
  13
  63:19,
  23,25
swear
  4:22,24
switched
  28:9
sworn
  5:7

32:10
sympathetic
  56:1,3,
  10

————————
       T
tab
  19:2,4
tabs
  19:1
tactics
  78:10
taker
  25:15
taking
  6:9
  35:24
talk
  11:4
  41:25
  75:9
  82:2
talked
  19:19
talking
  11:10
  13:24
  73:16
talks
  78:20
taser
  54:9,15
  55:20
  56:5
  57:24
  63:21
  73:17
  75:16
  80:17,18
  81:16,17

taught
  55:8
  57:25
  75:13
  77:20
  79:16
  81:12
techniques
  79:17
  81:2
  82:2
telling
  56:11
Telly
  30:14
  34:24
ten
  36:8
  83:5
term
  73:21
termination
  58:16
  60:24
terms
  13:18
  15:16
  17:14
  21:3
  22:1
  27:9
  28:2
  36:14
  58:20
  59:10
  63:20
  71:5
  75:9
  79:13
  81:4

82:18
terrible
  65:17
testified
  5:7
  40:19
  55:11
  87:9
testify
  22:1
testimony
  54:19
  56:19
  78:19
  86:13
  87:4
  88:19
thing
  15:14
  19:15
  25:15
  30:10
  67:17
  75:3
  76:17,23
  78:11
things
  7:8,23
  9:5
  22:19
  24:14
  30:7
  32:12
  35:8,10,
  12  42:8
  58:17,19
  68:5
  73:14
  77:16
  78:5

79:11,21
  80:6,7
thinks
  65:19
thought
  71:16
  84:1
threat
  47:22
  48:21
  49:13
  52:20
  53:3
threats
  81:14
three-
day
  82:24
til
  26:10
time
  4:3  5:16
  7:3  8:3,
  17  21:23
  26:18,21
  27:21
  29:8,15,
  21  30:1,
  19  31:11
  32:24
  33:12,14
  39:5
  40:12
  41:15
  56:15
  57:24
  60:15
  61:8,25
  62:24
  63:21
  67:7
  71:24

72:2
73:6,8,
18 74:2,
6,7 75:6
78:9
85:7
89:7,10
**times**
6:17
8:18
69:19
82:6
83:5
**Titusville**
4:20
5:17 6:5
11:12
18:1
19:24
20:7
23:16,
18,20,23
24:18
25:1
27:6
32:21
34:15
37:13
43:14
52:8
57:3
59:17
60:15
64:20
68:11,13
72:11
74:18
75:7
81:4
82:13
84:5
86:2,10

87:24
88:10
**TJ**
28:1
80:2
**today**
4:11
6:10,20
7:3,21
8:17
9:8,20
10:14
11:11
13:15
16:23
19:21
49:2
50:4
51:8
55:2
60:6
62:4
63:5,16
86:2,4,
13 87:2,
4,14
88:8
**today's**
4:7 7:24
8:24
10:1
19:25
22:9,17
**told**
35:22
51:18
69:19
71:10
**tongue**
82:9
**top**
43:6

47:4
77:11
**totality**
52:15
53:13
**track**
30:8
**traffic**
25:16
26:5
74:22
75:10
77:14
**trailed**
11:1
54:5
**train**
56:20
74:19
82:5
88:11
**trained**
56:17
62:22
67:5
**trainers**
20:25
**training**
10:9
17:14,
16,17,
18,19,
21,23
18:9,14,
19
19:17,18
20:3,8,
18,24
21:4,10
30:2,7,9
31:21
33:3

35:11
42:14,15
55:15
57:10,21
63:20
72:10,
16,17,
21,25
73:11
75:5,23
77:14
80:3
81:3
82:14,
19,21,
24,25
88:8
**trainings**
17:11,25
20:20,
21,23
21:5
74:21
**transcript**
19:5,7,
9,12
20:2
21:16
88:18,21
89:4
**transcripts**
10:10,11
18:21,
22,24
38:2
70:20
**transfer**
63:8
67:7

