# EXHIBIT 3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:23-cv-01313-PGB-LHP

JAMIYAH ROBINSON, as Personal
Representative of the ESTATE
OF JAMES LOWERY, Deceased,

      Plaintiff,

vs

JOSHUA NATHAN PAYNE, individually
and as an agent and employee of
the Titusville Police Department,
and CITY OF TITUSVILLE, FLORIDA,

      Defendants.
_____


VIDEO-RECORDED REMOTE DEPOSITION OF
TYLER WRIGHT


VOLUME 1 (Pages 1 - 79)


Friday, July 11, 2025
10:40 a.m. - 12:13 p.m.


LOCATION:  Remote via Zoom
Titusville, Florida



STENOGRAPHICALLY REPORTED BY:
CINDY A. LAYER, CSR


Job No.  412339

Page 2

1  APPEARANCES:  (All parties appearing via Zoom.)
2
3  ON BEHALF OF THE PLAINTIFF:
4
          HART, McLAUGHLIN & ELDRIDGE, LLC
5         One South Dearborn, Suite 1400
          Chicago, Illinois 60603
6         (312) 955-0545
          BY:  JOHN MARRESE, ESQUIRE
7         jmarrese@hmelegal.com
8
   ON BEHALF OF JOSHUA PAYNE:
9
10        ROBERTS, REYNOLDS, BEDARD & TUZZIO, PLLC
          470 Columbia Drive, Suite C101
11        West Palm Beach, Florida 33409
          (561) 688-6560
12        BY:  JAMES JIMENEZ, ESQUIRE
          jjimenez@rrbpa.com
13
14 ON BEHALF OF CITY OF TITUSVILLE:
15
          ROPER, TOWNSEND & SUTPHEN, P.A.
16        255 S. Orange Avenue, Suite 750
          Orlando, Florida 32801
17        (407) 897-5150
          BY:  DAVID JADON, ESQUIRE
18        djadon@roperpa.com
19
20
21
22 Also present:  Stephan Hoog, videographer
23
24
25

---

Page 3

1              I N D E X
2
3  Tyler Wright                        PAGE
4
5     Direct Examination by Mr. Marrese      5
6     Cross-Examination by Mr. Jimenez      70
7     Cross-Examination by Mr. Jadon       71
8
9  CERTIFICATE OF OATH                      76
10 CERTIFICATE OF REPORTER                  77
11 READ AND SIGN LETTER                     78
12 ERRATA SHEET                             79
13
14
15         INDEX OF EXHIBITS
16 NO.        DESCRIPTION             ID
17 1       Composite of pages from file    56
18 2       Transcript of interview         56
19 STENOGRAPHER NOTE: Exhibits retained by counsel
20
21
22
23
24 (Stenographer's note:  All exhibits were received
25 and marked at the conclusion of the deposition.)

---

Page 4

1  Remote proceedings began at 10:40 a.m.:
2          VIDEOGRAPHER:  We are now on the record
3  for the video deposition of Commander Tyler
4  Wright.  Today's date is July 11th, 2025.
5  The time is 10:40 a.m. as indicated on my
6  video screen.  The caption of the case is
7  Jamiyah Robinson, et al, versus Joshua
8  Nathan Payne.  Case Number
9  6:23-CV-01313-PGB-LHP.  This deposition is
10 being recorded remotely.
11         My name is Stephan Hoog.  I'm the legal
12 video specialist with Lexitas Chicago.  At
13 this time counsel present will identify
14 themselves and whom they represent.
15         MR. MARRESE:  John Marrese for
16 plaintiff.
17         MR. JIMENEZ:  James Jimenez for
18 Defendant Joshua Nathan Payne.
19         MR. JADON:  David Jadon on behalf of
20 City of Titusville and Commander Wright.
21         VIDEOGRAPHER:  Thank you.  Our court
22 reporter today is Cindy Layer.  Can you
23 please swear in the witness?
24         STENOGRAPHER:  Do you swear to tell the
25 truth, the whole truth, and nothing but the

---

Page 5

1  truth?
2          THE WITNESS:  Yes, I do.
3          STENOGRAPHER:  Thank you.
4  WHEREUPON,
5          T Y L E R   W R I G H T
6  was called as a witness and, after having been
7  first duly sworn, was deposed and testified as
8  follows:
9              DIRECT EXAMINATION
10 BY MR. MARRESE:
11         Q.   Good morning.  Would you please state
12 your name for the record?
13         A.   Yes.  Tyler Wright, W-r-i-g-h-t.
14         Q.   Commander Wright, my name is John
15 Marrese.  We met a moment ago.  I represent the
16 plaintiff in litigation filed against former
17 Officer Joshua Payne and the City of Titusville.
18 I'm here to take your deposition in that lawsuit.
19 You understand that you are not a defendant or
20 being sued in that lawsuit, correct?
21         A.   Correct.
22         Q.   All right.  Thank you.  We're here
23 today to focus on primarily an interview you gave
24 in conjunction with the professional standards
25 division review of the shooting in this case, and

Page 6

1  then also my general understanding is that you are
2  someone with a great deal of training experience at
3  a general level and then also some experience in
4  particular with Officer Payne.  Is that all
5  generally fair?
6      A.  Yes, sir.
7      Q.  Thank you.  In terms of depositions in
8  a civil case, have you ever sat for one before?
9      A.  No, not through civil.
10     Q.  Okay.  Just a couple of ground rules
11 that will govern our conversation today.
12 Everything that we say is being transcribed by the
13 court reporter, Ms. Layer, who's on the screen.
14 This deposition is also being videotaped, but for
15 clarity sake and for the sake of the transcript
16 that results, please continue to give verbal
17 responses to my questions as you have been as
18 opposed to head nods, or shakes, or shrugs, or
19 things like that.  Does that make sense?
20     A.  Understood.  Yes, sir.
21     Q.  Thank you.  Everything that you testify
22 today is under oath just like it was if you were
23 testifying in court in front of a judge or jury.  I
24 know you understand that.  Is that fair?
25     A.  Yes, sir.

Page 7

1      Q.  Thank you.  You may hear objections to
2  my questions from time to time today.  That's
3  perfectly typical and a normal part of the process.
4  It's just the lawyer trying to preserve his record.
5  After the objection is done I'll ask you to answer
6  my question anyway if you understand it.  Does that
7  make sense?
8      A.  Yes, it does.
9      Q.  Okay.  If you don't understand
10 something I ask you, which I'm sure will happen at
11 some point today, sometimes it's just because I ask
12 a bad question, sometimes it's just a tough
13 subject, whatever, you let me know and I'll
14 rephrase the question so it's more understandable.
15 Okay?
16     A.  Got it.
17     Q.  All right.  Let's think.  You can take
18 a break any time you want today and really as many
19 breaks as you want, just let me know.  Okay?
20     A.  Okay.
21     Q.  The only exception will be if I've
22 asked you a question, I'll ask you to answer it
23 before we take a break.  Okay?
24     A.  Understood.
25     Q.  And last guideline for today is, you

Page 8

1  are here to testify about what you know, and so I
2  won't ask you to guess, or speculate, or anything
3  like that.  Okay?
4      A.  Understood.
5      Q.  All right.  Did you -- well, let me
6  preface this by saying, I don't want to know what
7  you and your attorney, Mr. Jadon, talked about or
8  any other attorney that you prepped with in
9  advance, but I will ask you some questions just to
10 figure out what you did to prepare for today's
11 deposition.  Okay?
12     A.  Okay.
13     Q.  Did you meet with an attorney to
14 prepare for today's deposition?
15     A.  Yes, I did.
16     Q.  Who did you meet with?
17     A.  Mr. Jadon.
18     Q.  When did that meeting occur?
19     A.  Yesterday we briefly spoke, and then we
20 met -- I'm trying to get my days right here.  I
21 want to say it was sometime this week.  I just got
22 back from vacation.  I was out of the area, so I'm
23 trying to remember what day it was that we met, but
24 it was sometime this week, I believe.
25     Q.  Okay.  Thank you very much.  How long

Page 9

1  did that meeting last this week?
2      A.  Give or take, an hour.
3      Q.  Did you review any documents in
4  preparation for today?
5      A.  Yes, I did.
6      Q.  What did you review?
7      A.  I don't know how many pages it was, but
8  it was my -- he's commander now, but Lieutenant
9  Demmon at the time, his typed summary of my
10 interview for the internal investigation that he
11 ran.
12     Q.  There's actually -- I've seen that
13 typed summary.  You're talking about the summary
14 that's a part of his 107 page PSD report?
15     A.  Yes.
16     Q.  That's the professional standards
17 division report that I was referring to, right?
18     A.  Correct.
19     Q.  Okay.  And there's also actually a
20 fully transcribed document of your interview.
21 There's actually a transcription of a full
22 interview in another place that was produced to us
23 in the case.  Did you take a look at that?
24     A.  Oh, actually, I misspoke.  I reviewed
25 the transcription part of my interview, not the

Tyler Wright
07/11/2025

Page 10

1  typed portion.  Sorry.
2       Q.   That's okay.  Do you have that
3  transcription with you today?
4       A.   Yes, I do.
5       Q.   The transcription that I have for you
6  is 25 pages long.  Is that the same as the one you
7  have?
8       A.   Yes, it is.  26 if you count the cover
9  page, basically being sworn in.
10      Q.   Yeah.  Okay.  Great.  We'll look at
11 that at some point today.  Thank you.  Other than
12 your transcribed interview, did you review any
13 other documents to prepare for today?
14      A.   No, I did not.
15      Q.   Did you review any of the Axon video or
16 body cam video in preparation for today in
17 particular?
18      A.   No, I did not.
19      Q.   Back in 2022 when you were interviewed
20 by now Commander Demmon, you looked at some of the
21 body cam relating to this shooting as a part of
22 that interview, correct?
23      A.   Yes, that's correct.
24      Q.   And have you looked at it since that
25 time?

Page 11

1       A.   Not that I can recall.
2       Q.   Thank you.  Other than meetings or
3  discussions with your attorney, did you speak with
4  anyone else about today's deposition?
5       A.   It would have been briefly when I got
6  the notification of today's depo I went to
7  Commander Demmon, because I've never been a part of
8  civil, so I just asked, hey, what's going to be my
9  involvement, and then to get the copies of the
10 transcription.
11      Q.   Okay.  Great.  And other than your
12 transcript, you said you didn't review any body cam
13 or anything like that particularly in preparation
14 for today.  Did you listen to any audio or do
15 anything else to prepare for today?
16      A.   No, sir.
17      Q.   Did you do any internet searches, any
18 Googling, any media searches about the case to
19 prepare for today?
20      A.   No, sir.
21      Q.   Have you seen the actual complaint, the
22 lawsuit that my client filed that generated this
23 case?
24      A.   No, I have not.
25      Q.   Okay.  Thank you.  How old are you,

Page 12

1  Commander Wright?
2       A.   You're going to make me do math.  I
3  think 38.  I don't keep track of my age.  I was
4  born in 1987.
5       Q.   You're only as old as you feel.
6       A.   Yeah, 38.
7       Q.   All right.  Great.  And you live in the
8  State of Florida, obviously?
9       A.   Yes.
10      Q.   And in terms of your plans today, you
11 plan to continue to be a law enforcement officer
12 with the City of Titusville for the foreseeable
13 future?
14      A.   Yes, I do.
15      Q.   No plans to relocate in terms of your
16 permanent residence outside of the State of
17 Florida?
18      A.   No plans.
19      Q.   Were you born in Florida?
20      A.   No.
21      Q.   Where were you born?
22      A.   Utah.
23      Q.   What brought you out to Florida?
24      A.   I was -- parents relocated at a young
25 age, pretty much still an infant, due to work.

Page 13

1       Q.   Was that in or around the Titusville
2  area?
3       A.   Yes.
4       Q.   And I want to talk with you briefly
5  about any educational background that you had.  Did
6  you graduate high school in Florida?
7       A.   Yes, I did.
8       Q.   Where did you graduate from?
9       A.   Astronaut High School in Titusville.
10      Q.   After high school did you attend any
11 further schooling?
12      A.   It might have been a few college
13 classes here and there, and then I jumped into the
14 law enforcement academy.
15      Q.   The few college classes you took, was
16 that at a local college, or community college, or
17 whatever?
18      A.   Yes.  It would have been -- at the time
19 it was called Brevard Community College.  It is now
20 Eastern Florida State College.  But it was BCC
21 then.
22      Q.   Thank you.  Did you receive any degrees
23 or certificates from then Brevard County Community
24 College?
25      A.   Not for like your AA or AS or anything

Page 14

1  like that, but there was a certificate from the
2  academy through them for the law enforcement
3  academy.
4      Q.  Thank you.  What year did you receive
5  that certificate?
6      A.  That would have been 2007, beginning of
7  2007.
8      Q.  When did you first begin working for
9  the Titusville Police Department?
10     A.  That would have been in January or
11 February of 2007.  I think I was sworn in
12 February 5th, 2007.
13     Q.  The law enforcement certificate you got
14 through the Brevard Community College, were you
15 already with the Titusville Police Department at
16 that time, or is that something you get before you
17 apply?
18     A.  I put myself through, and then it was
19 roughly halfway through when I started putting
20 applications in.  I think it was, give or take,
21 October or November when I learned that Titusville
22 would be hiring me, but I wasn't on-boarded and
23 officially hired until, I believe, January of 2007.
24     Q.  Have you worked for the Titusville
25 Police Department continuously since that time?

Page 15

1      A.  Yes, I have.
2      Q.  Fantastic.  Have you ever been in the
3  United States military?
4      A.  No, I have not.
5      Q.  Can you take me through -- I know
6  you're a commander as of today in the Titusville
7  Police Department, correct?
8      A.  Yes.
9      Q.  Can you take me through the positions
10 that you held from 2007 up to the present?  I know
11 it's a number of years, so take your time.  I just
12 want to understand what you did professionally.
13     A.  Yes.  So 2007 through 2009 I was an
14 officer assigned to patrol.  I was assigned to
15 midnights those two years.  In February of 2009 I
16 transferred to the criminal investigations division
17 as a detective.  2009 through 2013 I was in that
18 position as a detective, and there was a blend from
19 roughly 2010 or 2011 until the time in 2013 that I
20 was duel sworn through ATF, Alcohol, Tobacco and
21 Firearms as a, I think they called them special
22 agents, doing part-time task force stuff.
23     And then I believe it was May of 2013 I was
24 promoted to the rank of corporal, which it the
25 lowest line level supervisor in our department.

Page 16

1  Went back to patrol as a patrol corporal for two
2  years running patrol -- or working in a patrol
3  capacity.  And then some of that was a blend where
4  I was assigned to our crime suppression unit which
5  focused on like violent crime, and persons of
6  interest, not just patrol, but, you know, specific
7  focus area.  That was maybe a three or four-month
8  stint.
9      And then I believe it was May of 2015 I was
10 promoted to the rank of sergeant, went back to
11 midnight patrol, and for about two years I ran
12 midnight patrol shift as a sergeant.  That brings
13 us to, I believe it was May 2017, I transferred,
14 still as a sergeant, but I went to the professional
15 standards division as a background investigator and
16 recruiter, was also going to be helping with
17 accreditation stuff here and there, but that was
18 very short.  That was only three months.
19     At that time I came out of that spot as an
20 acting lieutenant, went back to patrol from -- I
21 want to say that was August of '17 to January of
22 '18 I was an acting lieutenant.  January of 2018
23 then I was promoted to lieutenant.  2018 through
24 end of 2022 I was lieutenant for patrol operations
25 running a shift, sometimes two shifts at a time.

Page 17

1      Then there was a blend in there where I was
2  running special operations, which consists of
3  traffic, traffic unit, canine unit, school resource
4  officers -- there's something else on special
5  operations.  Oh, and kind of going back, sorry,
6  2010 through beginning of 2023 I was on our
7  department SWAT team.  In 2015 I was a team leader.
8  2019 to '20, somewhere around there, I was a team
9  commander.  And then that would have been part of
10 special operations -- SWAT fell under that part as
11 well.  I believe that was everything on that side.
12     January of 2023 I was promoted to the rank
13 of major, and I transferred to the professional
14 standards division leading that area, which
15 consists of backgrounds, recruiting, training,
16 accreditation, kind of HR component, working with
17 our city HR.  Held that assignment from January of
18 2023 through December 30th of 2024.  Then
19 December 30th of 2024 I was promoted to the rank of
20 commander and transferred to operations, which
21 consists of patrol, investigations, communication
22 center, forensics, or our evidence section, and
23 code enforcement.
24     Q.  Thank you very much.  That's the
25 position that you continue to serve in today?

Page 18

1    A.   Yes.

2    Q.   As a part of that role, I assume
3  everyone within patrol ultimately reports to you;
4  is that fair?

5    A.   Everyone within operations.  So patrol,
6  investigators, our crime scene and forensic
7  section, communications, which is our dispatchers,
8  code enforcement, feels like about 90 percent of
9  the department.

