# EXHIBIT 7



# IA 318

## Internal Investigation

**Subject:**
**Joshua Payne**

**Tracking #2022-00001**

**Investigator: Lt. Charles M. Demmon**
**Titusville Police Department**

**DATE OF INCIDENT**
**December 26, 2021**

**LOCATION:**

**1520 Gayle Ave, Titusville, Florida**

# Book 1 of 3

COPY

# TABLE OF CONTENTS

| | |
|---|---|
| (Book 1)  Investigative Summary | 1 |
| Order to Conduct IA Memo | 2 |
| Notification of Formal Investigation | 3 |
| Employee Action Report | 4 |
| General Orders | 5 |
| Original Case Report | 6 |
| CAD Report | 7 |
| Body Camera Photograph | 8 |
| Response to Resistance | 9 |
| BCSO Report | 10 |
| Medical Examiner Report | 11 |
| Map of Location/Payne's Firearm | 12 |
| (Book 2)  Department Training | 13 |
| Field Training Manuel | 14 |
| Body Camera Summer | 15 |
| Academy Attendance Sheets | 16 |
| (Book 3) Transcribed Interviews | 17 |
| Transcribed Initial 911 Call | 18 |
| Photographs of drugs/money/Items | 19 |
| FDLE Affidavit of Separation | 20 |
| Brevard Clerk of Courts | 21 |
| Payne's Resignation Letter | 22 |
| | 23 |
| | 24 |
| | 25 |
| | 26 |
| | 27 |
| | 28 |
| | 29 |
| | 30 |
| | 31 |

# IA-318

## INVOLVED EMPLOYEE PHOTO FOR JOSHUA PAYNE

## EXEMPT FROM PUBLIC RECORD
## REMOVE WHEN INVESTIGATION IS COMPLETE



**DATE OF INCIDENT**
**December 26, 2021**

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

# TITUSVILLE POLICE DEPARTMENT
**PROFESSIONAL STANDARDS DIVISION**

Administrative Investigation
**IA Number 0318-IA**            **Tracking Number:  IA-2022-00001**

**EMPLOYEE INVOLVED:**       **Officer Joshua Payne**

**APPLIED POLICIES:**
- Titusville Police Department General Order 300.6 (4)(A)(2) Standards of Conduct / Professional Conduct
- Titusville Police Department General Order 300.6 (4)(A)(23) Standards of Conduct / Unsatisfactory Performance
- Titusville Police Department General Order 300.6 (4)(A)(10) Standards of Conduct / Unnecessary Force
- Titusville Police Department General Order 300.6 (4)(A)(22) Standards of Conduct / Conformance to Laws
- City of Titusville Personnel Policy 6.13 D(11) Disciplinary Actions/Minor Violation/Single instances of violation of departmental policies and operating procedures, including violation of confidentiality and other conduct detrimental to departmental operations and/or the image of the municipal organization.
- City of Titusville Personnel Policy 6.13 E(18) Disciplinary Actions/Major Violation/Major violations of department policy or procedures.
- City of Titusville Personnel Policy 6.13 F(15) Disciplinary Actions/Capital Violation/Unlawful or improper conduct, either on or off the job, which tends to affect the employee's relationship to his/her job, fellow workers, his/her reputation or goodwill in the community.
- City of Titusville Personnel Policy 6.13 F(20) Disciplinary Actions/Capital Violation/Actions when considered on their own merit are equal in seriousness to established capital violations.
- City of Titusville Personnel Policy 6.13 F(22) Disciplinary Actions/Capital Violation/Capital violation of a department policy or procedure.

**DATE OF OCCURRENCE:**       *December 26th, 2021*

**LOCATION OF**
**OCCURRENCE:**              1510 Gayle Avenue, Titusville, FL 32780

**DATE RECEIVED:**            December 26th, 2021

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

**INVESTIGATORS ASSIGNED:**     Lieutenant Matt Demmon #704
                                Sergeant Telly Joiner #118

**DATE ASSIGNED:**               December 26th, 2021

**COMPLAINANT:**                 Chief John Lau

**BACKGROUND:**

On December 26th, 2021, at approximately 1854 hours, the Titusville Police Department received a report of domestic violence via two (2) 911 calls from two (2) different people. The first caller stated a black male pushed a black female into the roadway near the Palmetto Ridge Apartments on Deleon Avenue. The victim was described as having pink hair. A second 911 call received to the Titusville Police Department described a domestic violence incident involving the same individuals near the same area.

Officer Tyrone Logan, riding with Field Training Officer (FTO) Bryan Deal, responded to the area with lights and siren activated, arrived on scene and began their investigation. After Officers Deal and Logan met with the victim, Officers Matthew Gonzalez and Darius Wilder stopped two individuals in the area, who appeared to fit the initial descriptions of the suspect, asked for their identifications and questioned them as to whether or not they were involved in this case. Both individuals stopped, cooperated with the investigation and were released. Shortly after, Officer Payne attempted to stop out with another individual at a different location later identified as James Lowery who also fit the description of the suspect. After Officer Payne attempted to question Lowery, Lowery fled on foot, stopped, engaged Officer Payne in a brief physical confrontation, fled again on foot, and was subsequently shot by Officer Payne.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

## INVESTIGATION:

On December 26th, 2021, Police Chief John Lau ordered an internal investigation to ensure the City of Titusville and/or Department Rules and Regulations, General Orders and/or State Statutes were followed by Officer Payne during his attempted arrest and use of force against Mr. James Lowery.

### Internal Affairs Investigation – Order and Service

On December 26th, 2021, I, Lieutenant Matt Demmon met with Officer Payne in my office. Officer Payne was given notification of the formal investigation, which included the allegations against him. I told Officer Payne of the process involved in this type of investigation, which included me taking interview statements from witness officer(s) as well as reviewing all material related to this case.

### Incident Report Review 2021-00100443

On December 27th, 2021, I, Lt. Matt Demmon, reviewed the incident report, all supplements of the responding officers, as well as any crime scene reports and photographs of evidence available.

The purpose for the review of the incident report was to determine whether or not Officer Payne acted within the scope of the Titusville Police Department's and City of Titusville's policy, more specifically the response to resistance/use of force policy and professional conduct policy.

### <u>Interview with Officer Xzevies Baez</u>

On February 22nd, 2022, I interviewed Officer Xzevies Baez. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Officer Baez his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. Sergeant Telly Joiner was also present with me during this interview. This interview was audio recorded. Officer Baez was sworn in and I began my interview.

The following is a summary of the interview with Officer Baez. The full interview was recorded and is available for review:

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

Officer Baez responded to the officer involved shooting on December 26, 2021. Officer Baez said he responded to the area after he heard Officer Payne initiate his foot pursuit. Officer Baez stated, *"upon my arrival on scene, I assisted him and then gave him a ride, after clearing the scene, back to the police department."* Baez said Officer Payne and Officer Gonzalez were on scene when he arrived on scene. Officer Baez said Officer Wilder, Officer Rosas, Officer Mick and Sgt. Nelson showed up on scene as well. I asked Officer Baez if he came in contact with the decedent on scene and Officer Baez replied, *"I observed him from over the fence as a cover officer, when I responded there…. Officer Gonzalez was dealing with rendering aid to the….Mr. Lowery."* I asked Baez if he gave direction to other officers on scene and Baez replied, *"Yes, sir, the next oncoming officer and I believe over the radio I just advised them to bring their medical and wear protection to offer aid."* I asked Officer Baez what he did next and Baez replied, *"I took Officer Payne to the side, just evaluated his mental, and just got him out of the incident location…. I also reached out to have rescue respond immediately."*

Officer Baez did not collect any evidence on scene, however he did complete a supplemental report. I asked Officer Baez if he had a conversation with Officer Payne on the way to the police department and he said, *"there was an attempt however I just advised him not to say anything to me."* Officer Baez said he drove Payne directly back to the police department. Officer Baez said he did mute his body camera for a short distance.

Officer Baez attended in-house training as a new officer with the Titusville Police Department, as well as other in-house training. Officer Baez said he attended training including simmunitions, firearms, IFAK training, etc. Officer Baez said he attended training focusing on lethal vs. less-lethal training. Officer Baez said he was taught how to transition between lethal and less-lethal options as well.

I asked Officer Baez, *" Were there any scenarios that you can recall that involved using both your firearm and Taser at the same time?"* to which Baez replied, *"No, sir."* I asked Officer Baez, *"Why or why wouldn't you have both your firearm and Taser out at the same time?"* to which Officer Baez replied, *"Sympathetic reflex."* I asked Baez, *"What, what does that mean?"* and he (Officer Baez) replied, *"You may squeeze with like your left hand and you may have the action to do the same thing with your right in a very high stress situation, same could go for right hand, squeezing something in your right hand causing you to maybe impulsively squeeze something in your left hand."*

When I asked Officer Baez if Officer Payne indicated he did anything on purpose when Officer Baez was driving Officer Payne to the police department after the incident, Officer Baez stated, *"there was no indications that he (Officer Payne) did this on purpose. He (Officer Payne) was extremely emotional, and upset."* Sgt. Joiner then asks, *"This was during the time y'all muted your......or,*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

*turned off your camera?"* to which Officer Baez replied, *"Yes, sir."* Sgt. Joiner asked Officer Baez, *"Did he (Officer Payne) utter anything else during, the ride down to the PD?"* to which Officer Baez replied, *"No, sir. I specifically told him (Officer Payne), hey, don't say anything. I think I said that multiple times as well on scene…. Just don't say anything until you get back to whoever you need to speak with."*

### Interview with Officer Matthew Gonzalez

On February 9th, 2022, I interviewed Officer Matthew Gonzalez. The interview took place in my office, located in the Professional Standards Division. Present for the interview was Sgt. Telly Joiner. The interview was audio recorded. Before the interview began, I explained to Officer Gonzalez his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. This interview was audio recorded. Officer Gonzalez was sworn in and I began my interview.

The following is a summary of the interview with Officer Gonzalez. The full interview was recorded and is available for review.

Officer Gonzalez stated the following: *"So we received a call that there was a female being beaten up in the middle of the roadway I believe it was by Gibson (Street) or the original address was Prairie Lane, I got dispatched to the call and when I arrived in the area there was nobody walking in the area that they had described it. I drove down DeLeon and I saw a female matching the description walking down Gibson Street, and I went and made contact with her. She had some visible injuries to her person, I think she had like a small cut under her eye and some, some other marks. Her shirt was ripped like indicative she'd been in a struggle or, or a fight with somebody…. I came in contact with her, I got her information, as I begin to like ask her a few questions about what the male looked like or where, where he went and all that stuff, she said it was a black male in a black sweater with dark clothing on and he had, the last direction she'd seen him was going eastbound on Gibson Street. I think at that time Officer Deal and his trainee, Officer Logan, arrived on scene and they advised me that they would take primary on the investigation allowing me to go canvass the area and attempt to locate this, this male that they had....that had been involved in the altercation."*

Officer Gonzalez said he stopped two or three different individuals that were in the area at the time. I asked Officer Gonzalez if anything raised his concerns during the call and Officer Gonzalez replied, *"Well yeah, I mean they, the, specifically I believe the comments said that it, the female was like being beaten in the roadway and got pushed in front of a car or something like that so it*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

was, was just kind of an.....a serious thing. We didn't know whether she was OK or where the individual that shoved her was."

I asked Officer Gonzalez if he had any interaction with Officer Payne during this incident and Officer Gonzalez replied, *"while I was out with Officer Wilder, with another gentleman, he (Officer Payne) came up to me and asked if we needed anything, I advised him that I'd seen another male that matched the description of the person that we were looking for, in the area, and I said I had last seen him walking on DeLeon (Avenue) right by the street that she said he had, she had last seen the suspect going down."* Officer Gonzalez continued, *"I remember, I stayed with Officer Wilder while we attempted to collect the individual that we were just, we were out with's information, Officer Payne drove away, few, I can't recall how long but, I heard him key up over his police radio saying that he was involved in a foot pursuit. So I left Officer Wilder and drove over to the area that Officer Payne called out he said he was going westbound on Queen Street. Came onto Queen Street and didn't see any flashlights or anybody running or anything like that. I keyed up over my radio and asked Officer Payne where he was at, and somebody replied, I'm not sure who it was, but said that he, they had heard Gayle Avenue, which I had already passed, so I conducted a U-turn and then ended up coming in contact with Officer Payne again, on Gayle Avenue."* I asked Officer Gonzalez what happened next and he replied, *"so he was kind of out of breath, didn't, was like, like look stressed out, didn't...walked up to him I asked him if he was OK, cause he had called out shots fired over the radio.... I asked him are you OK and he didn't really answer me, then I began looking for the, the other, the subject that he had potentially been in a shooting with... when I saw him on the other side of the fence I asked Officer Payne to give me lethal cover while I climbed over the fence."* I asked Officer Gonzalez what he did once he climbed over the fence and he replied, *"I observed the male laying there, I wasn't really exactly what, what had happened or what was, what was going on so I rolled him over and placed him in handcuffs."* I asked Officer Gonzalez why he would place him in handcuffs and Officer Gonzalez replied, *"It's just, officer safety, part of our training, I don't know if he had any weapons on him or what kind of injuries he had or, or any of that thing at the exact moment that I climbed over so, I wanted to remain safe."* Officer Gonzalez continued to say, *"after I placed him in handcuffs there was a few other officers arriving on scene and I asked for somebody to grab me a medical kit. I think Officer Wilder came back an IFAK kit. I opened it up, removed the trauma shears, and began to cut the male's clothing, see if he had any injuries to his person or any bullet wounds anywhere."*

I asked Officer Gonzalez the following:

Q:     *Did you see any obvious signs of trauma to him when you were the first one over (the fence)?*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:      Yes, sir, he had a wound to his head.

Q:      What did you do next?

A:      So I'm, like I cut his clothing, we were checking to see if there was any
        injuries on him and then after we realized that he had a gunshot wound to
        the head that was, pretty much, that was pretty much it from there. We,
        relayed the information to dispatch and waited for EMS to arrive.

Q:      Okay. Was EMS already on, on their way?

A:      Yes, sir, they were.

        Sgt. Joiner asks Officer Gonzalez the following:
Q:      When you first went over the fence, did you…notice then male injured at
        the time when you first jumped over the fence?

A:      Ye…so I saw some what looked, appeared to be blood maybe or
        something over by his (Lowery's) head area and I saw like a, like a small
        bag of narcotics and I was like OK well I didn't know if he (Lowery) had
        any other weapons or anything on him (Lowery) so that's why I put him
        (Lowery) in handcuffs…

Q:      What was the bag of, narcotics?

A:      I believe it was marijuana.

Q:      Where was it (the bag of narcotics/marijuana), on the ground?

A:      Yeah it was on the ground, like right by his (Lowery's) sweatshirt hood.

        Officer Gonzalez did not collect any evidence, however, he spoke to the
victim of the domestic violence and stopped an individual prior to Officer Payne's
foot pursuit.

        When I asked Officer Gonzalez if there were any other conversations with
Officer Payne or did he (Officer Payne) leave the area, did he (Officer Payne)
stay there, or do you know what happened, Officer Gonzalez continued to say,
"So, upon Officer Baez arriving, I think was in between, I think I might have
skipped over that but I think Officer Baez arrived on scene and also assisted in
providing lethal cover and then him (Officer Baez) and Officer Payne moved
away from the scene and I was over on the fence attending to the male so I didn't
see anybody after that aside from Officer Wilder." Furthermore, I asked Officer

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Gonzalez since he mentioned lethal cover, what was the significance of having that, and he answered, *"So it was, 'cause I had to climb over the fence so I didn't want to, again we didn't know if he (Lowery) had any weapons on him or what, what the situation was, he (Lowery) was laying there but I didn't know if he was, was still alive or like I said had weapons or anything so to keep me safe climbing over the fence and ensure I didn't get hurt from anything."*

Officer Gonzalez attended new-hire training when he was hired by the Titusville Police Department. Officer Gonzalez said part of the training focused on lethal vs. less-lethal and first aid options. Officer Gonzalez said there were also training scenarios that addressed these issues as well. I asked Officer Gonzalez if there were any scenarios where he was taught to have both his firearm and taser out at the same time pointed at a subject and Officer Gonzalez replied, *"Not pointed, no, sir."* I asked Officer Gonzalez why and he replied, *"sympathetic reflexes and stuff like that. If you're not, if you're holding the trigger on both you might accidentally shoot, shoot one or shoot the other or something."*

### Interview with Officer Darius Wilder

On February 9th, 2022, I interviewed Officer Darius Wilder. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Officer Wilder his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. This interview was audio recorded. Officer Wilder was sworn in and I began my interview.

This is a summary of the interview with Officer Wilder. The full interview was recorded and is available for review.

Officer Wilder stated the following about his response to this incident: *We (TPD) got a dispatched call of a domestic battery, I think it was a female with pink hair, she said had just got away from somebody that held her captive and had somehow battered her in the process, responded to the call for additional units to search for the subject, the description was a black male dreads, dark color jeans, went to the area to assist in locating the subject.*

Officer Wilder responded to Officer Payne who called out a foot pursuit and responded to the area. When asked what Officer Wilder did when he arrived on scene, he stating the following: *When I arrived on scene I saw Payne walking back from the gate, then I heard Matt (Officer Matt Gonzalez) scream grab the medical kit. I ran back to my car, grabbed my medical kit, I jumped over the gate where Officer Gonzalez was, I observed a black male with dreads, dark hoodie, I want to say there was dark grayish, kind of black jeans, lying on the ground, he was not moving, he was not breathing, I observe blood coming from his, the*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

*back of his head, checked his pulse, made sure he didn't have any weapons on him, then tried to provide medical attention, checked his, like I said, checked his pulse. He did not have a pulse. Then after that we just kind of held the scene until we could try to get medical attention there.* When asked if Officer Gonzalez did anything else while he (Officer Wilder) was there, Officer Wilder responded by saying, *"Nope, besides we searched, Officer Gonzalez searched the male's pocket I believe we found some marijuana, he had a bunch of cash in his pocket, scratch off tickets, two little containers, we don't know what was in the little containers with, in his pocket, and that was it."*

Officer Wilder stated there was nothing in the medical kit they had that would have helped for the type of wound sustained by decedent. Officer Wilder said Lt. Jeremy Gonzalez called while they were still on scene instructing someone to bring Officer Payne to the Police Department. Officer Wilder said he did not collect any evidence, nor did he speak to any witnesses on scene.

When questioned about his training at the police department, I asked Officer Wilder if he participated in any training scenarios where he would have both his firearm and taser out at the same time and he (Officer Wilder) replied," *no, Sir"*. I asked Officer Wilder why he wouldn't have both his taser and firearm out at the same time and he replied, *"Because, I believe in my experiences as an officer, the situation is going determine if you're going to go lethal or less-lethal. I believe as officers that we're taught to be able to tell, properly identify those situations where we either need to use lethal or less-lethal, that is gonna depend on the officer and his knowledge and his comfortability in each situation that he deals in… One that it's a bad habit, two, people, you can make a mistake doing that, having both out at the same time, if you have to go hands on, both of your hands are now occupied with a Taser and a firearm, if you have to pursue a subject, now you have to holster both of your firearms and it's just not a safe practice to have both of them out."*

### Interview with Officer Tyrone Logan

On February 16th, 2022, I interviewed Officer Tyrone Logan. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Officer Logan his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. This interview was audio recorded. Officer Logan was sworn in and I began my interview.

This is a summary of the interview with Officer Logan. The full interview was recorded and is available for review.

