## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JAMIYAH ROBINSON, as Personal
Representative of the ESTATE OF
JAMES LOWERY, deceased,

        Plaintiff,

    v.

JOSHUA NATHAN PAYNE,
individually and as an agent and
employee of the Titusville Police
Department, and CITY OF
TITUSVILLE, FLORIA,

        Defendants.

Case No. 6:23-cv-01313-PGB-LHP

---

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CITY OF TITUSVILLE'S RENEWED MOTION FOR SUMMARY JUDGMENT

Plaintiff Jamiyah Robinson, as Personal Representative of the Estate of James Lowery, deceased, by and through counsel, hereby responds in opposition to Defendant City of Titusville's Renewed Motion for Summary Judgment (Doc. 90), as set forth below.

### INTRODUCTION

Plaintiff has filed a *Monell* claim against the City of Titusville ("TPD") for its police department's deliberate indifference in training on foot pursuits. Plaintiff's claim is a single-incident theory pursuant to *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). TPD has moved for summary judgment on this claim. However, TPD misapprehends the law and ignores the relevant facts.

This case involves a former TPD officer chasing an unarmed man with both his gun and taser drawn and shooting that unarmed man in the back of the head over a gate. The record establishes that Officer Payne was a young officer who was tragically untrained in how to handle this armed foot pursuit. The City had no foot pursuit policy, written or unwritten. The City did not train on foot pursuits while armed in any fashion whatsoever. Former officer Payne described his training in detail at deposition and confirmed repeatedly that he had no relevant foot pursuit training. Moreover, Officer Payne testified that he should have received foot pursuit training even though he did not.

TPD representatives admit that TPD knew its officers would engage in foot pursuits while armed. TPD admitted that it needed to train on such foot pursuits.

TPD's motion ignores this record. Instead, TPD attempts to characterize the training former officer Payne did receive as "foot pursuit training." It is nothing of the sort, as confirmed by review of training materials, the testimony of Officer Payne about his training, and the professional opinion of Plaintiff's retained law enforcement expert, Dr. Andrew Scott. TPD does not contend with any of that evidence. For these reasons, as discussed more fully below, Plaintiff has set forth a triable case of deliberate indifference in training which caused James Lowery's death. The Court should deny the City's motion.

## BACKGROUND AND ADDITIONAL FACTS

Plaintiff identifies the undisputed facts set forth in paragraphs 1, 5, 6, and 7 of the Parties' Stipulation of Agreed Material Facts (Doc. 90) as relevant and material to

the Court's determination of Defendant TPD's Motion. Plaintiff respectfully submits these additional facts for which there was no stipulation:

1.      On December 26, 2021, Defendant Joshua Nathan Payne engaged in a foot pursuit of James Lowery in connection with his investigation of a domestic disturbance involving "a man trying to push a woman into traffic." (Ex. 1, Deposition of Joshua Nathan Payne ("Payne Dep."), at 33:11-24, 86:2-8.)

2.      Payne encountered a man during his investigation, who Payne later learned was James Lowery. (*Id.*, at 38:8-11.) Payne exited his vehicle, turned on his flashlight, and pointed his flashlight at Mr. Lowery. (*Id.*, at 37:11-22.) When Mr. Lowery turned to walk away, Payne pursued Mr. Lowery on foot, at which point, Mr. Lowery began to jog. (*Id.* at 38:12-25.) Payne ran after Mr. Lowery in an effort to detain him. (*Id.*) At this time, Payne drew his taser and discharged a single cartridge shot at Mr. Lowery, which missed. (*Id.*, at 39:18-40:14.)  Payne thereafter discharged his taser a second time, and he believes "one of the barbs" hit Mr. Lowery in the shoulder but did not incapacitate him. (*Id.*)

3.      Payne continued to pursue Mr. Lowery on foot with his taser drawn. (*Id.*, at 40:21-41:1.) Payne observed Mr. Lowery placing his hands in his pockets, tossing things to the ground, after the second discharge of his taser. (*Id.*, at 41:6-20, 46:2-23.)

