EXHIBIT 2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:23-cv-01313-PGB-LHP

JAMIYAH ROBINSON, as Personal
Representative of the ESTATE
OF JAMES LOWERY, Deceased,

  Plaintiff,


vs


JOSHUA NATHAN PAYNE, individually
and as an agent and employee of
the Titusville Police Department,
and CITY OF TITUSVILLE, FLORIDA,

  Defendants.
_____


REMOTE DEPOSITION OF
CHARLES DEMMON


VOLUME 1 (Pages 1 - 93)


Thursday, July 10, 2025
10:16 a.m. - 12:48 p.m.


LOCATION:  Remote via Zoom
Titusville, Florida


STENOGRAPHICALLY REPORTED BY:
CINDY A. LAYER, CSR

Page 2
```
1   APPEARANCES:  (All parties appearing via Zoom.)
2
3   ON BEHALF OF THE PLAINTIFF:
4
5        HART, McLAUGHLIN & ELDRIDGE, LLC
         One South Dearborn, Suite 1400
         Chicago, Illinois 60603
6        (312) 955-0545
         BY:  JOHN MARRESE, ESQUIRE
7        jmarrese@hmelegal.com
8
    ON BEHALF OF JOSHUA PAYNE:
9
10       ROBERTS, REYNOLDS, BEDARD & TUZZIO, PLLC
         470 Columbia Drive, Suite C101
11       West Palm Beach, Florida 33409
         (561) 688-6560
12       BY:  JAMES JIMENEZ, ESQUIRE
         jjimenez@rrbpa.com
13
14  ON BEHALF OF CITY OF TITUSVILLE:
15
16       ROPER, TOWNSEND & SUTPHEN, P.A.
         255 S. Orange Avenue, Suite 750
16       Orlando, Florida 32801
17       (407) 897-5150
         BY:  DAVID JADON, ESQUIRE
18       djadon@roperpa.com
19
20
21
22  Also present:  Armando Forte, videographer
                    Morgan Forbes, paralegal
23
24
25
```

Page 3
```
1              I N D E X
2
3   Charles Demmon                      PAGE
4
5   Direct Examination by Mr. Marrese     5
6   Cross-Examination by Mr. Jadon       85
7
8   CERTIFICATE OF OATH                   #
9   CERTIFICATE OF REPORTER              ##
10  READ AND SIGN LETTER                 ##
11  ERRATA SHEET                         ##
12
13
14          INDEX OF EXHIBITS
15  NO.      DESCRIPTION              ID
16  1        Investigative report     11
17  2        Investigative report     15
18
19
20
21
22
23  (Stenographer's note:  All exhibits were received
24  and marked at the conclusion of the deposition.)
25
```

Page 4
```
1   Remote proceedings began at 10:16 a.m.:
2        VIDEOGRAPHER:  We're now on the record.
3   The time is 10:16 a.m.  This is the
4   video-recorded deposition of Lieutenant Matt
5   Demmon taken in the matter of Robinson
6   versus Joshua Nathan Payne.  This deposition
7   is being held on Zoom.  Today's date is
8   July 10th, 2025.
9        My name is Armando Forte.  I am the
10  videographer representing Lexitas.  Our
11  court reporter for today is Cindy Layer,
12  also an association with Lexitas.
13       Will counsel please identify themselves
14  and who they represent?
15       MR. MARRESE:  John Marrese for the
16  plaintiff.
17       MR. JIMENEZ:  James Jimenez for
18  Defendant Joshua Nathan Payne.
19       MR. JADON:  David Jadon on behalf of
20  Mr. Demmon and City of Titusville.
21       VIDEOGRAPHER:  Thank you, Counsel.  The
22  court reporter will now swear in the
23  witness.
24       STENOGRAPHER:  Do you swear to tell the
25  truth, the whole truth, and nothing but the
```

Page 5
```
1   truth?
2        THE WITNESS:  Yes.
3        STENOGRAPHER:  Thank you.
4   WHEREUPON,
5        C H A R L E S   D E M M O N
6   was called as a witness and, after having been
7   first duly sworn, was deposed and testified as
8   follows:
9             DIRECT EXAMINATION
10  BY MR. MARRESE:
11       Q.   Good morning.  Would you please state
12  your name for the record?
13       A.   Good morning.  It's Charles Demmon,
14  D-e-m-m-o-n.  I go by Matt.
15       Q.   Thank you very much.  And Mr. Demmon,
16  at the time of the documents at issue in this case
17  you were a lieutenant with the Titusville Police
18  Department.  Are you still a lieutenant?
19       A.   No, sir.  I'm a commander.
20       Q.   You're a commander?
21       A.   Yes, sir.
22       Q.   Thank you.  Is it okay if I refer to
23  you as Commander Demmon then throughout the
24  deposition?
25       A.   Sure.
```

Charles Demmon
07/10/2025

Page 6

1      Q.   Thanks.  Mr. Demmon, we met -- I called
2  you Mister.  Mr. Demmon, we met a moment ago.  My
3  name is John Marrese again.  I represent the
4  plaintiff in a lawsuit against a former officer,
5  Joshua Payne, and the City of Titusville.  You
6  understand that you personally are not a defendant
7  in this lawsuit, correct?
8      A.   Yes, sir.
9      Q.   And that we're taking your deposition
10  today simply as a witness with some involvement in
11  the review of the shooting that is involved in this
12  case, correct?
13      A.   Yes, sir.
14      Q.   Thank you.  Have you given a deposition
15  before?
16      A.   I have.
17      Q.   Many times?
18      A.   On the criminal side, yes.
19      Q.   Let me just go over some ground rules
20  for our deposition in this civil case today.  I'll
21  ask you most of the questions for a while, some
22  others may ask you questions when I'm done, and the
23  answers that you provide are under oath in this
24  case just as if you were giving them before a judge
25  or a jury.  Does that make sense?

Page 7

1      A.   Yes, sir.
2      Q.   Thank you very much.  We will be going
3  for some time today, and there will probably be a
4  lot of questions that you anticipate exactly what
5  I'm going to ask you.  If we were in normal
6  conversation, kind of outside of this formal
7  setting, we'd interrupt each other, we'd interject,
8  say things.  In this setting, if you would, please,
9  wait until I finish my question entirely and
10  then -- and the rule applies to me.  I'll wait
11  until you finish your answer entirely before we
12  begin speaking.  Does that make sense?
13      A.   Yes, sir.
14      Q.   Thank you very much.  If you don't
15  understand a question that I've asked you for
16  whatever reason, you'll obviously let me know, and
17  if it makes sense, I'll rephrase it for you.  Is
18  that okay?
19      A.   Yes.
20      Q.   All right.  Great.  Just as you have
21  been today, provide verbal responses, yesses, noes,
22  and other explanations.  It's harder to interpret
23  shrugs, and nods, and things like that.  Even
24  though there is video of today's deposition, still
25  give verbal responses to my questions.  Okay?

Page 8

1      A.   Yes, sir.
2      Q.   All right.  Thank you.  You will from
3  time to time hear objections to my question, which
4  is a very typical part of the deposition process
5  where lawyers are just preserving their rights.
6  Please wait for those objections to be completed,
7  and when completed, answer my question if you
8  understand it.  Okay?
9      A.   Yes, sir.
10      Q.   I suppose there's an exception.  If
11  your attorney instructs you not to answer, you get
12  to make the decision whether to follow that advice,
13  but typically speaking, answer subject to the
14  objections.  Okay?
15      A.   Okay.
16      Q.   Thank you.  Lastly, we can take breaks
17  any time you prefer today, just let me know.  I may
18  call for them on my own at times.  If you need to
19  use the bathroom, get up, walk around, whatever,
20  just let me know and we'll do that.  Okay?
21      A.   Thank you.
22      Q.   Thanks very much.  I want to ask you
23  some questions about the preparation, if any, that
24  you did for today's deposition.  The caveat I want
25  to give you is, I don't want to know anything that

Page 9

1  you discussed with your attorneys or attorney.
2  That's privileged information, so don't disclose
3  that to me.  But I'll ask you some questions about,
4  you know, just when you met, if you met, what kind
5  of things you looked at.  Okay?
6      A.   Okay.
7      Q.   All right.  Did you have any meetings
8  with attorneys to prepare for today?
9      A.   Yes.
10      Q.   How many?
11      A.   I think just the one.
12      Q.   Okay.  Was that an in-person meeting?
13      A.   Yes.
14      Q.   When did that take place?
15      A.   Yesterday.
16      Q.   How long was that meeting?
17      A.   Maybe an hour.
18      Q.   Thank you.  With whom did you meet?
19      A.   Mr. -- is it David?  Yes, the attorney
20  here today, David.
21      Q.   Thank you very much.  And was anyone
22  else in the room with you when you prepared with
23  David?
24      A.   No.
25      Q.   Thank you.  That's the only meeting

Page 10

1  that you had to prepare for today's deposition,
2  correct?
3      A.   Yes.
4      Q.   As a part of that meeting, did you
5  review any documents?
6      A.   My internal, yes, sir.
7      Q.   What documents did you review?
8      A.   The -- I went through some of my
9  summary, I believe some policy, some training, and
10 I think I looked at some transcripts, some printed
11 transcripts.
12     Q.   Did you review any video, including any
13 Axon video or body cam video as a part of preparing
14 for today?  I'm sorry.  I didn't hear you.
15     A.   No, sir.
16     Q.   Did you review any audio, be it of an
17 interview, or from 9-1-1 calls, or audio from
18 anyplace?
19     A.   No, sir.
20     Q.   That was a no?
21     A.   No.
22     Q.   Thank you.
23     A.   There's a lawn mower going behind us,
24 so I'll speak a little bit louder.
25     Q.   That's okay.  I don't know if it was on

Page 11

1  my end.  It just kind of trailed at the beginning.
2  It was hard to hear.  Thank you.
3      A.   Yes, sir.
4      Q.   So let's talk about the documents.
5  When you say the summary, do you mean your
6  professional standards division report in this
7  case?
8      A.   Yes, sir.
9      Q.   Let me just get this out of the way and
10 pull that up.  We'll be talking about that a bit
11 today.  So I have pulled up on the screen Page 1 of
12 102.  The first page is Titusville Police
13 Department Professional Standards Division and then
14 Administrative Investigation IA Number 031A-IA.
15 You see that?
16     A.   Yes, sir.
17     Q.   And this is a 102 page report.  Is that
18 the summary that you were referring to?
19     A.   Yes, sir.
20     Q.   Okay.  I'm not going to do it now --
21 okay.  Let's mark this as Exhibit 1.  I will just
22 scroll briefly through the 102 pages.
23         (Exhibit No. 1 was identified for the
24         record.)
25 BY MR. MARRESE:

Page 12

1      Q.   If you notice, when I get to Page 81
2  here -- you see that?  Let me blow it up a little
3  bit.  You see this Page 81?
4      A.   Yes, sir.
5      Q.   It changes to Page 81 of 107 as opposed
6  to 102 that we saw on the other pages.  Do you know
7  why that is?
8      A.   I don't.
9      Q.   Okay.
10     A.   I don't.  It might have been -- I
11 don't.  I don't know why.
12     Q.   Okay.  Thank you.  This report that I'm
13 looking at now, I'm going to scroll through the
14 findings in the report right now.  Getting towards
15 the end.  Page 107 of 107 has your signature on it,
16 correct?
17     A.   Yes, sir.
18     Q.   Okay.  I have a version -- so on this
19 version that we're looking at now, which is what
20 the city produced to us in this case, there's no
21 date next to your signature, but I have a version
22 that plaintiff produced, that I can pull up later,
23 that has a date of June 12, 2022 for your
24 signature, so two days before Chief John Lau's
25 signature.

Page 13

1      A.   Yes.
2      Q.   Does that sound accurate?
3      A.   Yes.  That's what I have.
4      Q.   I will tell you, I have not noticed any
5  differences between the version -- so you're
6  looking at the version with the date; is that
7  correct?
8      A.   Yes, sir.
9      Q.   Maybe I should pull that up then.
10 We'll mark this as Exhibit 1, and then give me one
11 minute and I'm going to see if I can pull the
12 version with the date on it.
13     A.   Okay.
14     Q.   That's a version you actually have in
15 front of you today?
16     A.   Yes, sir.
17     Q.   I should have asked, other than that,
18 do you have anything else in front of you in terms
19 of documents?
20     A.   Yes.  I have three binders, which is
21 the entire internal investigation.  You want me to
22 show you those?
23     Q.   Yeah.  Would you lift them up, because
24 I think I know the binders you're talking about.
25 Yep.  Book 2, Book 3 --

Page 14

1    A.    And then there's this one, which is
2    Book 3.
3        Q.    You got Book 1 with you too?
4    A.    Yes, sir.  I'll pull that up.
5        Q.    Would you just -- I'm sorry to do this
6    again, but since we're on video, with each one,
7    would you kind of hold it straight to the camera?
8    A.    Oh, yeah, absolutely.
9        Q.    Hold it there for a couple seconds so
10   we -- Book 1 of 3.  Thank you.  Book 2 of 3.  Thank
11   you.  Book 3 of 3.  Thank you.
12       A.    Yes, sir.
13       Q.    Just give me one second.  I'm going to
14   see if I can find that -- the electronic version of
15   the summary.
16       A.    Okay.
17       Q.    Do you see my screen right now?
18       A.    I can, yes.
19       Q.    I'm going to scroll to the start of the
20   report.
21          MR. JADON:  John, for the record, are
22       you still referring to Binder 1?
23          MR. MARRESE:  No.  This is documents
24       that were produced to plaintiff.  I don't
25       remember when.  Not in this litigation.  I

Page 15

1        think presuit.  But plaintiff produced these
2        and Bates labeled these.  This is the
3        version -- it came to us a little bit out of
4        order, so you'll see it starts at Robinson
5        248.  Let me increase the size on that.
6        That's Page 3 of 102, then the next page is
7        Page 1, then it goes to Page 2 and
8        continues.  Let me just -- hold on a minute.
9        I lost it.
10   BY MR. MARRESE:
11       Q.    Can you see the screen?
12       A.    Yes.
13       Q.    This will be Exhibit 2, and you'll
14   notice at Page 81 it does the same thing where it
15   says goes to 107.  There's a problem on my screen
16   in terms of viewing the document.  Give me a
17   second.
18       A.    Okay.
19          (Exhibit No. 2 was identified for the
20          record.)
21   BY MR. MARRESE:
22       Q.    Can you see the document on my screen
23   now?
24       A.    Yes.
25       Q.    Let me get to where I want to go.  All

Page 16

1    right.  We're back in the report.  You see again it
2    changes to 107 at the bottom like the other
3    document?
4        A.    Yes.
5        Q.    Okay.  Then I'll go to the last page,
6    and on this one I've got the June 12th, 2022 date
7    next to your signature at Page 107 of 107, correct?
8        A.    Yes, sir.
9        Q.    Okay.  And then Chief John Lau's
10   signature is below that dated June 14th, 2022, with
11   the handwritten note, concur with changes I made.
12   Do you see that?
13       A.    Yes, sir.
14       Q.    Okay.  And the signature initials next
15   to the asterisk, concur with changes I made, is
16   that John Lau's signature?
17       A.    Yes, sir.
18       Q.    Okay.  Thank you.  So we'll mark this
19   as Exhibit 2, and this is the one that you have in
20   front of you, correct?
21       A.    Yes, sir.
22       Q.    This ends at Robinson 354, and so when
23   I refer to this document today, I'll pull that one
24   up.  Okay.  Stop the share for a second.  So that
25   was the summary that you reviewed during

Page 17

1    preparation, correct?
2        A.    Yes, sir.
3        Q.    And did you review that in full,
4    Mr. Demmon?  Did you say no?
5        A.    No.
6        Q.    Then you mentioned that you reviewed
7    some policies.  Do you recall which ones you
8    reviewed?
9        A.    It was, I think, the response to
10   resistance in Book 2, I believe, and I think some
11   of the trainings in Book 2, in-house, I think,
12   maybe.  And I looked at some rosters, I think, that
13   are attached to Book 2.  Not a lot.
14       Q.    In terms of training, what did you look
15   at?
16       A.    The in-house training for Officer Payne
17   -- or former Officer Payne, the in-house training,
18   and the Madison Middle School training, active
19   shooter training.  I looked at that.  And I believe
20   I browsed through some FTO stuff when he was on FTO
21   field training, some of the documents associated
22   with that.  I think that was it.  It wasn't much.
23       Q.    The in-house training I have had
24   produced to me a document that kind of identifies
25   various trainings that Mr. Payne went through with

Charles Demmon
07/10/2025

Page 18

the Titusville Police Department. It's kind of a
spreadsheet, more or less. Is that what you were
looking at?

A. No, I have -- can you show me the
spreadsheet you were looking at? I'll tell you if
I have that one or not.

Q. Yes, I believe I can. Yes. I will
pull that up now. I don't know that I need to mark
this, but this is a document, personnel training
listing printed on August 3rd, 2023 for Joshua
Nathan Payne. Do you see that?

A. I do. I didn't review that one, no.

Q. Okay. Did you review the more
substantive documents that have like training
outlines?

A. Yes, there was, I think, two or three,
and they were with Officer Mick and Officer Knapp.

Q. Okay. Thank you. That was the extent
of the training you reviewed?

A. Yes, sir.

Q. Finally, you mentioned transcripts. Do
you recall what transcripts you reviewed?

A. So in this Book 3 of 3 I went to see if
I still had the transcripts of my interview with
Jennings, and I think Wright, because if you

Page 19

look -- It's easier to explain. The tabs that are
listed in the book, I didn't see their tab
initially, so they're in the back of the book.
They weren't marked with an actual paper tab that
said that was their transcript in the back of
the book. And then I looked at Jennings'
transcript.

Q. Did you also look at Wright's
transcript?

A. No. No, sir.

Q. When you say you looked at Jennings'
transcript, did you actually read that front to
back?

A. Part of it. No, I didn't read the
whole thing, just part of it.

Q. What part were you focused on?

A. The training, his involvement with
training.

Q. Okay. Thank you. Have we talked about
all the documents you reviewed in preparation for
today?

A. I believe so.

Q. Okay. Thank you. Did you speak to
anyone at the Titusville Police Department
regarding today's deposition?

Page 20

A. I spoke to -- Jennings had reached out
and asked if I had a copy of his transcript for
preparation, and our training coordinator, at some
point I asked her, I think, for -- if I was missing
any lesson plans that she had provided in the
original, and she said no.