**transition**
80:17,22
**transitioning**
80:13
**travel**
30:6
**trigger**
56:6,7,
8,9
**Trimaria**
84:24
**true**
36:12
48:3
67:17
82:8
**truth**
4:25 5:1
**turn**
28:11
**Tyler**
28:1
**type**
35:23
76:8,17
77:5,6,
16 79:10
80:23
**types**
76:3
**typical**
8:4
**typically**
8:13
29:25
65:19

_____

**U**

**ultimate**
64:25
66:16
**unbecoming**
64:6
**underlined**
43:6
**underneath**
57:8
59:21
62:18
**understand**
6:6 7:15
8:8 27:6
34:1
42:20
50:14
65:1,15
69:16
**understanding**
64:24
65:4
71:3
82:13
85:1
**understood**
39:20,24
70:8
78:19
**undertook**
39:21

| | | | | |
|---|---|---|---|---|
| **union** | **version** | **violatio** | **Wonderfu** | **wrote** |
| 70:1,2 | 12:18, | **ns** | **l** | 46:3 |
| **unique** | 19,21 | 57:4,7, | 23:22 | 66:21 |
| 42:18 | 13:5,6, | 13 | 24:25 | 86:23 |
| **unit** | 12,14 | 59:11,19 | **Wood** | |
| 25:20 | 14:14 | 67:15 | 54:20 | ——————— |
| **United** | 15:3 | **volume** | 55:10 | **Y** |
| 45:13 | 70:9 | 56:22 | **word** | **year** |
| 47:8 | **versus** | | 87:6 | 27:4 |
| 60:19 | 4:6 28:5 | ——————— | **words** | 77:2 |
| **Universi** | 80:15 | **W** | 44:10 | 81:9,10 |
| **ty** | **video** | **wait** | **work** | 84:21 |
| 24:5,8 | 7:24 | 7:9,10 | 35:7 | **years** |
| **Unnecess** | 10:12,13 | 8:6 | **worked** | 20:17 |
| **ary** | 14:6 | **waive** | 29:19 | 24:23 |
| 43:15 | 35:10 | 88:18 | **workers** | 25:10,13 |
| **unprofes** | 38:6,7 | **walk** | 59:25 | 26:7,22 |
| **sional** | 52:3 | 8:19 | **working** | 40:14 |
| 64:15 | 70:22 | 83:19 | 33:20 | 80:18 |
| 65:22 | 89:2,3,7 | **wanted** | 84:9 | 87:23 |
| **unquote** | **video-** | 70:3,6 | **works** | **yesses** |
| 47:7 | **recorded** | 71:16 | 35:8 | 7:21 |
| **unsatisf** | 4:4 | **watch** | **worries** | **Yesterda** |
| **actory** | **viewing** | 78:6 | 68:6 | **y** |
| 62:16 | 15:16 | 80:7 | **Wright** | 9:15 |
| **utilize** | **violated** | **weapon** | 18:25 | **younger** |
| 51:16 | 55:15 | 51:18 | 28:1,3 | 23:1 |
| ——————— | **violatio** | 80:11 | 54:21 | |
| **V** | **n** | 81:5,16 | 55:10 | ——————— |
| **variables** | 43:17, | **week-** | 80:2 | **Z** |
| **s** | 20,23, | **long** | 82:12 | **Zoom** |
| 48:6 | 24,25 | 82:24 | **Wright's** | 4:7 |
| **variety** | 44:1,11 | **white** | 19:8 | |
| 38:9 | 46:3 | 66:2 | **written** | |
| **vehicle** | 57:2,18 | **wife** | 44:15 | |
| 74:23 | 58:4,7, | 41:9 | 45:16,17 | |
| 75:11 | 13 59:16 | 83:10,19 | **wrong** | |
| **verbal** | 60:14,21 | **witnesses** | 33:21 | |
| 7:21,25 | 62:1 | **s** | 73:4,14 | |
| | 63:25 | 36:24 | 84:24 | |
| | 65:13,20 | | | |