10   Q.   Okay.  Thank you.  I understand there's
11 the Chief of Police John Lau, there's another
12 commander, Commander Demmon, whom we spoke with
13 yesterday.  Is there someone -- anyone between you
14 two and the chief of police in terms of the
15 hierarchy?  I can't recall.

16   A.   Yeah, we have a deputy chief.

17   Q.   Who's the deputy chief right now?

18   A.   Todd Hutchinson.

19   Q.   Thank you.

20   A.   You're welcome.

21   Q.   Just briefly to confirm, you have never
22 spoken with Officer Josh Payne, or former officer
23 now, about the shooting incident in this case,
24 correct?

25   A.   No, I have not.

Page 19

1    Q.   Thank you.  You have had involvement in
2  training in your nearly two decades with the
3  Titusville Police Department both as someone who
4  has received training, and then someone who has
5  actually acted as an instructor providing training
6  to other law enforcement officers; is that fair?

7    A.   Yes.

8    Q.   We'll look at a number of documents
9  during today's deposition.  It will be the bulk of
10 our focus.  But I wanted to ask you, some of the
11 documents, you know, include lesson plans for
12 different training operations, and training
13 exercises, and things like that, and you actually
14 authored some of them; is that correct?

15   A.   Yes.

16   Q.   When did you first start taking on that
17 kind of responsibility?

18   A.   It would have been around 2014, I
19 believe, and I think I started with the defensive
20 tactics, getting certified as a defensive tactics
21 instructor, one of the high liability topics.
22 There might have been -- I'm trying to go back to
23 the SWAT side too because there might have been
24 some topics that I helped like teach with, but I
25 don't think I wrote any lesson plans back then.  I

Page 20

1  probably just helped the main instructor.

2    But I would be confident saying 2014 and on
3  would be involved with beginning to write lesson
4  plans, and going to the general instructor
5  techniques class and things, starting to get all
6  these certifications.

7    Q.   And you continue to do that today in
8  some capacity?

9    A.   I don't think I've wrote a lesson plan
10 probably in the last year, year and a half, give or
11 take, because my responsibilities have kind of
12 changed and I've started taking a back seat to some
13 of this stuff and letting other people, but I
14 certainly could.

15   Q.   That makes sense.  Basically, you're a
16 commander now, obviously a lot of responsibility
17 that comes with that, not as much time you're going
18 to be spending with those responsibilities doing
19 the actual training or preparing the actual lesson
20 plans for training officers; is that fair?

21   A.   Correct.  Yeah, that's fair.

22   Q.   All right.  Would you agree with me
23 that in the period leading up to the time that
24 Mr. Payne shot James Lowery, the incident that's at
25 issue in this case, he was involved in a foot

Page 21

1  pursuit of Mr. Lowery?

2    A.   Yes.

3    Q.   And I want to talk about foot pursuits
4  in particular in terms of the training that Officer
5  Payne would have received.  First question, did
6  Officer Payne receive training as it relates to
7  foot pursuits of a suspect?

8    A.   We don't have like a specific lesson
9  plan for foot pursuits, but those type of
10 incidences fall under a ton of different topics
11 that we train and teach on.

12   Q.   Okay.  Can you tell me what training
13 topics would be relevant in terms of instruction
14 relating to foot pursuits?

15   A.   Sure.  Specifically physiological and
16 psychological response to stress, or dynamic
17 response to stress.  De-escalation techniques.  I'm
18 trying to remember the other term off the top of my
19 head.  But those two I gave you are intertwined
20 within most of our topics that we discuss and talk
21 about.

22   Q.   In terms of physiological and
23 psychological response to stress, what training was
24 Officer Payne provided?

25   A.   I mean, specifically, if we're talking

Page 22

1  just about those topics, we talk about what the
2  body does during stress, during those
3  psychological/physiological responses to your heart
4  rate, to the cortisol, adrenaline.  But to branch
5  out from that, there's firearms training, taser
6  training, defensive tactics training, handcuffing,
7  use of the baton, even flashlight.
8       Then we have scenario-based training,
9  simunitions.  I know there's a few other ones off
10  the top of my head.  Chemical spray, OC spray.
11  Yeah, those are about the main ones that are, you
12  know, bouncing off my head right now.
13       Q.   Thank you.  In terms of what the body
14  does in response to stress, what is it that Officer
15  Payne was taught?
16       A.   If your heart rate is going up, you
17  can't combat it, control it, that
18  physiological/psychological response, you tend to
19  get the tunnel vision where your cognitive ability
20  kind of starts to diminish, your hearing could go
21  away, you could lose the fine and gross motor
22  movement skills with your hands, and simple little
23  things that used to be simple, because you're in
24  that high stress environment are no longer simple
25  to get yourself through.

Page 23

1       Q.   Was he taught ways of dealing with
2  those physiological responses?
3       A.   Yes.
4       Q.   What was he taught in that respect?
5       A.   Specifically in my topics was like
6  healthiness, proper food nutrition diet, exercise
7  regime, specifically doing cardiovascular
8  exercises, kind of like mental preparedness-type
9  stuff, like starting to walk yourself through
10  things, visualizing-type stuff, stuff like that.
11  That was specifically my area that I focused on.
12       Q.   In terms of mental preparedness and
13  walking yourself through things, what did you
14  instruct in particular in that respect?
15       A.   There's videos out there all over the
16  place, you know.  Officers on their own time, they
17  were encouraged and spoken to about go out there,
18  find these videos, watch them, break them down,
19  find out where things started going wrong.  Even if
20  it was a picture perfect one, try to pick things
21  apart to see, you know, what could have been done
22  better.
23       We teach this good, better, best philosophy
24  here, and so a lot of it was on their own, to go do
25  on their own, to put themselves in that mindset so

Page 24

1  if they were ever presented with similar scenarios,
2  then they could draw back on what they watched on
3  their own.  And then also the scenario-based
4  training that we put them through, trying to put
5  them through real-life style scenarios, whether we
6  found them online or they're our own incidences
7  that we were trying to recreate.
8       Q.   And beyond finding videos -- when you
9  say findings videos, I assume you mean online, or
10  on YouTube.  There's various -- I personally seen
11  law enforcement instruction videos or things --
12  whatever.  You can find almost everything on
13  YouTube.
14       A.   Correct.
15       Q.   Is that the kind of thing you're
16  talking about, going out and doing searches like
17  that?
18       A.   Correct.
19       Q.   Okay.  Beyond that and the
20  scenario-based training, is there anything else
21  that they would have -- that Payne would have been
22  instructed with respect to mental preparedness?
23       A.   That's all I can think of specifically
24  on my topics.
25       Q.   Okay.  Thank you.  Are you aware of

Page 25

1  anything else that someone else would have
2  instructed when it comes to dealing with the body's
3  response to stress?
4       A.   Yeah, like I said, a lot of our topics
5  are intertwined.  I know in taser it's covered.
6  Physiological/psychological defensive tactics, we
7  covered it, which was my topic.  Firearms was one
8  of my topics, so it's covered in there.  It's
9  something that we've always tried to intertwine
10  with all these topics that are intertwined even
11  though they're broken apart into subtopics.
12       Q.   That makes sense.  In terms of firearm
13  training, and in particular dealing with potential
14  physiologic or psychological responses to stress,
15  what did you instruct as a part of that firearm
16  training?
17       A.   It should have been all the same lines:
18  Heart rate, controlling your breathing, vision
19  focus, stuff like that.  Trying to keep --
20  basically keeping the heart rate down so you can
21  see clearly, hear clearly, think clearly.  And
22  then, obviously, out in the field when we're doing
23  the training at the range, we try to get their
24  stress up as well.
25       Q.   Thank you.  Was Officer Payne

Page 26

1  instructed that foot pursuits of suspects in
2  particular could cause those kinds of physiologic
3  or psychological reactions?
4      A.    It basically fell under any type of
5  resistance that our officers were faced with.
6  Their response options, they will go through some
7  type of physiological/psychological response of
8  their own.
9      Q.    And is a fleeing suspect considered a
10 type of resistance?
11     A.    Yes.
12     Q.    Okay.  And in terms of discussing
13 physiologic or psychological response to forms of
14 resistance, what would Officer Payne have been
15 instructed in terms of dealing with that?
16     A.    If I'm understanding your question
17 correctly, it's, again, the heart rate, trying to
18 control the stress, control the breathing, keep the
19 heart rate at a decent area to where that specific
20 person can function through it, see things clearly,
21 hear things clearly, feel and understand things
22 clearly.
23     Q.    When you say -- and you've said it a
24 number of times in terms of trying to control your
25 breathing is that -- I guess what I just -- what I

Page 27

1  think is logical in terms of interpreting it,
2  focusing on your breathing so it's controlled and
3  you're intaking air and expelling air like you
4  would, you know, or as best you would normally?
5      A.    Yeah.  And the specific term we use is
6  tactical breathing, and everybody has different
7  versions of it, but we try to stick to the same
8  thing here where it's a controlled breath in for so
9  many seconds, hold, controlled breath out, and then
10 repeat the process, and that naturally helps your
11 body start calming down and keeping your heart rate
12 low.
13     Q.    Thank you.  Is there any prohibition on
14 unholstering or carrying your firearm while
15 involved in a foot pursuit?
16     A.    There's no prohibition, and we never
17 say never.  We do give the good, better, best
18 options.  If you're running after somebody, it's
19 best to probably have your hands clear, but each
20 scenario and each situation is going to be
21 different.  If it's a person with a gun, I can't
22 tell that person it's a bad choice to unholster
23 your gun and run after somebody.  It just depends.
24 Each scenario is different.
25     Q.    The Titusville Police Department,

Page 28

1  though, as of the December 2021 shooting in this
2  case, did instruct that while running it might not
3  be the best option to be carrying a firearm?
4      A.    It's -- I would say yes.  Again, we
5  cover -- it's all scenario dependent, what they're
6  seeing and all that type of stuff, but -- and I
7  believe specifically we also break it down to
8  running with a handgun and running with a rifle are
9  two different things because the rifle is easier to
10 control the muzzle versus the handgun having a such
11 a short barrel it's a little harder.  So, again,
12 everything was situational-dependent depending on
13 the call for service, type of crime, all that type
14 of stuff.
15     Q.    Why -- you know, and -- let's start
16 with the understanding.  You've testified it's
17 scenario dependent, and obviously every scenario is
18 a little different, so your decisions in those
19 scenarios may differ, right?  I mean, we can't
20 account for every possible permutation of a
21 situation, if I'm understanding what you're saying
22 generally, right, why you never say never type of
23 thing, right?  We're on that page?
24     A.    Right.  And it goes to what a
25 reasonable officer on scene is seeing, feeling,

Page 29

1  hearing, thinking.
2      Q.    And why might in certain scenarios it
3  might not be the best practice or even a good
4  practice to be in a foot pursuit while carrying
5  your firearm?
6          MR. JADON:  Form.  You can answer.
7      A.    Sorry.  Say that one more time.
8  BY MR. MARRESE:
9      Q.    Yeah.  Would you agree with me that in
10 certain circumstances it's not a good idea to be
11 carrying your firearm while in a foot pursuit?
12     A.    Correct.
13     Q.    And why might that be?
14     A.    Simply because, you know, you're
15 running, heart rate could be going up, high stress,
16 and those sympathetic reflexes could possibly
17 happen if you're running with a firearm in your
18 hand and violating any of the firearm safety
19 cardinal rules.
20     Q.    What is sympathetic reflex?
21     A.    The uncontrolled -- basically the
22 uncontrolled movement of your hand.  If I'm a
23 right-handed -- say I'm a right-handed shooter and
24 the handgun is in my right hand, and I go to grab
25 something with my left hand, under stress I might

Page 30

1  squeeze my right hand, you know, clinch it. And,
2  again, if you're violating one of the cardinal
3  range rules, then that could cause the firearm to
4  go off.
5      Q.   So in the scenario you just described
6  in defining sympathetic reflex, you're really
7  talking about an accidental discharge of the
8  firearm, right?
9      A.   Correct.
10     Q.   Okay. Would you agree with me that
11 running with a firearm can increase the chances
12 that you make a bad intentional decision to shoot
13 your firearm?
14          MR. JADON: Form.
15          MR. JIMENEZ: Join.
16     A.   I'd have to say no on that one, if I'm
17 understanding your question correctly.
18 BY MR. MARRESE:
19     Q.   Let me ask it a few different ways. So
20 there are scenarios where you're at the shooting
21 range and your two feet are firmly planted, you're
22 able to square up to your target and discharge your
23 firearm, right?
24     A.   Okay.
25     Q.   Okay. In terms of the possibility of

Page 31

1  bad -- strike the question. It was going to be
2  bad.
3          There are situations where you're running
4  with a firearm and you're pursuing a suspect,
5  right?
6      A.   Okay.
7      Q.   Okay. Comparing a situation where
8  you're firmly planted, you're squared to your
9  target and you're not running after a suspect,
10 would you agree that the likelihood of making the
11 wrong decision with respect to discharging your
12 firearm increases when you're running with the
13 weapon after a suspect?
14     A.   I would say it depends on if the --
15 mainly the one cardinal rule of firearm safety is
16 violated, then potentially yes.
17     Q.   What is that cardinal rule?
18     A.   Having your finger on the trigger at
19 any time you don't intend to pull the trigger.
20     Q.   Okay. Now, when you're in a foot
21 pursuit following a suspect, you know, typically
22 you can expect your heart rate to be higher as
23 compared to when you're firmly planted and not
24 running after a fleeing suspect; is that fair?
25     A.   Yes.

Page 32

1      Q.   There's exceptions to everything, but
2  typically speaking you'd agree with that?
3      A.   Correct.
4      Q.   Even if you are trained to control your
5  breathing during a foot pursuit and you do a good
6  job at doing that, the same is likely true that
7  your heart rate and the stresses you're
8  experiencing on average are going to be higher when
9  you're in a foot pursuit of a suspect as opposed to
10 when you're firmly planted somewhere; is that fair?
11     A.   Yes.
12     Q.   Does -- typically speaking, does that
13 increased physiological response during a foot
14 pursuit make it more likely that you're going to be
15 dealing with more factors that affect the ability
16 to make a good decision about shooting as compared
17 to a situation where you're firmly planted?
18          MR. JADON: Form.
19          MR. JIMENEZ: Join.
20     A.   I will say to that answer, it depends
21 on the person. It depends on their amount of
22 training, how much they train on theirselves, their
23 mental preparedness, their mental mindset. That's
24 where it's situation-dependent on the person. It
25 could change the decisionmaking capabilities.

Page 33

1  BY MR. MARRESE:
2      Q.   Now, and so I understand that in law
3  enforcement, really probably like anything else in
4  life, some people are naturally better than others,
5  some people work harder at it than others, some
6  people really listen and focus on their training
7  and do things outside the office to get better at
8  it, whereas some don't. There's different
9  variables that make, you know, one person versus
10 another better or worse at various tasks. Do we
11 agree on that as a baseline?
12     A.   Correct, and that's yes for every
13 profession.
14     Q.   For sure. So I guess my question is,
15 just taking your average patrol officer, would you
16 expect them -- would you expect the decision as to
17 whether to shoot as to be confronting more
18 difficult variables while running with the firearm
19 pursuing a suspect as opposed to be firmly planted
20 with your weapon pointed?
21          MR. JADON: Form.
22          MR. JIMENEZ: Join.
23     A.   I would say no to that, if I understand
24 the question correctly.
25 BY MR. MARRESE:

Tyler Wright
07/11/2025

Page 34

1     Q.    Why not?
2     A.    Because our department, we train moving
3  and shooting.  That's pretty much the first thing
4  we do.  We try to get them out of the mindset of
5  firmly planted and basically point shooting.
6  Really the only time we do that is when we do the
7  qualifications when they're standing still for the
8  most part.  Everything else is moving and shooting,
9  left, right, forward, backwards, diagonally.
10           We try to put that training and mindset on
11  them in our department here for that, so that's why
12  I would say no for the decision to shoot or not
13  shoot while running with a handgun could be
14  diminished or not diminished.
15     Q.    Okay.  Thank you.  Let's talk about the
16  training that the Titusville Police Department did
17  as of December 26, 2021 in terms of moving and
18  shooting.  What was done in that respect?
19     A.    So our -- specifically our new hire
20  training is roughly, give or take, 20 hours spread
21  across three days where two of those days and, give
22  or take, 16 hours are all hands-on out in the field
23  at the range.  There's -- in the lesson plan that
24  I'm sure you have, there's four to six handgun
25  courses of fire that involve moving and shooting.