Officer Logan was in the Field Training Officer Program assigned to his Field Training Officer, Bryan Deal. Officers Logan and Deal responded to the

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

_____

domestic violence call and would eventually become the primary call takers for the domestic violence call. Officer Logan stated when asked for information on the call, *"Yeah they were in the area of south DeLeon and Gibson and the male was seen pushing the female in front of a car and dragging her on the street. That was the call…. So it was an active call."* Officer Logan said he had limited information on the suspect of the incident. Officer Logan continued to talk about the call for service by saying, *"Matt Gonzalez was with the female…so we had limited information at the time as far as it was a black male with dreads and a black t-shirt. That was the information we got maybe 10 seconds before I arrived on scene. While we got on scene, multiple officers arrived, in different locations, so I wasn't with them, but we, saw, a male, a black male, a younger teen, with a black shirt and short twists in his hair, the different dreads, twists are just a, they're the starting form of dreads…. …Officer Deal asked me to stop out with this person. I can't remember exactly what street I was on but it, we were on, right next to Gibson, which should have been, …. Kennilworth."* As the interview continued, the following statements were made as part of the interview by Officer Logan:

A:    And so I was going to make a u-turn to come back cause I had already passed the male cause it was at that first house on south DeLeon and Kennilworth, it was at that first house, and I turned east on Kenn, onto Kennilworth and when I went to make my U-turn where Kennilworth and Gibson meet, I noticed Officer Gonzalez at the entrance of south DeLeon and Gibson. So I, we…I chose to go to see Officer Gonzalez to get more suspect information, just get more sus, suspect information.

Q:    *The male that you turned around on, to stop out with, were they there when you turned around and come back?*

A:    *I did not come back.*

Q:    *Okay. So you went back to….*

A:    *I went to Matt Gonzalez first, to try to get some more suspect information at the time I thought, at the time.*

Q:    *Okay. Did you speak to any, did you speak to the victim?*

A:    *I spoke to the victim, at this time I do not remember her name. I spoke to the victim, and that's when we assumed primary. Me, FTO trainer Deal assumed pri, we assumed primary on dispatch of the call…*

Q:    *What does that mean?*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:      *We took over the role, we were going to write the report, take the witness statements, take the brunt, the load of the investigation.*

Q:      *Okay. Have you done that before.*
A:      *Yes, sir.*

Q:      *So when you're on FTO that's one of the...*

A:      *Yes, sir.*

Q:      *Okay.*

A:      *Yes, sir.*

Q:      *And that gets you exposed to paperwork...*

A:      *Yes, sir.*

Q:      *...different calls for service, things like that.*

A:      *Interviewing and things like that.*

Q:      *Okay. Had you worked domestic violence cases before?*

A:      *Yes, sir.*

Q:      *Okay. During your, you spoke to the witness, is that correct?*

A:      *Yes, sir.*

Q:      *Okay. Do remember if you swore the witness in when she provided you information?*

A:      *I did not swear the witness in, she gave her statement, and I was trying to give out, more description, and when, then a hot call came out as far as, in reference to the twenty-two, the....the domestic, and I didn't swear her in.*

Q:      *Okay, so let's go back to that for just a second. What was it she was telling you prior to swearing her in?*

A:      *She told me that her ex-boyfriend, at the time, I can never remember her nickname she gave, she gave him.....*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

Q:     Okay.

A:     ...she said that he had kept her captive in the home all day, and while he
       was in the home, she, he wouldn't allow her to leave, and he kept tossing
       her around the room back and forth. She stated that her family was in the
       house but nobody would help her. They said, he said, she said that got in
       a fight basically, not a physical fight, a verbal fight because he thought that
       he was cheating on her so he wanted to go through her phone. She didn't,
       she finally, towards the end of the night, and ...she didn't give a...an exact
       time, she said she would allow him to go through the phone, so when he
       was going through the phone, she bolted out the front door. She bolted out
       the front door of the residence which she was, we were, at the time when
       we were interviewing were two houses away from where she said the
       incident took place. She bolted out the door and headed...west on
       Gibson, towards DeLeon.

Q:     Did she say why she ran out the door?

A:     She was trying to get away from him to get help.

Q:     Okay.

TJ:    Did you notice, did you notice any injuries or anything indicating,
       any kind of physical altercation on her?

A:     She didn't have any, she said she was just being tossed around the room
       but not physically being struck, so, she didn't have any, she had, might
       have had some kind of markings on her hand, not like blood, but maybe
       some fingerprint markings, and her shirt looked ripped, but I couldn't, I
       can't tell you a hundred percent if that was the design of the shirt or that,
       she, it was ripped from an altercation. It was ripped on the right side, more
       towards the shoulder....

Q:     Okay.

A:     ...area.

Q:     So either way she's still, she is still talking to you about what happened.

A:     Yes.

Q:     Uh, was she upset?

Page 12 of 102

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:      She was very frantic, very hysterical, she wasn't crying, she just kept telling me she wanted to just get her car and leave, that's all she wanted to do was get her car and just leave, she would, she was, I, she wouldn't give a good description, she just kept saying her ex-boyfriend, or, or, or her boy, her ex-boyfriend at the time now, and so I was just trying to get her to give me more description of the, the male.

Q:      Did she, was she able to provide you anything further?

A:      ...she provided me with a picture of the male, on her phone, which I took a screenshot, which I took a picture on my agency phone...

Q:      Okay.

A:      ...which I was going to send out to the all, the squad.

Q:      Do you remember what that picture looked like?

A:      It was a, it was a light skinned black male, with dreads, full dreads which would probably be, he had them tied up in a bun...

Q:      Okay.

A:      ...but I'm, I'm sure if they would, let 'em, let loose they would've probably been past the shoulder or to, or to the shoulder, light skinned black male, he had a jean jacket on in the picture and a, and a white shirt.

Q:      Okay. When the description went out, did the description of him, of the suspect change while you were to talking to her or from dispatch had originally, do you recall, like clothing, anything like that, that you recall?

A:      I believe at the time before I could get the description, get the, the picture out and his name, cause at that time I knew his name. I knew his nickname and his actual name. The call, that wasn't been made, that wasn't made.

Q:      Okay.

A:      That call wasn't made. It was still a description of a black male with, black male, black shirt, with dreads.

Q:      Okay. And while you're, while you're talking or getting this information, you mentioned something else happened, go ahead with that, I'm sorry.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Q:     You said, something about a hot call, on a, a hot call came in, or...

A:     Well, with the victim, she seemed like she was hesitant to report. Like she just didn't want to report it. She, it was, she was hysterical as far as, she was emotional but she was, it was, it was weird for her being someone that was saying that she was held captive. It was more of like she was, it was like a joke, and then I, the suspect's brother walked up and we thought it was him, and she said I, that might be him right there and I was like, so we interviewed him and was just the suspect's brother, she said no, it's not him, it's not him, cause he was wearing, he was a black male with dreads, heavier setting male with a black shirt on, and right when I got the picture we had a call, we got a call, a hot call saying uh, Officer Payne was in a foot pursuit, that he matched, it matched the description. He was just saying foot pursuit, foot pursuit, on heading n....south, I can't believe it, I don't, I don't, I can't remember if it was south (unintelligible – talking over)

Q:     DeLeon...

A:     ..or south on...

Q:     You, you remember there was a foot pursuit is that correct?

A:     Yes.

Q:     Okay. And you were still taking to the victim at this point?

A:     Yes.

Q:     Were other officers checking out with people in the area at the time?

A:     Yes, we had Officer Wilder, Officer Wood was on his way, Officer Payne was with that gentleman before the foot pursuit, and I believe Matt Gonzalez was with, an interview that matched the description, too.

Q:     Okay, and then you hear Officer Payne initiate a foot pursuit, is that correct?

A:     Yes, sir.

Q:     And what did you do after that?

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:    *Officer Deal and I started to run, west on Ken, west on Gibson towards the foot pursuit but Officer Deal commanded me to go back to get the car, and meet, and so he kept on foot towards Officer Payne in his direction, where, when he was giving out his, his direct, his location and I grabbed the car to chase after Officer Deal, and I met Officer Deal on south DeLeon and we were try, we both, he got into car, into the car around I want to say Coral and we headed to Day to try to cut off the suspect cause Officer Payne was running down south, said the suspect was running south.*

Q:    *Okay. What happened next, did you arrive...*

A:    *We arrived at Day into position and uh, cause the sus, we got a call that he was reaching and pulling out, pulling out things, I, no, he was reaching, that's all we knew so we took position to think that he had a Signal Zero, so we took position...*

Q:    *What's a Signal Zero?*

A:    *It's, a, a weapon, we don't, we didn't know what kind of weapon, it just he might have, he might have had a weapon, so I'm not saying it, it, I didn't hear it at the time, there was a lot going on, and uh didn't hear if it was, I know he was reaching, that's all it was, and so we took position to make sure we were, had cover.*

Q:    *When you heard that, what was your initial thought when you, when you heard that he was reaching?*

A:    *My focus at the time was just to take position, watch Coral, I think that q street was, the street was that we ended up on...*

Q:    *Okay.*

A:    *I wanted to take position to make sure I could see everything if the person was running, run, run past me, I didn't want him to go past me, so I kind of got tunnel vision on that, to focus on that.*

Q:    *Okay. Did you hear anything else?*

A:    *I heard the gun fire and Officer Payne key up and I can't a hundred percent quote but I, I believe it was, shots fired, shots, shots fired.*

Q:    *Okay.*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:    *And then we ran towards Officer Payne.*

Q:    *Okay.*

TJ:    *How many shots, you said you heard the gunfire, correct?*

A:    *I believe I heard one.*

TJ:    *Okay.*

Q:    *Okay. Did you eventually arrive on scene where Officer Payne was at?*

A:    *Yes, sir, we got back into the car, we got back to the car on Day and headed down, is it Coral, the street?*

Q:    *Cora.*

A:    *Cora?*

Q:    *Cora.*

A:    *We headed down Cora and right where it met at Elizabeth? No, no, it was.....*

Q:    *You're, you're there in that area though, right where Craig uh...*

A:    *Craig there you go...there you go, I'm sorry...*

Q:    *That's okay.*

A:    *Officer Payne, we met with Officer Payne, Officer Deal went to where the victim was, well we went to the suspect, went to where the suspect was, to check on him with Officer Wilder was there in that area and I went towards Officer Payne.*

Q:    *When you suspect with Officer Wilder, what do you mean, ....*

A:    *It was a (long pause) at the person that matched the description.*

Q:    *Oh I see what you are saying. Okay so it wasn't who Officer Payne was dealing with it was...*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:     No, it so, the, I don't know how we want to call it, but the person that got shot...

Q:     Oh I see what you're saying, the person that he was chasing on foot...

A:     Yes.

Q:     Okay.

A:     Yes. Was on the ground, I didn't clearly see him, I just know he was in that area and I, and Officer Payne was adjacent to him, right across the street.

Q:     Okay, I gotcha. And Officer Wilder, you mentioned that, Officer Wilder checked out with somebody earlier, is that correct?

A:     Officer Wilder was with a gentleman that matched the description also.

Q:     Okay. When you arrived on scene to where Officer Payne was at...

A:     Um hm.

Q:     Where the shooting took place...

A:     Yes, sir.

Q:     Was Officer Wilder there first or did he...

A:     Officer Wilder was there before me.

Q:     Okay. Okay...

A:     (unintelligible)

Q:     ....at some point Officer Wilder got there, correct?

A:     Yes. It was almost the same time.

Q:     Okay.

A:     Almost the same time.

Q:     And you mention that Officer Wilder was, was with somebody, was he, so, did Officer Wilder check out with somebody prior to this...

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:     Yes.

Q:     ....happening?

A:     Right when I was interviewing the witness, the victim slash witness, when I was interviewing her Officer Wilder was at the time checking out with another individual that matched the description.

Q:     Okay I gotcha. And then Officer Payne gets into a foot pursuit....

A:     A foot pursuit.

Q:     ....with somebody different.

A:     And we all converge on Officer....

Q:     Gotcha.

A:     .........Payne to try to find his location.

Q:     Okay. Did, were you able to assist in that regard, in any way? I know you had the call for the domestic, were you able to assist in anything that needed to be done on scene with Officer Payne?

A:     When it came to Officer Payne all I did, was, was able to, cause, was go to set perimeter. We started setting perimeter to lock everything down, to make sure no one could get in. That's as far as, I didn't get a chance to even really say a word to Officer Payne.

Officer Logan took pictures of the suspect from the cell phone of the victim and said detectives went out to find the victim of the domestic incident. Officer Logan also said he had no further contact with Officer Payne.

I asked Officer Logan a series of questions about his training as an Officer with the Titusville Police Department involving his lethal and less lethal weapons and the options available for their use in situations. The following questions were asked of Officer Logan regarding this:

Q:     Okay. Were you taught how to transition how to transition from lethal to less-lethal options?

A:     Yes, sir.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

Q:      Can you provide an example of, of that, how you would transition,
        between a le..., a lethal and less-lethal option?

A:      I wou....how I was trained?

Q:      Right.

A:      How I was trained was, depending on how the scen....when you arrive on
        scene was how the scenario was, it could, you could, it could be a hot call
        in the beginning like an active call as far as a domestic and when you get
        there to deescalate and switch to the fire...Ta...Taser or whatever,
        whatever you needed at the time.

Q:      Okay. Were you taught how to, and you, and you were taught how to
        transition between a lethal and less-lethal type option?

A:      Yes, sir.

Q:      Meaning if you had to transition between your firearm and Taser you were
        taught how to do that? So if, so...

A:      Yeah I mean...

Q:      Would there have been a scenario, let me ask you this, would there have
        been a scenario in your training that would have involved having both your
        firearm and Taser out at the same time?

A:      No, sir, No, sir.

Q:      Okay

A:      No, we've been taught to not have two things in our hands like that.

Q:      And, and why is that?

A:      It's, there's never a, it's against policy, there's never a scenario where
        you're gonna be walking around with your Taser and your firearm same
        time it's unsafe,....

Q:      Why would, why is it unsafe?

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:    *You could, in, would, depending on the call it could be something that involved your Taser but you having two things in your hand you might fire, you might fire your gun by accident.*

Q:    *Okay. And is that, have you, is that been gone over before in training, talking about how...that these things can happen?*

A:    *Yes, yes, sir.*

Q:    *Okay. Was that training here?*

A:    *Yes, sir.*

Q:    *Police Department...okay. Has there ever been a time when you've had both your firearm and Taser out at the same time (unintelligible, talking over) call.*

A:    *No, sir.*

**Interview with Officer Bryan Deal**

On March 7, 2022, I interviewed Officer Bryan Deal. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Officer Deal his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. This interview was audio recorded. Officer Deal was sworn in and I began my interview.

This is a summary of the interview with Officer Deal. The full interview was recorded and is available for review.

Officer Deal is a Field Training Officer (FTO) with the Titusville Police Department and was Officer Logan's Field Training Officer on December 26, 2021. Officer Deal and Officer Logan were riding together and responded to the area of the Domestic Violence incident as well as the officer involved shooting. Officer Deal said the victim of the domestic violence had injuries and he and his trainee spoke to her. During their interview with the victim, Officer Payne initiated a foot pursuit which would eventually lead to the officer involved shooting. The following statements were taken during my interview with Officer Deal:

Officer Deal stated, "...oth*er units were in the area looking for a gentleman that the suspect was described as and the last known direction, they did say the last known direction was south, from Gibson possibly on W.C. Stafford."* I asked

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Officer Deal, "*The victim, that, of the domestic incident, did you notice thing, uh, notice anything about her when you saw her, did you observe any injuries, do you, do recall anything...*to which Officer Deal replied, "*She did have injuries on the face I don't know where on the face, I also noticed that her shirt was ripped, as if it was grabbed...she had an injury on one of her arms I can't say exactly what, which, uh, which arm.....but we asked if she needed medical and she declined it.*" Sergeant Joiner asked Officer Deal, "*Did she appear to be in any distress? To which Officer Deal responded, "She did appear like she was in distress.*" The following is part of the interview transcript taken from Officer Deal's sworn testimony.

TJ:    *What, what was she doing? Was she crying, yelling...*

A:    *She was, from what I can remember, she was emotional, ended up having her sit on the ground but I could tell just from the way her, her, the collar of her shirt was that she was indeed in an altercation.*

Q:    *Okay. When you were speaking with her were you guys primary? Was your trainee primary to the call? Or did he become primary at some point?*

A:    *He become, or he became, primary once we arrived on scene, to the victim.*

Q:    *Alright, and was your intention to go out and look for the suspect after getting the information?*

A:    *After gathering all of the information, yes. We got cut short of......further interviewing her.*

Q:    *And why is that?*

A:    *Uh, we heard foot pursuit.*

Q:    *Was that Officer Payne?*

A:    *Yes.*

Q:    *In a foot pursuit?*

A:    *Yes.*

Q:    *What did you do after you heard him?*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:    I told the trainee to get the car, I thought he said he was running towards, closer towards our direction so I started running there and then once I heard him call out uh, I think it was Queen or, uh, or Gayle, a street over that I knew was further from us, I waved my trainee down, I got in the car, while I was running to him I heard a, a sma, a faint pop, I didn't see a pop but from my training experience and use of a Taser it sounded like it could have been a Taser.

Q:    Okay

A:    After then, after that, I don't know how long after, but when I was getting, I knew when I was getting into my car I heard a pop that...sounded like it might have been a firearm but I didn't see anything.

Q:    Okay.

Q:    Two separate pops then?

A:    Two separate.

Q:    Okay. So did you respond to the area?

A:    So after that, that's when, uh, I think it might have a lieutenant came on the radio and said set a perimeter, so we drove to Day and uh, Deleon until, other units were already on scene but they advised that they needed medical at their location and stuff so we ended up driving over there. Once we got on scene, I kind of told my trainee just to sit back, I noticed that some officers, I can't remember who, were dealing with the victim who had a gunshot wound, I saw Officer Payne, I walked up to Payne and just kind of...stood and made sure, I didn't...if I said something I don't remember what I said and I know if we said something it wasn't conversation. I just, he had uh, just to make sure he was alright.

Q:    Okay. Did he say he was okay or.....

A:    I don't remember. I know for a fact it wasn't a conversation.

Q:    Okay.

A:    It was, I kind of just put my hand on his shoulder.

Q:    Okay. Who was he with, do you recall?

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:     Uh...I want to say it was Baez, Officer Baez.

Q:     Okay. And your body camera was on?

A:     Yes, it was.

Q:     Okay. Did you assist in any way when you got to the scene, where the victim was, did you do anything or if you did how did you assist?

A:     When I first went there I noticed that there was a gate, they asked if we could uh, try to break it, there, there was a big lock on it and we couldn't, and then as soon as I turned around I saw there was people jumping over the fence so I knew they had that kind of handled so I just went over, there was only Baez by Payne so I wanted to see what......what was up with Payne, was there other people involved, was, what was going on.

Officer Deal said he did complete a supplement as part of this investigation.

I asked Officer Deal about his training as a Police Officer with the Titusville Police Department. Officer Deal stated the following in response to questions about his training:

Q:     Okay. Did any of these trainings focus on lethal versus less-lethal or any first aid type scenarios?

A:     Yes.

Q:     Were you taught how to transition between lethal and less-lethal options?

A:     Yes.

Q:     Can you provide an example of any scenarios where that would happen or that you may have attended a training or how you were taught that?

A:     I mean if there was a....less-lethal force you'd pull out your Taser and then, uh, if it, something happens and it becomes a lethal you switch to your firearm.

Q:     How would you do that?