4.      Approximately 55 seconds into Defendant Payne's foot pursuit, Mr. Lowery and Payne approached a fence. (*Id.*, at 63:5-15.) Payne drew his firearm in his left (dominant) hand and pointed it at Mr. Lowery as they approached the fence. (*Id.*, at 42:1-8.) Payne did not holster his taser when he drew his firearm, keeping the taser

drawn in his right hand, with his firearm in his left. (*Id.*, at 44:20-23.) Payne admits that he had not observed Mr. Lowery display any weapon at the time he drew his firearm. (*Id.*, at 41:6-42:4, 47:15-25.)

5.      As Payne drew and pointed his service weapon at Mr. Lowery, Payne continued to yell to Mr. Lowery to "get down." (Ex. 3 to TPD Mot., BWC, at 0:55-0:59.) Mr. Lowery continued to try to move away from Payne and Payne's weapon, which was still pointed at Mr. Lowery. (*Id.*, at 0:55-1:03.) Payne's and Mr. Lowery's confrontation in front of the fence lasted approximately seven seconds, until Mr. Lowery disengaged by shoving Defendant Payne away from him. (*Id.*) Mr. Lowery then turned his back to Defendant Payne in preparation to climb the fence. (*Id.*, at 1:03-1:04; Ex. 1, Payne Dep., 48:24-49:9.)

6.      While Payne's service taser was limited to two cartridge shots, Payne's taser was still functional in "drive stun" mode after both cartridges had been expended. (*Id.*, at 127:18-22.) Payne used his service taser to drive stun Mr. Lowery after he had expended both cartridges. (*Id.*, at 127:23-128:3, 135:8-136:5.)

7.      Payne observed Mr. Lowery, with his back to Payne, use both of his hands to hoist himself over the fence, head-first, with both of his feet vertically in the air as he went over the fence. (*Id.*, at 47:2-7, 49:3-5, 63:18-24.) Payne did not observe Mr. Lowery with any weapon. (*Id.*, at 47:15-25, 48:17-22.)

8.      Payne continued his foot pursuit of Mr. Lowery, and within one second of Mr. Lowery hoisting his body, head-first, over the fence, Payne moved towards the fence, pointed his firearm downward over the top of the fence, and fired a single shot

into the back of Lowery's head. (*Id.*, at 49:16-50:24; 58:8-59:4; Ex. 3 to TPD Mot., BWC, at 1:04-1:06.).

9.    Payne's firearm discharged within one second of Mr. Lowery's body going over the fence. (Ex. 1, Payne Dep., at 63:25-64:8; Ex. 3 to TPD Mot., BWC, at 1:06.) Payne had his taser in one hand and his firearm in the other at the time he shot. (Ex. 1, Payne Dep., at 52:22-25, 57:16-59:4.) Defendant Payne admits that he did not observe Mr. Lowery display any weapon or observe any weapon on Mr. Lowery at the time he shot. (*Id.*, at 47:15-50:1.)

10.    The TPD initiated an internal investigation to ensure that Payne's use of force and conduct complied with state and federal law and Titusville Police Department General Orders. (Ex. 2, Deposition of Charles Demmon ("Demmon Dep."), at 34:13-23.) The Titusville Police Department's internal investigation concluded, under the factors set forth in *Tennessee v. Garner* and *Graham v. Connor*, Defendant Payne's use of lethal force against Mr. Lowery was excessive and was not objectively reasonable. (*Id.*, at 47:4-14; 48:14-50:10.)

11.    The TPD concluded that, at the time that Defendant Payne shot and killed Mr. Lowery, deadly force was not reasonably necessary to protect Defendant Payne or others, as Mr. Lowery did not present an imminent threat. (*Id.*, at 52:23-53:7; Ex. 3, Deposition of Tyler Wright, at 68:25-69:22.)