Q. Who was the Titusville Police
Department training coordinator?

A. Christina Schmidt.

Q. Did she hold that position prior to the
December 26th, 2021 shooting that's at issue in
this case?

A. Yes, sir.

Q. Okay. Thank you. Do you know how long
she's held that position?

A. I could find out for you. It's been
several years, at least five or so, maybe longer.

Q. What is the role of a training
coordinator at the department?

A. Coordinate our trainings. She puts our
trainings together, keeps our FDLE certifications.
She's kind of the keeper of the record, if you
will, on all of our trainings, for our in-house
training, training we do outside the department for
our trainers, our officers, that kind of stuff.

Page 21

Q. Okay. If I paraphrase or summarize
what you just said, there's an administrative
function in terms of keeping the record of
everyone's training. There's also the function of
ensuring that the trainings are done and the
certifications are maintained, or renewed, or
whatever else. Is that a fair description?

A. Yes, sir.

Q. Okay. And then beyond that does
Ms. Schmidt do any actual training of the law
enforcement?

A. No, just the coordination of it.

Q. Thank you.

A. Yes, sir.

Q. And when you spoke to Mr. Jennings, did
you provide him his transcript?

A. Yes, sir.

Q. I assumed you spoke to him. Was that a
phone call, in-person meeting, e-mail?

A. I saw him briefly in person, and then
it was a phone call.

Q. Did you discuss the substance of your
involvement in the case with him during that time?

A. No.

Q. Did you discuss anything with him in

Page 22

1  terms of what you plan to testify about or anything
2  like that?
3      A.  No.
4      Q.  Same question with respect to him.  Did
5  he discuss any of that with you?
6      A.  No, sir.
7      Q.  Thank you very much.  And other than
8  your attorney, Mr. Jennings, and Ms. Schmidt, did
9  you speak with anyone else regarding today's
10 deposition?
11     A.  No.
12     Q.  So you did not speak with Chief John
13 Lau about that?
14     A.  No.  He knew I was having a deposition,
15 but no.
16     Q.  Thanks very much.  Is there anything
17 else that you did to prepare for today's deposition
18 outside of preparation?  And really anything, be
19 it, you know, Googling things online, checking into
20 the case, anything like that?
21     A.  I don't think so, no.
22     Q.  Okay.  Thank you.
23     A.  Yes, sir.
24     Q.  How old are you, Mr. Demmon?
25     A.  I mean, I look it, but I am 52.

Page 23

1      Q.  You look much younger.
2      A.  I appreciate that.  Thank you.
3      Q.  You live within the State of Florida
4  now; fair to say?
5      A.  Yes, sir.
6      Q.  Any plans to relocate outside the State
7  of Florida?
8          STENOGRAPHER:  I'm sorry.  I didn't
9  hear you.
10         THE WITNESS:  No, ma'am.
11 BY MR. MARRESE:
12     Q.  Some kind of basic background
13 questions.  Did you attend high school?
14     A.  Yes, I did.
15     Q.  Where did you attend?
16     A.  Titusville High School.
17     Q.  So you were born and raised in
18 Titusville?
19     A.  I was actually -- no, I was born in
20 Cape Canaveral, and we moved to Titusville from the
21 Cocoa area in 1989.
22     Q.  Wonderful.  Did you graduate from
23 Titusville High School?
24     A.  Yes, I did.
25     Q.  Did you attend any college after that?

Page 24

1      A.  Yes, sir.
2      Q.  Where did you attend?
3      A.  It was Brevard Community College back
4  then.  It's Eastern Florida now.  And then after I
5  graduated there, I attended University of Central
6  Florida where I obtained my bachelor's degree in
7  criminal justice, and then I went back to the
8  University of Central Florida and obtained my
9  master's degrees in criminal justice.
10     Q.  When did you obtain your master's?
11     A.  2008.
12     Q.  Thank you.  And then is there any other
13 education, you know, outside of certifications you
14 may have in law enforcement or things like that,
15 beyond the master's degree that you just discussed?
16     A.  No, sir.
17     Q.  All right.  Thank you.  When did you
18 join the Titusville Police Department?
19     A.  1998.
20     Q.  When did you graduate from college?
21     A.  Well, my master's in 2008, my
22 bachelor's was in 1997.  I graduated in '91 from
23 high school, so it was probably two years after
24 that I had my associate's, so '93, '94, maybe.
25     Q.  Wonderful.  So have you been with the

Page 25

1  Titusville Police Department continually since
2  1998?
3      A.  Yes, sir.
4      Q.  It sounds like that was pretty soon
5  after you had obtained your bachelor's degree that
6  you became a police officer?
7      A.  Yes, sir.
8      Q.  Can you take me through the roles you
9  had at the department over the course of those 27
10 years?
11     A.  Get ready for a long one.  No, I'm
12 kidding.  So in 1998 when I got hired, I got hired
13 as a patrol officer.  I spent two years on the road
14 as a patrol officer responding to calls for
15 service, report taker, that kind of thing, doing
16 traffic, investigating crimes, stuff like that.
17         And then I moved into the role of a
18 detective in 2000, initially in a rotating position
19 and then a permanent position.  It was our special
20 investigations unit.  And then from there I got
21 promoted to corporal in 2004.  I went back to the
22 road as a corporal, as a supervisor, and then in
23 2005 I got promoted to sergeant and was on the road
24 for a little bit as a sergeant.  And then in 2006 I
25 went back into special investigations as a

Page 26

1  sergeant.
2      And then 2010 I was promoted to lieutenant
3  and returned back to the road.  I oversaw patrol
4  functions, our property and evidence, at one point
5  code enforcement, investigations, canine traffic.
6  A little bit of everything when I went back as a
7  lieutenant.  Stayed a lieutenant for 12 years
8  coming out of professional standards in 2022 after
9  being promoted to commander.  Went back into
10 operations from -- 'til 2024, 2025 -- I went back
11 there probably in January of '25, back to
12 professional standards as commander.
13     Q.   When did you first join the
14 professional standards division?
15     A.   As a lieutenant, I want to say it was
16 2018.
17     Q.   And then it sounds like you were there
18 for a stint, maybe left for a short time, and then
19 returned.  Did I hear that right?
20     A.   Yes, sir.
21     Q.   Can you give me the time frame on that,
22 the years?
23     A.   From 2018 through 2022, the lieutenant
24 in professional standards, then I went back to
25 patrol operations from 2022 through 2025, early

Page 27

1  '25, and then I went back -- as a commander, and
2  then I went back in professional standards as a
3  commander early 2025.  I think January, February of
4  this year, something like that.
5      Q.   Can you give me the hierarchy of the
6  Titusville Police Department?  I understand chief
7  of police, and you're a commander, you were a
8  lieutenant prior to.  Can you give me the run-down
9  in terms of rank?
10     A.   Yes, sir.  So we have the chief of
11 police, and then we have deputy chief of police,
12 and then we have two commanders, two majors, I
13 believe five lieutenants, and then maybe seven or
14 eight sergeants and corporals, so seven or eight
15 sergeants, seven or eight corporals, and then we
16 have detectives and patrol officers.
17     Q.   Thank you.  For your summary of your
18 employment correctly, you went from being a
19 lieutenant to a commander, so kind of leaped over
20 that major stage?
21     A.   We didn't have majors at the time.
22 That came afterwards.  I got lucky, I guess.
23     Q.   Thank you very much.
24     A.   Yes, sir.
25     Q.   Who is the other commander currently?

Page 28

1      A.   Tyler Wright.  He goes by TJ.
2      Q.   In terms of responsibility between you
3  and Commander Wright, do you have the same
4  responsibilities split, or does one of you oversee
5  some aspect of the department versus another?  Can
6  you kind of explain that?
7      A.   Yes, sir.  So I oversee our
8  professional standards division.  He oversees our
9  operations division.  We pretty much just switched
10 roles, if you will, when he got promoted to
11 commander.  He's having his turn basically running
12 patrol operations, investigations, similar to what
13 I did when I came out of professional standards,
14 when I got promoted.  So he does that now, and I'm
15 back in professional standards.
16     Q.   Thank you.
17     A.   Yes, sir.
18     Q.   So currently are you the highest
19 ranking official in the professional standards
20 division?
21     A.   Yes, sir.
22     Q.   That's been the case as of early 2025?
23     A.   Yes, sir.
24     Q.   When you were in professional standards
25 in 2021 and 2022 after the December 26th, 2021

Page 29

1  shooting in this case, where did you rank within
2  the professional standards division?
3      A.   I was a lieutenant.
4      Q.   So there was a commander above you in
5  rank?
6      A.   Not in professional standards, no.
7      Q.   Were you the highest ranking individual
8  in professional standards at that time?
9      A.   Yes, sir.
10     Q.   How long were you the highest ranking
11 individual in professional standards?
12     A.   Since I came in.  Since I went in in
13 2018.
14     Q.   Oh, okay.  Thank you.  So the entirety
15 of the time you were in the professional standards
16 division you were the highest ranking officer
17 there?
18     A.   Yes, sir.
19     Q.   How many others worked under your
20 command within the professional standards division
21 during that time?  That was actually kind of a bad
22 question because there might be rotation in and
23 out.
24     A.   Yeah.
25     Q.   How many typically in professional

Charles Demmon
07/10/2025

1  standards during that time?
2      A.  We have our training coordinator,
3  accreditation manager, two sergeants who perform
4  background investigations or would assist me in
5  internal investigations, and then I have a police
6  service specialist that oversees our travel,
7  training, cost, things that are associated with
8  that, keeps track of our funds for, if you will,
9  for training or going to different events, that
10  kind of thing.
11     Q.  Is that it?
12     A.  Yes, sir.
13     Q.  In this particular investigation there
14  was a Sergeant Telly Joiner assigned alongside you
15  to conduct a review, correct?
16     A.  Yes, sir.
17     Q.  Sergeant Joiner, he would have been one
18  of those two background investigation sergeants in
19  the professional services division at the time --
20  standards division, excuse me?
21     A.  Yes, sir.
22     Q.  If I refer to the professional
23  standards division as the PSD; is that fair?
24     A.  Sure.  I may have to repeat it, but
25  yes.

1      Q.  Sorry.  Then I won't.
2      A.  That's okay.
3      Q.  Is there anything you folks call it
4  inside the office that's easier than professional
5  standards division?
6      A.  We just call it professional standards.
7      Q.  All right.  Professional standards.
8  Thank you.
9      A.  Yes, sir.
10     Q.  So is it fair to say that throughout
11  your time in the professional standards division in
12  both your stints, you're the point person
13  responsible for any review of serious use of force
14  incidents?
15     A.  Yes, sir.
16     Q.  Okay.  Can you explain for the ladies
17  and gentlemen of the jury what the professional
18  standards division is?
19     A.  So it is a compliance division within
20  the police department that oversees policies,
21  procedures, training, backgrounds, hiring.  What
22  else?  Accreditation.  That's pretty much it in a
23  nutshell.  Oh, and internal investigations.  I'm
24  sorry.
25     Q.  That's okay.  Thank you.  In this case

1  you conducted an internal investigation of Officer
2  Payne's shooting of James Lowery, correct?
3      A.  Yes, sir.
4      Q.  So that's a kind of internal
5  investigation that you would perform in internal
6  affairs.  Are there any other kinds of
7  investigations you perform other than use of force
8  investigations?
9      A.  It could be for claims of -- so use of
10  force, harassment, any kind of sworn complaints
11  against department members from the public that
12  come in, things like that.  It doesn't have to just
13  be a use of force.
14     Q.  Thank you.
15     A.  Yes, sir.
16     Q.  So is it fair to say that one of the
17  purposes of the division is to assess whether
18  officers within the department have complied with
19  the law?
20     A.  Yes, sir.
21     Q.  How long has the Titusville Police
22  Department had a professional services -- standards
23  division, excuse me?
24     A.  A long time.  Geez, I want to say
25  almost as long as I've been here.  I just don't

1  remember if it was called that.  But we always
2  had -- there was always -- we always did our IAs,
3  training.  It was never -- it was always in-house
4  that was done.  I just don't remember if it was
5  called professional standards, but as long as I've
6  known it since I've been here it's been a
7  professional standards division.
8      Q.  Thank you.
9      A.  Yes, sir.
10     Q.  I should have asked, do you have any
11  plans -- I mean in the present moment.  Do you have
12  any plans to retire any time soon?
13     A.  Well, I'd like to.  I've got a few
14  grandkids now that take up some of my time, in a
15  good way, but not anything in the very near future,
16  no.
17     Q.  Okay.  Thanks.  Sometimes I ask that
18  question, do you have any plans to retire, and
19  pretty much everyone says, yeah, yeah, I'd like to
20  stop working eventually.
21     A.  I would, don't get me wrong, but I
22  think I'm going to have a full-time gig as a
23  babysitter, which is all good with me.  I just had
24  my sixth grandchild last night.
25     Q.  I'm guilty of that form of

Page 34

1   grandparenting, so I understand.
2        A.   Love it.
3        Q.   So you were responsible for performing
4   the internal investigation into Officer Payne's
5   shooting of James Lowery, correct?
6        A.   Yes, sir.
7        Q.   I will pull the report up again as we
8   refer to it here.  This was marked as Exhibit 2.
9   Can you see Page 3 of that report on the screen
10  right now?
11       A.   Yes.
12       Q.   It begins under the section
13  Investigation on December 26th, 2021.  Police chief
14  John Lau ordered internal investigation to ensure
15  the City of Titusville and their department rules
16  and regulations, general orders and/or state
17  statutes were followed by Officer Payne during his
18  attempted arrest and use of force against Mr. James
19  Lowery.  Do you see that?
20       A.   Yes, sir.
21       Q.   And that is the investigation you were
22  assigned to perform, correct?
23       A.   Yes, sir.
24       Q.   Sergeant Telly Joiner was assigned
25  along with you as we briefly mentioned, correct?

Page 35

1        A.   Yes, sir.
2        Q.   What was his role in this particular
3   investigation?
4        A.   Just to assist me in the investigation,
5   give him some experience in handling internal
6   investigations.  I try and give my sergeants that
7   work for me the opportunity to see the functions of
8   how this works, interviewing officers, things of
9   that nature, you know, collecting and reviewing
10  video, different things.  It gives them an
11  opportunity to use some of the training they've
12  been to to kind of look at things and, you know,
13  are we missing anything, are we on the right page,
14  that kind of deal.
15       Q.   Thank you for that.
16       A.   Yes, sir.
17       Q.   The next section says Internal Affairs
18  Investigation Order and Service, and it states, on
19  December 26th, 2021, "I, Lieutenant Matt Demmon,
20  met with Officer Payne in my office.  Officer Payne
21  was given notification of the formal investigation,
22  which included the allegations against him.  I told
23  Officer Payne of the process involved in this type
24  of investigation, which included me taking
25  interview statements from witness officers, as well

Page 36

1   as reviewing all materials related to this case."
2   Do you see that?
3        A.   Yes, sir.
4        Q.   Okay.  And do you recall that meeting
5   with Mr. Payne in your office?
6        A.   I do.
7        Q.   How long did that last?
8        A.   Very brief, maybe ten minutes.
9        Q.   Thank you.  And in this report it
10  indicates that Mr. Payne declined to give a
11  statement in conjunction with this investigation;
12  is that true?
13       A.   Yes.
14       Q.   Thank you.  In terms of an internal
15  investigation like this one, you mentioned that you
16  conduct interviews and review all materials
17  relating to the case, correct?
18       A.   Yes, sir.
19       Q.   How do you determine which interviews
20  to conduct?
21       A.   I look at -- when the case comes in,
22  depending on the circumstances surrounding the
23  case, I look at do I need to interview civilian
24  witnesses, do I need to interview -- what
25  department members I need to interview, and where

Page 37

1   that investigation leads.
2        So in this case I determined that I needed
3   to speak to the officers that responded there that
4   night, detectives, supervisors.  It's really based
5   off of what I see initially, and then that list can
6   grow.  It could shrink, potentially.  But basically
7   that's it in a nutshell, where I see the initial
8   investigation starting, and then as my interviews
9   develop, sometimes I find out I need to speak to
10  somebody else, or there's somebody else I may need
11  to interview along the way.
12       Q.   And you interviewed several officers of
13  the Titusville Police Department in conjunction
14  with this investigation, correct?
15       A.   Yes, sir.
16       Q.   Within this report that we're looking
17  at in Exhibit 2 there are summaries of your
18  interviews with those officers, correct?
19       A.   Yes, sir.
20       Q.   If you've interviewed an officer, you
21  will include a summary of that interview in the
22  report?
23       A.   Yes, sir.
24       Q.   And there is audio of those interviews
25  as well, correct?

Page 38

1     A.   Yes, sir.

2     Q.   And there are transcripts of those

3 interviews as well, correct?

4     A.   Yes, sir.

5     Q.   Thank you.  You also reviewed Officer

6 Payne's Axon video, otherwise called body cam

7 video, in this case?

8     A.   Yes, sir.

9     Q.   And you reviewed a variety of other

10 materials, including incident reports relating to

11 this shooting?

12     A.   Yes, sir.

13     Q.   Did you review the autopsy report in

14 this case?

15     A.   Yes.

16     Q.   Thank you.  Do you also review the FDLE

17 report?

18     A.   Yes.

19     Q.   Thank you.  You were assigned this

20 investigation immediately, on the same evening of

21 the shooting, December 26th, 2021, correct?

22     A.   Yes, sir.

23     Q.   And you executed this 107 page report

24 on June 12th, 2022, correct?

25     A.   Yes.

Page 39

1     Q.   And that is the final step in the

2 process when you are signing off on your report?

3     A.   Yes, sir.

4     Q.   So that is about five-and-a-half months

5 from the time you were assigned this investigation,

6 correct?

7     A.   Yes, sir.

8     Q.   And so that is a lengthy review and

9 investigation of the shooting, correct?

10     A.   Yes, sir.

11     Q.   That investigation that you performed

12 in this case was a thorough investigation of

13 Officer Payne's shooting, correct?

14     A.   Yes, sir.

15     Q.   And when you took on responsibility for

16 an investigation of this nature involving the use

17 of force of a fellow officer, that is a serious

18 responsibility, correct?

19     A.   Yes, sir.

20     Q.   And you understood the seriousness of

21 that responsibility when you undertook that

22 investigation, correct?

23     A.   Yes, sir.

24     Q.   And you understood the potential

25 implications of your findings for the career of a

Page 40

1 fellow officer, correct?

2     A.   Yes, sir.

3     MR. JADON:  Form.

4 BY MR. MARRESE:

5     Q.   And that is a job that you take and

6 took in this case very seriously, correct?

7     A.   Yes, sir.

8     Q.   It was your job to obtain accurate

9 facts and reach accurate conclusions based on those

10 facts to the best of your ability, correct?