Page 35

1  They all have their different titles.
2           I'm trying to go back in my memory of what
3  they are right now, but those are all specifically
4  moving and shooting forward, backwards, right,
5  left, diagonal.  And that's just the handgun
6  portion.  And then there's also moving and shooting
7  courses of fire with a rifle as well.
8     Q.    In this case on the body camera video
9  we can see that former Officer Payne runs up to a
10  fence, reaches over it and shoots.  That was
11  something that was at issue in this case.  Would
12  you agree?
13     A.    Reaches over and the firearm goes off,
14  yes, I would.  Yes.
15     Q.    Do you train in the moving and shooting
16  drills for that kind of scenario?
17     A.    No.
18     Q.    And why not?
19     A.    Because if we're talking about trying
20  to jump something, or climb up something, or pull
21  yourself over something, good, better, best, you're
22  going to want your hands clear.
23     Q.    What if you're not going to climb or
24  jump over something, do you teach shooting by
25  reaching over an object, like a fence or things

Page 36

1  like that?
2     A.    We teach shooting around things.  I
3  guess a fence could be over, but we teach shooting
4  around, so like cars, barrels, areas that provide
5  the officer either some form of cover or
6  concealment.  We teach that.
7     Q.    Has the Titusville Police Department
8  trained at carrying both a firearm and a taser in
9  two hands at the same time?
10     A.    Yes.
11     Q.    What is that training?
12     A.    That would be specifically like
13  transition drills.
14     Q.    What are those?
15     A.    Like you might have your taser out,
16  situation changes from less lethal to lethal and
17  you need to come out with your firearm, so
18  transition drill would be bringing that taser down
19  completely out of the way, or holstering and going
20  to your other tool, or the taser's ineffective, et
21  cetera.  But transitioning out of that tool, lethal
22  or less lethal, to the other option, whatever might
23  be going back and forth.
24     Q.    So the training does not encourage
25  having both drawn at the same time; is that fair?

Page 37

1     A.    You could have them both drawn at the
2  same time, but drawn and pointing them both in the
3  same direction is discouraged and not trained on.
4     Q.    Wouldn't having them drawn at the same
5  time even if not pointed at the same time run the
6  risk of that sympathetic reflex that you've
7  discussed?
8           MR. JADON:  Form.
9           MR. JIMENEZ:  Join.
10           THE WITNESS:  Good to answer?
11           MR. JADON:  Yeah.  Yeah, you can
12  answer.
13     A.    No.  It's situational dependent, but
14  no.  If the taser is in your left hand and the
15  situation changes from less lethal to lethal, and
16  you bring your less lethal hand completely down and
17  out of the way, or bring it into your chest and you
18  come out strong hand with just the handgun only.
19  BY MR. MARRESE:
20     Q.    In that circumstance you would not run
21  a greater risk of a sympathetic reflex where you
22  pull the wrong weapon?
23     A.    Trying to remember what you asked here.
24  In my opinion, no.
25     Q.    Okay.  And so what is specifically

Page 38

1  discouraged is pointing both a lethal and less
2  lethal weapon at the same time?
3      A.  Yes, by the individual person
4  themselves, yes.
5      Q.  Is running with both a lethal and less
6  lethal weapon drawn at the same time discouraged?
7      A.  From what I recall, yes.
8      Q.  Is it prohibited?
9      A.  I don't recall if that's in the
10  training or the policy itself, but, I mean, that's
11  something we don't train on.
12      Q.  When you say it's something you don't
13  train on, do I understand you to mean it's not
14  something that you're training law enforcement
15  officers to do?
16      A.  Correct.
17      Q.  You might not tell them this is
18  prohibited, never run with the taser in one hand
19  and the firearm in another, but you're not training
20  them to affirmatively do that?
21      A.  Correct.
22      Q.  How would an officer know that he or
23  she should not do that?
24      A.  It goes back to our good, better, best
25  practices, and, again, it goes to situational.

Page 39

1  Maybe they are running with their taser out and it
2  turns to lethal, so then they would be going
3  through that transition, so it could happen there.
4  We always talk about holstering is the best option.
5  Depending on what's happening in front of you and
6  what you're seeing, you might not be able to get
7  back reholstered, but...
8      Q.  If you transition from less lethal to
9  lethal and had the opportunity, the proper practice
10  is to holster the less lethal at that point?
11      A.  The preferred, yes.
12      Q.  Would Officer Payne have been
13  instructed that?
14      A.  Yes, he would have, but I don't believe
15  that fell in any of my lesson plans.  That probably
16  would have been specifically the taser training
17  portion, and that wasn't one of my areas of
18  teaching.
19          MR. MARRESE:  Let's take a break, and
20      we'll come back and start to look at some of
21      the documents.  We can come back at --
22          MR. JADON:  12:05?
23          MR. MARRESE:  Yeah.  That's perfect.
24          MR. JADON:  I was about to ask for a
25      break too, so thank you.

Page 40

1          VIDEOGRAPHER:  Going off the record at
2      10:58 a.m.
3          (A short recess was taken.)
4          VIDEOGRAPHER:  We are back on the
5      record at 11:07 a.m.
6  BY MR. MARRESE:
7      Q.  Commander Wright, I'm sharing my screen
8  with you right now.  Can you see the screen?
9      A.  Yes.
10      Q.  This is Page 4 of binder -- of Book 3,
11  excuse me, of the internal investigation of Joshua
12  Payne's shooting in this case.  And it's a summary
13  table of various trainings that Joshua Payne
14  received at the Titusville Police Department.  Do
15  you see that?
16      A.  Yes, I do.
17      Q.  Okay.  Have you seen this kind of
18  summary table before?
19      A.  Yes, I have.
20      Q.  So this tells us that the officer
21  received these particular trainings in the
22  particular general orders listed at the particular
23  signature times listed?
24      A.  Yes.
25      Q.  Okay.  And so in both July of 2020 and

Page 41

1  November of 2021 Officer Payne would have received
2  the general orders relating to response to
3  resistance?
4      A.  Yes.
5      Q.  And what does that mean?  Does it mean
6  he receives them and signs off on them that he's
7  read them, or does he receive training in
8  conjunction with that?  What does it mean?
9      A.  This looks like the summary table for
10  our Power DMS, which holds our policies, and this
11  would be when he was either reassigned it to sign
12  off on it and acknowledge it, or they were revised
13  and then you sign off on the revision.
14      Q.  Okay.  Thank you.  So this is in
15  particular confirming that Officer Payne had
16  access, could have reviewed and should have
17  reviewed the general orders listed at the times he
18  signed off on them?
19      A.  Correct.
20      Q.  Okay.  Thanks.  I'm going to move in
21  the same binder to the fifth page, which is -- it's
22  a firearms qualification standard document for
23  Joshua Payne, and you are the instructor who signed
24  off on that in July 2020, correct?
25      A.  Yes.

Tyler Wright
07/11/2025

Page 42

1     Q.   And what does this represent?
2     A.   That is FDLE's form.  It's called the
3  86A form.  It is their qualification standard for
4  handgun, which is a -- we just switched it, so I'm
5  trying to remember, but I believe this is a
6  40-round -- yeah, 40-round course.  This was their
7  qualification course at the time to qualify a
8  specific officer with a specific handgun.
9     Q.   Okay.  And as the instructor signing
10 off on this, are you actually present for that
11 proficiency exam?
12    A.   Yes.
13    Q.   So you actually watched Officer Payne
14 fire his weapon in the various stages identified
15 here?
16    A.   Yes.
17    Q.   On the second page of this -- well,
18 strike that.  It's actually the 6th page in Book 3
19 still.  This is an individual weapon and firearm
20 tracking sheet, and you've signed off as the range
21 officer for Joshua Payne here, correct?
22    A.   Yes.
23    Q.   And you've written some instructor
24 notes in there?
25    A.   Yes, I did.

Page 43

1     Q.   In one of them a bullet point says,
2  "Needs to work on trigger control on both handgun
3  and rifle."  Do you see that?
4     A.   Yes, I do.
5     Q.   What did that mean?
6     A.   Throughout his day, based on where the
7  rounds were landing on the qualification target, I
8  could tell he was kind of slapping the trigger and
9  he wasn't focusing on that trigger control
10 technique to have the basic -- you know, fire
11 instructor terms -- but have that group of shot
12 placements like nice and tight, basically.  So that
13 was a common theme for him during that training
14 was, hey, work on your trigger control, nice, slow
15 trigger pulls versus slapping the trigger to
16 control your shot placements.
17    Q.   And the point of that is to be more
18 accurate with your shots?
19    A.   Correct.
20    Q.   This Page 7 of the same book, do you
21 see the instructor notes you've written there?
22    A.   Yes.
23    Q.   Can you read those?
24    A.   Yeah.  I'm trying to read my
25 handwriting here.  I believe it says, "Rifle, needs

Page 44

1  to stay familiarized with weapon controls and sight
2  picture alignment."
3     Q.   What does that mean?
4     A.   So weapon controls, the safety lever,
5  the on/off for the safety selector switch, could
6  have been that.  It could have been the magazine
7  release control.  It could have been the charging
8  handle.  Another part of the weapon control is the
9  magazine release catch.  And then sight picture
10 alignment, basically proper lining up the front and
11 rear aperture, especially with distance shooting.
12 If you could scroll up for me --
13    Q.   Yes.
14    A.   -- so I can see okay what you got --
15 okay.  So he had this version Colt which would have
16 had a rear aperture on it that should have given
17 him two options of a larger hole on the rear sight
18 and a smaller hole, so a sight picture alignment
19 between those two different holes in that appar --
20 I want to say apparatus.  That's not right.
21 Aperture.  So that's what I'm meaning by that in a
22 short, brief note.
23    Q.   Thank you.  On Page 11 there's a
24 document, Lesson Plan Cover Sheet.  You see this?
25    A.   Yes.

Page 45

1     Q.   It was prepared by a Sergeant Hamann.
2  Are you familiar with Hamann?
3     A.   Yeah, it's Hamann.
4          MR. MARRESE:  H-a-m-a-n-n, for the
5  record.
6  BY MR. MARRESE:
7     Q.   This particular lesson plan cover sheet
8  says, in terms of its scope and course objective,
9  "Provide practice for officers in the area high
10 liability.  Patrol activities such as building
11 searches, utilizing force on force, real-time
12 feedback."  And then it lists a number of
13 objectives.
14          Question, in terms of high liability, you
15 used that word earlier today, can you just define
16 for the jury what that means?
17    A.   Sure.  High liability is -- high
18 liability patrol activities would be those response
19 to resistance in scenarios, incidents.  Could be
20 certain calls for service.  For example, domestic
21 calls for service, those are some of the most
22 dangerous ones we respond to, so that could be
23 considered a high liability patrol activity.
24          A high-risk style traffic stop, depending on
25 if you know who's in the car, what the car is

Tyler Wright
07/11/2025

Page 46

1  related to, et cetera.  Those could fall under high
2  liability patrol activities.
3       Q.   Is it referred to as high liability in
4  reference to the likelihood that you or somebody
5  else could get hurt, or what is that in particular,
6  you know, trying to denote?
7       A.   So Sergeant Hamann wrote this.  If I
8  could speculate --
9       Q.   If you don't know -- if you don't know,
10  you don't know.  I don't want you to guess.
11       A.   Can you repeat your question then?
12       Q.   I was only just trying to understand
13  what in particular high liability is supposed to
14  reference.  You've identified high liability, you
15  know, in my mind as kind of patrol activities
16  involving more dangerous situations; is that fair?
17       A.   Yes.  I gotcha.  I understand what
18  you're asking now.
19       Q.   Okay.  Am I right?  Is my
20  interpretation right, a high liability patrol
21  activity is essentially a more dangerous patrol
22  activity on average?
23       A.   More dangerous on average, yeah, like
24  not your normal, typical, routine style event.
25       Q.   Okay.  The second bullet point

Page 47

1  objectives here says, "Officers will be given the
2  opportunity to practice the fundamentals of contact
3  and cover in dealing with uncooperative subjects."
4  Do you see that?
5       A.   Yes, I do.
6       Q.   What does that mean?
7       A.   Contact and cover, let's see -- it
8  could have a couple different meanings, but for me
9  contact and cover could be multiple officers
10  together at the same time dealing with something,
11  one of them is a contact officer, one of them is a
12  cover officer.
13       So your contact officer is going to be the
14  one speaking with the uncooperative subject or
15  subjects, while the cover officer is the one that's
16  going to be ready to respond to whatever force is
17  presented -- or resistance is presented.  Sorry.
18       Q.   In the next bullet point it says,
19  "Officers will be given the opportunity to practice
20  fundamental firearm skills under increased stress."
21  Do you see that?
22       A.   Yes.
23       Q.   Earlier you talked about increased
24  stress as involving stressful situations where the
25  heart rate might increase, controlling breathing

Page 48

1  and things of that nature.  Is this bullet point,
2  is that the kind of training that you were
3  referring to?
4       A.   Yes, it was.
5       Q.   In terms of fundamental firearm skills
6  under increased stress, what would be taught?
7       A.   Proper grip, sight picture alignment,
8  that proper trigger control, reloads, malfunction
9  drills, moving, walking, moving -- firearm skills
10  while moving, you know, whether it's forwards,
11  backwards, left, right, et cetera.  And then I
12  would also say like firearm safety skills also
13  would be a fundamental firearm skill.
14       Q.   What are those?
15       A.   Those pretty much cardinal rules.  We
16  have four of them here.  Finger not in the trigger
17  until sights are on target and you're wanting to
18  shoot, don't let your muzzle cover anything you
19  don't intend to destroy, treat every weapon as if
20  it's loaded, and know your target and what's behind
21  it.
22       Q.   The next few bullet points talk about
23  stress, including officers will better understand
24  the effects of stress on their minds and body, and
25  officers will be exposed to increased stress in a

Page 49

1  controlled training environment.  Do you see those?
2       A.   Yes.
3       Q.   And the following one talks about the
4  opportunity to practice controlling stress in a
5  training scenario environment.  Do you see that?
6       A.   Yes.
7       Q.   And finally it says, "Officers will be
8  given the opportunity to experience how increased
9  stress will affect them."  Those four bullet points
10  talking about stress and addressing stress, is your
11  understanding that they would be addressing the
12  same things you discussed earlier in terms of
13  controlling breathing, appreciating rises in heart
14  rates, and responding accordingly?
15       A.   Yes, that physiological/psychological
16  dynamic.
17       Q.   Officer Payne would have received this
18  training?
19       A.   I believe so, yes.  He should have, but
20  I don't know if he signed that specific roster.
21       Q.   Okay.  I'm showing you Page 20 of Book
22  3, and this was prepared in November of 2018 by
23  you, Commander Wright.  It's a lesson plan cover
24  sheet.
25       A.   Yes.

Page 50

1    Q.   It relates to firearms instruction,
2    correct?
3        A.   Correct.
4        Q.   There are a number of student
5    performance objectives written as it relates to
6    handguns, rifles, and other equipment.  Do you see
7    that?
8        A.   Yes.
9        Q.   Did you actually write this lesson plan
10   in terms of all these bullet points that were to be
11   a part of this plan?
12       A.   I believe so.  If you scroll up, it
13   should say -- yeah, prepared by me, yes.
14       Q.   One of the bullet points under rifle
15   is -- the second one is understand some of the
16   physiological reactions to combat stress.  Do you
17   see that?
18       A.   Yes.
19       Q.   What would that portion of the
20   instruction have involved?
21       A.   Same philosophy, the
22   physiological/psychological dynamics to stress, so
23   the heart rate, the breathing, the tunnel vision,
24   the audio exclusion -- audio exclusitory (sic)
25   factors.  All the same stuff we've been talking

Page 51

1    about.
2        Q.   And so the physiological reactions, if
3    I've understood your testimony today, they can
4    happen whether you're carrying a taser, a rifle, a
5    handgun.  It's just a function of stress; is that
6    fair to say?
7        A.   Yes.
8        Q.   And the physiological note here is in
9    particular written under the rifle.  I'm just
10   confirming, it's not specific to the rifle.  It
11   just happens to be written under rifle on this
12   lesson plan?
13       A.   Yes.
14       Q.   And there are General Orders 409 and
15   412, firearms in response to resistance referenced
16   in particular in this lesson plan at the bottom of
17   the page.  Do you see that?
18       A.   Yes.
19       Q.   So as a part of this instruction you
20   would be referencing those general orders in
21   teaching law enforcement officers with the
22   Titusville Police Department?
23       A.   Yes.
24       Q.   As a part of this lesson plan -- I'm
25   scrolling up for a second -- there are some --

Page 52

1    well, first, let me ask you:  Did you look at any
2    of this lesson plan in preparation for today?
3        A.   No.
4        Q.   There are diagrams of what appear to be
5    shooter drills.  This first one is called near/far
6    drill with a diagram and then a description in a
7    box below it.  Do you see that?
8        A.   Yes.
9        Q.   And then if you continue on to the next
10   page, this is now -- that was Page 28.  This is
11   Page 29 of Book 3.  There's a shoot and move to
12   cover drill, and it's noted this drill is intended
13   to simulate an attack by an armed subject in a
14   relatively close range.  Do you see that?
15       A.   Yes.
16       Q.   Those are the kinds of simulations that
17   you were referencing earlier in terms of training
18   officers on how to behave in real-world situations?
19       A.   Yes.
20       Q.   I'm showing you now Page 40 of Book 3
21   is a training roster.  One of the officers who
22   signed here is Officer Payne.  It's dated July 27,
23   2020, and you're the instructor -- one of the
24   instructors who signed off on this, correct?
25       A.   Yes.