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:   *I mean I, I have my belt set up to where normally I have my left hand for my Taser which would be like my, weak hand, and then my, my primary hand for my firearm, so I can transition.*

Q:   *Okay. Is there any scenarios that you can recall that would involve, that involved using both your firearm and Taser at the same time?*

A:   *The training that we've done in house?*

Q:   *Yes.*

A:   *I can't remem, I can't recall off the top of my head.*

Q:   *Okay. Were you trained on pointing your firearm or Ta, or Taser at subject at the same time?*

A:   *I mean I have my belt set up the way I have it now so I can transition if I have to.*

Q:   *But would you have pointed both your, would you, is there ever a case that you can think of, a scenario you can think of where you would point both your Taser and firearm at somebody at the same time?*

A:   *I mean it might be pointed for a brief second if I'm transition from one to another.*

Q:   *Right, so you would be transitioning but not, you wouldn't...*

TJ:  *Maintain, maintain....*

Q:   *You wouldn't maintain that where you're....*

A:   *I mean I would just transition....*

Q:   *Okay. Why would you do that?*

A:   *Uh, depending on what the force is, ....*

Q:   *So if you're dealing with a situation and you're transitioning between the two, so to speak, why wouldn't you keep both on there?*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:    *Cause I'd be transitioning for that reason, to, depending on what the threat is if it's a less-lethal threat and now becomes a lethal I would transition from my Taser that was pointing on him to now my gun, and have my gun pointed on him. Or if it's vice versa, if it's a lethal threat that they drop the weapon then they decide that they might may run, that would be something I would transition from my firearm pointing at them to now a Taser, or something of less-lethal.*

Q:    *Okay. And have you ever heard of the term sympathetic reflex?*

A:    *Yes.*

Q:    *Did you, did you ever go over that in training?*

A:    *Yes, we have.*

Q:    *What is that?*

A:    *What one hand does the other does.*

Q:    *Okay. So is it, so in your training has it, so when you went over that in training do you recall how they were, how they went over that in training here with you?*

A:    *I don't remember the exact scenario I just know they said what you do with one hand you do with the other.*

Q:    *Okay. Do you remember going over policies during training?*

A:    *I've signed off on the policies.*

Q:    *Okay but I mean the, so say response to resistance, use of force, things like that, before you, when you were in in-house did maybe say Sergeant Jennings or Lieutenant Wright, did they go over policies with you when you were doing...*

A:    *Yes.*

**Interview with Officer William Mick**

On January 27, 2022 I interviewed Officer William Mick. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Officer Mick his rights as a department employee

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

as a witness to an investigation and relating to his obligation to cooperate in this investigation. This interview was audio recorded. Also present for the interview with Sgt. Telly Joiner. Officer Mick was sworn in and I began my interview.

This is a summary of the interview with Officer Mick. The full interview was recorded and is available for review.

Officer Mick said he responded the incident once he heard Officer Payne in a foot pursuit. Once on scene, Officer Mick said he saw Officer Baez with Officer Payne walking away from a metal gate. Mick said he was instructed by Baez to help Officer Matt Gonzalez who was on the other side of the gate. Mick said he tried to get the gate open and observed an African American male laying on the ground. As Mick was trying to get the gate open, he said Officer Wilder got to the other side of the gate. Mick said he got out tape and set up an inner perimeter. Mick said he heard Lt. Gonzalez on the radio and Sgt. Nelson responded to the scene. Mick said he looked at the track of the foot pursuit and located a taser-7 probe that was on the ground. Mick said he completed a supplemental report. Mick said he did not talk to him about the incident but did check on him to see if he was ok. Mick said he maintained the perimeter and requested the Brevard County Sheriff's Office respond to help maintain the outer perimeter. Mick said once he got on scene, Officer Gonzalez had the decedent secured on scene on the other side of the gate.

Officer Mick attended in-house training with Officer Payne. This training consisted of firearms, building searches, simmunitions training, as well as first aid/IFAK (Individual first aid kit) training. Officer Mick stated the following: Officer Mick recalled attending in-house training with Officer Payne, as well as Officer D. Knapp. Officer Mick recalled participating in scenario-based training to include deadly force scenarios and lethal vs less-lethal training scenarios. Officer Mick recalled the scenarios as traffic stop scenarios, empty building/building search scenarios and calls for service scenarios. Mick recalled a scenario where a subject was banging a stick, and he had his taser out first, eventually having to use lethal force. Officer Mick said he practices transitioning between lethal and less/lethal placing less-lethal in his holster. Officer Mick said he remembered training consisting of drawing his taser and re-holstering. Officer Mick believed policy was gone over prior to the scenarios being taught. Officer Mick stated he was never taught to keep both his firearm (lethal) and his dart-firing stun gun/taser (less-lethal) pointed at a suspect during an incident at the same time and based this on training he has had over the years in law enforcement. Officer Mick specifically spoke about sympathetic reflex during a situation like that and why he would not do this. Officer Mick described sympathetic reflex as being involved in a situation where one hand is holding the taser and one finger is doing one thing with the taser and you could have a sympathetic reflex where you are pulling the trigger to your firearm as well.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

_____

**Interview with Officer Christopher Wood**

On January 27, 2022, I interviewed Officer Christopher Wood. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Officer Wood his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. This interview was audio recorded. Also present for the interview with Sgt. Telly Joiner. Officer Wood was sworn in and I began my interview.

This is a summary of the interview with Officer Wood. The full interview was recorded and is available for review.

Officer Wood was working on the night of December 26, 2021, and took a position to help on the perimeter of the incident. Officer Wood was also one of Officer Payne's Field Training Officers. I asked Officer Wood if he attended any training at the police department and if any of the training he participated in involved lethal versus less-lethal training, first aid or anything of that nature and in response, Officer Wood stated the following: *I recall going to a shots fired call in a school. I recall first aide and IFAK training with an officer down. I've been to pepper ball training. So, that would constitute less than lethal. The scenario, if I recall correctly, was active shooters inside the school. Two suspects. They gave a description. You respond to the scene, grab your patrol rifle, and start to enter the school and clear the school while individuals, who are actors, were in the hallway. I think I remember one being down and one saying that they were shot and needed help. So you give them your IFAK or tourniquet and then you continue on with your training.*" Officer Wood continued: *"Over my time here, yes. I have attended taser training twice. In-house taser training – twice. Where you're presented with a scenario and you either use the taser or you – if I remember right – you have a blue gun, it is an option, and pepper spray as well."* I asked Officer Wood if he was taught how to transition between lethal and less lethal, for instance using his taser and Officer Wood replied, *"Yes, your taser is kept on your weak or off-hand side where as your pistol is kept, your lethal force is kept on your dominate or strong side…. Put your taser away while drawing the lethal. But the taser has to go away or vice versa."* When asked why, Officer Wood replied, *"The reason for that is because of sympathetic reflex…. Sympathetic reflex, as an example, if I were to have my taser in my left hand and my pistol out in my right hand and I mean to pull my taser – deploy my taser, sympathetic reflex with your brain, in that moment of stress, you may pull your right trigger – your right finger as well. And actually, end up deploying both your taser and lethal."*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Officer Wood said sympathetic reflex was discussed in training. Officer Wood said there has never been a situation where he would have both his firearm and taser pointed at a subject at the same time.

Officer Wood was Officer Payne's Field Training Officer (FTO). I asked Officer Wood, *"are there instances where you've had to explain, specifically with Officer Payne, any response to resistance? Use of force? Things like that?"* to which Officer Wood replied, *"We go over the use of force, response to resistance. Back in my day we used to call it force matrix, but. We go over that policy. There were, at that time, seventy-two lessons in the FTO manual that were covered…. And use of force, response to resistance, and deadly force uses were two of those lessons."* I asked Officer Wood if he recalled going over those lesson plans with Officer Payne and Officer Wood replied, *"I don't specifically remember a date or time that I did that, but I make it a practice in my form of FTO to go over and address that with each of my trainee's. So, that way I am confident that they know."*

I asked Officer Wood, *"Do you recall responding to any incidents where use of force by Officer Payne was done? Were you able to observe him doing any use of force? Obviously, without looking over the DOR's"* to which Officer Wood replied, *"Like I said, nothing stands out other than normal handcuffing and dealing with arrestees or transporting of them, there's nothing that I can recall right off the top of my head of anything specific…"*

### Interview with Officer Carly Rosas

On February 21, 2022, I interviewed Officer Carly Rosas. The interview took place in my office, located in the Professional Standards Division. Also present for this interview with Sergeant Telly Joiner. Before the interview began, I explained to Officer Rosas her rights as a department employee as a witness to an investigation and relating to her obligation to cooperate in this investigation. This interview was audio recorded. Officer Rosas was sworn in and I began my interview.

This is a summary of the interview with Officer Rosas. The full interview was recorded and is available for review.

I asked Officer Rosas about the details of the Domestic Violence call for service. Officer Rosas said the following in her interview:

A:     *I believe some of the boys in the north end were on a call for service in regards to a domestic dispute, and Officer Payne called out a foot pursuit, and it's normal for us to, the whole squad to respond to foot pursuits so that we can perform and like get a perimeter around that area so I was actually on the phone with Officer Mick cause we were trying to go to dinner, and I think I was in the area of South Washington and, uh,*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

*Harrison like on the Titus Landing area, when the foot pursuit got called out so just starting heading that, to that area I think it was like Queen and, Queen and south Deleon was the area it was, for that incident was occurring so we just started going that way, so I made my way over. I don't know exactly what route I took, cause I can't really remember, but I just started going that way.*

Q:     *And you say you responded after hearing the foot pursuit?*

A:     *Correct.*

Q:     *Do you know what prompted that foot pursuit?*

A:     *I'm not sure.*

Q:     *Okay. Do you know what the call for service was originally that started that?*

A:     *There was a domestic dispute of some sort, and there was officers out with some subjects, but I'm not really sure the details of the call because I wasn't there.*

Q:     *Okay you did, so you did not respond to the domestic?*

A:     *I did not, I was trying to go to dinner with Officer Mick.*

Q:     *Okay. Did you have any, did you have any interaction with Officer Payne during this incident?*

A:     *I did.*

Q:     *What was that interaction?*

A:     *I got on scene and, Officer Payne was with Officer Baez when I pulled up on the scene and I came up to him and he was already with Officer Baez and he spoke with me, I'm not really sure what he said and I just told him to not speak to me cause I wasn't sure if he was part of FOP or not and I just told him, listen, don't talk to me, I don't want to know what happened and Officer Baez told me to start moving vehicles around to set up a large perimeter so we could stop, preventing the crowd from perf.., coming around the area so I just started moving my car, I moved Officer Baez's car and, I think I set mine up at the inter, at one of the intersections and then I moved Officer Baez's car a little bit further down. And I moved*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

*vehicles around and then I ran over to the area of where the victim was, and I think Officer Gonzalez and Officer Mick and Officer Wilder were over there and there was like a fence over there that I couldn't get over, cause I'm not like the most agile person, and they were trying to work on getting the gate open, so then I went back over to Officer Baez and he was still with Pay, uh, Payne. I think Officer Baez stayed with Payne the whole time.*

Q:    *Okay. So did you have any, did you make contact with the male that had the gunshot wound? That was late, later identified as James Lowery?*

A:    *Not until they had the gate open and then when they opened the gate it appeared to me from my training that he was deceased and we called for medical once we had the scene secure and we had medical come in.*

Q:    *You said we did, was that you that called or was that somebody else that called?*

A:    *I'm not sure exactly who called for medical. It was one of the officers on the scene.*

I asked Officer Rosas about her training as an officer with the Titusville Police Department and she stated the following:

A:    *I believe we had Taser training where we focused on lethal and non-lethal and lethal where you know we, we talk about like building teams and stacking up, where we, our squad we have designated people where you know, if there's two of us or three of us you say you got lethal and I have non, non-lethal, so...*

Q:    *What would that mean?*

A:    *Like, hey you got your Taser I'm gonna use my firearm so we don't have the mix up.*

Q:    *Okay. Were you taught how to transition between lethal and less-lethal options?*

A:    *We were, and I, I'm not sure, I can't recall correctly like the training cause it's been a while but I believe we were taught to transition. I know that I carry my Taser cross draw on my left-hand side because I'm a right-handed draw, so I don't have the confusion.*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Q:    So your firearm's on your right hand side?

A:    Correct. I'm a right-hand and my Taser's on my left so I have to cross
      draw so I don't have the confusion on whether I, pull my...

Q:    You mention that so there isn't any confusion, it's so, you draw with, so,
      would your right hand be considered and your left hand be non-dominant?

A:    Correct.

Q:    Okay. And then your firearm you would draw with your dominant hand?

A:    Correct.

Q:    But your non-dominant could draw your Taser, is that correct?

A:    Correct but I, my Taser is a cross-draw so if I wanted to draw my Taser I
      would have to put my firearm away in order to cross-draw my Taser the
      way that my Taser is set up.

Q:    Okay. Did you attend any, training in June of two thousand twenty-one at
      Madison Middle School for active shooter?

A:    I did.

Q:    Can you recall the, some of the incidents at that training and what they
      went over?

A:    We went over being able to distinguish whether we use our Taser or our
      firearm when we go into a active shooter training or dealing with children
      who are irate at the school if, I recall it properly I know it, it's been some
      time since we did that training as well, but, you know, we have them out,
      you know, we have to just de-escalate situations sometimes we don't
      always have to go to our firearm sometimes we have to be able to dictate
      the situation, but we have to be able to transition to analyze the situation
      and kind of go from, are we gonna use our Taser or are we gonna use our
      firearm, and go from there.

Q:    What about any scenarios, and it, maybe it's the training that you have
      your firearm first, but then you realize it's maybe not a lethal situation, you
      would transition to less-lethal, how would you do that?

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:    *How you would secure your firearm and then you can transition into your Taser if need be.*

Q:    *Okay. What about policies? Did you go over policies during those trainings or when you were in in-house training did you, review policies as well?*

A:    *We have access to PowerDMS to refresh your memory where you can go over those policies and I know that we can have, we have access to them all the time if you have forgotten them.*

Q:    *Okay.*

A:    *So it's good to refresh your memory if you haven't been up-to-date.*

Q:    *When you go into the training do they discuss policy as well?*

A:    *They do.*

Q:    *Okay. Was there any scenarios that you can recall where you would use both your firearm and Taser at the same time?*

A:    *No.*

Q:    *Why wouldn't you do that?*

A:    *It's just not the way we train.*

Q:    *Okay.*

A:    *I think they teach us something about having that reflex.*

Q:    *Okay.*

A:    *Both your hands. I don't know what it's called but they teach it to us. Lieutenant Wright tells us all the time it's a reflex that we have.*

**Interview with Detective Tom Krewson**

On February 04, 2022, I interviewed Detective Thomas Krewson. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Detective Krewson his rights as a department employee as a witness to an investigation and relating to his

Page 32 of 102

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

obligation to cooperate in this investigation. This interview was audio recorded. Also present for the interview with Sgt. Telly Joiner. Detective Krewson was sworn in and I began my interview.

This is a summary of the interview with Detective Krewson. The full interview was recorded and is available for review.

Detective Krewson said he responded to this incident after being instructed to do so by Sgt. Werring. Detective Krewson said Agent Deardoff with FDLE requested his assistance with uploading body camera footage to provide it to FDLE. Krewson spoke to Officer Deal about the domestic incident and informed him of giving his statement to Detective Givens for the domestic violence investigation.

Detective Krewson was called out on the night of December 26, 2021, to assist with this incident. Detective Krewson is a field-training Officer (FTO) and certified trainer at this agency. Detective Krewson stated the following:

" *I was contacted by Sergeant Tim Werring, who is over CID. He informed me that there was an officer involved shooting and said he needed additional detectives to help with the investigation. When I got out to the scene I was informed by him that FDLE has already been in contact about the incident and he wanted me to go to the police department to meet with Agent Deardoff to acquire the body camera videos that had been uploaded for his investigation…. So I was on scene for about five minutes. I briefly spoke with Officer Bryan Deal, about the incident but I basically told him that he would need to give a full statement to Detective Dan Givens who was the primary investigator of the domestic side of the incident… and Dan (Detective Dan Givens) was right there so I said well just give Dan your statement and I'm going to go meet with this agent, so briefly spoke with him and then left.*"

Detective Krewson is a Field Training Officer, as well as trainer with the Titusville Police Department. Detective Krewson has instructed new officers and current officers on first aid, report writing and IFAK (Individual first-aid kits). Detective Krewson has completed daily observation reports (DORs) on Police Officer Trainees as part of his duties as a Field Training Officer. The following is a series of questions and responses I received from Detective Krewson as part of this interview:

Q:    *Did you, have you ever trained an officer while as an FTO or as an instructor on use force, deadly force, response to resistance, firearms, anything of that nature?*

A:    *As an FTO in real world application and like discussing it after the fact and what you know, good, better, best, of what could have been done, never in a situation with a firearm with an officer involved shooting. I've never been involved in that scenario.*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

_____

Q:     Okay.

A:     I've talked about it with, with my trainees as far as their questions...

Q:     Okay. What about any training scenarios that would have included Simunitions or firearms, either through Officer Payne or others in the past?

A:     I never instr....I've been a participant but never an instructor in one of those scenarios.

Q:     Okay. You...go ahead.

TJ:    All the instructors are teaching the same thing as far as the training goes, correct?

A:     So for first aid....

TJ:    Yes for first aid, I'm sorry....

A:     ...myself and Corporal Lauren Watson, we work off the exact same material....

TJ:    Okay.

A:     .....a lot of time we're both training at the exact same time, ...

TJ:    Do any of your material cover, officer involved shooting and how they should react to, administering first aid to either themselves or the person that was injured?

A:     It's not so specific as to and officer involved shooting but treating a gunshot wound to yourself, as well as gunshot wounds to others and if both of those things have occurred in the same scene, to treat yourself first so you don't go into shock and pass out and then administer first aid to others if you can.

Q:     Okay. What about any training that would focus in lethal versus less-lethal options? I know you mentioned the first aid ones but....

A:     I haven't instructed that training at all.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Q:     Have you spoke about that before though with your FTOs? Transitioning from lethal to less-lethal....

A:     Lethal to less-lethal, I've, yes like speaking about it with trainees that I've had, yes.

Q:     Okay. What about, are there any examples that you can recall that you spoke about or how you talked about it with them?

A:     There is a call for service that I had early on in my career that I reference when people ask about it, specifically comes up when people ask about should I get a left handed draw Taser if I'm right handed and I shoot with my right hand and I said, there's an incident where I had to holster my Taser and then pull my gun out and it is basically it's I could only do it with my right hand cause I had the right hand draw and it prevents a situation where you're fumbling with both items or you know, in a high stress situation the wrong item or use the wrong item.

Q:     And you wouldn't want to do that, correct?

A:     Correct.

Q:     That'll lead to some of these other questions here. Did you happen to train Officer Payne to use his firearm or Taser at the same time?

A:     I did not.

Q:     What about other trainees in the past, have you taught them to use both their firearms and, have both their firearms and Taser out at the same time?

A:     I have not.

Q:     And why wouldn't you do that?

A:     In high stress situations you can make mistakes as far as fine motor skills and the, I believe it's called the parasym...parasympathetic refle, what you do with one hand might follow the...the other hand might follow the same motion.

Q:     Okay. Were you trained on pointing both your firearms and Tasers at a subject at the same time or have you trained anyone else to do so?

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:      I was not and I have not trained anyone in that.

Q:      And that would include Officer Payne

Q:      You mentioned sympathetic reflex, you may have given that definition, but what is that?

A:      The way it was explained to me, I believe it was covered when I did the training and it's basically like your trigger finger on one hand will go on the other hand if you're, if you're in a high stress situation.

Q:      And that was training here at the police department?

A:      Yes.

Q:      Do you, was that in-house and subsequent training or...?

A:      I think so I believe it was uh now Sergeant Jennings that I remember talking about that.