12.    TPD concluded that Payne was carrying both his firearm and taser when he approached the fence that Mr. Lowery had just climbed over less than one second prior. (Ex. 2, Demmon Dep., at 67:3-16; Ex. 3, Wright Dep., at 67:13-22.) Payne did

not act reasonably when he pointed both his taser and firearm at Mr. Lowery while engaged in a foot pursuit. (*Id.*)

13.     In the immediate moments after Defendant Payne shot Mr. Lowery, he told Titusville officers responding to the scene of the shooting that he "didn't want to do that." (Ex. 1, Payne Dep., at 81:14-25.) Defendant Payne did not offer Mr. Lowery's posture as a justification for his use of deadly force prior to his testimony in this lawsuit. (*Id.*, at 68:16-19, 72:3-25, 73:5-8.)

14.     On June 1, 2022, following a Florida Department of Law Enforcement investigation, Payne was arrested on a charge of manslaughter, pursuant to Fla. Stat. § 782.07(1), in connection with this shooting. (Ex. 4, Robinson 000193-98, *State v. Joshua Nathan Payne*, No. 05-2022-CF-030172-AXXX-XX; Ex. 1, Payne Dep., at 67:12-17.) On December 6, 2024, Payne pled guilty to manslaughter of Mr. Lowery, adjudication withheld. (Ex. 5, Plea Agreement, *State v. Joshua Nathan Payne*, No. 052022CF03172AXXXXX; Ex. 1, Payne Dep., at 117:14-118:14.) Payne was sentenced to five years' probation and ordered to pay restitution to Mr. Lowery's family for funeral expenses in the amount of $18,655.71. (*Id.*)

15.     As a result of the investigation into Payne's use of excessive force against Mr. Lowery, Payne was given the option to resign or be terminated. (Ex. 1, Payne Dep., at 77:8-78:12.) On June 1, 2022, Payne resigned from the TPD. (*Id.*, at 77:8-10, 77:14-20.)

16.    Payne had never met Lowery prior to his encounter with him on December 26, 2021, and did not know his name at any point prior to firing his weapon. (*Id.*, at 35:23-25, 134:20-22.)

17.    Payne did not receive training specific to foot pursuits during his employment with TPD. (*Id.*, at 88:12-24.) Payne was not instructed that running after a fleeing suspect with his weapons drawn was an improper and unreasonable practice while employed by Defendant TPD. (*Id.*, at 88:12-24, 89:10-90:9; Ex. 3, Wright Dep., at 27:13-24, 29:9-30:9, 63:1-10.) Payne believed that he was complying with his training when he ran after Mr. Lowery with both his taser and gun drawn. (Ex. 1, Payne Dep., at 88:12-24.) Payne did not receive training with respect to carrying, drawing, transitioning, or firing a weapon during a foot pursuit while employed by Defendant TPD. (*Id.*, at 93:2-94:4.) Payne did not receive training with respect to approaching a barrier during a foot pursuit, nor with respect to handling a weapon as he approached a barrier during a foot pursuit. (*Id.*, at 94:21-95:2.) Payne believes that he should have received training specific to foot pursuits during his employment with Defendant TPD, despite not having received it. (*Id.*, at 95:9-17.)

18.    While TPD held limited informal reviews and critiques of foot pursuits (e.g., at roll call), the entire purpose of the exercise was to highlight whether it was successful (e.g., the officer caught the suspect) or not (e.g., the officer slipped and fell allowing the suspect to get away). (*Id.*, at 139:15-141:2.) Payne did not review or critique any foot pursuits that involved the use of a firearm. (*Id.*)

19.     TPD was aware of the need to provide TPD officers with training specific to areas of "high liability," or patrol activities that carry a higher risk for TPD officer safety. (Ex. 3, Wright Dep., at 45:7-46:24.) TPD was aware that TPD patrol officers would be required to, and actually did, engage in foot pursuits of suspects, including fleeing suspects. (Ex. 2, Demmon Dep., at 74:1-17.) TPD was aware that carrying a weapon during a foot pursuit could lead to an improper discharge of that weapon by the TPD officer engaged in the foot pursuit. (*Id.*, at 55:19-56:12; Ex. 3, Wright Dep., at 29:9-30:9.) TPD was aware that TPD officers' decision-making capabilities could be compromised while engaged in a foot pursuit. (Ex. 3, Wright Dep., at 32:12-33:13.)