11     A.   Yes, sir.

12     Q.   At this time in December of 2021 to

13 June of 2022, you had been an officer for nearly 25

14 years, correct?

15     A.   Yes, sir.

16     Q.   Part of what you bring to an

17 investigation like that are those decades of

18 experience in the various roles within the police

19 department that you testified about earlier; isn't

20 that fair?

21     A.   Yes, sir.

22     Q.   And you endeavored when you performed

23 this investigation and prepared this report to

24 reach accurate conclusions to the best of your

25 ability based on those decades of experience; is

Page 41

1 that fair?

2     A.   Yes, sir.

3     Q.   And when you prepared and signed this

4 report, you were putting your name behind it as

5 accurate to the best of your knowledge and belief?

6     A.   Yes, sir.

7     Q.   Thank you.

8     MR. JIMENEZ:  John, can we break for

9 like two minutes?  I got to call my wife

10 real quick.

11     MR. MARRESE:  No problem.

12     MR. JIMENEZ:  Thanks.  Sorry about

13 that.

14     MR. MARRESE:  Why don't we come back at

15 11:15 your time.

16     MR. JIMENEZ:  Okay.  Thank you.

17     VIDEOGRAPHER:  Going off the record at

18 11:08.

19     (A short recess was taken.)

20     VIDEOGRAPHER:  We're back on the record

21 11:16.

22 BY MR. MARRESE:

23     Q.   Commander Demmon, I'm going to share

24 with you Exhibit 2, your report, again, and I moved

25 to Page 102 of 107.  I want to talk about some of

Page 42

1  your conclusions in the report.  You reference in
2  your conclusions general orders, correct?
3       A.  Yes, sir.
4       Q.  What is a general order?
5       A.  A general order is similar to a policy.
6  Basically it is a guideline.  It is an order for
7  the way that we do business.  It gives us an
8  outline of the way we do certain things.
9       Q.  And officers are made aware of the
10 department's general orders, correct?
11      A.  Yes, sir.
12      Q.  How are they made aware of them?
13      A.  Through a program we use called Power
14 DMS.  So our in-house training or any subsequent
15 training through their career, if a policy is put
16 into place, or if something has changed, a record
17 is kept through what's called Power DMS, and the
18 officers sign on with a unique signature, and when
19 they have read the policy, they digitally sign that
20 they have read the policy and understand it.
21      Q.  Thank you.  And so officers are
22 expected to read the general orders, correct?
23      A.  Yes, sir.
24      Q.  Officers are expected to comply with
25 the general orders, correct?

Page 43

1       A.  Yes, sir.
2       Q.  And officers are informed of this,
3  correct?
4       A.  Yes.
5       Q.  Thank you.  Looking at this Page 102,
6  at the very top it says, sustained, underlined.  Do
7  you see that?
8       A.  Yes, sir.
9       Q.  What does that mean?
10      A.  That means that the allegation made
11 against the individual is sustained per my
12 investigation.
13      Q.  Just below that it says City of
14 Titusville Police Department General Order
15 300.6-Standards of Conduct/4A10 Unnecessary Force.
16 And just beneath that there are two asterisks in a
17 parenthesis, and in red it says, major violation,
18 colon.  Do you see that?
19      A.  Yes.
20      Q.  What does the major violation phrase
21 mean?
22      A.  A designation of how the department
23 designates the policy violation.  If a violation
24 exists, it could be a capital violation, it could
25 be a minor violation, it could be a major

Page 44

1  violation.
2       Q.  Thank you.  Capital being the most
3  serious?
4       A.  Yes, sir.
5       Q.  Minor being the least serious?
6       A.  Yes, sir.
7       Q.  Can you explain that hierarchy for us?
8  Strike the question.  We'll get back to that.
9       A.  Okay.
10      Q.  Let's focus on the italicized words
11 here just beneath major violation.  It says,
12 "Department members shall not use more force in any
13 situation than is reasonably necessary under the
14 circumstances.  Members shall use force in
15 accordance with the law and department written
16 directives."  Do you see that?
17      A.  Yes, sir.
18      Q.  So that is a general order of the
19 department, correct?
20      A.  Yes, sir.
21      Q.  The purpose of that general order in
22 part is to instruct officers to use reasonable
23 force under the circumstances; is that fair?
24      A.  Can you repeat it again, please?
25      Q.  Yes.  The purpose of that instruction

Page 45

1  is to inform officers that they shall not use more
2  force in any situation than is reasonably necessary
3  under the circumstances; is that fair?
4       A.  Yes.
5       Q.  And the purpose of that general order
6  in part is to ensure that officers conform with the
7  law when they use force; is that fair?
8       A.  Yes.
9       Q.  Such law would include the law of the
10 State of Florida, correct?
11      A.  Yes.
12      Q.  And such law would include the law of
13 the United States Constitution, correct?
14      A.  Yes.
15      Q.  And that reference to department
16 written directives there, a general order is a kind
17 of written directive from the department, correct?
18      A.  Yes.
19      Q.  Thank you.  And then below there are
20 bullet points that begins with, based on general
21 order 412, response to resistance/4H, use of deadly
22 force and deadly force restrictions.  Do you see
23 that?
24      A.  Yes.
25      Q.  Okay.  And those bullet points, and

Page 46

1  they continue on to the next page, 103, with
2  respect to this particular sustained general order
3  violation, those are bullet points that you wrote
4  as a part of this report, correct?
5       A.   Yes.  They came from the general order.
6  It was language that came specifically from the
7  general order.
8       Q.   Thank you for that distinction.  You
9  are actually quoting relevant portions of general
10 order 412 relating to response to resistance,
11 correct?
12      A.   Yes, sir.
13      Q.   And the portion in that first bullet
14 that you're quoting is directly from the general
15 order governing use of deadly force and deadly
16 force restrictions, correct?
17      A.   Yes.
18      Q.   And my point about the bullets is,
19 these are materials, whether you're copying them in
20 here or whatever, that you are including, correct?
21      A.   Yes.
22      Q.   If you move on to the next page, we'll
23 discuss this in some detail, but these are
24 conclusions that you've reached in support of your
25 determination to sustain the allegations, correct?

Page 47

1       A.   Correct.
2       Q.   I want to move to the second page of
3  this particular part of the report, so Page 103.
4  The top bullet point says, "In determining if the
5  force used against Mr. James Lowery in this
6  incident was appropriate, the, quote, objective
7  reasonableness, unquote, standard as set forth in
8  the United States Supreme Court case of Graham v
9  Conner was applied."  Do you see that?
10      A.   Yes, sir.
11      Q.   So you are applying that objective
12 reasonableness standard in your review of Officer
13 Payne's actions, correct?
14      A.   Yes.
15      Q.   You are applying that standard under
16 Graham v Conner in reviewing Officer Payne's use of
17 force against James Lowery, correct?
18      A.   Yes.
19      Q.   The next bullet point on that page
20 says, "Careful attention to the facts and
21 circumstances of this particular case, to include
22 the severity of the crime, the threat to the safety
23 of the officers or others, and whether Lowery was
24 actively resisting arrest or attempted to evade
25 arrest by flight were considered."  Do you see

Page 48

1  that?
2       A.   Yes.
3       Q.   That is a true statement that you paid
4  careful attention to the facts and circumstances of
5  this particular case which included those
6  variables?
7       A.   Yes.
8       Q.   You did that in preparing this report,
9  and conducting the interviews, and review of other
10 materials that formed the basis for this report,
11 correct?
12      A.   Correct.
13      Q.   Thank you.  The third bullet point
14 states, "Given Lowery's actions during this
15 incident, to include his physical confrontation
16 with Officer Payne, the force used by Officer Payne
17 to gain compliance met the standard of objective
18 reasonableness during the initial confrontation.
19 However, once the confrontation ended and Lowery
20 jumped over the fence, he no longer posed an
21 imminent threat to Officer Payne."  Do you see
22 that?
23      A.   Yes, sir.
24      Q.   And that was your conclusion in this
25 investigation, correct?

Page 49

1       A.   Yes.
2       Q.   And that remains your conclusion today,
3  correct?
4       A.   Yes.
5       Q.   And that is a conclusion that Chief of
6  Police John Lau concurred with, correct?
7       A.   Yes.
8       Q.   That means that Chief of Police John
9  Lau agreed with your determination in that respect,
10 correct?
11      A.   Correct.
12      Q.   When Officer Payne shot James Lowery,
13 James Lowery no longer posed an imminent threat to
14 Officer Payne, correct?
15      A.   Correct.
16      Q.   The third bullet point from bottom
17 states, "Officer Payne reached over the fence with
18 his firearm drawn and shot his firearm striking
19 Mr. James Lowery in his head.  Officer Payne's
20 decision to use his firearm in this manner and
21 under these particular set of circumstances does
22 not meet the objective reasonableness standard, and
23 as such this use of deadly force is not justified."
24 Do you see that?
25      A.   Yes, sir.

Charles Demmon
07/10/2025

Page 50

1    Q.   That was your conclusion in this
2  investigation, correct?
3    A.   Correct.
4    Q.   And that is your conclusion today,
5  correct?
6    A.   Correct.
7    Q.   Officer Payne's decision to shoot James
8  Lowery after James Lowery had gone over the fence
9  was not objectively reasonable, correct?
10    A.   Correct.
11    MR. JADON:  John, were you asking that
12      question based on the document in front of
13      us, or is it a general question?
14    MR. MARRESE:  I don't understand.  If
15      you have an objection, you can make it, and
16      you can obviously ask questions when I'm
17      done, but I'd rather not have a discussion
18      on the record.
19    MR. JADON:  Okay.  Form.
20    MR. JIMENEZ:  Join.
21  BY MR. MARRESE:
22    Q.   The second bullet point from bottom
23  states, "Officer Payne failed to recognize other
24  available force compliance options, and therefore
25  used a force option not reasonably necessary under

Page 51

1  these circumstances enumerated in this report."  Do
2  you see that?
3    A.   Yes.
4    Q.   That was your conclusion in this
5  investigation, correct?
6    A.   Correct.
7    Q.   And that is your conclusion still as of
8  today, correct?
9    MR. JADON:  Form.
10    MR. JIMENEZ:  Join.
11  BY MR. MARRESE:
12    Q.   You can answer.
13    A.   Yes.
14    Q.   The next bullet point states, and it's
15  the last one on this page, "Officer Payne was
16  justified to utilize his dart-firing stun
17  gun/taser; however, absent seeing, feeling, or
18  being told of a weapon, the use of deadly force
19  during this incident is not justified."  Do you see
20  that?
21    A.   Yes.
22    Q.   That was your conclusion in this
23  investigation, correct?
24    A.   Correct.
25    Q.   And part of that conclusion was that --

Page 52

1  well, strike the question.
2    As a part of reaching that conclusion you
3  reviewed Officer Payne's Axon or body camera video,
4  correct?
5    A.   Correct.
6    Q.   With these conclusions you determined
7  that deadly force was not authorized against James
8  Lowery under the Titusville Police Department
9  General Order 412, correct?
10    A.   Correct.
11    Q.   I want to focus back on the first
12  bullet point on Page 102.  There's a section 1A
13  that you've quoted which states, "Members are
14  authorized to use deadly force when it is
15  objectively reasonable under the totality of the
16  circumstances.  Use of deadly force is justified
17  when one or both of the following apply:  A, to
18  protect a member, himself, herself, or others from
19  what is reasonably believed to be an immediate
20  threat of death or serious bodily injury."  Do you
21  see that?
22    A.   Yes.
23    Q.   Consistent with your conclusions, you
24  determined here that the circumstances did not
25  present a situation where deadly force was

Page 53

1  reasonably necessary to protect a member, himself,
2  herself, or others from what is reasonably believed
3  to be an immediate threat of death or serious
4  bodily injury, correct?
5    MR. JADON:  Form.
6    MR. JIMENEZ:  Join.
7    A.   Correct.
8  BY MR. MARRESE:
9    Q.   Thank you.  Subsection B, it states,
10  "To prevent" -- and, again, this relates -- let me
11  read it in entirety.  1B, "Members are authorized
12  to use deadly force when it is objectively
13  reasonable under the totality of the circumstances.
14  Use of deadly force is justified when one or both
15  of the following apply:  To prevent the escape of a
16  fleeing subject when the member has probable cause
17  to believe the person has committed or intends to
18  commit a felony involving serious bodily injury or
19  death, and the member reasonably believes there is
20  an imminent risk of serious bodily injury or death
21  to the member or another if the subject is not
22  immediately apprehended."  Do you see that?
23    A.   Yes.
24    Q.   Consistent with your conclusions in
25  this case, you determined that the circumstances

Page 54

1  did not present a situation where deadly force was
2  reasonably necessary under that provision of the
3  general order, correct?
4      Could you state that again?  Sorry.  It
5  trailed a little bit.
6      A.   Correct.
7      Q.   Thank you.  As a part of your findings
8  in this case, Commander Demmon, you determined that
9  Officer Payne was carrying both his taser and
10  firearm when he approached the fence, correct?
11     A.   Yes.
12     Q.   I want to go to a bullet point on Page
13  103.  It is the fifth bullet point down.  It
14  states, "Officer Payne made the decision to carry
15  both his taser and firearm in his hands when he
16  approached the fence.  In determining if given the
17  same particular set of circumstances a reasonable
18  officer would have made the same decision.  It is
19  clear by testimony provided by Officers D. Knapp,
20  W. Mick, C. Wood, J. Cantalupo, M. Jennings, T.
21  Wright, and others, the actions taken were not
22  reasonable."  Do you see that?
23     A.   Yes.
24     Q.   That was your conclusion in this
25  investigation, correct?

Page 55

1      A.   Yes.
2      Q.   That remains your conclusion today,
3  correct?
4      A.   Yes.
5      MR. JADON:  Form.
6  BY MR. MARRESE:
7      Q.   The next bullet point reads, "Officer
8  Payne was not taught to keep his firearm and
9  dart-firing stun gun/taser both drawn as Lieutenant
10  Wright, Sergeant Jennings, and Officers Wood, D.
11  Knapp, and Mick testified during their interviews."
12  Do you see that?
13     A.   Yes.
14     Q.   Based on that finding did you conclude
15  that Officer Payne violated his training by keeping
16  both his firearm and dart-firing stun gun/taser
17  drawn as he approached the fence?
18     A.   Yes.
19     Q.   Do you have an opinion as to why an
20  officer should not keep both firearm and taser
21  drawn under these circumstances?
22     MR. JADON:  Form.
23     A.   Yes.
24  BY MR. MARRESE:
25     Q.   What is your opinion?

Page 56

1      A.   The rule of sympathetic reflex.
2      Q.   What is that?
3      A.   Sympathetic reflex means that when you
4  have an object in one hand and an object in another
5  hand, in this case a gun and taser, if you are
6  pulling the trigger on one, your brain may tell you
7  to pull the trigger -- if you're pulling the
8  trigger with your right hand, your brain may tell
9  you to pull the trigger with your left hand.  It's
10  called a sympathetic reflex.  You don't mean to do
11  it, but your brain is telling you to do it, so you
12  do it.
13     Q.   Do you have an opinion that there are
14  any other reasons you would not want to keep both
15  drawn at the same time under these circumstances?
16     MR. JADON:  Form.
17     A.   I've never been trained to do it, so my
18  opinion is that I wouldn't do it.  I believe the
19  other officers testimony was the same, you just --
20  we don't train that way.  You wouldn't do that.
21     VIDEOGRAPHER:  Mr. Marrese, be aware
22     that your volume is a little low when you're
23     not facing your microphone.
24     MR. MARRESE:  Thank you for that.
25  BY MR. MARRESE:

Page 57

1      Q.   Moving to Page 105 of Exhibit 2, there
2  is a sustained capital violation of City of
3  Titusville personnel policy revised 6-4-2021,
4  6.13(F)20 disciplinary actions, capital violations,
5  and suggested discipline actions when considered on
6  their own merit are equal and serious to establish
7  capital violations.
8      Then underneath that it says, "Officer
9  Payne's decision to use deadly force and his
10  failure to retain training and establish policy
11  principles based on the findings of this
12  investigation are equal in seriousness to establish
13  capital violations as noted above."  Do you see
14  that?
15     A.   Yes, sir.
16     Q.   What are you saying with this
17  conclusion?
18     A.   So for the capital violation, where it
19  meets it is because the actions of Payne in this
20  case, as I've noted here before in his decision to
21  use deadly force, his failure to retain training
22  because of him carrying both his -- and I think you
23  see it in other bullet points -- his firearm and
24  his taser out at the same time, do not follow the
25  principles that he was taught.

Page 58

1    And it's a serious issue when you're doing
2  both as noted here in the investigation, and that's
3  why I believe that it met the criteria for a
4  capital violation.
5    Q.    And is there a particular repercussion
6  associated with being found to have committed a
7  capital violation?
8    A.    So the repercussion could be -- are
9  you --
10    Q.    Yeah, I mean --
11    A.    Yeah, ask it again.
12    Q.    My question is, if you are found to
13  have committed a capital violation, what are the
14  professional repercussions that are possible?
15    A.    It could be a suspension, a demotion,
16  termination.  You could lose -- I mean, there's a
17  number of things that could come out of it.
18  Potential for losing your certificate.  A number of
19  things that could come out of it.
20    Q.    Was a decision made in terms of what
21  the repercussions for Mr. Payne would be in this
22  instance?
23    A.    From my standpoint, no.  I don't make a
24  determination on the discipline that would follow.
25    Q.    Who does?

Page 59

1    A.    That would be the chief with the
2  concurrence, I believe, of the HR manager or the
3  city manager.
4    Q.    Are you aware of whether or not such a
5  decision was made in this case?
6    A.    No.  I believe he resigned.  It was a
7  resignation, so I don't think he got any discipline
8  in this.
9    Q.    So is it fair to say that a decision in
10  terms of the repercussions from these capital
11  violations would have been made, but Mr. Payne
12  resigned before that decision was made, at least
13  insofar as you're aware?
14    A.    Yes.
15    Q.    And then moving up to Page 104, there
16  is another capital violation notice noted with
17  respect to City of Titusville personnel policy
18  revised 6-4-2021, 6.13(F)15 disciplinary actions,
19  capital violations, and suggested discipline.  It
20  continues from there.
21    Underneath the bullet point states, "Based
22  on the conclusion of this investigation, Officer
23  Payne's decision to use deadly force demonstrated
24  improper conduct and affected his relationship to
25  his job, fellow workers, and his reputation or good

Page 60

1  will in the community."  Do you see that?
2    A.    Yes, sir.
3    Q.    That was your conclusion in this
4  investigation, correct?
5    A.    Correct.
6    Q.    And that remains your conclusion today,
7  correct?
8    A.    Correct.
9    Q.    The Chief of Police John Lau agreed
10  with that conclusion, correct?
11    I'm sorry.  I didn't hear your response.
12    A.    Yes.
13    Q.    Thank you.  Moving to Page 106, there
14  is a particular violation that was not sustained at
15  the time of this report.  City of Titusville Police
16  Department General Order GO300.6, standards of
17  conduct for a 22 conformance to laws, which states,
18  "Department member shall comply with the laws,
19  ordinances, rules, and Constitution of the United
20  States, the State of Florida, and any other
21  subdivisions.  The intentional violation of any
22  federal, state, county laws or city ordinances may
23  result in discipline up to and including
24  termination."  Do you see that?
25    A.    Yes.