Page 53

1        Q.   This relates to defensive tactics,
2    A-S-P, or ASP, and handcuffing.  New hire.  Do you
3    see this?
4        A.   Yes.
5        Q.   And de-escalation is also written as
6    one of the topics.  What is A-S-P or ASP?  What
7    does that represent?
8        A.   ASP is -- I forget what ASP stands for,
9    but it's a company that creates handcuffs, batons,
10   and flashlights.  That's what they are.  It's ASP
11   Armament Systems, but I can't remember what ASP
12   stands for.
13       Q.   Thank you.  Page 41, another lesson
14   plan that you prepared entitled Defensive Tactics
15   for Law Enforcement New Hires Begins.  Do you see
16   that?
17       A.   Yes.
18       Q.   If you move to Page 43, as I am, there
19   is discussion about de-escalation, disengagement,
20   escalation, exigent circumstances, objectively
21   reasonable.  Do you see that?
22       A.   Yes.
23       Q.   In terms of de-escalation, what did you
24   teach officers?
25       A.   From what I can recall at that time,

Page 54

1   de-escalation is basically if you have distance and
2   cover in nonfirearm-related incidences -- they
3   could be armed with something else, or not armed in
4   that, but as long as they have distance and cover,
5   then they have time on their side.  They can slow
6   the scene down to get more tools and resources in
7   place, and to also formulate better decisions or
8   better plans to make a better decision.
9       Q.  At Page 9 of Book 3 is another lesson
10  plan prepared by you and a Corporal Watson.  Do you
11  see that?
12      A.  Yes.
13      Q.  The subject of this lesson plan is
14  reality-based training, scenario-based firearms
15  training for first aide, and IFAK.  What was this
16  lesson plan about?
17      A.  If I can kind of just look at the
18  objectives to refresh.
19      Q.  Yeah, let me scroll to those, and I'll
20  try to blow it up a bit.
21      A.  I can see it.
22      Q.  Okay.
23      A.  From what I can recall, this was mainly
24  an IFAK, so that stands for Individual First Aide
25  Kit.  This was mainly an officer medical class for

Page 55

1   themselves should they get injured out in the
2   field.  It was mainly that.  Corporal Watson was
3   running point with that because she's our medical
4   instructor, and then I came to her with the idea of
5   to try to blend some of these trainings on top of
6   each other to help with the psychological and
7   physiological responses.
8       I gave her the idea of bringing in the
9   simunitions style that you see in here.  The
10  security .9 millimeter blank rounds, I gave her
11  that idea to take the level of training she had to
12  kind of level it up a little bit more to provide
13  that stress environment to our officers.
14      Q.  And how did you do that?
15      A.  Through the simunitions gear that we
16  have, simunitions firearms, and we used blank .9
17  millimeter rounds, basically allowing these
18  officers to go into a scenario with most of the
19  tools on their belt for this medical scenario that
20  they were wanting the officers to go through.
21      Q.  Okay.  Earlier in the deposition we
22  talked a bit about sympathetic reflex.  Was it your
23  understanding or impression that Officer Payne's
24  shooting in this case was the result of a
25  sympathetic reflex?

Page 56

1       MR. JADON:  Form.
2       MR. JIMENEZ:  Join.
3       MR. JADON:  You can answer.
4       A.  You said was it my opinion that it was
5   a sympathetic reflex?
6   BY MR. MARRESE:
7       Q.  Did you ever reach a conclusion in that
8   respect?
9       A.  My personal conclusion, yes.
10      Q.  Okay.  You don't know that for a fact,
11  but that was your conclusion, that the shooting was
12  the result of a sympathetic reflex?
13      A.  Yes.
14      Q.  Thank you.  So I'm sharing with you now
15  the transcript I have of your interview with the
16  professional standards division relating to this
17  case, Commander Wright.  It starts at Page 258 of
18  Book 3 and it continues, just for the record, to
19  Page 235, which is Page 283 of Book 3.
20      MR. MARRESE:  We'll mark it as Exhibit
21      2 to this case.  Exhibit 1 will be a
22      composite of the pages we referenced
23      previously.
24      (Exhibit Nos. 1 and 2 were identified
25      for the record.)

Page 57

1   BY MR. MARRESE:
2       Q.  I want to move to Page 7 of the
3   transcript.  There's a question and answer about
4   foot pursuits, and after some introduction it says,
5   "In your training and experience, can you explain
6   an officer's stress level during a high-risk
7   situation involving a foot pursuit, physical
8   altercation with another subject?"
9       And you answer, "Yeah, so with anything, but
10  especially foot pursuits, heart rate goes up.  We
11  talk about, in the training, the different
12  conditions of a person's body.  White, which is
13  like us just sitting right here, our heart rates
14  are normal.  We have condition yellow, condition
15  orange, condition red, condition black, and it's
16  all broken down in between, you know, heart rates,
17  and all that type of stuff, and how a person
18  responds to stress.
19      So, obviously, the higher the heart rate
20  elevation you go without proper training and
21  mindset.  And it's stuff like that, not being able
22  to control your heart rate.  And typically people
23  can tend -- tend to get in that condition black
24  where sometimes they're not able to make rational
25  decisions or anything, or respond to stress

Tyler Wright
07/11/2025

Page 58

1  accurately." Do you see that?
2      A.  Yes, I do.
3      Q.   Is that still an accurate response
4  today as you review it?
5      A.  Yes.
6      Q.   And you've touched on this throughout
7  today's deposition.  The different color conditions
8  you've given to stress levels or heart rate levels:
9  White, yellow, orange, red, black.  Are those
10  things in particular that Officer Payne would have
11  been trained on?
12      A.  Yes.
13      Q.   In conjunction, this is the very same
14  kind of training you talked about earlier in terms
15  of teaching officers how to control breathing, how
16  to recognize the increase in stress and control it?
17      A.  Yes.
18      Q.  Were you ever personally involved in
19  training Officer Payne on managing stress?
20      A.  Yes.
21      Q.   Do you have recollections of how he did
22  during that training?
23      A.   I know we had like a scenario-based
24  training, I think, June of '21, like a
25  reality-based training, and I don't recall having

Page 59

1  any concerns noted with him during that one.  That
2  was a department-wide training.
3      Q.   And the department-wide reality-based
4  training in 2021, was that the active shooter
5  training at the middle school?
6      A.  Yes.
7      Q.  What did that involve?
8      A.   That was -- going off my memory, it was
9  a two-part, like two-part scenario, but basically
10  they were -- my version of training where we
11  changed things was I never liked where it was,
12  okay, today's taser training, so put all your stuff
13  up and it's a taser.  It's spray day, put all your
14  stuff up.  I wanted them to have all their tools on
15  them.
16      So this specific training they had every
17  tool and resource that they would normally have on
18  everyday patrol on their belt, so handgun, spray --
19  I believe the only thing we took away was the baton
20  because it's hard to holster the training baton
21  because it's a big foam baton.
22      But they would have had a simunitions
23  handgun, inert chemical spray.  We had the taser 7s
24  at the time, so they would have had -- I think they
25  were called the Halt cartridge, which are the

Page 60

1  cartridges meant to be deployed on a taser training
2  suit.  They would have had their flashlight, and
3  probably training handcuffs on, if not the real
4  handcuffs.
5      And the whole premise of the training was
6  they get dispatched to a call for service -- there
7  should have been two scenarios in there.  The first
8  scenario should have been the, quote, unquote, SRO
9  calling for, hey, I need another unit here.  A guy,
10  I think, rushed the school or jumped the counter
11  and he's confronting a teacher in a classroom.  And
12  the officer is supposed respond, and then try to
13  find the SRO, gather what information they can, and
14  then there's their scenario and handle it
15  accordingly.  That was scenario one.
16      Q.   There was another scenario?
17      A.   Sorry?
18      Q.   You said there were two scenarios, I
19  think?
20      A.   Yeah.  I believe the second scenario
21  would have been more of like active shooter call
22  for service.  I believe the SRO keys up, I hear
23  active shots happening inside the school.  I need
24  assistance.  And then they respond, and enter
25  through a predetermined door, and they're presented

Page 61

1  with the information they see, hear, smell, et
2  cetera.
3      Q.   We talked about de-escalation a moment
4  ago, and some of what you described in terms of
5  training on that, if I recall correctly, is giving
6  yourself time and distance, which allows you better
7  opportunity to make decisions; is that fair?
8      A.   It's distance and cover.  If you have
9  distance and cover, then generally time is on your
10  side.
11      Q.   And the purpose of having time on your
12  side is to give yourself an opportunity to assess
13  the situation and make the best decision possible?
14      A.   Yeah, assess, make decisions, get other
15  tools, resources, personnel there.
16      Q.   In this case, you watched the body cam,
17  and Officer Payne followed James Lowery to the
18  fence, and ultimately James Lowery jumps the fence
19  followed by the shooting.  You recall that pattern
20  in particular?
21      A.   Yes.
22      Q.   Do you have any criticisms of Officer
23  Payne in terms of his failure to use distance and
24  cover in that situation?
25      A.   Watching that sitting from a controlled

Tyler Wright
07/11/2025

Page 62

1  environment, arm chair quarterbacking, I would have
2  liked to seen something different.  Knowing that
3  Mr. Lowery jumped the fence, knowing everything
4  Officer Payne went through at that time, I feel
5  like things could have been slowed down.
6      Q.  Thank you.
7      MR. MARRESE:  Why don't we take a
8      five-minute break.  I'll come back, and I'll
9      probably have a little bit more questioning,
10      but it's not going to be too long.
11      VIDEOGRAPHER:  We're going off the
12      record at 11:46 a.m.
13      (A short recess was taken.)
14      VIDEOGRAPHER:  We're back on the record
15      at 11:54 a.m.
16  BY MR. MARRESE:
17      Q.  Commander Wright, you reviewed this
18  transcript in entirety before today's deposition at
19  some point this week, correct?
20      A.  Yes.
21      Q.  Was there any answer during that review
22  that you thought was wrong, or that you wished you
23  could change, or anything like that?
24      A.  No.
25      Q.  Let me ask you about a few other items

Page 63

1  in here and we'll be done for today.  At Page 15 --
2  let me pull it back up -- of the transcript you are
3  asked, "So it is reasonable for an officer to point
4  both their taser and their gun at a subject at the
5  same time?"  And you answer, "At the same time, no.
6  That's not reasonable and that's not in line with
7  our training."  Do you see that?
8      A.  Yes.
9      Q.  That's an answer you stand by today?
10      A.  Yes.
11      Q.  On Page 16 you were asked, "All right.
12  So do you provide training involving drawing and
13  pointing both firearm and taser at a subject at the
14  same time?"  And you've answered, "I don't -- I
15  don't train in the taser side, I'm not a taser
16  instructor, but I do know the topics, and I do have
17  conversations about that stuff in trainings.  And,
18  again, we talk about -- we've always talked about
19  one job one hundred percent of the time.  So if
20  you're out on lethal, stay on lethal until it's
21  time to go to something else, put that up, and then
22  you go to some -- your other tool or tactic that
23  you have."  You see that?
24      A.  Yes.
25      Q.  What did you mean by that, if you're

Page 64

1  out on lethal stay on lethal until it's time to go
2  to something else?
3      A.  So one job one hundred percent of the
4  time.  If it's a lethal situation, stay out on
5  lethal.  If it gets de-escalated, whether it's the
6  officer de-escalated it or the subject in question
7  decided to de-escalate on their side as well, you
8  know, maybe they drop the gun and stay away from
9  the gun, then it might be time to transition to
10  something different.  But singularly talking about
11  when you're by yourself, one job one hundred
12  percent of the time.
13      Q.  Does that motto mean that it is the
14  preferred practice not to have both a less lethal
15  and lethal weapon in your hands at the same time?
16      A.  Pointed at somebody at the same time,
17  yes.  There could be scenarios where you might
18  still have a less lethal in your hand as long as
19  you made that decision to index down, do something
20  completely different with it so it's not pointing
21  at the person, it could be possible.  Again, not
22  preferred, but there could be scenarios where it's
23  like that.
24      Q.  On Page 18 of the transcript there's
25  the question here at the top of the page I'm

Page 65

1  showing you, "Okay.  Did anyone that -- do you
2  recall if any of our officers or anyone going
3  through the training scenarios had both their
4  firearm and taser out during the same time, running
5  with them, pointing at them, doing anything like
6  that?"  Answer, "No, they did not."  Question,
7  "Okay.  If you saw that, what would you have done?"
8  Let me stop there for a second.
9      In terms of you answering no, they did not
10  with respect to training scenarios involving
11  officers having their firearms and tasers out
12  during the same time, did you mean that to say that
13  during training there were not any scenarios where
14  any officers were running with both out at the same
15  time?
16      A.  Correct.
17      Q.  The next question is, "Okay.  If you
18  saw that, what would you have done?"  And you give
19  the answer that's stated here, and part of it is,
20  and you can have a second to review that before you
21  answer my question, but part of it is, you're
22  talking about during training stopping the
23  individual at some point and talking about the
24  negative side of doing this, meaning having both
25  out at the same time.  And my question is, what is

Page 66

1  the negative side of doing that?
2      A.   So specifically talking about having
3  both handgun -- or lethal and less lethal in both
4  of your hands pointing, a/k/a dual wielding,
5  pointing it at somebody at the same time, the
6  negative side of that would be bad decision-making,
7  sympathetic reflex, et cetera.
8      Q.   And a bad decision you can make under
9  that circumstance is to shoot someone where that
10  shooting is unjustified because they do not present
11  an imminent lethal threat or an imminent threat of
12  serious bodily harm; is that fair?
13          MR. JADON:  Form.
14          MR. JIMENEZ:  Join.
15      A.   Can you repeat that question?
16  BY MR. MARRESE:
17      Q.   Yeah.  I'll break it down.  You
18  mentioned that, you know, part of the negative
19  sides of carrying both the firearm and taser at the
20  same time is bad decision-making, sympathetic
21  reflex, et cetera.  Do you remember that?
22      A.   Yes.
23      Q.   I'm focusing on the bad decision-making
24  portion of that answer in saying that one of the
25  bad decisions that's possible and is a negative

Page 67

1  side is an unjustified shoot; is that fair?
2          MR. JADON:  Same objection.
3  BY MR. MARRESE:
4      Q.   You can answer.
5      A.   I would say that bad decision would
6  lead to any type of sympathetic reflex that the
7  person didn't intend to do, whether --
8      Q.   Okay.  You're -- I'm sorry.  Finish
9  your answer.  I interrupted.
10      A.   Yeah, like whether they meant to pull a
11  certain trigger on something, you know, lethal or
12  less lethal.
13      Q.   Do you recognize the possibility that
14  carrying both could contribute to the wrong
15  decision to shoot someone intentionally?
16      A.   I think in that stress scenario
17  carrying both, if you meant to deploy less lethal
18  and you're also holding your handgun in your hand,
19  could cause you to have that sympathetic reflex.
20      Q.   So the primary negative is the
21  possibility of a sympathetic reflex; is that fair?
22      A.   Yes.
23      Q.   Okay.  On Page 19 you were asked about
24  use of force reviews that you participated in
25  specifically where an officer at the Titusville

Page 68

1  Police Department displayed both the firearm and
2  taser at the same time, and you talk about an
3  officer Kim LaFrance.  Do you see that?
4      A.   Yes.
5      Q.   That was another officer in the
6  Titusville Police Department that in a real-life
7  situation had pointed both a taser and a firearm at
8  a citizen?
9      A.   If I recall -- I can't remember if both
10  handgun -- or lethal and less lethal, handgun and
11  taser, was indexed and pointed at the lady at the
12  same time, but I do recall she had taser, less
13  lethal, out, and a handgun out.  I don't remember
14  if both of them were pointed at the subject at the
15  same time, or if the firearm was indexed down.
16      Q.   Do you recall what the result -- I
17  assume Officer LaFrance was reviewed and
18  disciplined as a result of that?
19      A.   I'm trying to remember all the facts
20  that happened with that one because there was an
21  appeal, but she's no longer with our agency from
22  all this.  But there was an appeal somewhere, and I
23  don't remember everything that happened with that
24  one.
25      Q.   Okay.  At Page 20 you were asked about

Page 69

1  reviewing the body camera again and whether it's
2  reasonable to have the firearm out during this
3  incident, or to have discharged the firearm in this
4  incident.  And in your answer you say -- again, you
5  can review that answer in full before you answer,
6  but in that answer you stated, "Based on the video,
7  I don't see anything that would show a lethal
8  threat."
9          My question is simply, you stand by that
10  testimony today based on review of Officer Payne's
11  body camera video, correct?
12      A.   I stand by the part where I say, based
13  on the video, I don't see anything that would show
14  a lethal threat, because that's the angle of the
15  camera, and I couldn't tell what was on the other
16  side of the subject's body in that one.
17      Q.   Have you received any information since
18  you gave this interview in early 2022 that would
19  cause you to believe Mr. Lowery presented an
20  imminent lethal threat or imminent threat of
21  serious bodily injury to Mr. Payne?
22      A.   No.
23          MR. MARRESE:  I don't have any further
24  questions right now.  Some of the others may
25  have questions for you.  I really appreciate

Tyson Wright
07/11/2025

Page 70

1  your time this morning.  Thank you.
2          THE WITNESS:  Absolutely.
3          MR. JADON:  James, do you have any?
4          MR. JIMENEZ:  I think I have two quick
5  ones, if that's all right.
6          MR. JADON:  Yeah.  Yeah.  Go ahead.
7              CROSS-EXAMINATION
8  BY MR. JIMENEZ:
9      Q.  Sir, my name is James Jimenez.  I'm the
10 counsel for former Officer Payne in this matter.  I
11 just have a couple quick questions, I think, then
12 we can move on to any questions from your counsel
13 in this matter.
14      I just want to confirm, I think you
15 testified earlier, but you've never spoken to
16 former Officer Payne about this incident?
17      A.  No, I did not.
18      Q.  And aside from the body-worn camera
19 footage, which you reviewed as part of the IA
20 investigation, are you aware of any additional
21 observations, impressions that former Officer Payne
22 may have had during that incident?
23      A.  What he knew at the time, is that what
24 you're asking?
25      Q.  Yes.