Q:      Okay. When was that, so that was in one of the high liabilities whether it was Taser or firearms or do you remember which one it was taught in?

A:      I couldn't remember, I, I'm sure it was brought up....

Q:      Okay....

A:      ...in Taser.

**Interview with Detective Dan Givens**

On February 03, 2022, I interviewed Detective Dan Givens. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Detective Givens his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. This interview was audio recorded. Also present for the interview was Sgt. Telly Joiner. Detective Givens was sworn in and I began my interview.

This is a summary of the interview with Detective Givens. The full interview was recorded and is available for review.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

Detective Givens was called out on the night of December 26, 2021 to assist with this incident. Detective Givens is a field-training Officer at this agency and was one of Officer Payne's field training Officers. Detective Givens stated the following: *"They (Titusville Police Dispatch) got a call rece....from a caller saying they saw somebody in the roadway, laying on the ground, yelling call the police. As she talked to officers they would gave, give some kind of description and I responded out because they thought maybe the suspect was, was the deceased."* Givens continued by saying, *"The neighbor of the victim who lives across the street, he said he heard some yelling, a verbal argument, he never saw any physical, he saw her take off down the road yelling call the police. Due to the history at the house, they're always yelling, he didn't think much of it. He did know that she had a gray car, her car was there and she ran off on foot, and then he knows the house to belong to the kid lives there, his name's AJ. He knows him as AJ.... I talked to the girl at the hospital that the caller, the original caller, she said she's on the way to the hospital with her boyfriend, he's sick. They see her in the road. He says I think that guy may have pushed her down but they weren't one hundred percent sure. They drive by, they hear her scream call the police. The gentleman is saying, don't worry about it, nothing's going on. Due to going to the hospital, they kept going but called the police on their way. She was taking her boyfriend to the hospital."* Detective Givens was asked what investigative measures he had taken with respect to the domestic violence investigation and Givens replied, *"We called Melbourne PD to go down cause we had a description of the vehicle, and we had her name, and we tracked down her address to be 626 Tucker in Melbourne, I think, so, send over PD, they saw a gray car in the driveway, nobody answered the door. Due to a car match and the car being in the driveway, I went down there myself to try to get somebody to answer the door. I come to find out, a lady answers the door, says nobody lives here by that name, I don't know anybody by that name, I've never met anybody by that name, I'm the only one that lives in this house. Turns out that's not true, but.... The lady I talked to was Betty Jean, and she's the victim's biological grandmother."*

When asked if he (Detective Givens) had been back to the house, Givens replied, *"We haven't been back down there because the victim's vehicle is always parked at AJ's house any time I go by, I've been to AJ's house three times now, talked to Eileen Johnson(sp), Eileen Johnson's(sp) very uncooperative. Every time she says that she'll let her know, she, I say that's the victim's mother's car that's parked in your driveway, I know she's here. She's well that doesn't mean that she's here, well I know she's here and uh she's well maybe she just doesn't want to talk to you. I only see Eileen Johnson(sp), I don't ever see my victim there."* Detective Givens said he was still actively looking for the victim in this domestic violence case.

As one of Officer Payne's Field Training Officers, I asked Detective Givens the following questions:

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Q:      Okay. Were you taught or did you instruct Officer Payne on how to transition between lethal and less lethal options? And if so can you provide an example of any of the scenarios?

A:      Yeah we go through scenarios where we have to switch between lethal and less-lethal, I do anyway, through my training, I wasn't there for his in-house training.

Q:      Would you have had any conversations or something like that if, with Officer Payne, talking about, here's where your Taser is, here's for your firearms, and then maybe discuss that a little bit, anything like that?

A:      Not particularly with him because he was Phase 2 and that means he was already, he's already through the beginning (?) parts, we were more moving on to dealing with calls for service and incidents at that point. It would only have happened if it came up on an incident.

Q:      Did you speak to any of his other uh trainers while going through FTO, did they notice any deficiencies with him that you're aware of or that you recall?

A:      Not that they made me aware.

Q:      Okay. Did you train Officer Payne on using both his firearm and Taser at the same time?

A:      No.

Q:      Would you have trained him to do that?

A:      No.

Q:      Why is that?

A:      Uh, I just...I don't bel....we've never been trained that way, I've never been trained to have both out at the same time, it's one or the other, it's not, I mean I, just never, it was never an option like, I've never been trained that that's the way to do anything.

Q:      Did, is there a reason for that, that you recall, why you wouldn't do that, or...

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:     *I mean tactically, if even if you have to shoot how are you supposed to be
accurate with just one hand while you're holding your Taser.  And the
other side is, you want to be sure about what you're about to do. You don't
want to have two in your hands and shoot one by accident either.*

Q:     *Okay.*

A:     *You don't want to have accidental discharge of either weapon. It's all
meant to be purposeful.*

Q:     *Okay. Were you train...were you trained on pointing both your firearm and
Taser at a subject at the same time?*

A:     *No.*

Q:     *And you never trained Officer Payne to do that, correct?*

A:     *No.*

**Interview with Officer Devin Knapp**

On January 27, 2022 I interviewed Officer Devin Knapp. The interview
took place in my office, located in the Professional Standards Division. Before the
interview began, I explained to Officer Knapp his rights as a department
employee as a witness to an investigation and relating to his obligation to
cooperate in this investigation. This interview was audio recorded. Also present
for this interview was Sergeant Telly Joiner. Officer Knapp was sworn in and I
began my interview.

This is a summary of the interview with Officer Knapp. The full interview
was recorded and is available for review.

Officer Knapp attended in-house training with Officer Payne. This training
consisted of firearms, building searches, simmunitions training as well as first
aid/IFAK (Individual first aid kit) training. Officer Knapp stated the following:
*"Firearms training was – it was transition training as far as how to handle
your firearm. Everything from how to clean it, assemble it, to how to fire it, what
to do when you get jammed, when to shoot, when there's a threat. As far as
simunitions training, it was simunitions of going inside of a building and there
possibly being a subject in there and then determining how to handle that
subject; if you need to use force or not use force against them."*
I asked Officer Knapp the following:

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

Q:    Okay. So, you have the scenario-based training and then you have what
      you're doing in-house. We mentioned traffic stops, encounters on traffic
      stops. What about encounters (inaudible)? Was there any scenario bases
      to those, do you recall?

A:    Yeah, there was some scenario-based individuals in, simulation training
      and then in traffic stop training as well.

Q:    Did any of that include going hands-on with an individual, lethal situation,
      less-lethal situation, that type deal?

A:    There was a combination of both. I can't remember the exact scenario and
      how it – how the exact scenario went down, but I now there was some
      scenarios that are requiring us to use lethal and then less-lethal
      depending upon the situation.

Q:    Okay. When I say lethal, what does that mean to you?

A:    Lethal would mean deadly force.

Q:    Okay, and use of a...?

A:    Use of a firearm.

Q:    Okay. Did you go over policies?

A:    Yeah, we went over policies. I mean, I know we did in PowerDMS. I
      believe we went over them when we did, like, when we were in each of
      those in-houses we talked about the police that pertained to that – to that
      – like, firearms for instance. We went over the firearms policy.

Q:    Okay, and then you discussed out the course that type of...?

A:    Yeah, uh-hmm.

Q:    What about first aide? Giving first aide to somebody? Or scenarios where
      somebody may be injured and you're required to provide first aid while
      dealing with a lethal maybe versus less lethal situation?

A:    Yeah, I don't recall that as much. I know that we did have an in-house
      where we did have a medical portion of it – where we rendered first aid.

Q:    Was it scenario based or did they just go over...?

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:      *No, it was scenario-based.*

Q:      *Okay.*

A:      *I think they also went over as well.*

Q:      *Talked about policy and (inaudible).*

A:      *Yeah, talked about – I believe so.*

Q:      *Do you recall, were you taught how to transition between lethal and less-lethal and those options that were available to you?*

A:      *Yes, I was.*

Q:      *Can you just tell us what those were, what you recall?*

A:      *Yeah, I just recall when something went from lethal to less-lethal – or, I'm sorry, from – if you were at one or the other, just practice transitioning from one to the other.*

Q:      *What do you mean by that? Transition?*

A:      *So, if I'm lethal and I need to go less-lethal, you know, practice holstering one and going to the other. Or dropping one. If I have to drop one for whatever reason – if, you know, I have someone that's coming at me and I use a taser and it's not working, you know, to fire a second cartridge or do whatever I have to do. In essence, was to put one away and to transition into another. However, you – if you put it away, or if you had to drop it, whatever – to go from less-lethal to lethal.*

Q:      *Okay, were you given any scenarios that you can recall or were you taught to keep both your firearm and taser out at the same time?*

A:      *No, I don't – no, I was never taught to keep my firearm or taser out that I recall. I never – not that I remember. I mean, I know that's not the way that it's supposed to be done.*

Q:      *How do you know that? Is that from the training you had here?*

A:      *Just from, just from speaking with other people who have been trainers or who are trainers. Talking to people who have more knowledge than what I*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

do. As far as the training, yeah, we were never trained to hold both in one hand.

Q:  You mentioned transitioning. So, what I'm asking you is; you would keep a lethal in one hand, a less-lethal in another – you mentioned transitioning. So, if you have less-lethal options, but you're going to a lethal option (inaudible)... holstering.

A:  Yeah, so put your – yeah, I would holster or drop if I had a taser and I didn't – and something wasn't working or something, just to drop it, to go – not to have both in – in hands. You can have, I can't think of the word for it, but it's a – the trigger, the reflex or sympathetic reflex.

Q:  Sympathetic reflex, okay.

A:  Sympathetic reflex, yeah.

Q:  Do you remember going over that in in-house training? You were talking about transitioning. Was that something you talked about in in-house training?

A:  Yeah, I remember – the specific transition I remember is from, from a rifle to a pistol. I'm trying to think scenario, when we were doing scenario – I think there was when we went from a taser not working to going to a pistol.

Q:  Okay.

A:  Or going to a handgun.

Q:  You mentioned about the transition, so obviously you knew it.

A:  Yeah.

Q:  Do you believe at some point you were taught that, you just don't recall when or?

A:  Yeah, I believe it was taught. I mean, how else am I going to learn it. I just don't recall the specific scenario when it was taught.

Q:  Do you ever recall being trained to where you would point both your firearm and taser at a subject at the same time?

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:    Not that I recall. Nothing about pointing them both at the same time.

Q:    Okay, and you mentioned there's the – what you called sympathetic reflex.

A:    Yeah, sympathetic. Unless, I mean, I'll just answer your question; no, I don't remember being taught that.

Q:    Okay. Sergeant Joiner, do you have anything?

A:    No.

Q:    Okay. Do you recall attending a June 2021 scenario-based training at one of the local middle schools?

A:    Yeah.

Q:    Can you recall what that training was about?

A:    It was active shooter training.

Q:    Do you remember what some of the scenarios were that you were provided when you went in?

A:    Yeah, the first scenario was an angry or upset parent who had a knife. I believe I came in and was lethal – came in lethal and then I had back-up so I transitioned to less lethal and then deployed taser on the subject to stop the threat.

Q:    Okay. Did you go over any first aide? Was there opportunities to apply first aide?

A:    I think so, but I don't recall exactly. I know when we did the second scenario we had to – there was a shooter, an active shooter, so we had to bypass rendering first aide. I can't remember in that scenario if myself or my partner or somebody was it, it might've been the suspect who was hit, I can't recall.

Q:    As far as in-house goes, you mention it was Officer Payne, Officer Mick. Is there anyone else that you can recall that you did any in-house training with?

A:    No, I think it was just us three.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

**Interview with Corporal John Cantalupo**

On January 28, 2022, I interviewed Corporal John Cantalupo. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Corporal Cantalupo his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. This interview was audio recorded. Corporal Cantalupo was sworn in and I began my interview.

This is a summary of the interview with Corporal Cantalupo. The full interview was recorded and is available for review.

Cpl. Cantalupo is a training instructor with the Titusville Police Department. I asked Cpl. Cantalupo if there was any type of training scenario where an Officer would have both their firearm and taser out at the same time and he said no. Cpl Cantalupo said he does not train this way, due to the possibility of sympathetic fire, meaning squeezing both of the same triggers at the same time. The following was a question and answer part of my interview with Cpl. Cantalupo:

Q:     *I'm showing you a document right now, which is a training roster, do you recognize that raining roster as having your name on it?*

A:     *Yes, and I signed it.*

Q:     *You signed it, okay. Who are the officers that went through that?*

A:     *Devin Knapp, Joshua Payne, William Mick, and Sergeant Jennings.*

Q:     *Okay, do you recall anything in particular about that day - doing that active shooter or anything – actually, tell me about that scenario and the training of that day. What does that consist of?*

A:     *It's more for building clearing. Then we kind of cover, like, a brief version of active shooter so they get a concept of it. So, the first few repetitions they go through is to learn to clear the building with just a flashlight and no firearm, no taser, no rifle or anything out. As the day progresses they feel more comfortable with clearing doorways and the actual inside of rooms. They'll start to move using their flashlight out in one hand and their firearm out in the other. We'll show them how to clear the room from the outside and then move into the room. If we have – three people probably got to it, then we'll get to the point where they'll have their firearm holstered and*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

*they'll move around the building with their rifle out, depending on the situation. And that builds us up to the active shooter portion.*

Q:    *Now you mentioned the flashlight, is there a portion where the flashlight may be out where you're covering with the firearm as well?*

A:    *Yeah, we show them all the different positions. There're three different positions that we prefer that they use or we try not to teach them with the gun light right away. The light on top of the firearm or the bottom of the firearm. Just so they get more comfortable with the flashlight being out. I guess it's not always required to have your firearm out.*

Q:    *Okay, if their firearm is out and there's a light on the bottom of the firearm; is there training with that to use the light on the bottom of the firearm if you are in a lethal situation?*

A:    *Yes.*

Q:    *Okay, would your taser be out at the same time?*

A:    *No.*

### Interview with Sgt Bryan Nelson

On February 22, 2022, I interviewed Sgt Bryan Nelson. The interview took place in my office, located in the Professional Standards Division. Also present for this interview with Sgt. Telly Joiner. Before the interview began, I explained to Sergeant Nelson his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. This interview was audio recorded. Sgt. Nelson was sworn in and I began my interview.

This is a summary of the interview with Sgt. Nelson. The full interview was recorded and is available for review.

Sgt. Nelson was one of the supervisors working the night of December 26th,2021. Sgt. Nelson is also Officer Payne's direct supervisor. I asked Sgt. Nelson if he heard the call for domestic violence that evening and he said yes, however he did not recall the circumstances behind the call. Sgt. Nelson said he heard Officer Payne initiate a foot pursuit, however at the time he did not know whether or not it was related to the domestic violence incident. Sgt. Nelson said he heard Officer Payne call out shots fired and he responded to the scene. Sgt. Nelson said when he arrived on scene he got with the other officers and started

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

coordinating their response. Sgt. Nelson said Lt. Gonzalez told him Officer Payne was being brought back to the police department and he (Sgt Nelson) was told to manage the scene.

Sgt. Nelson said he coordinated with Officers setting up the crime scene tape, holding back crowds, essentially just held the area until detectives and agents arrived on scene from Criminal Investigations Division (CID/Titusville Police) and the Florida Department of Law Enforcement (FDLE).

Sgt. Nelson said he did not acquire any information form Officer Payne about the incident. Sgt Nelson said he did speak with Officer Payne over the phone. Sgt. Nelson said while he did speak to both Officer Baez and Officer Payne on speaker phone, he did not inquire any information from Officer Payne about the incident. Sgt. Nelson said what he could remember from the call was giving direction to Officer Payne to report to the Police Department, meet with Lt. Gonzalez and dock his body camera.

Sgt. Nelson said he did not collect any statements, nor did he complete any reports as part of this investigation. I asked Sgt. Nelson about his time as a field trainer and supervisor with the department. Sgt. Nelson recalled attending training sessions with the police department, but he did not personally train Officer Payne while he (Officer Payne) was assigned to field training. I asked Officer Nelson as a supervisor, had he discussed policies with his officers to include use of force or high liability policies and he (Sgt Nelson) replied, *"no sir".* I asked Sgt. Nelson,*"Did any of that training focus on lethal versus less lethal options or any first aid type scenarios?"* and he replied, *"Yes, sir."* I asked Sgt Nelson,*"Were you taught how to transition between lethal and less lethal options*?" and his response was *'Yes, sir.'* I asked Sgt. Nelson, *"Can you provide some examples of, uh, any of the lethal versus less lethal during that training?"* and Sgt Nelson responded, *"I think the first scenario was and irate, uh, parent or something at the school and you come in, or you enter the bus, or you enter the, the school and they come out and then it the uh, I don't believe they were armed so we, the appropriate use was a Taser at that time. I'm trying to remember the, I know there was a, one of the other scenarios was, uh, was an active shooter and moving through the school and addressing the threats and, and the people that weren't threats."* Sgt. Nelson continued to say,*" I believe, it'll take me a second here, Marco was the, Marco Innarelli was the uh, the person in the suit and I think there was, where they were armed and then, it talks about transitioning from your Taser, taking your Taser down and then using, uh, and then transitioning to a firearm."* I asked Sgt Nelson, *"So when you say taking your Taser down, does that mean holstering it?"* and he (Sgt. Nelson) replied, *"So there's two options with the Taser you can either, either straight draw or cross draw. Cross draw is whenever you come across the body with your uh, with your primary hand. Straight draw is with uh, the, the hand that the, your non-dominant hand…. I use my non-dominant hand for my Taser and I use my dominant hand for my firearm. So it's basically, essentially whenever you have your Taser pulled*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

_____

*up on somebody, and then get, if a goes to a lethal situation you take your Taser and you, basically put it down, and then you, then you, you draw your firearm... So put it down. So you would, you would put it either back in the holster or... put it to where it's not..."*

I asked Sgt. Nelson, *"Okay. Would you, have you ever, can you recall any kind of scenarios where that would involve using both your firearms and Taser, firearm and Taser, at the same time?"* to which Sgt Nelson replied, *"Never."* When asked why he would never do this, Sgt. Nelson replied, *"Well the theory is, is that if you have them both out and pointed that you essentially could have a sympathetic fire where you would, or uh, fire, uh, pulling of the, or pulling the trigger or firing, firing of the firearm, uh whenever you may be trying to use the Taser, and then essentially vice versa."* I asked Sgt. Nelson, *"Okay. And you were taught this here at the police department...."* to which he replied, *"Yes, sir."*

I asked Sgt. Nelson if there was a mechanism in place for his Officers to review policies and he said there was. I asked Sgt Nelson to describe the mechanism for his officer to review our policies and he replied, *"The system uses PowerDMS, uh, we have all our General Orders there. Whenever you first start with the department, at least whenever I did and I think that's, that's stayed, remained the same way is that we have to check off on all policies on PowerDMS. And anytime there's and update, we'll get a notification via email that, and uh, or, you can also just check it, uh, any updates you can go through, or you have to re-sign off on those, uh, policies."* Sgt Nelson described the digital signatures that allow him to see what policies his Officers had read and if there are times when he would be made aware that policies have not been read and Sgt. Nelson described this process as, *"Each policy sent and there's a uh, there's a date where it's uh, released and there's a date that it has to be signed off by. You'll get notifications that there's update or that you have to sign off on your PowerDMS but if you do not, then you get the email that says that you have, delayed, or you, you know, the email that says that they're overdue, excuse me, that's the word, overdue."* After this explanation, I asked Sgt. Nelson again, *"Have you review, have you reviewed use of, as a supervisor, have you reviewed use of force, uh, documentation, uh, here in the past with officers? Like if an officer used force would you have reviewed any kind of..."* Sgt Nelson replied, *"Oh, uh, yes, sir, yea, response to resistance."* I asked Sgt Nelson, *"Have you, ever encountered a use of force, uh, documentation or response to resistance for an officer having both their firearm and Taser out at the same time...."* to which he (Sgt. Nelson) replied, *"Never."*

### Interview with Lt. Jeremy Gonzalez

On February 9, 2022, I interviewed Lt. Jeremy Gonzalez. The interview took place in my office, located in the Professional Standards Division. Present with me for this interview with Sgt. Telly Joiner. Before the interview began, I

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

explained to Lieutenant Gonzalez his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. This interview was audio recorded. This interview was audio recorded. Lieutenant Gonzalez was sworn in and I began my interview.