20.     TPD did not maintain a General Order instructing TPD officers how to conduct themselves during foot pursuits of fleeing suspects. (Ex. 1, Payne Dep., at 86:23-87:17.) TPD did not provide its officers training specific to foot pursuits of suspects. (Ex. 3, Wright Dep., at 21:3-9; Ex. 1, Payne Dep., at 88:12-24, 89:10-90:9; Ex. 6, Expert Report of Andrew Scott, at 21-29.)

21.     Firearms training exercises in the form of move and shoot drills are unrelated to and do not train law enforcement officers with respect to proper procedures to conduct foot pursuits. (Ex. 6, Scott Report, at 28, ¶ 2.13.)

22.     Plaintiff brought this lawsuit against Defendant City of Titusville for its failure to train Payne because "the officer didn't know how to stop my father without killing him." (Ex. 7, Deposition of Ja'miyah Robinson ("Robinson Dep."), at 49:18-24.) Mr. Lowery communicated with Plaintiff monthly through her maternal grandmother before his passing. (*Id.*, at 17:12-18:6.) Mr. Lowery supported Plaintiff

through child support payments to Plaintiff's mother, contributed to Plaintiff's orthodontics treatments, and sent her gifts for her birthday. (*Id.*, at 18:12-17, 18:21-25, 19:11-19, 20:15-18.)

## LEGAL STANDARD

Plaintiff incorporates by reference his summary judgment legal standard section set forth in her opposition to Defendant Payne's motion for summary judgment, filed concurrently here.

## ARGUMENT

I.   **The Court should deny summary judgment on Plaintiff's deliberate indifference in training claim**

A.   **Florida's exception to its waiver of sovereign immunity for discretionary functions does not apply**

TPD contends that it is not liable for Plaintiff's § 1983 failure to train claim because "the discretionary function exception to the waiver of sovereign immunity applies and bars Plaintiff's claim." (Mot. at 7 (citing *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1266 (11th Cir. 2001); *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1117 (11th Cir. 2005).) Defendant is wrong.

As *Lewis* and *Cook* hold, governmental agencies are immunized from ***Florida tort liability*** for discretionary functions as an exception to Florida's statutory waiver of sovereign immunity for claims arising under "the general laws of ***this state***." *Lewis*, 280 F.3d at 1262 (quoting Fla. Stat. § 768.28(1)) (emphasis added); *Cook*, 402 F.3d at 1117 ("under Florida law, a governmental agency is immune from tort liability based upon

actions that involve its 'discretionary' functions.'"). Plaintiff has asserted a single claim against the City under Section 1983. Defendant's argument fails as a matter of law.

**B.    The record establishes that TPD was deliberately indifferent to the obvious consequences of its policy and training omissions with respect to foot pursuits, as evidenced by Officer Payne's use of excessive force on December 26, 2021.**

A municipality may be liable under § 1983 where a plaintiff shows: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *Monell v. N.Y. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). "[A] supervisor can be liable for failure to train under 42 U.S.C. § 1983 when the 'failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact and the failure had actually caused the injury of which the plaintiff complains." *Charles v. Chambers*, No. 23-11636, 2024 WL 4266842, at *6 (11th Cir. Sept. 23, 2024) (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1397 (11th Cir. 1994)). "Failure to train can amount to deliberate indifference when the need for more or different training is obvious, such as . . . when the failure to train is likely to result in the violation of a constitutional right." *Belcher*, 30 F.3d at 1397-98 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

First, TPD asserts that Plaintiff is unable to establish that TPD actually failed to train officers on foot pursuits. (Mot. at 6.) To support its contentions, TPD looks to

deposition testimony of Defendant Payne and Commander Tyler Wright, which TPD suggests demonstrates that TPD did train officers on foot pursuits. (Mot. at 6, 9.)