Page 61

1    Q.    You have stated that based on the
2  conclusion and summary of the independent criminal
3  investigation conducted by the Florida Department
4  of Law Enforcement, charges were brought against
5  Officer Payne for manslaughter by means of culpable
6  negligence.  Do you see that?
7    A.    Yes.
8    Q.    At the time that you completed this
9  report those charges had not been resolved one way
10  or another, correct?
11    A.    Correct.
12    Q.    You have noted that Officer Payne
13  resigned his position as a police officer prior to
14  providing any statement through interview or by
15  other means in accordance with his police officer
16  bill of rights.  Do you see that?
17    A.    Yes, sir.
18    Q.    So that notation, again, notes that
19  Officer Payne did not provide a statement as a part
20  of this investigation, correct?
21    A.    Correct.
22    Q.    And without such a statement or
23  resolution of the criminal charges that had been
24  brought against him, you were not in a position
25  factually, you felt at the time, to conclude that

Page 62

1  this violation should be sustained; is that fair?
2        A.   Yes.
3        Q.   Are you aware of the status of Officer
4  Payne's criminal charges as of today?
5        A.   I believe he pled to that.  I could be
6  mistaken, but I believe he pled to the charges.
7        Q.   If he entered a guilty plea to charges,
8  would that support a sustained finding with that
9  new fact?
10       A.   If he were still employed by the city,
11 then yes.
12       Q.   Thank you.  Moving up to Page 100,
13 there's another sustained finding by you with the
14 concurrence of the police chief, John Lau, relating
15 to General Order 300.6, standards of conduct for a
16 23, unsatisfactory performance.  Do you see that?
17       A.   Yes, sir.
18       Q.   And the bullet points underneath your
19 recitation of that portion of the general order
20 state, "Officer Payne did not maintain sufficient
21 competency to perform his duties during this
22 incident as he, Officer Payne, was not trained to
23 display both his firearm, lethal, and dart-firing
24 stun gun/taser, less lethal, at the same time."  Do
25 you see that?

Page 63

1        A.   Yes.
2        Q.   And that was your conclusion on that
3  date, correct?
4        A.   Yes.
5        Q.   It remains your conclusion, today?
6        A.   Yes.
7        Q.   Second bullet point states, "Officer
8  Payne's decision to transfer from a less lethal
9  response to a lethal response would require him to
10 holster/remove his dart-firing stun gun/taser from
11 the situation."  Do you see that?
12       A.   Yes.
13       Q.   That was your conclusion in this
14 investigation, correct?
15       A.   Yes.
16       Q.   And remains so today, correct?
17       A.   Yes.
18       Q.   On Page 101 you concluded another
19 sustained finding under General Order 300.6 that
20 relates to training, again, in terms of drawing
21 both the firearm and taser at the same time, but
22 Chief Lau does not concur with this particular
23 sustained finding.  Can you explain that?
24       A.   So my conclusion was that I had
25 sustained the major violation.  The chief, under

Page 64

1  professional conduct -- so professional conduct is
2  one of those we've used in the past for other
3  cases.  It's more -- as you read it, reflects
4  discredit to the department, department member.
5  These offenses may not be specifically enumerated,
6  considered conduct unbecoming a member of the
7  police department.
8        I think the chief was looking at this -- and
9  this is just my opinion in saying this, is that the
10 chief looked at this as he was not being
11 professional when this started or -- I don't know
12 how else to put it.  He just didn't -- like
13 somebody coming out to a scene and being goofy or
14 goofing around and doing something like that.  It
15 wasn't like he wasn't being unprofessional, it
16 was -- I believe, just in my opinion, that's why he
17 did not concur with that.
18       Q.   So the bullet point, the third bullet
19 point says, "The result of Officer Payne's actions
20 reflects discredit upon the Titusville Police
21 Department and department members, Officer Payne's
22 co-workers."  Do you see that?
23       A.   Yes, sir.
24       Q.   If I'm understanding your impression of
25 Chief Lau's ultimate determination, and I

Page 65

1  understand you're saying -- well, let me just make
2  this clear.  You don't know for a fact, you don't
3  have personal knowledge that that's why, but that
4  is your understanding and belief as to why he
5  didn't concur?
6        A.   Correct.
7        Q.   And that's because this standard
8  general order or portion of the general order is
9  used more for, as you described it, kind of
10 behavior that's -- if you were being silly, or
11 acting out of character, it brings discredit upon
12 officers in that respect as opposed to the conduct
13 that happened in this case, which was in violation
14 of several general orders, but not of that nature;
15 is that fair?  Do you understand what I'm saying?
16       A.   I think.  Can you say it again?
17       Q.   It was a terrible question.  That
18 happens.  Bottom line is, the nature of the
19 behavior that the department typically thinks of as
20 in violation of this portion of General Order 300.6
21 is something like, for example, like an officer
22 acting silly, or goofy, or unprofessional in that
23 way when interacting with the public, and this
24 wasn't that kind of incident.
25       A.   No.  And I think this is where you can

Page 66

1  interpret policies, like I may interpret very black
2  and white, like this is how I see it.  But, again,
3  as a policy guideline, others can interpret it
4  maybe, in this case, this way.
5       I'm not looking at this as -- I'm looking at
6  this as the incident, and not looking at him being
7  silly, like he's not off duty, he's not just
8  goofing around.  Does that make sense?
9       Q.   Yes, it does.
10      A.   Okay.
11      Q.   Moving up to Page 80 of your report.
12 This is the beginning of the findings section of
13 the report, correct?
14      A.   Yes, sir.
15      Q.   These were findings that you made in
16 conjunction with reaching the ultimate conclusions
17 that we discussed with respect to the general
18 orders, correct?
19      A.   Yes, sir.
20      Q.   In Paragraph 8 or Number 8 of those
21 findings you wrote, "Officer Payne reached over the
22 fence and discharged his firearm at Lowery."  Do
23 you see that?
24      A.   Yes, sir.
25      Q.   That was a finding that you made in

Page 67

1  conjunction with this investigation, correct?
2       A.   Yes.
3       Q.   Thank you.  Paragraph 14 of the
4  findings at Page 93 says, "Officer Payne was not
5  trained to display both his firearm, lethal, and
6  dart-firing stun gun/taser, less lethal, at the
7  same time.  Officer Payne's decision to transfer
8  from a less lethal response to a lethal response
9  would require him to holster, remove his
10 dart-firing stun gun/taser from the situation."  Do
11 you see that?
12      A.   Yes.
13      Q.   That's consistent with the conclusions
14 we discussed earlier in conjunction with the
15 general order violations, correct?
16      A.   Yes.
17      Q.   Same thing is true of 15, which states,
18 "Officer Payne's decision to use lethal force
19 during this incident is not supported by the
20 evidence provided in this investigation," correct?
21      A.   Correct.
22      Q.   One second.  I'm looking for a one-page
23 document, I believe.
24      A.   Okay.
25           MR. JADON:  Do you want to go off the

Page 68

1  record, John?
2           MR. MARRESE:  No.  I found it.  Thanks.
3  I'll pull it up.  I'm going to take a break
4  here momentarily.  I just want to get
5  through a couple short things.
6           MR. JADON:  No worries.
7  BY MR. MARRESE:
8       Q.   I'm showing you the last page of Binder
9  Number 3, which you have in your possession.  It's
10 a June 1st, 2022 letter from Joshua Payne to Chief
11 John Lau of the Titusville Police Department.  In
12 it Officer Payne formally resigns from the
13 Titusville Police Department.  Do you see that?
14      A.   Yes.
15      Q.   Have you seen this letter before?
16      A.   I believe so, yes.  You said it's in
17 Binder 3?
18      Q.   Yes.  The last page of Binder 3, as I
19 have it.
20      A.   Yes.
21      Q.   Have you seen this before I just showed
22 it to you?
23      A.   I believe I'd seen it before, but I
24 haven't looked at it recently, so...
25      Q.   Okay.  This letter is dated June 1st,

Page 69

1  2022, so 11 days before you signed and submitted
2  your report to Chief Lau, correct?
3       I'm sorry.  I didn't hear your answer.
4       A.   Yes.
5       Q.   And then there's a notation at the
6  bottom left, accepted 6-3-2022, and I believe
7  that's Chief Lau's signature with it; is that
8  correct?
9       A.   Yes, sir.
10      Q.   Do you know if Officer Payne was aware
11 that your professional standards division
12 investigation report was soon to be coming out when
13 he sent this letter?
14      A.   I needed to interview him, so it wasn't
15 done.  It wouldn't have been done.
16      Q.   I'm not sure I understand that.
17      A.   So part of the police officer bill of
18 rights is in order for me to conduct an interview
19 with him, the times were told when there's a
20 criminal investigation active.  And it was my
21 desire to get an interview with him as part of this
22 investigation, but to do that he would have a right
23 to review all the evidence I have in my internal
24 investigation, and to do all that before I could
25 conduct the interview.  And that's usually

Page 70

1   coordinated through the union representative or the
2   attorney representing the union in that case.
3        So I wanted to get an interview with him.
4   That was my desire to do that.  So in my mind I
5   wouldn't have been done until I had that interview
6   with him because I really wanted that for this
7   case.
8        Q.   Understood.  So would you have provided
9   him some version of your summary report like in
10  conjunction with asking for that interview?
11       A.   He wouldn't have gotten my summary.  He
12  would have gotten all the other evidence, the
13  interviews, any documentation that I would have,
14  aside from my summary, he would have had prior to
15  that.  If I knew he was going to give me a
16  statement in the case, as I've done in the past, he
17  would have been provided everything short of my
18  summary of the investigation.  Does that make
19  sense?
20       Q.   I think so, yes.  So like transcripts
21  of interviews, audio --
22       A.   Yes.  Any video, anything that I was
23  using in my case against him from the internal
24  side, he would have had access to so that he could
25  prepare his statement.  And that's covered under

Page 71

1   the Florida Police Officer Bill of Rights, and I
2   believe the Collective Bargaining Agreement.
3        Q.   So am I understanding to say that
4   at least as far as you're aware, he would not know
5   which way you were leaning in terms of your
6   conclusions with respect to the general orders and
7   compliance of the law?
8        A.   No, he wouldn't have known that until
9   he was provided everything.  And I wouldn't have
10  told him my conclusions or either way I was leaning
11  with that.  Again, my role is a fact finder, so my
12  questions would have been geared towards the facts
13  of the case, and the questions would have been
14  relevant to that.  And then whatever his answers
15  would be, he could offer something that I may not
16  have thought of that I wanted to look into further
17  during his questioning, you know, when he gave a
18  statement.
19       But that's kind of how I design my
20  interviews is, I have a particular list of
21  questions that I go in with, and then based on
22  their responses the interview may go where I have
23  to cover something else that maybe I wasn't aware
24  of or didn't see at the time.  If that make sense.
25       Q.   Yeah, it does.  Thank you.

Page 72

1        MR. MARRESE:  Let's take a break and
2   come back at 12:15 your time.
3        VIDEOGRAPHER:  Going off the record at
4   12:06.
5        (A short recess was taken.)
6        VIDEOGRAPHER:  We're back on the record
7   at 12:17.
8   BY MR. MARRESE:
9        Q.   Commander Demmon, are you aware of
10  whether any new training was or has been
11  implemented in the Titusville Police Department
12  relating to Officer Payne's actions in this case?
13       A.   No, I don't believe so.
14       Q.   When you say I don't believe so, just
15  to be clear, you mean you don't believe any new
16  training has been implemented, correct?
17       A.   Well, we do a lot of training, but
18  specifically related to this, no, I don't think we
19  did anything like that.  Not that I'm aware of.
20       Q.   Okay.  And same question with respect
21  to revisions in training or changes in training.
22  None that you are aware of specifically relating to
23  Officer Payne's actions in this case; is that fair?
24       A.   Yeah, I'd say that's fair.
25       Q.   Okay.  Are you aware of any training

Page 73

1   that has been implemented that's new or different
2   subsequent to the shooting that even if it doesn't
3   specifically relate to this case that you think is
4   relevant to what you found was wrong about Officer
5   Payne's actions?
6        A.   Can you ask that one more time?  I
7   think I followed you, but if you could ask that one
8   more time.
9        Q.   It wasn't a very good question.  So
10  you've already answered my questions with respect
11  to whether there's any new or different training
12  specifically related to this case.  Is there any
13  that comes to mind that is new or different that
14  would relate to the things that you found wrong
15  about Officer Payne's actions?
16       What I'm talking about in particular are his
17  holding both the taser and the gun at the same
18  time, and his use of deadly force under the
19  circumstances.
20       A.   No.
21       Q.   Thank you.  When I use the term foot
22  pursuit, I'm referring to a situation where an
23  officer pursues a fleeing suspect on foot.  Does
24  that make sense?
25       A.   Yes.

Charles Demmon
07/10/2025

Page 74

1    Q.   And would you agree with me that here
2  that for a time Officer Payne was involved in a
3  foot pursuit of James Lowery?
4    A.   Yes.
5    Q.   Is that the kind of activity that you
6  can expect a patrol officer to engage in from time
7  to time?
8    A.   Yes.
9    Q.   And officers approach suspects on foot,
10 correct?
11   A.   Yes.
12   Q.   If a suspect flees, an officer might
13 have to chase them on foot, correct?
14   A.   Yes.
15   Q.   So it's a predictable part of the
16 patrol officer's job, fair?
17   A.   Yeah, that's fair.
18   Q.   Does the Titusville Police Department
19 as of December 26, 2021 train on how to comport
20 one's self during a foot pursuit?
21   A.   So the trainings that I've been a part
22 of or with, we've done scenarios with traffic stops
23 where someone flees from the vehicle and the
24 officer gives chase.  We've gone over in our
25 response to resistance what active resistance is,

Page 75

1  which is evading an officer, heart rate, I believe
2  environmental factors.  They kind of run the whole
3  gamut of what to expect, that kind of thing.  If
4  that makes sense.
5    Q.   Okay.  And this is training that you
6  have had in particular in your time at the
7  Titusville Police Department?
8    A.   Yes, sir.
9    Q.   Let's talk about it in terms of the
10 scenario of a traffic stop where the driver, or
11 passenger, or some suspect gets out of the vehicle
12 and starts running and an officer has to give
13 chase.  What were you taught as a part of that
14 instruction?
15   A.   It depends on the scenario.  It could
16 be where you would use your taser.  It could be
17 firearms and simunitions.  I remember one in
18 particular, one of the -- give me a minute and I'll
19 think of who was a role player.  But it was at the
20 back of the PD, and we got out of the car to
21 address it, and he ran on foot behind one of the
22 sheds we had back there.
23       And you run up, and the training was you
24 want to make sure you kind of -- it's called like
25 slicing the pie.  If you come out, be mindful of

Page 76

1  your environment, what's around it so you don't
2  just run blindly around a corner, because the role
3  player was there and he presented different types
4  of force multipliers if you will.
5        He may have nothing in his hand.  He may
6  have a plastic knife in his hand.  He may have
7  something that gives you the ability do I shoot,
8  don't shoot, that type deal.  If that makes sense.
9        I know when I've run supervisory scenarios
10 in the past, we did one with a foot pursuit of an
11 individual and an officer getting on the radio, and
12 then the supervisor, who was part of the hands-on
13 portion of the process, was to hear the officer's
14 engaged in a foot pursuit with a subject, and then
15 the supervisor making a decision, setting up a
16 perimeter, do I need to lock down schools, that
17 type thing.
18       The physiological responses to it, again,
19 active resistance, so are you fighting, are you
20 running after them, what are you doing that's
21 causing your heart rate to increase besides just
22 the stress of the situation, and then how to
23 control your breathing, that kind of thing.  We've
24 done that in the past.
25       Let me think through simunitions.  Active

Page 77

1  shooter scenarios, we did one.  This was this past
2  year, so it probably wouldn't be relevant to this.
3  I know we did the one at Madison Middle School that
4  I cited in my report where you had two scenarios:
5  One was a deadly force type active shooter, the
6  other was an angry parents and a less lethal type
7  scenario, how would you handle it.  I remember that
8  one.
9        Those are the ones that are coming to mind.
10 I'm sure there's more, but those are the ones I
11 participated in that I can recall off the top of my
12 head.  I know our new hires when they get hired
13 they go through a number of scenario-type base
14 training for that, traffic stops when it comes to
15 radio procedures, stress, inducing stress, those
16 type things.
17   Q.   I want to focus on the portion of your
18 answer relating to physiological responses.
19   A.   Okay.
20   Q.   What is it that you have been taught
21 about physiological responses as it pertains to
22 foot pursuits?
23   A.   So when you -- I have a guideline that
24 was put out.  I can get a copy of it.  Basically,
25 it was classroom instruction, and it was here's how

Page 78

1  to control your heart rate:  Be mindful that, you
2  know, at a certain point if your heart rate gets
3  too high, you might start seeing black, which is
4  you're not aware of your surroundings, you know,
5  your stress is really high.  This is some things
6  you need to watch out for so that you don't make
7  like a bad decision, that kind of deal.  I've had a
8  couple different instructors go over that over the
9  time I've been here.
10      They do defensive tactics on our ground
11  fighting stuff too.  It's the same thing they go
12  over.  So I think -- that one -- those are both
13  classroom and practical.  So like you have a
14  classroom portion that's covered, whether it's
15  through a PowerPoint or something that the
16  instructor is going over, and then you have the
17  practical portion, which is like scenario based, or
18  combination of the two.
19      Q.  So if I understood your testimony
20  correctly, a part of that instruction talks about
21  how in certain circumstances your heart rate will
22  increase, and it can increase to such a point where
23  you're seeing black and therefore not as cognizant
24  of your environment and what's going on in it; is
25  that fair?