Page 71

1      A.  In this, my interview for the IA, I
2  listened to the -- it was either the 9-1-1 call or
3  the dispatched audio to the officers.  I think it
4  was the dispatched audio to the officers, what
5  dispatch relayed to them of what was happening,
6  subject description to include clothing, hair, et
7  cetera, stuff like that.
8      Q.  But nothing beyond that additional
9  audio you heard?
10      A.  No.
11      Q.  Other than the statement you gave
12 during that investigation, did you have any other
13 involvement in that IA investigation?
14      A.  No, I did not.
15          MR. JIMENEZ:  Okay.  That's all I have.
16          MR. MARRESE:  David, any for you?
17          MR. JADON:  Yeah I got a couple
18 questions.  Give me one second.
19              CROSS-EXAMINATION
20 BY MR. JADON:
21      Q.  Commander Wright, as you know, my name
22 is David Jadon.  I'm a lawyer for the City of
23 Titusville.  I have a couple questions for you
24 today on this matter.
25      Do you recall receiving your notice of

Page 72

1  deposition in this case?
2      A.  Yes.
3      Q.  Were you noticed as a corporate
4  representative for today's deposition?
5      A.  No, I was not.
6      Q.  Is it fair to say that all your
7  testimony today has been based on your personal
8  knowledge and/or experience?
9      A.  Yes.
10     Q.  As part of your experience with the
11 Titusville Police Department, you have trained
12 officers; is that fair?
13     A.  Yes, that's fair.
14     Q.  And you've written various lesson
15 plans?
16     A.  Yes.
17     Q.  And in your experience as a trainer
18 with the Titusville Police Department, is it your
19 expectation that officers are to remember the
20 training that they receive?
21     A.  Yes.
22     Q.  Does the department encourage
23 officers -- excuse me.  Let me back up.
24     To your knowledge, does the department
25 encourage officers to train or learn more on their

Page 73

1  own time outside the classroom training that you
2  provided them?
3      A.  Yes, we do.
4      Q.  Do you remember some questions that you
5  received, I think from Mr. Marrese, about shooting
6  and shooting around obstacles?
7      A.  Yes, I do.
8      Q.  Does the -- have you ever trained an
9  officer to shoot when their line of sight is
10 obstructed?
11     A.  No, we do not.
12     Q.  Have you ever trained officers to teach
13 them to run after a suspect when they can no longer
14 see the suspect?
15     A.  We don't specifically train on once
16 they lose sight of the suspect.  There could be a
17 multitude of scenarios.  It could be a corner.  It
18 could be a fence.  But we tell them to slow down
19 and -- threshold kind of is the term we use, get a
20 good pie slice of the corner until you just blindly
21 go around something or over something.
22     Q.  So I guess I'll give you a more
23 specific example.  A suspect is running from an
24 officer, the suspect turns the corner, disappears
25 behind the building.  Would you train the officer

Tyler Wright
07/11/2025

Page 74

1  then to keep running without slowing down and maybe
2  looking around the wall first to see what's, you
3  know, on the other side?
4      A.    Correct, we talk to them about slowing
5  things down and taking their time before going in.
6  Same thing with like building searching, they're
7  not just going to go into an open doorway where
8  they last saw somebody.  They're going to take
9  their time to try to see as much from the outside
10 in before they go in.
11     Q.    Fair to say you taught officers here at
12 Titusville Police Department to not blindly pursue
13 a suspect then?
14     A.    Correct.
15     Q.    Have you ever been involved in foot
16 pursuits personally?
17     A.    Yes, I have.
18     Q.    In your experience involving foot
19 pursuits, have they been exactly the same each
20 time?
21     A.    No, they have not.
22     Q.    In your experience as a trainer with
23 the Titusville Police Department, is it possible to
24 train officers for every circumstance or
25 contingency while they're out in the street or in

Page 75

1  the field?
2      A.    No, that's impossible to do.
3          MR. JADON:  No other questions.
4          MR. MARRESE:  None for me.
5          MR. JIMENEZ:  Nothing for me.
6          VIDEOGRAPHER:  Going off the record at
7      12:13 p.m.  That concludes today's testimony
8      of Commander Wright.
9          (A discussion was held off the record.)
10         STENOGRAPHER:  Can I get any orders if
11     anyone is ordering?
12         MR. MARRESE:  For plaintiff, electronic
13     pdf.  No video at this time.  Thank you.
14         MR. JIMENEZ:  Not at this time, no.
15     (The deposition was concluded at 12:13 p.m.)

Page 76

1              CERTIFICATE OF OATH
2
3  STATE OF FLORIDA   )
                       )
4  COUNTY OF ESCAMBIA )
5
6
7          I, Cynthia Layer, certify that TYLER
8  WRIGHT remotely appeared before me on the 11th day
9  of July 2025, and was duly sworn.
10         Signed this 25th day of July 2025.
11
12
13
14
15
16
17         CYNTHIA LAYER, CSR
           Notary Public, State of Florida
18         My Commission No. HH 341507
           My Commission Expires: 12/14/26
19
20
21
22
23
24
25

Page 77

1              CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA   )
                       )
4  COUNTY OF ESCAMBIA )
5
6          I, Cynthia Layer, CSR, do hereby
7  certify that I was authorized to and did
8  stenographically report the foregoing deposition of
9  TYLER WRIGHT; that a review of the transcript was
10 requested; and that the transcript, pages 1 through
11 75 is a true record of my stenographic notes.
12         I further certify that I am not a
13 relative, employee, attorney, or counsel of any of
14 the parties, nor am I a relative or employee of any
15 of the parties' attorneys or counsel connected with
16 the action, nor am I financially interested in this
17 action.
18         Signed this 25th day of July 2025.
19
20
21
22
23         CYNTHIA LAYER, CSR
           Certified Shorthand Reporter
24
25

Tyler Wright
07/11/2025

Page 78

```
1    July 25, 2025
2    David Jadon, Esquire
     C/o Roper, Townsend & Sutphen, P.A.
3    255 S. Orange Avenue, Suite 750
     Orlando, Florida 32801
4    djadon@roperpa.com
5    WITNESS: Tyler Wright
     RE: Jamiyah Robinson v Joshua Payne, et al
6    Case No: 6:23-cv-01313-PGB-LHP
     Type of Proceeding: Deposition on July 11, 2025
7
     The transcript of the above proceeding is now
8    available and requires signature by the witness.
9    Please e-mail fl.production@lexitaslegal.com for
     access to a read-only PDF transcript and
10   PDF-fillable errata sheet via computer or use the
     errata sheet that is located at the back of the
11   transcript.
12   Once completed, please print, sign, and return the
     the e-mail address listed below for distribution to
13   all parties.
14   If the witness does not read and sign the
     transcript within a reasonable amount of time (or
15   30 days if Federal), the original transcript may be
     filed with the Clerk of the Court.
16
     If the witness wishes to waive his/her signature
17   now, please have the witness sign in the blank at
     the bottom of this letter and return to the e-mail
18   address listed below.
19   Very truly yours,
20
     Cindy Layer, CSR
21   Lexitas
     Fl.production@lexitaslegal.com
22
     I do hereby waive my signature.
23   _____
24   Tyler Wright
25   Job No. 412339
```

Page 79

```
1              ERRATA SHEET
2    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3    In Re: Jamiyah Robinson v Joshua Payne, et al
           Case No.: 6:23-cv-01313-PGB-LHP
4               Tyler Wright
               July 11, 2025
5
     PAGE   LINE   CHANGE              REASON
6          _____
7          _____
8          _____
9          _____
10         _____
11         _____
12         _____
13         _____
14         _____
15         _____
16         _____
17         _____
18   Under penalties of perjury, I declare that I have
     read the foregoing transcript of my deposition and
19   I hereby swear that my testimony therein was true
     at the time it was given and is now true and
20   correct, including any corrections and/or
     amendments listed above.
21
22   _____   _____
     DATE        Name
23
24
25   Job No.  412339
```

| 1 | 2 | | | 7 | |
|---|---|---|---|---|---|

**1**
  56:21,24

**107**
  9:14

**10:40**
  4:1,5

**10:58**
  40:2

**11**
  44:23

**11:07**
  40:5

**11:46**
  62:12

**11:54**
  62:15

**11th**
  4:4

**12:05**
  39:22

**12:13**
  75:7,15

**15**
  63:1

**16**
  34:22
  63:11

**17**
  16:21

**18**
  16:22
  64:24

**19**
  67:23

**1987**
  12:4

**2**
  56:21,24

**20**
  17:8
  34:20
  49:21
  68:25

**2007**
  14:6,7,
  11,12,23
  15:10,13

**2009**
  15:13,
  15,17

**2010**
  15:19
  17:6

**2011**
  15:19

**2013**
  15:17,
  19,23

**2014**
  19:18
  20:2

**2015**
  16:9
  17:7

**2017**
  16:13

**2018**
  16:22,23
  49:22

**2019**
  17:8

**2020**
  40:25
  41:24

**52:23**

**2021**
  28:1
  34:17
  41:1
  59:4

**2022**
  10:19
  16:24
  69:18

**2023**
  17:6,12,
  18

**2024**
  17:18,19

**2025**
  4:4

**21**
  58:24

**235**
  56:19

**25**
  10:6

**258**
  56:17

**26**
  10:8
  34:17

**27**
  52:22

**28**
  52:10

**283**
  56:19

**29**
  52:11

| 3 | |
|---|---|

**3**
  40:10

**42:18**
**49:22**
**52:11,20**
**54:9**
**56:18,19**

**30th**
  17:18,19

**38**
  12:3,6

| 4 | |
|---|---|

**4**
  40:10

**40**
  52:20

**40-round**
  42:6

**409**
  51:14

**41**
  53:13

**412**
  51:15

**43**
  53:18

| 5 | |
|---|---|

**5th**
  14:12

| 6 | |
|---|---|

**6:23-CV-
01313-
PGB-LHP**
  4:9

**6th**
  42:18

**7**
  43:20
  57:2

**7s**
  59:23

| 8 | |
|---|---|

**86A**
  42:3

| 9 | |
|---|---|

**9**
  54:9
  55:10,16

**9-1-1**
  71:2

**90**
  18:8

| A | |
|---|---|

**A-S-P**
  53:2,6

**a.m.**
  4:1,5
  40:2,5
  62:12,15

**a/k/a**
  66:4

**AA**
  13:25

**ability**
  22:19
  32:15

**Absolutely**
  70:2

**academy**

**13:14**
**14:2,3**

**access**
  41:16

**accidental**
  30:7

**account**
  28:20

**accreditation**
  16:17
  17:16

**accurate**
  43:18
  58:3

**accurately**
  58:1

**acknowledge**
  41:12

**acted**
  19:5

**acting**
  16:20,22

**active**
  59:4
  60:21,23

**activities**
  45:10,18
  46:2,15

**activity**
  45:23
  46:21,22

**actual**
  11:21
  20:19

additional
70:20
71:8
addressing
49:10,11
adrenaline
22:4
advance
8:9
affect
32:15
49:9
affirmatively
38:20
age
12:3,25
agency
68:21
agents
15:22
agree
20:22
29:9
30:10
31:10
32:2
33:11
35:12
ahead
70:6
aide
54:15,24
air
27:3
Alcohol
15:20

alignment
44:2,10,
18 48:7
allowing
55:17
altercation
57:8
amount
32:21
and/or
72:8
angle
69:14
answering
65:9
aperture
44:11,
16,21
appar
44:19
apparatus
44:20
appeal
68:21,22
applications
14:20
apply
14:17
appreciating
49:13
area
8:22
13:2
16:7

17:14
23:11
26:19
45:9
areas
36:4
39:17
arm
62:1
Armament
53:11
armed
52:13
54:3
ASP
53:2,6,
8,10,11
assess
61:12,14
assigned
15:14
16:4
assignment
17:17
assistance
60:24
assume
18:2
24:9
68:17
Astronaut
13:9
ATF
15:20
attack
52:13

attend
13:10
attorney
8:7,8,13
11:3
audio
11:14
50:24
71:3,4,9
August
16:21
authored
19:14
average
32:8
33:15
46:22,23
aware
24:25
70:20
Axon
10:15

———————

B
back
8:22
10:19
16:1,10,
20 17:5
19:22,25
20:12
24:2
35:2
36:23
38:24
39:7,20,
21 40:4
62:8,14
63:2
72:23

background
13:5
16:15
backgrounds
17:15
backwards
34:9
35:4
48:11
bad
7:12
27:22
30:12
31:1,2
66:6,8,
20,23,25
67:5
barrel
28:11
barrels
36:4
based
43:6
69:6,10,
12 72:7
baseline
33:11
basic
43:10
basically
10:9
20:15
25:20
26:4
29:21
34:5
43:12

44:10
54:1
55:17
59:9
baton
22:7
59:19,
20,21
batons
53:9
BCC
13:20
began
4:1
begin
14:8
beginning
14:6
17:6
20:3
Begins
53:15
behalf
4:19
behave
52:18
belt
55:19
59:18
big
59:21
binder
40:10
41:21
bit
54:20
55:12,22
62:9
black

57:15,23
58:9
**blank**
55:10,16
**blend**
15:18
16:3
17:1
55:5
**blindly**
73:20
74:12
**blow**
54:20
**bodily**
66:12
69:21
**body**
10:16,21
11:12
22:2,13
27:11
35:8
48:24
57:12
61:16
69:1,11,
16
**body's**
25:2
**body-worn**
70:18
**book**
40:10
42:18
43:20
49:21
52:11,20
54:9
56:18,19

**born**
12:4,19,
21
**bottom**
51:16
**bouncing**
22:12
**box**
52:7
**branch**
22:4
**break**
7:18,23
23:18
28:7
39:19,25
62:8
66:17
**breaks**
7:19
**breath**
27:8,9
**breathing**
25:18
26:18,25
27:2,6
32:5
47:25
49:13
50:23
58:15
**Brevard**
13:19,23
14:14
**briefly**
8:19
11:5
13:4
18:21

**bring**
37:16,17
**bringing**
36:18
55:8
**brings**
16:12
**broken**
25:11
57:16
**brought**
12:23
**building**
45:10
73:25
74:6
**bulk**
19:9
**bullet**
43:1
46:25
47:18
48:1,22
49:9
50:10,14

———————
**C**
**call**
28:13
60:6,21
71:2
**called**
5:6
13:19
15:21
42:2
52:5
59:25
**calling**
60:9

**calls**
45:20,21
**calming**
27:11
**cam**
10:16,21
11:12
61:16
**camera**
35:8
69:1,11,
15 70:18
**canine**
17:3
**capabilities**
32:25
**capacity**
16:3
20:8
**caption**
4:6
**car**
45:25
**cardinal**
29:19
30:2
31:15,17
48:15
**cardiovascular**
23:7
**carrying**
27:14
28:3
29:4,11
36:8
51:4
66:19
67:14,17

**cars**
36:4
**cartridge**
59:25
**cartridges**
60:1
**case**
4:6,8
5:25 6:8
9:23
11:18,23
18:23
20:25
28:2
35:8,11
40:12
55:24
56:17,21
61:16
72:1
**catch**
44:9
**center**
17:22
**certificate**
14:1,5,
13
**certificates**
13:23
**certifications**
20:6
**certified**
19:20
**cetera**
36:21