This is a summary of the interview with Lieutenant Gonzalez. The full interview was recorded and is available for review.

Lt. Gonzalez responded to the Officer involved shooting on December 26, 2021. Lt Gonzalez directly supervises Officer Payne via Sgt Bryan Nelson via his chain of command. Lt Gonzalez said he heard Officer Payne initiate his foot pursuit. Lt Gonzalez stated the following, *"I was having lunch at my house, and I heard this domestic incident come out and I heard Officer Matt Gonzalez ask Officer Wilder to check out with a male. I heard the details of the call about somebody maybe being pushed down in the road, and I know that Officer Gonzalez initially checked out with somebody and then told Officer Wilder to check out with somebody else who might match the description. It was maybe, maybe, you know, a minute later or so, I, I hear, minute or two later I hear Officer Payne in a foot pursuit on Queen Street. And maybe sixty seconds or so into this foot pursuit uh, Officer Payne yells out over the radio, shots, shots fired. Based on my experience, shots fired we're trained that somebody's shooting at you. When we fire at somebody we say shots away. So I assumed that a suspect was firing at Officer Payne so I then keyed up and told him to stop chasing whoever it was that he was chasing and take up a position of cover and I tried to coordinate a, uh, a perimeter with that limited information. At this time I'm already, I'm on the way from my house to the scene and I, I, had, I tried to call somebody over the radio and I ended up calling him on the phone, I called Officer Wilder I believe, and he told me, and I was trying to figure out, I knew that, I heard somebody come over the radio and say something about a head shot, suspect was shot in the head. So I called Officer Wilder I think, who told me the, we had a, a deceased subject with what looks like a bullet wound to the head, and I asked him, who shot? And he said I think it was Officer Payne. So Immediately ordered Sergeant Nelson to, he was, he was almost on scene, I was a long way out still, I ordered Sergeant Nelson to control and contain that scene and I ordered uh, Officer Baez to take and remove Payne from the scene and immediately bring him to the PD, just to get him out of that area, and, and, and debrief him. "*

Lt Gonzalez said he did not make it to the scene of the shooting, rather he went to the police department. Lt. Gonzalez stated the following, *"So when he arrived with Officer Baez, I asked him if he was ok, if he was injured. He wasn't. And so I said, hey listen I need to, I'm trying to delineate a crime scene out here, figure out where we need to set up a perimeter, I said so can you give me a basic run down of what happened out there. Uh, he was very emotional, and he says, he told me that he tried to check out with this black male, uh, he says I need to*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

talk to you in regards to this, domestic situation that's going on, and he said the black male, didn't comply, kept walking away and he says, hey, I got to talk to you, and he stopped, and he, he gave him his name he says he told me his name was James but but he wouldn't stop, uh, and he says and then he started running. And he started running west bound on Queen Street. And he says, and his words were, he said Lt, he kept reaching into his waistband and I saw him throwing things, and he says he just kept reaching, and I tried to tase him and it didn't work, and he says we reached a fence, a fence, and I caught up to him and we started fighting. And he said, my Taser wouldn't work, and he says he just kept reaching, Lt, I thought he was going to try to shoot me, so I shot him."

I asked Lt Gonzalez if he asked Officer Payne anything specific about the shooting and he replied, "Yes. That's, that's, because I was inquiring, I didn't ask him anything specific, I just wanted to delineate the crime scene to make sure we had the proper area cordoned off cause I didn't know if we were dealing with a, a firearm that may be out there and we had a, a, you know, a potential issue with the public, so, uh, it was more of an inquiry with him."

Lt Gonzalez collected Officer Payne's firearm and completed a supplemental report as part of this investigation. I ask Lt. Gonzalez about his training here at the police department and he said the following, "We have annual training with firearms and uh, Ta...., and the...I'm trying to remember if we do it annually with Taser as well, I think we do. We've had, we have active shooter training we've done with firearms and Simmunitions, we have scenario-based training with Tasers quite often. Lt Gonzalez stated, "I routinely meet with officers, daily uh, I meet with the all the time and and we discuss various topics, a lot of time it's just to check on 'em but we'll we'll discuss scenario-based things, I try to go over the stuff with officers quite often and I, I, I mandate the sergeants to do it as well. It's not formal training. It's kinds informal, off the cuff, discussions, so uh, we do that quite often. I, I wouldn't be able to tell you exactly what they are 'cause I mean it's that often...."

I asked Lt Gonzalez if he spoke to his squad about use of force or policy and scenarios associated with this and Lt. Gonzalez replied, "I mean we talk about...use of force is one thing that we talk about and I know I've done it with, with officers and squads before, I just, I do it so often, I, I can't say specifically who I did it with."

Lt Gonzalez also stated, "we're trained to properly transition so one of the things is they want you to draw with your, with your, uh, off hand which means the hand that, uh, doesn't draw your firearm... the reason we do that is we, so you don't accidentally draw uh, your firearm instead of your Taser or vice versa. So I actually had to end up changing how I, uh, where I put my Taser because I used to have the Taser on the same side as my firearm in the front so I moved it to the opposite side to force me to draw, I used to do a cross draw with my dominant hand, we don't do that anymore. It's been a long time since we've done that."

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

I asked Lt Gonzalez if he recalled any training scenarios while Officer Payne has been under his command that would involve drawing both his firearm and taser at the same time and Lt Gonzalez replied, *"No, We don't train that at all."* I asked Lt Gonzalez, *"Were you ever trained on pointing both your firearm and Taser at a subject at a same time and did you ever train Officer Payne to do this?"* Lt Gonzalez responded, *"No. We specifically train not to do that."* I asked Lt Gonzalez if has ever read or seen a report where an Officer would have both his firearm and taser out at the same time and he replied, *"I can't recall cause that would, I mean, I don't think I have cause that would be a pretty big issue that we'd have to re-train on."* I asked Lt Gonzalez, *"Why wouldn't you have your Taser and firearm out at the same time?"* to which Lt Gonzalez replied, *"Cause they teach you that you have what's called a sympathetic reflex. Which you know, if you have your right hand, and if you have your...the theory is you, if you have your firearm drawn and your Taser drawn, out at the same time and you pull the trigger on your firearm or vice versa that the other finger tends to do the same thing and it's called that sympathetic reflex, you may accidentally discharge one when you didn't intend to."*

### Audio Transcribed from Officer Payne body camera during foot pursuit

| | |
|---|---|
| *Officer Payne:* | *Westbound on Queen. Westbound, black male, black jacket, jeans! On Gayle. Stop running! Stop reaching in your pocket! Drop it! Drop it! Drop it! Get down! Get down!* |
| *Suspect:* | *For What?* |
| *Officer Payne:* | *Get down! Get down! Get down! Get down! Hey, he's running, he's running! Oh shit. Shot fired! Shot fired!* |
| *Officer Payne:* | *Fuck, fuck dude. I shot this guy.* |
| *Officer (Matt Gonzalez):* | *We're good. Calm down, listen, calm down, calm down.* |
| *Officer Payne:* | *Oh, fuck. Oh, fuck.* |
| *Officer (Matt Gonzalez):* | *Hey, come here. Listen to me. Get lethal cover. Payne, get lethal cover on this male right now.* |
| *Officer:* | *What do you want?* |
| *Officer (Gonzalez):* | *Get lethal cover on this guy.* |

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

| | |
|---|---|
| *Officer Payne:* | *Oh, fuck.* |
| *Officer:* | *Payne listen, I need you to focus right now okay, brother. Payne, focus.* |
| *Officer (Baez):* | *I got him. I got you.* |
| *Officer (Baez):* | *Payne, focus for me, okay.* |
| *Officer Payne:* | *Fuck.* |
| *Officer (Gonzalez):* | *Standby for one second, please.* |
| *Officer (Baez):* | *You're good. you're good. Hey, holster, holster.* |
| *Officer (Baez):* | *I'm with you. I'm with you. I'm with 227. We're at Gayle. The address on Gayle is 1520. Roll medical for the, uh, the suspect. Hey, hey, hey, stay with me. 10-4 Hey, get to him! Get to him right now! Get to him!* |
| *Officer (Mick):* | *Where's he at?* |
| *Officer (Baez):* | *On here. Hey, grab your medical gear.* |
| *Officer (Wilder):* | *Alright.* |
| *Officer (Baez):* | *Grab your medical gear and grab gloves.* |
| *Officer (Baez):* | *You're good, breathe, breathe. 1520 Gayle, 1520 Gayle.* |
| *Officer Payne:* | *Oh fuck. Is he breathing?* |
| *Officer (Baez):* | *Don't say anything to anybody alright. Don't say anything to anybody. We talk, uh, to the sergeant and he's going to give you a run-down of how everything works, okay.* |
| *Officer Payne:* | *What'd he say?  Oh, fuck. Oh, no.* |

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

| Officer (Baez): | 232 to 117, 158. 227's 10-4. Hey, get your gloves, get your gloves, and bring your medical gear! Does somebody have a… |
|---|---|
| Officer (Rosas): | What do you need? |
| Officer (Baez): | 1520 Gayle. Tell her, just, 1520 Gayle. Hey, hey, start… hey, bring your car and put it over here. |
| Officer (Logan): | What you want? What you want? |
| Officer (Baez): | Hey! Hey! |
| Officer (Rosas): | Here. |
| Officer (Baez): | Hey, bring this car over here. |
| Officer (Rosas): | You want my car? |
| Officer (Baez): | We need to block this off. People are going to start coming in. |
| Officer (Rosas): | Here. Come sit in my car with me. |
| Officer (Baez): | No, no, no, he's fine with me. I got him. |
| Officer (Rosas): | Okay, okay. |
| Officer (Baez): | Please bring the car. |
| Officer (Rosas): | You want my car up here, Baez? |
| Officer (Baez): | Yeah, yeah, people are going to start coming. You're good, you're good. Breathe, breathe. |
| Officer (Rosas): | Where do you want my car, Baez? Baez, where do you want my car? |
| Officer (Deal): | Give it to me. |
| Officer (Baez): | Nobody on this street. |

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

| | |
|---|---|
| *Officer Payne:* | *Hey, my car, my car, make sure it's locked. It's unlocked.* |
| *Officer (Deal):* | *Where's your car? Where's your car at?* |
| *Officer (Baez):* | *My car's right here. My car's right here.* |
| *Officer (Deal):* | *Hey, take a deep breath, brother. Where's your car? Let me go grab it.* |
| *Officer Payne:* | *Oh, no, no, no, no.* |
| *Officer (Deal):* | *Hey, hey, take a breath.* |
| *Officer (Baez):* | *You're good, you're good.* |
| *Officer Payne:* | *Dude, I didn't want to…* |
| *Officer (Baez):* | *You're good. You don't talk about it. Don't talk about it.* |
| *Officer (Deal):* | *Where's your car, Payne? Payne, where's your car?* |
| *Officer (Baez):* | *We'll worry about that. We'll worry about that.* |
| *Officer (Baez):* | *My cars right here. My cars right here.* |
| *Officer (Rosas):* | *Where's your car?* |
| *Officer (Baez):* | *It's right here. It's unlocked, keys are in it.* |
| *Officer (Rosas):* | *Where do you want it?* |
| *Officer (Baez):* | *Just, just, we gotta make it wide. Nobody comes in. Dude! Yo! Don't say nothing over the radio!* |
| *Officer (Wilder):* | *I got you. Chill out.* |
| *Officer Payne:* | *Oh my god, bro. Oh, my god. Oh, my god. Oh, my god. Oh, my god.* |
| *Officer (Baez):* | *You're good.* |

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

| Officer Payne: | *Oh, my god. Oh, my god. Oh, my god.* |
| Officer (Baez): | *Just breathe. You're good. Breathe. Breathe. I'm here. You're okay. You're okay. Go mute, go mute.* |
| No sound | |
| Officer (Baez): | *Bring it all the way to that intersection, please. I know it's a far walk, but bring it all the way to the intersection.* |
| Officer (Rosas): | *Micks car.* |
| Officer (Baez): | *Get him in a car.* |
| Officer Payne: | *Bro, where's your car?* |
| Officer (Rosas): | *Come with me.* |
| Officer: | *Come get in my car, right here.* |
| Officer: | *Bring that car down there to the intersection real quick.* |
| Officer (Mick): | *I'm shutting down - I'm taping up, hold on.* |
| Officer (Rosas): | *So, you just keep him with you.* |
| Officer Payne: | *God damn it, bro.* |
| Officer (Rosas): | *You know more than anybody to keep him with you.* |
| Officer Payne: | *God, god, god, god, god, god, god.* |
| Officer (Rosas): | *Don't talk to anybody.* |
| Officer Payne: | *Oh my god, bro.* |
| Officer (Rosas): | *Just don't talk to anybody.* |
| Officer (Baez): | *Yeah, I told him. I told him.* |
| Officer Payne: | *Oh my god, bro.* |

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

| | |
|---|---|
| Officer (Rosas): | *Come here. You're okay. You're okay. Come here, come here. It's okay. You're Okay.* |
| Officer Payne: | *Bro, bro, bro.* |
| Officer (Rosas): | *You're okay, you're okay.* |
| Officer (Baez): | *Hey, you're doing the right thing, but let's all, let's take down a notch right here. He's fine, okay.* |
| Officer (Rosas): | *What else do you want me to do? I moved, I blocked here, I blocked here, and I blocked there.* |
| Officer (Baez): | *See whatever they need.* |
| Officer (Rosas): | *I asked them whatever they need and they don't need me. So…* |
| Officer (Baez): | *Let's get some light for them. Get some light…* |
| Officer (Rosas): | *I asked Gonzalez and them, they didn't want me, so.* |
| Officer (Baez): | *I'm saying move your car over to there.* |
| Officer (Baez): | *Yes, can you move his car for him down there?* |
| Officer (Rosas): | *32 is with 27, we are working right now, moving a couple of cars around and setting tape up.* |
| Officer Payne: | *Dude.* |
| Officer: | *You're good. Stay on me. You're fine.* |
| No sound | |
| Officer Payne: | *I didn't want to do that, bro. Oh, god. No, no, no, no, no.* |
| Officer (Baez): | *Don't make any calls until we get to the PD. Go ahead.* |
| Radio: | *Stand by.* |

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

                                     *You can go mute, dude.*

Officer Payne:                    *Sarge just called me.*

Officer (Baez):                *Call your wife.*

Officer Payne:                    *Sarge just called me.*

Officer (Baez):                *Call your girl.*

Officer Payne:                    *Sarge? Hang on.*

Officer (Baez):                *Turn it off.*

*End of Video*

### Interview with Sgt. Mark Jennings

On March 23, 2022, I interviewed Sgt. Mark Jennings. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Sergeant Jennings his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. Also present for this interview was Sgt. Telly Joiner. This interview was audio and video recorded. Sgt. Jennings was sworn in and I began my interview.

This is a summary of the interview with Sergeant Jennings. The full interview was recorded and is available for review.

Sgt. Jennings is a master trainer with the Titusville Police Department. Sgt. Jennings has overseen response to resistance review boards, has taught or instructed numerous new police officer trainees, has instructed current police officers and employees of the Titusville Police Department, is currently a Sergeant with the Titusville Police Department and has held the positions of Corporal, Detective, Field Training Officer and Officer with the Titusville Police Department.

As part of this interview, Sgt. Jennings listened to radio transmissions of the domestic violence call for service which took place, prior to the Officer involved shooting, as well as the radio traffic of the Officer involved shooting. Sgt. Jennings also reviewed Officer Payne's body camera footage of the Officer Involved shooting. These reviews were done in order to try and accurately depict

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

the actions of Officer Payne during this incident. Sgt. Jennings was asked a series of questions relating to the body worn camera footage from officer Payne as well as his knowledge and expertise as a master trainer with the Titusville Police Department. Below is a portion of my interview with Sgt. Jennings concerning this incident.

Q:    *Okay. Are you a high liability instructor with the pol...with our agency?*

A:    *Yes, sir.*

Q:    *Are you familiar with high liability policies within the police department?*

A:    *Yes, sir.*

Q:    *Do you instruct new officers as well as probationary and non-probationary officers at the police department as part of your duties and responsibilities?*

A:    *Yes, sir.*

Q:    *Do you prepare lesson plans for these trainings?*

A:    *Yes, sir.*

Q:    *Do your trainings involve reviewing policies and procedures such as use of force, response to resistance, first aid, firearms, dart firing stun guns, et cetera?*

A:    *Yes, sir.*

Q:    *Okay. Do you employ both practical and classroom-based scenario training as part of your training cadre?*

A:    *Yes, sir.*

Q:    *Did you train Officer Payne in the use of firearms, dart firing stun guns, defensive tactics, et cetera?*

A:    *Yes, sir.*

Q:    *Would that be both as, uh, in new hire training and scenario-based training as an officer not in, not, not as a new officer?*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:     *Annual, annual block training and so forth, yes, sir.*

Q:     *And we had, I think we had one up at Madison Middle School where there was scenario based, exercises. How would you know that Officer attended these trainings?*

A:     *For each training session that we have there's a roster that's generated. It has all of the people who attended the training as well as instructors sign their name.*

Q:     *So if I show you a couple of different training rosters here, one is for active shooter and building searches on July of two thousand twenty, do you recognize the officers that are on that?*

A:     *Yes, I do.*

Q:     *Did you train those, were those new officer hires?*

A:     *Yes.*

Q:     *Okay. Would that be Officer Knapp, Payne, and Mick?*

A:     *Yes, sir, correct.*

Q:     *And, and how would you know that they, were on this roster or they attended?*

A:     *Uh, they've placed their signature next to the printed name and my printed name and signature as well as Corporal Cantalupo, who was my fellow instructor for this block of training, is on this roster as well.*

Q:     *And that was for active shooter and building searches?*

A:     *Yes, sir.*

Q:     *And what about this, uh, dart firing stun gun July fourteenth two thousand twenty?*

A:     *Yes, uh, I can see that Devin Knapp, Joshua Payne, and William Mick are all printed and signed next to the names indicating that they attended this training.*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Q:     And are there, uh, were there lesson plans that were, uh, a part of this training?

A:     Yes, sir.

Q:     Okay. Do you generally create lesson plans when you, put on a training session?

A:     Yes, sir.

Q:     Okay. During those lesson plans do you go over policy, do you go over, different parts of that to include inside the lesson plan or that you're gonna do and uh, classroom assignment or teaching?

A:     Yes, sir.

Q:     I'm going to play for you a 911 call, um, actually I'm going to play for you the Titusville One audio transmissions of the evening of December twenty-sixth two thousand and twenty-one which led up to the officer involved shooting. And you said you did respond to this incident that evening but it wasn't during the incident, it was after the incident?

A:     I never actually went out to the incident, uh with... involving Josh Payne that night. I, I ran the incoming calls for service and then officers that were responding to those. I never actually made it out or responded to that scene or was involved in it at all.

Q:     So your role was to go to, was to come out and support the road functions of, of responding to other calls for service not involving the officer involved shooting and the domestic, is that correct?

A:     Yes, sir. Anything and everything not involving that incident, correct.