In the context of a municipal failure to train claim, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390. Here, the evidence shows that Defendant's training with respect to foot pursuits was not merely inadequate, but nonexistent. Commander Tyler Wright, TPD commander with primary responsibility for developing high-liability training for TPD officers, testified, "[w]e don't have like a specific lesson plan for foot pursuits[.]" (Ex. 3, Wright Dep., at 21:8-9.) Rather, he testified, "those type of incidences fall under a ton of different topics that we train and teach on," and described general training with respect to "physiological and psychological response to stress[,]" "de-escalation techniques[,]" and "scenario-based training[.]" (*Id.*, at 21:12-22:12.) Indeed, this is the only training that Defendant TPD identifies to support the adequacy of its training here. (Mot. at 5, 6.)

However, as Plaintiff's expert opines, none of the training identified by Defendant provided guidance to TPD officers "regarding the procedures to engage in a pursuit, or not" or "how, or if, an officer should hold or carry a firearm during a foot pursuit and how to do as such when the suspect is confronted or scaling barriers." (Ex. 6, Scott Report, at ¶¶ 2.6, 2.13.) To the extent that Defendant TPD relies upon sporadic, informal discussions of foot pursuits through video reviews at roll call, TPD's contention is directly undercut by Defendant Payne's testimony that, in his experience, no foot pursuit video he reviewed involved the use of a firearm, and these videos failed

to instruct him how to handle a firearm during a foot pursuit. (Mot. at 6-7; Ex. 1, Payne Dep., at 139:15-141:2.) Indeed, Officer Payne testified that the entire purpose of the limited videos of a foot pursuit he watched was to highlight whether it was successful (e.g., the officer caught the suspect) or not (e.g., the officer slipped and fell allowing the suspect to get away). (Ex. 1, Payne Dep., at 139:15-141:2.)

Mr. Payne further testified — and Defendant TPD fails to identify any record evidence to dispute — that, though he had successfully completed all training provided by TPD, he had never been trained on carrying or firing a weapon during a foot pursuit and had never simulated firing a weapon during a foot pursuit. (Ex. 1, Payne Dep., at 93:10-94:4.) This makes sense, given Defendant Payne also testified that he believed his actions with respect to his foot pursuit of Mr. Lowery comported with his TPD training, and that he should have received training specific to foot pursuits. (*Id.*, at 88:12-24, 95:9-17.) Moreover, while Mr. Payne had previously conducted a few foot pursuits in his short career with TPD, none of them required him to draw or use a weapon. (*Id.*, at 93:2-9.) That means that Mr. Lowery was his first time engaging in a foot pursuit while armed.

Critically, Defendant ignores *City of Canton*. There, the Supreme Court expressly recognized that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons[,]" and it "has armed its officers with firearms, in part to allow them to accomplish this task." 489 U.S. at 390 n.10. "Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious' that failure to do so could properly be characterized as

'deliberate indifference to constitutional rights.'" *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)).

Overlooking *City of Canton*, Defendant contends that it cannot be liable given the absence of "factually similar incidents with substantial merit." (Mot. at 9.) But, "[a] city may be put on notice in two ways," either through its "aware[ness] that a pattern of constitutional violations exist[]," or where "the likelihood for constitutional violation is so high that the need for training would be obvious." *Lewis*, 561 F.3d at 1293.

The cases on which Defendant relies are distinguishable on this basis, (Mot. at 9), as both plaintiffs sought to establish the municipal-defendant's deliberate indifference through prior notice of similar constitutional violations. *Brooks*, 813 F.2d at 1193; *Gold v. City of Miami*, 151 F.3d 1346, 1352 (11th Cir. 1998). The *Gold* court further rejected the plaintiff's *City of Canton* single-incident argument, as training "regarding the disorderly conduct statute and the proper response to handcuff complaints" falls "far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference[.]" *Id.* (quoting *City of Canton*, 489 U.S. at 396-97.) The *Gold* court further observed that "to date, the Supreme Court has given only one hypothetical example of a need to train being 'so obvious' without prior constitutional violations: the use of deadly force where firearms are provided to police officers." *Id.*