Page 79

1      A.  Yes.
2      Q.  Is that instructed in particular with
3  respect to something that can happen during a foot
4  pursuit?
5      A.  Yes, so it's called active resistance.
6  So when a subject is doing that, maybe they're
7  fighting, maybe they're running.  Those are the
8  factors that go into it because now you're running,
9  your heart is elevated, you're in a physical
10  confrontation, your heart is elevated, that type
11  deal.  And these are the things to be cognizant of
12  to look for.
13      Q.  In terms of attempting to control your
14  heart rate, or to avoid a situation where you make
15  a bad decision as a result of physiologic responses
16  to the body, were you taught anything?
17      A.  Breathing techniques, how to slow down,
18  how to control your breathing.  Yeah, I think, if I
19  remember correctly, that was a classroom portion,
20  and that's what they went over, these are the
21  things that you need to be mindful.  I can remember
22  that one in particular.
23      And it was -- I want to say that was
24  Lieutenant Burn, who's one of our DT instructors,
25  that went over that, that did that classroom

Page 80

1  portion.  I think Mark may have done the same,
2  Jennings, and TJ Wright probably -- they were all
3  part of that cadre, that training cadre.
4      So they could probably give you more
5  specifics on that.  But what I can recall in
6  particular is the breathing exercises, the things
7  to watch for, and the things you do.
8      Q.  Thank you.
9      A.  Yes, sir.
10      Q.  Have you ever received instruction on
11  the use of a weapon during a foot pursuit?
12      A.  Again, that would be more towards
13  transitioning from, again -- so best I can describe
14  it as, I would say yes, and here's how:  Active
15  resistance versus passive resistance from
16  aggressive resistance to deadly force, and how to
17  transition from a taser to a pistol.
18      Now, I quit carrying a taser many years ago.
19  I'm the old guy now, right, so I'm not out there
20  humping calls and doing that kind of stuff.  But,
21  again, it's in a classroom portion.  It was going
22  over that stuff, this is how you transition, you
23  know, that type deal.  All of a sudden you may be
24  in an active resistance situation and now it's,
25  okay, now they're passive, now they've given up,

Page 81

1  they've laid down, it's over.  Deescalation
2  techniques, that kind of stuff.
3      Q.  Is it -- do officers receive training
4  at the Titusville Police Department in terms of
5  firing their weapon during a foot pursuit?
6      A.  We go to the range for -- so we have
7  the qualification, and then it's proficiency with a
8  firearm, so that's where simunition comes into
9  play, is proficiency.  So one year it may be
10  proficiency, the following year it would be for
11  qualifications.
12      And we're taught how to shoot and move,
13  running up to an area, stopping, shooting,
14  addressing threats, maybe, you know, in certain
15  scenarios this is a lethal situation, now it's less
16  lethal so holster your weapon, draw your taser.  It
17  doesn't have to be your taser.  It could be your
18  spray, because they go over that.  It could be your
19  baton.  It could be just hands on at that point,
20  you know.  It just depends on what the scenario is
21  and what the situation is.
22      I'm the old guy again, so I've been to the
23  range and I've had to -- in situations and
24  scenarios where you're running with the handgun and
25  it has simunitions in it, and it's a shoot

Page 82

1  scenario, it's a don't shoot scenario, and then I'm
2  using de-escalation techniques to talk the
3  situation down.  So, yeah, as far as that goes,
4  yes.  It's not every situation.  It's not every
5  scenario, but they do train on that.
6        Q.   A few times you've noted you're kind of
7  the old guy.  I know it's somewhat -- you know,
8  it's both true because you've been in the
9  department for a while, somewhat tongue and cheek,
10 so overstated, but I think if I'm hearing you, your
11 point is, there's other officers, including
12 Jennings and Wright, who are going to have a more
13 detailed understanding of Titusville Police
14 Department's training certainly as it pertained to
15 Officer Payne and officers in the department as of
16 December 2021?
17       A.   Yes.
18       Q.   Would you defer to them in terms of the
19 details of training, particularly when it comes to
20 use of force and foot pursuits?
21       A.   I would.  They're at all the training,
22 so if it's part of their cadre they're assigned
23 when the officers go, they'd be there.  So if it's
24 a three-day training or if it's a week-long
25 training, they would be there pretty much every day

Page 83

1  either all together or one or the other, if that
2  makes sense.
3        Q.   Yes.
4        A.   I think I've called myself old guy like
5  ten times now.
6        Q.   You're not even that old.
7        A.   I appreciate that, but I feel it.
8        Q.   But I bet you feel like it with all
9  those grandkids.
10       A.   Yes, I do.  My wife sent me pictures of
11 the new grandbaby --
12       Q.   I was going to say, my colleague,
13 Morgan, on a break -- I didn't hear you say it, but
14 you said you had a sixth grandchild last night?
15       A.   Yes.
16       Q.   I did not --
17       A.   Thank you.  She's amazing.  I'm a big
18 softy, a big cry-baby when it comes to that, so I
19 walk in, my wife laughs at me.  She's like, why do
20 you cry at that.  I said, because I'm happy.  It's
21 a big deal to me.  She laughs.  She gets a big kick
22 out of it.  I'm like, whatever.  You guys make fun
23 of me now.
24       Q.   Just a few more questions, I think, for
25 now.  This is going to be a little shorter than I

Page 84

1  thought.
2        A.   Okay.
3        Q.   Have you -- are you aware of other
4  shootings of civilians during a foot pursuit
5  specifically with respect to the Titusville Police
6  Department?
7            MR. JADON:  Form.
8        A.   I have a current internal that I'm
9  working right now that involved an armed subject.
10 The officer -- I can't really get into it, but as a
11 current officer-involved shooting.  I don't believe
12 any component of that was a foot pursuit, but
13 individual was armed.  Give me a second to think.
14 We really don't have a lot of officer-involved
15 shootings.  I don't think so, no.  I'm really
16 trying to go back to my early stuff.  I don't think
17 so.
18 BY MR. MARRESE:
19       Q.   Okay.  Is the officer-involved shooting
20 that you just referenced, did that occur in
21 February of this year?
22       A.   Yes, sir.
23       Q.   That was -- I'm going to pronounce the
24 name wrong -- Trimaria Raquan Charles (ph)?
25       A.   Yes, sir.

Page 85

1        Q.   And your understanding is that he was
2  involved -- he was armed.  Is that armed with a
3  firearm?
4        A.   Yes, sir.
5            MR. MARRESE:  I don't have any further
6        questions right now.  Thank you very much
7        for your time, Commander Demmon.
8            THE WITNESS:  Yes, sir.  Thank you.
9        Thank you very much.
10           MR. JADON:  Can we take five real quick
11       so I can look at my notes?
12           MR. MARRESE:  Sure.
13           VIDEOGRAPHER:  Going off the record at
14       12:38.
15           (A short recess was taken.)
16           VIDEOGRAPHER:  We're back on the record
17       at 12:45.
18           MR. JADON:  Can everyone hear me okay
19       and clearly for the computer?
20           MR. MARRESE:  Yes.
21           MR. JIMENEZ:  Yes.
22           THE WITNESS:  Yes, sir.
23                CROSS-EXAMINATION
24 BY MR. JADON:
25       Q.   Good afternoon, Mr. Demmon.  My name is

Page 86

1   David Jadon.  I'm the lawyer for the City of
2   Titusville today.  How are you?
3       A.   I'm good.
4       Q.   I have a couple questions for you today
5   just real quick.  Do you remember getting your
6   notice of deposition in this case?
7       A.   Yes.
8       Q.   In that notice of deposition were you
9   ever noticed as a corporate representative for the
10  City of Titusville?
11      A.   No.
12      Q.   Is it fair to say, then, all your
13  testimony today was based on your personal
14  knowledge?
15      A.   Yes.
16      Q.   And your personal involvement, if any,
17  in this case?
18      A.   Yes.
19      Q.   Do you remember showing Mr. Marrese
20  three binders?
21      A.   Yes.
22      Q.   Those three binders constitute the
23  internal affairs report that you wrote, right?
24      A.   Yes, sir.
25      Q.   I think you said before you did not

Page 87

1   review all 900-plus pages in that report in those
2   three binders prior to today, correct?
3       A.   Correct.
4       Q.   Fair to say that your testimony today,
5   unless there was something shown explicitly on the
6   screen word for word, it's based on your best
7   recollection?
8       A.   Yes.
9       Q.   You did not -- you testified to this
10  before, but you did not interview Mr. Payne; is
11  that correct?
12      A.   Correct.
13      Q.   Obviously, you were not at the incident
14  that we're here for today, right?
15      A.   Correct.
16      Q.   And so you do not know what Mr. Payne
17  saw or did not see outside of the body camera,
18  correct?
19      A.   Correct.
20      Q.   Now, you were asked some questions
21  about foot pursuits.  Do you remember those?
22      A.   Yes.
23      Q.   In your 20-something or 20-plus years
24  with the Titusville Police Department, were you
25  ever involved in foot pursuits yourself?

Page 88

1       A.   Yes.
2       Q.   Can you recall all the foot pursuits
3   you were ever in?
4       A.   No.
5       Q.   Were any of them exactly the same?
6       A.   No.
7       Q.   You received -- you had some questions
8   about training today and training in foot pursuits.
9   In your experience and your involvement with the
10  Titusville Police Department, is it possible to
11  train for every scenario that an officer could be
12  involved in?
13      A.   No.
14          MR. JADON:  I have no other questions.
15          MR. MARRESE:  Nothing from plaintiff.
16          MR. JIMENEZ:  Nothing from me.
17          MR. JADON:  Mr. Demmon, you have the
18      option to read or waive your transcript
19      testimony.  I recommend that you read it
20      just in case to see if there were any
21      spelling issues when the transcript is
22      created, or any errors, something like that.
23      You don't have the ability necessarily to
24      rewrite anything, but I recommend everyone
25      reads it just to make sure.

Page 89

1       THE WITNESS:  Okay.  I'll read.
2       VIDEOGRAPHER:  Going off the video
3   record at 12:48.  We're off the video.
4       STENOGRAPHER:  Can I get transcript
5   orders before I go off the record?
6       MR. MARRESE:  Yeah, plaintiff will take
7   an electronic pdf, no video at this time.
8   Thank you.
9       STENOGRAPHER:  Anybody else?
10      MR. JIMENEZ:  Not at this time for
11  Officer Payne.
12      MR. JADON:  I don't think we need one
13  either, Cindy, but we will reach out if we
14  do.
15  (The deposition was concluded at 12:48 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 90

```
 1              CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA   )
                         )
 4    COUNTY OF ESCAMBIA )

 5

 6

 7             I, Cynthia Layer, certify that CHARLES

 8    DEMMON remotely appeared before me on the 10th day

 9    of July 2025, and was duly sworn.

10             Signed this 21st day of July 2025.

11

12

13

14

15

16

17                       CYNTHIA LAYER, CSR
                         Notary Public, State of Florida
18                       My Commission No. HH 341507
                         My Commission Expires: 12/14/26
19

20

21

22

23

24

25
```

Page 91

```
 1              CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA   )
                         )
 4    COUNTY OF ESCAMBIA )

 5

 6             I, Cynthia Layer, CSR, do hereby

 7    certify that I was authorized to and did

 8    stenographically report the foregoing deposition of

 9    CHARLES DEMMON; that a review of the transcript was

10    requested; and that the transcript, pages 1 through

11    89 is a true record of my stenographic notes.

12             I further certify that I am not a

13    relative, employee, attorney, or counsel of any of

14    the parties, nor am I a relative or employee of any

15    of the parties' attorneys or counsel connected with

16    the action, nor am I financially interested in this

17    action.

18             Signed this 21st day of July 2025.

19

20

21

22                       CYNTHIA LAYER, CSR
                         Certified Shorthand Reporter
23

24

25
```

Page 92

```
      July 21, 2025
      David Jadon, Esquire
      C/o  Roper, Townsend & Sutphen, P.A.
      255 S. Orange Avenue, Suite 750
      Orlando, Florida 32801
      Djadon@roperpa.com
      WITNESS:  Charles Demmon
      RE:  Jamiyah Robinson v Joshua Payne, et al
      Case No:  6:23-cv-01313-PGB-LHP
      Type of Proceeding: Deposition on July 10, 2025
      The transcript of the above proceeding is now
      available and requires signature by the witness.
      Please e-mail philadelphia.production@lexitaslegal.com
      for access to a read-only PDF transcript and
      PDF-fillable errata sheet via computer or use the
      errata sheet that is located at the back of the
      transcript.
      Once completed, please print, sign, and return the
      the e-mail address listed below for distribution to
      all parties.
      If the witness does not read and sign the
      transcript within a reasonable amount of time (or
      30 days if Federal), the original transcript may be
      filed with the Clerk of the Court.
      If the witness wishes to waive his/her signature
      now, please have the witness sign in the blank at
      the bottom of this letter and return to the e-mail
      address listed below.
      Very truly yours,
      Cindy Layer, CSR
      Lexitas
      philadelphia.production@lexitaslegal.com
      I do hereby waive my signature.
      _____
      Charles Demmon
```

Page 93

```
 1              ERRATA SHEET

 2    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 3    In Re:  Jamiyah Robinson v Joshua Payne, et al
              Case No.:  6:23-cv-01313-PGB-LHP
 4                      Charles Demmon
                        July 10, 2025
 5

      PAGE   LINE   CHANGE                    REASON
 6
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    Under penalties of perjury, I declare that I have
      read the foregoing transcript of my deposition and
19    I hereby swear that my testimony therein was true
      at the time it was given and is now true and
20    correct, including any corrections and/or
      amendments listed above.
21
22    _____    _____
      DATE         Name
23

24

25
```

Charles Demmon
07/10/2025

---

**Exhibits**

**412344MD**
**emmon071**
**025 Ex 0**
**01**
  3:16
  11:21,23
  13:10
**412344MD**
**emmon071**
**025 Ex 0**
**02**
  3:17
  15:13,19
  16:19
  34:8
  37:17
  41:24
  57:1

---

**0**

**031A-IA**
  11:14

---

**1**

**1**
  11:11,
  21,23
  13:10
  14:3,10,
  22 15:7
**100**
  62:12
**101**
  63:18
**102**
  11:12,
  17,22
  12:6
  15:6

---

  41:25
  43:5
  52:12
**103**
  46:1
  47:3
  54:13
**104**
  59:15
**105**
  57:1
**106**
  60:13
**107**
  12:5,15
  15:15
  16:2,7
  38:23
  41:25
**10:16**
  4:1,3
**10th**
  4:8
**11**
  69:1
**11:08**
  41:18
**11:15**
  41:15
**11:16**
  41:21
**12**
  12:23
  26:7
**12:06**
  72:4
**12:15**
  72:2
**12:17**
  72:7

---

**12:38**
  85:14
**12:45**
  85:17
**12:48**
  89:3,15
**12th**
  16:6
  38:24
**14**
  67:3
**14th**
  16:10
**15**
  67:17
**1989**
  23:21
**1997**
  24:22
**1998**
  24:19
  25:2,12
**1A**
  52:12
**1B**
  53:11
**1st**
  68:10,25

---

**2**

**2**
  13:25
  14:10
  15:7,13,
  19 16:19
  17:10,
  11,13
  34:8
  37:17
  41:24

---

  57:1
**20-plus**
  87:23
**20-**
**somethin**
**g**
  87:23
**2000**
  25:18
**2004**
  25:21
**2005**
  25:23
**2006**
  25:24
**2008**
  24:11,21
**2010**
  26:2
**2018**
  26:16,23
  29:13
**2021**
  20:11
  28:25
  34:13
  35:19
  38:21
  40:12
  74:19
  82:16
**2022**
  12:23
  16:6,10
  26:8,23,
  25 28:25
  38:24
  40:13
  68:10
  69:1

---

**2023**
  18:10
**2024**
  26:10
**2025**
  4:8
  26:10,25
  27:3
  28:22
**22**
  60:17
**23**
  62:16
**248**
  15:5
**25**
  26:11
  27:1
  40:13
**26**
  74:19
**26th**
  20:11
  28:25
  34:13
  35:19
  38:21
**27**
  25:9

---

**3**

**3**
  13:25
  14:2,10,
  11 15:6
  18:23
  34:9
  68:9,17,
  18
**300.6**
  62:15

---

  63:19
  65:20

**300.6-**
**standard**
**s**
  43:15
**354**
  16:22
**3rd**
  18:10

---

**4**

**412**
  45:21
  46:10
  52:9

---

**5**

**52**
  22:25

---

**6**

**6-3-2022**
  69:6
**6-4-2021**
  57:3
  59:18
**6.13(F)**
**15**
  59:18
**6.13(F)**
**20**
  57:4

---

**8**

**8**
  66:20
**80**
  66:11

---

**81**
  12:1,3,5
  15:14

---

**9**
**9-1-1**
  10:17
**900-plus**
  87:1
**91**
  24:22
**93**
  24:24
  67:4
**94**
  24:24

---

**A**
**a.m.**
  4:1,3
**ability**
  40:10,25
  76:7
  88:23
**absent**
  51:17
**absolutely**
  14:8
**accepted**
  69:6
**access**
  70:24
**accordance**
  44:15
  61:15
**accreditation**
  30:3

31:22
**accurate**
  13:2
  40:8,9,
  24 41:5
**acting**
  65:11,22
**actions**
  47:13
  48:14
  54:21
  57:4,5,
  19 59:18
  64:19
  72:12,23
  73:5,15
**active**
  17:18
  69:20
  74:25
  76:19,25
  77:5
  79:5
  80:14,24
**actively**
  47:24
**activity**
  74:5
**actual**
  19:4
  21:10
**address**
  75:21
**addressing**
  81:14
**administrative**
  11:14
  21:2

**advice**
  8:12
**affairs**
  32:6
  35:17
  86:23
**affected**
  59:24
**afternoon**
  85:25
**aggressive**
  80:16
**agree**
  74:1
**agreed**
  49:9
  60:9
**Agreement**
  71:2
**allegation**
  43:10
**allegations**
  35:22
  46:25
**alongside**
  30:14
**amazing**
  83:17
**and/or**
  34:16
**angry**
  77:6
**answers**
  6:23

71:14
**anticipate**
  7:4
**anyplace**
  10:18
**applied**
  47:9
**applies**
  7:10
**apply**
  52:17
  53:15
**applying**
  47:11,15
**apprehended**
  53:22
**approach**
  74:9
**approached**
  54:10,16
  55:17
**area**
  23:21
  81:13
**Armando**
  4:9
**armed**
  84:9,13
  85:2
**arrest**
  34:18
  47:24,25
**aspect**
  28:5
**assess**
  32:17

**assigned**
  30:14
  34:22,24
  38:19
  39:5
  82:22
**assist**
  30:4
  35:4
**associate's**
  24:24
**association**
  4:12
**assumed**
  21:18
**asterisk**
  16:15
**asterisks**
  43:16
**attached**
  17:13
**attempted**
  34:18
  47:24
**attempting**
  79:13
**attend**
  23:13,
  15,25
  24:2
**attended**
  24:5
**attention**
  47:20