46:1
48:11
61:2
66:7,21
71:7
**chair**
62:1
**chances**
30:11
**change**
32:25
62:23
**changed**
20:12
59:11
**charging**
44:7
**chemical**
22:10
59:23
**chest**
37:17
**Chicago**
4:12
**chief**
18:11,
14,16,17
**choice**
27:22
**Cindy**
4:22
**circumstance**
37:20
66:9
74:24
**circumstances**
29:10
53:20

| | | | | | |
|---|---|---|---|---|---|
| citizen | 22:19 | 19,23 | condition | continue | conversations |
| 68:8 | college | 14:14 | 57:14, | 6:16 | 63:17 |
| city | 13:12, | company | 15,23 | 12:11 | copies |
| 4:20 | 15,16, | 53:9 | conditions | 17:25 | 11:9 |
| 5:17 | 19,20,24 | compared | 57:12 | 20:7 | corner |
| 12:12 | 14:14 | 31:23 | 58:7 | 52:9 | 73:17, |
| 17:17 | color | 32:16 | confident | continues | 20,24 |
| 71:22 | 58:7 | Comparing | 20:2 | 56:18 | corporal |
| civil | Colt | 31:7 | confirm | continuously | 15:24 |
| 6:8,9 | 44:15 | complaint | 18:21 | 14:25 | 16:1 |
| 11:8 | combat | 11:21 | 70:14 | contribute | 54:10 |
| clarity | 22:17 | completely | confirming | 67:14 | 55:2 |
| 6:15 | 50:16 | 36:19 | 41:15 | control | corporate |
| class | commander | 37:16 | 51:10 | 22:17 | 72:3 |
| 20:5 | 4:3,20 | 64:20 | confronting | 26:18,24 | correct |
| 54:25 | 5:14 9:8 | component | 33:17 | 28:10 | 5:20,21 |
| classes | 10:20 | 17:16 | 60:11 | 32:4 | 9:18 |
| 13:13,15 | 11:7 | composite | conjunction | 43:2,9, | 10:22,23 |
| classroom | 12:1 | 56:22 | 5:24 | 14,16 | 15:7 |
| 60:11 | 15:6 | concealment | 41:8 | 44:7,8 | 18:24 |
| 73:1 | 17:9,20 | 36:6 | 58:13 | 48:8 | 19:14 |
| clear | 18:12 | concerns | considered | 57:22 | 20:21 |
| 27:19 | 20:16 | 59:1 | 26:9 | 58:15,16 | 24:14,18 |
| 35:22 | 40:7 | concluded | 45:23 | controlled | 29:12 |
| client | 49:23 | 75:15 | consists | 27:2,8,9 | 30:9 |
| 11:22 | 56:17 | concludes | 17:2,15, | 49:1 | 32:3 |
| climb | 62:17 | 75:7 | 21 | 61:25 | 33:12 |
| 35:20,23 | 71:21 | conclusion | contact | controlling | 38:16,21 |
| clinch | 75:8 | 56:7,9, | 47:2,7, | 25:18 | 41:19,24 |
| 30:1 | common | 11 | 9,11,13 | 47:25 | 42:21 |
| close | 43:13 | | contingency | 49:4,13 | 43:19 |
| 52:14 | communication | | 74:25 | controls | 50:2,3 |
| clothing | 17:21 | | | 44:1,4 | 52:24 |
| 71:6 | communications | | | conversation | 62:19 |
| code | 18:7 | | | 6:11 | 65:16 |
| 17:23 | community | | | | 69:11 |
| 18:8 | 13:16, | | | | 74:4,14 |
| cognitive | | | | | correctly |
| | | | | | 26:17 |

30:17
33:24
61:5
**cortisol**
22:4
**counsel**
4:13
70:10,12
**count**
10:8
**counter**
60:10
**County**
13:23
**couple**
6:10
47:8
70:11
71:17,23
**courses**
34:25
35:7
**court**
4:21
6:13,23
**cover**
10:8
28:5
36:5
44:24
45:7
47:3,7,
9,12,15
48:18
49:23
52:12
54:2,4
61:8,9,
24
**covered**
25:5,7,8

**creates**
53:9
**crime**
16:4,5
18:6
28:13
**criminal**
15:16
**criticisms**
61:22
**CROSS-EXAMINATION**
70:7
71:19

————

**D**
**dangerous**
45:22
46:16,
21,23
**date**
4:4
**dated**
52:22
**David**
4:19
71:16,22
**day**
8:23
43:6
59:13
**days**
8:20
34:21
**de-escalate**
64:7

**de-escalated**
64:5,6
**de-escalation**
21:17
53:5,19,
23 54:1
61:3
**deal**
6:2
**dealing**
23:1
25:2,13
26:15
32:15
47:3,10
**decades**
19:2
**December**
17:18,19
28:1
34:17
**decent**
26:19
**decided**
64:7
**decision**
30:12
31:11
32:16
33:16
34:12
54:8
61:13
64:19
66:8
67:5,15

**decision-making**
66:6,20,
23
**decision making**
32:25
**decisions**
28:18
54:7
57:25
61:7,14
66:25
**defendant**
4:18
5:19
**defensive**
19:19,20
22:6
25:6
53:1,14
**define**
45:15
**defining**
30:6
**degrees**
13:22
**Demmon**
9:9
10:20
11:7
18:12
**denote**
46:6
**department**
14:9,15,
25 15:7,

25 17:7
18:9
19:3
27:25
34:2,11,
16 36:7
40:14
51:22
68:1,6
72:11,
18,22,24
74:12,23
**department-wide**
59:2,3
**dependent**
28:5,17
37:13
**depending**
28:12
39:5
45:24
**depends**
27:23
31:14
32:20,21
**deploy**
67:17
**deployed**
60:1
**depo**
11:6
**deposed**
5:7
**deposition**
4:3,9
5:18
6:14

8:11,14
11:4
19:9
55:21
58:7
62:18
72:1,4
75:15
**depositions**
6:7
**deputy**
18:16,17
**description**
52:6
71:6
**destroy**
48:19
**detective**
15:17,18
**diagonal**
35:5
**diagonally**
34:9
**diagram**
52:6
**diagrams**
52:4
**diet**
23:6
**differ**
28:19
**difficult**
33:18
**diminish**
22:20

diminished
34:14
DIRECT
5:9
direction
37:3
disappears
73:24
discharge
30:7,22
discharged
69:3
discharging
31:11
disciplined
68:18
discouraged
37:3
38:1,6
discuss
21:20
discussed
37:7
49:12
discussing
26:12
discussion
53:19
75:9

discussions
11:3
disengagement
53:19
dispatch
71:5
dispatched
60:6
71:3,4
dispatchers
18:7
displayed
68:1
distance
44:11
54:1,4
61:6,8,9,23
division
5:25
9:17
15:16
16:15
17:14
56:16
DMS
41:10
document
9:20
41:22
44:24
documents
9:3
10:13
19:8,11

39:21
domestic
45:20
door
60:25
doorway
74:7
draw
24:2
drawing
63:12
drawn
36:25
37:1,2,4
38:6
drill
36:18
52:6,12
drills
35:16
36:13
48:9
52:5
drop
64:8
dual
66:4
due
12:25
duel
15:20
duly
5:7
dynamic
21:16
49:16
dynamics
50:22

———————
E
earlier
45:15
47:23
49:12
52:17
55:21
58:14
70:15
early
69:18
easier
28:9
Eastern
13:20
educational
13:5
effects
48:24
electronic
75:12
elevation
57:20
encourage
36:24
72:22,25
encouraged
23:17
end
16:24
enforcement
12:11
13:14

14:2,13
17:23
18:8
19:6
24:11
33:3
38:14
51:21
53:15
enter
60:24
entirety
62:18
entitled
53:14
environment
22:24
49:1,5
55:13
62:1
equipment
50:6
escalation
53:20
essentially
46:21
et al
4:7
event
46:24
everyday
59:18
evidence
17:22
exam
42:11

EXAMINATION
5:9
exception
7:21
exceptions
32:1
exclusion
50:24
exclusitory
50:24
excuse
40:11
72:23
exercise
23:6
exercises
19:13
23:8
exhibit
56:20,21,24
exigent
53:20
expect
31:22
33:16
expectation
72:19
expelling
27:3
experience

6:2,3
49:8
57:5
72:8,10,
17
74:18,22
**experiencing**
32:8
**explain**
57:5
**exposed**
48:25

---

**F**
**faced**
26:5
**fact**
56:10
**factors**
32:15
50:25
**facts**
68:19
**failure**
61:23
**fair**
6:5,24
18:4
19:6
20:20,21
31:24
32:10
36:25
46:16
51:6
61:7
66:12
67:1,21
72:6,12,
13  74:11

**fall**
21:10
46:1
**familiar**
45:2
**familiarized**
44:1
**Fantastic**
15:2
**FDLE's**
42:2
**February**
14:11,12
15:15
**feedback**
45:12
**feel**
12:5
26:21
62:4
**feeling**
28:25
**feels**
18:8
**feet**
30:21
**fell**
17:10
26:4
39:15
**fence**
35:10,25
36:3
61:18
62:3
73:18
**field**
25:22

34:22
55:2
75:1
**figure**
8:10
**filed**
5:16
11:22
**finally**
49:7
**find**
23:18,19
24:12
60:13
**finding**
24:8
**findings**
24:9
**fine**
22:21
**finger**
31:18
48:16
**Finish**
67:8
**fire**
34:25
35:7
42:14
43:10
**firearm**
25:12,15
27:14
28:3
29:5,11,
17,18
30:3,8,
11,13,23
31:4,12,
15  33:18
35:13

36:8,17
38:19
42:19
47:20
48:5,9,
12,13
63:13
65:4
66:19
68:1,7,
15 69:2,
3
**firearms**
15:21
22:5
25:7
41:22
50:1
51:15
54:14
55:16
65:11
**firmly**
30:21
31:8,23
32:10,17
33:19
34:5
**five-minute**
62:8
**flashlight**
22:7
60:2
**flashlights**
53:10
**fleeing**
26:9
31:24

**Florida**
12:8,17,
19,23
13:6,20
**foam**
59:21
**focus**
5:23
16:7
19:10
25:19
33:6
**focused**
16:5
23:11
**focusing**
27:2
43:9
66:23
**food**
23:6
**foot**
20:25
21:3,7,
9,14
26:1
27:15
29:4,11
31:20
32:5,9,
13 57:4,
7,10
74:15,18
**footage**
70:19
**force**
15:22
45:11
47:16
67:24
**forensic**
18:6

**forensics**
17:22
**foreseeable**
12:12
**forget**
53:8
**form**
29:6
30:14
32:18
33:21
36:5
37:8
42:2,3
56:1
66:13
**forms**
26:13
**formulate**
54:7
**forward**
34:9
35:4
**forwards**
48:10
**found**
24:6
**four-month**
16:7
**front**
6:23
39:5
44:10
**full**
9:21
69:5

**fully**
9:20

**function**
26:20
51:5

**fundamental**
47:20
48:5,13

**fundamentals**
47:2

**future**
12:13

———

**G**

**gather**
60:13

**gave**
5:23
21:19
55:8,10
69:18
71:11

**gear**
55:15

**general**
6:1,3
20:4
40:22
41:2,17
51:14,20

**generally**
6:5
28:22
61:9

**generated**
11:22

**get all**
20:5

**give**
6:16 9:2
14:20
20:10
27:17
34:20,21
61:12
65:18
71:18
73:22

**giving**
61:5

**good**
5:11
23:23
27:17
29:3,10
32:5,16
35:21
37:10
38:24
73:20

**Googling**
11:18

**gotcha**
46:17

**govern**
6:11

**grab**
29:24

**graduate**
13:6,8

**great**
6:2
10:10
11:11
12:7

**greater**
37:21

**grip**
48:7

**gross**
22:21

**ground**
6:10

**group**
43:11

**guess**
8:2
26:25
33:14
36:3
46:10
73:22

**guideline**
7:25

**gun**
27:21,23
63:4
64:8,9

**guy**
60:9

———

**H**

**H-A-M-A-N-N**
45:4

**hair**
71:6

**half**
20:10

**halfway**
14:19

**Halt**
59:25

**Hamann**
45:1,2,3
46:7

**hand**
29:18,
22,24,25
30:1
37:14,
16,18
38:18
64:18
67:18

**handcuffing**
22:6
53:2

**handcuffs**
53:9
60:3,4

**handgun**
28:8,10
29:24
34:13,24
35:5
37:18
42:4,8
43:2
51:5
59:18,23
66:3
67:18
68:10,13

**handguns**
50:6

**handle**
44:8
60:14

**hands**
22:22
27:19
35:22
36:9
64:15
66:4

**hands-on**
34:22

**handwriting**
43:25

**happen**
7:10
29:17
39:3
51:4

**happened**
68:20,23

**happening**
39:5
60:23
71:5

**hard**
59:20

**harder**
28:11
33:5

**harm**
66:12

**head**
6:18
21:19
22:10,12

**healthiness**
23:6

**hear**
7:1
25:21
26:21
60:22
61:1

**heard**
71:9

**hearing**
22:20

29:1

**heart**
22:3,16
25:18,20
26:17,19
27:11
29:15
31:22
32:7
47:25
49:13
50:23
57:10,
13,16,
19,22
58:8

**held**
15:10
17:17
75:9

**helped**
19:24
20:1

**helping**
16:16

**helps**
27:10

**hey**
11:8
43:14
60:9

**hierarchy**
18:15

**high**
13:6,9,
10 19:21
22:24
29:15
45:9,14,
17,23
46:1,3,

13,14,20

**high-risk**
45:24
57:6

**higher**
31:22
32:8
57:19

**hire**
34:19
53:2

**hired**
14:23

**Hires**
53:15

**hiring**
14:22

**hold**
27:9

**holding**
67:18

**holds**
41:10

**hole**
44:17,18

**holes**
44:19

**holster**
39:10
59:20

**holstering**
36:19
39:4

**Hoog**
4:11

**hour**
9:2

**hours**
34:20,22

**HR**
17:16,17

**hundred**
63:19
64:3,11

**hurt**
46:5

**Hutchinson**
18:18

———

**I**

**IA**
70:19
71:1,13

**idea**
29:10
55:4,8,11

**identified**
42:14
46:14
56:24

**identify**
4:13

**IFAK**
54:15,24

**imminent**
66:11
69:20

**impossible**
75:2

**impression**
55:23

**impressions**
70:21

**incidences**
21:10
24:6
54:2

**incident**
18:23
20:24
69:3,4
70:16,22

**incidents**
45:19

**include**
19:11
71:6

**including**
48:23

**increase**
30:11
47:25
58:16

**increased**
32:13
47:20,23
48:6,25
49:8

**increases**
31:12

**index**
64:19

**indexed**
68:11,15

**individual**
38:3
42:19
54:24
65:23

**ineffective**
36:20

**inert**
59:23

**infant**
12:25

**information**
60:13
61:1
69:17

**injured**
55:1

**injury**
69:21

**inside**
60:23

**instruct**
23:14
25:15
28:2

**instructed**
24:22
25:2
26:1,15
39:13

**instruction**
21:13
24:11
50:1,20
51:19

**instructor**
19:5,21
20:1,4
41:23
42:9,23
43:11,21
52:23
55:4
63:16

**instructors**
52:24

**intaking**
27:3

**intend**
31:19
48:19
67:7

**intended**
52:12

**intentional**
30:12

**intentionally**
67:15

**interest**
16:6

**internal**
9:10
40:11

**internet**
11:17

**interpretation**
46:20

**interpreting**
27:1

**interrupted**
67:9

**intertwine**
25:9

**intertwined**
21:19
25:5,10

**interview**
5:23
9:10,20,22,25
10:12,22
56:15
69:18
71:1

**interviewed**
10:19

**introduction**
57:4

**investigation**
9:10
40:11
70:20
71:12,13

**investigations**
15:16
17:21

**investigator**
16:15

**investigators**
18:6

**involve**
34:25
59:7
**involved**
20:3,25
27:15
50:20
58:18
74:15
**involvement**
11:9
19:1
71:13
**involving**
46:16
47:24
57:7
63:12
65:10
74:18
**issue**
20:25
35:11
**items**
62:25

**J**

**Jadon**
4:19
8:7,17
29:6
30:14
32:18
33:21
37:8,11
39:22,24
56:1,3
66:13
67:2
70:3,6

71:17,
20,22
75:3
**James**
4:17
20:24
61:17,18
70:3,9
**Jamiyah**
4:7
**January**
14:10,23
16:21,22
17:12,17
**Jimenez**
4:17
30:15
32:19
33:22
37:9
56:2
66:14
70:4,8,9
71:15
75:5,14
**job**
32:6
63:19
64:3,11
**John**
4:15
5:14
18:11
**Join**
30:15
32:19
33:22
37:9
56:2
66:14
**Josh**
18:22