Q:     Okay.

TJ:    One more thing, this incident had already occurred before you came on duty, correct?

A:     Correct. That's what predicated me being called, I believe, was to have supervisor, they needed a supervisor to come out and have, uh, some kind of, oversight for the officers that came in to also cover the road for incoming calls for service.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Q:    Okay. Have you done that before? Have you been called in before to help out if uh, if need be, in the past?

A:    I believe...

Q:    Not for an officer involved shooting but....

A:    I believe so, I'm sure that I have.

Q:    Okay.

A:    I can't think of exact dates and stuff.

Q:    Okay. I'm going to go ahead and play, these are the uh, Titusville One audio transmissions, these are the transmissions between the officers and dispatch, dispatching uh, a domes, the domestic call.

A:    Okay.

*(AUDIO TRANSMISSION PLAYING)*

Q:    Can you hear that Okay?

A:    Yes, sir.

Q:    Okay.

*(AUDIO TRANSMISSION PAUSED)*

Q:    Alright for the purpose of this I want to pause that for now, alright? Where it's at. I wanted you to hear the Titusville One transmissions because some of the questions I'm going to ask you involve, what we know with the information that we currently have which would include reports, reports that were written, the officers audio transmissions to Titusville One as well as the body camera. And I'm going to have you view the body camera here in just a minute and then some of the questions are gong to be, related to that, okay?

Q:    You ready?

A:    Yes, sir.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Q:     Alright. And if you need to I can pull the, I can turn the light down, if it, if it helps at all, ...

A:     Yeah...

Q:     Does that show up a little bit better?

A:     Yes.

Q:     Alright.

A:     Had a glare from the light.

Q:     So there's a little bit of a delay because as the, as you know, when the AXONs turn on there isn't, uh, the audio doesn't kick on right away, uh, it's usually a thirty second catch up but, it should be completely in sync with the, uh, when it does kick on, so....

(AXON BODY CAMERA AUDIO PLAYING)

Q:     Alright. Can you get that light real quick?

A:     Yep.

Q:     From your training and experience can you explain an officer's stress level during a high-risk situation involving, uh, a foot pursuit or a physical altercation with another subject?

A:     Sure, I think the answer to that would be dictated by the totality of the circumstances as to what the officer was responding to, there's a bunch of different factors that can lead to the level of stress that an officer possibly is experiencing on a call for service. Some of those things could be time of the day, nature of the call for service, uh, amount of training that they've received, physical fitness, the amount of sleep, food, mental preparedness, I think all those factors would play into the level of stress a certain officer may receive or be under for a given call for service.

Q:     Can different levels of stress can affect your decision making?

A:     Yes, sir.

Q:     Have you noticed that when you're doing training?

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:      Yes.

Q:      Do you, do you induce some stressful situations in training?

A:      Yes, so for the Taser portion of the in house training we start off with basic instruction using PowerPoint, uh, we then test their comprehension of that information by providing them with a written test which they must pass. We then work ourselves into building blocks basically using a crawl walk run philosophy of basic manipulations for the Taser, we then go into live fires with static targets and we culminate the training with basically a scenario-based training where they're actually deploying the Taser using specific cartridges on a role player in a stressful environment.

Q:      Okay. We're going to watch the video again and this time I'd like for you to break the video down for me as, uh, as a trainer, what you see and knowing what you have up to this point which, is what we've provided you which is the reports to, to look at as well as the dispatched audio that you heard, the officers talking to each other, the different factors that would change different things with stress according to what you had, what you had said as well as this, uh, video again and I want you to kind of break this video down for me and what you're seeing and, and maybe what's going on as best you can, given, given the particular set of circumstances and the, and the evidence that we have been able to provide you. That, that sound good?

A:      Yes, sir.

Q:      Alright. Can you go ahead and get that light again and...and again this is basically going off of your expertise as a trainer with the agency and, and what you've done in the past and the fact that you were one of, uh, you actually trained Officer Payne on some of his in-house, so... We'll play it again and then tell me when to pause and just explain to me what you're, uh, seeing if you can, we may have some follow up questions for that.

(AXON BODY CAMERA PLAYBACK)

A:      Pause right there if you'd like.

(AXON BODY CAMERA PLAYBACK PAUSED)

Q:      Okay.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:      So based off of the audio assuming that Officer Payne was listening to his radio throughout the transmissions he was given the description of the subject, he possibly pushed a female out on front of a moving vehicle, uh, and as off, as other officers responded on scene he was directed it sounded like to check out with assumedly it was this male. In the description given in the initial call for service it was a black male with dredlocked hair and a black jacket was the initial description given. And I understand time of day in this video but this particular person seems to match that description, uh, given over the radio.

Q:      Okay. The...just real quick where this took place, where this started, is this close, based off of what the radio transmissions you heard, is this close to the area where she called or where she was calling from, I believe on, that they said something about Gibson Street.

A:      It's..

Q:      Relatively close to there...

A:      ...relatively close, within a block or two, yes.

Q:      Okay. As he gets out of the car it looks like he's, the individual's just walking away, and then there's a, foot pursuit starts. Would he have had, based off of what you know, off what he heard on the radio and everything would he have had a right to have detained that individual, uh, as he's fleeing on foot, not prior to that but because he fled on foot, would he have had a reason to engage in a foot pursuit with him?

A:       Yes.

Q:      Okay. Anything else before I keep playing or.....go forward...

A:      No.

Q:      Sergeant Joiner do you have anything else.....

TJ:     Uh um.

Q:      Okay.

(AXON BODY CAMERA PLAYBACK)

A:      Actually can you pause it right there if you wouldn't mind.....

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

*(AXON BODY CAMERA PLAYBACK PAUSED)*

A:    *....so it, our Tasers, he's obviously deployed the Taser once, uh, that was the initial pop and pulse rate that you hear. One of the things we talk about in training is that if the Taser is effective, the, the Taser's very quiet because the delivered charge is to the subject as opposed to arcing up at the Taser or out on the open. Uh that's one of the things, one of the cues we talk about in Taser training as far as listen for the loud arcing sounds, it's in the Tasers PowerPoint, I can hear this thing arcing, and it, and when we talk about using the Taser it's to achieve a desired change of behavior is the specific terminology that we use, as with any force incident. So when you deploy the Taser, you would hope that the desired change of behavior would be that in this case he would stop running and either go to the ground or, or start complying with verbal commands which, based on the video, he's not.*

Q:    *Okay. Ready to keep playing?*

A:    *Sure.*

*(AXON BODY CAMERA PLAYBACK)*

A:    *Would you pause it again.*

*(AXON BODY CAMERA AUDIO PAUSED)*

A:    *So he deploys a, our Tasers now have two cartridges which allow you to deploy a second set of probes. The Taser also has the ability to, at least one top probe and one bottom probe from either of these cartridges, uh, successfully make connection that the Taser will recognize that and deliver a charge. The Taser starts to beep to, as an audible clue that the cy...five second cycle is going to run out. Starts beeping right about three and a half seconds which is the noise that you're hearing with the beeping. And again on that second probe deployment, the second trigger pull with the probes being sent down range, it appears that the subject did not display a desire to change a behavior.*

Q:    *Okay. Did you also notice anything else, is he giving verbal directions to where he's going, maybe some commands, or...*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:      Yes. Officer Payne appears to be telling him to stop running and so forth,
        uh, he's also giving communications, it sounds like it's over the radio to
        the responding officers as to what his location is.

Q:      Okay. Were you able to hear him initiate a foot pursuit on the radio
        transmission that I played for you?

A:      Yes I was.

Q:      Okay.

(AXON BODY CAMERA PLAYBACK)

Q:      Okay. What else do you notice from where we paused it up to, to here?

A:      As we, as the subject appeared to be running it was, he was concealing
        his hands, looked to be towards the center of the front of his body. In
        listening to Officer Payne's verbal commands the tone of his voice
        changed, apparently shortly thereafter, that was viewed on the video, in
        my opinion it would seem that he was, his stress level was quickly rising
        based on the subject's behavior. The direction the subject ran also would
        seem to be troubling, he'd almost, to the point where he was trying to
        conceal himself or move himself off onto an area as opposed to continuing
        to run down the street to get away from Officer Payne. That, combined
        with two non-desirable changes in behavior, from those Taser probe
        deployments, would all kind of factor in as far as what he was
        experiencing I would say.

Q:      Is there a change in the subject's behavior from just running at any point,
        do you notice? Is there a, does he start, does he, does he at any time
        engage the officer, Officer Payne?

A:      So the term we use as far as response to resistance, uh, that the subject
        displayed initially, was considered active physical resistance. He was
        actively resisting Officer Payne's verbal commands to stop running
        because he was displaying behavior that he was running, so that would be
        active physical resistance. Just before this video was paused, the subject
        appears to actually turn around and aggress or move towards Officer
        Payne's position with his hands somewhat above his waist, it appeared.
        Depending upon the perception Officer Payne would have, you're chasing
        somebody and they turn around and face you, uh, could possibly be
        articulated as being aggressive physical resistance, which is a level
        above, uh, active physical resistance, which would just be basically acting

Page 65 of 102

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

*and trying to get away from somebody, from an officer. He appears to turn and face and blade off with Officer Payne.*

Q:  *Okay. Was there any comments that you recall from this, uh, subject that he made, or was, was there any type of compliance from the subject to the officer?*

A:  *I heard Officer Payne tell him to stop reaching, so that indicates to me that Officer Payne was aware of the subject's hands and their movements. Any reasonable person I think would think that Officer Payne believed that the subject was reaching for something. The reason why someone would be reaching for something during a foot pursuit and front loaded with all the other information about the call for service of possibly some active violence against a female, pushing her in front of a moving car, uh, would definitely all factor into what decision you're going to make next.*

Q:  *Okay. Can you turn the light on for me? Questions from the video. I'm just going over some stuff.*

TJ:  *So....*

Q:  *Go ahead...*

TJ:  *You, you probably already said it before, given the circumstance, uh, would a reasonable officer, deploy their Taser at someone, at a subject that is fleeing from them, running on foot?*

A:  *Yes. Given this set of circumstances, the nature of the call for service, the fact everything all added up together, the proximity for where the call for service was where the encounter with this individual was, his description, uh, and the severity of the possible crime of shoving somebody into a, uh, path of an oncoming vehicle, yes.*

TJ:  *And you said that was active, he was actively resisting that officer?*

A:  *Active physical resistance, yes, sir.*

TJ:  *Were there, are there any other options that that officer had, ....*

A:  *Yes.*

TJ:  *...other than Tasing him while he was fleeing from him?*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:      Yes.

TJ:     What other options?

A:      The officer could have used his pepper spray on the subject had he been
        able to deploy it successfully. The officer could have closed the distance
        and actually went hands on, we'd say, of bringing the subject to the
        ground forcibly with his body. The officer could have also not chased this
        person whatsoever and let him get away. That's, that's something else
        that could have possibly happened, another outcome.

TJ:     I'm not, uh, given the circumstances, uh, as we saw in the video, at some
        point, when he came in contact with that individual, he had, he had his
        Taser out and then he, uh, drew his gun out. Would a reasonable officer
        draw both, gun, or firearm, and Taser, uh, and point it at a subject?

A:      No.

TJ:     And why is that?

A:      One of the philosophies we talk about, or one of the principles we talk
        about, during in house training is doing one job one hundred percent.
        Meaning if I'm going to use my Taser, that's what I'm going to use. If I'm
        going to use my pistol, that's what I'm going to use. If you have both things
        out there's a concern about what they call sympathetic reflex, which is
        what one hand does, the other hand may do unintentionally. We go back
        to Taser training, one of the drills that we do is transitioning from less
        lethal, which is the Taser, to lethal, which would be the pistol. Not
        necessarily shooting, but whatever situation that presents itself in front of
        you rises to the level of you may possibly need to use deadly force. We
        give them several different options as far as transitions are concerned
        based off of Taser's training recommendations, but in none of those
        transitions do we ever have both the Taser and the pistol pointed at a
        subject at the same time. Officer Payne uses what's called a straight draw
        holster meaning that he's drawing his Taser with his non-dominant hand,
        dominant hand being the one that he uses to shoot the firearm, which
        appears to be his left hand, he's a left-handed shooter. He keeps his
        Taser on his right hip to be drawn straight draw with his right hand. The
        philosophy behind that is so that there is no confusion between which
        weapon is in your hand, so basically his non-dominant or for in his case
        his right hand, is used for his less lethal weapon systems, including the
        Taser. The transition for folks when they need to go to lethal from less
        lethal is to index, or bring that Taser down and out from the sight picture

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

*and out of your work space, your field of view, index the finger high up on the Taser, and then present the firearm.*

Q:    *What you saw going up to a certain point, what you saw on the video, do you believe, and we want to make sure we ask it the right way is that, do you believe a reasonable officer, given the same or similar set of circumstances, would have done, would have both their firearm and Taser out at the same time engaging a subject?*

A:    *No.*

Q:    *Okay. And that's becau......and we do train on that, that's, that's taught, is that correct?*

A:    *We do not train on having both weapon systems out and pointed at a subject. We've never taught that. Or trained on that.*

Q:    *What about de-escalation.*

A:    *We do teach de-escalation and in fact, one of the scenarios that we have for Taser  that we ran the entire department that carries Tasers through is a de-escalation scenario using both laser painting and warning arcs, laser painting means having the lasers that display out the front of the Taser in the field of view of the subject hopefully to gain compliance and to de-escalate the situation so that further force doesn't have to be used. A warning arc is another option that we have on the Taser which is depressing the warning arc or the arc buttons on the side of the Taser which produces an audible and visual, uh, electrical connection that's also used to, for de-escalation purposes, uh, so that further force hopefully doesn't have to be used. The verbal commands, as with Officer Payne was, had initially index, indexed his Taser, it appeared, on the subject, whether or not the subject saw those lasers as he was running, I couldn't tell you, uh but I would consider that laser painting on the subject before the, the trigger's actually pressed. That is something that we do train, it's a scenario actually, that the, the department goes through. In the scenario you actually achieve compliance, uh, based on those de-escalation tactics.*

Q:    *You mentioned earlier you do introduce some stressful situation to them in training. Do you ever do any debriefs after stressful situations or where the officer's been engaged in having to use a situation where he may use deadly force or may use, less lethal force, something to that effect, is there any kind of de.....is there any kind of debrief after that's done in training?*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:      So after any type of force on force or scenario based training we do conduct a debrief for every officer that participates and it, the debrief is tailored based on the performance of the officer. Any deficiencies that are there as well as things that they did well on, to reinforce the good things and to make them aware of some of the things that they can improve on, that's the whole purpose of scenario based and force on force training. Some of the questions we ask them are specifically related to the physiological responses that officers have during stressful encounters. So for instance, if the role player says some kind of threatening comments to the officer at some point during the scenario, once the scenario's over, many times we'll ask the officer to recall what they heard the off, the subject or the role player say. And some officers are not able to recall that right away, and we talk about, at that point, auditory exclusion, meaning typically the officer's ears should have heard that and possibly did hear that, but right here, right after this incident they're unable to recall that because that information is not necessarily as pertinent as what they're visually seeing. Most officers are able to recall that what the visual, uh, threating mannerisms that the role player may be displaying over certain other things. And the reason that we do that is that it makes them aware of those possible deficiencies or things that they could possibly work on so that when it happens out in the field, they'll recall their training and hopefully fix it quicker out there in the field as opposed to having things happen to them and not understanding why it happens, so when we do see some sort of physiological responses that they're having, heart rate and rhythm increase, uh, perspiration, shaking hands and so forth, we try to talk about those things with them so they understand why they're happening and then that way they have a way to understand what's happening to their body out there on the street and be able to fix it through breathing techniques or just, as, uh, the actual awareness of what's happening to them.

Q:      And you mentioned you do this with every training that you've participated in, is there a time where you haven't, that you recall, is there, hss there ever been a time where you haven't done that?

A:      No, not at all. That's the purpose of the scenario-based trainings and the force on force trainings is to elicit the good and the not so good, or thing they could improve on and then there would be no purpose in doing that training without having the debrief to make them aware of what those deficiencies are so yes, we debrief every single scenario with every single officer.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Q:    In watching the video, and what you heard and what you saw, did the Taser have a desired effect of incapacitating or stopping, uh, the subject as he was running?

A:    No.

Q:    I'm going to show you some charts...from AXON. And you, you're a Taser instructor, is that correct?

A:    Yes, sir.

Q:    I'm going to show you these charts, and tell me what these, what these charts mean, when it comes to trying to see, it is, can you tell if the Taser had an effect, didn't have an effect, what are, what are the charts designed for?

A:    You want me to start here or?

Q:    Sure, where, wherever you want to start, whatever's easier.

A:    So my understand of these chart is at the top left corner of this page, this is page number, page number one in the top right, it says discharge one. In the top left corner it basically shows the front of the Taser, a representation of the front of the Taser...

Q:    And this would be Officer Payne's Taser?

A:    Yes, it starts at twelve twenty-six two thousand twenty-one the start time is nineteen twelve and thirty six seconds.

Q:    Is his name, uh, on there?

A:    Yep. Says this particular Taser serial number X40006177 is assigned to Joshua Payne ID number 227.

Q:    Okay. And when you're looking at those charts, are they all, are they all the same Taser, related to the same Taser?

A:    Those charts?

Q:    I think there's several of them in there.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

A:      *Discharge one, discharge two......discharge three.....four.......and five. It
        appears these charts are broken down into five different discharges and
        they all (unintelligible) Joshua Payne's name as well as his Taser serial
        number, yes.*

Q:      *You say. uh, discharge, uh, five, does that mean that there were five
        discharges with his Taser during this incident?*

A:      *I believe so, yes.*

Q:      *Okay. I think the total time of the incident was just under a minute, or
        maybe, maybe just over a minute form when he got out of the car until he
        started his foot pursuit so five times he attempted to discharge the Taser
        within that time frame, would that sound, accurate?*

A:      *Well depending upon the definition of attempts, uh, what this appears to,
        to do is the Taser, well our Tasers are programmed, we have them
        programmed to automatically shut off at the end of a five second cycle.
        Meaning if you hold the trigger down it's going to shut off no matter what
        at five seconds. You can then reenergize, deploy probes, by hitting the arc
        button on the side which will then run it for another five seconds or if you
        press the trigger again and you have another cartridge left you will then
        send two additional probes out of the Taser and the five second cycle will
        start again.*

Q:      *Okay.*

A:      *Any kind of manipulations of the Taser during the five second cycle won't
        extend the, the duration but I believe the Taser does record those
        manipulations whether it's an arc switch press or a tripper press.*

Q:      *What do these charts tell you, when you look at them?*

A:      *As far as what I can say as far as my understanding of this is concerned,
        for this discharge number one, what it's showing is, on the top left corner
        bay one was deployed, probe A is the top probe B is the second probe.
        On this chart it's related in the color green. And then the pulses that
        occurred through bay one through this particular probe, probe pattern A
        and B are represented in, in time as far as seconds across the different
        graphs. It talks about charge on the very first graph and appears that it's
        sitting around, it pulse, it, it varies back and forth as the time goes on
        within the first second of this discharge, uh, the charge may be
        somewhere between, looks like we got one charge up almost to a hundred*

Page 71 of 102

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

microcoulomb and then it all kind of hovers around the sixty microcoulomb
line for about the first second, and then it appears that there is no charge
for the remaining four and a half seconds or so of this graph. As far as
what that actually means happening down range, that's still undetermined
as far as it relates to what you're seeing on the video. I can't explain that
part of it. I'm not familiar with it.

Q:      Okay.

TJ:     So after discharge one did it appear Taser was, uh, functioning properly?