Here, the evidence shows that TPD was aware that its officers would be required and expected to engage in foot pursuits of fleeing felons while armed with their service

weapons. (Ex. 2, Demmon Dep., at 74:1-17.) TPD further admitted that it knew that, under certain circumstances, carrying a weapon during a foot pursuit could lead to an improper discharge by the TPD officer engaged in the foot pursuit. (*Id.*, at 55:19-56:12; Ex. 3, Wright Dep., at 29:9-30:9.) Moreover, Defendant TPD was aware that TPD officers' decision-making capabilities could be compromised while engaged in a foot pursuit. (Ex. 3, Wright Dep., at 32:12-33:13.). Defendant TPD knew it was obligated to provide TPD officers with training specific to the patrol activities that carry a higher risk to safety. (*Id.*, at 45:7-46:24.)

Accordingly, TPD's "need to train officers in the constitutional limitations on the use of deadly force" in the context of foot pursuits was "so obvious" that its failure to do so constitutes "deliberate indifference to constitutional rights," sufficient to prove the intent inquiry[1]. 489 U.S. at 390 n.10; *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009) (explaining, in establishing the "single-incident" theory of notice, "the Supreme Court referenced the proper use of firearms and the correct use of deadly force as an area that would be so obvious as to require adequate training by the municipality to avoid liability.").

Finally, Defendant TPD contends that Plaintiff's § 1983 claim must fail because Defendant Payne cannot confer municipal liability on TPD. (Mot. at 9.) Defendant TPD misunderstands Plaintiff's allegations; Plaintiff does not assert that Officer Payne

---

[1] To the extent TPD frames the deposition testimony of Plaintiff as a "concession" that "she has no evidence," Defendant is again incorrect. Plaintiff, as a layperson, is entitled to rely upon counsel to develop the legal theories and evidence to support her claim.

was responsible for making decisions regarding the nature, structure, or contents of TPD's training program. (Doc. 1, Compl., ¶¶ 55-64.) Rather, TPD was tasked with final authority to develop the training provided to TPD officers, including the topics, structure, and content, and Commander Wright actually made final decisions with respect to the topics, content, and structure of TPD's "high liability" patrol training. (Ex. 3, Wright Dep., at 19:1-20:6.) This evidence adequately establishes that TPD's failures to adequately train constituted official policy decisions "for which the governmental entity is actually responsible," sufficient to confer liability on TPD. (Mot. at 8 (citing *Pembar v. Cincinnati*, 475 U.S. 469, 479 (1986)).

Because Plaintiff has established facts that would lead a reasonable jury to conclude that Defendant TPD, through the TPD Chief of Police, had final policymaking authority with respect to whether and how TPD trained on foot pursuits; Defendant TPD failed to adequately train its officers on use of force during foot pursuits; and Defendant TPD's failure constituted deliberate indifferent to the obvious consequential constitutional violations, Defendant is not entitled to summary judgment on Plaintiff's § 1983 claim.

### C. Plaintiff has demonstrated a clearly established constitutional violation by Defendant Payne connected to Defendant's failure to train.

TPD seeks judgment by arguing that Defendant Payne is entitled to qualified immunity for shooting and killing Mr. Lowery. (Mot. at 7-8, 14-19.) Defendant's argument is similar to Defendant Payne's arguments in his motion for summary

judgment (Doc. 91). Therefore, Plaintiff incorporates his opposition to those arguments here, rather than repeating the same law and facts.

Briefly, TPD asserts that, "at the very minimum," the record establishes that Defendant Payne "had arguable probable cause" to employ deadly force. (Mot. at 18.) As an initial matter, TPD fails to provide a single citation to the pages and lines of the record that support its contention, in violation of this Court's Case Management and Scheduling Order. (Doc. 51, CMSO, § H.) Instead, TPD relies principally on reference to Mr. Payne's self-serving agreement with questions asserting that he perceived Mr. Lowery as having "made a furtive movement towards his sweater's front pocket, which was perceived as going for a firearm by Payne." (Mot. at 18.)