48:4
**attorney**
  8:11
  9:1,19
  22:8
  70:2
**attorneys**
  9:1,8
**audio**
  10:16,17
  37:24
  70:21
**August**
  18:10
**authorized**
  52:7,14
  53:11
**autopsy**
  38:13
**avoid**
  79:14
**aware**
  42:9,12
  56:21
  59:4,13
  62:3
  69:10
  71:4,23
  72:9,19,
  22,25
  78:4
  84:3
**Axon**
  10:13
  38:6
  52:3

**B**

**babysitter**
33:23

**bachelor's**
24:6,22
25:5

**back**
16:1
19:3,5,
13  24:3,
7  25:21,
25  26:3,
6,9,10,
11,24
27:1,2
28:15
41:14,20
44:8
52:11
72:2,6
75:20,22
84:16
85:16

**background**
23:12
30:4,18

**backgrounds**
31:21

**bad**
29:21
78:7
79:15

**Bargaining**
71:2

**base**

77:13

**based**
37:4
40:9,25
45:20
50:12
55:14
57:11
59:21
61:1
71:21
78:17
86:13
87:6

**basic**
23:12

**basically**
28:11
37:6
42:6
77:24

**basis**
48:10

**Bates**
15:2

**bathroom**
8:19

**baton**
81:19

**began**
4:1

**begin**
7:12

**beginning**
11:1
66:12

**begins**
34:12
45:20

**behalf**
4:19

**behavior**
65:10,19

**belief**
41:5
65:4

**believed**
52:19
53:2

**believes**
53:19

**beneath**
43:16
44:11

**bet**
83:8

**big**
83:17,
18,21

**bill**
61:16
69:17
71:1

**Binder**
14:22
68:8,17,
18

**binders**
13:20,24
86:20,22
87:2

**bit**
10:24
11:10
12:3
15:3
25:24
26:6
54:5

**behalf**

**black**
66:1
78:3,23

**blindly**
76:2

**blow**
12:2

**bodily**
52:20
53:4,18,
20

**body**
10:13
38:6
52:3
79:16
87:17

**book**
13:25
14:2,3,
10,11
17:10,
11,13
18:23
19:2,3,6

**born**
23:17,19

**bottom**
16:2
49:16
50:22
65:18
69:6

**brain**
56:6,8,
11

**break**
41:8
68:3
72:1
83:13

**breaks**
8:16

**breathing**
76:23
79:17,18
80:6

**Brevard**
24:3

**briefly**
11:22
21:20
34:25

**bring**
40:16

**brings**
65:11

**brought**
61:4,24

**browsed**
17:20

**bullet**
45:20,25
46:3,13
47:4,19
48:13
49:16
50:22
51:14
52:12
54:12,13
55:7
57:23
59:21
62:18
63:7
64:18

**bullets**
46:18

**Burn**
79:24

**business**
42:7

**C**

**cadre**
80:3
82:22

**call**
8:18
21:19,21
31:3,6
41:9

**called**
5:6  6:1
33:1,5
38:6
42:13,17
56:10
75:24
79:5
83:4

**calls**
10:17
25:14
80:20

**cam**
10:13
38:6

**camera**
14:7
52:3
87:17

**Canaveral**
23:20

**canine**
26:5

**Cantalupo**
54:20

Cape
23:20
capital
43:24
44:2
57:2,4,
7,13,18
58:4,7,
13
59:10,
16,19
car
75:20
career
39:25
42:15
careful
47:20
48:4
carry
54:14
carrying
54:9
57:22
80:18
case
5:16
6:12,20,
24 11:7
12:20
20:12
21:23
22:20
28:22
29:1
31:25
36:1,17,
21,23
37:2
38:7,14
39:12
40:6

47:8,21
48:5
53:25
54:8
56:5
57:20
59:5
65:13
66:4
70:2,7,
16,23
71:13
72:12,23
73:3,12
86:6,17
88:20
cases
64:3
causing
76:21
caveat
8:24
Central
24:5,8
certificate
58:18
certifications
20:21
21:6
24:13
changed
42:16
character
65:11
charges
61:4,9,
23 62:4,
6,7

Charles
5:13
84:24
chase
74:13,24
75:13
checking
22:19
cheek
82:9
chief
12:24
16:9
22:12
27:6,10,
11 34:13
49:5,8
59:1
60:9
62:14
63:22,25
64:8,10,
25 68:10
69:2,7
Christina
20:9
Cindy
4:11
89:13
circumstances
36:22
44:14,23
45:3
47:21
48:4
49:21
51:1
52:16,24
53:13,25
54:17

55:21
56:15
73:19
78:21
cited
77:4
city
4:20 6:5
12:20
34:15
43:13
57:2
59:3,17
60:15,22
62:10
86:1,10
civil
6:20
civilian
36:23
civilians
84:4
claims
32:9
classroom
77:25
78:13,14
79:19,25
80:21
clear
54:19
65:2
72:15
co-workers
64:22
Cocoa
23:21

code
26:5
cognizant
78:23
79:11
colleague
83:12
collecting
35:9
Collective
71:2
college
23:25
24:3,20
colon
43:18
combination
78:18
command
29:20
commander
5:19,20,
23 26:9,
12 27:1,
3,7,19,
25 28:3,
11 29:4
41:23
54:8
72:9
85:7
commanders
27:12

commit
53:18
committed
53:17
58:6,13
community
24:3
60:1
competency
62:21
complaints
32:10
completed
8:6,7
61:8
compliance
31:19
48:17
50:24
71:7
complied
32:18
comply
42:24
60:18
component
84:12
comport
74:19
computer
85:19
conclude
55:14

61:25

**concluded**

63:18
89:15

**conclusion**

48:24
49:2,5
50:1,4
51:4,7,
22,25
52:2
54:24
55:2
57:17
59:22
60:3,6,
10 61:2
63:2,5,
13,24

**conclusions**

40:9,24
42:1,2
46:24
52:6,23
53:24
66:16
67:13
71:6,10

**concur**

16:11,15
63:22
64:17
65:5

**concurred**

49:6

**concurrence**

59:2

62:14

**conduct**

30:15
36:16,20
59:24
60:17
62:15
64:1,6
65:12
69:18,25

**Conduct/
4a10**

43:15

**conducted**

32:1
61:3

**conducting**

48:9

**conform**

45:6

**conformance**

60:17

**confrontation**

48:15,
18,19
79:10

**conjunction**

36:11
37:13
66:16
67:1,14
70:10

**Conner**

47:9,16

**considered**

47:25
57:5
64:6

**consistent**

52:23
53:24
67:13

**constitute**

86:22

**Constitution**

45:13
60:19

**continually**

25:1

**continue**

46:1

**continues**

15:8
59:20

**control**

76:23
78:1
79:13,18

**conversation**

7:6

**Coordinate**

20:20

**coordinated**

70:1

**coordination**

21:12

**coordinator**

20:3,8,
19 30:2

**copy**

20:2
77:24

**copying**

46:19

**corner**

76:2

**corporal**

25:21,22

**corporals**

27:14,15

**corporate**

86:9

**correct**

6:7,12
10:2
12:16
13:7
16:7,20
17:1
30:15
32:2
34:5,22,
25 36:17
37:14,
18,25
38:3,21,
24 39:6,
9,13,18,
22 40:1,
6,10,14
42:2,10,

22,25
43:3
44:19
45:10,
13,17
46:4,11,
16,20,25
47:1,13,
17
48:11,
12,25
49:3,6,
10,11,
14,15
50:2,3,
5,6,9,10
51:5,6,
8,23,24
52:4,5,
9,10
53:4,7
54:3,6,
10,25
55:3
60:4,5,
7,8,10
61:10,
11,20,21
63:3,14,
16 65:6
66:13,18
67:1,15,
20,21
69:2,8
72:16
74:10,13
87:2,3,
11,12,
15,18,19

**correctly**

27:18
78:20

79:19

**cost**

30:7

**counsel**

4:13,21

**county**

60:22

**couple**

14:9
68:5
78:8
86:4

**court**

4:11,22
47:8

**cover**

71:23

**covered**

70:25
78:14

**created**

88:22

**crime**

47:22

**crimes**

25:16

**criminal**

6:18
24:7,9
61:2,23
62:4
69:20

**criteria**

58:3

**CROSS-
EXAMINATION**

85:23

**cry**

83:20

cry-baby
83:18

culpable
61:5

current
84:8,11

———————
D

D-E-M-M-
O-N
5:14

dart-
firing
51:16
55:9,16
62:23
63:10
67:6,10

date
4:7
12:21,23
13:6,12
16:6
63:3

dated
16:10
68:25

David
4:19
9:19,20,
23 86:1

day
82:25

days
12:24
69:1

de-
escalati
on
82:2

deadly
45:21,22
46:15
49:23
51:18
52:7,14,
16,25
53:12,14
54:1
57:9,21
59:23
73:18
77:5
80:16

deal
35:14
76:8
78:7
79:11
80:23
83:21

death
52:20
53:3,19,
20

decades
40:17,25

December
20:11
28:25
34:13
35:19
38:21
40:12
74:19
82:16

decision
8:12
49:20
50:7
54:14,18
57:9,20

58:20
59:5,9,
12,23
63:8
67:7,18
76:15
78:7
79:15

declined
36:10

Deescala
tion
81:1

defendan
t
4:18 6:6

defensiv
e
78:10

defer
82:18

degree
24:6,15
25:5

degrees
24:9

Demmon
4:5,20
5:13,15,
23 6:1,2
17:4
22:24
35:19
41:23
54:8
72:9
85:7,25
88:17

demonstr
ated
59:23

demotion
58:15

departme
nt
5:18
11:13
18:1
19:24
20:8,19,
24 24:18
25:1,9
27:6
28:5
31:20
32:11,
18,22
34:15
36:25
37:13
40:19
43:14,22
44:12,
15,19
45:15,17
52:8
60:16,18
61:3
64:4,7,
21 65:19
68:11,13
72:11
74:18
75:7
81:4
82:9,15
84:6
87:24
88:10

departme
nt's
42:10
82:14

depending
36:22

depends
75:15
81:20

deposed
5:7

depositi
on
4:4,6
5:24
6:9,14,
20 7:24
8:4,24
10:1
19:25
22:10,
14,17
86:6,8
89:15

deputy
27:11

describe
80:13

descript
ion
21:7

design
71:19

designat
es
43:23

designat
ion
43:22

desire
69:21
70:4

detail
46:23

detailed
82:13

details
82:19

detectiv
e
25:18

detectiv
es
27:16
37:4

determin
ation
46:25
49:9
58:24
64:25

determin
e
36:19

determin
ed
37:2
52:6,24
53:25
54:8

determin
ing
47:4
54:16

develop
37:9

differen
ces
13:5

digitall
y
42:19

DIRECT
5:9

directive
45:17
directives
44:16
45:16
directly
46:14
discharged
66:22
disciplinary
57:4
59:18
discipline
57:5
58:24
59:7,19
60:23
disclose
9:2
discredit
64:4,20
65:11
discuss
21:22,25
22:5
46:23
discussed
9:1
24:15
66:17
67:14
discussion
50:17

display
62:23
67:5
distinction
46:8
division
11:6,13
26:14
28:8,9,
20 29:2,
16,20
30:19,
20,23
31:5,11,
18,19
32:17,23
33:7
69:11
DMS
42:14,17
document
15:16,22
16:3,23
17:24
18:9
50:12
67:23
documentation
70:13
documents
5:16
10:5,7
11:4
13:19
14:23
17:21
18:14
19:20

draw
81:16
drawing
63:20
drawn
49:18
55:9,17,
21 56:15
driver
75:10
DT
79:24
duly
5:7
duties
62:21
duty
66:7

———————

**E**
e-mail
21:19
earlier
40:19
67:14
early
26:25
27:3
28:22
84:16
easier
19:1
31:4
Eastern
24:4
education
24:13

electronic
14:14
89:7
elevated
79:9,10
employed
62:10
employment
27:18
end
11:1
12:15
endeavored
40:22
ended
48:19
ends
16:22
enforcement
21:11
24:14
26:5
61:4
engage
74:6
engaged
76:14
ensure
34:14
45:6
ensuring
21:5
entered
62:7
entire
13:21

entirety
29:14
53:11
enumerated
51:1
64:5
environment
76:1
78:24
environmental
75:2
equal
57:6,12
errors
88:22
escape
53:15
establish
57:6,10,
12
evade
47:24
evading
75:1
evening
38:20
events
30:9
eventually
33:20
everyone's
21:4
evidence
26:4

67:20
69:23
70:12
EXAMINATION
5:9
exception
8:10
excuse
30:20
32:23
executed
38:23
exercises
80:6
exhibit
11:21,23
13:10
15:13,19
16:19
34:8
37:17
41:24
57:1
exists
43:24
expect
74:6
75:3
expected
42:22,24
experience
35:5
40:18,25
88:9
explain
19:1
28:6

31:16
44:7
63:23

**explanat ions**
7:22

**explicit ly**
87:5

**extent**
18:18

---

**F**

**facing**
56:23

**fact**
62:9
65:2
71:11

**factors**
75:2
79:8

**facts**
40:9,10
47:20
48:4
71:12

**factuall y**
61:25

**failed**
50:23

**failure**
57:10,21

**fair**
21:7
23:4
30:23
31:10
32:16

40:20
41:1
44:23
45:3,7
59:9
62:1
65:15
72:23,24
74:16,17
78:25
86:12
87:4

**FDLE**
20:21
38:16

**February**
27:3
84:21

**federal**
60:22

**feel**
83:7,8

**feeling**
51:17

**fellow**
39:17
40:1
59:25

**felony**
53:18

**felt**
61:25

**fence**
48:20
49:17
50:8
54:10,16
55:17
66:22

**field**
17:21

**fighting**
76:19
78:11
79:7

**final**
39:1

**Finally**
18:21

**find**
14:14
20:16
37:9

**finder**
71:11

**finding**
55:14
62:8,13
63:19,23
66:25

**findings**
12:14
39:25
54:7
57:11
66:12,
15,21
67:4

**finish**
7:9,11

**firearm**
49:18,20
54:10,15
55:8,16,
20  57:23
62:23
63:21
66:22
67:5
81:8
85:3

**firearms**
75:17

**firing**
81:5

**five- and-a- half**
39:4

**fleeing**
53:16
73:23

**flees**
74:12,23

**flight**
47:25

**Florida**
23:3,7
24:4,6,8
45:10
60:20
61:3
71:1

**focus**
44:10
52:11
77:17

**focused**
19:16

**folks**
31:3

**follow**
8:12
57:24
58:24

**foot**
73:21,23
74:3,9,
13,20
75:21
76:10,14
77:22
79:3
80:11

81:5
82:20
84:4,12
87:21,25
88:2,8

**force**
31:13
32:7,10,
13  34:18
39:17
43:15
44:12,
14,23
45:2,7,
22
46:15,16
47:5,17
48:16
49:23
50:24,25
51:18
52:7,14,
16,25
53:12,14
54:1
57:9,21
59:23
67:18
73:18
76:4
77:5
80:16
82:20

**form**
33:25
40:3
50:19
51:9
53:5
55:5,22
56:16
84:7

**formal**
7:6
35:21

**formally**
68:12

**formed**
48:10

**Forte**
4:9

**found**
58:6,12
68:2
73:4,14

**frame**
26:21

**front**
13:15,18
16:20
19:12
50:12

**FTO**
17:20

**full**
17:3

**full- time**
33:22

**fun**
83:22

**function**
21:3,4

**function s**
26:4
35:7

**funds**
30:8

**future**
33:15

Charles Demmon
07/10/2025

| | | | | | |
|---|---|---|---|---|---|
| **G** | 15:16 | grandbab | guy | head | hires |
| gain | 26:21 | y | 80:19 | 49:19 | 77:12 |
| 48:17 | 27:5,8 | 83:11 | 81:22 | 77:12 | hiring |
| gamut | 35:5,6 | grandchil | 82:7 | hear | 31:21 |
| 75:3 | 36:10 | d | 83:4 | 8:3 | hold |
| gave | 70:15 | 33:24 | guys | 10:14 | 14:7,9 |
| 71:17 | 75:12,18 | 83:14 | 83:22 | 11:2 | 15:8 |
| geared | 80:4 | grandkid |  | 23:9 | 20:10 |
| 71:12 | 84:13 | s | **H** | 26:19 | holding |
| Geez | giving | 33:14 | hand | 60:11 | 73:17 |
| 32:24 | 6:24 | 83:9 | 56:4,5, | 69:3 | holster |
| general | GO300.6 | grandpar | 8,9 | 76:13 | 67:9 |
| 34:16 | 60:16 | enting | 76:5,6 | 83:13 | 81:16 |
| 42:2,4, | good | 34:1 | handgun | 85:18 | holster/ |
| 5,10,22, | 5:11,13 | Great | 81:24 | hearing | remove |
| 25 43:14 | 33:15,23 | 7:20 | handle | 82:10 | 63:10 |
| 44:18,21 | 59:25 | ground | 77:7 | heart | hour |
| 45:5,16, | 73:9 | 6:19 | handling | 75:1 | 9:17 |
| 20 46:2, | 85:25 | 78:10 | 35:5 | 76:21 | HR |
| 5,7,9,14 | 86:3 | grow | hands | 78:1,2, | 59:2 |
| 50:13 | goofing | 37:6 | 54:15 | 21 79:9, | humping |
| 52:9 | 64:14 | guess | 81:19 | 10,14 | 80:20 |
| 54:3 | 66:8 | 27:22 | hands-on | held |  |
| 60:16 | goofy | guidelin | 76:12 | 4:7 | **I** |
| 62:15,19 | 64:13 | e | handwrit | 20:15 | IA |
| 63:19 | 65:22 | 42:6 | ten | hierarch | 11:14 |
| 65:8,14, | Googling | 66:3 | 16:11 | y | IAS |
| 20 66:17 | 22:19 | 77:23 | happen | 27:5 | 33:2 |
| 67:15 | governin | guilty | 79:3 | 44:7 | identifi |
| 71:6 | g | 33:25 | happened | high | ed |
| gentleme | 46:15 | 62:7 | 65:13 | 23:13, | 11:23 |
| n | graduate | gun | happy | 16,23 | 15:19 |
| 31:17 | 23:22 | 56:5 | 83:20 | 24:23 | identifi |
| gig | 24:20 | 73:17 | harassme | 78:3,5 | es |
| 33:22 | graduate | gun/ | nt | highest | 17:24 |
| give | d | taser | 32:10 | 28:18 | identify |
| 7:25 | 24:5,22 | 51:17 | hard | 29:7,10, | 4:13 |
| 8:25 | Graham | 55:9,16 | 11:2 | 16 | immediat |
| 13:10 | 47:8,16 | 62:24 | harder | hired | ely |
| 14:13 |  | 63:10 | 7:22 | 25:12 | 38:20 |
| | | 67:6,10 | | 77:12 | |