**Joshua**
4:7,18
5:17
40:11,13
41:23
42:21
**judge**
6:23
**July**
4:4
40:25
41:24
52:22
**jump**
35:20,24
**jumped**
13:13
60:10
62:3
**jumps**
61:18
**June**
58:24
**jury**
6:23
45:16

**K**

**keeping**
25:20
27:11
**keys**
60:22
**Kim**
68:3
**kind**
17:5,16
19:17
20:11
22:20
23:8

24:15
35:16
40:17
43:8
46:15
48:2
54:17
55:12
58:14
73:19
**kinds**
26:2
52:16
**Kit**
54:25
**knew**
70:23
**knowing**
62:2,3
**knowledge**
72:8,24

**L**

**lady**
68:11
**Lafrance**
68:3,17
**landing**
43:7
**larger**
44:17
**Lau**
18:11
**law**
12:11
13:14
14:2,13
19:6
24:11
33:2

38:14
51:21
53:15
**lawsuit**
5:18,20
11:22
**lawyer**
7:4
71:22
**Layer**
4:22
6:13
**lead**
67:6
**leader**
17:7
**leading**
17:14
20:23
**learn**
72:25
**learned**
14:21
**left**
29:25
34:9
35:5
37:14
48:11
**legal**
4:11
**lesson**
19:11,25
20:3,9,
19 21:8
34:23
39:15
44:24
45:7
49:23
50:9

51:12,
16,24
52:2
53:13
54:9,13,
16 72:14
**lethal**
36:16,
21,22
37:15,16
38:1,2,
5,6
39:2,8,
9,10
63:20
64:1,4,
5,14,15,
18 66:3,
11
67:11,
12,17
68:10,13
69:7,14,
20
**letting**
20:13
**level**
6:3
15:25
55:11,12
57:6
**levels**
58:8
**lever**
44:4
**Lexitas**
4:12
**liability**
19:21
45:10,
14,17,

18,23
46:2,3,
13,14,20
**lieutenant**
9:8
16:20,
22,23,24
**life**
33:4
**likelihood**
31:10
46:4
**lines**
25:17
**lining**
44:10
**listed**
40:22,23
41:17
**listen**
11:14
33:6
**listened**
71:2
**lists**
45:12
**litigation**
5:16
**live**
12:7
**loaded**
48:20
**local**
13:16
**logical**
27:1

**long**
8:25
10:6
54:4
62:10
64:18
**longer**
22:24
68:21
73:13
**looked**
10:20,24
**lose**
22:21
73:16
**lot**
20:16
23:24
25:4
**low**
27:12
**Lowery**
20:24
21:1
61:17,18
62:3
69:19
**lowest**
15:25

———

**M**
**made**
64:19
**magazine**
44:6,9
**main**
20:1
22:11
**major**
17:13

**make**
6:19 7:7
12:2
30:12
32:14,16
33:9
54:8
57:24
61:7,13,
14 66:8
**makes**
20:15
25:12
**making**
31:10
**malfunction**
48:8
**managing**
58:19
**mark**
56:20
**Marrese**
4:15
5:10,15
29:8
30:18
33:1,25
37:19
39:19,23
40:6
45:4,6
56:6,20
57:1
62:7,16
66:16
67:3
69:23
71:16
73:5
75:4,12

**math**
12:2
**matter**
70:10,13
71:24
**meaning**
44:21
65:24
**meanings**
47:8
**means**
45:16
**meant**
60:1
67:10,17
**media**
11:18
**medical**
54:25
55:3,19
**meet**
8:13,16
**meeting**
8:18 9:1
**meetings**
11:2
**memory**
35:2
59:8
**mental**
23:8,12
24:22
32:23
**mentioned**
66:18
**met**
5:15
8:20,23

**middle**
59:5
**midnight**
16:11,12
**midnights**
15:15
**military**
15:3
**millimeter**
55:10,17
**mind**
46:15
**minds**
48:24
**mindset**
23:25
32:23
34:4,10
57:21
**misspoke**
9:24
**moment**
5:15
61:3
**months**
16:18
**morning**
5:11
70:1
**motor**
22:21
**motto**
64:13
**move**
41:20
52:11
53:18
57:2

70:12
**movement**
22:22
29:22
**moving**
34:2,8,
17,25
35:4,6,
15 48:9,
10
**multiple**
47:9
**multitude**
73:17
**muzzle**
28:10
48:18

———

**N**
**Nathan**
4:8,18
**naturally**
27:10
33:4
**nature**
48:1
**near/far**
52:5
**negative**
65:24
66:1,6,
18,25
67:20
**nice**
43:12,14
**nods**
6:18

| nonfirea rm- related | O | office | officers | 19:12 | part |
|---|---|---|---|---|---|
| 54:2 | oath | 33:7 | 17:4 | opinion | 7:3 |
| normal | 6:22 | officer | 19:6 | 37:24 | 9:14,25 |
| 7:3 | object | 5:17 6:4 | 20:20 | 56:4 | 10:21 |
| 46:24 | 35:25 | 12:11 | 23:16 | opportun ity | 11:7 |
| 57:14 | objectio n | 15:14 | 26:5 | 39:9 | 17:9,10 |
| Nos | 7:5 67:2 | 18:22 | 38:15 | 47:2,19 | 18:2 |
| 56:24 | objectio ns | 21:4,6, 24 22:14 | 45:9 | 49:4,8 | 25:15 |
| note | 7:1 | 25:25 | 47:1,9, 19 | 61:7,12 | 34:8 |
| 44:22 | objective | 26:14 | 48:23,25 | opposed | 44:8 |
| 51:8 | 45:8 | 28:25 | 49:7 | 6:18 | 50:11 |
| noted | objectiv ely | 33:15 | 51:21 | 32:9 | 51:19,24 |
| 52:12 | 53:20 | 35:9 | 52:18,21 | 33:19 | 65:19,21 |
| 59:1 | objectiv es | 36:5 | 53:24 | option | 66:18 |
| notes | 45:13 | 38:22 | 55:13, 18,20 | 28:3 | 69:12 |
| 42:24 | 47:1 | 39:12 | 58:15 | 36:22 | 70:19 |
| 43:21 | 50:5 | 40:20 | 65:2,11, 14 71:3, | 39:4 | 72:10 |
| notice | 54:18 | 41:1,15 | 4 72:12, | options | part- time |
| 71:25 | observat ions | 42:8,13, 21 | 19,23,25 | 26:6 | 15:22 |
| noticed | 70:21 | 47:11, 12,13,15 | 73:12 | 27:18 | particip ated |
| 72:3 | obstacle s | 49:17 | 74:11,24 | 44:17 | 67:24 |
| notifica tion | 73:6 | 52:22 | official ly | orange | patrol |
| 11:6 | obstruct ed | 54:25 | 14:23 | 57:15 | 15:14 |
| November | 73:10 | 55:23 | on- boarded | 58:9 | 16:1,2, 6,11,12, |
| 14:21 | OC | 58:10,19 | 14:22 | ordering | 20,24 |
| 41:1 | 22:10 | 60:12 | on/off | 75:11 | 17:21 |
| 49:22 | occur | 61:17,22 | 44:5 | orders | 18:3,5 |
| number | 8:18 | 62:4 | online | 40:22 | 33:15 |
| 4:8 | October | 63:3 | 24:6,9 | 41:2,17 | 45:10, |
| 15:11 | 14:21 | 64:6 | open | 51:14,20 | 18,23 |
| 19:8 | | 67:25 | 74:7 | 75:10 | 46:2,15, |
| 26:24 | | 68:3,5, 17 69:10 | operatio ns | P | 20,21 |
| 45:12 | | 70:10, 16,21 | 16:24 | p.m. | 59:18 |
| 50:4 | | 73:9,24, 25 | 17:2,5, 10,20 | 75:7,15 | pattern |
| nutritio n | | officer' s | 18:5 | pages | 61:19 |
| 23:6 | | 57:6 | | 9:7 10:6 | Payne |
| | | | | 56:22 | 4:8,18 |
| | | | | parents | 5:17 6:4 |
| | | | | 12:24 | 18:22 |

20:24
21:5,6,
24 22:15
24:21
25:25
26:14
35:9
39:12
40:13
41:1,15,
23
42:13,21
49:17
52:22
58:10,19
61:17,23
62:4
69:21
70:10,
16,21

**Payne's**
40:12
55:23
69:10

**pdf**
75:13

**people**
20:13
33:4,5,6
57:22

**percent**
18:8
63:19
64:3,12

**perfect**
23:20
39:23

**perfectly**
7:3

**performance**
50:5

**period**
20:23

**permanent**
12:16

**permutation**
28:20

**person**
26:20
27:21,22
32:21,24
33:9
38:3
57:17
64:21
67:7

**person's**
57:12

**personal**
56:9
72:7

**personally**
24:10
58:18
74:16

**personnel**
61:15

**persons**
16:5

**philosophy**
23:23
50:21

**physical**
57:7

**physiologic**
25:14
26:2,13

**physiological**
21:15,22
23:2
32:13
50:16
51:2,8
55:7

**physiological/
psychological**
22:18
25:6
26:7
49:15
50:22

**pick**
23:20

**picture**
23:20
44:2,9,
18 48:7

**pie**
73:20

**place**
9:22
23:16
54:7

**placements**
43:12,16

**plaintiff**
4:16
5:16
75:12

**plan**
12:11
20:9
21:9
34:23
44:24
45:7
49:23
50:9,11
51:12,
16,24
52:2
53:14
54:10,
13,16

**plans**
12:10,
15,18
19:11,25
20:4,20
39:15
54:8
72:15

**planted**
30:21
31:8,23
32:10,17
33:19
34:5

**point**
7:11
10:11
34:5
39:10
43:1,17
46:25
47:18
48:1
55:3
62:19
63:3
65:23

**pointed**
33:20
37:5
64:16
68:7,11,
14

**pointing**
37:2
38:1
63:13
64:20
65:5
66:4,5

**points**
48:22
49:9
50:10,14

**police**
14:9,15,
25 15:7
18:11,14
19:3
27:25
34:16
36:7
40:14
51:22
68:1,6
72:11,18
74:12,23

**policies**
41:10

**policy**
38:10

**portion**
10:1
35:6
39:17
50:19
66:24

**position**
15:18

17:25

**positions**
15:9

**possibility**
30:25
67:13,21

**possibly**
29:16

**potential**
25:13

**potentially**
31:16

**Power**
41:10

**practice**
29:3,4
39:9
45:9
47:2,19
49:4
64:14

**practices**
38:25

**predetermined**
60:25

**preface**
8:6

**preferred**
39:11
64:14,22

**premise**
60:5

preparation
  9:4
  10:16
  11:13
  52:2
prepare
  8:10,14
  10:13
  11:15,19
prepared
  45:1
  49:22
  50:13
  53:14
  54:10
preparedness
  23:12
  24:22
  32:23
preparedness-type
  23:8
preparing
  20:19
prepped
  8:8
present
  4:13
  15:10
  42:10
  66:10
presented
  24:1
  47:17
  60:25
  69:19

preserve
  7:4
pretty
  12:25
  34:3
  48:15
previously
  56:23
primarily
  5:23
primary
  67:20
proceedings
  4:1
process
  7:3
  27:10
produced
  9:22
profession
  33:13
professional
  5:24
  9:16
  16:14
  17:13
  56:16
professionally
  15:12
proficiency
  42:11
prohibited

38:8,18
prohibition
  27:13,16
promoted
  15:24
  16:10,23
  17:12,19
proper
  23:6
  39:9
  44:10
  48:7,8
  57:20
provide
  36:4
  45:9
  55:12
  63:12
provided
  21:24
  73:2
providing
  19:5
PSD
  9:14
psychological
  21:16,23
  25:14
  26:3,13
  55:6
psychological/
physiological
  22:3
pull
  31:19
  35:20

37:22
  63:2
  67:10
pulls
  43:15
purpose
  61:11
pursue
  74:12
pursuing
  31:4
  33:19
pursuit
  21:1
  27:15
  29:4,11
  31:21
  32:5,9,
  14 57:7
pursuits
  21:3,7,
  9,14
  26:1
  57:4,10
  74:16,19
put
  14:18
  23:25
  24:4
  34:10
  59:12,13
  63:21
putting
  14:19

___
Q
qualification
  41:22
  42:3,7
  43:7

qualifications
  34:7
qualify
  42:7
quarterbacking
  62:1
question
  7:6,12,
  14,22
  21:5
  26:16
  30:17
  31:1
  33:14,24
  45:14
  46:11
  57:3
  64:6,25
  65:6,17,
  21,25
  66:15
  69:9
questioning
  62:9
questions
  6:17 7:2
  8:9
  69:24,25
  70:11,12
  71:18,23
  73:4
  75:3
quick
  70:4,11
quote
  60:8

___
R
ran
  9:11
  16:11
range
  25:23
  30:3,21
  34:23
  42:20
  52:14
rank
  15:24
  16:10
  17:12,19
rate
  22:4,16
  25:18,20
  26:17,19
  27:11
  29:15
  31:22
  32:7
  47:25
  50:23
  57:10,
  19,22
  58:8
rates
  49:14
  57:13,16
rational
  57:24
reach
  56:7
reaches
  35:10,13
reaching
  35:25
reactions

| | | | | | |
|---|---|---|---|---|---|
| 26:3 | 53:25 | 62:12,14 | **reflexes** | 68:9,13, | **resource** |
| 50:16 | 54:23 | 75:6,9 | 29:16 | 19,23 | 17:3 |
| 51:2 | 58:25 | **recorded** | **refresh** | 72:19 | 59:17 |
| **read** | 61:5,19 | 4:10 | 54:18 | 73:4 | **resources** |
| 41:7 | 65:2 | **recreate** | **regime** | **Remote** | 54:6 |
| 43:23,24 | 68:9,12, | 24:7 | 23:7 | 4:1 | 61:15 |
| **ready** | 16 71:25 | **recruiter** | **reholste** | **remotely** | **respect** |
| 47:16 | **receive** | 16:16 | **red** | 4:10 | 23:4,14 |
| **real** | 13:22 | **recruiti** | 39:7 | **repeat** | 24:22 |
| 60:3 | 14:4 | **ng** | **related** | 27:10 | 31:11 |
| **real-** | 21:6 | 17:15 | 46:1 | 46:11 | 34:18 |
| **life** | 41:7 | **red** | **relates** | 66:15 | 56:8 |
| 24:5 | 72:20 | 57:15 | 21:6 | **rephrase** | 65:10 |
| 68:6 | **received** | 58:9 | 50:1,5 | 7:14 | **respond** |
| **real-** | 19:4 | **referenc** | 53:1 | **report** | 45:22 |
| **time** | 21:5 | **e** | **relating** | 9:14,17 | 47:16 |
| 45:11 | 40:14,21 | 46:4,14 | 10:21 | **reporter** | 57:25 |
| **real-** | 41:1 | **referenc** | 21:14 | 4:22 | 60:12,24 |
| **world** | 49:17 | **ed** | 41:2 | 6:13 | **respondi** |
| 52:18 | 69:17 | 51:15 | 56:16 | **reports** | **ng** |
| **reality-** | 73:5 | 56:22 | **relayed** | 18:3 | 49:14 |
| **based** | **receives** | **referenc** | 71:5 | **represen** | **responds** |
| 54:14 | 41:6 | **ing** | **release** | **t** | 57:18 |
| 58:25 | **receivin** | 51:20 | 44:7,9 | 4:14 | **response** |
| 59:3 | **g** | 52:17 | **relevant** | 5:15 | 21:16, |
| **rear** | 71:25 | **referred** | 21:13 | 42:1 | 17,23 |
| 44:11, | **recess** | 46:3 | **reloads** | 53:7 | 22:14,18 |
| 16,17 | 40:3 | **referring** | 48:8 | **represen** | 25:3 |
| **reasonab** | 62:13 | **g** | **relocate** | **tative** | 26:6,7, |
| **le** | **recogniz** | 9:17 | 12:15 | 72:4 | 13 32:13 |
| 28:25 | **e** | 48:3 | **relocate** | **residenc** | 41:2 |
| 53:21 | 58:16 | **reflex** | **d** | **e** | 45:18 |
| 63:3,6 | 67:13 | 29:20 | 12:24 | 12:16 | 51:15 |
| 69:2 | **recollec** | 30:6 | **remember** | **resistan** | 58:3 |
| **reassign** | **tions** | 37:6,21 | 8:23 | **ce** | **response** |
| **ed** | 58:21 | 55:22,25 | 21:18 | 26:5,10, | **s** |
| 41:11 | **record** | 56:5,12 | 37:23 | 14 41:3 | 6:17 |
| **recall** | 4:2 5:12 | 66:7,21 | 42:5 | 45:19 | 22:3 |
| 11:1 | 7:4 | 67:6,19, | 53:11 | 47:17 | 23:2 |
| 18:15 | 40:1,5 | 21 | 66:21 | 51:15 | 25:14 |
| 38:7,9 | 45:5 | | | | 55:7 |
| | 56:18,25 | | | | |