A:      So the other graphs talk about stimulation voltage and that appears to be
bouncing back and forth in between the two thousand and fifteen hundred
volt range. The arc voltage seems to be pretty constant at a thousand. Uh,
I would understand that this means the Taser itself appears to have been
functioning properly, and then it talks about pulse rates on the bottom
graph of page two for discharge one and our Tasers now are pulsing at
twenty two pulses per second and based on this chart it appears that the
twenty two pulses per second were achieved at....the entire discharge.

Q:      Is it possible that the Taser can make contact with some, someone and
not, not have a desired effect?

A:      Yes, it can. We talk about, uh, intermittent clothing disconnects, or clothing
disconnects in general, depending upon what clothing the subject's
wearing, the Taser probes can get caught and dis, lodged in the clothing
and not create a circuit through the subject's body. We've seen that both
out in the field as well as we offer to expose each of our new officers to
the Taser and just recently we had a clothing disconnect with one of our
new hire officers that participated in, in our in-house new hire trading for
Taser where one of the probes successfully deployed, penetrated her shirt
into her skin in her back and the bottom probe caught her in the cargo
pocket of the pants she was wearing and she did not experience any
neuromuscular incapacitation or any of the effects of the Taser during the
first portion of that five second cycle and it wasn't until the Taser instructor
followed up with what we call a drive stun which is basically touching the
end of the Taser to the subject's body, in this case, to the officer's body,
did this new hire, this officer actually feel the effects of the Taser.

Q:      Okay. Have you participated in use of force or response to resistance
reviews in the past?

A:      Yes, sir.

Page 72 of 102

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Q:    *Can you recall any reviews that you've participated in where an officer would display both his firearm and Taser at the same time?*

A:    *No, sir.*

Q:    *Do you have anything else?*

TJ:    *(unintelligible/background noise)*

Q:    *Sergeant Jennings is there anything you can think of that might be pertinent to this investigation?*

### Interview with Lieutenant Tyler Wright

On 2022 I interviewed Lieutenant Tyler Wright. The interview took place in my office, located in the Professional Standards Division. Before the interview began, I explained to Lieutenant Wright his rights as a department employee as a witness to an investigation and relating to his obligation to cooperate in this investigation. Also present for this interview was Sgt. Telly Joiner. This interview was audio recorded. Lieutenant Wright was sworn in and I began my interview.

This is a summary of the interview with Lieutenant Wright. The full interview was recorded and is available for review.

Lt. Wright is a master trainer with the Titusville Police Department. Lt Wright has overseen response to resistance review boards, has taught or instructed numerous new police officer trainees, has instructed current police officers and employees of the Titusville Police Department, is currently a Lieutenant with the Titusville Police Department and has held the positions of Sergeant, Corporal, Detective, Field Training Officer and Officer with the Titusville Police Department.

As part of this interview, Lt Wright listened to radio transmissions of the domestic violence call for service which took place, prior to the Officer involved shooting, as well as the radio traffic of the Officer involved shooting. Lt Wright also reviewed Officer Payne's body camera footage of the Officer Involved shooting. These reviews were done in order to try and accurately depict the actions of Officer Payne during this incident. Lt Wright was asked a series of questions relating to the body worn camera footage from officer Payne as well as his knowledge and expertise as a master trainer with the Titusville Police Department. Below is a portion of my interview with Lt. Wright concerning this incident.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

(footage from the body camera as well as the audio transmissions are played from the night of the Officer involved shooting)...

Q:    Okay. Telly, can you turn the light back on? Thank you. In your training and experience can you explain an officer's stress level during a high-risk situation involving a foot pursuit, physical altercation, with another subject?

A:    Uh, yeah, so with anything, but especially foot pursuits, heart rate goes up, we talk about in the training the different, uh, conditions of a person's body, like, uh, condition, white, which is like us just sitting right here our heart rates are normal, we have condition yellow, condition orange, condition red, condition black, um, and it's all broken down in between, you know, heart rates and all that type of stuff and how a person responds to stress, um, so obviously the higher heart rate, uh, elevation you go without proper training and mindset and, uh, it's stuff like that, not being able to control your heart rate and typically people can tend, tend to get into that condition black, where sometimes they're not able to make rational decisions or anything or respond to stress accurately.

Q:    That was my question, one of the next questions was is, can this kind of, can this type of stress affect your decision making?

A:    Uh, yes.

Q:    Okay. Do any of your trainings, uh, teach officers how to perform under stress?

A:    Yes, they do.

Q:    Do you debrief with individual officers after they go through say a training scenario where you've in, introduced stress into the scenario?

A:    Yes, we do.

Q:    What's the purpose of that?

A:    Uh, to point out both their strengths, their weaknesses, where maybe they had some major deficiencies or just deficiencies themselves, or also point out the things they did well and, um, walk them back through it, uh, one, another reason we do all that is to see if they realized, uh, what they, if they know what they did, uh, both good and bad, uh, for that training scenario. If they even recognize the fact that they maybe they missed a few things or, uh, um, some little things they didn't realize they would of,

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

they did on a normal daily basis, so we debrief it to put them back into it once the whole stress and everything's gone, uh, have them walk us back through the scene and point those things out to them and stuff for them to focus on for the next time they go to training or if they are presented with an incident that's similar like that.

Q:     Has that happened before, where, um, when you're talking to an officer, um, after introducing stress into a, um, scenario-based training, have, have you seen it to where, uh, the stress has played, uh, a role in their decision making?

A:     Yes.

Q:     Okay. And you do talk about that afterwards?

A:     Yes. And depending on how it is, uh, if it's like very severe stress, uh, stress reaction, I guess if that's the word you want to call it, um, if it's they go in and they don't do that great of a job for what we think should have happened, uh, we talk about it, we'll let them go decompress and then we'll run them back through the same exact scenario just so they can, uh, go back through it and have a, uh, have a successful outcome as well.

Q:     Okay. Um, here in a second we're going to break the vid, we're going to watch the video again, we're going to break it down, I want you to break the video down for us, um, as to what you're seeing as a trainer and, and what's going on. Between the Titusville One, uh, transmissions that you heard and, uh, the video that we played, did you notice any stress, um, or could you tell that that was maybe some stress with the officer or a stressful situation?

A:     Yes.

Q:     Um, what gave you some indications that this might be, uh, something that would have caused a stressful situation for an officer or officers responding out there?

A:     Um, I mean initially him calling out foot pursuit, you, you kind of get that but you only get like a brief blip, um, and then all you get next is real quick west on Queen I think is what I heard, and then Gayle and that was pretty much it. Um, most of the time in foot pursuits where people are responding to stress pretty well you get, uh, their initial location, the description, the direction they're going, um, where they need units to start

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

going like you normally get a good play-by-play. This one you really didn't get any good radio communication and play-by-play.

Q:    Okay. What about the call itself?

A:    Um, the initial call for service? As far as stress, or?

Q:    Well yeah, the, the call itself leading up to, um, the, the foot pursuit, is there anything that, uh, you're looking at that is maybe different than a typical, is there, so let me ask you this, are there different calls that we respond to?

A:    Oh absolutely.

Q:    And can some calls induce more stress than others?

A:    Yeah, absolutely.

Q:    So in this call, would this been, would this have been a typical call or would this have been something a little bit more different given the circumstances?

A:    Uh, being that it's being called in as a domestic disturbance, typically those are heightened, um, depending on the comments that are in the call, I think this one was just being battered, um, so weapon was displayed but we all know that domestics are usually one of the most dangerous things we respond to, so that typically can, uh, increase, uh, a person or an officer's heart rate as they're just driving to the scene based on that.

Q:    Were there multiple officers responding to this call that you are aware of?

A:    Yeah, I think I heard, uh, initially two, and then a few more just went in route once they heard that they were still looking for a subject in this case. So it sounded like maybe two to four initially.

Q:    Okay.

A:    Can I answer this text real quick?

Q:    Yeah, go ahead.

A:    Okay.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

A:     Sorry.

Q:     That's ok, we've got, um, I know you've got some stuff getting ready to do
       so not too much longer. Um, alright so we're going to watch the video
       again. I kind of want to break it down, list some, uh, pros and cons that
       you're seeing as far as training goes in the video, and some things that
       you're seeing, and, um, I think Sergeant Joiner's going to have some
       questions with that, follow up with that...or are we good where we're at on
       that one?

TJ:    Yeah.

Q:     Alright. So you want to kill that light again and, um, what we'll so is we'll,
       I'll start playing it, you tell me where to stop so you can kind of explain
       some things that you're seeing as far as....

A:     Okay.

Q:     ......training goes. You ready?

A:     Yep.

(AXON BODY CAMERA PLAYBACK)

Q:     Hold on real quick, let me pause this.

(AXON BODY CAMERA PLAYBACK PAUSED)

A:     Yep.

Q:     Do you know where this is taking place at? In relationship, in relation to
       the call for service?

A:     It's within like a half block. This is, um, Elizabeth, Gayle, um, Craig, I
       believe....

Q:     Okay.

A:     ..... this is Craig, if I'm right, and then Gayle's the middle street, then
       Elizabeth, then you have Cora that splits them, which is to the, uh, south,
       and Queen just to the north, and if you round the corner at Queen and
       Deleon, um, W. C. Sta, er uh, Kenilworth, Gibson, Zephyr, they're all
       within, uh, quarter mile.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

Q:     Okay. Do you have a, uh, suspect description during this incident?

A:     Yeah, they initially gave out, black male in a jacket. They gave that out twice, and then I think it was Officer, Matt Gonzalez two fourteen, checks out with, what it sounds like, a girl with pink hair, so it might be the, initial caller.

Q:     Okay.

A:     Um, she gives out, or somewhere in there he's able to get more information, gives out black male with dreads, blue jeans, and a jacket. And then he provides, uh, as of, as of right now, just battery charges. So a little bit better description is, is given out at that point.

### Florida Department of Law Enforcement (FDLE) Findings

On April 08th, 2022, Agent Christopher Shepard with the Florida Department of Law Enforcement (FDLE) prepared his criminal findings in reference to Officer Payne and this investigation. Agent Shepard's summary of events are listed as follows:

*On December 26, 2021, the Titusville Police Department (TPD) requested the Florida Department of Law Enforcement (FDLE) conduct an investigation into the use of force by Officer Joshua Payne which resulted in the death of James Lowery. The incident occurred at 1520 Craig Avenue, Titusville, Brevard County, Florida. (TPD Case Number 2021-00100443)*

*On Sunday December 26,2021, the TPD responded to a domestic violence call on Gibson Street. TPD Officers made contact with Zarria Anderson, who had visible signs of injuries and reported that her boyfriend, later identified as Alton Johnson, had battered her. Anderson provided a brief statement and description of her boyfriend. Officer Payne initiated a stop with a male matching the description provided by Anderson.*

*Officer Payne approached the individual, later identified as Lowery, who fled from him and a foot pursuit ensued. During the encounter, Lowery was disposing of what appeared to be narcotics. Officer Payne deployed his Taser at Lowery, which was ineffective. A physical altercation occurred and Officer Payne fired one round killing Lowery. It was determined that Lowery was not the subject related to the domestic violence call.*

*The following FDLE personnel responded, Resident Agent in Charge (RAC) Jason Kriegsman, Special Agent (SA) Chris Shephard (Case Agent), SA Christopher Deardoff, SA Lisa Gundrum, and SA Scott Ratliff. The Brevard County Sheriff's Office (BCSO) Crime Scene Investigators (CSI) processed the scene at the direction of FDLE.*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

*The Florida Department of Law Enforcement (FDLE) has completed a comprehensive investigation into the use of force by the Titusville Police Department Officer Joshua Payne. This presentation of facts is based on law enforcement witnesses, civilian witnesses, and physical evidence. FDLE submits this investigative summary to the Office of the State Attorney for their review and disposition.*

### Office of the Medical Examiner Reported Findings

On March 29, 2022, I received a copy of the medical examiner report. The following is summary of the reported findings by the Office of the Medical Examiner.

   *I.*     *GUNSHOT WOUND OF HEAD*
       *A. Entrance: Left side of the occiput with no evidence of range of fire on the skin*
       *B. Path of Injury: Skin, subcutaneous tissue, muscle, occipital bone and the first and second cervical vertebrae, medulla and upper cervical spinal cord, occipital bone at the foraman magnum, posterior pharynx and terminates its path in the right side of the pharynx*
       *C. Exit: None (penetrating)*
       *D. Recovery: Deformed, medium-caliber, jacketed projectile*
       *E. Direction: Back to front, downward and left-to-right*
       *F. Associated Findings: Bihemispheric, pontine, and medullary subarachnoid hemorrhage associated with gyral flattening, hemorrhagic lacerations of the bilateral cerebellar tonsils, comminuted fractures of the occipital bone, and pharyngeal soft tissue hemorrhage*
      *Toxicology report revealed the presence of Oxycodone, Oxymorphone, Fentanyl and Acetaminophen in Lowery's system.*

### Crime Scene Report from the Brevard County Sheriff's Office

On April 13, 2022, I received the completed Crime Scene report from the Brevard County Sheriff's Office, whom were tasked with completing the crime scene for FDLE after the Officer Involved Shooting. This crime scene report detailed all of the items collected and/or field tested as part of this investigation. This report revealed there were several different types of drugs recovered from

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

Lowery to include approximately 43 grams of suspected Fentanyl, 12.5 grams of suspected cocaine, 10 grams of suspected cannabis, 24 grams of Oxycodone as well as 19.3 grams of Alprazolam and approximately 19 suboxone patches.
        *The cocaine and fentanyl were field tested with positive results.*
        On May 13, 2022, the drugs recovered from the crime scene during this incident were transferred from the Brevard County Sheriff's Officer to Titusville Police Investigations Sgt. Troy Barbour and Property Room Manager Amanda Wright.

**FINDINGS:**

1.      On December 26th, 2021, at approximately 1912, hours Officer Joshua Payne was riding in a marked patrol vehicle and contacted James Lowery near Craig Avenue and Queen Street. Officer Payne responded to the area in an effort to assist a domestic violence investigation wherein information received by the Titusville Police Department reported a violent confrontation between a male and a female, where the male pushed the female into the roadway in front of a moving vehicle. Lowery was approximately 700 to 750 feet away from the original incident location and fit the description of the suspect given, a black male wearing jeans and a black jacket with dreads. After making contact from a short distance with Lowery, Lowery ran off on foot and Payne gave chase.



TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA



2.    As Officer Payne chased after Lowery his body camera
revealed Officer Payne yelled, "stop running" as he (Payne)
gave the description to dispatch over his (Payne's) radio of
Lowery as he (Lowery) ran away. Officer Payne continued to
yell, "stop running, stop reaching into your pockets, drop it,
drop it, drop it, get down, get down." Payne had his taser
activated and has his firearm drawn and pointed at Lowery.
Lowery can clearly be seen reaching for something out of his
right pocket and produced a red shaped object he had to
hold in this right hand before bending over at the waist.
Lowery approached the fence and discarded this red object
he was holding over the fence. This object was recovered
and determined to hold drugs both powder and pills.



TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA



The fence Lowery threw red object over

Red object recovered containing drugs

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA





TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA



3.    Additional items recovered from Lowery on scene included more drugs, money and other miscellaneous items.



TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA





TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA







TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA





4.      Lowery can be heard on body camera saying, "for what?" at which point Lowery turned and positioned himself in a bladed stance to confront Officer Payne.

5.      Lowery got face-to-face with Officer Payne and grabbed the wires from the activated taser and moved his arms up towards Officer Payne's firearm and taser.



TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA



Flashlight now on the ground



6.      Lowery continued to confront Officer Payne while Officer
        Payne had his taser activated and his firearm still pointed at
        Lowery. Officer Payne's flashlight can be seen on the ground
        after the physical confrontation with Officer Payne.



TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA



7.        Officer Payne backed up and as he continued to give commands to Lowery, Lowery continued to disobey lawful orders and kept reaching into his pockets. Lowery turned and ran to the fence and climbed over the fence.



8.        Officer Payne reached over the fence and discharged his firearm at Lowery.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA



9.       After discharging his firearm, the following statements were made by Officer Payne:

Officer Payne:        Fuck, fuck dude. I shot this guy.

Officer Gonzalez:     We're good. Calm down, listen, calm down, calm down.

Officer Payne:        Oh, fuck. Oh, fuck.

Officer Gonzalez:     Hey, come here. Listen to me. Get lethal cover. Payne, get lethal cover on this male right now.

Officer Baez:         What do you want?

Officer Gonzalez:     Get lethal cover on this guy.

Officer Payne:        Oh, fuck.

Officer Gonzalez:     Payne listen, I need you to focus right now okay, brother. Payne, focus.

Officer Baez:         I got him. I got you.

Officer Gonzalez:     Payne, focus for me, okay.

Officer Payne:        Fuck.

Officer Gonzalez:     Standby for one second, please.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

---

| Officer Baez: | You're good. you're good. Hey, holster, holster. |
|---|---|
| Officer Baez: | I'm with you. I'm with you. I'm with 227. We're at Gayle. The address on Gayle is 1520. Roll medical for the, uh, the suspect. Hey, hey, hey, stay with me. 10-4 Roll medical for the suspect, hey stay with me...Hey get to him right now |
| Officer Mick: | Where's he at? |
| Officer Baez: | On here. Hey, grab your medical gear. |
| Officer Mick: | Alright. |
| Officer Baez: | Grab your medical gear and grab gloves. |
| Officer Baez: | You're good, breathe, breathe. 1520 Gayle, 1520 Gayle. |
| Officer Payne: | (Gasps) Oh fuck. Is he breathing? |
| Officer Baez: | Don't say anything to anybody alright. Don't say anything to anybody. We talk, uh, to the sergeant and he's going to give you a run-down of how everything works, okay. |
| Officer Payne: | What'd he say? (Breathing heavily) Oh, fuck. Oh, no. |

10.    Officer Matthew Gonzalez and Officer Wilder jumped the fence to attend and render aid to Lowery. Officer Gonzalez placed Lowery in handcuffs and assessed the scene. Emergency medical personnel attend to Lowery as well. Lowery was pronounced deceased on scene.

*11.*    The total time it took from the initial foot pursuit with Lowery to the time Officer Payne announced "Shot fired" over the radio was approximately 52 seconds. Within approximately thirty (30) seconds, Officer Payne can be heard yelling, "drop it, drop it." The struggle between Lowery and Officer Payne lasted approximately 5 seconds. Approximately six (6) seconds later, Lowery jumped the fence and Officer Payne stated, "shots fired, shots fired."

*12.*    Lowery fit the description of the domestic violence suspect in reference to Titusville Police Department case report number 2021-00100443. Lowery was located within approximately 700 to 750 feet from the initial call for service (South Deleon

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

Avenue and Gibson Street) and within approximately 311 feet from the updated call for service at Queen Street and Deleon Avenue. *(See map presented below)*



TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

- Initial call for service location
- Secondary location with female victim of domestic violence case
- Foot pursuit ends with Lowery physical confrontation and deadly force use
- Foot pursuit begins on Craig Avenue with Lowery

13.     Officer Payne had a lawful obligation to stop Lowery as Lowery fit the description of the suspect who, according to initial calls for service, committed a violent act against the victim by pushing her in front of a moving vehicle. When Lowery made the decision to flee on foot, Officer Payne made the lawful decision to chase Lowery in an effort to take Lowery into custody. While he had not established probable cause to arrest Lowery for the charges of domestic violence, Lowery fleeing on foot from a lawful stop created probable cause for him to be taken into custody.

14.     Officer Payne was not trained to display both his firearm (lethal) and dart-firing stun gun/taser (less-lethal) at the same time. Officer Payne's decision to transfer from a less-lethal response to a lethal response would require him to holster/remove his dart-firing stun gun/taser from the situation.