As set forth in Plaintiff's opposition to Defendant Payne's motion for summary judgment (pp. 13-16), the record is replete with evidence directly contradicting Payne's testimony, including, principally, Payne's body worn camera, which shows that he shot an unarmed Lowery in the back of the head within one second after the 40-year-old Lowery flung himself head first, with his legs and feet vertically extended towards the sky, over the fence. In other words, a reasonable jury could find that Mr. Payne simply shot in the back of the head an unarmed, fleeing man who had just crashed to the ground.

*TPD itself* reviewed the shooting and found that Mr. Payne's actions were unconstitutionally excessive. (Ex. 3, Demmon Dep., at 36:14-18, 47:4-50:10.) "Officer Payne's decision to use his firearm in this manner and under these particular set of circumstances does not meet the objective reasonableness standard and as such this

use of deadly force is not justified." (*Id.*, at 47:4-50:10; Ex. 9, Titusville – IA Binder 1 – 0103.) TPD Police Chief John Lau concurred with the conclusion. (*Id.*) Given this admission, TPD's contention otherwise here is outrageous.

Furthermore, Defendant Payne pled guilty and was convicted of manslaughter, which necessarily required him to admit that he was not justified in firing his weapon at Mr. Lowery. (*Id.*, at 117:14-20.)

In short, the record here easily establishes a triable claim of excessive force. *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (officer-defendant's use of lethal force on unarmed, retreating suspect who was "outside of striking distance" was unconstitutionally excessive, even though the suspect had engaged in a physical altercation with officers); *Atkins v. Bennett*, 792 F. Supp. 3d 1282, 1288-89 (11th Cir. 2025) (officer-defendant "violated clearly established law by shooting a fleeing suspect who did not present a direct threat," even though the decedent dropped a pistol during the encounter); *Cantu*, 974 F.3d at 1231 (finding force excessive on summary judgment where evidence was conflicting as to the suspect's control of officer's taser when shot, despite suspect's resistance to arrest, attempted flight, and altercation with officer-defendant).

Because the record demonstrates that Payne "[u]se[ed] deadly force, without warning, on an unarmed, retreating suspect," it was clearly established at the time of Mr. Lowery's death that Payne's use of force was excessive. *Salvato*, 790 F.3d at 1295. To the extent Defendant TPD implies that Defendant Payne is entitled to qualified immunity because the challenged right had not been clearly established, with reference

to *Murphy v. Dennings*, 626 F. App'x 836, 840 (11th Cir. 2015), TPD improperly ignores binding Eleventh Circuit precedent finding, under circumstances factually analogous to those herein, "we have clearly established that 'a police officer may not seize an unarmed, non-dangerous suspect by shooting him dead.'" (*See* Mot. at 14); *see also Watkins*, 156 F.4th at 1111 (quoting *Garner*, 471 U.S. at 11); *Salvato*, 790 F.3d at 1293; *Cantu*, 974 F.3d at 1231; *Atkins*, 792 F. Supp. 3d at 1288-89. Accordingly, TPD cannot look to qualified immunity to shield it from its municipal liability here.

Defendant further argues that Plaintiff's Section 1983 claim should fail regardless of Payne's entitlement to qualified immunity, "as it cannot be held vicariously liable under § 1983 for actions of its employees." (Mot. at 8.) But, as explained in Section I.B., *supra*, Plaintiff's § 1983 claims against Defendant TPD are premised on allegations of its own unconstitutional failure to train. (Doc. 1, Compl., ¶¶ 55-64.)

Finally, TPD's reference to Mr. Lowery's criminal record or possession of drugs is irrelevant. It is a transparent attempt to disparage the deceased in a manner untethered to relevant law. Payne did not know Mr. Lowery, and he was not able to obtain any identification for Mr. Lowery before shooting him. (Ex. 1, Payne Dep., at 35:23-25, 134:20-22.) Mr. Payne admitted that he did not observe Mr. Lowery in possession of a weapon. (*Id.*, at 47:15-50:1; 76:22-77:3.)