Charles Demmon
07/10/2025

10

53:22

imminent
48:21
49:13
53:20

implemented
72:11,16
73:1

implications
39:25

impression
64:24

improper
59:24

in-house
17:11,
16,17,23
20:23
33:3
42:14

in-person
9:12
21:19

incident
38:10
47:6
48:15
51:19
62:22
65:24
66:6
67:19
87:13

incidents
31:14

include
37:21
45:9,12
47:21
48:15

included
35:22,24
48:5

including
10:12
38:10
46:20
60:23
82:11

increase
15:5
76:21
78:22

independent
61:2

individual
29:7,11
43:11
76:11
84:13

inducing
77:15

inform
45:1

information
9:2

informed
43:2

initial
37:7
48:18

initially
19:3
25:18
37:5

initials
16:14

injury
52:20
53:4,18,
20

inside
31:4

instance
58:22

instruct
44:22

instructed
79:2

instruction
44:25
75:14
77:25
78:20
80:10

instructor
78:16

instructors
78:8
79:24

instructs
8:11

intends
53:17

intentional
60:21

interacting
65:23

interject
7:7

internal
10:6
13:21
30:5
31:23
32:1,4,5
34:4,14
35:5,17
36:14
69:23
70:23
84:8
86:23

interpret
7:22
66:1,3

interrupt
7:7

interview
10:17
18:24
35:25
36:23,
24,25
37:11,21
61:14
69:14,
18,21,25
70:3,5,
10 71:22

87:10

interviewed
37:12,20

interviewing
35:8

interviews
36:16,19
37:8,18,
24 38:3
48:9
55:11
70:13,21
71:20

investigating
25:16

investigation
11:14
13:21
30:13,18
32:1,5
34:4,13,
14,21
35:3,4,
18,21,24
36:11,15
37:1,8,
14 38:20
39:5,9,
11,12,
16,22
40:17,23
43:12
48:25
50:2
51:5,23
54:25
57:12

58:2
59:22
60:4
61:3,20
63:14
67:1,20
69:12,
20,22,24
70:18

investigations
25:20,25
26:5
28:12
30:4,5
31:23
32:7,8
35:6

involved
6:11
35:23
74:2
84:9
85:2
87:25
88:12

involvement
6:10
19:17
21:23
86:16
88:9

involving
39:16
53:18

issue
5:16
20:11
58:1

Charles Demmon
07/10/2025

| | | | | | |
|---|---|---|---|---|---|
| **issues** | 54:20 | **Joshua** | 7:6 9:4 | ——— | **lawsuit** |
| 88:21 | 55:10 | 4:6,18 | 11:1 | **L** | 6:4,7 |
| **italiciz** | 80:2 | 6:5 | 14:7 | **labeled** | **lawyer** |
| **ed** | 82:12 | 18:10 | 17:24 | 15:2 | 86:1 |
| 44:10 | **Jennings** | 68:10 | 18:1 | **ladies** | **lawyers** |
| | **'** | **judge** | 20:22,25 | 31:16 | 8:5 |
| ——— | 19:6,11 | 6:24 | 23:12 | **laid** | **Layer** |
| **J** | **Jimenez** | **July** | 25:15 | 81:1 | 4:11 |
| **Jadon** | 4:17 | 4:8 | 27:19 | **language** | **leads** |
| 4:19 | 41:8,12, | **jumped** | 28:6 | 46:6 | 37:1 |
| 14:21 | 16 50:20 | 48:20 | 29:21 | **Lastly** | **leaning** |
| 40:3 | 51:10 | **June** | 30:10 | 8:16 | 71:5,10 |
| 50:11,19 | 53:6 | 12:23 | 32:4,10 | **Lau** | **leaped** |
| 51:9 | 85:21 | 16:6,10 | 35:12,14 | 22:13 | 27:19 |
| 53:5 | 88:16 | 38:24 | 45:16 | 34:14 | **left** |
| 55:5,22 | 89:10 | 40:13 | 65:9,24 | 49:6,9 | 26:18 |
| 56:16 | **job** | 68:10,25 | 71:19 | 60:9 | 56:9 |
| 67:25 | 40:5,8 | **jury** | 74:5 | 62:14 | 69:6 |
| 68:6 | 59:25 | 6:25 | 75:2,3, | 63:22 | **lengthy** |
| 84:7 | 74:16 | 31:17 | 24 76:23 | 68:11 | 39:8 |
| 85:10, | **John** | **justice** | 78:7 | 69:2 | **lesson** |
| 18,24 | 4:15 6:3 | 24:7,9 | 80:20 | **Lau's** | 20:5 |
| 86:1 | 12:24 | **justifie** | 81:2 | 12:24 | **lethal** |
| 88:14,17 | 14:21 | **d** | 82:6 | 16:9,16 | 62:23,24 |
| 89:12 | 16:9,16 | 49:23 | **kinds** | 64:25 | 63:8,9 |
| **James** | 22:12 | 51:16,19 | 32:6 | 69:7 | 67:5,6, |
| 4:17 | 34:14 | 52:16 | **Knapp** | **laughs** | 8,18 |
| 32:2 | 41:8 | 53:14 | 18:17 | 83:19,21 | 77:6 |
| 34:5,18 | 49:6,8 | | 54:19 | **law** | 81:15,16 |
| 47:5,17 | 50:11 | ——— | 55:11 | 21:10 | **letter** |
| 49:12, | 60:9 | **K** | **knew** | 24:14 | 68:10, |
| 13,19 | 62:14 | **keeper** | 22:14 | 32:19 | 15,25 |
| 50:7,8 | 68:1,11 | 20:22 | 70:15 | 44:15 | 69:13 |
| 52:7 | **join** | **keeping** | **knife** | 45:7,9, | **Lexitas** |
| 74:3 | 24:18 | 21:3 | 76:6 | 12 61:4 | 4:10,12 |
| **January** | 26:13 | 55:15 | **knowledg** | 71:7 | **lieutenan** |
| 26:11 | 50:20 | **kick** | **e** | **lawn** | **t** |
| 27:3 | 51:10 | 83:21 | 41:5 | 10:23 | 4:4 |
| **Jennings** | 53:6 | **kidding** | 65:3 | **laws** | 5:17,18 |
| 18:25 | **Joiner** | 25:12 | 86:14 | 60:17, | 26:2,7, |
| 20:1 | 30:14,17 | **kind** | | 18,22 | |
| 21:15 | 34:24 | | | | |
| 22:8 | | | | | |

15,23
27:8,19
29:3
35:19
55:9
79:24

**lieutenants**
27:13

**lift**
13:23

**list**
37:5
71:20

**listed**
19:2

**listing**
18:10

**litigation**
14:25

**live**
23:3

**lock**
76:16

**long**
9:16
20:14
25:11
29:10
32:21,
24,25
33:5
36:7

**longer**
20:17
48:20
49:13

**looked**
9:5
10:10

17:12,19
19:6,11
64:10
68:24

**lose**
58:16

**losing**
58:18

**lost**
15:9

**lot**
7:4
17:13
72:17
84:14

**louder**
10:24

**Love**
34:2

**low**
56:22

**Lowery**
32:2
34:5,19
47:5,17,
23 48:19
49:12,
13,19
50:8
52:8
66:22
74:3

**Lowery's**
48:14

**lucky**
27:22

——————

**M**

**made**
16:11,15
42:9,12

43:10
54:14,18
58:20
59:5,11,
12
66:15,25

**Madison**
17:18
77:3

**maintain**
62:20

**maintained**
21:6

**major**
27:20
43:17,
20,25
44:11
63:25

**majors**
27:12,21

**make**
6:25
7:12
8:12
50:15
58:23
65:1
66:8
70:18
71:24
73:24
75:24
78:6
79:14
83:22
88:25

**makes**
7:17
75:4
76:8

83:2

**making**
76:15

**manager**
30:3
59:2,3

**manner**
49:20

**manslaughter**
61:5

**mark**
11:21
13:10
16:18
18:8
80:1

**marked**
19:4
34:8

**Marrese**
4:15
5:10  6:3
11:25
14:23
15:10,21
23:11
40:4
41:11,
14,22
50:14,21
51:11
53:8
55:6,24
56:21,
24,25
68:2,7
72:1,8
84:18
85:5,12,
20 86:19
88:15

89:6

**master's**
24:9,10,
15,21

**materials**
36:1,16
38:10
46:19
48:10

**Matt**
4:4  5:14
35:19

**matter**
4:5

**means**
43:10
49:8
56:3
61:5,15

**meet**
9:18
49:22

**meeting**
9:12,16,
25  10:4
21:19
36:4

**meetings**
9:7

**meets**
57:19

**member**
52:18
53:1,16,
19,21
60:18
64:4,6

**members**
32:11
36:25

44:12,14
52:13
53:11
64:21

**mentioned**
17:6
18:21
34:25
36:15

**merit**
57:6

**met**
6:1,2
9:4
35:20
48:17
58:3

**Mick**
18:17
54:20
55:11

**microphone**
56:23

**Middle**
17:18
77:3

**mind**
70:4
73:13
77:9

**mindful**
75:25
78:1
79:21

**minor**
43:25
44:5

**minute**
13:11

15:8
75:18
minutes
36:8
41:9
missing
20:4
35:13
mistaken
62:6
Mister
6:2
moment
6:2
33:11
momentar
ily
68:4
months
39:4
Morgan
83:13
morning
5:11,13
move
46:22
47:2
81:12
moved
23:20
25:17
41:24
moving
57:1
59:15
60:13
62:12
66:11
mower
10:23

multipli
ers
76:4

——————

N

Nathan
4:6,18
18:11
nature
35:9
39:16
65:14,18
necessar
ily
88:23
needed
37:2
69:14
negligen
ce
61:6
night
33:24
37:4
83:14
nods
7:23
noes
7:21
normal
7:5
notation
61:18
69:5
note
16:11
noted
57:13,20
58:2
59:16

61:12
82:6
notes
61:18
85:11
notice
12:1
15:14
59:16
86:6,8
noticed
13:4
86:9
notifica
tion
35:21
number
11:14
58:17,18
66:20
68:9
77:13
nutshell
31:23
37:7

——————

O

oath
6:23
object
56:4
objectio
n
50:15
objectio
ns
8:3,6,14
objective
47:6,11

48:17
49:22
objectiv
ely
50:9
52:15
53:12
obtain
24:10
40:8
obtained
24:6,8
25:5
occur
84:20
offenses
64:5
offer
71:15
office
31:4
35:20
36:5
officer
6:4
17:16,17
18:17
25:6,13,
14 29:16
32:1
34:4,17
35:20,23
37:20
38:5
39:13,17
40:1,13
47:12,16
48:16,21
49:12,
14,17,19
50:7,23
51:15

52:3
54:9,14,
18 55:7,
15,20
57:8
59:22
61:5,12,
13,15,19
62:3,20,
22 63:7
64:19,21
65:21
66:21
67:4,7,
18 68:12
69:10,17
71:1
72:12,23
73:4,15,
23 74:2,
6,12,24
75:1,12
76:11
82:15
84:10
88:11
89:11
officer'
s
74:16
76:13
officer-
involved
84:11,
14,19
officers
20:25
27:16
32:18
35:8,25
37:3,12,
18 42:9,
18,21,24

43:2
44:22
45:1,6
47:23
54:19
55:10
56:19
65:12
74:9
81:3
82:11,
15,23
official
28:19
one's
74:20
one-page
67:22
online
22:19
operatio
ns
26:10,25
28:9,12
opinion
55:19,25
56:13,18
64:9,16
opportun
ity
35:7,11
opposed
12:5
65:12
option
50:25
88:18
options
50:24
order
15:4

Charles Demmon
07/10/2025

14

| | | | | performance | phrase |
|---|---|---|---|---|---|
| 35:18 | 31:20 | 61:19 | 55:8,15 | performance | phrase |
| 42:4,5,6 | **overstat** | 69:17,21 | 57:19 | 62:16 | 43:20 |
| 43:14 | **ed** | 74:15,21 | 58:21 | **performed** | **physical** |
| 44:18,21 | 82:10 | 75:13 | 59:11 | 39:11 | 48:15 |
| 45:5,16, | | 76:12 | 61:5,12, | 40:22 | 79:9 |
| 21 46:2, | ———— | 78:20 | 19 | **performing** | **physiolog** |
| 5,7,10, | **P** | 80:3 | 62:20,22 | 34:3 | **ic** |
| 15 52:9 | **p.m.** | 82:22 | 66:21 | **perimeter** | 79:15 |
| 54:3 | 89:15 | **particip** | 67:4 | 76:16 | **physiolo** |
| 60:16 | **pages** | **ated** | 68:10,12 | **permanent** | **gical** |
| 62:15,19 | 11:22 | 77:11 | 69:10 | 25:19 | 76:18 |
| 63:19 | 12:6 | **passenger** | 74:2 | **person** | 77:18,21 |
| 65:8,20 | 87:1 | 75:11 | 82:15 | 21:20 | **pictures** |
| 67:15 | **paid** | **passive** | 87:10,16 | 31:12 | 83:10 |
| 69:18 | 48:3 | 80:15,25 | 89:11 | 53:17 | **pie** |
| **ordered** | **paper** | **past** | **Payne's** | **personal** | 75:25 |
| 34:14 | 19:4 | 64:2 | 32:2 | 65:3 | **pistol** |
| **orders** | **Paragraph** | 70:16 | 34:4 | 86:13,16 | 80:17 |
| 34:16 | **h** | 76:10,24 | 38:6 | **personally** | **place** |
| 42:2,10, | 66:20 | 77:1 | 39:13 | 6:6 | 9:14 |
| 22,25 | 67:3 | **patrol** | 47:13,16 | **personnel** | 42:16 |
| 65:14 | **paraphra** | 25:13,14 | 49:19 | 18:9 | **plaintif** |
| 66:18 | **se** | 26:3,25 | 50:7 | 57:3 | **f** |
| 71:6 | 21:1 | 27:16 | 52:3 | 59:17 | 4:16 6:4 |
| 89:5 | **parenthe** | 28:12 | 57:9 | **pertained** | 12:22 |
| **ordinanc** | **sis** | 74:6,16 | 59:23 | 82:14 | 14:24 |
| **es** | 43:17 | **Payne** | 62:4 | **pertains** | 15:1 |
| 60:19,22 | **parents** | 4:6,18 | 63:8 | 77:21 | 88:15 |
| **original** | 77:6 | 6:5 | 64:19,21 | **ph** | 89:6 |
| 20:6 | **part** | 17:16, | 67:7,18 | 84:24 | **plan** |
| **outline** | 8:4 | 17,25 | 72:12,23 | **phone** | 22:1 |
| 42:8 | 10:4,13 | 18:11 | 73:5,15 | 21:19,21 | **plans** |
| **outlines** | 19:14, | 34:17 | **PD** | | 20:5 |
| 18:15 | 15,16 | 35:20,23 | 75:20 | | 23:6 |
| **oversaw** | 40:16 | 36:5,10 | **pdf** | | 33:11, |
| 26:3 | 44:22 | 48:16,21 | 89:7 | | 12,18 |
| **oversee** | 45:6 | 49:12, | **perform** | | **plastic** |
| 28:4,7 | 46:4 | 14,17 | 30:3 | | 76:6 |
| **oversees** | 47:3 | 50:23 | 32:5,7 | | **play** |
| 28:8 | 51:25 | 51:15 | 34:22 | | 81:9 |
| 30:6 | 52:2 | 54:9,14 | 62:21 | | |
| | 54:7 | | | | |

player
  75:19
  76:3
plea
  62:7
pled
  62:5,6
point
  20:4
  26:4
  31:12
  46:18
  47:4,19
  48:13
  49:16
  50:22
  51:14
  52:12
  54:12,13
  55:7
  59:21
  63:7
  64:18,19
  78:2,22
  81:19
  82:11
points
  45:20,25
  46:3
  57:23
  62:18
police
  5:17
  11:12
  18:1
  19:24
  20:7
  24:18
  25:1,6
  27:6,7,
  11 30:5
  31:20

32:21
34:13
37:13
40:18
43:14
49:6,8
52:8
60:9,15
61:13,15
62:14
64:7,20
68:11,13
69:17
71:1
72:11
74:18
75:7
81:4
82:13
84:5
87:24
88:10
policies
  17:7
  31:20
  66:1
policy
  10:9
  42:5,15,
  19,20
  43:23
  57:3,10
  59:17
  66:3
portion
  46:13
  62:19
  65:8,20
  76:13
  77:17
  78:14,17
  79:19
  80:1,21

portions
  46:9
posed
  48:20
  49:13
position
  20:10,15
  25:18,19
  61:13,24
possessi
on
  68:9
potentia
l
  39:24
  58:18
potentia
lly
  37:6
Power
  42:13,17
Powerpoi
nt
  78:15
practica
l
  78:13,17
predicta
ble
  74:15
prefer
  8:17
preparat
ion
  8:23
  17:1
  19:20
  20:3
  22:18
prepare

9:8 10:1
22:17
70:25
prepared
  9:22
  40:23
  41:3
preparin
g
  10:13
  48:8
present
  33:11
  52:25
  54:1
presente
d
  76:3
preservi
ng
  8:5
presuit
  15:1
pretty
  25:4
  28:9
  31:22
  33:19
  82:25
prevent
  53:10,15
principl
es
  57:11,25
printed
  10:10
  18:10
prior
  20:10
  27:8
  61:13

70:14
87:2
privileg
ed
  9:2
probable
  53:16
problem
  15:15
  41:11
procedur
es
  31:21
  77:15
proceedi
ngs
  4:1
process
  8:4
  35:23
  39:2
  76:13
produced
  12:20,22
  14:24
  15:1
  17:24
professi
onal
  11:6,13
  26:8,12,
  14,24
  27:2
  28:8,13,
  15,19,24
  29:2,6,
  8,11,15,
  20,25
  30:19,22
  31:4,6,
  7,11,17

32:22
33:5,7
58:14
64:1,11
69:11
proficie
ncy
  81:7,9,
  10
program
  42:13
promoted
  25:21,23
  26:2,9
  28:10,14
pronounc
e
  84:23
property
  26:4
protect
  52:18
  53:1
provide
  6:23
  7:21
  21:16
  61:19
provided
  20:5
  54:19
  67:20
  70:8,17
  71:9
providin
g
  61:14
provisio
n
  54:2