**responsibilities**
  20:11,18
**responsibility**
  19:17
  20:16
**result**
  55:24
  56:12
  68:16,18
**results**
  6:16
**review**
  5:25
  9:3,6
  10:12,15
  11:12
  58:4
  62:21
  65:20
  69:5,10
**reviewed**
  9:24
  41:16,17
  62:17
  68:17
  70:19
**reviewing**
  69:1
**reviews**
  67:24
**revised**
  41:12
**revision**
  41:13
**rifle**
  28:8,9
  35:7
  43:3,25

  50:14
  51:4,9,
  10,11
**rifles**
  50:6
**right-handed**
  29:23
**rises**
  49:13
**risk**
  37:6,21
**Robinson**
  4:7
**role**
  18:2
**roster**
  49:20
  52:21
**roughly**
  14:19
  15:19
  34:20
**rounds**
  43:7
  55:10,17
**routine**
  46:24
**rule**
  31:15,17
**rules**
  6:10
  29:19
  30:3
  48:15
**run**
  27:23
  37:5,20
  38:18
  73:13

**running**
  16:2,25
  17:2
  27:18
  28:2,8
  29:15,17
  30:11
  31:3,9,
  12,24
  33:18
  34:13
  38:5
  39:1
  55:3
  65:4,14
  73:23
  74:1
**runs**
  35:9
**rushed**
  60:10

———————
      **S**
**safety**
  29:18
  31:15
  44:4,5
  48:12
**sake**
  6:15
**sat**
  6:8
**scenario**
  27:20,24
  28:5,17
  30:5
  35:16
  49:5
  55:18,19
  59:9
  60:8,14,
  15,16,20

  67:16
**scenario-based**
  22:8
  24:3,20
  54:14
  58:23
**scenarios**
  24:1,5
  28:19
  29:2
  30:20
  45:19
  60:7,18
  64:17,22
  65:3,10,
  13 73:17
**scene**
  18:6
  28:25
  54:6
**school**
  13:6,9,
  10 17:3
  59:5
  60:10,23
**schooling**
  13:11
**scope**
  45:8
**screen**
  4:6 6:13
  40:7,8
**scroll**
  44:12
  50:12
  54:19
**scrolling**

  51:25
**searches**
  11:17,18
  24:16
  45:11
**searching**
  74:6
**seat**
  20:12
**seconds**
  27:9
**section**
  17:22
  18:7
**security**
  55:10
**selector**
  44:5
**sense**
  6:19 7:7
  20:15
  25:12
**sergeant**
  16:10,
  12,14
  45:1
  46:7
**serve**
  17:25
**service**
  28:13
  45:20,21
  60:6,22
**shakes**
  6:18
**sharing**
  40:7
  56:14
**sheet**

  42:20
  44:24
  45:7
  49:24
**shift**
  16:12,25
**shifts**
  16:25
**shoot**
  30:12
  33:17
  34:12,13
  48:18
  52:11
  66:9
  67:1,15
  73:9
**shooter**
  29:23
  52:5
  59:4
  60:21
**shooting**
  5:25
  10:21
  18:23
  28:1
  30:20
  32:16
  34:3,5,
  8,18,25
  35:4,6,
  15,24
  36:2,3
  40:12
  44:11
  55:24
  56:11
  61:19
  66:10
  73:5,6
**shoots**

35:10

**short**
16:18
28:11
40:3
44:22
62:13

**shot**
20:24
43:11,16

**shots**
43:18
60:23

**show**
69:7,13

**showing**
49:21
52:20
65:1

**shrugs**
6:18

**sic**
50:24

**side**
17:11
19:23
54:5
61:10,12
63:15
64:7
65:24
66:1,6
67:1
69:16
74:3

**sides**
66:19

**sight**
44:1,9,
17,18
48:7

73:9,16

**sights**
48:17

**sign**
41:11,13

**signature**
40:23

**signed**
41:18,23
42:20
49:20
52:22,24

**signing**
42:9

**signs**
41:6

**similar**
24:1

**simple**
22:22,
23,24

**simply**
29:14
69:9

**simulate**
52:13

**simulations**
52:16

**simunitions**
22:9
55:9,15,
16 59:22

**singularly**
64:10

**sir**
6:6,20,

25
11:16,20
70:9

**sitting**
57:13
61:25

**situation**
27:20
28:21
31:7
32:17
36:16
37:15
57:7
61:13,24
64:4
68:7

**situation-dependent**
32:24

**situational**
37:13
38:25

**situational-dependent**
28:12

**situations**
31:3
46:16
47:24
52:18

**skill**
48:13

**skills**
22:22
47:20
48:5,9,
12

**slapping**
43:8,15

**slice**
73:20

**slow**
43:14
54:5
73:18

**slowed**
62:5

**slowing**
74:1,4

**smaller**
44:18

**smell**
61:1

**speak**
11:3

**speaking**
32:2,12
47:14

**special**
15:21
17:2,4,
10

**specialist**
4:12

**specific**
16:6
21:8
26:19
27:5
42:8
49:20
51:10

59:16
73:23

**specifically**
21:15,25
23:5,7,
11 24:23
28:7
34:19
35:3
36:12
37:25
39:16
66:2
67:25
73:15

**speculate**
8:2 46:8

**spending**
20:18

**spoke**
8:19
18:12

**spoken**
18:22
23:17
70:15

**spot**
16:19

**spray**
22:10
59:13,
18,23

**spread**
34:20

**square**
30:22

**squared**
31:8

**squeeze**
30:1

**SRO**
60:8,13,
22

**stages**
42:14

**stand**
63:9
69:9,12

**standard**
41:22
42:3

**standards**
5:24
9:16
16:15
17:14
56:16

**standing**
34:7

**stands**
53:8,12
54:24

**start**
19:16
27:11
28:15
39:20

**started**
14:19
19:19
20:12
23:19

**starting**
20:5
23:9

**starts**
22:20
56:17

state
  5:11
  12:8,16
  13:20
stated
  65:19
  69:6
statement
  71:11
States
  15:3
stay
  44:1
  63:20
  64:1,4,8
STENOGRA
PHER
  4:24 5:3
  75:10
Stephan
  4:11
stick
  27:7
stint
  16:8
stop
  45:24
  65:8
stopping
  65:22
street
  74:25
stress
  21:16,
  17,23
  22:2,14,
  24 25:3,
  14,24
  26:18
  29:15,25

subject
  7:13
  47:14
  52:13
  54:13
  57:8
  63:4,13
  64:6
  68:14
  71:6
subject'
s
  69:16
subjects
  47:3,15
subtopic
s
  25:11
sued
  5:20
suit
  60:2
summary
  9:9,13
  40:12,18
  41:9
supervis
or
  15:25
supposed
  46:13
  60:12
suppress
ion
  16:4
suspect
  21:7
  26:9
  31:4,9,
  13,21,24
  32:9

47:20,24
48:6,23,
24,25
49:4,9,
10
50:16,22
51:5
55:13
57:6,18,
25 58:8,
16,19
67:16
stresses
  32:7
stressfu
l
  47:24
strike
  31:1
  42:18
strong
  37:18
student
  50:4
stuff
  15:22
  16:17
  20:13
  23:9,10
  25:19
  28:6,14
  50:25
  57:17,21
  59:12,14
  63:17
  71:7
style
  24:5
  45:24
  46:24
  55:9

33:19
73:13,
14,16,
23,24
74:13
suspects
  26:1
SWAT
  17:7,10
  19:23
swear
  4:23,24
switch
  44:5
switched
  42:4
sworn
  5:7 10:9
  14:11
  15:20
sympathe
tic
  29:16,20
  30:6
  37:6,21
  55:22,25
  56:5,12
  66:7,20
  67:6,19,
  21
Systems
  53:11

―――――――

T

table
  40:13,18
  41:9
tactic
  63:22
tactical
  27:6

tactics
  19:20
  22:6
  25:6
  53:1,14
taking
  19:16
  20:12
  33:15
  74:5
talk
  13:4
  21:3,20
  22:1
  34:15
  39:4
  48:22
  57:11
  63:18
  68:2
  74:4
talked
  8:7
  47:23
  55:22
  58:14
  61:3
  63:18
talking
  9:13
  21:25
  24:16
  30:7
  35:19
  49:10
  50:25
  64:10
  65:22,23
  66:2
talks
  49:3
target

30:22
31:9
43:7
48:17,20
taser
  22:5
  25:5
  36:8,15,
  18 37:14
  38:18
  39:1,16
  51:4
  59:12,
  13,23
  60:1
  63:4,13,
  15 65:4
  66:19
  68:2,7,
  11,12
taser's
  36:20
tasers
  65:11
task
  15:22
tasks
  33:10
taught
  22:15
  23:1,4
  48:6
  74:11
teach
  19:24
  21:11
  23:23
  35:24
  36:2,3,6
  53:24
  73:12

| | | | | | |
|---|---|---|---|---|---|
| teacher | 52:17 | 26:20,21 | 47:10 | 72:11,18 | 36:20,21 |
| 60:11 | 53:23 | 28:9 | 53:25 | 74:12,23 | 59:17 |
| teaching | 58:14 | 33:7 | 54:5 | Tobacco | 63:22 |
| 39:18 | 61:4,23 | 35:25 | 59:24 | 15:20 | tools |
| 51:21 | 65:9 | 36:2 | 61:6,9, | today | 54:6 |
| 58:15 | testified | 48:1 | 11 62:4 | 4:22 | 55:19 |
| team | 5:7 | 49:12 | 63:5,14, | 5:23 | 59:14 |
| 17:7,8 | 28:16 | 58:10 | 19,21 | 6:11,22 | 61:15 |
| technique | 70:15 | 59:11 | 64:1,4, | 7:2,11, | top |
| 43:10 | testify | 62:5 | 9,12,15, | 18,25 | 21:18 |
| techniqu | 6:21 8:1 | 74:5 | 16 65:4, | 9:4 | 22:10 |
| es | testifyi | thinking | 12,15,25 | 10:3,11, | 55:5 |
| 20:5 | ng | 29:1 | 66:5,20 | 13,16 | 64:25 |
| 21:17 | 6:23 | thought | 68:2,12, | 11:14, | topic |
| tells | testimon | 62:22 | 15 70:1, | 15,19 | 25:7 |
| 40:20 | y | threat | 23 73:1 | 12:10 | topics |
| tend | 51:3 | 66:11 | 74:5,9, | 15:6 | 19:21,24 |
| 22:18 | 69:10 | 69:8,14, | 20 | 17:25 | 21:10, |
| 57:23 | 72:7 | 20 | 75:13,14 | 20:7 | 13,20 |
| term | 75:7 | threshol | times | 45:15 | 22:1 |
| 21:18 | theirsel | d | 26:24 | 51:3 | 23:5 |
| 27:5 | ves | 73:19 | 40:23 | 52:2 | 24:24 |
| 73:19 | 32:22 | tight | 41:17 | 58:4 | 25:4,8, |
| terms | theme | 43:12 | titles | 63:1,9 | 10 53:6 |
| 6:7 | 43:13 | time | 35:1 | 69:10 | 63:16 |
| 12:10,15 | thing | 4:5,13 | Titusvil | 71:24 | touched |
| 18:14 | 24:15 | 7:2,18 | le | 72:7 | 58:6 |
| 21:4,13, | 27:8 | 9:9 | 4:20 | today's | tough |
| 22 22:13 | 28:23 | 10:25 | 5:17 | 4:4 | 7:12 |
| 23:12 | 34:3 | 13:18 | 12:12 | 8:10,14 | track |
| 25:12 | 59:19 | 14:16,25 | 13:1,9 | 11:4,6 | 12:3 |
| 26:12, | 74:6 | 15:11,19 | 14:9,15, | 19:9 | tracking |
| 15,24 | things | 16:19,25 | 21,24 | 58:7 | 42:20 |
| 27:1 | 6:19 | 20:17,23 | 15:6 | 59:12 | traffic |
| 30:25 | 19:13 | 23:16 | 19:3 | 62:18 | 17:3 |
| 34:17 | 20:5 | 29:7 | 27:25 | 72:4 | 45:24 |
| 43:11 | 22:23 | 31:19 | 34:16 | 75:7 | train |
| 45:8,14 | 23:10, | 34:6 | 36:7 | Todd | 21:11 |
| 48:5 | 13,19,20 | 36:9,25 | 40:14 | 18:18 | 32:22 |
| 49:12 | 24:11 | 37:2,5 | 51:22 | ton | 34:2 |
| 50:10 | | 38:2,6 | 67:25 | 21:10 | 35:15 |
| | | 42:7 | 68:6 | tool | |
| | | | 71:23 | | |

38:11,13
63:15
72:25
73:15,25
74:24

**trained**
32:4
36:8
37:3
58:11
72:11
73:8,12

**trainer**
72:17
74:22

**training**
6:2
17:15
19:2,4,
5,12
20:19,20
21:4,6,
12,23
22:5,6,8
24:4,20
25:13,
16,23
32:22
33:6
34:10,
16,20
36:11,24
38:10,
14,19
39:16
41:7
43:13
48:2
49:1,5,
18
52:17,21
54:14,15
55:11

57:5,11,
20
58:14,
19,22,
24,25
59:2,4,
5,10,12,
16,20
60:1,3,5
61:5
63:7,12
65:3,10,
13,22
72:20
73:1

**trainings**
40:13,21
55:5
63:17

**transcribed**
6:12
9:20
10:12

**transcript**
6:15
11:12
56:15
57:3
62:18
63:2
64:24

**transcription**
9:21,25
10:3,5
11:10

**transferred**
15:16

16:13
17:13,20

**transition**
36:13,18
39:3,8
64:9

**transitioning**
36:21

**treat**
48:19

**trigger**
31:18,19
43:2,8,
9,14,15
48:8,16
67:11

**true**
32:6

**truth**
4:25 5:1

**tunnel**
22:19
50:23

**turns**
39:2
73:24

**two-part**
59:9

**Tyler**
4:3 5:13

**type**
21:9
26:4,7,
10 28:6,
13,22
57:17
67:6

**typed**
9:9,13

10:1

**typical**
7:3
46:24

**typically**
31:21
32:2,12
57:22

————————

**U**

**ultimately**
18:3
61:18

**uncontrolled**
29:21,22

**uncooperative**
47:3,14

**understand**
5:19
6:24
7:6,9
15:12
18:10
26:21
33:2,23
38:13
46:12,17
48:23
50:15

**understandable**
7:14

**understanding**
6:1
26:16

28:16,21
30:17
49:11
55:23

**understood**
6:20
7:24 8:4
51:3

**unholster**
27:22

**unholstering**
27:14

**unit**
16:4
17:3
60:9

**United**
15:3

**unjustified**
66:10
67:1

**unquote**
60:8

**Utah**
12:22

**utilizing**
45:11

————————

**V**

**vacation**
8:22

**variables**
33:9,18

**verbal**
6:16

**version**
44:15
59:10

**versions**
27:7

**versus**
4:7
28:16
33:9
43:15

**video**
4:3,6,12
10:15,16
35:8
69:6,11,
13 75:13

**videos**
23:15,18
24:8,9,
11

**violated**
31:16

**violating**
29:18
30:2

**violent**
16:5

**vision**
22:19
25:18
50:23

**visualizing-type**
23:10

---

**W**

**W-R-I-G-H-T**
  5:13

**walk**
  23:9

**walking**
  23:13
  48:9

**wall**
  74:2

**wanted**
  19:10
  59:14

**wanting**
  48:17
  55:20

**watch**
  23:18

**watched**
  24:2
  42:13
  61:16

**Watching**
  61:25

**Watson**
  54:10
  55:2

**ways**
  23:1
  30:19

**weapon**
  31:13
  33:20
  37:22
  38:2,6
  42:14,19
  44:1,4,8
  48:19
  64:15

**week**
  8:21,24
  9:1
  62:19

**White**
  57:12
  58:9

**wielding**
  66:4

**wished**
  62:22

**word**
  45:15

**work**
  12:25
  33:5
  43:2,14

**worked**
  14:24

**working**
  14:8
  16:2
  17:16

**worse**
  33:10

**Wright**
  4:4,20
  5:13,14
  12:1
  40:7
  49:23
  56:17
  62:17
  71:21
  75:8

**write**
  20:3
  50:9

**written**
  42:23
  43:21

  50:5
  51:9,11
  53:5
  72:14

**wrong**
  23:19
  31:11
  37:22
  62:22
  67:14

**wrote**
  19:25
  20:9
  46:7

---

**Y**

**year**
  14:4
  20:10

**years**
  15:11,15
  16:2,11

**yellow**
  57:14
  58:9

**yesterday**
  8:19
  18:13

**young**
  12:24

**Youtube**
  24:10,13