15.     Officer Payne's decision to use lethal force during this incident is not supported by the evidence provided in this investigation.

16.     Officer Payne digitally signed General Order 412 - Response to Resistance on July 07, 2020, February 19, 2021, and November 13, 2021.

17.     Officer Payne digitally signed General Order 409 - Firearms on July 07, 2020, and March 31, 2021.

18.     Officer Payne digitally signed General Order 411 - Less Lethal Weapons on July 07, 2020.

19.     Officer Payne attended in-house training for simmunitions on July 31, 2020, with Officers Devin Knapp and William "Tyler" Mick.

20.     Officer Payne attended in-house training listed as, "Introduction to Firearms/Classroom" on July 10th, 2020, along with Officers Devin Knapp and William "Tyler" Mick.

21.     Officer Payne attended in house training listed as Dart Firing Stun Gun (Taser) on July 14, 2020 along with Officers Devin Knapp and William "Tyler" Mick.

22.     Officer Payne attended in-house training listed as, "De-escalation, Defensive Tactics, Asp (expandable baton) and

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

|    |    |
|----|----|
|    | Handcuffing" on July 27, 2020, along with Officers Devin Knapp and William "Tyler" Mick. |
| 23. | Officer Payne attended in-house training listed as, "Active Shooter and Building Searches" on July 23, 2020, along with Officers Devin Knapp and William "Tyler" Mick. |
| 24. | Officer Payne attended in-house training on active-shooter scenarios and participated in scenario-based training on June 8, 2021, at Madison Middle School. |
| 25. | Officer Payne's use of the dart-firing stun gun was lawful and within policy as Lowery actively resisted Officer Payne's efforts to take him into custody. |
| 26. | Officer Payne had other less-lethal options available to him, such as pepper spray; however, he chose to rely on the use of his dart-firing stun gun/taser. |
| 27. | In determining if the force used against Lowery in this incident was appropriate, the Objective Reasonableness standard as set forth in the United States Supreme Court Case of, "Graham vs Connor" was applied. Careful attention to the facts and circumstances of this particular case, to include the severity of the crime, the threat to the safety of the officers or others, and whether Lowery was actively resisting arrest, or attempted to evade arrest by flight, were considered. Given Lowery's actions during this incident, to include his physical confrontation with Officer Payne, the force used by Officer Payne to gain compliance met the standard of objective reasonableness during the initial confrontation; however, once that confrontation ended and Lowery jumped over the fence, he no longer posed an imminent threat to Officer Payne. While Lowery's actions (refusing to obey lawful commands and continuing to reach into his pockets) would continue to raise concern for a reasonable officer, Lowery took flight and jumped the fence forcing Officer Payne to re-assess his threat level options. Officer Payne made the decision to carry both his taser and firearm in his hands when he approached the fence. In determining if a reasonable Officer would have made the same decision given the same particular set of circumstances, it is clear by testimony provided by sworn members Knapp, Mick, Wood, Cantalupo, Jennings, Wright and others, the actions taken were not reasonable given this particular set of circumstances. Officer Payne was not taught to keep his firearm and taser both drawn as Lt. Wright, Sgt. Jennings, Officer Wood, Knapp and Mick testified during |

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

their respective interviews. Officer Payne reached over the fence with his firearm drawn and shot his firearm striking Lowery in his head. Officer Payne's decision to use his firearm in this manner and under these particular set of circumstances does not meet the objective reasonableness standard and as such this use of deadly force is not justified.

28. James Lowery has a criminal history, which included trafficking in heroin, as well as felon in possession of a firearm, which he was sentenced to prison for prior to this incident. This information however, was not known to Officer Payne and therefore would have no bearing on his decision to use his firearm in this incident.

29. Officer Mick attended in-house training for newly hired police officers with Officer Payne. Officer Mick stated he was never taught to keep both his firearm (lethal) and his dart-firing stun gun/taser (less-lethal) pointed at a suspect during an incident at the same time and based this on training he has had over the years in law enforcement. Officer Mick specifically spoke about "sympathetic reflex" during a situation like that and why he would not do this.

30. Officer Devin Knapp attended newly hired police officer training with Officer Payne. Officer Knapp stated the following in his sworn interview: "*So, if I'm lethal and I need to go less-lethal, you know, practice holstering one and going to the other. Or dropping one. If I have to drop one for whatever reason – if, you know, I have someone that's coming at me and I use a taser and it's not working, you know, to fire a second cartridge or do whatever I have to do. In essence, was to put one away and to transition into another. However, you – if you put it away, or if you had to drop it, whatever – to go from less-lethal to lethal…. Yeah, so put your – yeah, I would holster or drop if I had a taser and I didn't – and something wasn't working or something, just to drop it, to go – not to have both in – in hands. You can have, I can't think of the word for it, but it's a – the trigger, the reflex or sympathetic reflex.*"

31. Detective Givens was one of Officer Payne's field training Officers. When Detective Givens was asked if he would have trained Officer Payne to have both his firearm and dart-firing stun gun/taser out at the same time and why, Detective Givens said he did not, and further stated, "*…We've never been trained that way, I've never been trained to have both out at the same time, it's one or the other, it's not, I mean I,*"

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

*just never, it was never an option like, I've never been trained that's the way to do anything....I mean tactically, if even if you have to shoot how are you supposed to be accurate with just one hand while you're holding your Taser. And the other side is, you want to be sure about what you're about to do. You don't want to have two in your hands and shoot one by accident either...You don't want to have accidental discharge of either weapon. It's all meant to be purposeful."*

32.    Officer Christopher Wood was Officer Payne's Field Training Officer (FTO). I asked Officer Wood, *"are there instances where you've had to explain, specifically with Officer Payne, any response to resistance? Use of force? Things like that?"* to which Officer Wood replied, *"We go over the use of force, response to resistance. Back in my day we used to call it force matrix, but. We go over that policy. There were, at that time, seventy-two lessons in the FTO manual that were covered.... And use of force, response to resistance, and deadly force uses were two of those lessons."* I asked Officer Wood if he recalled going over those lesson plans with Officer Payne and Officer Wood replied, *"I – I don't specifically remember a date or time that I did that, but I make it a practice in my form of FTO to go over and address that with each of my trainee's. So, that way I am confident that they know."* I further asked Officer Wood, *"Was there any scenarios that you can recall where you would use both your firearm and Taser at the same time?"* To which Officer Wood replied, *"No."* I asked Officer Wood why he wouldn't do this and he replied, *"It's just not the way we train....I think they teach us something about having that reflex...Both your hands. I don't know what it's called but they teach it to us. Lieutenant Wright tells us all the time it's a reflex that we have."*

33.    Officer Payne failed to respond to training as Sgt. Jennings explained, *"We do not train on having both weapon systems out and pointed at a subject. We've never taught that. Or trained on that."* Officer Payne's field training Officers never taught him to have both his firearm and taser out at the same time either.

34.    Approximately 43 grams of Fentanyl were recovered from the scene. According to Florida State Statute 893.135, if the amount of Fentanyl is 28 grams or more, such person shall be sentenced to a mandatory minimum term of imprisonment

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

of 25 years, and shall be ordered to pay a fine of $500,000. Approximately 24 grams of Oxycodone was recovered from the scene as well. According to Florida State Statute 893.135, if the amount of Oxycodone is 14 grams or more, but less than 28 grams, such person shall be sentenced to a mandatory minimum term of imprisonment of 15 years, and shall be ordered to pay a fine of $100,000.

35. The Approximate street value for the drugs recovered from the scene was approximately $6050.00.

36. Officer Payne resigned from his position as a police officer prior to his interview taking place.

37. Officer Payne submitted his resignation with the City of Titusville prior to giving an interview as part of this investigation, therefore the results of the charges brought against Officer Payne in his criminal trial were not concluded and therefore the Conformance to Laws Policy cannot be sustained.

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

## CONCLUSION:

This investigation was conducted to determine if Officer Joshua Payne violated City of Titusville Police Department General Order 412.13 - Response to Resistance/(H)(3) Use of Deadly Force and Deadly Force Restrictions, General Order 300.6 - Standards of Conduct/(4)(A)(2) Professional Conduct and (4)(A)(23) Unsatisfactory Performance.

Acting under the color of office and at the direction of Chief John Lau and based on the facts and logical persuasiveness of the evidence presented in this case, Lieutenant Matt Demmon is led to believe **Officer Joshua Payne**, did (not) act in accordance with the missions, goals, objectives and other pertinent directives, policies and practices of the Titusville Police Department and therefore did violate:

- City of Titusville Police Department Policy regarding:
  - o **General Order 300.6 – Standards of Conduct/(4)(A)(23) Unsatisfactory Performance (Minor Violation)**
  - o **General Order 300.6 – Standards of Conduct/(4)(A)(2) Professional Conduct (Major Violation)**
  - o **General Order 300.6 – Standards of Conduct/(4)(A)(10) Unnecessary Force (Major Violation)**

- And therefore did (not) act in accordance with the mission, goals, objectives and other pertinent directives, policies and practices of the City of Titusville and also did violate:
  - o **City of Titusville Personnel Policy (_Revised 06/04/2021_) 6.13 (D)(11) Disciplinary Actions/Minor Violations and Suggested**

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

**Discipline/Single instances of violation of departmental policies and operating procedures, including violation of confidentiality and other conduct detrimental to departmental operations and/or the image of the municipal organization.**

○ **City of Titusville Personnel Policy (Revised 06/04/2021) 6.13 E(18) Disciplinary Actions/Major Violations and Suggested Discipline/Major violations of department policy or procedures.**

○ **City of Titusville Personnel Policy *(Revised 06/04/2021)* 6.13 F(15) Disciplinary Actions/Capital Violations and Suggested Discipline – (Depending on circumstances and/or progressive disciplinary actions)/Unlawful or improper conduct, either on or off the job, which tends to affect the employee's relationship to his/her job, fellow workers, his/her reputation or goodwill in the community.**

○ **City of Titusville Personnel Policy (*Revised 06/04/2021*) 6.13 F(20) Disciplinary Actions/Capital Violations and Suggested Discipline - (Depending on circumstances and/or progressive disciplinary actions)/Actions when considered on their own merit are equal in seriousness to established capital violations.**

○ **City of Titusville Personnel Policy (Revised 06/04/2021) 6.13 F(22) Disciplinary Actions/Capital Violations and Suggested Discipline - (Depending on circumstances and/or progressive disciplinary actions)/Capital violation of a department policy or procedure**

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

# SUSTAINED

## City of Titusville Police Department General Order 300.6 – Standards of Conduct/(4)(A)(23) Unsatisfactory Performance
 (\*)Minor Violation:

a.    *Department members shall maintain sufficient competency to perform their duties and assume the responsibilities of their position.*

b.    *Department members shall perform their duties in a manner that shall maintain the highest standards of efficiency in carrying out the functions and objectives of the Titusville Police Department.*

c.    *Unsatisfactory performance may be demonstrated by:*
   1.    *A lack of knowledge of the application of laws required to be enforced.*
   2.    *An unwillingness or inability to perform assigned tasks.*
   3.    *The failure to conform to work standards established for the member's rank, grade, or position.*
   4.    *The failure to take appropriate action on the occasion of a crime, disorder, or other condition deserving police action.*
   5.    *The absence without leave including abuse of sick time.*

d.    *In addition to other indicia of unsatisfactory performance, the following shall be considered prima facial evidence of unsatisfactory performance:*
   1.    *Repeated poor performance evaluations.*
   2.    *A written record of repeated infractions of policies, procedure, directives, or orders of the Titusville Police Department*

• Officer Payne did not maintain sufficient competency to perform his duties during this incident, as he (Officer Payne) was not trained to display both his firearm (lethal) and dart-firing stun gun/taser (less-lethal) at the same time.

• Officer Payne's decision to transfer from a less-lethal response to a lethal response would require him to holster/remove his dart-firing stun gun/taser from the situation.

**Chief John Lau**

Concur ☑ /Do Not Concur ☐   Initials: _____

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

# SUSTAINED

## City of Titusville Police Department General Order 300.6 – Standards of Conduct/(4)(A)(2)Professional Conduct
 (**)Major Violation:

*Any breach of the peace, neglect of duty, misconduct, or any conduct on the part of a department member, either within or outside the City of Titusville, that tends to undermine the good order, efficiency, or discipline of the department or reflects discredit upon the department or a department member, even though these offenses may not be specifically enumerated or articulated, shall be considered conduct unbecoming a member of the City of Titusville Police Department and shall subject the member to disciplinary action by the Chief of Police.*

- Officer Payne was not trained to display and point both his firearm and dart-firing stun gun/taser at the same time.
- Officer Payne's failure to retain the training he did receive and apply this training during this incident undermined the good order, efficiency, or discipline of the department.
- The result of Officer Payne's actions reflects discredit upon the Titusville Police department and department members (Officer Payne's co-workers).

**Chief John Lau**

Concur ☐ /Do Not Concur ☑ Initials _____ 4/01

Case 6:23-cv-01313-PGB-LHP   Document 99-7   Filed 01/12/26   Page 108 of 113

TITUSVILLE POLICE DEPARTMENT
PageID 3132
Professional Standards Division
Administrative Investigation Report
0318-IA

# **SUSTAINED**

## **City of Titusville Police Department General Order 300.6 – Standards of Conduct/(4)(A)(10)Unnecessary Force**
 **(\*\*)Major Violation**:

*Department members shall not use more force in any situation than is reasonably necessary under the circumstances. Members shall use force in accordance with the law and department written directives.*

* Based on General Order 412 - Response to Resistance/(4)(H) Use of Deadly Force and Deadly Force Restrictions:
  1. *Members are authorized to use deadly force when it is objectively reasonable under the totality of the circumstances. Use of deadly force is justified when one or both of the following apply:*
     a. *To protect a member, himself/herself, or others from what is reasonably believed to be an immediate threat of death or serious bodily injury.*
        1) *A previously demonstrated threat to human life or wanton disregard for human life may be considered as constituting a threat; however, such a threat must be immediate in nature with the potential and probability for immediate consequences. Long-term or long-range potential and probability for threat are not considered "immediate."*
     b. *To prevent the escape of a fleeing subject when the member has probable cause to believe the person has committed, or intends to commit a felony involving serious bodily injury or death, and the member reasonably believes there is an imminent risk of serious bodily injury or death to the member or another if the subject is not immediately apprehended.*
        1) *Where feasible, the member shall identify himself or herself as a law enforcement officer and warn of his or her intent to use deadly force.*
        2) *No distinction shall be made concerning the age or sex of the intended target of deadly force. Self-defense and imminent threat shall be the only policy guidelines for employing deadly force.*

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

- In determining if the force used against Mr. James Lowery in this incident was appropriate, the "objective reasonableness" standard, as set forth in the United States Supreme Court Case of *Graham v. Connor* was applied.
- Careful attention to the facts and circumstances of this particular case, to include the severity of the crime, the threat to the safety of the officers or others, and whether Lowery was actively resisting arrest or attempted to evade arrest by flight were considered.
- Given Lowery's actions during this incident, to include his physical confrontation with Officer Payne, the force used by Officer Payne to gain compliance met the standard of objective reasonableness during the initial confrontation; however, once the confrontation ended and Lowery jumped over the fence, he no longer posed an imminent threat to Officer Payne.
- While Lowery's actions (refusing to obey lawful commands and continuing to reach into his pockets) would continue to raise concern for a reasonable officer, Lowery took flight and jumped the fence forcing Officer Payne to re-assess his threat level options.
- Officer Payne made the decision to carry both his taser and firearm in his hands when he approached the fence. In determining if, given the same particular set of circumstances, a reasonable officer would have made the same decision, it is clear by testimony provided by officers D. Knapp, W. Mick, C. Wood, J. Cantalupo, M. Jennings, T. Wright and others, the actions taken were not reasonable.
- Officer Payne was not taught to keep his firearm and dart-firing stun gun/taser both drown as Lt. Wright, Sgt. Jennings, and Officers Wood, D. Knapp and Mick testified during their respective interviews.
- Officer Payne reached over the fence with his firearm drawn and shot his firearm striking Mr. James Lowery in his head. Officer Payne's decision to use his firearm in this manner and under these particular set of circumstances does not meet the objective reasonableness standard and as such this use of deadly force is not justified.
- Officer Payne failed to recognize other available force compliance options and therefore, used a force option not reasonably necessary under these circumstances, enumerated in this report.
- Officer Payne was justified to utilize his dart-firing stun gun/taser; **HOWEVER,** absent seeing, feeling or being told of a weapon, the use of deadly force during this incident is not justified.

**Chief John Lau**

Concur ☑ /Do Not Concur ☐   Initials: _____

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

# SUSTAINED

**City of Titusville Personnel Policy (*Revised 06/04/2021*) 6.13 (F)(15) Disciplinary Actions/Capital Violations and Suggested Discipline - (Depending on circumstances and/or progressive disciplinary actions)/Unlawful or improper conduct, either on or off the job, which tends to affect the employee's relationship to his/her job, fellow workers, his/her reputation or goodwill in the community.**
**(\*\*\*) Capital Violation**

- Based on the conclusion of this investigation, Officer Payne's decision to use deadly force demonstrated improper conduct and affected his relationship to his job, fellow workers, and his reputation or goodwill in the community.
- Based on the conclusion of this investigation, Officer Payne's failure to retain training affected his conduct during this incident which in turn, affected his relationship to his/her job, fellow workers, and his reputation or goodwill in the community.

**Chief John Lau**

Concur ☑ /Do Not Concur ☐ Initials: _____

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

# SUSTAINED

**City of Titusville Personnel Policy (*Revised 06/04/2021*) 6.13 F(20) Disciplinary Actions/Capital Violations and Suggested Discipline - Actions when considered on their own merit are equal in seriousness to established capital violations.**
**(\*\*\*) Capital Violation**

- Officer Payne's decision to use deadly force and his failure to retain training and established policy principles based on the findings of this investigation are equal in seriousness to established capital violations as noted above.

**Chief John Lau**

Concur ☑/Do Not Concur ☐  Initials: _____

  
Professional Standards Division
Administrative Investigation Report
0318-IA

## NOT-SUSTAINED

### City of Titusville Police Department General Order G.O. 300.6 – Standards of Conduct/(4)(A)(22) Conformance to Laws

**(\*\*\*) Capital Violation:**

*Department members shall comply with the laws, ordinances, rules, and Constitution of the United States, the State of Florida, or any of their subdivisions. The intentional violation of any federal, state, county laws or City ordinances may result in discipline up to and including termination.*

- Based on the conclusion and summary of the independent criminal investigation conducted by the Florida Department of Law Enforcement, charges were brought against Officer Payne for Manslaughter by means of Culpable Negligence.
- Officer Payne resigned his position as a police officer prior to providing any statement, through an interview or by other means, in accordance with his police officer bill of rights.
- The charges against Officer Payne did not result in a conviction prior to his resignation; therefore, this policy of conformance to laws cannot be sustained.

**Chief John Lau**

Concur ☑/Do Not Concur ☐  Initials:

TITUSVILLE POLICE DEPARTMENT
Professional Standards Division
Administrative Investigation Report
0318-IA

"I, the undersigned, do hereby swear, under penalty of perjury, that to the best of my knowledge, information and belief, I have not knowingly or willingly deprived, or allowed anyone to deprive the subject of this investigation or any of the rights contained in FSS. 112.532 and 112.533".

Lieutenant Matt Demmon
Professional Standards Division

_____   _____
Signature                    Date

_____

**I HAVE READ THE FOREGOING AND** Concur ☐ /Do Not Concur ☐

**Chief John Lau**
**Titusville Police Department**

_____   06-14-2022
Signature                    Date