## II.    Plaintiff is entitled to present evidence establishing her damages to a jury

TPD attacks Plaintiff's damages requests. (Mot. at 11.) Notably, TPD does not assert that it is entitled to summary judgment on this basis, nor does it cite any

authority to that effect. (*Id.*, at 11-13.) There is no such authority. In this Circuit,
Section 1983 plaintiffs are entitled to seek compensatory damages for "monetary
losses, such as lost wages, damaged property, and future medical expenses[,]" as well
as "physical pain and suffering," loss of reputation, and personal humiliation. *Slicker
v. Johnson*, 215 F.3d 1225, 1231 (11th Cir. 2000). Eleventh Circuit Pattern Jury
Instruction 5.13 specifically instructs that "compensatory damages are not restricted
to actual loss of money—they also cover the physical aspects of the injury." 11th Cir.
Pattern Jury Instruction 5.13; *Slicker*, 215 F.3d at 1229 (explaining that a § 1983
plaintiff need not rely solely upon "evidence of *direct* monetary loss" to prove "actual
injury," as "compensatory damages may include more than out-of-pocket losses and
other monetary harms."). Even "in the absence of actual injury entitling the plaintiff
to compensatory damages, a § 1983 plaintiff whose constitutional rights are violated
by the defendant is entitled to nominal damages." *Id.* at 1229-30 (quoting *Carey v.
Piphus*, 435 U.S. 247, 266-67 (1978)).

Here, for example, Plaintiff suffered an actual injury caused by TPD's deliberate
indifference: the loss of her father James Lowery when Mr. Payne shot and killed him.
(Ex. 7, Robinson Dep., at 14:13-17; Doc. 90, SAMF, at ¶ 8.) Plaintiff is entitled to
recover damages to compensate her for her loss. *Howard v. Wilkinson*, 379 F. Supp. 3d
1251, 1255-56 (M.D. Fla. 2019).

Without any viable legal argument, Defendant sets forth irrelevant facts meant
to impugn Mr. Lowery's character and, ultimately, devalue Plaintiff's loss of her
father. (Mot. at 12-13.) To the extent any of it is admissible (which Plaintiff reserves

the right to dispute), such matters may be argued to a jury. They are not a basis for summary judgment. *See Voss v. City of Key West, Fla.*, 24 F. Supp. 3d 1228, 1231 (S.D. Fla. 2014) (explaining that the precise measure of damages to which plaintiff is entitled is "inherently [a] fact question[] to be left to the jury").

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied in entirety.

Respectfully Submitted,

Date: January 13, 2026

JAMIYAH ROBINSON, as
Personal Representative of the Estate
of James Lowery, deceased,

/s/    *John Marrese*
        John Marrese

/s/    *Paige Smith*
        Paige Smith

Ben Crump
Natalie Jackson
**BEN CRUMP LAW**
122 S. Calhoun Street
Tallahassee, Florida 32301
P. (800) 713-1222
ben@bencrump.com
natalie@nataliejacksonlaw.com

Steven Hart*
Brian Eldridge*
John Marrese* (*Lead Counsel pursuant to Local Rule 2.02(a)*)
Paige Smith*

**HART MCLAUGHLIN & ELDRIDGE, LLC**
One South Dearborn, Suite 1400
Chicago, Illinois 60603
P. (312) 955-0545
shart@hmelegal.com
beldridge@hmelegal.com
jmarrese@hmelegal.com
psmith@hmelegal.com

Kevin Edwards*
**EDWARDS INJURY LAW**
226 Baldwin Avenue
Charlotte, NC 28204
(980) 400-3244
kevin@edwardsinjury.com

*Attorneys for Plaintiff Jamiyah Robinson,
as Personal Representative of the Estate
of James Lowery, deceased*

*Specially Admitted