Charles Demmon
07/10/2025

PSD
30:23
public
32:11
65:23
pull
11:10
12:22
13:9,11
14:4
16:23
18:8
34:7
56:7,9
68:3
pulled
11:11
pulling
56:6,7
purpose
44:21,25
45:5
purposes
32:17
pursues
73:23
pursuit
73:22
74:3,20
76:10,14
79:4
80:11
81:5
84:4,12
pursuits
77:22
82:20
87:21,25
88:2,8
put
42:15

64:12
77:24
puts
20:20
putting
41:4

_____

Q
qualific
ation
81:7
qualific
ations
81:11
question
7:9,15
8:3,7
22:4
29:22
33:18
44:8
50:12,13
52:1
58:12
65:17
72:20
73:9
question
ing
71:17
questions
6:21,22
7:4,25
8:23 9:3
23:13
50:16
71:12,
13,21
73:10
83:24

85:6
86:4
87:20
88:7,14
quick
41:10
85:10
86:5
quit
80:18
quote
47:6
quoted
52:13
quoting
46:9,14

_____

R
radio
76:11
77:15
raised
23:17
ran
75:21
range
81:6,23
rank
27:9
29:1,5
ranking
28:19
29:7,10,
16
Raquan
84:24
rate
75:1
76:21
78:1,2,

21 79:14
reach
40:9,24
89:13
reached
20:1
46:24
49:17
66:21
reaching
52:2
66:16
read
19:12,14
42:19,
20,22
53:11
64:3
88:18,19
89:1
reads
55:7
88:25
ready
25:11
real
41:10
85:10
86:5
reason
7:16
reasonab
le
44:22
50:9
52:15
53:13
54:17,22
reasonab
leness
47:7,12

48:18
49:22
reasons
56:14
recall
17:7
18:22
36:4
77:11
80:5
88:2
receive
81:3
received
80:10
88:7
recently
68:24
recess
41:19
72:5
85:15
recitati
on
62:19
recognize
50:23
recollec
tion
87:7
recommen
d
88:19,24
record
4:2 5:12
11:24
14:21
15:20
20:22
21:3

41:17,20
42:16
50:18
68:1
72:3,6
85:13,16
89:3,5
red
43:17
refer
5:22
16:23
30:22
34:8
referenc
e
42:1
45:15
referenc
ed
84:20
referrin
g
11:18
14:22
73:22
reflects
64:3,20
reflex
56:1,3,
10
regulati
ons
34:16
relate
73:3,14
related
36:1
72:18
73:12

Charles Demmon
07/10/2025

relates
  53:10
  63:20
relating
  36:17
  38:10
  46:10
  62:14
  72:12,22
  77:18
relationship
  59:24
relevant
  46:9
  71:14
  73:4
  77:2
relocate
  23:6
remains
  49:2
  55:2
  60:6
  63:5,16
remember
  14:25
  33:1,4
  75:17
  77:7
  79:19,21
  86:5,19
  87:21
Remote
  4:1
remove
  67:9
renewed
  21:6
repeat
  30:24

44:24
repercussion
  58:5,8
repercussions
  58:14,21
  59:10
rephrase
  7:17
report
  11:6,17
  12:12,14
  14:20
  16:1
  25:15
  34:7,9
  36:9
  37:16,22
  38:13,
  17,23
  39:2
  40:23
  41:4,24
  42:1
  46:4
  47:3
  48:8,10
  51:1
  60:15
  61:9
  66:11,13
  69:2,12
  70:9
  77:4
  86:23
  87:1
reporter
  4:11,22
reports
  38:10

represent
  4:14 6:3
representative
  70:1
  86:9
representing
  4:10
  70:2
reputation
  59:25
require
  63:9
  67:9
resignation
  59:7
resigned
  59:6,12
  61:13
resigns
  68:12
resistance
  17:10
  46:10
  74:25
  76:19
  79:5
  80:15,
  16,24
resistance/4h
  45:21
resisting
  47:24

resolution
  61:23
resolved
  61:9
respect
  22:4
  46:2
  49:9
  59:17
  65:12
  66:17
  71:6
  72:20
  73:10
  79:3
  84:5
responded
  37:3
responding
  25:14
response
  17:9
  45:21
  46:10
  60:11
  63:9
  67:8
  74:25
responses
  7:21,25
  71:22
  76:18
  77:18,21
  79:15
responsibilities
  28:4

responsibility
  28:2
  39:15,
  18,21
responsible
  31:13
  34:3
restrictions
  45:22
  46:16
result
  60:23
  64:19
  79:15
retain
  57:10,21
retire
  33:12,18
returned
  26:3,19
review
  6:11
  10:5,7,
  12,16
  17:3
  18:12,13
  30:15
  31:13
  36:16
  38:13,16
  39:8
  47:12
  48:9
  69:23
  87:1
reviewed
  16:25
  17:6,8
  18:19,22

19:20
  38:5,9
  52:3
reviewing
  35:9
  36:1
  47:16
revised
  57:3
  59:18
revisions
  72:21
rewrite
  88:24
rights
  8:5
  61:16
  69:18
  71:1
risk
  53:20
road
  25:13,
  22,23
  26:3
Robinson
  4:5 15:4
  16:22
role
  20:18
  25:17
  35:2
  71:11
  75:19
  76:2
roles
  25:8
  28:10
  40:18

Charles Demmon
07/10/2025

room
  9:22
rosters
  17:12
rotating
  25:18
rotation
  29:22
rule
  7:10
  56:1
rules
  6:19
  34:15
  60:19
run
  75:2,23
  76:2,9
run-down
  27:8
running
  28:11
  75:12
  76:20
  79:7,8
  81:13,24

_____

      S

safety
  47:22
scenario
  75:10,15
  77:7
  78:17
  81:20
  82:1,5
  88:11
scenario
-type
  77:13

scenario
s
  74:22
  76:9
  77:1,4
  81:15,24
scene
  64:13
Schmidt
  20:9
  21:10
  22:8
school
  17:18
  23:13,
  16,23
  24:23
  77:3
schools
  76:16
screen
  11:11
  14:17
  15:11,
  15,22
  34:9
  87:6
scroll
  11:22
  12:13
  14:19
seconds
  14:9
section
  34:12
  35:17
  52:12
  66:12
sense
  6:25
  7:12,17

66:8
70:19
71:24
73:24
75:4
76:8
83:2
sergeant
  25:23,24
  26:1
  30:14,17
  34:24
  55:10
sergeant
s
  27:14,15
  30:3,18
  35:6
seriousn
ess
  39:20
  57:12
service
  25:15
  30:6
  35:18
services
  30:19
  32:22
set
  47:7
  49:21
  54:17
setting
  7:7,8
  76:15
severity
  47:22
share
  16:24
  41:23

sheds
  75:22
shoot
  50:7
  76:7,8
  81:12,25
  82:1
shooter
  17:19
  77:1,5
shooting
  6:11
  20:11
  29:1
  32:2
  34:5
  38:11,21
  39:9,13
  73:2
  81:13
  84:11,19
shooting
s
  84:4,15
short
  26:18
  41:19
  68:5
  70:17
  72:5
  85:15
shorter
  83:25
shot
  49:12,18
show
  13:22
  18:4
showed
  68:21
showing

68:8
86:19
shown
  87:5
shrink
  37:6
shrugs
  7:23
side
  6:18
  70:24
sign
  42:18,19
signatur
e
  12:15,
  21,24,25
  16:7,10,
  14,16
  42:18
  69:7
signed
  41:3
  69:1
signing
  39:2
silly
  65:10,22
  66:7
similar
  28:12
  42:5
simply
  6:10
simuniti
on
  81:8
simuniti
ons
  75:17

76:25
81:25
sir
  5:19,21
  6:8,13
  7:1,13
  8:1,9
  10:6,15,
  19 11:3,
  8,16,19
  12:4,17
  13:8,16
  14:4,12
  16:8,13,
  17,21
  17:2
  18:20
  19:10
  20:13
  21:8,14,
  17 22:6,
  23 23:5
  24:1,16
  25:3,7
  26:20
  27:10,24
  28:7,17,
  21,23
  29:9,18
  30:12,
  16,21
  31:9,15
  32:3,15,
  20 33:9
  34:6,20,
  23 35:1,
  16 36:3,
  18
  37:15,
  19,23
  38:1,4,
  8,12,22
  39:3,7,

Charles Demmon
07/10/2025

10,14,
19,23
40:2,7,
11,15,21
41:2,6
42:3,11,
23 43:1,
8 44:4,
6,17,20
46:12
47:10
48:23
49:25
57:15
60:2
61:17
62:17
64:23
66:14,
19,24
69:9
75:8
80:9
84:22,25
85:4,8,
22 86:24

**situatio
n**
44:13
45:2
52:25
54:1
63:11
67:10
73:22
76:22
79:14
80:24
81:15,21
82:3,4

**situatio
ns**
81:23

**sixth**
33:24
83:14

**size**
15:5

**slicing**
75:25

**slow**
79:17

**softy**
83:18

**sound**
13:2

**sounds**
25:4
26:17

**speak**
10:24
19:23
22:9,12
37:3,9

**speaking**
7:12
8:13

**special**
25:19,25

**speciali
st**
30:6

**specific
ally**
46:6
64:5
72:18,22
73:3,12
84:5

**specific
s**
80:5

**spelling**

88:21

**spent**
25:13

**split**
28:4

**spoke**
20:1
21:15,18

**spray**
81:18

**spreadsh
eet**
18:2,5

**stage**
27:20

**standard**
47:7,12,
15 48:17
49:22
65:7

**standard
s**
11:6,13
26:8,12,
14,24
27:2
28:8,13,
15,19,24
29:2,6,
8,11,15,
20 30:1,
20,23
31:5,6,
7,11,18
32:22
33:5,7
60:16
62:15
69:11

**standpoi
nt**

58:23

**start**
14:19
78:3

**started**
64:11

**starting**
37:8

**starts**
15:4
75:12

**state**
5:11
23:3,6
34:16
45:10
54:4
60:20,22
62:20

**stated**
61:1

**statemen
t**
36:11
48:3
61:14,
19,22
70:16,25
71:18

**statemen
ts**
35:25

**states**
35:18
45:13
47:8
48:14
49:17
50:23
51:14
52:13

53:9
54:14
59:21
60:17,20
63:7
67:17

**status**
62:3

**statutes**
34:17

**Stayed**
26:7

**STENOGRA
PHER**
4:24 5:3
23:8
89:4,9

**step**
39:1

**stint**
26:18

**stints**
31:12

**stop**
16:24
33:20
75:10

**stopping**
81:13

**stops**
74:22
77:14

**straight**
14:7

**stress**
76:22
77:15
78:5

**strike**
44:8

52:1

**striking**
49:18

**stuff**
17:20
20:25
25:16
78:11
80:20,22
81:2
84:16

**stun**
51:16
55:9,16
62:24
63:10
67:6,10

**subdivis
ions**
60:21

**subject**
8:13
53:16,21
76:14
79:6
84:9

**submitte
d**
69:1

**Subsecti
on**
53:9

**subseque
nt**
42:14
73:2

**substanc
e**
21:22

substantive
18:14
sudden
80:23
sufficient
62:20
suggested
57:5
59:19
summaries
37:17
summarize
21:1
summary
10:9
11:5,18
14:15
16:25
27:17
37:21
61:2
70:9,11,
14,18
supervisor
25:22
76:12,15
supervisors
37:4
supervisory
76:9
support
46:24
62:8

supported
67:19
suppose
8:10
Supreme
47:8
surrounding
36:22
surroundings
78:4
suspect
73:23
74:12
75:11
suspects
74:9
suspension
58:15
sustain
46:25
sustained
43:6,11
46:2
57:2
60:14
62:1,8,
13
63:19,
23,25
swear
4:22,24
switched
28:9
sworn
5:7

32:10
sympathetic
56:1,3,
10

————————

T
tab
19:2,4
tabs
19:1
tactics
78:10
taker
25:15
taking
6:9
35:24
talk
11:4
41:25
75:9
82:2
talked
19:19
talking
11:10
13:24
73:16
talks
78:20
taser
54:9,15
55:20
56:5
57:24
63:21
73:17
75:16
80:17,18
81:16,17

taught
55:8
57:25
75:13
77:20
79:16
81:12
techniques
79:17
81:2
82:2
telling
56:11
Telly
30:14
34:24
ten
36:8
83:5
term
73:21
termination
58:16
60:24
terms
13:18
15:16
17:14
21:3
22:1
27:9
28:2
36:14
58:20
59:10
63:20
71:5
75:9
79:13
81:4

82:18
terrible
65:17
testified
5:7
40:19
55:11
87:9
testify
22:1
testimony
54:19
56:19
78:19
86:13
87:4
88:19
thing
15:14
19:15
25:15
30:10
67:17
75:3
76:17,23
78:11
things
7:8,23
9:5
22:19
24:14
30:7
32:12
35:8,10,
12 42:8
58:17,19
68:5
73:14
77:16
78:5

79:11,21
80:6,7
thinks
65:19
thought
71:16
84:1
threat
47:22
48:21
49:13
52:20
53:3
threats
81:14
three-
day
82:24
til
26:10
time
4:3 5:16
7:3 8:3,
17 21:23
26:18,21
27:21
29:8,15,
21 30:1,
19 31:11
32:24
33:12,14
39:5
40:12
41:15
56:15
57:24
60:15
61:8,25
62:24
63:21
67:7
71:24

72:2
73:6,8,
18 74:2,
6,7 75:6
78:9
85:7
89:7,10

**times**
6:17
8:18
69:19
82:6
83:5

**Titusville**
4:20
5:17 6:5
11:12
18:1
19:24
20:7
23:16,
18,20,23
24:18
25:1
27:6
32:21
34:15
37:13
43:14
52:8
57:3
59:17
60:15
64:20
68:11,13
72:11
74:18
75:7
81:4
82:13
84:5
86:2,10

87:24
88:10

**TJ**
28:1
80:2

**today**
4:11
6:10,20
7:3,21
8:17
9:8,20
10:14
11:11
13:15
16:23
19:21
49:2
50:4
51:8
55:2
60:6
62:4
63:5,16
86:2,4,
13 87:2,
4,14
88:8

**today's**
4:7 7:24
8:24
10:1
19:25
22:9,17

**told**
35:22
51:18
69:19
71:10

**tongue**
82:9

**top**
43:6

47:4
77:11

**totality**
52:15
53:13

**track**
30:8

**traffic**
25:16
26:5
74:22
75:10
77:14

**trailed**
11:1
54:5

**train**
56:20
74:19
82:5
88:11

**trained**
56:17
62:22
67:5

**trainers**
20:25

**training**
10:9
17:14,
16,17,
18,19,
21,23
18:9,14,
19
19:17,18
20:3,8,
18,24
21:4,10
30:2,7,9
31:21
33:3

35:11
42:14,15
55:15
57:10,21
63:20
72:10,
16,17,
21,25
73:11
75:5,23
77:14
80:3
81:3
82:14,
19,21,
24,25
88:8

**trainings**
17:11,25
20:20,
21,23
21:5
74:21

**transcript**
19:5,7,
9,12
20:2
21:16
88:18,21
89:4

**transcripts**
10:10,11
18:21,
22,24
38:2
70:20

**transfer**
63:8
67:7

**transition**
80:17,22

**transitioning**
80:13

**travel**
30:6

**trigger**
56:6,7,
8,9

**Trimaria**
84:24

**true**
36:12
48:3
67:17
82:8

**truth**
4:25 5:1

**turn**
28:11

**Tyler**
28:1

**type**
35:23
76:8,17
77:5,6,
16 79:10
80:23

**types**
76:3

**typical**
8:4

**typically**
8:13
29:25
65:19

——————
**U**

**ultimate**
64:25
66:16

**unbecoming**
64:6

**underlined**
43:6

**underneath**
57:8
59:21
62:18

**understand**
6:6 7:15
8:8 27:6
34:1
42:20
50:14
65:1,15
69:16

**understanding**
64:24
65:4
71:3
82:13
85:1

**understood**
39:20,24
70:8
78:19

**undertook**
39:21

| | | | | |
|---|---|---|---|---|
| **union** 70:1,2 | **version** 12:18, 19,21 13:5,6, 12,14 14:14 15:3 70:9 | **violatio ns** 57:4,7, 13 59:11,19 67:15 | **Wonderfu l** 23:22 24:25 | **wrote** 46:3 66:21 86:23 |
| **unique** 42:18 | | | | |
| **unit** 25:20 | | **volume** 56:22 | **Wood** 54:20 55:10 | _____ |
| **United** 45:13 47:8 60:19 | **versus** 4:6 28:5 80:15 | | | **Y** |
| | | _____ | **word** 87:6 | **year** 27:4 77:2 81:9,10 84:21 |
| **Universi ty** 24:5,8 | **video** 7:24 10:12,13 14:6 35:10 38:6,7 52:3 70:22 89:2,3,7 | **W** | **words** 44:10 | |
| | | **wait** 7:9,10 8:6 | **work** 35:7 | **years** 20:17 24:23 25:10,13 26:7,22 40:14 80:18 87:23 |
| **Unnecess ary** 43:15 | | **waive** 88:18 | **worked** 29:19 | |
| **unprofes sional** 64:15 65:22 | | **walk** 8:19 83:19 | **workers** 59:25 | |
| | **video- recorded** 4:4 | **wanted** 70:3,6 71:16 | **working** 33:20 84:9 | **yesses** 7:21 |
| **unquote** 47:7 | | | | |
| **unsatisf actory** 62:16 | **viewing** 15:16 | **watch** 78:6 80:7 | **works** 35:8 | **Yesterda y** 9:15 |
| | **violated** 55:15 | | **worries** 68:6 | |
| **utilize** 51:16 | **violatio n** 43:17, 20,23, 24,25 44:1,11 46:3 57:2,18 58:4,7, 13 59:16 60:14,21 62:1 63:25 65:13,20 | **weapon** 51:18 80:11 81:5,16 | **Wright** 18:25 28:1,3 54:21 55:10 80:2 82:12 | **younger** 23:1 |
| _____ | | | | |
| **V** | | **week- long** 82:24 | | _____ |
| **variable s** 48:6 | | **white** 66:2 | | **Z** |
| **variety** 38:9 | | **wife** 41:9 83:10,19 | **Wright's** 19:8 | **Zoom** 4:7 |
| **vehicle** 74:23 75:11 | | | **written** 44:15 45:16,17 | |
| | | **witnesse s** 36:24 | **wrong** 33:21 73:4,14 84:24 | |
| **verbal** 7:21,25 | | | | |